**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DISH NETWORK L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> COX MEDIA GROUP, LLC, APOLLO GLOBAL MANAGEMENT, LLC, APOLLO INVESTMENT FUND IX, L.P., TERRIER MEDIA BUYER, INC., NBI HOLDINGS, LLC, BRYSON BROADCAST HOLDINGS, LLC, NORTHWEST BROADCASTING, L.P., NORTHWEST BROADCASTING, INC., CAMELOT MEDIA BUYER, INC., and CAMELOT MEDIA HOLDINGS, LLC, <br><br> Defendants. | No. _____ |

## NOTICE OF REMOVAL

Terrier Media Buyer, Inc. d/b/a Cox Media Group ("CMG"), NBI Holdings, LLC,

Bryson Broadcast Holdings, LLC, Northwest Broadcasting, LP, Northwest Broadcasting, Inc.,

Camelot Media Buyer, Inc., Camelot Media Holdings, LLC, Apollo Global Management, LLC,

and Apollo Investment Fund IX, LP (collectively, "Defendants"), by and through their

undersigned counsel, hereby provide notice pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 of

the removal of the case captioned *DISH Network L.L.C. v. Cox Media Group, LLC, et al.*, No.

20-CH-00528 (the "State Court Action") from the Circuit Court of Cook County, Illinois to the

United States District Court for the Northern District of Illinois, Eastern Division.  Federal

diversity jurisdiction exists in this case because there is complete diversity among the properly

joined parties and the amount in controversy exceeds $75,000.

Pursuant to 28 U.S.C. § 1446(a), Defendants provide the following short and plain statement of the grounds for removal:

1.      On January 15, 2020, Plaintiff DISH Network L.L.C. ("DISH") filed a verified complaint (the "Complaint" or "Cmplt.") in the Circuit Court of Cook County, Illinois, captioned *DISH Network L.L.C. v. Cox Media Group, LLC, et al.*, No. 20-CH-00528.  The Complaint alleges breach of contract claims against Defendants relating to DISH's retransmission of the local TV signals of certain broadcast stations owned by certain Defendants.

2.      This action is properly removed.  The procedural requirements of removal are met.  This Court has subject matter jurisdiction.  Defendants opposed an *ex parte* temporary restraining order ("TRO") entered in the State Court Action on January 15, 2020 – the same day the Complaint was filed – and was maintained by order entered on January 24.  That action does not waive removal.  *Rothner v. City of Chicago*, 879 F.2d 1402, 1404, 1418–19 (7th Cir. 1989). If any question arises about this removal, Defendants respectfully request the opportunity to submit briefing and evidence, and present oral argument, in support of removal.

## I.      THE PROCEDURAL REQUIREMENTS OF REMOVAL ARE MET.

3.      True and correct copies of all process, pleadings, and orders served on Defendants in the State Court Action are attached in the Appendix to this Notice.  28 U.S.C. § 1446(a).

4.      This Notice of Removal is filed fewer than 30 days after the State Court Action was filed by Plaintiff.  Accordingly, removal is timely.  28 U.S.C. § 1446(b).

5.      This Court presides in the locality in which the State Court Action was filed.  It is therefore a proper forum for removal.  28 U.S.C. § 93(a)(1).

6.      No properly joined defendant is a citizen of Illinois, the state where this action was brought.  28 U.S.C. § 1441(b)(2).

7.     The only defendant not joining this Notice of Removal is Cox Media Group,

LLC.  Cox Media Group, LLC consented to removal via email to Defendants' counsel dated

January 23, 2020.

8.     A copy of this Notice of Removal will be served on DISH via email to its counsel

of record in the State Court Action, and a copy is being filed with the state court.  28 U.S.C.

§ 1446(d).

## II.     THIS COURT HAS SUBJECT MATTER JURISDICTION.

9.     An action may be removed from state court to federal court if the action could

have originally been brought in federal court.  28 U.S.C. § 1441(a).  Here, federal jurisdiction

exists based upon diversity of citizenship pursuant to 28 U.S.C. § 1332 because the amount in

controversy is greater than $75,000 and this is a civil action between citizens of different states.

### A.     The Amount In Controversy Requirement Is Satisfied.

10.     The amount in controversy exceeds $75,000.  28 U.S.C. § 1332.  The Complaint

seeks nonmonetary relief and does not allege a specific amount of damages.  (*See generally*

Cmplt.)  However, the face of the Complaint demonstrates that the amount at issue is

substantially greater than $75,000, and DISH has asserted in its TRO briefing that the amount at

issue is greater than $238 million.  (*See* App'x.)  This adequately establishes the amount in

controversy.  28 U.S.C. § 1446(c)(2)(B); *see also McCormick v. Indep. Life & Annuity Co.*, 794

F.3d 817, 818 (7th Cir. 2015); *Bloomberg v. Service Corp. Int'l*, 639 F.3d 761, 763 (7th Cir.

2011).

**B.      There Is Complete Diversity Of Citizenship Between The Properly Joined Parties.**

11.      Plaintiff DISH is a citizen of Colorado.  It is a Colorado limited liability company whose sole member is a corporation who is a citizen of Colorado.  Its principal place of business is at 9601 S. Meridian Blvd., Englewood, Colorado 80112.  (Cmplt. ¶ 8.)

12.      Defendant Cox Media Group, LLC is a citizen of Delaware and Georgia.  It is a Delaware limited liability company whose sole member is a corporation who is a citizen of Delaware and Georgia.  Its principal place of business is at 6205 Peachtree Dunwoody Road, Atlanta, GA 30328.  (*See also* Cmplt. ¶ 9.)

13.      Defendant Apollo Global Management, LLC is in fact Apollo Global Management, Inc., and is a citizen of Delaware and New York.  It is a Delaware corporation with its principal place of business at 9 West 57th Street, New York, NY 10019.  (*See also* Cmplt. ¶ 10.)

14.      Defendant Terrier Media Buyer, Inc. is a citizen of Delaware and New York.  It is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577 and headquarters at 223 Perimeter Center Drive, Atlanta, GA 303461.  (*See also* Cmplt. ¶ 12.)

15.      Defendant NBI Holdings, LLC is a citizen of Delaware and New York.  It is a Delaware limited liability company whose sole member is Defendant Terrier Media Buyer, Inc.  Its principal place of business is at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.  (*See also* Cmplt. ¶ 13.)

16.      Defendant Bryson Broadcast Holdings, LLC is a citizen of Delaware and New York.  It is a Delaware limited liability company whose sole member is Defendant NBI

Holdings, LLC. Its principal place of business is at 4311 Wilshire Boulevard, Suite 408, Los Angeles, CA 90010. (*See also* Cmplt. ¶ 14.)

17. Defendant Northwest Broadcasting, L.P. is a citizen of Delaware, New York, and Michigan. It is a Delaware limited partnership whose general partner is Defendant Northwest Broadcasting, Inc., and whose limited partners are Defendant NBI Holdings, LLC and a corporation who is a citizen of Delaware and Michigan. Its principal place of business is at 2111 University Park Drive, Suite 650, Okemos, MI 48864. (*See also* Cmplt. ¶ 15.)

18. Defendant Northwest Broadcasting, Inc. is a citizen of Delaware and Michigan. It is a Delaware corporation with its principal place of business at 2111 University Park Drive, Suite 650, Okemos, MI 48864. (*See also* Cmplt. ¶ 16.)

19. Defendant Camelot Media Buyer, Inc. is a citizen of Delaware and New York. It is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577. (*See also* Cmplt. ¶ 17.)

20. Defendant Camelot Media Holdings, LLC is a citizen of Delaware and New York. It is a Delaware limited liability company whose sole member is Defendant Camelot Media Buyer, Inc. Its principal place of business is at 1 Manhattanville Road, Suite 201, Purchase, NY 10577. (*See also* Cmplt. ¶ 18.)

21. Accordingly, DISH is a citizen of Colorado, and the properly joined defendants are citizens of Delaware, Georgia, New York, and Michigan. Complete diversity of citizenship exists between DISH and the properly joined Defendants. Defendants can and will submit affidavits or other evidence to prove these parties' citizenship if and when necessary.

**C.      Defendant Apollo IX Does Not Destroy Complete Diversity Because It Is Fraudulently Joined.**

22.      Defendant Apollo Investment Fund IX, LP ("Apollo IX") is a Delaware limited partnership with many limited partners, some of whom are citizens of Colorado and some of whom are citizens of Illinois.  However, it does not destroy complete diversity because it was fraudulently joined.

23.      The Seventh Circuit has explained that a plaintiff "may not join a non-diverse defendant simply to destroy diversity jurisdiction.  The fraudulent joinder doctrine, therefore, permits a district court considering removal to disregard, for jurisdictional purposes, the citizenship of certain non-diverse defendants, assume jurisdiction over a case, dismiss the non-diverse defendants, and thereby retain jurisdiction."  *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 763 (7th Cir. 2009) (cleaned up).

24.      In such cases, the district court should disregard the presence of the non-diverse party for jurisdictional purposes if there is no reasonable probability that the state court would find liability as to the non-diverse party.  *Schwartz v. State Farm Mut. Auto Ins. Co.*, 174 F.3d 875, 879 (7th Cir. 1999); *see also Hoosier Energy Rural Elec. Coop., Inc. v. Amoco Tax Leasing IV Corp.*, 34 F.3d 1310, 1314–15 (7th Cir. 1994); *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992).

25.      There is no reasonable probability that the state court would find liability against Apollo IX.  The Complaint's only specific allegation about that entity is that Defendant Terrier Media Buyer, Inc. "is controlled by Apollo IX."  (Cmplt. ¶ 44.)  This assertion is utterly unsubstantiated.  (*See generally id.*)  Nor does DISH's 45 pages of briefing on the State Court Action TRO mention Apollo IX *even once*.  (*See* App'x.)

26.     The only Counts pleaded in the Complaint against Apollo IX are Counts I and

VII, which are generically pleaded against "All Defendants."  (*See generally* Cmplt.)  Count I is

for a declaratory judgment regarding the "Cox Retransmission Agreement."  (*Id.* ¶¶ 81–86.)

However, Apollo IX is not a party to the Cox Retransmission Agreement and is not alleged to

have taken any action whatsoever regarding that Agreement.  (*See generally id.*)  Apollo IX is

thus irrelevant to a declaratory judgment regarding that Agreement.

27.     Count VII is for unfair competition for "knowingly and intentionally

misappropriating DISH's rights . . . by acting to deprive DISH of (i) its retransmission rights

with respect to the Cox Stations and (ii) its rights under the change-in-control and assignment

provisions of the Cox Retransmission Agreement," in particular by "threatening to 'black out'

the four major networks in ten of DISH's markets."  (*Id.* ¶¶ 122–29.)  Again, DISH does not

allege any action by Apollo IX – which was not a party to the Cox Retransmission Agreement –

let alone any action that affected or threatened any of DISH's rights under that Agreement.  (*See

generally id.*)

28.     The complete absence of even a *single* factual allegation against Apollo IX means

that there is no reasonable possibility that DISH can recover against it.  *See, e.g.*, *City of Chicago

v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 368, 821 N.E.2d 1099 (2004) (recognizing that in order

to state a viable claim, a plaintiff must allege facts sufficient to bring a claim within a legally

cognizable cause of action).

29.     Therefore, Apollo IX was fraudulently joined and should be disregarded for

diversity purposes.  After disregarding Apollo IX, complete diversity between the parties exists,

and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441.

## III.    DEFENDANTS DID NOT WAIVE REMOVAL.

30.    On Wednesday January 15, 2020, the same day that DISH filed its Complaint in the State Court Action, it also filed a motion for a TRO.  (*See* App'x.)  At an *ex parte* hearing that day, the state court entered a TRO.  (*See id.*)

31.    After retaining counsel over the holiday weekend, Defendants appeared before the state court on Tuesday, January 21 to oppose the TRO.  The state court requested that Defendants file a brief in opposition to the TRO on Wednesday, January 22 and appear again for a hearing on the TRO on Friday, January 24.  At the January 24 hearing, the state court entered a new order maintaining the TRO.  (*See* App'x.)

32.    Defendants did not waive their right to removal by opposing DISH's TRO in state court.  The "long-settled common law rule" is "that opposing a motion for a temporary restraining order does not waive the right to remove."  *Rothner*, 879 F.2d at 1402, 1404, 1418–19; *see also Mostafa v. Voight*, 2016 WL 2593367, at *3 (N.D. Ill. May 5, 2016) (denying remand even though defendants opposed TRO in state court); *Alaska Fin. Co. III, LLC v. Glob. Mortg. Grp., LLC*, 2018 WL 574940, at *3 (D. Del. Jan. 26, 2018) (same); *cf. Radaszewski v. Garner*, 2002 WL 31430325, at *3 (N.D. Ill. Oct. 21, 2002) ("Generally, actions taken by a party to defend against the plaintiff's claims or to merely maintain the status quo do not constitute a waiver.").

33.    Defendants have not actively litigated the state court action.  They have only opposed the TRO that was entered at an *ex parte* hearing.  They then promptly sought removal.  Accordingly, Defendants did not waive removal.

## **CONCLUSION**

WHEREFORE, notice is given that the State Court Action is removed from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois.

Dated:  January 24, 2020

Respectfully submitted,

***/s/ Scott Lassar***

Scott Lassar (No. 1586270)
Bruce R. Braun (No. 6206628)
Hille R. Sheppard (No. 6226077)
John M. Skakun III (No. 6297636)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036
slassar@sidley.com
bbraun@sidley.com
hsheppard@sidley.com
jskakun@sidley.com

*Attorneys for Defendants (other than Cox Media Group, LLC)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of January, 2020, I electronically filed the foregoing with the Court using the CM/ECF system, and delivered the foregoing to all counsel of record by email.

Michael Dockterman (mdockterman@steptoe.com)

Pantelis Michalopoulos (pmichalopoulos@steptoe.com)

John Byron (jbyron@steptoe.com)

/s/ John M. Skakun III
John M. Skakun III
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000
jskakun@sidley.com

*Counsel for Defendants (other than Cox Media Group, LLC)*

# APPENDIX

(Public Version)

| | |
|---|---|
| **2120 - Served** | **2121 - Served** |
| **2220 - Not Served** | **2221 - Not Served** |
| **2320 - Served By Mail** | **2321 - Served By Mail** |
| **2420 - Served By Publication** | **2421 - Served By Publication** |

**Summons - Alias Summons**                                             **(08/01/18) CCG 0001 A**

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

DISH Network L.L.C.

(Name all parties)

v.

Cox Media Group, LLC et al.

Case No. _____

### ☑ SUMMONS    ☐ ALIAS SUMMONS

To each Defendant: See Attached Service List

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Summons - Alias Summons** (08/01/18) CCG 0001 B

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 43315

Atty Name: Michael Dockterman

Atty. for: Steptoe & Johnson LLP

Address: 227 W. Monroe Street, Suite 4700

City: Chicago

State: IL    Zip: 60606

Telephone: (312) 577-1300

Primary Email: mdockterman@steptoe.com

Witness: _____

_____
DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

◉ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**SUMMONS SERVICE LIST**

Cox Media Group, LLC
R/A: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5401

Apollo Global Management, Inc.
R/A: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5401

Apollo Investment Fund IX, L.P.
R/A: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5401

Terrier Media Buyer, Inc.
R/A: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5401

NBI Holdings, LLC
R/A: The Corporation Trust Company
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801
(302) 658-7581

Bryson Broadcast Holdings, LLC
R/A: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5401

Northwest Broadcasting, L.P.
R/A: The Corporation Trust Company
Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801
(302) 658-7581

Northwest Broadcasting, Inc.
R/A: The Corporation Trust Company

Corporation Trust Center 1209 Orange Street
Wilmington, DE 19801
(302) 658-7581

Camelot Media Buyer, Inc.
R/A: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5401

Camelot Media Holdings, LLC
R/A: Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808
(302) 636-5401

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

DISH NETWORK L.L.C.
9601 S. Meridian Blvd.,
Englewood, Colorado 80112
Plaintiff,

                vs.

COX MEDIA GROUP, LLC
6205 Peachtree Dunwoody Road
Atlanta, GA 30328

APOLLO GLOBAL MANAGEMENT, LLC
APOLLO INVESTMENT FUND IX, L.P.
9 West 57th Street,
New York, NY 10019

TERRIER MEDIA BUYER, INC.
1 Manhattanville Road, Suite 201
Purchase, NY 10577

NBI HOLDINGS, LLC
1 Manhattanville Road, Suite 201
Purchase, NY 10577

BRYSON BROADCAST HOLDINGS, LLC
4311 Wilshire Boulevard, Suite 408
Los Angeles, CA 90010

NORTHWEST BROADCASTING, L.P.
2111 University Park Drive, Suite 650,
Okemos, MI 48864

NORTHWEST BROADCASTING, INC.
2111 University Park Drive, Suite 650,
Okemos, MI 48864

AND

CAMELOT MEDIA BUYER, INC.
CAMELOT MEDIA HOLDINGS, LLC
1 Manhattanville Road, Suite 201
Purchase, NY 10577

              Defendants.

Case No. _____

## VERIFIED COMPLAINT

Plaintiff DISH Network L.L.C. ("DISH"), for its complaint against Cox Media Group, LLC ("Cox"); Terrier Media Buyer, Inc. ("Terrier"); NBI Holdings, LLC ("NBI Holdings"); Bryson Broadcast Holdings, LLC ("Bryson"); Northwest Broadcasting, L.P. ("Northwest Broadcasting"); Northwest Broadcasting, Inc. ("Northwest"); Camelot Media Buyer Inc. ("CMB"); Camelot Media Holdings, LLC ("CMH" and together with CMB, "Camelot"); and Apollo Global Management, Inc. and Apollo Investment Fund IX, L.P. (collectively "Apollo"), alleges as follows:

## INTRODUCTION

1.      With the ink fresh on the retransmission contract between DISH and Cox, the Defendants—a collection of private equity vehicles created by Apollo—are trying to consign that contract to the trash heap, let the television screens of hundreds of thousands of DISH customers go dark, and hold out for higher prices for retransmission of Cox's stations based on a fictional construct that has no basis in law. DISH therefore seeks the assistance of this Court to preserve its contractual rights and to prevent an alteration of the *status quo ante* with irreparable consequences to DISH while this Court determines whether Defendants' arguments have any weight whatsoever.

2.      As of late 2019, Cox owned thirteen local television broadcast stations. Each operates in one of ten U.S. local markets—Atlanta, Georgia; Boston, Massachusetts; Seattle, Washington; Charlotte, North Carolina; Pittsburgh, Pennsylvania, Dayton, Ohio; Jacksonville and Orlando, Florida; Memphis, Tennessee; and Tulsa, Oklahoma—and ten of them are affiliated with one of the "Big Four" broadcast networks—ABC, CBS, NBC, or Fox. In March 2019, DISH entered into a contract with Cox that permits DISH to retransmit the signal of each

2

of the stations it owns ("Cox Retransmission Agreement"). The Cox Retransmission Agreement remains in full force and effect.

3. Through an artful reading of the documents crafted by Apollo, Defendants seek to take advantage of two acquisitions, consummated in December 2019, in an effort to abrogate the Cox Retransmission Agreement, avoid Cox's contractual obligations to DISH, and deprive DISH of the benefit of its 2019 bargain with Cox. The Apollo private equity firms at the heart of this scheme have not previously engaged in the broadcast business. Rather, various Apollo affiliates simultaneously acquired local television broadcast stations owned by Cox as well as another group of local stations formerly owned by Northwest, which DISH also retransmits. The Defendants contend that the Northwest acquisition occurred a millisecond before the Cox acquisition, so that the Cox Stations were supposedly acquired by a freshly minted broadcaster— an owner that already had a retransmission consent agreement with DISH. Defendants make this argument to trigger a provision in the Cox Retransmission Agreement in an attempt to take the Cox Stations out of that agreement and move them under DISH's retransmission consent agreement covering Northwest stations, which is set to expire on Wednesday, January 15, 2020. Defendants have run "crawls" on the screens of Cox programming advising viewers that DISH will soon no longer have the right to carry the Cox Stations on the DISH platform.

4. As a result, as of January 15, the hundreds of thousands of DISH subscribers in those ten U.S. markets will lose access to at least one of the major broadcast networks.

5. DISH will be irreparably harmed if this occurs. When major networks "go dark" on DISH's platform, DISH loses goodwill with its existing and potential subscribers. DISH subscribers who have suddenly lost access to their favorite TV programming have an incentive to abandon DISH and switch to another multichannel video programming distributor—the local

cable system or DIRECTV—and some unknown number of them will do so. Others may cut the cord altogether and switch to online video distributors such at Hulu Plus or YouTube TV. This is particularly true when the subscribers lose network programming to some of the most popular live sports (such as the NFL playoffs currently in progress), hit shows, and other marquee events. In addition, the lack of such popular programming means that potential new subscribers in these ten markets will find DISH less attractive—and some unknown number of them who otherwise would have subscribed to DISH will fail to do so. This loss of goodwill and incalculable loss of existing and potential subscribers constitutes irreparable harm. Damages would not compensate DISH either for the loss of existing and potential subscribers or for the lingering goodwill effects in each market from having lost access to Big 4 network channels.

6. The loss of programming in these ten markets would also harm the public interest by depriving these consumers of access to network programming after 11:59 p.m. Mountain Time on January 15, 2020. To continue receiving such programming, the customers would have to switch either to another multichannel video programming distributor that is not their first choice, switch to an online video distributor, or resort to the solution of a "rabbit-ears" antenna to receive these stations over the air, if they can.

7. Accordingly, DISH brings this Complaint seeking declaratory and injunctive relief to preserve the status quo, compel specific performance of its contract with Cox, and prevent further interference with its contract rights.

## **PARTIES**

8. Plaintiff DISH Network L.L.C. is a Colorado limited liability company with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. DISH maintains an office at 500 North Michigan Ave, Suite 1920, Chicago, IL 60611.

4

9.      Defendant Cox Media Group, LLC is a Delaware limited liability company with its principal place of business at 6205 Peachtree Dunwoody Road, Atlanta, GA 30328.

10.     Defendant Apollo Global Management, Inc. is a Delaware corporation with its principal place of business at 9 West 57th Street, New York, NY 10019.

11.     Defendant Apollo Investment Fund IX, L.P. ("Apollo IX") is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019.

12.     Defendant Terrier Media Buyer, Inc. is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

13.     Defendant NBI Holdings, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

14.     Defendant Bryson Broadcast Holdings, LLC is a Delaware limited liability company with its principal place of business at 4311 Wilshire Boulevard, Suite 408, Los Angeles, CA 90010.

15.     Defendant Northwest Broadcasting, L.P. is a Delaware limited liability company with its principal place of business at 2111 University Park Drive, Suite 650, Okemos, MI 48864.

16.     Defendant Northwest Broadcasting, Inc. is a Delaware corporation with its principal place of business at 2111 University Park Drive, Suite 650, Okemos, MI 48864.

17.     Defendant Camelot Media Buyer, Inc. is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

18.     Defendant Camelot Media Holdings, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over the Defendants because the contract at issue in this dispute, *i.e.*, the Cox Retransmission Agreement provides for disputes to be litigated here.

20.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, as "the county in which the transaction or some part thereof occurred out of which the cause of action arose." Venue is also proper in Cook County pursuant to the venue selection provision in the Cox Retransmission Agreement.

21.     Pursuant to the governing law provision of the contract at issue in this dispute (*i.e.*, the Cox Retransmission Agreement), the Cox Retransmission Agreement and the conduct of the parties to the Cox Retransmission Agreement are governed by the laws of the state of New York.

## FACTUAL BACKGROUND

**Cox and DISH Execute the Cox Retransmission Agreement.**

22.     DISH is a multichannel video programming distributor ("MVPD") that carries hundreds of programming networks by satellite directly to subscribers, who receive them at their homes by means of a pizza-sized dish.  Among other programs, DISH retransmits local television broadcast stations in each of the nation's 210 local markets.  That includes the local stations that are affiliated with one of the Big 4 networks (ABC, CBS, Fox, and NBC).  In some markets, the local stations are actually owned by the networks.  In most markets, they are only affiliated with one of the networks and are owned by broadcast groups such as Cox.

23.    Pursuant to 47 U.S.C. § 325(b), MVPDs are not permitted to "retransmit the signal of a broadcasting station, or any part thereof, except with the express authority of the originating station . . .."

24.    DISH negotiated a retransmission consent agreement with Cox, which became effective on March 31, 2019 (previously defined as the "Cox Retransmission Agreement"). The Cox Retransmission Agreement is, by its terms, confidential. Pursuant to 735 ILCS 5/2-606, DISH sets out the relevant portions of the Cox Retransmission Agreement herein, incorporates the full Cox Retransmission Agreement by reference as if fully set forth herein, and will file a true and correct copy of the Cox Retransmission Agreement as **Exhibit 1** under seal.

25.    Section 3(a) of the Cox Retransmission Agreement gives DISH the right to retransmit the signals of thirteen local television broadcast stations in ten major U.S. markets during the term of the Agreement:

> Grant of Retransmission Consent by Broadcaster.    Pursuant to 47 U.S.C. § 325(b)(1) and the rules and regulations promulgated thereunder, Broadcaster [Cox] grants to DISH consent throughout the Term to retransmit the signal of each station (including each Programming Stream) on a non-exclusive basis via the Distribution System with the applicable Station's Local Market and Significantly Viewed Areas substantially contemporaneously with the applicable Station's primary broadcast. For clarity, such consent does not convey to DISH any ownership rights in or to the underlying programming.

26.    The Cox Retransmission Agreement granted DISH consent to retransmit Big 4 Network programming and other programming to its customers in Atlanta, Georgia; Boston, Massachusetts; Charlotte, North Carolina; Dayton, Ohio; Jacksonville and Orlando, Florida; Memphis, Tennessee; Pittsburgh, Pennsylvania; Seattle, Washington; and Tulsa, Oklahoma.

27.    The following thirteen stations and markets are covered by the Cox Retransmission Agreement (collectively, the "Cox Stations"). Ten of them are affiliated with ABC, NBC, CBS, or Fox, as shown below:

a. WSB-TV (ABC, Atlanta)
b. WFXT (FOX, Boston)
c. WSOC-TV (ABC, Charlotte)
d. WAXN-TV (Independent, Charlotte)
e. WHIO-TV (CBS, Dayton)
f. WFOX-TV (FOX, Jacksonville)
g. WHBQ-TV (FOX, Memphis)
h. WFTV (ABC, Orlando-Daytona Beach-Melbourne)
i. WRDQ (Independent, Orlando-Daytona Beach-Melbourne)
j. WPXI (NBC, Pittsburgh)
k. KIRO-TV (CBS, Seattle-Tacoma)
l. KOKI-TV (FOX, Tulsa)
m. KMYT-TV (Independent, Tulsa)

28.    Pursuant to Section 2, the Term of the Cox Retransmission Agreement does not expire for more than two years from now.

29.    Pursuant to Section 11 of the Cox Retransmission Agreement, either party has the right to early termination only in the event of (i) an uncured, material breach or default by the other party, (ii) a "change in Law" as defined in the Agreement, or (iii) bankruptcy or insolvency of the non-terminating party.  No such event has occurred.

30.    Pursuant to Section 8 of the Cox Retransmission Agreement, DISH pays monthly retransmission fees to Cox.  Those fees are based on a pre-determined monthly rate per DISH customer receiving each Cox Station.

31.    Pursuant to Section 12(b)(iii) of the Cox Retransmission Agreement, Cox represented and warranted to DISH that "no third party has or has claimed any right that would be inconsistent with the rights granted to DISH in this Agreement."

32.    Pursuant to Section 12(c)(ii) of the Cox Retransmission Agreement, Cox covenanted that it "will maintain, at all times during the Term, all licenses, permits, rights, exemptions, authorizations and consents necessary to fully perform this Agreement."

**A Change in Control Does Not Extinguish DISH's Retransmission Rights Under the Cox Retransmission Agreement.**

33.     Section 17 of the Cox Retransmission Agreement defines the parties' rights in the event of a change in control of a Cox station.

34.     Section 17(b) also provides a mechanism granting DISH the right to continue retransmitting the Cox station's programming under an agreement with the new owner of the station, as follows:

      a.  If the new owner of the Cox station already has an existing retransmission agreement with DISH that requires incorporation of the station, then the station becomes subject to the terms of that agreement and the Cox Retransmission Agreement terminates with respect to that station.

      b.  If the new owner has an existing retransmission agreement with DISH that permits, but does not require, incorporation of the Cox station, then DISH has the right to choose whether the station will become subject to the terms of the agreement with the new owner or, instead, will continue to be subject to the terms of the Cox Retransmission Agreement, pursuant to a valid assignment by Cox to the new owner of the rights and obligations with respect to that station.

      c.  If neither of these two situations applies, then the Cox Retransmission Agreement requires Cox to assign its rights and obligations under the Cox Retransmission Agreement to the new owner of the Cox station.  This means that, if the new owner does not have an existing retransmission agreement with DISH, then the new owner must take the station subject to the terms of the Cox Retransmission Agreement.

9

35.     The third alternative is what has happened here, and this is what Defendants unlawfully attempt to hide.

36.     Thus, under the change-in-control provisions of Section 17, the terms of the Cox Retransmission Agreement continue to apply to the Cox Stations.

37.     DISH has complied with its obligations under the Cox Retransmission Agreement at all relevant times.

**DISH Has a Separate Retransmission Agreement Covering the Northwest Stations.**

38.     Northwest Broadcasting Inc. has a separate retransmission agreement with DISH. On June 6, 2018, DISH had executed a retransmission agreement with Northwest that became effective on or around June 6, 2018 (the "Northwest Retransmission Agreement") and covers the retransmission by DISH of Northwest's separate group of eighteen local television broadcast stations, fourteen of which are affiliated with one of the four major networks:

a.   WBPN-LD (MNT, Binghamton, NY)
b.   WICZ-TV (FOX, Binghamton, NY)
c.   KIEM-TV (NBC, Eureka, CA)
d.   KVIQ-LD (CBS, Eureka, CA)
e.   WABG-TV (ABC, Greenwood, MS)
f.   WNBD-LD (NBC, Greenwood, MS)
g.   WXVT-LD (CBS, Greenwood, MS)
h.   KPVI-DT (NBC, Idaho Falls, ID)
i.   KFBI-LD (MNT, Medford, OR)
j.   KMVU-DT (FOX, Medford, OR)
k.   KMCW-LD (Not currently broadcasting, Medford, OR)
l.   KAYU-TV (FOX, Spokane, WA)
m.   WNYS (MNT, Syracuse, NY)
n.   WSYT (FOX, Syracuse, NY))
o.   KCYU-LD (FOX, Yakima, WA)
p.   KFFX-TV (FOX, Yakima, WA)
q.   KFFX-TV (FOX, Yakima, WA)
r.   KSWT (CBS, Yuma, AZ)
s.   KYMA-DT (NBC, Yuma, AZ)

39.     The Northwest Retransmission Agreement is, by its terms, confidential.  Pursuant to 735 ILCS 5/2-606, DISH sets out the relevant portions of the Northwest Retransmission

Agreement herein and incorporates the full Northwest Retransmission Agreement by reference as if fully set forth herein, and will file a true and correct copy of the Northwest Retransmission Agreement as **Exhibit 2** under seal.

40.     The Northwest Retransmission Agreement granted DISH consent to retransmit Big 4 Network programming and other programming to its customers in Birmingham and Syracuse, New York; Eureka, California; Greenwood, Mississippi; Idaho Falls, Idaho; Medford, Oregon; Spokane and Yakima, Washington; and Yuma, Arizona until December 31, 2019.

41.     The Northwest Retransmission Agreement was set to expire on December 31, 2019, and has been extended by the parties to 11:59 p.m. Mountain Time on January 15, 2020. Paragraph 5 of the extension agreement states, "Nothing contained in this letter agreement shall constitute an agreement or acknowledgment by DISH that the [Cox Stations] listed in Exhibit A to NBI Holdings, LLC's letter to DISH dated December 20, 2019 are After-Acquired Stations." If the parties do not reach a further agreement by that time, the screens of DISH customers will go dark for all Northwest stations.

42.     The Northwest Retransmission Agreement contains a change-in-control clause like the change-in-control clause in the Cox Retransmission Agreement.

43.     The Northwest Retransmission Agreement also contains a clause commonly referred to as an After-Acquired Station Clause.  This clause provides that any TV station not covered by the Northwest Retransmission Agreement shall be deemed added to the Northwest Retransmission Agreement and governed by its terms if the station is acquired by Northwest *after* the Northwest Retransmission Agreement's effective date.  Assuming satisfaction of the applicable change-in-control provisions, the effect of the After-Acquired Station Clause is to impose the terms of the Northwest Retransmission Agreement on TV stations that Northwest

11

acquires after June 6, 2018, the effective date of the Agreement. Northwest has not acquired the Cox Stations.

**Cox and Northwest Agree to Transactions that Result in the Acquisition of the Cox Stations and the Northwest stations by Different Apollo Affiliates.**

44. Terrier was created by Apollo, a private equity firm that invests in alternative assets on behalf of the world's most prominent investors, and is controlled by Apollo IX. Apollo and its affiliates, including Apollo IX, Terrier, NBI Holdings, and Camelot, are new entrants in the broadcast television market.

45. On or around February 14, 2019, Terrier entered into a purchase agreement (the "Northwest Acquisition Agreement") with entities operating under the name Northwest Broadcasting, to acquire, among other things, the interests in Northwest's 18 broadcast television stations in markets covering nearly 13 percent of U.S. television households (the "Northwest Acquisition"). The Northwest Acquisition required the prior approval of the FCC.

46. All parties to this action have copies of the Northwest Acquisition Agreement. Pursuant to 735 ILCS 5/2-606, DISH sets out the relevant portions of the Northwest Acquisition Agreement herein and incorporates the full Northwest Acquisition Agreement by reference as if fully set forth herein, and will file a true and correct copy of the Northwest Acquisition Agreement as **Exhibit 3**.

47. On or around February 14, 2019, Terrier entered into a purchase agreement (the "Camelot Purchase Agreement") with Cox whereby certain Apollo subsidiaries and affiliates would acquire interests in the Cox Stations (the "Cox Acquisition"). Defendants refer to the agreement as the "Camelot Purchase Agreement" because certain Camelot-named affiliates of Apollo were part of the transaction.

48. All parties to this action have copies of the Camelot Purchase Agreement. Pursuant to 735 ILCS 5/2-606, DISH sets out the relevant portions of the Camelot Purchase Agreement herein and incorporates the full Camelot Purchase Agreement by reference as if fully set forth herein, and will file a true and correct copy of the Camelot Purchase Agreement as **Exhibit 4**.

49. The Cox Acquisition was also subject to FCC approval. The parties requested FCC approval of the Northwest Acquisition on the same day as the Cox Acquisition by means of a consolidated application on March 4, 2019. The FCC approved both transactions on the same day—November 22, 2019. Finally, both transactions were consummated on the same day—December 17, 2019. The FCC also approved the transfer of the relevant broadcasting licenses to Terrier.

**Apollo's Broadcasting Assets at the Time of the Cox Acquisition.**

50. The crux of this dispute is Apollo's wrongful reliance upon the simultaneous acquisition of another broadcast group by Apollo affiliates to try to engineer an early termination of the Cox Retransmission Agreement. The mechanism on which Apollo relies is its concurrent acquisition of the Northwest broadcast stations. Apollo argues that the Northwest Asset Acquisition gives it the right to treat the Cox Stations as after-acquired under the Northwest Agreement, and to treat the Cox Retransmission Agreement as terminated. As explained below, this argument is incorrect both under the terms of the relevant contracts and because the sequence of events does not support the argument. The Apollo affiliates that acquired the Cox Stations did not own the Northwest stations at the time they acquired the Cox Stations (or at any time for that matter), and as a result, Defendants cannot invoke the provisions of the Northwest Retransmission Agreement to treat the Cox Retransmission Agreement as if it were terminated when the Cox Stations were acquired.

13

51.     The acquisition of Northwest was described in the Northwest Acquisition Agreement as being "concurrent" with the Cox acquisition:

> [C]oncurrently with the execution of this Agreement, Buyer and Cox Enterprises, Inc., Cox Media Group, LLC, Cox Media Group Ohio, Inc. and Cox Radio, Inc. (collectively, "Cox") are entering into a purchase agreement, pursuant to which Buyer, or one or more of its Affiliates, will purchase the Purchased Assets (as defined therein) and the Equity Interests (as defined therein) and will assume certain Assumed Liabilities (as defined therein). . . .

52.     Moreover, under the terms of the Northwest Purchase Agreement, closing of the Northwest Acquisition was "[s]ubject to the satisfaction or waiver of each of the conditions set forth in Article 6." And Article 6.3 of the Northwest Acquisition Agreement provided in relevant part that "all of the conditions set forth in Article VI and Article VII of the Camelot [Cox] Purchase Agreement shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the closing of the transactions contemplated by the Camelot [Cox] Purchase Agreement (the "Camelot Closing"), each of which is capable of being satisfied at the Camelot Closing)."

53.     Under these conditions, the Cox Acquisition had to be capable of being completed before the Northwest Acquisition could close.

54.     DISH is informed and believes that the extraordinary web of transactions in which Apollo engaged to subsequently consummate the acquisitions was attempted for no economic purpose other than to deny DISH the right it negotiated under the Cox Retransmission Agreement to have that same Cox Retransmission Agreement govern the Cox Stations when they were acquired by affiliates of Terrier.

**Cox Notifies DISH Regarding the Acquisition by Terrier.**

55.     In December 2019, Cox notified DISH that it was consummating a sale to Terrier and that Cox's rights under the Cox Retransmission Agreement would be transferred to Terrier.

14

56.     On or around December 7, 2019, Cox's President Kim Guthrie sent a letter to DISH regarding the Cox Retransmission Agreement.  Ms. Guthrie represented that Cox "is in the process of selling all or substantially all of the assets of [Cox] to Terrier Media Buyer, Inc . . . " She further stated that the transaction was expected to close in the fourth quarter of 2019.  She concluded by informing DISH "that effective as of the Closing Date, the right to grant retransmission consent with respect to the Stations listed on Exhibit A hereto [the Cox Stations] will be transferred to Terrier Media Buyer, Inc."  A true and correct copy of the letter will be filed as **Exhibit 5**.

57.     Terrier did not have a retransmission agreement with DISH.  Therefore, if this is what in fact occurred, the Cox Stations continue to be governed by the terms of the Cox Retransmission Agreement pursuant to the change-in-control provision of Section 17 of the Cox Retransmission Agreement.

**Terrier and Cox Act to Circumvent the Cox Retransmission Agreement.**

58.     Instead of adhering to the terms of the Cox Retransmission Agreement, however, Defendants Terrier and Cox devised a scheme to attempt to circumvent the Cox Retransmission Agreement.

59.     On or around December 13, 2019, counsel for NBI Holdings sent a notice to DISH regarding a change in control under the Northwest Retransmission Agreement.  A true and correct copy of the letter will be filed as **Exhibit 6**.

60.     Terrier then apparently arranged the Northwest and Cox acquisitions to close in quick succession on December 17, 2019.  Despite the "concurrent" language in the Northwest Acquisition Agreement, Terrier takes the position that, because Cox's stations were supposedly acquired by an existing broadcaster rather than a private equity vehicle, they are subsumed

15

within that broadcaster's soon-to-expire retransmission agreement, and the Cox Retransmission Agreement becomes a dead letter.

61.     To effectuate that scheme, on or around December 20, 2019, counsel for NBI Holdings sent a letter to DISH stating that NBI Holdings had acquired the Cox Stations.  DISH responded and requested confirmation.  A true and correct copy of the letter will be filed as **Exhibit 7**. DISH responded by email to the letter on December 23, 2019, asking NBI Holdings to substantiate its claim because its claim contradicted multiple public sources about the Terrier transactions.

62.     On or around December 27, 2019, NBI Holdings counsel sent a follow-up letter and draft presentation purporting to describe the legal steps in the Northwest transaction and the Cox transaction.  Although the details remain unclear, a presentation by Terrier's deal counsel was provided to DISH.  That presentation suggests that the Cox Stations came to be held by Camelot and the Northwest entities came to be held by NBI Holdings.  In turn, NBI Holdings is directly owned by Terrier.  True and correct copies of the letter and draft presentation will be filed as **Exhibit 8** under seal. Indeed, these documents support the position that the Apollo affiliates that acquired the Cox Stations did not own the Northwest stations at the time they acquired the Cox Stations (or at any time for that matter).

63.     Neither Terrier nor Camelot had an existing retransmission agreement with DISH. This means that neither the prospective purchaser of the Cox Stations nor the apparent current owner of the Cox Stations had an existing retransmission agreement with DISH at the time of the Cox acquisition.

64.     Moreover, neither the letter nor the presentation by deal counsel shows the actual structure of the transactions.  Accordingly, DISH responded that it would not be able to treat the

Cox Stations as after-acquired stations subject to the Northwest Retransmission Agreement. A true and correct copy of DISH's response will be filed as **Exhibit 9**.

65. On or around December 30, 2019, DISH requested information to confirm the timing of the transactions. Counsel for NBI Holdings agreed to provide additional information. To date, however, NBI Holdings has not demonstrated either that the Cox Stations were actually acquired by the owner of the Northwest stations or that the Cox Stations were acquired after the acquisition of the Northwest stations.

66. Last week, Defendants started to run a "crawl" message on the Cox Stations stating that DISH would lose its Cox Stations soon because "it has refused to agree to reasonable terms for the valuable programming we provide."

67. On January 10, 2020, Defendants reiterated the position that the Cox Stations also are subject to the Northwest Transmission Agreement and that, if DISH does not reach a new retransmission consent agreement for the Cox Stations, they must "go dark" soon.

**Defendants Are Acting in Bad Faith.**

68. Defendants have engaged in bad-faith conduct to conceal their maneuverings and have constructed a façade of transactions in an effort to obscure the end result, which is their attempt to avoid the remaining two years of the Cox Retransmission Agreement and create an unfair opportunity to increase the retransmission fees that DISH previously negotiated with Cox—all at the expense of DISH customers whose television screens are about to go dark.

69. If the Cox Stations were sold directly to Camelot (which appears to be the case), they would be subject to the Cox Retransmission Agreement. This is because the new owner (Camelot) did not have an existing retransmission agreement with DISH and, therefore, was obligated to take the Cox Stations subject to the terms of the Cox Retransmission Agreement. That agreement does not expire for more than two years.

17

70.     Instead, Terrier and NBI Holdings have contended that the Cox Stations were acquired by NBI Holdings and are subject to the Northwest Retransmission Agreement.  But the documents provided by Defendants are not consistent with the position that Defendants have taken regarding the acquisitions of Cox and Northwest.

71.     For example, nowhere does the Northwest Acquisition Agreement, the Camelot Purchase Agreement, or any other transaction document suggest that Northwest was involved in the purchase of the Cox assets.

72.     In this circumstance, the change-in-control provision of Section 17 of the Cox Retransmission Agreement requires that the terms of the Cox Retransmission Agreement continue to apply to the Cox Stations and their new owner, whether that be Terrier, Camelot, or another of Terrier's subsidiaries or affiliates.

73.     The terms of the two agreements show that they were intended to be part of the same unitary transaction.

　　　a.  The Northwest Acquisition Agreement specifies that the two agreements were executed "concurrently."

　　　b.  The Northwest transaction could not close until after Cox and Terrier had obtained the rights to close their transaction.

　　　c.  While the Northwest Acquisition Agreement contemplates closing "immediately prior to . . .  the closing of the transactions contemplated by the Camelot [Cox] Purchase Agreement," the ability to close the Camelot Purchase Agreement is a condition precedent to the obligations of the Buyer (Terrier) and the Sellers (Northwest's owners) for the Northwest Acquisition Agreement.

18

d.  The Northwest Acquisition Agreement could not be amended or modified without the prior written consent of Cox.

e.  The Camelot Purchase Agreement provides "for the avoidance of doubt, that the consummation of the transactions contemplated by the Northwest Acquisition Agreement shall not be a condition to Buyer's obligation to consummate the Closing."

74.     In addition, both purchase agreements were actually executed on the same day, were the subject of the same application filed with the FCC, were approved by the FCC in the same decision, and were consummated on the same day.

75.     In any event, the Cox Stations were not even acquired by Terrier (the Apollo entity that acquired the interests in the Northwest stations).  While the Camelot Purchase Agreement provides for Terrier to acquire these interests, an assignment agreement dated December 16, 2019 assigns to the Camelot subsidiaries *pre-closing* Terrier's contractual rights to the Cox Stations.  This means that the Cox Stations were never acquired by an entity in which the Northwest stations were housed.

**DISH Will Suffer Irreparable Harm.**

76.     DISH will suffer irreparable harm unless the status quo is preserved under the Cox Retransmission Agreement.

77.     Unless Defendants are restrained, they will act today to deprive DISH of its rights under the Cox Retransmission Agreement.  This will prevent DISH from offering ABC, CBS, NBC, or Fox programming to the ten major U.S. markets covered by the Cox Retransmission Agreement, which means that DISH subscribers in these markets will suddenly lose access to their favorite TV programming—such as the popular live sports, hit shows, and other marquee events offered by the Big Four networks.

19

78.    These stations, however, will continue to be available from DISH's competitors, including cable systems, DIRECTV, and online video distributors.  Thus, many subscribers are likely to leave DISH and switch to a competitor in order to continue receiving their favorite programming.  Indeed, DISH has already begun to experience call volume and some customer loss in response to the "crawl" messages on the Cox Stations.

79.    Additional harm will be suffered by DISH's subscribers.  Those who remain with DISH will be deprived of programming, including live events such as sporting events that only happen once.  Those who leave DISH will face the burdens of switching and may be locked into more expensive long-term contracts with other MVPDs who are not their first choice.

80.    Defendants, on the other hand, will not be harmed irreparably if the status quo is preserved.  This is because DISH has paid, and will continue to pay, the monthly retransmission fees under the Cox Retransmission Agreement for the balance of its term.

## CLAIMS

### COUNT I
### (All Defendants)
### Declaratory Judgment

81.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

82.    Pursuant to Section 5/2-701 of the Illinois Code of Civil Procedure, this Court has the power to grant declaratory judgments, making "binding declarations of rights, having the force of final judgments . . . ."

83.    The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

84.     Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the change-in-control and assignment terms of the Cox Retransmission Agreement.

85.     No Defendant has a right to interfere with or avoid the Cox Retransmission Agreement.

86.     Therefore, DISH is entitled to a declaration that the terms of the Cox Retransmission Agreement remain in force with respect to the Cox Stations through its full term.

## COUNT II
### (Cox, Camelot)
### Specific Performance of the Cox Retransmission Agreement

87.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

88.     The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

89.     DISH has performed all of its obligations under the Cox Retransmission Agreement.

90.     Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the change-in-control and assignment terms of the Agreement.

91.     Cox and Camelot have breached the retransmission rights granted to DISH under Section 3 of the Cox Retransmission Agreement with respect to the Cox Stations by taking actions that deprive DISH of the ability to retransmit those stations for the full term of the Agreement.

92.     Cox and Camelot have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Retransmission Agreement.

21

93.     DISH has no adequate remedy at law.  Money damages will not adequately compensate DISH.  Unless Cox and Camelot are enjoined, DISH will suffer irreparable harm caused by these breaches of the Cox Retransmission Agreement.

94.     Accordingly, DISH is entitled to an injunction and specific performance of the Cox Retransmission Agreement.

**COUNT III**
**(Cox, Camelot)**
**Breach of the Cox Retransmission Agreement**

95.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

96.     The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

97.     DISH has performed all of its obligations under the Cox Retransmission Agreement.

98.     Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the change-in-control and assignment terms of the Cox Retransmission Agreement.

99.     Cox and Camelot have breached the retransmission rights granted to DISH under Section 3 of the Cox Retransmission Agreement with respect to the Cox Stations by taking actions that deprive DISH of the ability to retransmit those stations for the full term of the Cox Retransmission Agreement.

100.    Cox and Camelot have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Retransmission Agreement.

101.    Cox and Camelot's breaches of the Cox Retransmission Agreement have caused damages to DISH.

102.    DISH is entitled to an injunction and specific performance of the Cox Retransmission Agreement, or in the alternative, DISH is entitled to money damages in an amount to be determined at trial.

**COUNT IV**
**(Cox)**
**<u>Breach of the Cox Retransmission Agreement</u>**

103.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

104.    The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

105.    DISH has performed all of its obligations under the Cox Retransmission Agreement.

106.    Cox breached the representation and warranty of Section 12(b)(iii) that "no third party has or has claimed any right that would be inconsistent with the rights granted to DISH in this Agreement." Cox knew, or should have known, that Terrier's acquisition of Cox was at least inconsistent with the rights granted to DISH.

107.    Cox also breached the covenant of Section 12(c)(ii) that it "will maintain, at all times during the Term, all licenses, permits, rights, exemptions, authorizations and consents necessary to fully perform this Agreement." Instead, Cox has acted to prevent full performance of the Cox Retransmission Agreement.

108.    Cox's breaches of its warranties and covenants under the Cox Retransmission Agreement have caused damages to DISH in an amount to be determined at trial.

## COUNT V
## (Cox)
## Breach of Duty of Good Faith and Fair Dealing

109.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

110.     Cox has exercised its contractual rights in a way that deprives DISH of the benefit of its bargain.

111.     Specifically, Cox engaged in a sale of the Cox Stations that was and is intended to deprive DISH of (i) its retransmission rights under the Cox Retransmission Agreement and (ii) its rights under the change-in-control and assignment provisions of the Agreement in the event of new ownership of the Stations.

112.     Cox has assisted the other Defendants in thwarting the purpose of the Cox Retransmission Agreement, which was to establish the pricing and other terms by which DISH would be able to retransmit the Cox Stations for the full term of the Agreement.

113.     Cox's conduct breaches not only its express contractual obligations but also the implied obligations that a reasonable person in DISH's position would be justified in understanding were included in the Cox Retransmission Agreement.

114.     Cox's breach of its duty of good faith and fair dealing has caused damages to DISH in an amount to be determined at trial.

## COUNT VI
## (Terrier, NBI Holdings)
## Tortious Interference with the Cox Retransmission Agreement

115.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

24

116. The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

117. Terrier and NBI Holdings had knowledge of the Cox Retransmission Agreement and its terms.

118. As set forth above, Cox and Camelot breached their obligations under the Cox Retransmission Agreement.

119. The conduct of Terrier and NBI Holdings, as set forth above, constitutes intentional procurement of these breaches of the Cox Retransmission Agreement, without justification.

120. DISH has no adequate remedy at law. Money damages will not adequately compensate DISH. Unless Terrier and NBI Holdings are enjoined, DISH will suffer irreparable harm caused by these breaches of the Cox Retransmission Agreement.

121. Alternatively, because of the damages caused to DISH by these breaches of the Cox Retransmission Agreement and by Terrier and NBI Holding's unjustified interference therewith, DISH is entitled to damages in an amount to be determined at trial.

**Count VII**
**(All Defendants)**
**Unfair Competition**

122. DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

123. DISH's rights with respect to the Cox Stations have commercial value, as demonstrated by the fact that DISH pays for them and uses them to generate revenues from subscribers.

124.     Defendants have engaged in unfair competition by knowingly and intentionally misappropriating DISH's rights—specifically by acting to deprive DISH of (i) its retransmission rights with respect to the Cox Stations and (ii) its rights under the change-in-control and assignment provisions of the Cox Retransmission Agreement.

125.     Defendants' conduct has adversely affected, and will continue to adversely affect, the operations of DISH.  Defendants are threatening to "black out" the four major networks in ten of DISH's markets, which will harm DISH and cause its subscribers to leave.

126.     On information and belief, Defendants' unfair competition is willful, deliberate, and in bad faith.

127.     DISH has no adequate remedy at law.  Defendants' conduct has caused, and if not enjoined, will continue to cause, immediate and irreparable damage to DISH.

128.     DISH is entitled to injunctive relief to prevent Defendants from engaging in further acts of unfair competition.

129.     Alternatively, DISH is entitled to damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, DISH respectfully requests that the Court enter judgment in favor of DISH and against Defendants and issue an order as follows:

1.     Granting all relief requested in this Complaint;

2.     Declaring that the terms of the Cox Retransmission Agreement remain in force with respect to the Cox Stations through its full term;

3.     Ordering specific performance of the Cox Retransmission Agreement;

4.     Enjoining Defendants from continuing to breach the terms of the Cox Retransmission Agreement and enjoining them from depriving DISH of its retransmission rights with respect to the Cox Stations;

5.     Enjoining Terrier and NBI Holdings from continuing to tortiously interfere with the Cox Retransmission Agreement;

6.     Alternatively, if specific performance is not ordered, awarding DISH actual, incidental, and consequential damages for Defendants' breaches of and tortious interference with the Cox Retransmission Agreement;

7.     Awarding DISH interest, attorneys' fees, and costs; and

8.     Ordering such other and further relief as the Court may deem appropriate.


Dated: January 15, 2020                    Respectfully submitted,

                                        */s/ Michael Dockterman*
                                        Michael Dockterman (ARDC #: 3121675)
                                        STEPTOE & JOHNSON LLP (Firm ID: 43315)
                                        227 West Monroe, Suite 4700
                                        Chicago, Illinois 60606
                                        Telephone:  (312) 577-1243
                                        Fax:  (312) 577-1370

                                        *Attorney for Plaintiff DISH Network L.L.C.*

**VERIFICATION**

I hereby verify that I have read the attached Verified Complaint. Under penalties by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes them to be true.

Date: January 15, 2020

By: _____

Name: Andrew LeCuyer

Title: SVP, Programming

*For Plaintiff DISH Network L.L.C.*

28

# EXHIBIT 1
## (Exhibit Filed Under Seal)

# EXHIBIT 2
## (Exhibit Filed Under Seal)

# EXHIBIT 3

*Execution Version*

**PURCHASE AGREEMENT**

**Dated as of February 14, 2019**

**by and**

**among**

**Cox Enterprises, Inc.,**

**Cox Media Group, LLC,**

**Cox Media Group Ohio, Inc.,**

**Cox Radio, Inc.**

**and**

**Terrier Media Buyer, Inc.**

41462373.9

# TABLE OF CONTENTS

This Table of Contents is not part of this Agreement to which it is attached but is inserted for convenience only.

**Page**

ARTICLE 1 PURCHASE AND SALE ................................................................................2

   1.1   Purchase and Sale ................................................................................2

   1.2   Purchase Price ................................................................................2

   1.3   Closing ................................................................................3

   1.4   Purchase Price Adjustment ................................................................................3

   1.5   Allocation; Asset Sale ................................................................................7

   1.6   Withholding ................................................................................8

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLERS ................................8

   2.1   Existence; Good Standing ................................................................................8

   2.2   Authorization and Binding Obligation ................................................................8

   2.3   Ownership of Equity Interests; Subsidiaries ........................................................8

   2.4   No Conflict ................................................................................9

   2.5   Governmental Consents and Approvals ..............................................................9

   2.6   FCC Licenses; MVPD Matters ..........................................................................10

   2.7   Taxes ................................................................................11

   2.8   Real Property; Leases ................................................................................13

   2.9   Contracts; Validity of Material Agreements .......................................................13

   2.10  Environmental ................................................................................15

   2.11  Intellectual Property ................................................................................16

   2.12  Employees; Labor Matters; Employee Matters ................................................19

   2.13  Employee Benefit Plans ................................................................................20

   2.14  Insurance ................................................................................22

   2.15  Permits ................................................................................23

   2.16  Litigation ................................................................................23

   2.17  Financial Reports ................................................................................23

   2.18  Absence of Changes ................................................................................24

   2.19  Compliance with Laws ................................................................................24

   2.20  Corruption; Sanctions ................................................................................24

2.21    No Undisclosed Liabilities .................................................................................24

2.22    Assets; Sufficiency .............................................................................................25

2.23    No Brokers .........................................................................................................26

2.24    Affiliate Transactions .........................................................................................26

ARTICLE 3 BUYER REPRESENTATIONS AND WARRANTIES .........................................26

3.1     Organization .......................................................................................................26

3.2     Authorization ......................................................................................................26

3.3     No Conflicts ........................................................................................................26

3.4     Litigation ............................................................................................................26

3.5     Qualification .......................................................................................................27

3.6     Financing .............................................................................................................27

3.7     Solvency ..............................................................................................................28

3.8     Limited Guarantee ..............................................................................................29

3.9     Projections and Other Information .....................................................................29

3.10    Investment ..........................................................................................................29

3.11    Brokers ................................................................................................................30

3.12    Northwest Purchase Agreement .........................................................................30

3.13    Pre-Closing Agreements .....................................................................................30

3.14    Designated MVPD Agreements ..........................................................................30

3.15    No Other Representations or Warranties ............................................................31

ARTICLE 4 CERTAIN COVENANTS ....................................................................................31

4.1     Governmental Consents .....................................................................................31

4.2     Operations of the Business Prior to the Closing Date .......................................35

4.3     Director and Officer Indemnification .................................................................40

4.4     Northwest Purchase Agreement .........................................................................42

ARTICLE 5 JOINT COVENANTS ..........................................................................................42

5.1     Confidentiality ....................................................................................................42

5.2     Announcements ...................................................................................................43

5.3     Control ................................................................................................................43

5.4     Consents; Certain Contracts ...............................................................................43

5.5     Employee Matters ...............................................................................................46

5.6     Access to Business ..............................................................................................51

5.7   Further Action .................................................................................................52

5.8   Notice ...............................................................................................................52

5.9   Title Insurance; Survey ....................................................................................53

5.10  Financing..........................................................................................................53

5.11  Tax Matters ......................................................................................................58

5.12  Intercompany Accounts and Intercompany Arrangements................................60

5.13  Pre-Closing Restructuring.................................................................................61

5.14  Non-Solicitation of Employees; Non-Competition ...........................................61

5.15  Intellectual Property Matters.............................................................................62

5.16  Transition Services Agreement .........................................................................64

5.17  Rollover Transactions .......................................................................................64

5.18  CCI Retransmission Consent Agreement ..........................................................65

ARTICLE 6 SELLERS' CLOSING CONDITIONS.......................................................65

6.1   Representations and Covenants .........................................................................66

6.2   Proceedings ......................................................................................................66

6.3   FCC Authorization ...........................................................................................66

6.4   Hart-Scott-Rodino ............................................................................................66

ARTICLE 7 BUYER'S CLOSING CONDITIONS.........................................................66

7.1   Representations and Covenants .........................................................................66

7.2   Proceedings ......................................................................................................67

7.3   FCC Authorization ...........................................................................................67

7.4   Hart-Scott-Rodino ............................................................................................67

7.5   Northwest Purchase Agreement ........................................................................67

7.6   No Material Adverse Effect ..............................................................................67

ARTICLE 8 CLOSING DELIVERIES............................................................................67

8.1   Seller Documents ..............................................................................................67

8.2   Buyer Documents ..............................................................................................69

ARTICLE 9 SURVIVAL AND INDEMNIFICATION ...................................................70

9.1   Survival ............................................................................................................70

9.2   Indemnification .................................................................................................70

9.3   Notice and Defense............................................................................................72

41462373.9

ARTICLE 10 TERMINATION AND REMEDIES ....................................................... 73

    10.1    Termination ............................................................................................. 73

    10.2    Termination and Survival ..................................................................... 75

    10.3    Specific Performance ............................................................................. 75

    10.4    Buyer Termination Fee ......................................................................... 77

    10.5    Buyer Expenses ..................................................................................... 79

ARTICLE 11 MISCELLANEOUS ............................................................................... 79

    11.1    Expenses ................................................................................................ 79

    11.2    Further Assurances ................................................................................ 80

    11.3    Wrong Pockets ...................................................................................... 80

    11.4    Assignment ............................................................................................ 81

    11.5    Notices .................................................................................................. 81

    11.6    Amendments .......................................................................................... 82

    11.7    Entire Agreement .................................................................................. 82

    11.8    Severability ........................................................................................... 82

    11.9    Third Party Beneficiaries ...................................................................... 82

    11.10  Governing Law; Consent to Jurisdiction; Waiver of Jury Trial .......... 83

    11.11  Neutral Construction ............................................................................. 84

    11.12  Counterparts .......................................................................................... 84

    11.13  Interpretation ......................................................................................... 84

    11.14  No Recourse .......................................................................................... 85

    11.15  Certain Definitions ............................................................................... 86

41462373.9

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is made as of February 14, 2019, by and among Cox Enterprises, Inc., a Delaware corporation ("Parent"), Cox Media Group, LLC, a Delaware limited liability company ("CMG"), Cox Media Group Ohio, Inc., a Delaware corporation ("Cox Ohio"), Cox Radio, Inc., a Delaware corporation ("Cox Radio" and, together with Parent, CMG and Cox Ohio, each, a "Seller" and collectively, the "Sellers"), on the one hand, and Terrier Media Buyer, Inc., a Delaware corporation ("Buyer"), on the other hand. For the purposes of this Agreement, Buyer and Sellers each may be referred to as a "Party" and together as the "Parties."

## Recitals

WHEREAS, Sellers collectively own all of the issued and outstanding equity interests in the companies set forth in Exhibit A hereto (the "Acquired Companies"), which, in turn, directly or indirectly through a wholly owned subsidiary own and operate the television broadcast stations listed on Exhibit A hereto (the "TV Stations"), pursuant to certain licenses, permits and other authorizations issued by the Federal Communications Commission (the "FCC");

WHEREAS, Cox Radio owns and operates the radio stations listed on Exhibit B hereto (collectively, the "Dayton Radio Stations"), pursuant to certain licenses, permits and other authorizations issued by the FCC;

WHEREAS, Cox Ohio owns and operates the Dayton Daily News and the related community publications and online, digital and mobile publications listed on Exhibit C hereto (collectively, the "Dayton Newspapers");

WHEREAS, to effect the sale of the TV Stations, the Dayton Radio Stations and the Dayton Newspapers and the business related thereto to Buyer, Sellers desire to sell and transfer to Buyer, and Buyer desires to purchase and acquire from Sellers, the Equity Interests (as defined herein) and the Purchased Assets (as defined herein), pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as consideration for Sellers entering into this Agreement, the Equity Investors (as defined therein) and Buyer have entered into an equity commitment letter, dated as of the date hereof (the "Equity Commitment Letter"), a copy of which is attached hereto as Exhibit D-1;

WHEREAS, concurrently with the execution and delivery of this Agreement, Buyer has delivered to Sellers a limited guarantee (the "Limited Guarantee"), a copy of which is attached hereto as Exhibit D-2, from the Guarantors (as defined therein) pursuant to which the Guarantors have guaranteed certain of Buyer's obligations under this Agreement; and

WHEREAS, at or prior to the Closing, Sellers intend to implement the Pre-Closing Restructuring in order to facilitate the Transactions (as defined herein) and the consummation of the transactions contemplated hereby, pursuant to the terms and subject to the conditions set forth in this Agreement.

**Agreement**

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

ARTICLE 1
PURCHASE AND SALE

1.1     Purchase and Sale.  Subject to and upon the terms and conditions set forth in this Agreement, at the Closing:

(a)     Equity Sale.  Sellers shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from Sellers, the Equity Interests, in each case, free and clear of all Liens.

(b)     Asset Sale.

(i)     Transfer of Purchased Assets; Retention of Excluded Assets.  Sellers shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase, acquire and accept from Sellers, all right, title and interest of Sellers in the Purchased Assets, in each case, free and clear of all Liens, other than Permitted Liens.  Notwithstanding anything herein to the contrary, Sellers shall retain, and Buyer shall not purchase or acquire hereunder, the Excluded Assets.

(ii)     Assumed Liabilities and Excluded Liabilities.  Buyer shall assume and shall pay, perform and discharge all Liabilities of Sellers (other than the Acquired Companies) in respect of or arising in connection with the Purchased Assets or, if accrued prior to Closing, primarily related to the conduct of the Business, and if accruing following the Closing, related to the conduct of the Business, including all Liabilities whether arising before, at or after the Effective Time with respect to the Assumed Contracts (collectively, and without duplication, the "Assumed Liabilities").  Notwithstanding the foregoing, Buyer shall not be successor to Sellers or their Affiliates and shall not assume and shall not be responsible to pay, perform or discharge any of the Excluded Liabilities. Sellers shall retain, pay, perform and discharge the Excluded Liabilities.

1.2     Purchase Price.  The aggregate consideration to be paid to Sellers for the sale of the Equity Interests and the Purchased Assets to Buyer shall be $3,100,000,000 (the "Base Consideration"), as increased or decreased on a dollar-for-dollar basis for the cumulative net adjustments required by the following (as adjusted, the "Purchase Price"): (i) the Base Consideration shall be increased by the amount, if any, by which the Net Working Capital exceeds the Target Net Working Capital; (ii) the Base Consideration shall be decreased by the amount, if any, by which the Net Working Capital is less than the Target Net Working Capital; (iii) the Base Consideration shall be decreased by an amount equal to the Company Transaction Expenses; (iv) the Base Consideration shall be decreased by an amount equal to the Indebtedness Payoff Amount, to the extent not included in the foregoing clause (iii); and (v) the Base Consideration shall be decreased by an amount equal to the value of any rollover equity or assets as set forth in the Contribution Agreement entered into pursuant to Section 5.17.

41462373.9

1.3    Closing.

(a)    Subject to any prior termination of this Agreement pursuant to Section 10.1, the consummation of the sale and purchase of the Equity Interests and the Purchased Assets, and the assumption of the Assumed Liabilities (the "Closing"), shall take place at the offices of Eversheds Sutherland (US) LLP, 999 Peachtree Street, Atlanta, Georgia 30309 at 10:00 a.m. Atlanta, Georgia time on the third (3rd) Business Days following the date upon which the last of the conditions set forth in Article 6 and Article 7 (other than those conditions that are to be satisfied by action taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) have been satisfied (or, to the extent permitted, waived by the Parties entitled to the benefits thereof) or at such other place, time and date as may be agreed among Sellers and Buyer; provided, that notwithstanding the satisfaction or waiver of the conditions set forth in Article 6 and Article 7, if the Marketing Period has not ended at the time of the satisfaction or waiver (to the extent permitted hereunder) of the last to be satisfied or waived of the conditions set forth in Article 6 and Article 7 (other than those conditions that by their nature can be satisfied only on the Closing Date (as defined below), then the Closing will occur on the earlier of (i) any Business Day during the Marketing Period specified by Buyer to Sellers on no less than three (3) Business Days' prior written notice to Sellers and (ii) the third (3rd) Business Day following the final day of the Marketing Period (subject, in the case of each of (i) and (ii), to the satisfaction or waiver (to the extent permitted hereunder) of all of the conditions set forth in Article 6 and Article 7, other than those conditions that by their nature can be satisfied only on the Closing Date, but subject to the satisfaction or waiver (to the extent permitted hereunder) of such conditions). The date on which the Closing occurs is referred to herein as the "Closing Date."

(b)    At the Closing:

(i)    Buyer shall pay, or cause to be paid, to Sellers an amount equal to the Estimated Purchase Price as determined pursuant to Section 1.4(a), by wire transfer of immediately available funds pursuant to the wire transfer instructions provided by Sellers to Buyer in writing at least three (3) Business Days prior to the Closing Date; and

(ii)    Sellers shall deliver to Buyer the instruments, certificates and other documents required to be provided by each of them in Section 8.1, and Buyer shall deliver to Sellers the instruments, certificates and other documents required to be provided by it in Section 8.2.

1.4    Purchase Price Adjustment.

(a)    No later than the fifth (5th) Business Day prior to the anticipated Closing Date, Sellers shall prepare and deliver to Buyer a written statement (the "Estimated Closing Statement") setting forth in reasonable detail (i) Sellers' good faith estimates of the Net Working Capital, Company Transaction Expenses and Indebtedness Payoff Amount, (ii) a calculation of the Purchase Price based on such estimates (such amount the "Estimated Purchase Price") and (iii) supporting documentation upon which Sellers based their good faith estimates and any other relevant information reasonably requested by Buyer. Sellers shall consider in good faith, and consult with Buyer regarding, any comments on the Estimated Closing Statement that are submitted by Buyer on or before the second (2nd) Business Day prior to the Closing Date. For the

3

41462373.9

avoidance of doubt, if Sellers disagree with any such comments, the position of Sellers with respect to such comments shall control for purposes of the calculation of the Estimated Purchase Price; provided, that no such failure to agree shall prejudice or limit Buyer's rights pursuant to this Section 1.4.

(b)     Within ninety (90) calendar days after the Closing Date, Buyer shall prepare and deliver to Sellers a written statement (the "Closing Statement") setting forth Buyer's good faith determination of (i) the actual amounts of the Net Working Capital, Company Transaction Expenses and Indebtedness Payoff Amount and (ii) a calculation of the Purchase Price based on such amounts. The Closing Statement and the determination of calculations set forth therein shall become final and binding upon the Parties on the thirtieth (30th) calendar day after the date upon which such Closing Statement is received by Sellers (such 30-day period, the "Objection Period"), unless Sellers deliver to Buyer written notice that they dispute the calculation, preparation or content of the Closing Statement (an "Objection Notice") prior to the end of such Objection Period. The Objection Notice shall specify in reasonable detail the nature and amount of any dispute so asserted; provided, that such Objection Notice shall be limited to mathematical errors and that the accounting principles, practices, methodologies and policies used in preparing the Closing Statement were inconsistent with the Agreed Accounting Principles. Any amount contained in the Closing Statement that is not specifically disputed in the Objection Notice shall be final and binding on the Parties as set forth in the Closing Statement. If an Objection Notice is delivered to Buyer prior to the end of the Objection Period, then the Closing Statement and the determination of calculations set forth therein (as revised in accordance with clause (i) or (ii) below) shall become final and binding upon the Parties on the earlier to occur of (i) the date Buyer and Sellers resolve in writing any differences they have with respect to the matters specified in the Objection Notice or (ii) the date any disputed matters are finally resolved by the Accounting Firm as provided below. The Purchase Price as set forth in the version of the Closing Statement that becomes final and binding on the Parties in accordance with this Section 1.4(b) is referred to herein as the "Final Purchase Price."

(c)     From the Closing until such time as all matters set forth in the Objection Notice, if any, have been fully and finally resolved in accordance herewith, each Party shall (i) maintain and provide to the other Party and their respective advisors and representatives reasonable access to all documents and other information utilized by such Party and its representatives and advisors in connection with Buyer's preparation of the Closing Statement and Sellers' preparation of the Objection Notice (and the resolution any disputes thereunder), as applicable, including all financial statements, work papers, schedules, accounts, analysis and books and records relating to the Closing Statement as was utilized by Buyer in connection with preparation of the Closing Statement and the Objection Notice as was utilized by Sellers in connection with preparation of the Objection Notice, as applicable; (ii) provide the other Party and their representatives and advisors reasonable access to such employees, auditors, advisors and representatives who participated in the preparation or review of, or otherwise have relevant knowledge concerning, the Closing Statement or the Objection Notice, as applicable; and (iii) reasonably cooperate with the other Party in providing the information and personnel reasonably required by such Party to resolve the matters set forth in the Objection Notice; provided, that any access provided to the Parties pursuant to this Section 1.4(c) shall be (w) subject to executing customary confidentiality agreements and access letters, as applicable, (x) during regular business hours, (y) with no less than two (2) Business Days' prior written notice to the other Party and (z) in a manner which will

4

not unreasonably interfere with the operation of the Business. Notwithstanding the foregoing, the Parties may withhold any document (or portions thereof) or information (A) that is subject to the terms of a nondisclosure agreement or undertaking with a third party, (B) that may constitute privileged attorney-client communications or attorney work product, the transfer of which, or the provision of access to which, as determined in good faith by such Party after consultation with counsel, would reasonably be expected to risk a waiver of such privilege or (C) if the provision of access to such document (or portion thereof) or information, as determined by such Party in good faith after consultation with counsel, would reasonably be expected to conflict with applicable Law; provided, that the Parties shall use their respective commercially reasonable efforts to cause such information to be provided in a manner that would not violate the foregoing. The rights of each Party under this Agreement shall not be prejudiced by the failure of the other Party to comply with this Section 1.4(c).

(d)     In the event that Sellers provide an Objection Notice to Buyer prior to the end of the Objection Period, then Sellers and Buyer shall, within twenty (20) calendar days following Sellers' delivery of such Objection Notice (such 20-day period, the "Dispute Resolution Period"), in good faith seek to resolve the items disputed in the Objection Notice. All negotiations pursuant to this Section 1.4 shall be treated as compromise and settlement negotiations for purposes of Rule 408 of the Federal Rules of Evidence and comparable state rules of evidence, and all negotiations and submissions to the Accounting Firm (as defined below) shall be treated as confidential information; provided, however, that compromised offers and negotiations pursuant to this Section 1.4 shall not be treated as compromise offers and negotiations for purposes of Rule 408 of the Federal Rules of Evidence and comparable state rules of evidence to the extent offered for purposes of establishing performance of, or the failure to perform, this Section 1.4.

(e)     If, during the Dispute Resolution Period, Sellers and Buyer resolve their differences in writing as to any disputed amount, such resolution shall be deemed final and binding with respect to such amount for the purpose of determining that component of the Final Purchase Price. In the event that Sellers and Buyer do not resolve all of the items disputed in the Objection Notice prior to the end of the Dispute Resolution Period, all such unresolved disputed items shall be submitted by Buyer or Sellers to PricewaterhouseCoopers (the "Accounting Firm") for resolution, and Buyer and each Seller shall promptly sign an engagement letter with the Accounting Firm in a form customary for an engagement of this type. The Accounting Firm shall determine only those items still in dispute, and for each such item shall determine a value within the range of values submitted therefor by Buyer and Sellers in the Closing Statement and the Objection Notice, respectively. As promptly as practicable, and in any event not more than fifteen (15) calendar days following the engagement of the Accounting Firm, Buyer and Sellers shall each prepare and submit a written presentation detailing each Party's complete statement of proposed resolution of each issue still in dispute to the Accounting Firm (it being understood that the content of each such presentation shall be limited to whether the Net Working Capital, Company Transaction Expenses and Indebtedness Payoff Amount were properly calculated in accordance with the Agreed Accounting Principles, the proposed resolution of each disputed issue by such Party and reasonable supporting detail for the foregoing); provided, that such disputed issues shall be limited to those items and amounts listed in the Objection Notice that remain unresolved. The Accounting Firm shall deliver to Buyer and Sellers a written determination based on the standards and definitions set forth in the Agreed Accounting Principles and this Agreement (such determination to include a work sheet setting forth all material calculations used in arriving at such

41462373.9

determination and to be based solely on information provided to the Accounting Firm by Buyer and Sellers) of the disputed amounts within thirty (30) calendar days of submission to the Accounting Firm of such disputed amounts (such 30-day period, the "Adjudication Period"), which determination shall be final and binding and shall be the exclusive remedy with respect to the matters addressed therein.  In the event that either Buyer or Sellers fail to submit their respective statement regarding any items remaining in dispute within the fifteen (15) calendar days following the engagement of the Accounting Firm, then the Accounting Firm shall render a decision based solely on the information timely submitted to the Accounting Firm by Buyer and Sellers.  Notwithstanding the foregoing, if either Party prevents the other Party from obtaining access to any information that such Party has reasonably requested pursuant to this Section 1.4, or if a Party otherwise fails to provide such information on a timely basis after receiving a reasonably specific request for access from the other Party, the Accounting Firm shall have the authority, in its sole discretion, to (i) extend the Adjudication Period for such reasonable amount of time as the Accounting Firm deems equitable; (ii) direct that the withholding Party promptly provide the other Party with such access as the Accounting Firm deems equitable; and/or (iii) render a decision adverse to the withholding Party in respect of any issue or amount that the Accounting Firm deems equitable given the information that has been withheld; provided, the Parties may withhold any document (or portions thereof) or information (A) that is subject to the terms of a nondisclosure agreement or undertaking with a third party, (B) that may constitute privileged attorney-client communications or attorney work product, the transfer of which, or the provision of access to which, as determined in good faith by such Party after consultation with counsel, would reasonably be expected to risk a waiver of such privilege or (C) if the provision of access to such document (or portion thereof) or information, as determined by such Party in good faith after consultation with counsel, would reasonably be expected to conflict with applicable Law; provided, further, that the Parties shall use their respective commercially reasonable efforts to cause such information to be provided in a manner that would not violate the foregoing.

(f)       In the event that the Final Purchase Price is less than the Estimated Purchase Price, Sellers shall pay to Buyer an amount equal to such difference in the manner provided in Section 1.4(g).  In the event that the Final Purchase Price is greater than the Estimated Purchase Price, Buyer shall pay to Sellers an amount equal to such difference in the manner provided in Section 1.4(g).

(g)       All payments to be made pursuant to Section 1.4(f) hereof shall be made on the second (2nd) Business Day following the date on which the Closing Statement becomes final and binding on the Parties in accordance with Section 1.4(b).  All payments made pursuant to this Section 1.4(g) shall be made via wire transfer of immediately available funds to such account or accounts as shall be designated in writing by the recipient, without interest.

(h)       All fees and expenses relating to the work, if any, to be performed by the Accounting Firm shall be allocated between Buyer, on the one hand, and Sellers, on the other hand, in the same proportion that the aggregate amount of the disputed items so submitted to the Accounting Firm that are unsuccessfully disputed by such Party (as finally determined by the Accounting Firm) bears to the total amount of the disputed items so submitted.  Buyer, on the one hand, and Sellers, on the other hand, shall each pay one-half of any indemnification payments due to the Accounting Firm pursuant to the terms of the Accounting Firm's engagement hereunder.

(i)     The Estimated Closing Statement and the Closing Statement and the determinations and calculations contained therein will be prepared and calculated using the Agreed Accounting Principles.

(j)     For Tax purposes, any payments pursuant to Section 1.4(g) shall be treated as adjustments to the Purchase Price to the extent permitted by applicable Law.

1.5     Allocation; Asset Sale.  As soon as reasonably practicable after the Closing Date, Buyer shall prepare and deliver to Sellers an allocation of the Final Purchase Price (and any liabilities treated as part of the purchase price for tax purposes) among the Purchased Assets and the Equity Interests and then, further, among the Purchased Assets and the assets of the Acquired Companies that are deemed acquired for U.S. federal income tax purposes, as a result of Section 338(h)(10) Elections or otherwise, consistent with Section 1060 of the Code (the "Allocation Schedule").  Within thirty (30) days following Sellers' receipt of such Allocation Schedule, Sellers will deliver a written notice to Buyer setting forth in reasonable detail any dispute Sellers have with respect to the preparation or content of the Allocation Schedule.  If Sellers do not deliver any written notice of objection to the Allocation Schedule within such 30-day period, the Allocation Schedule shall be final, conclusive and binding on all Parties.  If a written notice of objection is timely delivered to Buyer, Sellers and Buyer will negotiate in good faith for a period of twenty (20) days to resolve such dispute; (the "Allocation Dispute Resolution Period").  If, during the Allocation Dispute Resolution Period, Sellers and Buyer resolve their differences in writing as to any disputed amount, such resolution shall be deemed final and binding with respect to such amount for the purpose of determining that component of the Allocation Schedule.  In the event that Sellers and Buyer do not resolve all of the items disputed in the Allocation Schedule prior to the end of the Allocation Dispute Resolution Period, all such unresolved disputed items shall be submitted by Sellers or Buyer to the Accounting Firm for resolution in accordance with the procedures of Section 1.4(e), *mutatis mutandis* (except that the fees, costs and expenses of the Accounting Firm shall be borne equally by Buyer, on the one hand, and Sellers, on the other hand).  Sellers and Buyer shall report the allocation of the Final Purchase Price in a manner consistent with the Allocation Schedule as finally determined hereunder, including in preparing and filing IRS Form 8594 or any comparable form under state or local Tax law, and neither party shall take any position in any Tax proceeding that is inconsistent therewith, in each case, except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any similar provision of applicable state, local or foreign Law).  Any subsequent adjustments to purchase price shall be allocated in a manner consistent with the Allocation Schedule as finally determined hereunder.

1.6     Withholding.  Buyer shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as are required under the Code or other applicable Tax law to be deducted and withheld; provided, however, that Buyer shall (i) provide written notice of such withholding at least fifteen (15) Business Days prior to such withholding together with an explanation of the relevant legal requirement that requires such withholding and (ii) upon the request of Sellers, cooperate with Sellers to reduce or eliminate such withholding.  Any such amounts deducted or withheld which are properly remitted to the appropriate taxing authorities will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.  Buyer shall promptly deliver to

Sellers a receipt evidencing the payment of any such withheld and deducted amount to the appropriate taxing authority.

ARTICLE 2
REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller, jointly and severally, hereby represents and warrants to Buyer as follows:

2.1     Existence; Good Standing.  Each Seller and each Acquired Company and its subsidiaries is duly organized, validly existing and in good standing under the applicable Law of the jurisdiction of its incorporation or formation. Each Seller and each Acquired Company is licensed or qualified to do business under the applicable Laws of each jurisdiction in which the character of its properties or the transaction of its business makes such licensure or qualification necessary, except where the failure to be so licensed or qualified would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business. Each Seller and each Acquired Company and its subsidiaries have all requisite corporate or limited liability company power and authority to own, operate and lease their properties and carry on their business as presently conducted.

2.2     Authorization and Binding Obligation.  Each Seller has the power and authority to execute and deliver this Agreement and the Transaction Documents (to which it is a party) and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement, the performance by each Seller of its obligations hereunder and the consummation of the Transactions have been duly and validly authorized by all requisite action on the part of each Seller and each Acquired Company.  Each Seller has obtained all necessary company approvals required in connection therewith, and this Agreement has been, and the other Transaction Documents when executed by such Seller will be, duly executed and delivered by such Seller, and (assuming due authorization, execution and delivery by Buyer) constitute and will constitute the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with their terms, except with respect to the Enforceability Exceptions.

2.3     Ownership of Equity Interests; Subsidiaries.

(a)     (i) Parent is the sole owner of all of the issued and outstanding membership interests of Georgia Television, LLC, a Delaware limited liability company (the "Georgia Television Interests"); (ii) CMG is the sole owner of all of the issued and outstanding membership interests or capital stock as applicable, of (A) Cox Media Group NE, Inc., a Delaware corporation, (B) WSOC Television LLC, a Delaware limited liability company, (C) WFTV, LLC, a Delaware limited liability company, (D) KIRO-TV, Inc., a Delaware corporation, and (E) WPXI, LLC, a Delaware limited liability company (collectively, the "CMG Owned Interests"); (iii) Cox Ohio is the sole owner of all of the issued and outstanding capital stock of Miami Valley Broadcasting Corporation, a Delaware corporation ("MVBC Stock"); and (iv) Cox Radio is the sole owner of all of the issued and outstanding membership interests of Cox Television Jacksonville, LLC, a Delaware limited liability company (the "CMG JAX Interests," and collectively with the CMG Owned Interests, the MVBC Stock and the Georgia Television Interests, the "Equity Interests"), in each case, free and clear of all Liens, other than Permitted Liens.  No Seller has granted or created any options or warrants for the purchase, sale, issuance or granting of any Equity Interests,

8

or issued any securities convertible into, or exercisable for, such Equity Interests or any agreement granting preemptive rights related thereto, and no Seller is a party to any voting trust, proxy or other Contract relating to the voting of any Equity Interests. All Equity Interests are duly authorized and validly issued, fully paid and non-assessable, if applicable, and, in each case, have been issued in material compliance with all applicable Laws.

(b)     Other than the subsidiaries specifically disclosed on Schedule 2.3(b), none of the Acquired Companies has any subsidiaries, and all of the outstanding equity interests in such subsidiaries have been validly issued, are fully paid and non-assessable, if applicable, and are owned by the Acquired Companies as set forth on Schedule 2.3(b), free and clear of all Liens, other than Permitted Liens. Prior to the date hereof, Sellers have made available to Buyer true, correct and complete copies of each of the Organizational Documents of each Acquired Company or in any joint venture Contract or shareholders agreement between Seller or its Affiliates, on the one hand, and any other holder of record of the outstanding equity interests of such Acquired Company, on the other hand.

2.4     No Conflict. With respect to each Seller, the execution and delivery of this Agreement and the Transaction Documents, the consummation of the Transactions and the performance by such Seller of its obligations hereunder or thereunder do not and will not (a) result in a violation or breach of any provision of the Organizational Documents of such Seller or any Acquired Company; (b) subject to the receipt of the Governmental Consents, conflict with, require consent under, or violate any applicable Law or Governmental Order applicable to it; or, (c) except as set forth on Schedule 2.4, conflict with, result in any breach of, terminate any right under, or constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under any Material Agreement or Real Property Lease, except in the case of clauses (b) and (c), as would not (i) prevent or materially delay the consummation of the Transactions or (ii) reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business.

2.5     Governmental Consents and Approvals. The execution and delivery of this Agreement and the Transaction Documents, the consummation of the Transactions and the performance by Sellers of their obligations hereunder and thereunder do not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to, any Governmental Entity, except (a) the Governmental Consents; (b) where failure to obtain such consent, approval or authorization, or to make such filing or notification, would not reasonably be expected to, individually or in the aggregate, (i) prevent or materially delay the consummation of the Transactions or (ii) have a Material Adverse Effect; or (c) as may be necessary as a result of any facts or circumstances solely relating to the identity of Buyer or any of its Affiliates.

2.6     FCC Licenses; MVPD Matters.

(a)     Schedule 2.6(a) sets forth a true and complete list of the FCC Licenses and the holders thereof, which FCC Licenses constitute all of the FCC Licenses of the TV Stations and the Dayton Radio Stations. The FCC Licenses are in full force and effect and have not been revoked, suspended, canceled, rescinded or terminated. There is no pending, or, to the Knowledge of Sellers, threatened action by or before the FCC to revoke, suspend, cancel, rescind or materially adversely modify any of the FCC Licenses (other than in connection with proceedings of general

9

applicability, including any post-Broadcast Incentive Auction repacking). There is no issued or outstanding, by or before the FCC, order to show cause, notice of violation, notice of apparent liability or order of forfeiture against the TV Stations, the Dayton Radio Stations or the holders of the FCC Licenses with respect to the TV Stations or the Dayton Radio Stations that would have a Material Adverse Effect. Except as set forth on Schedule 2.6(a), the FCC Licenses have been issued for the full terms customarily issued by the FCC for each class of TV Station or the Dayton Radio Stations, as applicable, and the FCC Licenses are not subject to any condition except for those conditions appearing on the face of the FCC Licenses and conditions generally applicable to each class of TV Station (including any conditions associated with the post-Broadcast Incentive Auction repacking) or the Dayton Radio Stations, as applicable. The FCC Licenses are the only material FCC authorizations necessary to own and operate the Purchased Assets and to conduct the Business as it is currently being conducted. The TV Stations and the Dayton Radio Stations are operating in compliance in all material respects with the terms of the FCC Licenses and the Communications Laws.

(b)        Schedule 2.6(b)(i) contains, as of the date hereof, a list of all Carriage Agreements with MVPDs that have more than 25,000 subscribers in any of the TV Stations' DMAs. Except as set forth on Schedule 2.6(b)(i), Sellers (or an Acquired Company or subsidiary thereof, as applicable) have not entered into or otherwise become a party to any Carriage Agreement(s) with any MVPD that has reported more than 25,000 subscribers in any of the TV Stations' DMAs. Except as set forth on Schedule 2.6(b)(ii), since January 1, 2018, and solely with respect to MVPD systems in a TV Station's DMA where such MVPD has more than 25,000 subscribers, (1) no such MVPD has provided written notice to any Seller or any of their Affiliates of any material Signal quality issue or, to the Knowledge of the Sellers, sought any form of relief from carriage of a TV Station from the FCC, (2) the Sellers have not received written notice of a petition seeking FCC modification of any DMA in which a TV Station is located, (3) the Sellers, the Acquired Companies and their Affiliates have not received any written notice of the intention of any such MVPD (x) to delete a TV Station or its Signal from carriage on any system, facility or distribution service or (y) cancel or otherwise terminate a Carriage Agreement, and (4) no MVPD has asserted via written notice to the Sellers pursuant to its Carriage Agreement which is an Assumed Carriage Agreement relating to a TV Station, that (x) it has the right to a repayment of or other crediting of amounts paid to Sellers, the Acquired Companies or any of their Affiliates pursuant to such Carriage Agreement, or (y) that the Sellers, Acquired Companies, or any of their Affiliates has materially breached or defaulted pursuant to such Carriage Agreement.

(c)        Schedule 2.6(c) sets forth a list of all Carriage Agreements that contain most favored nation provisions concerning the fees or net effective rate to be paid by the applicable MVPD to Sellers and/or other economic terms applicable to such MVPD (such a most-favored nation provision, an "MFN").

2.7        Taxes.

(a)        Sellers have filed or caused to be filed on a timely basis all income Tax Returns and all other material Tax Returns that were required to be filed (i) with respect to the Acquired Companies, either separately or as a member of the affiliated group of corporations of which each such Acquired Company is a member, and (ii) that relate to the Purchased Assets, and all such Tax Returns are complete and correct in all material respects and prepared in substantial

41462373.9

compliance with all applicable Laws. All Taxes owed by any of the Acquired Companies, or owed by Sellers with respect to the Purchased Assets, have been timely paid (whether or not shown on any Tax Return and whether or not any Tax Return was required). Except as qualified on Schedule 2.17(a), each Acquired Company has adequately provided for, in its respective Financial Reports and books of account and related records, liabilities for all current Taxes not yet due and payable in accordance with GAAP.

(b)     There are no Liens against the Equity Interests or assets of the Acquired Companies or their subsidiaries or against the Purchased Assets in respect of any Taxes, other than Permitted Liens.

(c)     The Acquired Companies have complied in all material respects with respect to (i) the withholding of all amounts required to have been withheld and paid in connection with any amounts paid or owing to any of their employees, agents, contractors, customers and nonresidents, and remitting such amounts to the proper agencies; and (ii) filing all federal, state, local and foreign returns and reports with respect to employee income Tax withholding, social security, unemployment Taxes and premiums.

(d)     There are no audits, examinations, suits, proceedings or investigations currently pending or threatened in writing by any Governmental Entity in respect of any material Taxes relating primarily to the Acquired Companies, the Purchased Assets or the Business.

(e)     No Seller or any Acquired Company is the beneficiary of any extension of time within which to file any material Tax Return (other than automatic extensions) relating primarily to the Acquired Companies or the Purchased Assets.

(f)     No Seller or any Acquired Company has waived any statute of limitations in respect of any material Taxes relating primarily to the Acquired Companies, the Purchased Assets or the Business or agreed to any extension of time with respect to a material Tax assessment or deficiency which extension is currently in effect relating primarily to the Acquired Companies, the Purchased Assets or the Business.

(g)     As of the Closing, there will be no Tax sharing agreements or similar arrangements in effect with respect to or involving any of the Acquired Companies.

(h)     Except as set forth on Schedule 2.7(h), none of the Acquired Companies has been a member of an affiliated group of companies filing a consolidated federal income Tax Return. None of the Acquired Companies has any liability for the Taxes of another Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, by contract, or otherwise.

(i)     None of the Acquired Companies is or has been a party to any "listed transaction" as defined in Section 6707A(c)(2) of the Code and Treasury Regulation Section 1.6011-4(b)(2).

(j)     No written claim has been made in the past three (3) years by any taxing authority in any jurisdiction in which an Acquired Company does not file Tax Returns that such Acquired Company is or may be subject to taxation by that jurisdiction.

11

(k)     Within the past three (3) years, no Acquired Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 of the Code or Section 361 of the Code.

(l)     The U.S. federal income tax classification of each of the Acquired Companies is set forth on Schedule 2.7(l).

(m)     Except as set forth on Schedule 2.7(m), no Acquired Company other than the Acquired Corporations is or has been treated as a corporation for U.S. federal income tax purposes.

(n)     No Acquired Corporation will be required to include in a taxable period ending after the Closing Date taxable income attributable to income that accrued in a taxable period prior to the Closing Date but was not recognized for Tax purposes in such prior taxable period (or to exclude from taxable income in a taxable period ending after the Closing Date any deduction the recognition of which was accelerated from such taxable period to a taxable period prior to the Closing Date) as a result of the installment method of accounting, the completed contract method of accounting, the long-term contract method of accounting, the cash method of accounting, Section 481 of the Code or Section 108(i) of the Code or comparable provisions of state, local, or foreign Tax law, or for any other reason.

(o)     No Acquired Company has been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

(p)     At all times since the 2010 tax year, the Acquired Companies have participated in the Compliance Assurance Process program of the Internal Revenue Service (the "CAP Program") as part of the affiliated group of which Parent is the parent.  Sellers, with respect to the Acquired Companies, the Purchased Assets and the Business, have complied with all requirements of the CAP Program.

2.8     Real Property; Leases.

(a)     Schedule 2.8(a) lists the address of all Owned Real Property.  Prior to the Closing, the Acquired Companies and their subsidiaries and Sellers, taken together, will have good and marketable fee simple title to the Owned Real Property free and clear of all Liens, other than Permitted Liens.  Except as set forth on Schedule 2.8(a), neither the Acquired Companies, Sellers, nor any of their respective Affiliates, is obligated under, nor is a party to, any option, right of first refusal or other contractual right to purchase, acquire, sell, assign or dispose of any of the Owned Real Property or any portion thereof or interest therein.  Except as set forth on Schedule 2.8(a), no Acquired Company, Seller or their respective Affiliates has leased or otherwise granted to any Person the right to use or occupy any of the Owned Real Property or any portion of the income or profits from the sale, operation or development thereof.

(b)     No Acquired Company, nor any subsidiary of an Acquired Company, nor any Seller nor, to the Knowledge of Sellers, any other party to any Real Property Lease has violated any provision of, or committed or failed to perform any act which constitutes a material existing

default under the provisions of any of the Real Property Leases. Schedule 2.8(b) includes a list of (x) all leases for Real Property to which any Acquired Company or its subsidiaries or Seller is a party, but with respect to any leases to which any Seller is a party, only those leases which are used primarily in the operation of the Business ("Real Property Leases") and (y) the premises subject to the Real Property Leases. Each of the Real Property Leases is in full force and effect and is binding upon Sellers, the Acquired Companies or their subsidiaries, as applicable and, to the Knowledge of Sellers, the other parties thereto, subject in each case to the Enforceability Exceptions. Except as set forth on Schedule 2.8(b), the Acquired Companies and their subsidiaries and Sellers, taken together, have a good and valid leasehold interest in the Real Property subject to the Real Property Leases (the "Leased Real Property"), which leasehold interest is free and clear of all Liens other than Permitted Liens. Except as set forth on Schedule 2.8(b), no Acquired Company, subsidiary of an Acquired Company or Seller has subleased, licensed or otherwise granted any Person the right to use or occupy any leased real property which is the subject of any Real Property Lease. Except as set forth on Schedule 2.8(b), the Owned Real Property and Leased Real Property constitute all real property used primarily in the conduct of the Business.

(c)     There is no pending nor, to the Knowledge of Sellers, threatened condemnation, eminent domain, taking or similar proceeding relating to any Owned Real Property or any material portion thereof or interest therein or, to the Knowledge of Sellers, any Leased Real Property, which, in either such case, would reasonably be expected to curtail or interfere with the use of such property for the conduct of the Business.

2.9     Contracts; Validity of Material Agreements.

(a)     Schedule 2.9(a) sets forth a list of the following Contracts, as of the date hereof, (y) to which a Seller or any of its Affiliates is a party and that is used primarily in the Business or (z) to which an Acquired Company or any of its subsidiaries is a party (and provided, that, with respect to those Network Affiliation Agreements and Carriage Agreements, such list is true, correct and complete):

(i)     any programming agreement or sports programming agreement under which it would reasonably be expected that the Acquired Companies, Sellers or the Business would make annual payments of $500,000 or more during any twelve (12) month period or the remaining term of such Contract (a "Material Programming Rights Agreement");

(ii)     any Contract that is a local marketing agreement or time brokerage agreement, joint sales agreement or shared services agreement (a "Sharing Agreement");

(iii)     any material partnership, joint venture, co-investment or other similar Contract;

(iv)     any affiliation agreement with any of the ABC, CBS, FOX, NBC, CW or MyNet national television networks (a "Network Affiliation Agreement");

(v)     any digital multicast channel affiliation agreement (or similar Contract), under which it would reasonably be expected that the Acquired Companies, Sellers or the Business would make annual payments of $500,000 or more during any twelve (12) month period or the remaining term of such contract;

13

(vi)     any Contract for capital expenditures for an amount in excess of $500,000 during any twelve (12) month period or the remaining term of such Contract;

(vii)    any employment agreement or other Contract for personal services that provides for base compensation in excess of $300,000 during any twelve (12) month period or the remaining term of such Contract that provides benefits or payments to any Employee;

(viii)   any Real Property Lease that provides for payments in an amount in excess of $100,000 during any twelve (12) month period or the remaining term of such Contract;

(ix)     any Carriage Agreement with any MVPD that has more than 25,000 subscribers in any Station's DMA;

(x)      any Carriage Agreement that contains an MFN provision;

(xi)     any Contract relating to the acquisition or disposition of any business (whether by merger, sale of equity interests or stock, sale of assets or otherwise) having a transaction value in excess of $1,000,000 under which there are any remaining indemnification obligations or other unperformed obligations which would result in any material liability to Buyer following the Closing;

(xii)    any Contract (other than any Contract of the type described in clauses (i) through (viii) above) that is not terminable by the Acquired Companies or Sellers, as applicable, without penalty on ninety (90) days' notice or less, which is reasonably expected to involve the payment by the Acquired Companies or their subsidiaries or Sellers, as applicable, after the date hereof of more than $1,000,000 during any twelve (12) month period or the remaining term of such Contract;

(xiii)   any Contract evidencing Indebtedness, or under which any Acquired Company has issued any note, bond, indenture, mortgage (other than Permitted Liens), security interest (other than Permitted Liens) or other evidence of Indebtedness, or has directly or indirectly guaranteed Indebtedness of any Person, in each case for Indebtedness in excess of $1,000,000, or under which any material asset of the Business is subject to a Lien (other than Permitted Liens); and

(xiv)    any Contract between any Acquired Company or any of their respective subsidiaries, on the one hand, and any current or former executive officer, director, equityholder, or Affiliate of the Sellers or any Related Party of any of the foregoing Persons, on the other hand, under which it would reasonably be expected that the Acquired Companies, Sellers or the Business would make annual payments of $100,000 or more during any twelve (12) month period or the remaining term of such contract.

The Contracts of the type described in this Section 2.9(a), whether or not so listed on Schedule 2.9(a) are collectively with the Real Property Leases referred to herein as the "Material Agreements."

(b)     Except as set forth on Schedule 2.9(b) or would not reasonably expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business,

14

each of the Material Agreements is in full force and effect and is binding upon Sellers, the Acquired Companies or their subsidiaries, as applicable and, to the Knowledge of Sellers, the other parties thereto, subject in each case to the Enforceability Exceptions. Except would not reasonably expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business taken as a whole, Sellers, the Acquired Companies and their subsidiaries have performed their obligations under each of the Material Agreements in all respects and are not in breach of or default (and there has been no event which, with the giving of notice or lapse of time or both, would become a default to give rise to right of termination) thereunder, and to the Knowledge of Sellers, no other party to any of the Material Agreement is in breach or default thereunder. There are no disputes pending or, to the Knowledge of Sellers, threatened with respect to any Material Agreement, and no Seller, Acquired Company or their subsidiaries has received any written notice of the intention of any other party to a Material Agreement to terminate for default, convenience or otherwise any Material Agreement, in each case except as would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business taken as a whole. Copies of each of the Material Agreements have heretofore been made available to Buyer by Sellers.

2.10    Environmental. Except as set forth on Schedule 2.10:

(a)    As of the date of this Agreement and for the past three (3) years, each Acquired Company, each of their subsidiaries and each Seller, in respect of the Purchased Assets and the Business, is, and at all times during such three (3) year period has been, in compliance with all Environmental Laws, except where the failure to comply would not, individually or in the aggregate, have a Material Adverse Effect;

(b)    Each Acquired Company, each of their subsidiaries and each Seller, in respect of the Purchased Assets and the Business, has obtained, and, to the extent applicable, has filed timely application to renew, all Permits required under Environmental Law necessary for its operation, except for such Permits as to which the failure to so own, hold, possess or renew would not, individually or in the aggregate, have a Material Adverse Effect. Each Acquired Company, each of their subsidiaries and each Seller, in respect of the Purchased Assets and the Business, is and at all times has been, in compliance with all terms and conditions of such Permits except where the failure to comply would not, individually or in the aggregate, have a Material Adverse Effect. Each of such Permits is valid, subsisting and in full force and effect and has not been revoked, suspended, cancelled, rescinded or terminated, other than those that the revocation, suspension, cancellation or rescission or termination of which, individually or in the aggregate, would not have a Material Adverse Effect;

(c)    As of the date of this Agreement, each Acquired Company and their subsidiaries are, and each Seller, in respect of the Purchased Assets and the Business is, not the subject of any pending or, to the Knowledge of Sellers, threatened Action alleging any failure of any Acquired Company, any of their subsidiaries, any Seller or the Purchased Assets or the Business to comply with, or Liability of any Acquired Company, any of their subsidiaries, any Seller or the Business under, any Environmental Law, except as would not, individually or in the aggregate, have a Material Adverse Effect. There is no judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator arising under or relating to Environmental Law outstanding against any Acquired Company, any of their subsidiaries, or any Seller, in respect of

41462373.9

the Purchased Assets and the Business, which would reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business;

(d)     Except as set forth on Schedule 2.10(d), to the Knowledge of Sellers, there are no underground storage tanks, PCB-containing equipment, or asbestos-containing materials at any of the Owned Real Property or Leased Real Property;

(e)     To the Sellers' Knowledge, there has been no Release or threatened Release at, on, under or from, and no Hazardous Material is present at, on or under, any Owned Real Property or any Leased Real Property, or any other property currently or formerly owned, leased or operated by any Acquired Company, any of their subsidiaries, or any Seller, in respect of the Purchased Assets or the Business, or any other location, except as would not reasonably be expected to have a Material Adverse Effect; and

(f)     Sellers have provided to the Buyer all written environmental audits, assessments, investigations and studies relating to the Purchased Assets, the Business, any Acquired Company, any of their subsidiaries, or any of their current or former businesses, properties or assets, that are in the possession of any Seller, any Acquired Company, or any of their subsidiaries or any of their respective representatives.

2.11    Intellectual Property.

(a)     Schedule 2.11(a) contains a list of (i) the material Business Intellectual Property that is registered, issued or subject to an application for registration or issuance and (ii) all material unregistered Business Intellectual Property. The Business Intellectual Property required to be described on Schedule 2.11(a) is subsisting, valid, enforceable (subject to the Enforceability Exceptions) and in full force and effect.

(b)     Except as set forth on Schedule 2.11(b), (i) the operation of the Business does not infringe, misappropriate or otherwise conflict with any other Person's Intellectual Property; (ii) to the Knowledge of the Sellers, none of the Business Intellectual Property is being infringed, misappropriated or otherwise conflicted with by any other Person; (iii) no Business Intellectual Property is the subject of any pending or, to the Knowledge of the Sellers, threatened Action claiming infringement, misappropriation, violation of or other conflict with, any other Person's Intellectual Property by any Acquired Company, any of their subsidiaries or any Seller; and (iv) in the past three (3) years, none of Sellers, the Acquired Companies or their subsidiaries have received any written Claim or notice asserting that the operation of the Business materially infringes, misappropriates, violates or otherwise conflicts with the Intellectual Property of any other Person or challenging the ownership, use, validity or enforceability of any Business Intellectual Property, and there is no reasonable basis for any of the foregoing. The Acquired Companies or their subsidiaries or Sellers, as applicable, (A) are the owners of the Business Intellectual Property, free and clear of all Liens other than Permitted Liens, and (B) with respect to all other Intellectual Property used or held for use in the operation of the Business, as it is currently conducted, have the valid and enforceable right to use all of such Intellectual Property. The Acquired Companies and their subsidiaries and Sellers, as applicable, take all reasonable measures to maintain the Business Intellectual Property, and the Business Intellectual Property is

16

not subject to any outstanding consent, settlement, decree order, injunction, judgment or ruling restricting the use or ownership thereof.

(c)     All Business IT is in operating condition and in a good state of maintenance and repair (ordinary wear and tear excepted) and is adequate and suitable for the purposes for which such Business IT is presently being used or held for use. There have been no breakdowns, continued substandard performance or other adverse events affecting the Business IT in the past three (3) years that have caused a material disruption or interruption outside of the ordinary course in the operation of the Business.  To the Knowledge of Sellers, none of the Business IT contains any unauthorized "back door", "drop dead device", "time bomb", "Trojan horse", "virus" or "worm" (as such terms are commonly understood in the software industry) or any other unauthorized code intended to disrupt, disable, harm or otherwise impede the operation of, or provide unauthorized access to, a computer system or network or other device on which such code is stored or installed.

(d)     No material Business IT contains or requires use of any "open source" code, shareware or other Software that is made generally available to the public without requiring payment of fees or royalties or that does or may require disclosure or licensing of any such Software or any other Business Intellectual Property.  None of the material Business IT is covered by or subject to the requirements of any version of the GNU General Public License (the "GPL") or the GNU Affero General Public License (the "Affero GPL"), and no rights under the Business Intellectual Property are obligated to be (x) waived as to or (y) licensed to any Person as a result of any Acquired Company's or Seller's use of "open source" code in the Business IT.

(e)     The Acquired Companies', each of their subsidiaries' and each Sellers' access, receipt, collection, monitoring, maintenance, creation, transmission, use, analysis, disclosure, storage, disposal, privacy, protection and security of Protected Information related to the Business has complied in the past three (3) years, and complies, in all material respects, with, (i) any Material Agreement to which such entity is a Party, (ii) applicable Information Privacy and Security Laws, (iii) to the extent applicable, PCI DSS, and (iv) applicable policies and procedures adopted by the Acquired Companies, any of their subsidiaries or any Seller.  The Acquired Companies, each of their subsidiaries and each Seller has, in all material respects, if applicable, all lawful bases, rights and consents that are required under any Information Privacy or Security Law to receive, access, use and disclose the Protected Information in such entity's possession or under its control in connection with the operation of the business of such entity and the Business.

(f)     The Acquired Companies, each of their subsidiaries and each Seller has posted, privacy policies governing its use of Protected Information on its websites and, with respect to the Business, each such entity is in compliance in all material respects with applicable privacy policies.

(g)     The Acquired Companies, each of their subsidiaries and each Seller, in respect of the Purchased Assets and the Business, has implemented and maintains an information security program that: (i) complies in all material respects with all Information Privacy and Security Laws and prevailing industry standards; (ii) is reasonably designed to identify internal and external risks to the security of any proprietary or confidential information in its possession, including Protected Information and the rights and freedoms of the subjects of that Protected

17

Information; (iii) is reasonably designed to monitor and protect Protected Information and all IT Systems against any unauthorized use, access, interruption, modification or corruption; (iv) implements, monitors, and maintains administrative, organizational, technical, and physical safeguards consistent with general industry standards that are reasonably designed to control the risks described above in (ii) and (iii); (v) is described in written data security policies and procedures; (vi) assesses the Acquired Companies', each of their subsidiaries' and each Sellers' data security practices, programs and risks; and (vii) maintains an incident response and notification procedures in compliance with applicable Information Privacy and Security Laws, including in the case of any breach of security compromising Protected Information. The Acquired Companies, each of their subsidiaries and each Seller, in respect of the Purchased Assets and the Business, is in compliance in all material respects with such information security program. The Acquired Companies, each of their subsidiaries and each Seller, in respect of the Purchased Assets and the Business, takes and has at all times taken commercially reasonable steps to require that any Protected Information collected or handled by authorized third parties acting on behalf of such entity provides similar safeguards, in each case, in compliance with applicable Privacy and Data Security Law and consistent with general industry standards.

(h)     In the past three (3) years, there has been no data security breach of any IT Systems, or unauthorized acquisition, access, use or disclosure of any Protected Information, owned, transmitted, used, stored, received, or controlled by or on behalf of the Acquired Companies, each of their subsidiaries or any Seller, in respect of the Purchased Assets and the Business.

(i)     The (i) collection, storage, processing, transfer, sharing and destruction of Protected Information in connection with the transactions contemplated hereby, and (ii) execution, delivery and performance of this Agreement and the transactions contemplated hereby complies, in all material respects, with each of the Acquired Companies', each of their subsidiaries' and each Sellers' applicable privacy notices and policies and with all applicable Information Privacy and Security Laws. As of the Closing, the Acquired Companies and each of their subsidiaries, solely in respect of the Purchased Assets and the Business, shall have in all material respects least the same rights to use, process and disclose Protected Information as the applicable entity had immediately before Closing.

2.12    Employees; Labor Matters; Employee Matters.

(a)     Sellers have made available to Buyer a list of all Employees, including their (i) name; (ii) employer; (iii) location of employment; (iv) title or position (including whether full-time or part-time or per diem); (v) hire or retention date; (vi) current annual base compensation, hourly rate or contract fee; (vii) commission, bonus or other incentive-based compensation targeted for 2018 and 2019; (viii) exempt or non-exempt status of the employees of Sellers or any of their respective subsidiaries under the Fair Labor Standards Act; (ix) union-represented status and name of any applicable collective bargaining agreement; (x) employment status (*i.e.*, active, disabled or on authorized leave and the reason therefor); (xi) accrued but unused vacation and sick leave; (xii) service credited for purposes of vesting and eligibility to participate in the Employee Plans; and (xiii) whether covered by a collective bargaining agreement and whether full time, part time or per diem. Such list, redacted to delete the information set forth in clauses (vi)-(xii), is attached as Schedule 2.12(a). Except with respect to those employees of a Seller or its Affiliates

whose principal work location is at CMG's corporate headquarters in Atlanta, Georgia or in Cox's Washington News Bureau, no individuals, other than the Employees set forth on Schedule 2.12(a) are necessary to operate the Business.

(b)     Except as set forth on Schedule 2.12(b) or that would not reasonably be expected to result in a material liability, (i) none of the Acquired Companies or their subsidiaries or Sellers in respect of the TV Stations, the Dayton Radio Stations or the Dayton Newspapers is subject to or bound by any labor agreement or collective bargaining agreement, and (ii) to the Knowledge of Sellers, there is no activity involving any Employee seeking to certify a collective bargaining unit or engaging in any other organizational activity. Sellers have made available to Buyer true, correct and complete copies of each collective bargaining agreement to which any of the Acquired Companies or their subsidiaries or Sellers are party.

(c)     Except as set forth on Schedule 2.12(c), as of the date of this Agreement (i) none of the Acquired Companies nor their subsidiaries nor Sellers in respect of the Employees is engaged in any unfair labor practice that would reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business; (ii) there are no labor strikes, material labor disputes, concerted work stoppages or lockouts pending or, to the Knowledge of Sellers, threatened with respect to any of the Acquired Companies, their subsidiaries or any of Employees of Sellers; (iii) there are no grievances, complaints or other legal proceedings pending, or to the Knowledge of Sellers, threatened, against any Seller or any Acquired Company or its subsidiaries in connection with the employment of their respective Employees, except that would not reasonably be expected to result in a material liability; and (iv) each Seller and each Acquired Company and its subsidiaries are in compliance with all applicable labor and employment laws in connection with the employment of their respective Employees including relating to equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, pay equity, accessibility, immigration, wages, hours, overtime compensation, employment or labor standards, employee classification, child labor, hiring and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, unemployment insurance or any other employment related matter arising under applicable laws, except for any failure to comply that would not reasonably be expected to result in a material liability. Except as would not have a Material Adverse Effect, all current or former employees, officers, directors, consultants or independent contractors of the Business have been properly classified under applicable Law (A) as employees or individual independent contractors and (B) for employees, as an "exempt" employee or a "non-exempt" employee (within the meaning of the Fair Labor Standards Act and state Law).

(d)     Except as set forth on Schedule 2.12(d), there are no Actions against the Sellers pending, or to the Knowledge of Sellers, threatened to be brought or filed, by or with any Governmental Entity or arbitrator in connection with the employment of any current or former employee, consultant or independent contractor of the Business.

(e)     Any outsourced or temporary labor Contracts between the Sellers and other third parties or individuals as relates to the Business comply in all material respects with applicable laws.

(f)     The Sellers have complied with the Worker Adjustment Retraining and Notification Act of 1988 (the "WARN Act") and any similar applicable mass or group termination requirements under applicable Law relating to employment and labor standards.  In the 90 days preceding the Closing, no employee of any Seller has suffered an "employment loss" with the Seller, as such term is defined in the WARN Act.  The Seller shall be responsible for any WARN Act notification and liability arising out of terminations of employees up to and including the Effective Time. The Parties will cooperate with each other to ensure that each has the information necessary to assess their obligations with respect to notification obligations, including assessment of all lookback periods contemplated by the WARN Act and any mass or group termination requirements under applicable law relating to employment and labor standards.

(g)     Except as listed in Schedule 2.12(g), no current or former employees of the Business is in receipt of workers' compensation benefits, there are no outstanding penalties pursuant to worker's compensation statutes, or charges regarding the same.

(h)     Within the three (3) years prior to the date hereof, there have not been any sexual harassment claims (x) raised internally that were not responded to in an appropriate manner or (y) filed with the EEOC and/or state administrative agency against the Business.  All reported allegations of sexual harassment or sexual misconduct against any then current director, manager, employee or officer of the Business have been investigated and appropriately addressed.

2.13     Employee Benefit Plans.

(a)     Schedule 2.13(a)(i) contains a correct and complete list identifying each material Employee Plan which is not maintained by any Acquired Company or its subsidiaries, and except as set forth on Schedule 2.13(a)(ii), none of Sellers or any Acquired Company or its subsidiaries sponsors any Employee Plan.  Except as provided for explicitly in Schedule 5.5 of this Agreement, Sellers and their Affiliates shall retain (and shall retain all assets and liabilities related to) the Employee Plans which are not maintained by an Acquired Company.

(b)     Each Employee Plan which is maintained by an Acquired Company or its subsidiaries is in compliance in all material respects with all applicable requirements of ERISA, the Code and other applicable Laws and has been funded, administered and operated materially in accordance with their terms.  Each Employee Plan that is intended to be qualified within the meaning of Section 401(a) of the Code has received a favorable determination letter as to its qualification, and nothing has occurred that could reasonably be expected to adversely affect such qualification. With respect to each Employee Plan which is maintained by an Acquired Company or its subsidiaries, (i) all contributions required to be made by applicable Law or by any plan document or other contractual undertaking, and all premiums due or payable with respect to insurance policies funding any Employee Plan, for any period in the prior three (3) years through the date hereof, have been timely made and (ii) other than routine claims for benefits, there are no pending or, to the Knowledge of Sellers, threatened proceedings by or on behalf of any participant in any Employee Plan, or otherwise involving any Employee Plan or the assets of any Employee Plan.

(c)     Except as set forth in Schedule 2.13(c) or which would not result in any liability to the Purchased Assets or the Business, no Employee Plan provides post-employment or

post-termination life, health or welfare benefits for any current or former employees or other service providers (or any dependent thereof) of the Business, other than as required under Section 4980B of the Code or other applicable Law for which the covered Person pays the full cost of coverage.

(d)     Except as set forth in Schedule 2.13(d) or which would not result in any liability to the Purchased Assets or the Business (either directly or indirectly), neither the Seller nor any of its ERISA Affiliates maintains, contributes to, or sponsors (or has in the past six (6) years maintained, contributed to, or sponsored) a multiemployer plan as defined in Section 3(37) or Section 4001(a)(3) of ERISA (a "Multiemployer Plan") or any plan subject to Title IV of ERISA.  Except as would not result in any liability to the Purchased Assets or the Business, no liability under Title IV of ERISA has been incurred by the Sellers or any ERISA Affiliate thereof that has not been satisfied in full, and no condition exists that presents a risk to the Buyer or any ERISA Affiliate thereof of incurring or being subject (whether primarily, jointly or secondarily) to a liability (whether actual or contingent) thereunder.

(e)     Except as set forth in Schedule 2.13(e), the consummation of the transactions contemplated hereby will not, either alone or in combination with another event, (i)  result in any payment becoming due, accelerate the time of payment or vesting, or increase the amount of compensation (including severance) due to any current or former director, officer, individual consultant or employee of the Business that would result in any liability to the Purchased Assets or the Business, (ii) result in any forgiveness of indebtedness with respect to any current or former employee, director or officer, or individual consultant of the Business, trigger any funding obligation under any Employee Plan maintained by any Acquired Company or impose any restrictions or limitations on the ability to administer, amend or terminate any Employee Plan maintained by an Acquired Company or (iii) result in the acceleration or receipt of any payment or benefit (whether in cash or property or the vesting of property) by Sellers or any of their subsidiaries to any "disqualified individual" (as such term is defined in Treasury Regulations Section 1.280G-1) that would reasonably be expected, individually or in combination with any other such payment, to constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).  Neither the Sellers nor any Acquired Company has any obligation to provide any gross-up payment to any individual with respect to any income Tax, additional Tax, excise Tax or interest charge imposed pursuant to Section 409A or Section 4999 of the Code.

(f)     With respect to each material Employee Plan maintained by an Acquired Company, to the extent applicable, current, true, correct and complete copies of the following have been delivered or made available to Buyer: (i) all plan documents (including all written amendments thereto) (which, for the avoidance of doubt, with respect to any material Employee Plan for which a form agreement is used, shall consist of a copy of such form and a summary of any material deviations); (ii) the most recent audited financial statements and actuarial or other valuation reports; (iii) the most recent annual report on Form 5500 required to be filed with the Internal Revenue Service; (iv) the most recent determination, opinion or advisory letter from the IRS for any Employee Plan that is intended to qualify under Section 401(a) of the Code; (v) the most recent summary plan description; and (vi) any related trust agreement or other funding instrument.

(g)     Neither the Sellers nor any of their respective ERISA Affiliates, (i) has incurred or triggered either a complete or partial withdrawal (as defined in Section 4203 or Section 4205 of ERISA) from any Multiemployer Plan or (ii) has any knowledge as of the date hereof of any facts that would give rise to a partial withdrawal from any such plan by any such entity.

2.14     Insurance.     Schedule 2.14(a) contains a true and complete list of all insurance policies currently in effect as of the date hereof, and all historic occurrence-based insurance policies, that insure the business, operations or Employees of the Acquired Companies or their subsidiaries or affect or relate primarily to the ownership, use or operation of any of the Purchased Assets or the Business (collectively, the "Insurance Policies"). Except as would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business, (x) all such Insurance Policies are in full force and effect and are valid and enforceable, (y) all premiums due thereunder have been paid to the extent due, and since the Balance Sheet Date, neither the Sellers nor any of their respective Affiliates has received notice of cancellation, non-renewal, reduction in coverage or termination of any material Insurance Policy other than in connection with normal renewals of any such Insurance Policy. As of the date of this Agreement, except as set forth on Schedule 2.14(b), there are no material outstanding claims related to the Purchased Assets or the Business under any such Insurance Policy or material default with respect to the provisions in any such Insurance Policy. There are no claims pending under any Insurance Policy that have been denied, rejected, questioned or disputed by any insurer or as to which any insurer has made any reservation of rights or refused to cover all or any portion of such claims. Sellers and their subsidiaries have not failed to give any notice or present any claims under any applicable Insurance Policy in a due and timely fashion.

2.15     Permits.     As of the date of this Agreement, the Acquired Companies and their subsidiaries and Sellers, taken together, hold or possess all registrations, licenses, permits, approvals and regulatory authorizations from a Governmental Entity that are reasonably necessary to entitle them to operate the Business as operated immediately prior to the date of this Agreement (herein collectively called, "Permits"), except for such Permits as to which the failure to so own, hold or possess would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business.  The Acquired Companies and their subsidiaries and Sellers, taken together, have fulfilled and performed their respective obligations under each of the Permits, except for noncompliance that would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business.  Each of the Permits is valid, subsisting and in full force and effect and has not been revoked, suspended, cancelled, rescinded or terminated, other than those that the revocation, suspension, cancellation or rescission or termination of which would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business.

2.16     Litigation.     Except as set forth on Schedule 2.16, there is no legal or administrative claim, suit, action, complaint, charge, grievance or arbitration (each, an "Action") currently pending, or, to the Knowledge of Sellers, threatened against the Acquired Companies or their subsidiaries or Sellers in respect of the Purchased Assets or the Business, except as would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business. None of the Acquired Companies or the Sellers is subject to any outstanding Governmental Order which would reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business.

41462373.9

2.17    Financial Reports.

(a)    Schedule 2.17(a) contains unaudited balance sheets of the Acquired Business as of December 31, 2017 and December 31, 2016, respectively, and the related statements of income for the years then ended (collectively, the "Financial Reports"). Except as set forth on Schedule 2.17(a), the Financial Reports (i) were prepared in accordance with GAAP in all material respects applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and (ii) present fairly, in all material respects, the financial position and results of the operation of the Acquired Business as of their respective dates and for the respective periods covered thereby, subject to the absence of notes thereto none of which, if presented, would materially differ from those required by GAAP and normal year-end adjustments, which are not material, individually or in the aggregate.

(b)    Schedule 2.17(b) contains an unaudited trial balance of the Acquired Business as of December 31, 2018 (the "Balance Sheet Date") which includes unadjusted management reports of the balance sheet and the related statement of income for the year then ended (collectively, the "Management Report"). The Management Report is taken from the financial statements of Parent, which were prepared in accordance with GAAP in all material respects applied on a consistent basis throughout the period involved. The Management Report represents Sellers' good faith determination of the assets and liabilities of the Business as of the Balance Sheet Date and the revenues, costs and expenses of conducting the Business for the period covered thereby, except as qualified by Schedule 2.17(b).

(c)    Sellers maintain proper and adequate internal accounting controls which provide reasonable assurance that transactions are: (A) executed with management's authorization and (B) recorded as necessary to permit preparation of the financial statements and to maintain accountability for the assets of the Acquired Business.

2.18    Absence of Changes. (a) Since the Balance Sheet Date and through the date hereof, there have not been any events, changes or occurrences or states of facts that, individually or in the aggregate, have had a Material Adverse Effect, and (b) (i) except as set forth on Schedule 2.18, since the Balance Sheet Date, the Business has been operated in all material respects in the ordinary course of business consistent with past practice and (ii) Sellers and their respective Affiliates have not taken any action that would require the consent of Buyer pursuant to Section 4.2 if taken after the date hereof.

2.19    Compliance with Laws. Except for violations that would not reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets or the Business, (a) none of the Sellers or the Acquired Companies is, or in the past three (3) years has been, in violation of any Law or Governmental Order applicable to the Business and (b) to the Knowledge of Sellers, none of the Sellers, in respect of the Business, or the Acquired Companies is, or in the past three (3) years has been, under investigation by any Governmental Entity with respect to any violation of any applicable Law or Governmental Order.

2.20    Corruption; Sanctions. None of the Acquired Companies, their subsidiaries, nor any of their respective officers, directors, or agents, nor any of the Employees:

(a) has, directly or indirectly, made, offered, promised or authorized any payment or gift of any money or anything of value to or for the benefit of any Person for the purpose of (i) influencing any official act or decision of a government official, political party, or candidate for political office, (ii) inducing such official, party or candidate to use his, her or its influence to affect any act or decision of a Governmental Entity, or (iii) securing any improper advantage, in any such case in violation of any applicable Anti-Corruption Laws;

(b) is nor in the past three (3) years has been a Sanctioned Person;

(c) has in the past three (3) years transacted any business directly or knowingly indirectly with any Sanctioned Person or otherwise violated applicable Sanctions;

(d) has violated in the past three (3) years any applicable Ex-Im Laws; nor

(e) is nor has been in the past three (3) years the subject of any allegation, inquiry, voluntary disclosure, investigation, prosecution or actual or threatened enforcement action related to any alleged violation of any of the Anti-Corruption Laws, Sanctions, or Ex-Im Laws.

2.21    No Undisclosed Liabilities.  Except as set forth on Schedule 2.21, neither any Acquired Company or its subsidiaries, nor any Seller with respect to the Business or the Purchased Assets, is subject to any Liability (including unasserted claims, whether known or unknown), whether absolute, contingent, accrued or otherwise, which would be required to be reflected on or reserved against a balance sheet prepared in accordance with GAAP, or with respect to the Balance Sheet Date, in Sellers' good faith determination (as qualified by Schedules 2.17(a) and 2.17(b), and except for liabilities which are (a) specifically reflected and adequately reserved for on the balance sheet as of the Balance Sheet Date, (b) incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation), (c) to be performed in the ordinary course of business pursuant to the Material Agreements, or (d) which, individually or in the aggregate, would not be materially adverse to the Purchased Assets or the Business.

2.22    Assets; Sufficiency.

(a) (i) The Acquired Companies and their subsidiaries, taken together, have good and valid title to, a valid leasehold interest in, or, assuming receipt of the Approvals set forth on Schedule 2.4, the right to transfer (or cause to be transferred) the Acquired Company Assets free and clear of all Liens, other than Permitted Liens; and (ii) Sellers have good and valid title to, a valid leasehold interest in, or, assuming receipt of the Approvals set forth on Schedule 2.4, the right to transfer (or cause to be transferred) the Purchased Assets free and clear of all Liens, other than Permitted Liens, in each case under clauses (i) and (ii), in accordance with the terms of this Agreement and the transactions contemplated hereby.

(b) Except for the Excluded Assets and as set forth on Schedule 2.22(b), the Acquired Company Assets and the Purchased Assets constitute, and at the Closing, will constitute, all of the assets and properties (including FCC Licenses), whether tangible or intangible, whether personal, real or mixed, wherever located, that are used in the Business and that are necessary to

24

conduct the Business in substantially the form and manner in which it is conducted on the date hereof and immediately prior to the Closing.

2.23 <u>No Brokers</u>.  Neither Sellers nor the Acquired Companies are obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the Transactions or in connection with the other transactions contemplated hereby for which Buyer may become liable or which is otherwise included as an Assumed Liability.

2.24 <u>Affiliate Transactions</u>.  Except for those Contracts identified on <u>Schedule 2.24</u> that are in existence as of the date of this Agreement between any Acquired Company or any of their respective subsidiaries, on the one hand, and any current or former executive officer, director, equityholder, or Affiliate of the Sellers or any Related Party of any of the foregoing Persons, on the other hand, there are no Contracts under which any Person (other than Sellers or their Affiliates) owns or has any interest in any Purchased Asset or the Business, or is the beneficiary thereof.

ARTICLE 3
<u>BUYER REPRESENTATIONS AND WARRANTIES</u>

Buyer hereby represents and warrants to Sellers:

3.1 <u>Organization</u>.  Buyer is duly organized, validly existing and in good standing under the applicable Law of the jurisdiction of its organization.  Buyer has the requisite power and authority to execute and deliver this Agreement and perform its obligations hereunder.

3.2 <u>Authorization</u>.  The execution and delivery of this Agreement and the performance by Buyer of its obligations hereunder and the consummation of the Transactions by Buyer have been duly authorized and approved by all necessary action of Buyer and its directors, officers and stockholders and do not require any further authorization or consent of Buyer or its directors, officers or stockholders.  This Agreement is, and the other Transaction Documents when executed and delivered by Buyer (assuming due authorization, execution and delivery by Sellers) will be, a legal, valid and binding agreement of Buyer enforceable in accordance with its terms, except in each case as such enforceability may be limited by the Enforceability Exceptions.

3.3 <u>No Conflicts</u>.  The execution and delivery of this Agreement and the performance by Buyer of its obligations hereunder does not and will not (a) result in a violation or breach in any material respect of any provision of the Organizational Documents of Buyer; (b) subject to the receipt of the Governmental Consents, conflict with or violate any applicable Law or Governmental Order; or (c) conflict with or result in any material breach or default of any material contract or agreement to which Buyer is a party, except, in the case of clause (c), for any such items that would not prevent or materially delay the ability of Buyer to consummate the Transactions and the other transactions contemplated hereby (a "<u>Buyer Material Adverse Effect</u>").

3.4 <u>Litigation</u>.  There is no Action pending or, to the Knowledge of Buyer, threatened against Buyer which would reasonably be expected to have a Buyer Material Adverse Effect.

41462373.9

3.5    Qualification.  Buyer is legally, financially and otherwise qualified to be the licensee of, acquire, own and operate each of the TV Stations, the Dayton Radio Stations and the Dayton Newspapers under the Communications Laws, including but not limited to the provisions relating to media ownership and attribution and character qualifications.  Buyer is in compliance with Section 310(b) of the Communications Laws and the FCC's rules governing alien ownership.  There are no facts or circumstances that would, under the Communications Laws and the existing procedures of the FCC or any other applicable Law, disqualify Buyer as a holder of any of the FCC Licenses held by the Acquired Companies or Sellers with respect to the Business, as applicable, or as the owner and operator of the TV Stations or the Dayton Radio Stations.  No waiver of, exemption from, or declaratory ruling under 47 U.S.C. § 310(b)(4) regarding any provision of the Communications Laws of the FCC, whether temporary or permanent, is necessary for the FCC Consent to be obtained, including but not limited to a showing pursuant to 47 C.F.R. § 73.3555(b).  Buyer is not a "foreign person" within the meaning of 31 C.F.R. § 800.216.  There are no facts or circumstances that might reasonably be expected to (a) result in the FCC's refusal to grant the FCC Consent or otherwise disqualify Buyer, (b) materially delay obtaining the FCC Consent or (c) cause the FCC to impose a material condition or conditions on its granting of the FCC Consent or to designate the FCC Application for a hearing.

3.6    Financing.

(a)    As of the date of this Agreement, Buyer has delivered to Sellers true and complete copies of (i) the Equity Commitment Letter, among Buyer and the other party thereto (the "Equity Financing Source"), pursuant to which the Equity Financing Source has committed, subject to the terms and conditions thereof, to invest in Buyer, directly or indirectly, the amounts set forth therein on the date on which the Closing should occur pursuant to Section 1.3 (the "Equity Financing"), and (ii) the executed commitment letter (together with the term sheet and any other annexes, exhibits, schedules and other attachments thereto), dated as of the date hereof (the "Debt Commitment Letter" and, together with the Equity Commitment Letter, the "Commitment Letters") among Buyer and the lenders party thereto (the "Lenders" and, together with the Equity Financing Source, the "Financing Sources"), pursuant to which the Lenders have committed, subject to the terms and conditions thereof, to lend the amounts set forth therein for purposes of funding a portion of the Transactions on the date on which the Closing should occur pursuant to Section 1.3 (the "Debt Financing" and, together with the Equity Financing, the "Financing").  As of the date of this Agreement, Buyer has also delivered to Sellers true and complete copies of any and all fee letter(s) (with only the fee amounts, "flex" terms and other terms redacted in a customary manner so long as no redaction covers terms that would reduce the amount of the Debt Financing below the amount required to satisfy the Financing Uses (after taking into account the amount of the Equity Financing and available cash of the Acquired Companies and their respective subsidiaries) or adversely affect the conditionality, enforceability availability or termination of the Debt Financing) relating to the Debt Commitment Letter (any such fee letter, a "Fee Letter"). As of the date hereof, there are no side letters or Contracts to which Buyer is a party relating to the funding or investing, as applicable, of the Financing other than as expressly set forth in the Commitment Letters or Fee Letter.

(b)    Assuming the Financing is funded in accordance with the Commitment Letters, the aggregate net proceeds from the Financing when funded in accordance with the Commitment Letters are sufficient to fund all of the amounts required to be provided by Buyer

26

under this Agreement for the consummation of the Financing and the Transactions (collectively, the "<u>Financing Uses</u>").

(c)     As of the date hereof, (A) the Commitment Letters and Fee Letter are in full force and effect without amendment, modification, breach or default; (B) no amendment or modification of the Commitment Letter or Fee Letter is contemplated (other than amendments or modifications to add lenders, lead arrangers, bookrunners, syndication agents or any person with similar roles or titles); (C) no event has occurred which, with or without notice, lapse of time or both, would reasonably be expected to constitute a default or breach on the part of the Buyer or, to the Knowledge of Buyer, any other party thereto under any Commitment Letter; (D) the Commitment Letters and Fee Letter are the valid, binding and enforceable obligations of Buyer and, to the Knowledge of Buyer, each other party thereto, subject to the Enforceability Exceptions; and (E) the Commitment Letters and Fee Letter have not been withdrawn or rescinded in any respect. As of the date hereof, the Buyer is not aware of any fact, event or other condition that makes any of the representations or warranties of the Buyer in any of the Commitment Letters or Fee Letter inaccurate in any material respect. The Buyer has fully paid any and all commitment fees or other fees required by the terms of the Commitment Letters or Fee Letter to be paid on or before the date of this Agreement and will continue to pay in full all such amounts required to be paid pursuant to the terms of the Commitment Letters and Fee Letters as and when they become due and payable on or prior to the Closing Date. Except as set forth in the Commitment Letters, there are no other conditions to the consummation of the Financing, and, as of the date hereof, Buyer has no reason to believe that (x) any condition to the Commitment Letters or Fee Letter will not be satisfied or waived prior to the Closing Date or (y) the Financing will not be consummated on or prior to the Closing Date. Buyer acknowledges and agrees that neither the obtaining of the Financing or any alternative financing is a condition to the Closing or any of its other obligations under this Agreement, and reaffirms its obligation to consummate the Transactions and its other obligations under this Agreement irrespective and independently of the availability of the Financing or any alternative financing, subject to the applicable conditions set forth in Article 7 and the provisions of <u>Section 10.4</u>.

3.7     <u>Solvency</u>.  Assuming (a) the satisfaction of the conditions in <u>Article 6</u> and <u>Article 7</u> hereof, (b) the accuracy in all material respects of the representations and warranties of Sellers set forth in <u>Article 2</u> hereof, (c) the satisfaction and performance in full by the Sellers, including the Acquired Companies, of the covenants set forth herein, and (d) the most recent financial forecasts of the Acquired Business made available to Buyer prior to the date hereof have been prepared in good faith upon assumptions that were and continue to be reasonable (it being understood and agreed that Sellers are making no representation and warranty with respect thereto as a result of such assumption in this clause (d)), then immediately after giving effect to the Transactions, payment of all amounts required to be paid in connection with the consummation of the Transactions, the Financing, and payment of all related fees and expenses, Buyer shall be Solvent. For purposes of this Agreement: (i) "<u>Solvent</u>", when used with respect to a Person, means that, as of any date of determination, (<u>A</u>) the amount of the "fair saleable value" of the assets of such Person and its subsidiaries on a consolidated basis will, as of such date, exceed the sum of (<u>i</u>) the value of all "liabilities of such Person and its subsidiaries on a consolidated basis, including contingent and other liabilities," as of such date, as such quoted terms are generally determined in accordance with applicable Laws governing determinations of the insolvency of debtors, and (<u>ii</u>) the amount that will be required to pay the probable liabilities of such Person and its

41462373.9

subsidiaries on a consolidated basis, as of such date, on its existing debts (including contingent and other liabilities) as such debts become absolute and mature, (B) such Person and its subsidiaries on a consolidated basis will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date, and (C) such Person and its subsidiaries on a consolidated basis will be able to pay its liabilities, as of such date, including contingent and other liabilities, as they mature. For purposes of this definition, "not have an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged" and "able to pay its liabilities, as of such date, including contingent and other liabilities, as they mature" means that such Person and its subsidiaries on a consolidated basis will be able to generate enough cash from operations, asset dispositions or refinancing, or a combination thereof, to meet its obligations as they become due.

3.8     Limited Guarantee.  Concurrently with the execution of this Agreement, Buyer has delivered Sellers a true, complete and correct copy of the executed Limited Guarantee. As of the date of this Agreement, the Limited Guarantee is valid, binding and enforceable in accordance with its terms, and is in full force and effect, and no event has occurred that, with or without notice, lapse of time, or both, would constitute a default thereunder.

3.9     Projections and Other Information.  Without prejudice to Buyer's right to rely upon the truth and accuracy of the representations and warranties of Sellers set forth in this Agreement, Buyer acknowledges that, with respect to any estimates, projections, forecasts, business plans, budget information and similar documentation or information relating to the Acquired Companies, the Purchased Assets or the Business that Buyer has received from Sellers, any of Sellers' Affiliates or Sellers' advisors, (a) Buyer is not relying on such documentation in making its determination with respect to signing this Agreement or completing the Transactions; (b) there are uncertainties inherent in attempting to make such estimates, projections, forecasts, plans and budgets; (c) Buyer is familiar with such uncertainties; (d) Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts, plans and budgets so furnished to Buyer; and (e) Buyer does not have, and will not assert, any Action against Sellers or their Affiliates or any of their respective directors, officers, members, shareholders, managers, employees or representatives, or hold Sellers or any such Persons liable, with respect thereto.  Buyer represents and warrants that none of Sellers, any of Sellers' Affiliates, nor any other Person, has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Acquired Companies, the Purchased Assets or the Business or the Transactions not expressly set forth in this Agreement, and none of Sellers nor any of their Affiliates or any other Person will have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer or their representatives or Buyer's use of any such information, including any confidential memoranda distributed on behalf of Sellers in respect of the Acquired Companies, the Purchased Assets or the Business or other publications or data room information provided or made available to Buyer or its representatives, or any other document or information in any form provided or made available to Buyer or its representatives in connection with the Transactions.

3.10     Investment.  Buyer is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), and is able to bear any economic risks associated with the Transactions.  Buyer is acquiring

41462373.9

the Equity Interests as provided in this Agreement solely for investment for its own account, and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable state and federal securities laws.  Buyer (either acting alone or together with its advisors) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Equity Interests and is capable of bearing the economic risks of such investment, including a complete loss of its investment in such Equity Interests.  Buyer hereby acknowledges that the Equity Interests have not been registered pursuant to the Securities Act or any state securities laws, and agrees that the Equity Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act, except pursuant to an exemption from such registration available under the Securities Act, and without compliance with foreign securities laws, in each case, to the extent applicable.

3.11    Brokers.  Neither Buyer nor any of its Affiliates acting on its behalf, or any party acting on any of their behalf, has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the Transactions or in connection with the other transactions contemplated hereby for which Sellers may become liable.

3.12    Northwest Purchase Agreement.  Buyer or one of its Affiliates has provided to Sellers a true, complete and correct fully executed copy of the Northwest Purchase Agreement (including any schedules and exhibits relating thereto) and copies of ancillary agreements relating thereto to the extent entered into as of the date of the Northwest Purchase Agreement, in each case, in effect as of the date hereof. Except for the ancillary agreements provided to Sellers, there are no side letters, undertakings or other agreements affecting, modifying or otherwise relating to the Northwest Purchase Agreement that would reasonably be expected to delay the consummation of the Transactions or otherwise be adverse to the Sellers in any material respect.  The Northwest Purchase Agreement is in full force and effect and constitutes the valid, binding and enforceable obligation of the parties thereto, enforceable in accordance with its terms.  There are no conditions precedent related to the closing of the Northwest Transactions other than as set forth in Section 6 of the Northwest Purchase Agreement.  Neither Buyer nor any of its Affiliates nor, to the Knowledge of Buyer, any other party to the Northwest Purchase Agreement, is in breach of or default under the Northwest Purchase Agreement.

3.13    Pre-Closing Agreements.  If, prior to Closing, Buyer or any of its Affiliates enters into any agreement to purchase any entity or entities or assets identified on Schedule 3.13 and such entity, entities or assets include any television stations, such television stations shall not be located in any Designated Market Area that includes any TV Station.

3.14    Designated MVPD Agreements.  With respect to the MVPDs which are parties to the Carriage Agreements listed on Schedule 3.14, Buyer or a Buyer Affiliate has a retransmission or other carriage agreement in effect with such MVPD that Buyer represents will apply to retransmission of the Stations on such MVPD's applicable multichannel video programming distribution systems in lieu of Seller's Carriage Agreement with such MVPD.

3.15    No Other Representations or Warranties.  Sellers acknowledge that neither Buyer nor any of Buyer's Affiliates has made any representation or warranty, express or implied, except as expressly set forth in this Article 3 or in any certificate delivered hereunder or any

Transaction Document.  Sellers have not relied on any representation or warranty from Buyer or any of Buyer's Affiliates in determining to enter into this Agreement, except as expressly set forth in this Article 3.

ARTICLE 4
CERTAIN COVENANTS

4.1     Governmental Consents.

(a)     FCC Consent.

(i)     Within ten (10) Business Days after the date of this Agreement, Buyer and Sellers shall file one or more applications with the FCC (the "FCC Applications") requesting FCC consent to the transfer of control of the FCC Licenses to Buyer and Buyer shall file with the FCC the necessary applications required under the Northwest Purchase Agreement. FCC consent to the FCC Applications with respect to the FCC Licenses is referred to herein as the "FCC Consent."  Until such time as the FCC Consent shall have been obtained, Buyer and Sellers shall diligently prosecute the FCC Applications and otherwise use their best efforts to obtain the FCC Consent as soon as possible; provided, however, except as provided in the following sentence or in Section 4.1(b)(i) and Section 4.1(b)(v), neither Buyer nor Sellers nor any Acquired Company shall be required to pay consideration to any third party to obtain the FCC Consent.  Buyer shall pay all FCC filing fees relating to the Transactions irrespective of whether the Transactions are consummated.

(ii)     Until such time as the FCC Consent with respect to the Transactions shall have been obtained, each of Buyer and Sellers shall oppose any petitions to deny or other objections filed with respect to the FCC Applications to the extent such petition or objection relates to such Party.  Sellers, with respect to the Transactions, and Buyer shall not take (and Buyer shall use reasonable best efforts to prevent Northwest from taking) any action that would, or fail to take (and Buyer shall use reasonable best efforts to prevent Northwest from failing to take) such action the failure of which to take would, reasonably be expected to have the effect of materially delaying the receipt of the FCC Consent with respect to the Transactions.

(iii)     If the Closing shall not have occurred for any reason within the original effective period of the FCC Consent, and neither Party shall have terminated this Agreement under Section 10.1, Buyer and Sellers shall request one or more extensions of the effective period of the FCC Consent.  No extension of the FCC Consent shall limit the right of any Party to exercise its rights under Section 10.1.

(iv)     The FCC Licenses of the TV Stations and the Dayton Radio Stations expire on the dates corresponding thereto as set forth on Schedule 2.6(a).  If, at any point prior to Closing, an application for the renewal of any FCC License (a "Renewal Application") must be filed pursuant to the Communications Laws, the applicable Seller (or the applicable Acquired Company) shall execute, file and prosecute with the FCC such Renewal Application in accordance with Section 4.2(a)(ii) hereof.  If an FCC Application is granted by the FCC subject to a renewal condition, then the term "FCC Consent" shall be deemed to also include satisfaction of such renewal condition.  To avoid disruption or delay in the processing of the FCC Applications, Buyer

30

agrees, as a part of the FCC Applications, to request that the FCC apply its policy permitting the transfer of control of FCC Licenses in transactions involving multiple stations to proceed, notwithstanding the pendency of one or more Renewal Applications. Buyer agrees to make such representations and undertakings as are necessary or appropriate to invoke such policy, including undertakings to assume, as between the Parties and the FCC, the position of the applicant before the FCC with respect to any pending Renewal Application and to assume the corresponding regulatory risks relating to any such Renewal Application. Buyer and Sellers acknowledge that, to the extent reasonably necessary to expedite the grant by the FCC of any Renewal Application, and thereby to facilitate the grant of the FCC Consent with respect to such TV Station, each of the Buyer, Sellers, and their applicable subsidiaries (including any Acquired Company) and Northwest, as applicable, shall be permitted to enter into tolling agreements with the FCC to extend the statute of limitations for the FCC to determine or impose a forfeiture penalty against such TV Station in connection with (a) any pending complaints that such TV Station aired programming that contained obscene, indecent or profane material or (b) any other enforcement matters against such TV Station with respect to which the FCC may permit Buyer, Sellers or any of their respective subsidiaries (including any Acquired Company) to enter into a tolling agreement. For the purposes hereof, "Communications Laws" shall mean the Communications Act of 1934, as amended, and the rules, regulations and written policies of the FCC promulgated pursuant thereto).

(b)     Governmental Consents; Antitrust Filings.

(i)     Within ten (10) Business Days after the date of this Agreement, Buyer and Sellers shall make any required filings with the Federal Trade Commission (the "FTC") and the United States Department of Justice (the "DOJ") pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), with respect to the Transactions (including a request for early termination of the waiting period thereunder), and, solely with respect to Buyer, with respect to the transactions contemplated by the Northwest Purchase Agreement, and shall thereafter promptly respond to all requests received from such agencies for additional information or documentation. Expiration or termination of all applicable waiting periods under the HSR Act is referred to herein as the "HSR Clearance." If one of the Parties extends the Outside Date under Section 10.1(d) and the new Outside Date is more than one year after HSR Clearance, both Parties shall make any required filings with the FTC and the DOJ pursuant to the HSR Act as may be necessary to effectuate the Closing. In the event that the Parties make such filings, the terms of this Section 4.1(b) shall apply. Any filing fees payable under the HSR Act relating to the Transactions shall be borne by Buyer. The FCC Consent and HSR Clearance are referred to herein collectively as the "Governmental Consents."

(ii)     Each Party shall keep each other Party apprised of the content and status of any communications with, and communications from, any Governmental Entity with respect to the Transactions, including promptly notifying the other Party of any communication it or any of its Affiliates receives from any Governmental Entity relating to any review or investigation of the Transactions under the HSR Act or any other applicable non-United States antitrust Laws or Communications Laws and shall permit the other Party to review in advance (and to consider any comments made by the other Party in relation to) any proposed communication by such party to any Governmental Entity relating to such matters. Neither Party shall agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or other inquiry unless it consults with the other Party in

31

advance and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend and participate at such meeting, telephone call or discussion. Subject to the NDA, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as each other Party may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods including under the HSR Act or Communications Laws. Subject to the NDA, the Parties shall provide each other with copies of all correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand, with respect to this Agreement and the Transactions, and, solely with respect to Buyer, with respect to the transactions contemplated by the Northwest Purchase Agreement; provided, however, that materials may be redacted (i) to remove references concerning the valuation of the Business, (ii) as necessary to comply with contractual arrangements, and (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns. Without limiting the foregoing, Buyer shall be entitled to take the lead, in advance consultation with Sellers, in the development of strategy with respect to (x) filings with or presentations or submissions to any Governmental Entity relating to this Agreement or the Transactions contemplated hereby (provided that Buyer shall approve the content of all presentations or submission), and (y) any meetings with, and the conducting of negotiations with, Governmental Entities relating to this Agreement or the Transactions contemplated hereby.

(iii)    The Parties hereto shall use their respective best efforts to consummate and make effective the Transactions, and, solely with respect to Buyer, with respect to the transactions contemplated by the Northwest Purchase Agreement, and to cause the conditions set forth in Article 6 and Article 7 to be satisfied, including (i) the undertaking or obtaining of all necessary actions or nonactions, consents and approvals from Governmental Entities or other persons necessary in connection with the consummation of the Transactions and the making of all necessary registrations and filings (including filings with Governmental Entities, if any) and the taking of all steps as may be necessary to obtain an approval from, or to avoid the initiation of an action or proceeding by any Governmental Entity or other Persons, necessary for the consummation of the Transactions, including any Divestiture (as defined below) commitments by Buyer in accordance with Section 4.1(b)(iv), and (ii) the execution and delivery of any additional instruments necessary to consummate the transactions to be performed or consummated by such party in accordance with the terms of this Agreement and, solely with respect to Buyer, the Northwest Purchase Agreement and to carry out fully the purposes of this Agreement and, solely with respect to Buyer, the Northwest Purchase Agreement.

(iv)    Buyer agrees not to, and shall not permit any of its Affiliates to, take (and shall use reasonable best efforts to prevent Northwest from taking) any action that would reasonably be expected to materially delay, materially impede or prevent receipt of the Governmental Consents, including any action that would reasonably be expected to result in any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the Northwest Purchase Agreement or the consummation of the transactions performed or consummated by Buyer in accordance with the terms of this Agreement or Northwest Purchase Agreement. In the event any Actions as described in the foregoing sentence are commenced, Buyer shall defend any such Actions, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Entity vacated or reversed. Without limiting the foregoing, Buyer shall take promptly any and all steps necessary to avoid or eliminate each and

41462373.9

every impediment and obtain all consents under any antitrust, competition or Communications Laws that may be required by any U.S. federal, state or local antitrust or competition Governmental Entity, or by the FCC or similar Governmental Entity, in each case with competent jurisdiction, so as to enable the Parties to close the Transactions and the transactions contemplated by the Northwest Purchase Agreement as promptly as practicable, including committing to or effecting, by consent decree, hold separate orders, trust, or otherwise, the Divestiture (as defined below) of such assets or businesses as are required to be divested in order to obtain the Governmental Consents, or to avoid the entry of, or to effect the dissolution of or vacate or lift, any Governmental Order, that would otherwise have the effect of preventing or materially delaying the consummation of the Transactions or the transactions contemplated by the Northwest Purchase Agreement. For purposes of this Agreement, a "Divestiture" of any asset or business shall mean (i) any sale, transfer, separate holding, divestiture or other disposition, or any prohibition of, or any limitation on, the acquisition, ownership, operation or effective control or exercise of full rights of ownership, of such asset or (ii) the termination or amendment of any existing or contemplated governance structure or other contractual or governance rights of Buyer, in each case, for the purpose of promptly obtaining the Governmental Consents. Further, and for the avoidance of doubt, Buyer will take any and all actions necessary as promptly as reasonably practicable to ensure that (x) no requirement for any non-action, consent or approval of the FTC, the Antitrust Division of the DOJ, any authority enforcing applicable antitrust, competition, Communications Laws, any state attorney general or other Governmental Entity; (y) no Governmental Order; and (z) no other matter relating to any antitrust or competition Law or any Communications Law would preclude consummation of the Transactions.

(v) Without limiting the foregoing, each of Buyer and Sellers shall comply with their respective obligations under Schedule 4.1 (the "Divestiture Plan") with respect to Divestitures in the markets referenced therein (the "Divestiture Markets"). In addition to, and not in limitation of, any other provision of this Agreement, (i) not later than the date (the "Divestiture Deadline Date") that is, with respect to Divestiture Markets existing as of the date of this Agreement, sixty (60) days following execution of this Agreement (subject to extension by Sellers, in their discretion), or, with respect to Divestiture Markets created by transactions entered into by Buyer or any of its Affiliates after execution of this Agreement and before the Closing, thirty (30) days following execution of any agreement creating such Divestiture Market(s), Buyer shall enter into an agreement with a third party or third parties approved by the DOJ and qualified by the FCC to hold the licenses of the divested stations pursuant to the Divestiture Plan to cause the applicable Acquired Company or Buyer to transfer the FCC Licenses for the Divestiture Markets and all related license assets used in the operation of the divested stations to such third party contemporaneously with the Closing (the assets described in this clause (i) being the "Divestiture Station Assets"; the third party described in this clause (i) being the "Divestiture Station Assets"; the third party described in this clause (i) being a "Third Party Buyer;" and each transfer described in this clause (i) being a "Third Party Transaction"), and (ii) Buyer shall cause such Third Party Buyer to consummate each Third Party Transaction concurrently with the Closing. If, by the Divestiture Deadline Date, Buyer has not entered into a Third Party Transaction with a Third Party Buyer approved by the DOJ and qualified by the FCC as required by clause (i), then Buyer shall, as applicable (A) agree to, and at Closing will, put the relevant Divestiture Station Assets into a divestiture trust acceptable to the FCC, and/or (B) agree to, and at Closing will, enter into a Hold Separate Stipulation and Order with the DOJ with respect to any such Divestiture Station Assets, in either case contemporaneously with and conditioned upon the Closing, to

facilitate the grant of the Governmental Consents. Buyer will use best efforts to cause the actions described in this Section 4.1(b)(v) not to delay unnecessarily or otherwise impair the receipt of the Governmental Consents or the consummation of the Transactions hereunder. Seller will use its reasonable best efforts to provide such assistance as is reasonably requested by Buyer to effect the Divestiture Plan. In the event that (x) Buyer enters into a Stipulation and Order with the DOJ that requires the sale of the Divestiture Station assets, and (y) the FCC Consent includes a condition that requires the sale of the Divestiture Station assets, then if Buyer fully complies with the terms of such Stipulation and Order and such FCC Consent, Buyer will be deemed to have fulfilled its obligations under this Section 4.1(b)(v). Notwithstanding anything to the contrary contained in this Agreement, neither the failure to enter into or consummate a Third Party Transaction contemplated by this Section 4.1(b)(v) nor the terms of any such Third Party Transaction shall relieve Buyer of its obligation to consummate the Transactions or pay the entire Purchase Price at the Closing. Notwithstanding anything to the contrary contained in this Agreement, until such time as the FCC Consent shall have become a Final Order and the Governmental Consents shall have been obtained, Buyer shall take all necessary actions, and comply with all conditions imposed on them, to obtain the Governmental Consents with respect to the Divestiture Markets and the Divestiture Station Assets (including, but not limited to, any requirement that Buyer consummate, and/or cause any Third Party Buyer to consummate, one or more Third Party Transactions at the Closing, or utilize an FCC divestiture trust or trusts, hold separate arrangement, or other similar structures or transactions in connection with the consummation of the Transactions at the Closing to the extent related to such Divestiture Station Assets or the Divestiture Markets). Buyer shall be responsible for the payment of all Taxes and other costs and expenses, including filing fees for any applicable application with the FCC and under the HSR Act, incurred in connection with or as a result of the Divestiture Plan.

(c)     If Buyer or any of its Affiliates enters into any agreement to purchase any entity or entities or assets identified on Schedule 3.13, the entering into of any such agreement, or the making of any filings required to obtain Governmental Consents, pursuant to such agreements and any actions reasonably taken with respect to those filings (provided that such actions would not reasonably be expected to materially delay the Closing), shall not be deemed to be a breach by Buyer of any covenant in this Section 4.1. For avoidance of doubt, such actions taken at the direction of Governmental Entities in order to obtain the Governmental Consents described in the preceding sentence shall not be deemed a breach by Buyer of any covenant in this Section 4.1.

4.2     Operations of the Business Prior to the Closing Date.

(a)     From the date hereof until the Closing, except as (A) permitted by this Agreement, (B) requested by Buyer and agreed to by Sellers, (C) set forth on Schedule 4.2(a), (D) required by applicable Law, or (E) required by the regulations or requirements of any regulatory organization applicable to Sellers, the Acquired Companies, the Purchased Assets or the Business, unless Buyer otherwise consents in writing (which request for consent shall not be unreasonably withheld, conditioned or delayed, and unless Buyer responds within five (5) Business Days of receipt of such request for consent denying such request for consent, Buyer shall be deemed to have given such consent), Sellers shall with respect to the Business, and shall cause the Acquired Companies to:

41462373.9

(i)     operate the Business in the ordinary course of business consistent with past practices and conduct the Business in all material respects in accordance with the Communications Laws and with all other applicable Laws, including using commercially reasonable efforts to preserve and maintain the goodwill, business, significant relationships with customers and third parties and Permits of the Business;

(ii)     use commercially reasonable efforts to maintain all of the material FCC Licenses listed on Schedule 2.6(a) in full force and effect, timely file all applications or requests necessary to renew or extend all of the material FCC Licenses, and not materially adversely modify any of the material FCC Licenses; and

(iii)     not agree, commit or resolve to take any actions inconsistent with the foregoing.

(b)     From the date hereof until the Closing, except as (A) permitted by this Agreement, (B) requested by Buyer and agreed to by Sellers, (C) set forth on Schedule 4.2(b), (D) required by applicable Law, or (E) required by the regulations or requirements of any regulatory organization applicable to Sellers, the Acquired Companies, the Purchased Assets or the Business, unless Buyer otherwise consents in writing (which request for consent shall not be unreasonably withheld, conditioned or delayed, Sellers shall not with respect to the Business, and shall cause each Acquired Company not to, do any of the following (whether by merger, consolidation, operation of law or otherwise):

(i)     with respect to any Material Programming Rights Agreement that relates to the receiving or obtaining of Programming Rights by any Acquired Companies or their subsidiaries, any Network Affiliation Agreement, and any agreement, contract or other binding obligation that is or would be a Sharing Agreement (such agreements, the "Material Station Operations Agreements"), (A) renew, amend, extend, modify, let lapse or terminate any Material Station Operations Agreement, (B) enter into any agreement that would constitute a Material Station Operations Agreement, or (C) waive, release or assign any material rights, claims or benefits or grant any material consent under a Material Station Operations Agreement or consent to the termination of the Acquired Business' or any Acquired Company's (or of their respective applicable subsidiary's) rights thereunder; provided, however, that Sellers may, in the ordinary course of business consistent with past practices, renew, amend, enter into or grant an extension of any such Material Programming Rights Agreement or Network Affiliation Agreement, in each case, on terms customary for the Seller or the applicable Acquired Company; provided that with respect to any Material Programming Rights Agreement or Network Affiliation Agreement, Sellers shall use reasonable best efforts not to renew, amend, enter into or otherwise grant a temporary extension that (x) contains rates and economic terms that include a rate increase more frequently than on an annual basis or are materially less favorable to Seller and/or the Acquired Company than those in effect prior to the execution of this Agreement (provided that this clause (x) shall not apply to any temporary extension of a Material Programming Rights Agreement or Network Affiliation Agreement that expires no later than the Closing Date);

(ii)     (A) renew, amend, extend or modify or terminate (excluding terminations based on material breach by the other party or upon expiration of the term thereof in accordance with the terms thereof), any Material Agreement that constitutes a Carriage Agreement

with any MVPD, provided, however, that Sellers may, in the ordinary course of business consistent with past practices and Sellers' obligations pursuant to the Communications Laws, renew, amend, enter into or grant an extension of any such Carriage Agreement, in each case, on terms customary for the Seller; provided that (I) with respect to any Assumed Carriage Agreement, Sellers shall (x) use their commercially reasonable efforts to ensure that any renewal, amendment, or temporary extension of any such Carriage Agreement has an expiration date that occurs no later than one (1) year from the date of execution; provided that with respect to the Carriage Agreements set forth on Schedule 4.2(b)(ii), Sellers shall use their best efforts to ensure that any renewal, amendment or temporary extension thereof shall expire no later than November 30, 2020, (y) not renew, amend, enter into or otherwise grant a temporary extension of such Carriage Agreements that does not contain rates and economic terms that include a rate increase at least as frequently as an annual basis (provided that this clause (y) shall not apply to any temporary extension of an Assumed Carriage Agreement that expires in under one (1) year or no later than the Closing Date), and (z) not renew, amend, enter into or otherwise grant a temporary extension of such Carriage Agreements that includes any MFN provision, and (II) such renewal, amendment, extension, or other agreement does not amend or modify any terms of any Material Agreement which is a Carriage Agreement, as in effect prior to the execution of this Agreement, relating to the divestiture of Stations or the applicability of such Carriage Agreement to Buyer which amendment or modification, as compared to the terms of the Carriage Agreement in effect prior to such amendment or modification, could reasonably be expected to materially increase the likelihood that such Carriage Agreement applies to Buyer or the Stations subsequent to the Closing, or (B) fail to timely make any retransmission consent election with any MVPD that has more than 25,000 subscribers in a TV Station's DMA;

(iii)    other than in the ordinary course of business consistent with past practices (including renewals consistent with the existing terms thereof), (i) amend or modify in any material respect or terminate (excluding terminations or renewals upon expiration of the term thereof in accordance with the terms thereof) any Material Agreement, (ii) enter into any agreement that would constitute a Material Agreement if in effect on the date hereof, (iii) waive, release or assign any material rights, claims or benefits or grant any material consent, under any Material Agreement, or (iv) consent to the termination of the Acquired Business' or any Acquired Company's (or of their respective applicable subsidiary's) rights thereunder; provided, that, this Section 4.2(b)(iii) shall not apply to Material Station Operations Agreements or any Material Agreement that constitutes a Carriage Agreement with any MVPD;

(iv)    (A) authorize or effect any amendment or change to the certificate of incorporation, bylaws or other similar organizational documents of any Acquired Company or (B) create or organize any new subsidiary of any Acquired Company;

(v)    (A) other than dividends and other distributions by a direct or indirect subsidiary of an Acquired Company to such Acquired Company or any direct or indirect wholly owned subsidiary of such Acquired Company, declare, set aside or pay any non-cash dividends on, or make any other non-cash distributions in respect of, any of its capital stock or other equity securities of any Acquired Company, (B) adjust, split, reverse split, recapitalize, subdivide, consolidate, combine or reclassify the capital stock, interests or other securities of any Acquired Company or issue or authorize the issuance of any other securities in respect of, or in substitution for, outstanding shares of capital stock, interests or other securities of any Acquired

Company (including any warrants, options or other rights to acquire the foregoing) or (C) purchase, redeem or otherwise acquire any shares of capital stock, interests or other securities of any Acquired Company, except, in the case of this clause (C), for such purchases, redemptions and other acquisitions solely between such Acquired Company and a wholly owned subsidiary thereof, or between a wholly owned subsidiary of such Acquired Company and another wholly owned subsidiary of such Acquired Company;

(vi)     (A) issue, deliver, pledge or sell, or otherwise encumber by any Lien (other than a Permitted Lien) or authorize the issuance, delivery, sale or encumbrance by any Lien (other than a Permitted Lien) of, any shares of any Acquired Company or any of its subsidiaries, other than issuances of securities of the Acquired Company's subsidiaries to such Acquired Company or to wholly owned subsidiaries of such Acquired Company or (B) amend any term of any security of any Acquired Company (in each case, whether by merger, consolidation or otherwise); provided, in each case, that such Acquired Company shall not make any issuances to the extent that such issuances, would cause such Acquired Company or any of its subsidiaries to be in violation of the Communications Laws;

(vii)     sell, assign, license, lease, transfer, abandon or create any Lien (other than any Permitted Lien) on, or otherwise dispose of, any assets that are material to the Business or the Purchased Assets;

(viii)     make any acquisition (whether by merger, consolidation or acquisition of equity interests or assets) of any interest in any Person or any division or assets thereof with a value or purchase price (including all potentially payable "earn-out" consideration or any other obligation to potentially pay consideration in the future) in excess of $10 million in the aggregate, other than purchases of assets in the ordinary course of business;

(ix)     incur any Indebtedness with respect to any Acquired Company, other than (A) intercompany indebtedness (between or among the Acquired Companies) or (B) Indebtedness that is paid off in full prior to or in conjunction with the Closing;

(x)     make any loans, advances or capital contributions to, or investments in, any Person in excess of $10 million in the aggregate with respect to the Business, other than pursuant to any written binding contractual obligation in effect as of the date hereof and ordinary course advancements and reimbursements to Employees;

(xi)     other than as required by applicable Law (including good faith obligations to bargain as required by Law), the existing terms of any Employee Plan or a collective bargaining agreement in effect on the date hereof: (i) grant, increase or agree to any severance or termination pay to any employee, officer, director or independent contractor of the Business in excess of the greater of (x) $100,000 individually or (y) up to $2.5 million in the aggregate, provided that any such severance or termination pay will be in accordance with the Seller Severance Policy; (ii) (x) enter into or amend any employment agreement with any Top Tier Employee; provided that Sellers may amend any such employment agreement to provide additional annual base compensation up to an additional 5% of such Top Tier Employee's current base salary if the amendment is made within 3 months prior to the expiration of the agreement or (y) enter into or amend any employment agreement with any On-Air Talent; provided that Sellers

37

may amend any such employment agreement to provide additional annual base compensation up to an additional 10% of such On-Air Talent's current base salary if the amendment is made within 3 months prior to the expiration of the agreement; (iii) establish, adopt, terminate or materially amend any (x) Employee Plan (including any plan, agreement or arrangement that would be an Employee Plan if in effect on the date hereof, but excluding any Employee Plans administered by Cox Enterprises, Inc. with respect to employees generally) or (y) collective bargaining agreement to the extent it would have any impact on employees of the Business; (iv) take any action to accelerate the vesting or payment, or fund or secure the payment, of compensation (including any equity-based compensation) or benefits under an Employee Plan applicable to employees of the Business, other than grants for 2019 of long term incentive awards by Cox Enterprises, Inc. in the ordinary course consistent with past practice; (v) loan or advance any money or any other property to any current or former director, officer, employee or independent contractor of the Business with a value in excess of $100,000 individually or up to $1 million in the aggregate; (vi) grant or increase any change-in-control or retention bonus to any director, officer, independent contractor or employee of the Business with a value in excess of $100,000 individually or $2.5 million in the aggregate; (vii) grant any other increase in compensation, bonus or other payments payable to any independent contractor, employee, officer or director of the Business, except for increases in base salaries (and corresponding increases in target bonuses and long term incentive awards) in the ordinary course of business in conjunction with any annual merit pay increases for Top Tier Employees, and so long as the increases for all such individuals do not exceed 5.0% for any individual or 3.5% in the aggregate; (viii) terminate, other than for cause (as reasonably determined by the Sellers in good faith), the employment or services of, or hire or engage the services of any Top Tier Employee or On-Air Talent, provided that this clause (viii) does not apply to the non-renewal of On-Air-Talent or to Employees promoted to open positions within the Business; or (xi) effectuate any plant closing or mass layoff that would incur any Liability or obligation to the Business under the WARN Act;

(xii)  materially change the Acquired Companies' methods, principles or practices of financial accounting or annual accounting period, except as required by GAAP or by any Governmental Entity or applicable Law;

(xiii)  (i) materially change any method of Tax accounting, (ii) make or change any material election with respect to Taxes, (iii) amend any federal income Tax Return in a manner that would materially increase the Taxes of the Acquired Companies or the Business, (iv) settle, or offer, propose or agree to settle, any claim or deficiency in respect of a material amount of Taxes, (v) enter into any closing agreement within the meaning of Section 7121 of the Code (or any similar provision of state, local, or non-U.S. Law) with respect to a material amount of Taxes, (vi) surrender any right to a material refund of Taxes, (vii) consent to any extension or waiver of the limitation period applicable to any audit, assessment or claim for a material amount of income Taxes except in the ordinary course of business consistent with past practice or (viii) fail to timely pay any material Tax or file any material Tax Return when due;

(xiv)  adopt or publicly propose a plan of complete or partial liquidation or resolutions providing for or authorizing such a liquidation or a dissolution, in each case, of any Acquired Company or any subsidiary of such Acquired Company;

(xv)    settle, offer to settle, or propose to settle or offer to settle, any liabilities or obligations arising out of or relating to any Action involving or against any Acquired Company or any of its subsidiaries or the Purchased Assets in excess of $10 million per Action or $15 million in the aggregate, in each case, that would not involve injunctive, equitable or non-monetary relief or impose any material restrictions on the operation of the Business (other than compliance with confidentiality and other similar customary provisions), and without any admission of fault or wrongdoing or other liability;

(xvi)    modify any of the FCC Licenses if doing so is reasonably likely to be materially adverse to the Business taken as a whole or fail to provide Buyer with a copy of (and a reasonable opportunity to review and comment on) any application for the modification of any FCC License reasonably in advance of filing with the FCC, except, in each case, as required by Law or as required in connection with the broadcast incentive auction, reassignment and repack conducted by the FCC pursuant to Section 4603 of the Middle Class Tax Relief and Job Creation Act (Pub. L. No. 112- 96, §6403, 126 Stat. 156, 225-230 (2012)) (the "Incentive Auction & Repack");

(xvii)    apply to the FCC for any construction permit with respect to any FCC License that would restrict in any material respect the stations' operations or make any material change in the assets of the stations that is not in the ordinary course of business, except as may be necessary or advisable to maintain or continue effective transmission of the stations' signals within their respective service areas as of the date hereof, except, in each case as required by Law or as required in connection with the Incentive Auction & Repack;

(xviii)    change the fiscal year of any Acquired Company;

(xix)    cause any Acquired Company to enter into a new material line of business outside the existing business of any Acquired Company or its subsidiaries as of the date hereof;

(xx)    fail to take any commercially reasonable action necessary to maintain or renew, as applicable, any Business Intellectual Property; and

(xxi)    agree, commit or resolve to take any actions inconsistent with the foregoing.

4.3    Director and Officer Indemnification.

(a)    For a period of six (6) years after the Closing, the Acquired Companies shall (and Buyer shall cause the Acquired Companies to) fulfill and honor all rights to indemnification pursuant to the Organizational Documents of the Acquired Companies and the agreements listed on Schedule 4.3 in favor of each Person who is now, or has been at any time prior to the date hereof or who becomes prior to the Closing, an officer, director or limited liability company manager of any Acquired Company (the "Company Indemnified Parties"). Each Company Indemnified Party shall continue to be afforded the rights to indemnification pursuant to the Organizational Documents of the Acquired Companies and the agreements listed on Schedule 4.3 so long as such Company Indemnified Party does not settle, compromise or consent to the entry of any judgment in any actual or threatened claim in respect of which indemnification has been sought by such

Company Indemnified Party hereunder without the prior written consent of Buyer not to be unreasonably withheld or delayed. In the event of any such Action, (i) the Acquired Companies will have the right to control the defense thereof after the Closing, (ii) each Company Indemnified Party will be entitled to retain his or her own counsel (the reasonable and documented fees and expenses of which will be advanced by the applicable Acquired Company), whether or not the applicable Acquired Company elects to control the defense of any such Action and (C) no Company Indemnified Party will be liable for any settlement of such Action effected without his or her prior written consent (unless such settlement related only to monetary damages for which the applicable Acquired Company is entirely responsible). The provisions of the Organizational Documents of the Acquired Companies with respect to indemnification, advancement of expenses and exculpation of liability shall not be amended, repealed or otherwise modified for a period of six (6) years from the Closing Date in any manner that would adversely affect the rights of the Company Indemnified Parties thereunder, unless such modification is required by applicable Law. Buyer shall not take any action after the Closing to cause any of the Acquired Companies not to fulfill or honor indemnification rights of the Company Indemnified Parties that are no less favorable than in effect as of immediately prior to the Closing under the Organizational Documents and under the agreements listed on <u>Schedule 4.3</u>.

(b)    At Closing, the Acquired Companies shall, at Buyer's sole expense, obtain and pay for in full as of the Closing Date, "tail" coverage for Directors & Officers Liability insurance with a claims period of six (6) years from the Closing Date; <u>provided</u>, that in no event shall Buyer or the Acquired Companies be required to expend for such policies pursuant to this sentence an annual premium amount in excess of two hundred percent (200%) of the last premium amount per annum the Sellers paid prior to the date of this Agreement (the "<u>Premium Cap</u>"); <u>provided</u>, <u>further</u>, that if the amount necessary to procure such insurance coverage exceeds the Premium Cap, the Acquired Companies shall (and Buyer shall or shall cause the Acquired Companies to) purchase the most advantageous policy available for an amount not to exceed the Premium Cap. After the Closing, neither Buyer, nor any of their Acquired Companies or any of their Affiliates will take any action to negate, cancel or otherwise modify or terminate such "tail" insurance policies (unless such insurance policies are modified or replaced with substantially comparable policies, subject to the Premium Cap).

(c)    The provisions of this <u>Section 4.3</u> are intended for the benefit of, and shall be enforceable by, the Company Indemnified Parties and their heirs and personal representatives, and shall be binding on Buyer and the Acquired Companies, and their successors and assigns. In the event that Buyer or any Acquired Company or any successor or assign (i) consolidates with or merges into any other Person and shall not be the continuing or surviving Person in such consolidation or merger, or (ii) transfers all or substantially all of its properties and assets to any other Person, then, in each such case, provisions shall be made so that such successors or assigns honor the obligations set forth with respect to Buyer and the Acquired Companies in this <u>Section 4.3</u>.

4.4    <u>Northwest Purchase Agreement</u>. Without the prior written consent of Sellers, Buyer and its Affiliates shall not agree to or permit any amendment, supplement or other modification to be made to, or any waiver of any provision or remedy under, the Northwest Purchase Agreement or any ancillary agreement relating thereto or enter into any side letter, undertaking or other agreement affecting, modifying or otherwise relating to the Northwest

Purchase Agreement, except in each case to the extent not adverse to Sellers in any material respect or be reasonably likely to delay the Transactions or, in the case of amendments, to the extent permitted without the consent of Sellers under Section 11.5 thereof. Without limiting the generality of the foregoing, without the consent of Sellers, Buyer and its Affiliates shall not agree to any amendment or waiver under the Northwest Purchase Agreement or any ancillary agreement that would reasonably be expected to delay consummation of the transactions contemplated by the Northwest Purchase Agreement. In connection with any request by Buyer for Sellers' consent, Buyer shall provide Sellers with a draft of such amendment, supplement, modification, waiver or agreement at least four (4) Business Days prior to the date it proposes to enter into such amendment, supplement, modification, waiver or agreement and with such information as Sellers may reasonably request in connection with any such amendment, supplement, modification, waiver or agreement. Buyer shall, and shall cause its Affiliates to, use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated by Northwest Purchase Agreement as promptly as reasonably practicable. Upon the request of Sellers, Buyer shall keep Sellers informed on a current basis of the status of the satisfaction of the conditions precedent to the Northwest Closing and any material developments with respect thereto. Without limiting the foregoing, Buyer shall promptly (and in no event later than one (1) Business Day) after obtaining knowledge thereof, give Sellers written notice of any material breach or default by Buyer, its Affiliates or any other party to the Northwest Purchase Agreement or any ancillary document related thereto (or any event or circumstance that, with or without notice, lapse of time, or both, would give rise to any material breach or default).

ARTICLE 5
JOINT COVENANTS

Buyer, on the one hand, and Sellers, on the other hand, hereby covenant and agree as follows:

5.1     Confidentiality.  Parent and Buyer (or an Affiliate of Buyer) are parties to a nondisclosure agreement, dated October 30, 2018 (as amended, the "NDA").  To the extent not already a direct party thereto, Buyer hereby assumes the NDA and agrees to be bound by the provisions thereof applicable to Buyer's Affiliate that is a party thereto, and such NDA shall remain in effect in accordance with its terms.  Without limiting the terms of the NDA, and subject to the requirements of applicable Law, all non-public information regarding Sellers, the Purchased Assets and the Business shall be confidential and shall not be disclosed to any other Person, except Buyer's representatives and lenders for the purpose of consummating the Transactions; provided, that effective upon the Closing, the NDA shall terminate with respect to information related solely to the Business.  From and after the Closing, Sellers shall not, and shall cause its Affiliates and Representatives not to, disclose to any Person (other than any Representative of Seller owning a confidentiality obligation to Seller in its capacity as such) information concerning the Business, any Purchased Asset, any Assumed Liability or any Acquired Company (including such Acquired Company Assets). It is understood that Sellers shall have no liability hereunder with respect to the use of such information (a) to the extent necessary in order to comply with obligations under this Agreement or any other Transaction Document, (b) that is in or, through no fault of Sellers or any of their respective Affiliates or Representatives, comes into the public domain or (c) that is rightfully obtained by Sellers or any of its Affiliates from a third party not under any confidentiality

41

obligation to Buyer or any of its Affiliates. Notwithstanding the foregoing, Buyer and its Affiliates may provide ordinary course communications regarding this Agreement, the Transaction Documents, the Transactions and the other transactions contemplated hereby and thereby to existing or prospective general and limited partners, equity holders, members, managers and investors of any Affiliates of such Person, in each case, who are subject to customary confidentiality restrictions.

5.2     Announcements.  Prior to Closing, no Party shall, without the prior written consent of the other Parties (which consent shall not be unreasonably withheld, conditioned or delayed), issue any press release or make any other public announcement concerning the Transactions, except to the extent that such Party is so obligated by applicable Law or any rule or regulation of any securities exchange upon which the securities of such Party are listed or traded, in which case such Party shall give advance notice and an opportunity to comment to the other, and except that the Parties shall cooperate to make a mutually agreeable announcement; provided, that nothing in this Section 5.2 shall prohibit any disclosure of information concerning this Agreement in connection with any dispute between the Parties regarding this Agreement.

5.3     Control.  Notwithstanding any other provision set forth in this Agreement, this Agreement is not intended to and shall not be interpreted to transfer control of any TV Station or Dayton Radio Station, or to give Buyer the right, directly or indirectly, to control, supervise or direct the business or operations of the Business, prior to Closing.  Consistent with the Communications Laws, control, supervision and direction of the operation of the Business prior to Closing shall remain the responsibility of the holders of the FCC Licenses.

5.4     Consents; Certain Contracts.

(a)     Consents.  Buyer and Sellers shall use commercially reasonable efforts to obtain any third-party consents, approvals, authorizations or waivers (collectively, "Approvals") required to sell, assign or transfer any Purchased Assets, including any Material Agreements. If such Approval is not obtained prior to Closing and the Closing occurs, until such time as such Approval or Approvals are obtained, then Sellers will, if and to the extent Buyer shall request, use commercially reasonable efforts to cooperate with Buyer in effecting a lawful and commercially reasonable arrangement under which Buyer shall receive benefits under such Purchased Asset or such Contract, as applicable, in the ordinary course of business (taking into account the Transactions) and taking reasonable direction from Buyer with respect to such operation, which would be intended to both (i) provide Buyer, to the fullest extent practicable, the claims, rights and benefits of such Purchased Assets or such Contract, including enforcing, or allowing Buyer to enforce the rights retained by such Sellers with respect to such assets or such Contract and (ii) cause Buyer to bear all costs and Liabilities thereunder from and after the Closing in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).  In furtherance of the foregoing, Buyer will promptly pay, perform or discharge when due any Liability arising thereunder after the Closing Date and Sellers shall, and shall cause their respective Affiliates to, without further consideration therefore, pay and remit to Buyer promptly all monies, rights and other consideration received thereunder.  No Party shall be obligated to (A) make any payment to any third party to obtain any Approval under this Section 5.4 other than normal and usual processing fees, filing fees or other similar normal costs incurred in connection with such third-party Approval or (B) grant any accommodation (financial or

otherwise) to any third party in connection with obtaining such third-party Approval. Any such costs incurred by the Parties shall be shared and borne equally by Buyer, on the one hand, and Sellers, on the other hand. Without limiting Sellers' obligations contained in this Section 5.4(a), Buyer expressly acknowledges and agrees that (i) it is not a condition to Buyer's obligation to consummate the Closing that Sellers obtain any required Approvals under the Material Agreements, and (ii) the failure of Sellers to obtain any required Approval under any Material Agreement, so long as Sellers disclosed the requirement for such Approval in compliance with Section 2.4, shall not be considered (A) for purposes of determining whether a Material Adverse Effect has occurred or (B) whether the condition to Buyer's obligation to consummate the Closing set forth in Section 7.1(a)(i) has been met. With respect to any Carriage Agreement that constitutes a Material Agreement, Sellers shall consult in good faith with Buyer in advance (with reasonable advance notice) with respect to any notices, and consider in good faith Buyer input on strategy relating thereto, relating to the transactions contemplated hereby.

(b)     Commingled Contracts.

(i)     The Parties acknowledge that Sellers or their respective subsidiaries are parties to certain contracts listed on Schedule 5.4(b) that relate to both the operations or conduct of the Business and that of other businesses of Sellers (and/or their subsidiaries), but that will remain with Sellers (and/or their subsidiaries) after the Closing (the "Commingled Contracts"). Sellers and Buyer shall cooperate and use their respective commercially reasonable efforts with the unaffiliated counterparty to the Commingled Contracts (A) to obtain, through an amendment, partial assignment or new contract (any such arrangement, a "Replacement Contract") for the benefit of Buyer the respective rights and obligations related to the Business under each Commingled Contract (the "Commingled Contract Rights"), such that, effective at or after the Closing, Buyer will be the beneficiary of the rights and will be responsible for the obligations related to the Commingled Contract Rights of such Commingled Contracts and (B) to novate the respective rights and obligations related to the Commingled Contract Rights under each such Commingled Contract and obtain an unconditional release for the applicable Seller and its Affiliates thereunder, such that, subsequent to the Closing, Sellers and their subsidiaries will have no rights or Liability with respect to the Commingled Contract Rights under and in respect of the Commingled Contracts; provided, however, that (A) no Replacement Contract shall impose any Liability on Sellers or any of their subsidiaries after the Closing; (B) any and all consideration paid in order to obtain amend, assign in part, novate or replace such Comingled Contract or Replacement Contract shall be borne equally be Sellers and Buyer (provided, that, neither Sellers nor Buyer shall have any obligation to offer or pay any consideration in excess of $10,000); (C) obtaining Replacement Contracts is not a condition to the Closing; and (D) if any Commingled Contract includes any group discount or similar benefit that is not assignable or transferable to Buyer, then the Replacement Contract will not include or reflect such terms.

(ii)     In the event a Replacement Contract is not obtained by the Closing and the Closing occurs, Sellers will, if and to the extent Buyer shall request, use commercially reasonable efforts to cooperate with Buyer in effecting a lawful and commercially reasonable arrangement under which Buyer shall receive benefits under the Commingled Contracts and continue to operate such assets in the ordinary course of business (taking into account the Transactions) and taking reasonable direction from Buyer with respect to such operation with respect to the Commingled Contract Rights of each Commingled Contract, which would be

43

intended to both (x) provide Buyer, to the fullest extent practicable under such Commingled Contract, the claims, rights and benefits of the Commingled Contract Right of each Commingled Contract, including enforcing, or allowing Buyer to enforce, the rights retained by Sellers with respect thereto and (y) cause Buyer to bear all costs and Liabilities thereunder from and after the Closing in accordance with this Agreement (including by means of any subcontracting, sublicensing or subleasing arrangement).

(iii)    Notwithstanding anything to the contrary herein, this Agreement and the consummation of the Transactions shall not be construed as an attempt or agreement to assign any Contract or rights thereunder, including any rights under a Commingled Contract, or other right, which by its terms or by Law is not assignable without the consent of a third party or a Governmental Entity or is cancelable by a third party in the event of an assignment, unless and until such consent shall have been obtained; provided, that upon receipt of such Approval, such assignment or transfer shall automatically and without further action be effected in accordance with the terms of this Agreement.

(c)    Release of Guarantees.

(i)    Prior to the Closing Date, the Parties hereto agree to cooperate and use commercially reasonable efforts to terminate any guarantees, performance bonds, letters of credit or other similar agreements providing credit support for or related to any of the Acquired Companies (or their subsidiaries), the Purchased Assets, the Assumed Liabilities or the Business (the "Business Guarantees"), including those set forth on Schedule 5.4(c)(i), and obtain the release of Sellers and their Affiliates that are a party to such Business Guarantees, or, if the Parties are unable to so terminate, cause Buyer or one of its subsidiaries to be substituted in all respects for the applicable Seller or subsidiary of a Seller that is a party thereto, in respect of all obligations of such Seller or subsidiary of Seller, as applicable, under such Business Guarantee on the Closing Date.

(ii)    In the event any of such Business Guarantees are not released prior to or at the Closing, (A) Sellers and Buyer shall continue to cooperate and use their respective commercially reasonable efforts to terminate, or, if the Parties are unable to so terminate, cause Buyer or one of its subsidiaries to be substituted in all respects for the applicable Seller or subsidiary of a Seller that is a party thereto, in respect of all obligations under such Business Guarantees and (ii) Buyer shall indemnify and hold harmless Sellers and their respective subsidiaries for amounts required to be paid under such Business Guarantees from and after the Closing, until such Business Guarantee is released.

5.5    Employee Matters.

(a)    Effective as of the Closing Date, Buyer or its Affiliates will offer employment to each of the Employees listed on Schedule 5.5(a), as may be updated by Sellers after consultation with Buyer and mutual approval of the Parties, subject to the next sentence, at least five (5) Business Days prior to the Closing Date, who are not employed by an Acquired Company (each such Employee who accepts such offer of employment and commences employment on the applicable Employment Commencement Date, a "Seller Transferred Employee"), including any Employee who is then on an authorized leave of absence, sick leave,

short- or long-term disability leave, military leave or layoff with recall rights, upon substantially the same terms and conditions and with substantially the same duties as in effect immediately preceding the Closing Date. Buyer's offer of employment to each Employee included on Schedule 2.12(a) (as updated) who are not employed by an Acquired Company who is on authorized leave of absence, sick leave, short- or long-term disability leave, military leave or layoff with recall rights as of the Closing Date (each an "Inactive Employee") may be conditioned upon such Employee's return to active employment immediately following such absence and within six (6) months of the Closing Date or such later date as required under applicable Law. For the purposes of this Agreement, the "Employment Commencement Date" shall mean (x) as to those Seller Transferred Employees who are not Inactive Employees, the Closing Date, and (y) as to those Seller Transferred Employees who are Inactive Employees, the date on which the Transferred Employee begins employment with Buyer or any of its Affiliates. For the avoidance of doubt, this Agreement and the Transactions shall not create a termination of or other interruption of employment with respect to the Employees listed on Schedule 2.12(a) (as updated) who are employed by any of the Acquired Companies or any wholly owned subsidiary of such entities (such individuals, the "Acquired Company Employees," and together with the Seller Transferred Employees, collectively, the "Transferred Employees").

(b)    The initial terms and conditions of employment for those Transferred Employees who have employment agreements and who are not Union Employees shall be as set forth in such employment agreements as set forth on Schedule 2.13(a), which, with respect to any Seller Transferred Employee shall, to the extent permitted under the applicable agreements, be assigned to Buyer or its Affiliates and assumed by Buyer or its Affiliates. The employment of all other Seller Transferred Employees who are not Union Employees will be "at will." With respect to Transferred Employees who are not Union Employees (including, for the avoidance of doubt, those with employment agreements), for a period ending no earlier than the first anniversary of the Closing Date, Buyer and its Affiliates shall (i) not reduce the regular wages or salary, commission rate or annual target bonus opportunity as in effect on the Closing Date of any Transferred Employees who are not Union Employees, (ii) provide employee benefits to such Transferred Employees that are no less favorable than those employee benefits provided to such Transferred Employees as of the Closing Date (but excluding long-term incentive, nonqualified deferred compensation, defined benefit pension and retiree health care benefits), and (iii) with respect to those Transferred Employees listed on Schedule 5.5(b), provide those certain perquisites listed next to each such individual's name.

(c)    Buyer shall cause Buyer or its Affiliates to employ those Transferred Employees that are Union Employees in accordance with the terms and conditions established in the applicable collective bargaining agreement and/or under applicable Law, and shall assume and agree to be bound by the terms and obligations of any unexpired (as of the Closing Date) collective bargaining agreement listed on Schedule 2.12(b) as a successor or assign. With respect to Union Employees working under an expired collective bargaining agreement (defined to include such agreements which expire with notice from Seller of 90 days or less and provided such notice is given by Seller, regardless of whether such 90 days expires after the Closing Date), as of the Closing Date and each applicable Employment Commencement Date, Buyer and its Affiliates agrees to provide such Union Employees with an initial base salary (or hourly wage), commission rate and normal bonus opportunity at least as favorable as those provided by Sellers immediately

45

prior to the Closing Date or the applicable Employment Commencement Date (as applicable), unless (and until) otherwise required by law and/or subsequent required bargaining (if any).

(d)     To the extent permitted by Law, Buyer shall cause Buyer and its Affiliates to give all Transferred Employees full credit for purposes of eligibility waiting periods and vesting and benefit accrual under the employee benefit plans or arrangements, leave policies (not otherwise addressed in Sections 5.5(e) or 5.5(f)) or severance practices maintained by Buyer and its Affiliates in which such Transferred Employees participate for such Transferred Employees' service with Sellers or their Affiliates or predecessors to the extent Sellers or their Affiliates or predecessors recognized such service for purposes of its equivalent benefit plans or arrangements. With respect to Transferred Employees (i) terminated without cause within twelve (12) months of the Closing Date, (ii) who are not subject to an employment agreement, and (iii) who execute a full release of claims against Sellers, Buyer and each of its Affiliates shall (x) provide severance benefits to the Employees in accordance with the terms of Sellers' severance policy ("Seller Severance Policy") as set forth on Schedule 5.5(d) hereto and (y) credit the Employees for their past service with Sellers and/or their Affiliates and, to the extent currently credited by Sellers, any prior employer of such Employee, for purposes of benefits under the Seller Severance Policy. With respect to Transferred Employees who are the parties to an employment agreement, such agreement shall govern the terms of any severance provided following the Closing Date or their Employment Commencement Date (as applicable), provided that any such Transferred Employee who is terminated without cause within twelve (12) months of the Closing Date or their Employment Commencement Date (as applicable) and who is not subject to the terms of an employment agreement at the time of such termination shall be provided severance pursuant to the terms and conditions of the second sentence of this Section 5.5(d). Notwithstanding the foregoing, following the Closing Date, with respect to any Transferred Employee who is a Union Employee, the terms and conditions of any severance provided to such individuals shall be governed by the collective bargaining agreement applicable to them, including, without limitation any collective bargaining agreement entered into following the Closing Date. Nothing herein shall limit Buyer's ability to terminate any Employee at any time after the Closing.

(e)     Buyer or its Affiliates shall establish or designate a tax-qualified defined contribution plan (a "Buyer's 401(k) Plan") to accept rollover contributions from the Transferred Employees of any account balances distributed to them by the existing tax-qualified defined contribution plan established or designated by Sellers or their Affiliates ("Sellers' 401(k) Plan"). Buyer shall allow any such Transferred Employees' outstanding plan loan to be rolled into Buyer's 401(k) Plan. The distribution and rollover described herein shall comply with applicable Law, and each party shall make all filings and take any actions required of such party by applicable Law in connection therewith. Buyer shall cause Buyer's 401(k) Plan to credit Transferred Employees with service credit for eligibility and vesting purposes for service recognized for the equivalent purposes under the Sellers' 401(k) Plan.

(f)     Sellers and their Affiliates shall retain responsibility for and continue to pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Transferred Employee and their covered dependents with respect to claims incurred under the terms of the Employee Plans which are not maintained by an Acquired Company by such Employees or their covered dependents prior to the Closing Date or their Employment Commencement Date (as applicable). Expenses and benefits with respect to claims incurred by

46

Transferred Employees or their covered dependents on or after the Closing Date or their Employment Commencement Date (as applicable) shall be the responsibility of Buyer and its Affiliates, subject to the terms and conditions of medical, life insurance, disability and other welfare plans maintained by Buyer and its Affiliates. With respect to any welfare benefit plans maintained by Buyer for the benefit of Transferred Employees on and after the Closing Date or their Employment Commencement Date (as applicable), Buyer shall use reasonable best efforts to (i) make the Transferred Employees immediately eligible for such plans, (ii) cause there to be waived any eligibility requirements or pre-existing condition limitations, and (iii) give effect, in determining any deductible and maximum out-of-pocket limitations, to amounts paid by such Transferred Employees for the plan year in which the Closing Date or their Employment Commencement Date (as applicable) occurs with respect to similar plans maintained by Sellers or their Affiliates.

(g)    To the extent permitted by applicable Law, Buyer or its Affiliates will assume all liabilities for unpaid, accrued vacation of each Transferred Employee as of the Closing Date or his or her Employment Commencement Date (as applicable) as set forth on Schedule 5.5(g) and to the extent accrued in Net Working Capital, giving credit under Buyer's vacation policy for service with Sellers, and shall permit Transferred Employees to use their vacation entitlement accrued as of the Closing Date in accordance with Buyer's policy for carrying over unused vacation, provided that all Transferred Employees shall receive credit for the term of their employment with Sellers, their Affiliates and predecessors for purposes of determining eligibility for using vacation. To the extent that, following the Closing Date, Buyer's policies do not permit a Transferred Employee to use any accrued and unused vacation for which Buyer has assumed the liabilities hereunder (other than as a result of such Transferred Employee's failure to use such vacation despite his or her eligibility to do so, without adverse consequences, under Buyer's policies), Buyer or its Affiliates shall pay such Transferred Employee for any such vacation in full within fifteen (15) days of the Closing Date or his or her Employment Commencement Date (as applicable). To the extent required by applicable Law, accrued and unpaid vacation will be paid by the Sellers or their Affiliates to a Transferred Employee in connection with the Transactions prior to the Closing Date or his or her Employment Commencement Date (as applicable). Service with both Sellers and Buyer shall be taken into account in determining Transferred Employees' vacation entitlement under Buyer's vacation policy after the Closing Date.

(h)    To the extent permitted by applicable Law, Buyer and its Affiliates shall grant credit for all unused sick and wellness leave accrued by Transferred Employees on the basis of their service during the current calendar year as employees of Sellers as set forth on Schedule 5.5(g) and to the extent accrued in Net Working Capital, in accordance with Buyer's policy on sick and wellness leave. To the extent required by applicable Law, unused sick and wellness leave will be paid by the Sellers or their Affiliates to a Transferred Employee in connection with the Transactions prior to the Closing Date or his or her Employment Commencement Date (as applicable).

(i)    As of the Closing Date or the Employment Commencement Date (as applicable, such date, the "Transfer Date"), Sellers shall transfer from the Employee Plans that are medical and dependent care account plans and which are not maintained by an Acquired Company of each Transferred Employee (each, a "Seller FSA Plan") to one or more medical and dependent care account plans established or designated by Buyer for such individuals (collectively, the

"Buyer FSA Plan") the account balances (positive or negative) of Transferred Employees, and Buyer shall be responsible for the obligations of the Seller FSA Plans to provide benefits to the Transferred Employees with respect to such transferred account balances at or after the Transfer Date (whether or not such claims are incurred prior to, on or after the Transfer Date). Each Transferred Employee shall be permitted to continue to have payroll deductions made as most recently elected by him or her under the applicable Seller FSA Plan. As soon as reasonably practicable following the end of the plan year for the Buyer FSA Plan, including any grace period, Buyer shall promptly reimburse Sellers for benefits paid by the Seller FSA Plans to any Transferred Employee prior to the Transfer Date to the extent in excess of the payroll deductions made in respect of such Transferred Employee at or prior to the Transfer Date, but only to the extent that such Transferred Employee continues to contribute to the Buyer FSA Plan the amount of such deficiency. This Section 5.5(i) shall be interpreted and administered in a manner consistent with Rev. Rul. 2002-32.

(j) Sellers and their Affiliates will be responsible for any obligations to provide health care continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985, and the regulations issued thereunder ("COBRA") to any current or former Employees and their dependents who experience a "qualifying event" (as defined in COBRA) prior to the Closing Date. Buyer and its Affiliates will be responsible for any obligations to provide health care continuation coverage under COBRA to any Transferred Employee and his or her dependents who experience a "qualifying event" (as defined in COBRA) on or after the Closing Date.

(k) The Parties acknowledge that, as it pertains to the AFTRA Health and Retirement Fund or any other multiemployer pension plan to which Sellers or their Affiliates contribute or have contributed, the Parties have not entered into a transaction set forth in Section 4204 of ERISA and Sellers and their Affiliates shall be solely responsible for any withdrawal liability that may be triggered under such plans on or prior to the Closing Date; provided, that Buyer and its Affiliates shall be solely responsible for any withdrawal liability that is or may be triggered under such plans following the Closing Date to the extent such liability relates to Buyer's and its Affiliates' contribution histories to such plans.

(l) Sellers and Buyer shall follow the "standard procedures" for preparing and filing Internal Revenue Service Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53 for Transferred Employees. Under this procedure, (i) Sellers shall provide all required Forms W-2 to all Transferred Employees reflecting wages paid and Taxes withheld by Sellers and their Affiliates prior to the Closing Date or their Employment Commencement Date (as applicable), and (ii) Buyer (or one of its Affiliates) shall provide all required Forms W-2 to all Transferred Employees reflecting all wages paid and Taxes withheld by Buyer and its Affiliates on and after the Closing Date or their Employment Commencement Date (as applicable).

(m) Sellers and Buyer shall adopt the "alternative procedure" of Revenue Procedure 2004-53 for purposes of filing Internal Revenue Service Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate). Under this procedure, Sellers shall provide to Buyer all Internal Revenue Service Forms W-4 and W-5 on file with respect to each Transferred Employee and any written notices received from the Internal Revenue Service under Treasury Regulation Section 31.3402(f)(2)-

(g)(5), and Buyer will honor these forms until such time, if any, that such Transferred Employee submits a revised form.

(n)     With respect to garnishments, tax levies, child support orders and wage assignments in effect with Sellers or their Affiliates on the Closing Date or the Employment Commencement Date (as applicable) for Transferred Employees and with respect to which Sellers have notified Buyer in writing, Buyer and its Affiliates shall honor such payroll deduction authorizations with respect to Transferred Employees and will continue to make payroll deductions and payments to the authorized payee, as specified by a court or order which was filed with Sellers or their Affiliates on or before the Closing Date or Employment Commencement Date (as applicable), to the extent such payroll deductions and payments are in compliance with applicable Law. Sellers shall, within three (3) days after the Closing Date or the Employment Commencement Date (as applicable), provide Buyer with a schedule including such information in the possession of Sellers and their Affiliates as may be reasonably necessary for Buyer or its Affiliates to make the payroll deductions and payments to the authorized payee as required by this Section 5.5(n).

(o)     Buyer and its Affiliates shall not take any action on or after the Closing Date that would cause any non-compliance with or create any liability to Sellers or their Affiliates under the Worker Adjustment and Retraining Act of 1988, as amended (the "WARN Act") or any similar state or local Law.  The Assumed Liabilities assumed by Buyer pursuant to Section 1.1 shall include all liabilities with respect to any amounts (including any severance, fines or penalties) payable under or pursuant to the WARN Act or any similar state or local Law with respect to any Employees, including without limitation those who do not become Transferred Employees solely as a result of Buyer's failure to extend offers of employment or continued employment as required by Section 5.5 or in connection with events that occur from and after the Closing Date, and Buyer shall reimburse Sellers for any such amounts or any liabilities thereof incurred by Sellers.

(p)     With respect to those Transferred Employees who are foreign nationals identified on Schedule 5.5(p), from and after the Closing Date or Employment Commencement Date (as applicable), Buyer and its Affiliates agree that for so long as such individuals remain employed by Buyer or its Affiliates, Buyer and its Affiliates shall take such actions as may be reasonably necessary to act as a successor in interest  under applicable immigration laws and assume responsibility for sponsorship or otherwise transfer employment of such individual, including, without limitation, maintenance of any PERM application, submission of any new PERM application, filing of any labor condition application or any petition for a non-immigrant visa.

(q)     Without limiting the generality of Section 11.9, nothing in this Section 5.5, express or implied, is intended to confer on any Person (including any Transferred Employees and any current or former employees of Sellers or the holders of the FCC Licenses), other than the Parties hereto and their respective successors and assigns, any rights, benefits, remedies, obligations or liabilities under or by reason of this Section 5.5.  This Section 5.5 does not amend any provision of any employee benefit plan of Sellers, Buyer or their respective Affiliates, and it is not intended to require, nor shall it require, either Party to continue any employee benefit plan or to continue to maintain any other term or condition of employment beyond the time when it otherwise lawfully could be terminated or modified.

(r)     Buyer shall use commercially reasonable efforts to negotiate in good faith with the Management Employees with respect to the terms of their hire by Buyer or one of its Affiliates.  Seller shall provide Buyer commercially reasonable access to Management Employees during regular business hours in connection with Buyer's negotiation with such employees.  In the event Buyer and any such Management Employee(s) reach an agreement with respect to the terms of such hire, Schedule 5.5 shall be updated as of the Closing Date to include such Management Employee as a Transferred Employee.  In such event, the Management Employee shall be deemed an Employee for all purposes hereunder.

5.6     Access to Business.

(a)     From and after the date of this Agreement until the earlier to occur of the Effective Time and the termination of this Agreement in accordance with Article 10, Sellers shall provide Buyer and their authorized representatives with reasonable access (for the purpose of examining and copying at Buyer's sole cost), during normal business hours and after reasonable advance notice, to books and records and other information and materials in the possession of Sellers or any of the Acquired Companies or their subsidiaries which relates to the Acquired Companies or their subsidiaries, the Purchased Assets or the Business, as may be reasonably requested by Buyer from time to time; provided, that such inspection and copying shall be conducted in a manner that will not interfere with or disrupt the normal course of Sellers' or the Acquired Companies' respective businesses.  Buyer shall not, prior to the Closing Date, contact any vendor, customer, supplier, or employee (other than senior management employees, or officers) of any Seller, Acquired Companies or their subsidiaries, except in connection with the Debt Financing or in consultation with the Sellers with the express prior approval of the Sellers, which approval shall not be unreasonably withheld, conditioned or delayed; provided that the foregoing shall not restrict any ordinary course contact with any Person that is unrelated to the Transaction or the relationship between such Person and the Business.

(b)     All requests of Buyer for access or information shall be submitted or directed exclusively to an individual or individuals to be designated by the Sellers.

(c)     For a period of seven (7) years following the Closing Date, Buyer shall, subject any restrictions imposed from time to time in good faith upon advice of counsel respecting the provision of privileged communications or competitively sensitive information and any applicable confidentiality agreement with any Person, provide Sellers and their authorized representatives with reasonable access (for the purpose of examining and copying at Sellers' sole cost), during normal business hours and after reasonable advance notice, to books and records and other information and materials in the possession of Buyer or any of the Acquired Companies or their subsidiaries which relates to the Acquired Companies or their subsidiaries, the Purchased Assets or the Business that relate to the period prior to the Closing Date, as may be reasonably requested for legitimate business reasons, including with respect to taxes, financial reporting and any other reasonable legitimate business purposes; provided, that such inspection and copying shall be conducted in a manner that will not unreasonably disrupt the normal course of Buyer or the Acquired Companies' respective businesses. Unless otherwise consented to in writing by Sellers, Buyer shall not, and shall cause each Acquired Company and its subsidiaries not to, for a period of seven (7) years following the Closing Date, destroy, alter or otherwise dispose of any books and records of the Acquired Companies, their respective subsidiaries or the Business, or any

50

portions thereof, relating to periods prior to the Closing Date without first offering to surrender to Sellers such books and records or such portions thereof.

(d)     For a period of seven (7) years following the Closing Date, Sellers shall, subject any restrictions imposed from time to time in good faith upon advice of counsel respecting the provision of privileged communications or competitively sensitive information and any applicable confidentiality agreement with any Person, provide Buyer and its authorized representatives with reasonable access (for the purpose of examining and copying at Buyer's sole cost), during normal business hours and after reasonable advance notice, to books and records and other information and materials in the possession of Sellers or their subsidiaries which relates to the Excluded Assets or the Excluded Liabilities or the Business, as may be reasonably requested for legitimate business reasons, including with respect to taxes (other than tax returns), financial reporting and any other reasonable legitimate business purposes; provided, that such inspection and copying shall be conducted in a manner that will not unreasonably disrupt the normal course of Sellers' or its subsidiaries' respective businesses.

(e)     Notwithstanding the foregoing, neither Party shall be required to provide access to or disclose information where (i) upon the advice of counsel, such access or disclosure would jeopardize attorney-client privilege or contravene any Laws; provided, that such Party shall use its reasonable best efforts to provide such access or disclose such information in a manner that would not violate the foregoing; (ii) the disclosing Party has determined in good faith that the information requested is confidential and competitively sensitive; provided, that such Party shall use its reasonable best efforts to provide such access or disclose such information in a manner that would not violate the foregoing; or (iii) Buyer or any of its Affiliates' rights of discovery, on the one hand, and Sellers or any of their respective Affiliates, on the other hand, are adverse parties in an Action and such access or information is reasonably pertinent thereto.

5.7     Further Action.  In furtherance (and not in limitation) of the provisions set forth in this Agreement, at all times prior to the Closing, Buyer and Sellers shall use their respective commercially reasonable efforts to take or cause to be taken all action necessary or desirable in order to consummate the Transactions as promptly as is practicable.

5.8     Notice.  Each Party shall promptly notify the other of any Action that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of the Transactions.

5.9     Title Insurance; Survey.  Buyer may obtain, at its sole option and expense, and Sellers shall grant Buyer access (subject to the terms of any lease or consent of any lessor of the Leased Real Property) to obtain (a) commitments for owner's and lender's title insurance policies on the Owned Real Property and commitments for leasehold and lender's title insurance policies for all Leased Real Property (collectively the "Title Commitments"), and (b) an ALTA survey on each parcel of Real Property (the "Surveys"); provided, however, that Sellers shall provide Buyer with any existing Title Commitments and Surveys in their possession. Sellers shall reasonably cooperate with Buyer in obtaining such Title Commitments and Surveys, provided that Sellers shall not be required to incur any cost, expense or other liability in connection therewith.

5.10    Financing.

(a)    Buyer shall use its commercially reasonable efforts to arrange and obtain the Financing not later than the date the Closing is required to be effected in accordance with Section 1.3 on the terms and conditions (including, to the extent applicable, the "flex" provisions) described in the Commitment Letters and any related Fee Letter (or on other terms that, with respect to conditionality, are not less favorable to Buyer than the terms and conditions (including any "flex" provisions) set forth in the Commitment Letters and any Fee Letter related thereto), including using commercially reasonable efforts to (i) enter into definitive agreements (which, with respect to the bridge facility documentation, shall not be required until reasonably necessary in connection with the funding of the Debt Financing) with respect to the Debt Financing on the terms and conditions (as such terms may be modified or adjusted in accordance with the terms of, and within the limits of the "flex" provisions contained in, any Fee Letter) contemplated by the Debt Commitment Letter and the related Fee Letter (or on other terms that, with respect to conditionality, are not less favorable to Buyer than the terms and conditions (including any "flex" provisions) set forth in the Debt Commitment Letter and the related Fee Letter), (ii) satisfy, or cause the satisfaction of, on a timely basis all conditions to funding that are applicable to Buyer or any of its Affiliates in the Commitment Letters (or, if necessary or deemed advisable by Buyer, seek the waiver of conditions applicable to Buyer contained in the Commitment Letters), (iii) maintain in full force and effect the commitments of the Financing Sources to the Financing in accordance with the terms and conditions of the Commitment Letters, (iv) consummate the Financing no later than the Closing Date, (v) enforce its rights under the Commitment Letters and (vi) upon request of the Seller, Buyer shall appraise Seller of material developments relating to the Financing.  Buyer shall not agree to any amendments or modifications to, or grant any waivers of, any condition or other provision under the Commitment Letters without the prior written consent of Sellers (other than any amendment of the Commitment Letters to add lenders, lead arrangers, bookrunners, syndication agents or any person with similar roles or titles who had not executed the Debt Commitment Letter as of the date hereof) other than amendments, modifications or waivers to the Commitment Letters that would not (A) reduce the aggregate amount of the Debt Financing to an amount below the amount necessary to satisfy the Financing Uses (after taking into account the amount of the Equity Financing and available cash of Buyer and the Acquired Business) unless the Equity Financing is increased by a corresponding amount, (B) impose new or additional conditions, or otherwise amend, modify or expand any conditions, to the receipt of the Debt Financing or the Equity Financing in a manner that would reasonably be expected to delay or prevent the Closing or the funding of the Debt Financing or the Equity Financing (or the satisfaction of the conditions to obtaining any of the Financing) or (C) adversely impact the ability of Buyer to enforce its rights against the other parties to the Debt Commitment Letter or the Equity Commitment Letter.

(b)    If any portion of the Debt Financing becomes unavailable on the terms and conditions (including any "flex" provisions) contemplated in the Debt Commitment Letter and the related Fee Letter, Buyer shall use its commercially reasonable efforts to, as promptly as practicable following the occurrence of such event, arrange and obtain from alternative sources of debt financing an amount sufficient to satisfy the Financing Uses (after taking into account the amount of the Equity Financing and available cash of Buyer) or such unavailable portion thereof, as the case may be, on terms and conditions (including any "flex" provisions) that are at least as favorable to Buyer as those contained in the Debt Commitment Letter and the related Fee Letter

52

(including the "flex" provisions), which shall not expand upon the conditions precedent to the funding on the Closing Date of the Financing as set forth in the Commitment Letters in effect on the date hereof. The new debt commitment letter and fee letter entered into in connection with such alternative debt financing are referred to, respectively, as a "New Debt Commitment Letter" and a "New Fee Letter." In the event Buyer enters into any such New Debt Commitment Letter, (i) Buyer shall promptly provide Sellers with true, correct and complete copies of such New Debt Commitment Letter and New Fee Letter (which, in the case of the New Fee Letter, may be redacted in a manner consistent with the provisions of Section 3.6(a)), (ii) any reference in this Agreement to the "Debt Financing" shall mean the debt financing contemplated by the Debt Commitment Letter as modified pursuant to clause (iii) below, and (iii) any reference in this Agreement to the "Debt Commitment Letter" (and any definition incorporating the term "Debt Commitment Letter") shall be deemed to include the Debt Commitment Letter to the extent not superseded by a New Debt Commitment Letter at the time in question and any New Debt Commitment Letter to the extent then in effect.

(c)     Buyer shall (i) promptly furnish Sellers complete, correct and executed copies of any amendments to the Commitment Letters promptly upon their execution and (ii) give Sellers prompt notice (A) of any default or breach give rise to any default or breach) by any party under any of the Commitment Letters or the definitive agreements relating to the Financing of which Buyer becomes aware and (B) of any termination of either of the Commitment Letters.

(d)     Notwithstanding anything to the contrary contained in this Agreement, nothing contained in this Section 5.10 will require, and in no event will the commercially reasonable efforts of Buyer be deemed or construed to require, Buyer to (i) subject to Section 10.3(b), bring any enforcement action against any Equity Financing Source to enforce its rights pursuant to the Equity Commitment Letter; (ii) seek the Equity Financing from any source other than a counterparty to, or in any amount in excess of that contemplated by, the Equity Commitment Letter or (iii) pay any material fees in excess of those contemplated by the Equity Commitment Letter or the Debt Commitment Letter.

(e)     Prior to the Closing, Sellers shall, and shall cause the Acquired Companies and their respective subsidiaries and representatives to, in each case, use their commercially reasonable efforts to provide to Buyer such cooperation as is reasonably requested by Buyer to assist in causing the conditions in the Debt Commitment Letter to be satisfied or as is otherwise customary and reasonably requested by Buyer in connection with the Debt Financing, including to use commercially reasonable efforts to:

(i)     participate (and cause senior management and representatives of Sellers and the Acquired Companies to participate) in a reasonable number of meetings, calls, presentations, road shows, due diligence sessions (including accounting due diligence sessions), drafting sessions and sessions with rating agencies (in each case, at reasonable times and locations mutually agreed), otherwise cooperate with the marketing efforts for any of the Debt Financing and assist Buyer in obtaining ratings as contemplated by the Debt Commitment Letter;

(ii)     assist Buyer with the timely preparation of customary rating agency presentations, bank information memoranda, lender presentations, offering documents, prospectuses, memoranda, investor presentations and similar documents required in connection

53

with the Debt Financing (in each case, Seller shall be permitted a reasonable period to review and comment);

(iii)    assist Buyer with the preparation of pro forma financial information and pro forma financial statements to the extent necessary or reasonably required by Buyer, it being agreed that none of the Sellers, the Acquired Companies or their subsidiaries will be required to provide any information or assistance relating to (A) the proposed aggregate amount of debt and equity financing, together with assumed interest rates, dividends (if any) and fees and expenses relating to the incurrence of such debt or equity financing or (B) any post-Closing or pro forma cost savings, synergies, capitalization, ownership or other pro forma adjustments desired to be incorporated into any information used in connection with the Debt Financing;

(iv)    execute and deliver as of the Closing (but not prior to the Closing) any pledge and security documents, supplemental indentures, currency or interest hedging arrangements, other definitive financing documents, or other certificates or documents as may be reasonably requested by Buyer or the Debt Financing Sources and otherwise reasonably facilitate the pledging of collateral and the granting of security interests in respect of the Debt Financing, it being understood that such documents will not take effect until the Effective Time; provided that no directors or officers of the Acquired Companies shall be required to approve or execute any such documents contemplated by this clause (iv) unless such directors or officers will be continuing as directors or officers, as applicable, of the relevant Acquired Companies following the Closing;

(v)    as promptly as reasonably practicable, (A) furnish Buyer and its representatives with the Required Financing Information (and, in the case of the audited financial statements of the Acquired Business as of December 31, 2018 and 2017 and 2016 and for the three fiscal years then ended, furnish such financial statements by June 1, 2019) and (B) inform Buyer if the chief executive officer, chief financial officer, treasurer or controller of each Seller or Acquired Company shall have actual knowledge of any facts that would likely require the restatement of any financial statement for such financial statement to comply with GAAP;

(vi)    provide customary authorization letters to the Debt Financing Sources authorizing the distribution of information to prospective lenders or investors and containing a customary representation to the Debt Financing Sources contemplated by the Debt Commitment Letter, including that the public side versions of such documents do not include material non-public information about Sellers, the Acquired Companies or any of their respective subsidiaries or their securities and the accuracy of the information contained in the disclosure and marketing materials related to the Debt Financing;

(vii)    cause the independent auditors of the Acquired Business to (A) provide, consistent with customary practice, (x) customary auditors consents and customary comfort letters (including "negative assurance" comfort and change period comfort) as reasonably requested by Buyer or as necessary or customary for financings similar to the Debt Financing (including any offering or private placement of debt securities pursuant to Rule 144A under the Securities Act) and (y) reasonable assistance to Buyer in connection with Buyer's preparation of pro forma financial statements and information and (B) attend a reasonable number of accounting due diligence sessions and drafting sessions; and

(viii)  (A) furnish Buyer, and the Debt Financing Sources as directed by Buyer, at least three (3) Business Days prior to the Closing Date with all documentation and other information reasonably required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and a beneficial ownership certificate for any entity that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation (31 C.F.R. § 1010.230), relating to the Acquired Companies or any of their respective subsidiaries to the extent requested in writing at least ten (10) Business Days prior to the Closing Date;

provided, however, (1) in no event shall the "commercially reasonable efforts" of Sellers, the Acquired Companies or their respective subsidiaries and representatives be deemed or construed to require such Persons to, and such Persons shall not be required, to provide such cooperation to the extent it would, in the Sellers' reasonable judgment, (A) interfere unreasonably with the business or operations of Sellers, the Acquired Companies or any of their respective subsidiaries or (B) require Sellers, the Acquired Companies or any of their respective subsidiaries or their representatives to take, or be committed to take, any action that would or would reasonably be expected to (x) conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under the Organizational Documents of Sellers, the Acquired Companies and their respective subsidiaries, any applicable Laws or any material Contract to which Sellers, the Acquired Companies or any of their respective subsidiaries is a party, (y) cause any condition to Closing set forth in this Agreement to fail to be satisfied or otherwise cause any breach of this Agreement that would provide Buyer the right to terminate this Agreement or seek indemnity under the terms hereof (unless, in each case, waived by Buyer and the Debt Financing Sources) or (z) result in any employee, officer or director of such Person incurring any personal liability (as opposed to liability in his or her capacity as an officer of such Person) with respect to any matters related to the Debt Financing, (2) none of the Sellers, the Acquired Companies or any of their respective subsidiaries shall be required to take any action pursuant to any agreement, certificate or instrument (other than customary representation letters and authorization letters to the extent contemplated in the Debt Commitment Letter (including with respect to the presence or absence of material non-public information and the accuracy of the information contained in the disclosure and marketing materials related to the Debt Financing)) that is not contingent upon the occurrence of the Closing, (3) the board of directors (or equivalent bodies) of any Seller, Acquired Company or their respective subsidiaries shall not be required to approve or adopt any Financing or agreements related thereto (or any alternative financing) that would become effective prior to the Effective Time (and in any case subject to Section 5.10(e)(iv)), (4) deliver or cause the delivery of any legal opinions necessary for the Debt Financing, and (5) neither Sellers, the Acquired Companies, nor any of their respective subsidiaries shall be required to pay any commitment or other similar fee prior to the Effective Time or bear any cost or expense or make any other payment or incur any liability, loss, damage, claim, cost, expense, or penalty in connection with the Debt Financing or any of the foregoing matters described in this Section 5.10 that is not subject to reimbursement or indemnity hereunder.  It is understood and agreed that the Buyer does not have an independent right to demand a restatement of any portion of the Required Financing Information or any other financial statements under this Section 5.10 for marketing purposes or otherwise to the extent such Required Financing Information is Compliant.

(f)  Sellers will use their commercially reasonable efforts, and will cause each of the Acquired Companies their respective subsidiaries to use their respective commercially

41462373.9

reasonable efforts, to update any Required Financing Information provided to Buyer as may be necessary so that such Required Financing Information (i) is Compliant, (ii) meets the applicable requirements set forth in the definition of "Required Financing Information" and (iii) would not, after giving effect to such update(s), cause the Marketing Period to cease pursuant to the definition of "Marketing Period." For the avoidance of doubt, Buyer may, to most effectively access the financing markets, require the cooperation of Sellers, the Acquired Companies and their respective subsidiaries under this Section 5.10 at any time, and from time to time and on multiple occasions, between the date hereof and the Closing Date; provided, that, for the avoidance of doubt, the Marketing Period shall not be applicable as to each attempt to access the markets. In addition, if, in connection with any financing marketing efforts during the term of this Agreement, Buyer reasonably requests Sellers or the Acquired Companies to make available to their respective securityholders and lenders material non-public information with respect to the Sellers, the Acquired Company and their respective subsidiaries or securities, which Buyer reasonably determines to include in marketing materials for such financing, then Sellers and the Acquired Companies shall make such information available to their respective securityholders and lenders.

(g)     Each of the Sellers and the Acquired Companies hereby consent to the use of their and their respective subsidiaries' logos solely in connection with the Debt Financing; provided that such logos are used solely in a manner that is not intended or reasonably likely to harm, disparage or otherwise adversely affect Sellers, the Acquired Companies or any of their respective subsidiaries or the reputation or goodwill of Sellers, the Acquired Companies or any of their respective subsidiaries.

(h)     Buyer shall, promptly upon request by Sellers, reimburse Sellers for all documented and reasonable out-of-pocket costs and expenses incurred by Sellers, the Acquired Companies or any of their respective subsidiaries or any of their respective representatives in connection with such cooperation contemplated by this Section 5.10. Buyer shall indemnify and hold harmless Sellers, the Acquired Companies, their respective subsidiaries and their respective representatives from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by any of them in connection with the Debt Financing, including, without limitation, in connection with the provision of any information utilized in connection therewith (other than information provided in writing by Sellers or their respective subsidiaries specifically for use in connection with the Debt Financing), in each case, except to the extent any of the foregoing was suffered or incurred as a result of bad faith, gross negligence, willful misconduct or material breach of this Agreement by Sellers, the Acquired Companies or any of their respective subsidiaries or, in each case, their respective representatives.

(i)     (i)     Buyer acknowledges and agrees that neither the obtaining of the Financing or any alternative financing is a condition to the Closing or its other obligations under this Agreement, and reaffirms its obligation to consummate the Transactions and its other obligations under this Agreement irrespective and independently of the availability of the Financing or any alternative financing, subject to the applicable conditions set forth in Article 7 and the provisions of Section 10.4.

41462373.9

5.11    Tax Matters.

(a)    Notwithstanding anything to the contrary in this Agreement, each of Buyer, on the one hand, and Sellers, on the other hand, shall be responsible for 50% of any Transfer Taxes. Sellers and Buyer shall, and shall cause their respective Affiliates to, cooperate to timely prepare and file any Tax Returns or other filings relating to Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

(b)    Sellers shall be responsible for the preparation and timely filing of all income Tax Returns of the Acquired Companies for Pre-Closing Tax Periods. Such Tax Returns shall be prepared consistent with past practice and in accordance with applicable Law.

(c)    Buyer shall be responsible for the preparation and timely filing of all other Tax Returns of the Acquired Companies. Straddle Period Tax Returns shall be prepared consistent with the past practice of the Acquired Companies, except to the extent required by applicable Law. Buyer shall provide Sellers with a draft of each Straddle Period Tax Return at least thirty (30) days prior to filing any Tax Return of the Acquired Companies for review and comment.

(d)    To the extent permitted or required by Applicable Law, the taxable year of each of the Acquired Companies that includes the Closing Date shall be treated as closing on (and including) the Closing Date. For purposes of determining the amount of Taxes of the Acquired Companies for Straddle Periods attributable to a Pre-Closing Tax Period or a Post-Closing Tax Period, the amount of Taxes attributable to the Pre-Closing Tax Period shall be deemed to be (i) in the case of Taxes imposed on a periodic basis (such as certain franchise Taxes, real or personal property Taxes), the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the number of calendar days in the entire Straddle Period, and (ii) in the case of Taxes other than Taxes described in (i) above, such as Taxes based on income or receipts, the amount of such Taxes shall be computed as if such taxable period ended as of the end of the day on the Closing Date; provided, that exemptions, allowances or deductions that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in proportion to the number of days in each period.

(e)    After Closing, Sellers, on the one hand, and Buyer and the Acquired Companies, on the other hand, shall promptly deliver to the other any notice received by them (or by an Affiliate thereof) from any Governmental Entity relating to Taxes for which such other Person is or may be liable under this Agreement. Sellers, Buyer and the Acquired Companies shall cooperate fully, as and to the extent reasonably requested by any of the other Parties, in connection with the filing of Tax Returns pursuant to this Section 5.11 and any Tax Proceeding (as defined below) with respect to Taxes. Sellers and Buyer and the Acquired Companies, further agree (after Closing) to retain all books and records with respect to Tax matters pertinent to the Acquired Companies relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by any other Party, any extensions thereof) of the respective taxable periods, and upon any other Party's request, to give such other Party access to such books and records which are reasonably relevant to a Tax Proceeding or Tax Return involving the Acquired Companies and to make employees and personnel available on a mutually

57

convenient basis to provide additional information and explanation of any material provided hereunder.

(f)    Buyer shall not amend (or cause or permit any Acquired Company to amend) any Tax Return of any Acquired Company for any taxable period beginning before the Closing Date without the prior written consent of Sellers, which consent shall not be unreasonably withheld.

(g)    Buyer in its sole discretion shall be permitted to cause Pittsburgh Cable News Channel, LLC to make an election under Section 754 of the Code.  Sellers shall in good faith cooperate with Buyer to enable Buyer, in its sole discretion, to cause Pittsburgh Cable News Channel, LLC to make an election under Section 6226 of the Code.

(h)    Sellers and Buyer intend that the sales of the Purchased Assets and the Acquired Companies (including both the Acquired Companies that are treated as disregarded entities for U.S. federal income tax purposes and the Acquired Corporations) contemplated hereby will be treated as fully taxable asset sales for U.S. federal income tax purposes Sellers and their Affiliates shall join with Buyer in making an election under Section 338(h)(10) of the Code and any corresponding or similar elections under state, local or foreign Tax law (a "Section 338(h)(10) Election") with respect to the purchase and sale of the stock of any of the Acquired Corporations hereunder. At Buyer's request, in lieu of Section 338(h)(10) Elections, Sellers and their Affiliates shall reasonably consider alternatives to Section 338(h)(10) Elections that will cause the acquisition of the Acquired Corporations to be treated as fully taxable asset sales for U.S. federal income tax purposes.  Buyer shall prepare and file all forms and documents required in connection with any Section 338(h)(10) Election.  In addition to the Forms 8023 described in Section 8.1(s), Sellers shall execute (or cause to be executed) and deliver to Buyer such additional documents or forms as Buyer reasonably requests to complete any Section 338(h)(10) Election at least 10 days prior to the date such documents or forms are required to be filed.  Buyer and Sellers and their respective Affiliates shall be bound by any Section 338(h)(10) Election for all Tax purposes. Buyer and Sellers shall file, and shall cause their respective Affiliates to file, all Tax Returns in a manner consistent with any Section 338(h)(10) Election and shall take no position contrary thereto except to the extent otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code (or any similar provision of applicable state, local or foreign Law).

(i)    Sellers shall be entitled to receive any refunds or credits of any Taxes for any Pre-Closing Tax Period (including any interest in respect thereof, and including any reduction of Post-Closing Tax Period Taxes as a result of application of any refund or credit for a Pre-Closing Tax Period against such Taxes), except to the extent that such refund or credit is attributable to the carryback of Tax attributes arising in a taxable year (or portion thereof) beginning after the Closing Date. Buyer shall cause the amount of any refunds or credits to which Sellers are entitled under this Section 5.11, but which are received by or credited to Buyer or any Acquired Company after the Closing Date, to be paid to Sellers within five (5) Business Days following such receipt or crediting.   In addition, at the request of Sellers, Buyer shall (and shall cause the Acquired Companies to) cooperate with Sellers in seeking any Tax refunds or credits described in this Section 5.11(i).  The Sellers shall repay to Buyer or the applicable Acquired Company any amounts received pursuant to this Section 5.11(i) to the extent that the refund or credit giving rise to such amounts are subsequently disallowed by any Governmental Entity. The Buyer Indemnified Parties

shall be entitled to offset any payment owed to Sellers pursuant to this Section 5.11(i) against any amounts Sellers are obligated to pay to the Buyer Indemnified Parties under Section 9.2(a).

(j)     Notwithstanding anything herein to the contrary, Sellers shall have the right to conduct and control any audit, examination, litigation or other proceeding with respect to Taxes (a "Tax Proceeding") involving the Acquired Companies to the extent it relates to any Pre-Closing Tax Period, provided, however, that Buyer shall have the right to participate in any such Tax Proceeding and Sellers shall not, without the written consent of Buyer, which consent shall not be unreasonably withheld or delayed, settle or compromise any such Tax Proceeding in a manner that would have the effect of materially increasing the Taxes of the Acquired Companies in a Post-Closing Tax Period.

5.12     Intercompany Accounts and Intercompany Arrangements.  Immediately prior to the Closing, all intercompany balances and accounts (other than accounts set forth in Schedule 5.12) between any Seller or any of its Affiliates (other than the Acquired Companies), on the one hand, and the Acquired Companies, on the other hand, shall be settled or otherwise eliminated. Immediately prior to the Closing, except for the Transaction Documents to be entered into in connection with this Agreement or as set forth on Schedule 5.12, all Affiliate Contracts, other than Affiliate Contracts identified and made available to Buyer within sixty (60) days of the date of this Agreement involving consideration of less than $250,000 per annum, shall automatically be terminated without further payment or performance and cease to have any further force and effect, such that no party thereto shall have any further Liabilities therefor or thereunder.

5.13     Pre-Closing Restructuring.  At or prior to the Closing, Sellers shall, and shall cause their respective applicable Affiliates (including the Acquired Companies) to use reasonable best efforts to complete the transactions set forth on the Pre-Closing Restructuring Steps Plan attached to Schedule 5.13(a) (the "Step Plan") as described therein other than immaterial changes, in compliance with applicable Law (such transactions, collectively, the "Pre-Closing Restructuring"), including (i) obtaining all Approvals of all Governmental Entities and under all Permits and (ii) using reasonable best efforts to obtain all material Approvals of all third parties, in each case that are required to consummate the transactions contemplated by the Pre-Closing Restructuring. Following the Pre-Closing Restructuring, CMG will own equity interests in Pearl Mobile DTV Company, LLC,  Right This Minute, LLC, and Garnet Media Company, LLC in the percentages set forth on Schedule 5.13(c) (the "Minority Investment Interests") and shall convey the Minority Investment Interests to Buyer at Closing. For the avoidance of doubt, none of the Minority Investments shall be considered an Acquired Company (or subsidiary thereof) for purposes of this Agreement or the Trans-actions. For the avoidance of doubt, the Pre-Closing Restructuring will not include the transfer of the Purchased Assets to Buyer.

5.14     Non-Solicitation of Employees; Non-Competition.

(a)     For a period of two (2) years from the Closing Date, without the prior written consent of Buyer, as to any individual who was an officer or other member of senior management of the Business to be listed on Schedule 5.14(a) immediately prior to the Closing and became employed by Buyer or its subsidiaries as of immediately following the Closing (a "Covered Person"), Sellers agree that none of Sellers or any of their respective subsidiaries will (and that Sellers will cause their respective subsidiaries not to), directly or indirectly, solicit for

59

employment or employ any Covered Person; provided, that Sellers shall not be precluded from soliciting, or taking any other action with respect to any such individual (i) whose employment ceased at least three (3) months prior to commencement of employment discussions between any Seller and such individual or (ii) who responds to general solicitations not specifically targeted at employees of Buyer or any of its Affiliates (including through any search firm or recruiting agency so long as such search firm or recruiting agency has not been directed to target employees of Buyer or any of its Affiliates); provided, further, that Sellers and their respective Affiliates shall not be restricted from engaging in general solicitations or advertising not targeted at any such Persons described above.  The parties hereto agree that if a Covered Person requests that Buyer waive the non-solicitation and non-employment restrictions set forth in this Section 5.14(a) with respect to that Covered Person, Buyer shall consider such request in good faith.

(b)     For a period of three (3) years from the Closing Date, without the prior written consent of Buyer, Sellers agrees that none of Sellers or any of their respective subsidiaries will (and that Sellers will cause their respective subsidiaries not to) engage in the Business; provided, that nothing herein shall preclude Sellers from:

(i)     owning five percent (5%) or less of the outstanding voting power or equity securities of any Person (other than Buyer or its Affiliates);

(ii)     acquiring and, after such acquisition, owning an interest in any Person (or its successor) that is engaged in a business activity that would otherwise violate this Section 5.14(b) (a "Competing Business") if such Competing Business generated less than ten percent (10%) of such Person's consolidated annual gross revenues in the last completed fiscal year of such Person;

(iii)     acquiring and, after such acquisition, owning an interest in any Person (or its successor) that is engaged in a Competing Business if (A) such Competing Business generated five percent (5%) or more (but in no event greater than ten percent (10%)) of such Person's consolidated annual revenues in the last completed fiscal year of such Person and (B) Sellers enter, within one (1) year after the consummation of such acquisition, into a definitive agreement to cause the divestiture of the Competing Business of such Person to an unaffiliated third party such that the restrictions set forth in this Section 5.14(b) would not operate to restrict such ownership and has completed such disposition within twelve (12) months of the date of such definitive agreement (the "Divestiture Period");

(iv)     exercising its rights or complying with its obligations under this Agreement or any of the Transaction Documents; or

(v)     conducting the ownership and operations of Sellers (or any of their respective Affiliates) apart from the Business or the ownership of the Purchased Assets as of the date of this Agreement.

(c)     Sellers acknowledge and agree that (x) the covenants set forth in this Section 5.14 are reasonable with respect to duration and scope and are reasonable and necessary to protect the goodwill and other assets purchased by Buyer pursuant to this Agreement and to protect its investment therein and (y) Buyer and its Affiliates shall have the right and remedy,

41462373.9

without regard to any other available remedy, to (i) have the covenants set forth in this <u>Section 5.14</u> specifically enforced by any court of competent jurisdiction and (ii) have issued an injunction restraining any such breach without posting of a bond; it being understood that any breach of any of the covenants set forth in this <u>Section 5.14</u> would cause irreparable and material loss to Buyer and its Affiliates, the amount of which cannot be readily determined and as to which neither Buyer nor any of its Affiliates will have any adequate remedy at Law or in equity.

      5.15   <u>Intellectual Property Matters</u>.  Effective as of the Closing Date:

      (a)   Each Seller, on behalf of itself and its subsidiaries as of the Closing Date (other than the Acquired Companies) hereby grants to Buyer and the Acquired Companies a non-exclusive, worldwide, perpetual, revocable (as provided below), fully paid-up, royalty-free, non-transferable (except as set forth in this Section 5.15) and non-sublicensable (except as set forth in this Section 5.15) license under all Intellectual Property (other than trademarks, including, without limitation, the Cox TMs) that (x) is owned by such Seller and the above subsidiaries as of immediately following the Closing and (y) has been used in the Business as of the Closing Date or at any time during the twelve (12) month period prior to the Closing Date (the "Seller Licensed IP"), in each case, to use, reproduce, create derivative works of, modify, distribute, make, have made, sell, offer for sale, import or otherwise commercially exploit products and services solely in connection with the current and future operation of the Business or any reasonable evolutions or expansions thereof.

      (b)   Buyer, on behalf of itself and its subsidiaries as of the Closing Date (including the Acquired Companies), hereby grants to Sellers and their respective subsidiaries a non-exclusive, worldwide, perpetual, revocable (as provided below), fully paid-up, royalty-free, non-transferable (except as set forth in this Section 5.15) and non-sublicensable (except as set forth in this Section 5.15) license under the owned Intellectual Property (other than trademarks) that has been used by Sellers or their respective subsidiaries in the operation of any of their existing businesses (other than the Business) as of the Closing Date or at any time during the twelve (12) month period prior to the Closing Date, in each case, to use, reproduce, create derivative works of, modify, distribute, make, have made, sell, offer for sale, import or otherwise commercially exploit products and services solely in connection with the current and future operation of their existing businesses or any reasonable evolutions or expansions thereof (other than the Business).

      (c)   The above licenses may be sublicensed by the licensed parties to (x) their Affiliates and (y) their respective vendors, service providers, distributors, retailers, customers and end-users, as applicable, in each case with respect to the operation of the Business (or existing businesses or any reasonable evolutions or expansions thereof that remain in substantially the same fields of business as were conducted at Closing and in the 12 months preceding Closing, as applicable), but, with respect to clause (y) not with respect to other products or services of such third parties.

      (d)   The above licenses may be revoked and terminated upon written notice, following a fifteen (15) day notice and cure period: (a) in the event that the licensee under either such license takes such action as to imperil the ongoing validity and enforceability of such Intellectual Property, or (b) in the event that the licensee materially breaches its license. In the event that conditions occur giving a licensor the right to exercise its termination right pursuant to

the preceding sentence, such termination right shall only apply to the particular Intellectual Property at issue, and not to all Intellectual Property licensed pursuant to this Section 5.15.

(e)     The Parties hereto intend and agree that, for purposes of Section 365(n) of the U.S. Bankruptcy Code (and any amendment thereto) and any equivalent Law in any foreign jurisdiction, each of the above licenses will be treated as a license to intellectual property (as defined in Section 101(35A) of the U.S. Bankruptcy Code).

(f)     The above licenses are intended to run with the Intellectual Property subject thereto. Each licensing party may and must transfer this license, in whole or in part, to the acquirer of any Intellectual Property owned by a party and subject thereto, and such acquirer shall assume its obligations in writing or by operation of law. Any such acquirer is deemed automatically bound by such license, regardless of whether such acquirer executes such written assumption. Further, each licensed party may transfer the license granted to such party, in whole or in part, to (i) an Affiliate or successor via merger that engages in the Business or Sellers' or their respective subsidiaries' existing businesses or any reasonable evolutions or expansions thereof that remain in substantially the same fields of business as were conducted at Closing and in the 12 months preceding Closing (other than the Business), as applicable, as part of an internal reorganization or (ii) the acquirer of one or more businesses or business lines of such party covered by such license (or the entities owning the same), provided that, after any such acquisition, the above licenses shall apply only to the Party's transferred businesses and not to any unrelated businesses of any such acquirer. All other transfers of this license require the prior written consent of the other Party in its sole discretion, and are void ab initio without same.

(g)     Each Seller, on behalf of itself and its subsidiaries as of the Closing Date (other than the Acquired Companies) hereby grants to Buyer and the Acquired Companies a limited, non-transferable, non-exclusive, fully-paid up, royalty free license to use all (i) trademarks containing or incorporating the term "Cox," (ii) variations or acronyms of any of the foregoing, and (iii) trademarks confusingly similar to or dilutive of any of the foregoing (the "Cox TMs") for the sole purpose of winding down the use of such Cox TMs in the operation of the Business for a period of up to ninety (90) days following the Closing Date (the "Transitional Period"). As soon as reasonably practicable following the Closing Date, but in any event by the expiration of the Transitional Period, Buyer shall, and shall cause the Acquired Companies to, (x) cease and discontinue all uses of the Cox TMs and (y) eliminate the Cox TMs from any signage or other public-facing materials owned or controlled by Buyer or any of its Acquired Companies after the Closing Date. Buyer, on behalf of itself and the Acquired Companies, agrees that any use of the Cox TMs within the Transitional Period shall be substantially similar to how the Cox TMs were used by Sellers prior to the Closing Date and in accordance with all applicable Laws. Seller may provide Buyer with Seller's trademark usage guidelines, in which case Buyer will use the marks in conformance with such usage guidelines. As between the Parties, Sellers are the sole and exclusive owners of all right, title and interest in and to the Cox TMs and all rights related thereto and goodwill associated therewith, and all uses of the Cox TMs and the goodwill arising therefrom shall inure solely to the benefit of Sellers. Sellers shall have the right to inspect and exercise quality control with respect to Buyer's use of the Cox TMs. Buyer shall not, and shall cause the Acquired Companies to not, use the Cox TMs in a manner that could reasonably be expected in any respect to reflect negatively on, or otherwise adversely affect, the Cox TMs (including the goodwill associated therewith) or Sellers. In the event that Buyer uses any such Cox TM in a

41462373.9

manner that could reasonably be expected in any respect to reflect negatively on, or otherwise adversely affect, any such Cox TM (including the goodwill associated therewith) or Sellers, Buyer shall promptly cease any such use upon receiving written notice from Seller and shall coordinate with Seller to remedy such use.

5.16    Transition Services Agreement.  From and after the date hereof, the Parties hereto shall work in good faith to finalize the schedules to the Transition Services Agreement, in accordance with the principles set forth on Schedule 5.16.

5.17    Rollover Transactions.  Within a reasonable time following the execution of this Agreement, Parent, Buyer and any relevant Affiliates of such persons will enter into a Contribution Agreement consistent with the Rollover Term Sheet attached to this Agreement as Exhibit E hereto (the "Contribution Agreement"), pursuant to which, contemporaneously with the Closing and in a transaction fully taxable as an asset sale for U.S. federal income tax purposes, Buyer will deliver or cause to be delivered the equity interests in the indirect parent of Buyer ("Holdco") set forth in the Contribution Agreement to Parent or a wholly-owned Affiliate thereof and reduce the Purchase Price payable under this Agreement by the amount set forth in the Contribution Agreement.  Parent shall not contribute the equity interests in Holdco to CMG and shall ensure that CMG continues to be treated as a corporation for U.S. federal income tax purposes.  Following the date of this Agreement, Buyer and Sellers shall reasonably negotiate in good faith (a) to finalize the Contribution Agreement and (b) if elected by Sellers, to identify additional media-related assets of Parent or its Affiliates (for the avoidance of doubt, that are not Purchased Assets or assets of Acquired Companies or their subsidiaries hereunder) to be transferred by Parent or its Affiliates at Closing to Holdco, Buyer, or an Affiliate thereof in return for additional equity interests in Holdco, and the valuation of any such assets for purposes of such transfer, in such amount as is necessary for Parent and its Affiliates to own 25% (the "Maximum Percentage") of the common equity of Holdco as of the Closing (or such lesser percentage as Sellers shall elect).  Upon any such agreement by the Parties, the Parties shall amend the Contribution Agreement to provide for the transfer of any such additional assets in return for additional equity interests in Holdco.  Within three (3) months of the date of this Agreement, in the event Sellers and Buyer are not able to agree upon any such additional media-related assets to be transferred and the valuation thereof for purposes of such transfer, then Parent, if it so elects, instead shall be entitled to transfer cash to Holdco as the purchase price for any such additional equity in Holdco that it elects to acquire, up to the Maximum Percentage.  Notwithstanding the foregoing, Parent and its Affiliates shall not acquire more than 19.9% of the stock of Holdco unless a gain recognition election is made pursuant to Section 197(f)(9) with respect to the entire transaction that is reasonably acceptable to Buyer. Contemporaneously with the Closing, Buyer, Parent or the applicable Affiliate(s) thereof, and the other stockholders of Holdco shall enter into a Stockholders Agreement governing the operation of Holdco on the terms and conditions set forth in such Rollover Term Sheet (the "Holdco Stockholders Agreement").

5.18    CCI Retransmission Consent Agreement.  Reference is made to that certain Retransmission Consent Agreement by and between CMG and CoxCom LLC, d/b/a Cox Communications ("CCI"), dated as of April 1, 2017 (the "2017 RTC Agreement"), which shall be assumed by Buyer pursuant to its acquisition of the TV Stations as part of the Transactions.  Buyer agrees and acknowledges that as of the Closing, the 2017 RTC Agreement shall be amended to reflect the updated terms described in Exhibit F (the "Amended Terms"), and in the event of any

41462373.9

conflict between the terms of the 2017 RTC Agreement and the Amended Terms, the Amended Terms shall govern. Except as amended pursuant to the Amended Terms, the 2017 RTC Agreement shall remain in full force and effect after the Closing. Without limiting the forgoing, Buyer agrees and acknowledges that the 2017 RTC Agreement, as amended by the Amended Terms, shall govern the terms of retransmission of the TV Stations and any other TV stations in which Buyer or any of its Affiliates acquires a controlling interest as of or after the Closing, until the expiration or earlier termination of the 2017 RTC Agreement, as amended by the Amended Terms.

ARTICLE 6
SELLERS' CLOSING CONDITIONS

The obligation of Sellers to consummate the Closing hereunder is subject to satisfaction, at or prior to Closing, of each of the following conditions (unless waived in writing by Sellers, other than the Governmental Consents, which cannot be waived):

6.1     Representations and Covenants.

(a)     All representations and warranties of Buyer contained in this Agreement shall be true and correct at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which need be true and correct as of such specified date only), except to the extent that the failure of the representations and warranties of Buyer contained in this Agreement to be so true and correct at and as of the Closing (or in respect of any representation or warranty that is expressly made as of a specified date, as of such date only) has not had and would not reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect; provided, that for purposes of this Section 6.1(a), all materiality or similar qualifiers within such representations and warranties shall be disregarded.

(b)     The covenants and agreements that by their terms are to be complied with and performed by Buyer at or prior to the Closing shall have been complied with or performed by Buyer in all material respects.

(c)     Sellers shall have received a certificate dated as of the Closing Date from Buyer executed by an authorized officer of Buyer to the effect that the conditions set forth in Sections 6.1(a) and 6.1(b) have been satisfied.

6.2     Proceedings.  Neither Seller, nor any Acquired Company or its respective subsidiaries, nor Buyer shall be subject to any court or Governmental Order or injunction, and no Law shall have been enacted, which remains in effect, prohibiting or making illegal the consummation of the Transactions.

6.3     FCC Authorization.  The FCC Consent shall have been granted and shall be in full force and effect.

6.4     Hart-Scott-Rodino.  The HSR Clearance shall have been obtained.

64

ARTICLE 7
BUYER'S CLOSING CONDITIONS

The obligation of Buyer to consummate the Closing hereunder is subject to satisfaction, at or prior to Closing, of each of the following conditions (unless waived in writing by Buyer, other than the Governmental Consents, which cannot be waived):

7.1    Representations and Covenants.

(a)    (i) The representations and warranties of Sellers contained in this Agreement (other than the representations and warranties of Sellers described in clauses (ii) and (iii)) shall be true and correct at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which need be true and correct as of such specified date only), except to the extent that the failure of such representations and warranties of Sellers contained in this Agreement to be so true and correct at and as of the Closing (or in respect of any representation or warranty that is expressly made as of a specified date, as of such date only) has not had a Material Adverse Effect; (ii) the representations and warranties of Sellers contained in the first sentence of Section 2.1 (Existence; Good Standing), Section 2.2 (Authorization and Binding Obligation), Section 2.22 (Assets; Sufficiency), and Section 2.23 (No Brokers) shall be true and correct at and as of the Closing (other than any representation or warranty that is expressly made as of a specified date, which need be true and correct as of such specified date only) in all material respects; and (iii) the representations and warranties of Sellers contained in Section 2.3 (Ownership of Equity Interests; Subsidiaries) other than the last sentence thereof, shall be true and correct in all respects; provided, that for purposes of this Section 7.1(a), in each case, all materiality or similar qualifiers within such representations and warranties shall be disregarded.

(b)    The covenants and agreements that by their terms are to be complied with and performed by Sellers at or prior to Closing shall have been complied with or performed by Sellers in all material respects.

(c)    Buyer shall have received a certificate dated as of the Closing Date from Sellers executed by an authorized officer of Sellers to the effect that the conditions set forth in Sections 7.1(a), 7.1(b) and 7.5 have been satisfied.

7.2    Proceedings.    Neither any Seller, nor any Acquired Company or its respective subsidiaries, nor Buyer shall be subject to any court or Governmental Order or injunction, and no Law shall have been enacted, which remains in effect, prohibiting or making illegal the consummation of the Transactions.

7.3    FCC Authorization.  The FCC Consent shall have been granted and shall be in full force and effect.

7.4    Hart-Scott-Rodino.  The HSR Clearance shall have been obtained.

7.5    Northwest Purchase Agreement.  The conditions set forth in Section 6.1 and Section 6.2 of the Northwest Purchase Agreement shall have been satisfied (provided, for the avoidance of doubt, that the consummation of the transactions contemplated by the Northwest Purchase Agreement shall not be a condition to Buyer's obligation to consummate the Closing).

65

7.6     No Material Adverse Effect.  Since the date of this Agreement, there shall not have been, nor shall there be, any Material Adverse Effect.

ARTICLE 8
CLOSING DELIVERIES

8.1     Seller Documents.  At Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)     bills of sale, substantially in the form attached hereto as Exhibit G (each, a "Bill of Sale"), duly executed by CMG, Cox Ohio and Cox Radio, as applicable;

(b)     assignment and assumption agreements substantially in the form attached hereto as Exhibit H (each, an "Assignment and Assumption Agreement"), duly executed by CMG, Cox Ohio, and Cox Radio, as applicable;

(c)     assignment agreements for the FCC Licenses, substantially in the form attached hereto as Exhibit I (each, an "FCC Assignment Agreement"), duly executed by the applicable licensee;

(d)     assignment and assumption agreements for the Real Property Leases included in the Purchased Assets, substantially in the form attached hereto as Exhibit J (each, a "Real Property Assignment"), duly executed by CMG, Cox Ohio and Cox Radio, respectively;

(e)     assignment agreements for the Intellectual Property substantially in the form attached hereto as Exhibit K (each, an "IP Assignment Agreement"), duly executed by CMG, Cox Ohio and Cox Radio, and any Affiliates of such parties as may be mutually agreed by the Parties;

(f)     certified copies of all resolutions necessary to authorize the execution, delivery and performance of this Agreement by Sellers, including the consummation of the Transactions;

(g)     the certificate described in Section 7.1(c);

(h)     (i) original share certificates representing the Equity Interests (or in the case of lost share certificates, affidavits of loss, including customary indemnification provisions), duly endorsed in blank for transfer, or accompanied by irrevocable stock powers duly executed in blank, and (ii) membership interest assignments, duly executed by the Seller or other holder of the Equity Interests, as applicable;

(i)     affidavits of non-foreign status of each Seller that comply with Treasury Regulations Section 1.1445-2(b)(2), duly executed by each Seller;

(j)     resignations of each officer and director of the Acquired Companies, effective as of the Closing;

(k)     copies of the Organizational Documents of each Acquired Company and Seller, certified by the Secretary of State hereof;

(l)     transition services agreement substantially in the form attached hereto as Exhibit L (the "Transition Services Agreement"), duly executed by Buyer;

(m)     the Seller landlord leases set forth on Schedule 8.1(m) (each, a "Seller Landlord Lease"), duly executed by Buyer, respectively;

(n)     the Buyer landlord leases set forth on Schedule 8.1(n) (each, a "Buyer Landlord Lease"), duly executed by Buyer, respectively;

(o)     subordination, non-disturbance and attornment agreements (the "SNDAs") as contemplated by Article 5 of the Seller Landlord Leases, duly executed by the landlord and by the mortgagees of the properties subject to Seller Landlord Leases;

(p)     a duly executed limited warranty deed (or the equivalent under applicable Law) for each Owned Real Property included in the Purchased Assets (each, a "Deed")

(q)     documentation evidencing any consents obtained pursuant to the terms of the Material Agreements specified in Sections 2.9(a)(i), 2.9(a)(iv), 2.9(a)(v) and 2.9(a)(ix);

(r)     with respect to each acquisition of an Acquired Corporation by Buyer, two copies of IRS Form 8023 (or successor form), executed by Parent and completed in a manner that will permit Buyer to make a Section 338(h)(10) Election with respect to such Acquired Corporation;

(s)     (i) the Debt Payoff Letters for any Indebtedness for borrowed money that is to be repaid at Closing, and (ii) customary releases, reconveyances, UCC terminations and other relevant documentation, suitable for filing in each applicable jurisdiction and sufficient to evidence the release of any Indebtedness for borrowed money or guarantees thereof by the Acquired Companies or their respective subsidiaries and any security interests or other Liens (other than Permitted Liens) encumbering all or any portion of the Acquired Companies, their respective subsidiaries or the Purchased Assets; and

(t)     the Holdco Stockholders Agreement, duly executed by CMG and the other Affiliates of Parent acquiring equity interests in Holdco.

8.2     Buyer Documents.  At Closing, Buyer shall deliver or cause to be delivered to Sellers (unless otherwise specified herein):

(a)     the Estimated Purchase Price as calculated pursuant to Section 1.2 hereof;

(b)     the Assignment and Assumption Agreements duly executed by Buyer;

(c)     the FCC Assignment Agreements duly executed by Buyer;

(d)     the Real Property Assignment Agreements duly executed by Buyer;

(e)     the IP Assignment Agreements duly executed by Buyer;

(f)     certified copies of all corporate or other resolutions necessary to authorize the execution, delivery and performance of this Agreement by Buyer, including the consummation of the Transactions;

(g)     the certificate described in Section 6.1(c);

(h)     the Transition Services Agreement duly executed by Buyer;

(i)     the Seller Landlord Leases duly executed by Buyer;

(j)     the Buyer Landlord Leases duly executed by Buyer;

(k)     SNDAs duly executed by the tenant under each of the Seller Landlord Leases; and

(l)     the Holdco Stockholders Agreement, duly executed by each owner of an equity interest in Holdco (other than Parent and its Affiliates).

ARTICLE 9
SURVIVAL AND INDEMNIFICATION

9.1     Survival. The representations, warranties, covenants and agreements in this Agreement and any certificates delivered in connection herewith shall not survive the Closing, whereupon they shall expire and be of no further force or effect, and all claims related thereto, or otherwise related to the subject matter of this Agreement, whether based upon breach of contract or any other legal or equitable claim or theory of recovery, shall terminate and expire upon the Closing; provided that the (a) covenants and agreements contained in Section 4.2 (the "Pre-Closing Covenants") shall survive Closing for one (1) year; and (b) the covenants and agreements in this Agreement and the other Transaction Documents, to the extent expressly contemplated by their respective terms to be performed after the Closing (the "Post-Closing Covenants") shall survive the Closing until fully performed, whereupon they shall expire and be of no further force or effect, and all claims related thereto shall then terminate and expire.

9.2     Indemnification.

(a)     Subject to the other provisions and limitations of this Article 9, from and after the Closing, Sellers shall, jointly and severally, indemnify, defend and hold harmless Buyer, the Acquired Companies and their subsidiaries (post-Closing), and each of their respective officers, directors, members, shareholders, equityholders, managers, representatives, agents, successors and assigns (collectively, the "Buyer Indemnified Parties") from and against any Actions, costs, expenses, losses, damages, liabilities, deficiencies, judgments, interest, Taxes, awards, penalties and fines (collectively, "Damages") that any Buyer Indemnified Party suffers, sustains, or incurs arising out of, relating to or resulting from (i) a breach of any Pre-Closing Covenant made by Sellers; (ii) a breach of any Post-Closing Covenant made by Sellers; (iii) any Excluded Liability; (iv) any Excluded Asset; and (v) the Pre-Closing Restructuring ((i) through (v) collectively, the "Retained Liability Indemnities". Notwithstanding the foregoing, any

68

indemnity payment to be made by Sellers hereunder shall be made by Sellers to Buyer, the Acquired Companies or their subsidiaries (post-Closing), except that, to the extent any other Buyer Indemnified Party sustains an out-of-pocket loss in connection with any such indemnified matter, then, to such extent only, payment shall be made to such Buyer Indemnified Party, subject to the other terms and conditions of this Agreement.

(b)     Subject to the other provisions and limitations of this Article 9, from and after the Closing, Buyer shall indemnify, defend and hold harmless Seller and its Affiliates (excluding the Acquired Companies and their subsidiaries after the Closing) and each of their respective officers, directors, members, shareholders, equityholders, managers, representatives, agents, successors and assigns (collectively, the "Seller Indemnified Parties") from and against any Damages that any Seller Indemnified Party suffers, sustains, or incurs arising out of: (i) a breach of or material misrepresentation with respect to, any of the representations and warranties made by Buyer contained in Article 3 of this Agreement; (ii) a breach by Buyer of any Pre-Closing Covenant made by Buyer; (iii) any Assumed Liabilities; and (iv) all Carriage Resolution Damages. Buyer agrees that Damages payable to any Seller Indemnified Party for any claim for Carriage Resolution Damages shall be grossed up in an amount to make such Seller Indemnified Party whole for the entirety of its Damages to account for the percentage of equity in Holdco (and resulting loss) that Seller or its Affiliates would incur in respect of such Damages payment.

(c)     Notwithstanding anything to the contrary set forth in this Agreement, Buyer acknowledges and agrees, on behalf of itself and each Buyer Indemnified Party, that Sellers shall not have any direct or indirect liability with respect to any breach of any representation or warranty contained in this Agreement. The preceding sentence shall be without prejudice to Buyer Indemnified Parties' indemnification for a Retained Liability Indemnity, irrespective of whether such Retained Liability Indemnity would also constitute a breach of a representation or warranty made by Sellers' provided that in the case of an Excluded Liability, to the extent (if any) there exists a breach of a representation or warranty by Seller in respect of such Excluded Liability, Buyer and the other Buyer Indemnified Parties must assert claims for indemnification under the R&W Insurance Policy first prior to asserting such claims against Sellers pursuant to this Agreement.

(d)     For the purposes of determining (i) whether there has occurred any breach of any representation and warranty and (ii) the amount of any Damages suffered by any Buyer Indemnified Party, the representations and warranties of Seller set forth in Article 2 of this Agreement shall be considered without regard to any materiality or Material Adverse Effect qualification therein.

(e)     Any Indemnified Party that becomes aware of any Damages for which it seeks indemnification under this Article 9 shall be required to use reasonable best efforts to mitigate such Damages including taking any actions reasonably requested by the Indemnifying Party and an Indemnifying Party shall not be liable for any Damages to the extent that it is attributable to the Indemnified Party's failure to mitigate; provided, that any costs or expenses incurred in connection with such efforts shall be deemed Damages hereunder.

(f)     The Parties acknowledge and agree that the R&W Insurance Policy is intended to be a Contract between Buyer and the R&W Insurer, separate and apart from this

Agreement. As such, notwithstanding anything to the contrary in this <u>Article 9</u> or elsewhere in this Agreement, nothing in this <u>Article 9</u> (including the limitations or exceptions set forth in this <u>Article 9</u>) or elsewhere in this Agreement shall be deemed to limit the rights of Buyer and any other Buyer Indemnified Parties (including, following the Closing, the Acquired Companies and their subsidiaries) provided under the R&W Insurance Policy, subject to the terms and conditions thereof. The R&W Insurer shall have no right of subrogation against Sellers or their Affiliates and Buyer shall indemnify Sellers and their Affiliates against any claims brought by the R&W Insurer, its Affiliates or assigns, except for subrogation rights in the case of fraud to the extent expressly required pursuant to the terms of the R&W Insurance Policy.

(g)    If any amount is determined to be due from Buyer or Sellers under this <u>Article 9</u>, such indemnification shall be paid by such party to the Indemnified Party by wire transfer of immediately available funds within five (5) Business Days after it is determined that such amount is due pursuant to Section 9.2(a) or Section 9.2(b), as applicable.

(h)    Neither a Buyer Indemnified Party nor a Seller Indemnified Party shall be entitled to be compensated more than once for the same Loss.

(i)    Payments by an Indemnifying Party pursuant to <u>Section 9.2(a)</u> or <u>9.2(b)</u> in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received by the Indemnified Party in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Damages prior to seeking indemnification under this Agreement.

(j)    The Buyer Indemnified Parties' will not be entitled to indemnification pursuant to <u>Section 9.2(a)</u> for Damages to the extent that any Buyer Indemnified Party has been compensated therefor as a reduction to the Final Purchase Price.

9.3    <u>Notice and Defense</u>.

(a)    Any party entitled to receive indemnification under this <u>Article 9</u> (the "<u>Indemnified Party</u>") agrees to give written notice to the party required to provide such indemnification (the "<u>Indemnifying Party</u>") promptly after becoming aware of the occurrence of any indemnifiable Loss under circumstances where such claim is brought by a third party and the Indemnified Party may seek Indemnification under this <u>Article 9</u> (such claim, a "<u>Third Party Claim</u>"). The Indemnified Party's failure to give such notice will not affect the obligations of the Indemnifying Party under this <u>Article 9</u> unless the Indemnifying Party is materially prejudiced thereby, and then only to the extent so prejudiced. Such written notice will include a brief description of the event or events forming the basis of such claim and a good faith estimate of the amount involved.

(b)    If a Third Party Claim is made against an Indemnified Party, the Indemnifying Party shall be entitled to assume the defense thereof and, if it elects to assume such defense, the Indemnifying Party must notify the Indemnified Party thereof within thirty (30) days after receiving the indemnification notice relating to such Third Party Claim and assume the

defense thereof with counsel selected by the Indemnifying Party and reasonably satisfactory to such Indemnified Party; provided, however, that the Indemnifying Party shall not be entitled to assume the defense of such Third Party Claim if (x) counsel to the Indemnified Party shall have in good faith concluded that there is or is reasonably likely to be an actual conflict of interest between the Indemnifying Party and the Indemnified Parties in such Action that would reasonably be expected to adversely affect the Indemnifying Party's ability to defend the interests of the Indemnified Party in such Third Party Claim, (y) such Third Party Claim is a claim made pursuant to Section 9.2(a) and is covered by the R&W Insurance Policy, or (z) the Third Party Claim seeks an injunction or other equitable relief or relates to or arises in connection with any criminal or quasi-criminal action. Should the Indemnifying Party assume the defense of such Third Party Claim, the Indemnifying Party shall not be liable to such Indemnified Party for legal expenses subsequently incurred by such Indemnified Party in connection with the defense thereof. If the Indemnifying Party does not assume the defense and control of any Third Party Claim pursuant to this Section 9.3(b), the Indemnified Party shall be entitled to assume and control such defense and the Indemnifying Party shall pay the fees and expenses of counsel retained by the Indemnified Party, but the Indemnifying Party may nonetheless participate in the defense of such Third Party Claim with its own counsel and at its own expense. Buyer or Seller, as the case may be, shall, and shall cause each of its Affiliates and Representatives to, reasonably cooperate with the Indemnifying Party in the defense of any Third Party Claim, including by furnishing books and records, personnel and witnesses, as appropriate for any defense of such Third Party Claim. If the Indemnifying Party assumes such defense, (i) such Indemnified Party shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Party; provided, however, that the Indemnifying Party shall control such defense, (ii) the Indemnifying Party will at all times keep the Indemnified Party reasonably apprised of the status of the defense of any matter the defense of which they are maintaining, and (iii) except with prior consent of the Indemnified Party, no Indemnifying Party, in the defense of a Third Party Claim, shall consent to entry of any judgment or enter into any settlement unless (A) the Indemnified Party receives a full, complete, and unconditional release in respect of the Third Party Claim without any admission or finding of obligation, liability, fault, or guilt (criminal or otherwise) or violation of applicable Law with respect to the Third Party Claim, and (B) no injunctive, extraordinary or equitable relief of any kind is imposed on the Indemnified Party or any of its Affiliates. Unless such consent is obtained, the Indemnifying Party shall continue the defense of such Third Party Claim.

(c)      Upon receipt of a notice of a claim for indemnity from an Indemnified Party pursuant to Section 9.2(a) or Section 9.2(b) that does not involve a Third Party Claim, the Indemnifying Party shall use reasonable best efforts to notify the Indemnified Party within thirty (30) days following the receipt of such notice whether the Indemnifying Party disputes its indemnity obligation to the Indemnified Party for any Damages with respect to such claim, provided that any failure to give such notice shall not limit the Indemnifying Party's rights under this Article 9. If the Indemnifying Party disputes its indemnity obligation for any Losses with respect to such claim, the parties shall proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute shall be resolved by litigation in an appropriate court of jurisdiction determined pursuant to Section 11.10.

(d)     Purchase Price Adjustment.  To the extent permitted by applicable Law, any indemnity payment under this Article 9 or otherwise under this Agreement shall be treated as an adjustment to the Final Purchase Price for all purposes, including Tax purposes.

ARTICLE 10
TERMINATION AND REMEDIES

10.1     Termination.  This Agreement may be terminated prior to the Closing as follows:

(a)     by mutual written agreement of Buyer and Sellers;

(b)     by written notice of Buyer to Sellers if (i) Buyer is not in material breach of its obligations under this Agreement, (ii) Sellers breach their representations or warranties, or default in the performance of their covenants, contained in this Agreement and (iii) all such breaches and defaults by Sellers that are (x) not cured by Sellers by the Outside Date (as defined below), or (y) incapable of being cured, if any such breach or default, individually or in the aggregate, would prevent the conditions to the obligations of Buyer set forth in Section 7.1 from being satisfied;

(c)     by written notice of Sellers to Buyer if (i) Sellers are not in material breach of their obligations under this Agreement, (ii) Buyer breaches its representations or warranties, or defaults in the performance of its covenants, contained in this Agreement and (iii) all such breaches and defaults by Buyer that are (x) not cured by Buyer during the earlier of (A) the sixty (60) day period after written notice from Sellers of such breach or default and (B) the Outside Date, or (y) incapable of being cured, if any such breach or default, individually or in the aggregate, would prevent the conditions to the obligations of Sellers set forth in Section 6.1 from being satisfied;

(d)     by written notice of Buyer to Sellers, or by Sellers to Buyer, if the Closing does not occur by the date that is twelve (12) months after the date of this Agreement (such date, as same may be extended by Sellers as set forth in this paragraph, the "Outside Date"); provided; however, that the right to terminate this Agreement under this Section 10.1(d) shall not be available to any Party whose breach or failure to comply in all material respects with the provisions of this Agreement has been the primary cause of, or resulted in, the Closing not having occurred by the Outside Date; provided further, however, that, (x) Sellers on one hand, or Buyer on the other, may, by written notice to the other Party, extend the Outside Date by 45 days by written notice given at any time prior to termination of this Agreement and (y) in the event the Marketing Period has commenced but has not completed as of the Outside Date, the Outside Date may be extended (or further extended) by Sellers, on the other hand, or Buyer, on the other hand,  by providing written notice thereof to the other Party at least one (1) Business Day prior to the Outside Date until four (4) Business Days after the then-scheduled expiration date of the Marketing Period; provided further, however, that the Outside Date shall automatically be extended by up to 30 days in the event that either the FTC or the FCC is not open and conducting normal operations after the date of this Agreement and prior to the valid termination hereof;

(e)     by Sellers or Buyer, by written notice to the other if a Governmental Entity of competent jurisdiction has issued an Governmental Order or any other action permanently

72

enjoining or otherwise prohibiting the consummation of (i) the Transactions or (ii) the Northwest Transactions and, in either case of clause (i) or (ii), such Governmental Order or other action has become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 10.1(e) shall not be available to any Party whose breach or failure to comply in all material respects with any provision of this Agreement has been the primary cause of, or resulted in, such Governmental Order or other action, or, solely in the case of Buyer, of the Northwest Purchase Agreement; or

      (f)     by Sellers, if (i) Buyer shall have failed to consummate the Transactions within three (3) Business Days of the first date (the "First Date") on which Buyer was required to consummate the Closing pursuant to Section 1.3, (ii) all the conditions set forth in Article 6 and Article 7 would have been satisfied if the Closing were to have occurred at such time (other than those conditions that by their terms are to be satisfied by actions taken at the Closing, provided such conditions would have been able to be satisfied as of such date), (iii) Sellers shall have given irrevocable written notice to Buyer at least two (2) Business Days prior to the First Date confirming that Sellers stand ready, willing and able to consummate the Transactions, the Closing and the other transactions contemplated hereby and (iv) at all times during such three (3) Business Day period described in clause (i), Sellers stood ready, willing and able consummate the Transactions, the Closing and the other transactions contemplated hereby.

      10.2    Termination and Survival.  In the event of the termination of this Agreement in accordance with Section 10.1, written notice thereof shall forthwith be given to the other Party specifying the provision hereof pursuant to which such termination is made (other than in the case of termination pursuant to Section 10.1(a)). Subject to the payment of the Buyer Termination Fee under circumstances in which such fee is payable in accordance with this Agreement, and in all other respects to, Section 10.4 and Section 11.14 (including, in each case, the limitations set forth therein), this Agreement shall forthwith become null and void, and there shall be no damages or Liability except, (i) nothing in this Agreement shall be deemed to release any Party from any Liability for fraud prior to such valid termination and (ii) nothing herein shall be deemed to release Sellers on the one hand, or Buyer, on the other hand from any Liability for any Intentional Breach of the provisions of this Agreement prior to such valid termination by the other Party  or any of their respective directors, officers, employees, incorporators, members, partners, equityholders, Affiliates, agents, attorneys or representatives (in each of the case of clause (i) and this clause (ii), which the Parties acknowledge and agree will not be limited to reimbursement of expenses or out-of-pocket costs, and in the case of any damages sought by the non-breaching party, including any Intentional Breach, such damages will include the benefit of the bargain lost by the non-breaching party, taking into consideration relevant matters, including opportunity costs and the time value of money)); provided, that the provisions of this Section 10.2 and Section 5.1 (Confidentiality), Section 5.2 (Announcements), Section 10.4 (Buyer Termination Fee), Section 11.1 (Expenses), Section 11.7 (Entire Agreement), Section 11.9 (Third Party Beneficiaries), Section 11.10 (Governing Law; Consent to Jurisdiction; Waiver of Jury Trial), Section 11.11 (Neutral Construction), Section 11.12 (Counterparts) and Section 11.13 (Interpretation) shall remain in full force and effect and survive any termination of this Agreement; provided, further, that in no event will the Buyer Related Parties have any Liability for monetary damages (including damages for monetary damages in lieu of specific performance or otherwise) in the aggregate in excess of (A) the amount of the Buyer Termination Fee and subject in all respects to the limitations set forth in Section 10.4, or (B) solely in the event the termination of this Agreement that gives rise to Buyer's

obligation to pay Sellers the Buyer Termination Fee pursuant to Section 10.4(b) resulted directly from fraud or an Intentional Breach of this Agreement by Buyer Related Parties acting on the Buyer's behalf, or fraud or an Intentional Breach by the Buyer Related Parties acting on the Buyer's behalf caused the Closing not to occur, the Maximum Liability Amount (inclusive of any payment of the Buyer Termination Fee).

10.3     <u>Specific Performance</u>.

(a)     The Parties hereto acknowledge and agree that the Parties hereto would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached and that any non-performance or breach of this Agreement by any Party hereto could not be adequately compensated by monetary damages (even if available) alone and that the Parties hereto would not have any adequate remedy at law. Accordingly, in addition to any other right or remedy to which any Party hereto may be entitled, at law or in equity (including monetary damages), prior to the termination of this Agreement pursuant to Section 10.1, such Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive and other equitable relief to prevent breaches or threatened breaches of any of the provisions of this Agreement without posting any bond or other undertaking subject to the terms and limitations set forth in this Agreement. Without limiting the generality of the foregoing, the Parties hereto agree that the Party seeking specific performance shall be entitled to enforce specifically (a) a Party's obligations under Section 4.1 and (b) a Party's obligation to consummate the Transactions (including the obligation to consummate the Closing and to pay the Purchase Price, if applicable), if the conditions set forth in Article 6 or Article 7, as applicable, have been satisfied (other than those conditions that by their nature are to be satisfied at the Closing or are unsatisfied as a result of breach of the representations and warranties or default in the performance of the covenants and agreements contained in this Agreement of the Party against whom specific performance is sought) or waived.

(b)     Notwithstanding Section 10.3(a) or anything in any Transaction Document or otherwise to the contrary, and subject in all respects to this Section 10.3, Sellers shall not nor shall any Affiliate or equityholder thereof (or any of the forgoing's respective Representatives) be entitled to enforce or seek to enforce specifically Buyer's obligation to cause all or any portion of the Equity Financing to be funded (whether under this Agreement or the Equity Commitment Letter) or otherwise cause Buyer to take action to consummate the Transactions, the Equity Financing or the other transactions contemplated hereunder or under any other Transaction Documents or otherwise (including the obligation to pay all or any portion of the aggregate Purchase Price) unless and only if: (i) Buyer is required to consummate the Closing pursuant to Section 1.3, (ii) the Debt Financing (including any alternative financing that has been obtained in accordance with Section 5.10) has been received by Buyer in full, or such full amount will be funded to Buyer at the Closing if the Equity Financing is funded at the Closing (provided that Buyer shall not be required to draw down the Equity Financing or consummate the Closing if the Debt Financing is not in fact funded at the Closing), (iii) Sellers have irrevocably confirmed in writing to Buyer that, if specific performance is granted and the Equity Financing and Debt Financing (including any alternative financing that has been obtained in accordance with Section 5.10) are funded, then the Closing will occur (and Sellers have not revoked, withdrawn, modified

74

or conditioned such confirmation) and (iv) Buyer fail to complete the Closing within three (3) Business Days after delivery of Sellers' irrevocable written confirmation.

(c)     Notwithstanding anything else to the contrary in any Transaction Document or otherwise, for the avoidance of doubt, while Sellers may, subject in all respects to this Section 10.3, Section 10.4 and Section 11.14 (including, in each case, the limitations set forth therein), concurrently seek (i) specific performance or other equitable relief, subject in all respects to this Section 10.3 and (ii) payment of the Buyer Termination Fee, if, as and when required pursuant to Section 10.4, under no circumstances shall Sellers, directly or indirectly, be permitted or entitled to receive (1) both a grant of specific performance to cause the Equity Financing to be funded (whether under this Agreement or the Equity Commitment Letter) or other equitable relief, on the one hand, and payment of any of the Buyer Termination Fee and/or any of the amounts, if any, as and when due, pursuant to Section 5.10(h) and this Section 10.3, on the other hand, or (2) except in the case of Intentional Breach or fraud, both payment of any monetary damages whatsoever, on the one hand, and payment of any of the Buyer Termination Fee and/or any of the amounts, if any, as and when due, pursuant to Section 5.10(h) and this Section 10.3, on the other hand.  The Parties further agree that (x) by seeking the remedies provided for in this Section 10.3, a Party shall not in any respect waive its right to seek any other form of relief that may be available to a Party under this Agreement or the Equity Commitment Letter (including monetary damages) in the event that the remedies provided for in this Section 10.3 are not available or otherwise are not granted, and (y) nothing set forth in this Section 10.3 shall require any Party hereto to institute any Action for (or limit any party's right to institute any Action for) specific performance under this Section 10.3 prior to or as a condition to exercising any termination right under Article 10 (and/or receipt of any amounts due pursuant to Section 10.4), nor shall the commencement of any legal action or legal proceeding pursuant to this Section 10.3 or anything set forth in this Section 10.3 restrict or limit any party's right to terminate this Agreement in accordance with the terms of Article 10, or pursue any other remedies under this Agreement or the Equity Commitment Letter that may be available then or thereafter.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other Party has an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity.

10.4     Buyer Termination Fee.

(a)     If this Agreement is validly terminated pursuant to:

(i)     Section 10.1(c), unless the material breach or material default by Buyer is demonstrated by Buyer not to be the primary cause for the failure of the Closing to be consummated;

(ii)     Section 10.1(d) and as of the Outside Date, the FCC Consent has not been granted or the HSR Clearance has not been obtained, in either case, unless due to facts or circumstances primarily relating to Sellers;

(iii)     Section 10.1(e) due to the issuance of a Governmental Order permanently enjoining or otherwise prohibiting the consummation of the Transactions, or the Northwest Transactions, solely to the extent such Governmental Order arises under the HSR Act

41462373.9

or the Communications Laws; provided, that, in the case of the Transactions, such issuance of a Governmental Order or failure to obtain HSR Clearance or FCC Consent is not caused by any action or nonaction, or any breach of Section 4.1 or any noncompliance therewith, by Sellers or their respective Affiliates;

(iv)     Section 10.1(f) due to Buyer's failure to close; or

(v)     Section 10.1(d) and as of the Outside Date, the conditions set forth in Section 6.1 and Section 6.2 of the Northwest Purchase Agreement have not been satisfied;

then in each case of clauses (i), (ii), (iii), (iv) and (v), but never more than one, Buyer shall pay to Sellers within two (2) Business Days following termination of this Agreement a fee equal to One Hundred Million Dollars ($100,000,000) (the "Buyer Termination Fee") by wire transfer of immediately available funds to an account designated by Sellers, as Buyer's sole liability in respect thereof, except solely to the extent that the termination of this Agreement that gives rise to Buyer's obligation to pay Sellers the Buyer Termination Fee pursuant to this Section 10.4 resulted directly from fraud or an Intentional Breach of this Agreement by Buyer Related Parties acting on the Buyer's behalf, or fraud or an Intentional Breach by the Buyer Related Parties acting on the Buyer's behalf caused the Closing not to occur, in which case, in no event will the Buyer Related Parties have any Liability for monetary damages (including damages for monetary damages in lieu of specific performance or otherwise) in the aggregate in excess of the Maximum Liability Amount (inclusive of any payment of the Buyer Termination Fee). The Parties acknowledge and hereby agree that in no event shall Buyer be required to pay the Buyer Termination Fee on more than one occasion or any amount in the aggregate in excess of the Maximum Liability Amount.

(b)     Notwithstanding anything to the contrary in this Agreement or any Transaction Document or any other agreement referenced herein or therein or otherwise, but subject in all respects to this Section 10.4, Section 10.3 and Section 11.14 (including, in each case, the limitations set forth therein), if Buyer fails to effect the Closing when required by Section 1.3 for any or no reason or otherwise breaches this Agreement or any Transaction Document (whether such breach is intentional, unintentional, willful or otherwise) or fails to perform hereunder or thereunder or fails to perform any obligation under Law (in each case, whether such failure is intentional, unintentional, willful or otherwise), then Sellers' right to (A) a decree or order of specific performance or any injunction or injunctions or other equitable relief if and to the extent permitted by Section 10.3, (B) validly terminate this Agreement pursuant to Section 10.1 and seek monetary damages from Buyer for Buyer's fraud and (C) validly terminate this Agreement pursuant to Section 10.1(c), Section 10.1(e) or Section 10.1(f) and if, as and when required pursuant to Section 10.4(a), receive payment of the Buyer Termination Fee (and solely to the extent the termination of this Agreement that gives rise to Buyer's obligation to pay Sellers the Buyer Termination Fee pursuant to this Section 10.4(b) resulted directly from fraud or an Intentional Breach of this Agreement by Buyer Related Parties, or fraud or an Intentional Breach by Buyer Related Parties caused the Closing not to occur seek monetary damages from Buyer Related Parties, in which case, Buyer Related Parties' liability for monetary damages shall not exceed the Maximum Liability Amount, in addition to payment of the Buyer Termination Fee; provided, that such monetary damages are finally determined by a court of competition jurisdiction to be in excess of the amount of the Buyer Termination Fee), shall, together with, if applicable, the rights of Sellers pursuant to Section 5.10(h) relating to Buyer's reimbursement and indemnification

41462373.9

obligations and this <u>Section 10.4</u>, be the sole and exclusive remedies (whether at Law, in equity, in contract, in tort or otherwise) of Sellers, its Affiliates, and its and their respective equityholders and Representatives and any other Person against the Buyer Related Parties for any breach, liability, cost, expense, obligation, loss or damage suffered as a result thereof or in connection therewith or related thereto.  Notwithstanding anything to the contrary, under no circumstances can Sellers receive both (i) an award of monetary damages, on the one hand, and (ii) any of the Buyer Termination Fee and/or any of the amounts, if any, as and when due, pursuant to <u>Section 5.10(h)</u> and this <u>Section 10.4</u>, except solely to the extent the termination of this Agreement that gives rise to Buyer's obligation to pay Sellers the Buyer Termination Fee resulted directly from fraud or an Intentional Breach of this Agreement by Buyer Related Parties, or fraud or an Intentional Breach by Buyer Related Parties caused the Closing not to occur.

(c)       Buyer acknowledges that (i) the agreement contained in <u>Section 10.4(a)</u> is an integral part of the Transactions, (ii) the Buyer Termination Fee is not a penalty, and except as set forth in <u>Section 10.4(a)</u>, is liquidated damages, in a reasonable amount intended to compensate Sellers in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision, and (iii) without such agreement, Sellers would not enter into this Agreement.  Accordingly, if Buyer fails to promptly pay any amount due pursuant to <u>Section 10.4(a)</u>, Buyer also shall pay to Sellers all reasonable out-of-pocket fees, costs and expenses of enforcement actually incurred (including reasonable attorney's fees as well as reasonable out-of-pocket expenses actually incurred), together with interest on the amount of the Buyer Termination Fee at the prime lending rate as published in *The Wall Street Journal*, in effect on the date such payment is required to be made; <u>provided</u>, <u>further</u>, that Buyer shall not be required to reimburse Sellers any amount in excess of $2,000,000 in the aggregate (including interest on such unpaid amounts at the prime lending rate as published in *The Wall Street Journal*, in effect on the date such payment is required to be made).

(d)       For the avoidance of doubt, the Parties expressly acknowledge and agree that this <u>Section 10.4</u> in no way limits or restricts Sellers' ability to exercise their rights to specific performance pursuant to <u>Section 10.3</u> at any time prior to the termination of this Agreement in accordance with its terms.

10.5     <u>Buyer Expenses</u>.  If this Agreement is validly terminated pursuant to <u>Section 10.1(b)</u> and the material breach or material default by Sellers is the primary cause for the failure of the Closing to consummated, then Sellers shall pay to Buyer (or one or more of its designees) within two (2) Business Days following termination of this Agreement an amount equal to that required to reimburse Buyer and its Affiliates for all fees and expenses actually incurred in connection with this Agreement and the transactions contemplated hereby, up to $5,000,000 (the "<u>Buyer Expenses</u>") by wire transfer of immediately available funds to an account designated by Buyer.  Notwithstanding the foregoing, the payment of the Buyer Expenses will not relieve Sellers from Liability for any fraud or Intentional Breach of this Agreement.

ARTICLE 11
MISCELLANEOUS

11.1    Expenses.  Except as may be otherwise specified herein, whether or not the Closing takes place, each Party shall be solely responsible for all costs and expenses incurred by it in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement.  Each Party is responsible for any commission, brokerage fee, advisory fee or other similar payment that arises as a result of any agreement or action of it or any party acting on its behalf in connection with this Agreement or the Transactions.  In the event of any litigation regarding or arising from this Agreement prior to the Closing, the prevailing Party as determined by a court of competent jurisdiction in a final non-appealable judgment shall be entitled to recover its reasonable costs and expenses (including attorneys' fees and expenses) incurred therein or in the enforcement or collection of any judgment or award rendered therein.

11.2    Further Assurances.  At any time after the date hereof, each Party shall from time to time, at the request of and without further cost or expense to the other, execute, acknowledge and deliver such other further assignments, conveyances, and other assurances, documents, and instruments of transfer reasonably requested by the other Party, and take such other actions consistent with the terms of this Agreement as may reasonably be requested in order to assign, transfer, grant, convey, and confirm to Buyer the Purchased Assets, the Acquired Company Assets, the Equity Interests or otherwise consummate the Transactions.  To the fullest extent permitted by applicable Law, Sellers hereby authorize Buyer and its assignees and give Buyer and its assignees its irrevocable power of attorney, with full power of substitution, which authorization shall be coupled with an interest, to take any and all steps in Sellers' respective names and on behalf of Sellers that are necessary or desirable in the reasonable determination of Buyer and its assignees to assign, transfer, endorse, negotiate, deposit or otherwise realize on any Purchased Asset, Acquired Company Asset, Equity Interests or any writing of any kind in connection with any Purchased Asset, Acquired Company Asset or Equity Interests if Sellers do not do so within a reasonable period of time after receipt of a request from Buyer.

11.3    Wrong Pockets.

(a)    If, following the Closing, Buyer or Sellers become aware that Buyer or any of its Affiliates owns any asset or rights which is not Business Intellectual Property, a Purchased Asset or is not used in connection with the Transition Services Agreements, such party shall promptly inform the other party of that fact.  Thereafter, at the request of Sellers, Buyer shall execute or cause the relevant Affiliate of Buyer to execute, such documents as may be reasonably necessary to cause the transfer of any such asset or right to Sellers or such other Person nominated by Sellers for no consideration and Sellers shall do all such things as are reasonably necessary to facilitate such transfer.  If, following the Closing, Buyer receives any payments or collects any funds in respect of an Excluded Asset, Buyer shall promptly, and in any event within five (5) Business Days after its receipt thereof, remit such payments to Sellers or other entity nominated by Sellers.

(b)    If, following the Closing, Buyer or Sellers become aware that Sellers or any of their respective Affiliates owns any asset or rights which is Business Intellectual Property or a Purchased Asset or is used in connection with the Transition Services Agreements, but which has

78

not been transferred to Buyer as a result of the transactions hereunder, such party shall promptly inform the other party of that fact. Thereafter, at the request of Buyer, Sellers shall execute or cause the relevant Affiliate of Sellers to execute such documents as may be reasonably necessary to cause the transfer of any such asset or right to Buyer or any other entities nominated by Buyer for no consideration and Buyer shall do all such things as are reasonably necessary to facilitate such transfer. If, following the Closing, the Sellers or their respective receive any payments or collects any funds in respect of any Business Intellectual Property or Purchased Asset, the Sellers shall, or cause their respective Affiliates to, promptly, and in any event within five (5) Business Days after its receipt thereof, remit such payments to Buyer or other Person nominated by Buyer.

11.4 <u>Assignment</u>. No Party may assign this Agreement without the prior written consent of the other Parties hereto. The terms of this Agreement shall bind and inure to the benefit of the Parties' respective successors and any permitted assigns, and no assignment shall relieve any Party of any obligation or liability under this Agreement. Notwithstanding the foregoing, Buyer may assign any or all of its rights under this Agreement to (a) any of its Affiliates (b) to any Debt Financing Source pursuant to the terms of the Debt Financing for purposes of creating a security interest herein or otherwise assigning as collateral security in respect of the Debt Financing without the consent of any of the other Parties hereto, and no assignment shall relieve any Party of any obligation or liability under this Agreement.

11.5 <u>Notices</u>. Any notice or other communications pursuant to this Agreement shall be in writing and shall be deemed delivered on the date of personal delivery, confirmed facsimile transmission, confirmed delivery by a nationally recognized overnight courier service, five (5) days after being mailed by certified or registered mail, return receipt requested, with appropriate postage prepaid, or when received in the form of an email transmission (receipt confirmation requested), and shall be addressed as follows (or to such other address as any Party may request by written notice):

if to Sellers:

    Cox Media Group, LLC
    6205 Peachtree Dunwoody Road
    Atlanta, GA 30328
    Attention:  General Counsel
    Email: Juliette.Pryor@coxinc.com
    Phone: (678) 645-0158

with a copies (which shall not constitute notice to Sellers) to:

    Eversheds Sutherland (US) LLP
    999 Peachtree Street, NE
    Suite 2300
    Atlanta, Georgia 30309-3996
    Attention:  Marc Rawls
              Matthew Block
              David Phillips
    Email:    marcrawls@eversheds-sutherland.com
             matthewblock@eversheds-sutherland.com
             davidphillips@eversheds-sutherland.com

|  | Phone: | (404) 853-8000 |
|---|---|---|

if to Buyer:                Terrier Media Buyer, Inc.
c/o Apollo Management IX, L.P.
9 West 57th Street, 43rd Floor
New York, NY 10019
Attention:  David Sambur, Senior Partner
John Suydam, Chief Legal Officer
Email:  sambur@apollo.com
jsuydam@apollo.com
Phone:  (212) 515-3200

with a copy (which shall not
constitute notice to Buyer) to:    Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:  Taurie M. Zeitzer
Brian Scrivani
Email:  tzeitzer@paulweiss.com
bscrivani@paulweiss.com
Phone:  (212) 373-3000

       11.6   <u>Amendments</u>.  Subject to <u>Section 11.9</u>, no amendment or waiver of compliance with any provision hereof or consent pursuant to this Agreement shall be effective unless evidenced by an instrument in writing signed by the Party against whom enforcement of such amendment, waiver or consent is sought.

       11.7   <u>Entire Agreement</u>.  The Schedules, Annexes and Exhibits hereto are hereby incorporated into this Agreement.  This Agreement, the Transaction Documents and the schedules, annexes and exhibits thereto, together with any other agreement executed on the date hereof in connection herewith, constitutes the entire agreement and understanding among the Parties hereto with respect to the subject matter hereof and thereof, and supersedes all prior agreements and understandings, both written and oral, with respect to the subject matter hereof and thereof, except the NDA, which shall remain in full force and effect; <u>provided</u>, that any term or provision under the NDA conflicting with this Agreement shall be superseded by this Agreement.  The representations, warranties, covenants and agreements set forth herein are solely for the benefit of the applicable Parties hereto, in accordance with and subject to the terms of this Agreement.

       11.8   <u>Severability</u>.  If any Governmental Entity holds any provision in this Agreement invalid, illegal or unenforceable as applied to any Party or to any circumstance under any applicable Law, then, so long as no Party is deprived of the benefits of this Agreement in any material respect, (a) such provision, as applied to such Party or such circumstance, is hereby deemed modified to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under applicable Law; (b) the Parties will use good faith efforts to negotiate a replacement provision to give effect to the original written intent of the Parties to the greatest extent consistent with being valid and enforceable under applicable Law;

80

(c) the application of such provision to any other Party or to any other circumstance will not be affected or impaired thereby; and (d) the validity, legality and enforceability of the remaining provisions of this Agreement will remain in full force and effect.

11.9    Third Party Beneficiaries.  Except as provided in Section 4.3(c), Section 10.4(a) and Section 11.14, nothing in this Agreement, the Transaction Documents and the schedules, annexes and exhibits thereto, or any other agreement executed on the date hereof in connection herewith, expressed or implied, is intended or shall be construed to give any rights, benefits, causes of action or remedies to any Person other than the Parties hereto and their successors and permitted assigns with respect to the subject matter hereof and thereof. Notwithstanding the foregoing, the portions of Section 5.10(e)(viii), Section 10.2, Section 10.3, Section 10.4(a), Section 10.4(b), Section 11.6, Section 11.10(b) and (c), Section 11.14 and this sentence of Section 11.9 applicable to the Debt Financing Sources will inure to the benefit of the Debt Financing Sources and their successors and assigns, each of whom are intended to be third-party beneficiaries thereof (it being understood and agreed that the foregoing provisions may not be amended in a manner adverse to the Debt Financing Sources (or Debt Financing Related Parties) in any material respect without the prior written consent of the Debt Financing Sources party to the Debt Commitment Letter).

11.10    Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.

(a)    All disputes, claims (and counter-claims), controversies or causes of action (whether at law or in equity, whether in contract or in tort or otherwise) based upon, arising out of or relating to this Agreement, or the negotiation, validity or performance of this Agreement or the Transactions shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its rules of conflict of laws.  Each of the Parties hereby irrevocably and unconditionally consents to submit to the sole and exclusive jurisdiction of the Delaware Court of Chancery; provided, that if (and only after) such court determines that it lacks subject matter jurisdiction over any particular matter, such matter shall be brought in the state or Federal courts of the United States located in the State of Delaware (in such order, the "Chosen Courts"), for any Action arising out of or relating to this Agreement or the Transaction Documents, or the negotiation, validity or performance of this Agreement, the Transaction Documents or the Transactions (and agrees not to commence any Action relating thereto except in such Chosen Courts), waives any objection or defense with respect to the laying of venue of any such Action in the Chosen Courts and agrees not to plead or claim (or counter-claim), or advocate as a defense, in any Chosen Court that such Action brought therein (i) has been brought in any inconvenient forum, (ii) should be transferred or removed to any court other than one of the Chosen Courts, or (iii) should be stayed by reason of the pendency of some other proceeding in any court other than one of the Chosen Courts.  Each of the Parties hereby agrees not to commence any such Action other than before one of the Chosen Courts.  Each Party agrees that a final, non-appealable judgment in any Action so brought shall be conclusive and may be enforced by suit on the judgment in any court of competent jurisdiction, or in any other manner provided by Law.

(b)    Notwithstanding anything in this Agreement to the contrary, each of the parties acknowledges and irrevocably agrees (i) that any legal Action, whether at law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources arising out of, or relating to, the acquisition of the Acquired Companies by Buyer, the Debt Financing, the Debt

81

Commitment Letter, or the performance of services thereunder or related will be subject to the exclusive jurisdiction of any state or federal court sitting in the State of New York in the borough of Manhattan and any appellate court thereof, and each party hereto submits for itself and its property with respect to any such legal Action to the exclusive jurisdiction of such court; (ii) not to bring or permit any of their Affiliates to bring or support anyone else in bringing any such legal Action in any other court; (iii) that service of process, summons, notice or document by registered mail addressed to them at their respective addresses provided in the Debt Commitment Letter will be effective service of process against them for any such legal Action brought in any such court; (iv) to waive and hereby waive, to the fullest extent permitted by applicable Law, any objection which any of them may now or hereafter have to the laying of venue of, and the defense of an inconvenient forum to the maintenance of, any such legal Action in any such court; and (v) any such legal Action will be governed and construed in accordance with the Laws of the State of New York.

(c)     EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY OTHER PARTY HERETO IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF (INCLUDING ANY SUCH LITIGATION RELATING TO THE DEBT FINANCING OR INVOLVING THE DEBT FINANCING SOURCES).

11.11   Neutral Construction.  The Parties agree that this Agreement was negotiated at arms-length and that the final terms hereof are the product of the Parties' negotiations.  This Agreement shall be deemed to have been jointly and equally drafted by Buyer, on one hand, and Sellers, on the other hand, and the provisions hereof should not be construed against a Party on the grounds that the Party drafted or was more responsible for drafting the provision.

11.12   Counterparts.   This Agreement may be executed in two or more counterparts, which together shall constitute a single agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, .pdf, or electronic mail intended to preserve the original graphic and pictorial appearance of the signature shall be effective as delivery of a manually executed original counterpart of this Agreement.

11.13   Interpretation.     Article titles and section headings herein are for convenience of reference only and are not intended to affect the meaning or interpretation of this Agreement.  The Schedules, Exhibits and Annexes hereto shall be construed with and as an integral part of this Agreement to the same extent as if set forth verbatim herein.  Where the context so requires or permits, the use of the singular form includes the plural, and the use of the plural form includes the singular.  When used in this Agreement, unless the context clearly requires otherwise, (i) words such as "herein," "hereof," "hereto," "hereunder," and "hereafter" shall refer to this Agreement as a whole, including the Schedules, Exhibits and Annexes to this Agreement; (ii) the term "including" (and words of similar import) when used in this Agreement or the Transaction Documents shall not be limiting; (iii) the word "or" shall not be exclusive; (iv) the term "ordinary course" or "ordinary course of business" shall refer to the ordinary manner in which the Acquired Companies or Sellers, as applicable, operate the Business consistent with reasonable past practices; (v) the terms "Dollars", "dollars" and "$" each mean lawful money of the United States of

82

America; (vi) references to "written" or "in writing" include in electronic form; (vii) a reference to a Person includes such Person's successors and permitted assigns; (viii) a reference to "days" means calendar days, unless Business Day is expressly specified; (ix) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; (x) whenever this Agreement requires any party hereto to take or not take any action, such requirement shall be deemed to include a requirement of such party to cause each of its subsidiaries to take or not take such action, as applicable; (xi) a reference to any documents or information "furnished", "provided" or "made available" by any Seller shall mean such documents and information as are included in the electronic data room administered by or on behalf of the Seller by 11:59 p.m. Eastern Time on the date that is two (2) Business Days prior to the date of this Agreement; (xii) a reference to any statute shall be deemed to refer to such statute, as may be amended, and to any rules or regulations promulgated thereunder; and (xiii) a reference to a Contract shall mean such Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

11.14  <u>No Recourse</u>.  Each party agrees, on behalf of itself and its Affiliates and its and their present or former directors, officers, stockholders, partners, members or employees, that all Actions (whether at law or in equity, whether in contract or in tort or otherwise, or granted by statute or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil or any other theory or doctrine, including alter ego or otherwise) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate to: (A) this Agreement, any other Transaction Document or any other agreement referenced herein or therein or the transactions contemplated hereunder or thereunder (including the Financing), (B) the negotiation, execution or performance this Agreement, any other Transaction Document or any other agreement referenced herein or therein (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement, any other Transaction Document or such other agreement), (C) any breach or violation of this Agreement, any other Transaction Document or any other agreement referenced herein or therein and (D) any failure of the transactions contemplated hereunder or under any Transaction Document or any other agreement referenced herein or therein (including the Financing) to be consummated, in each case, may be made only against (and are those solely of) the Persons that are expressly identified as parties to, as applicable, this Agreement, the Equity Commitment Letter or the Limited Guarantees and, in accordance with, and subject to the terms and conditions of, as applicable, this Agreement, the Equity Commitment Letter or the Limited Guarantees. In furtherance and not in limitation of the foregoing, and notwithstanding anything contained in this Agreement, any other Transaction Document or any other agreement referenced herein or therein or otherwise to the contrary, each Party hereto covenants, agrees and acknowledges, on behalf of itself and its respective Affiliates and its and their present or former directors, officers, stockholders, partners, members or employees, that no recourse under this Agreement, any other Transaction Document or any other agreement referenced herein or therein or in connection with any transactions contemplated hereby or thereby (including the Financing) shall be sought or had against any other Person, including any Buyer Related Party, and no other Person, including any Buyer Related Party, shall have any liabilities or obligations (whether at law or in equity, whether in contract or in tort or otherwise, or granted by statute or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil or any

41462373.9

other theory or doctrine, including alter ego or otherwise) for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related to the items in the immediately preceding clauses (A) through (D), it being expressly agreed and acknowledged that no personal liability or losses whatsoever shall attach to, be imposed on or otherwise be incurred by any of the aforementioned, as such, arising under, out of, in connection with or related to the items in the immediately preceding clauses (A) through (D), in each case, except for claims that (1) Sellers or Buyer, as applicable, may assert (subject, with respect to the following clauses (ii) and (iii), in all respects to the limitations set forth in Sections 10.2, 10.3, 10.4 and 10.5, and this Section 11.14): (i) against any Person that is party to and solely pursuant to the terms and conditions of, the NDA, (ii) against each Guarantor under, if, as and when required pursuant to the terms and conditions of the Limited Guarantee, (iii) against the Guarantors for specific performance of the Guarantors' obligation to fund their committed portions of the Equity Financing thereunder solely in accordance with, and pursuant to the terms and conditions of, Section 6 of the Equity Commitment Letter, (iv) against Buyer solely in accordance with, and pursuant to the terms and conditions of, this Agreement or (v) against any Person that is a party to, and solely pursuant to the terms and conditions of, the Northwest Purchase Agreement and (2) Buyer may assert against the Debt Financing Sources pursuant to the terms and conditions of the Debt Commitment Letter.

11.15   Certain Definitions.  As used in this Agreement, the following terms have the respective meanings set forth below.

"Accounting Firm" has the meaning set forth in Section 1.4(e).

"Accounts Receivable" means all accounts receivable and all rights to receive payments under any notes, bonds and other evidences of indebtedness and all other rights to receive payments, arising out of sales occurring in the conduct of the Business prior to the Effective Time for services performed or delivered by the Business prior to the Effective Time.

"Acquired Business" means, collectively, the Acquired Companies, the Purchased Assets and the Assumed Liabilities (without duplication of the Liabilities of the Acquired Companies).

"Acquired Companies" has the meaning set forth in the Recitals.

"Acquired Company Assets" means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, and wherever situated), including the goodwill related thereto, operated, owned, leased or primarily used by the Acquired Companies or their respective subsidiaries.

"Acquired Company Employees" has the meaning set forth in Section 5.5(a).

"Acquired Corporations" means Cox Media Group Northeast, Inc., Miami Valley Broadcasting Corporation, and KIRO TV, Inc.

"Action" has the meaning set forth in Section 2.16.

"Adjudication Period" has the meaning set forth in Section 1.4(e).

"Affiliate" means, with respect to a specified Person, any Person or member of a group of Persons acting together that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified Person; provided, that except in the case of the definition of "Buyer Related Party", Article 10 (Termination and Remedies), Section 11.5 (Assignment) and Section 11.14 (No Recourse), in no event shall Buyer or any of its respective subsidiaries be considered an Affiliate of any portfolio company or investment fund affiliated with Apollo Global Management, LLC, nor shall any portfolio company or investment fund affiliated with Apollo Global Management, LLC, be considered to be an Affiliate of Buyer or any of its respective subsidiaries. As used in this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"Affiliate Contract" means any Contract between any Acquired Company or any of their respective subsidiaries, on the one hand, and any current or former executive officer, director, equityholder, or Affiliate of the Sellers, on the other hand.

"Agreed Accounting Principles" means the accounting principles, practices, methodologies and policies set forth on Schedule 11.15(a).

"Agreement" has the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 1.5.

"Anti-Corruption Laws" means (i) the U.S. Foreign Corrupt Practices Act of 1977, as amended, (ii) United Kingdom Bribery Act 2010, (iii) anti-bribery legislation promulgated by the European Union and implemented by its member states, (iv) legislation adopted in furtherance of the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, and (v) similar legislation applicable to any of the Acquired Companies from time to time.

"Assignment and Assumption Agreement" has the meaning set forth in Section 8.1(b).

"Assumed Carriage Agreements" means all Carriage Agreements that are not Excluded Carriage Agreements.

"Assumed Contracts" means the Assumed Dayton Contracts and the Assumed Related Contracts.

"Assumed Dayton Contracts" has the meaning set forth in the definition of "Purchased Dayton Assets" in this Section 11.14.

"Assumed Liabilities" has the meaning set forth in Section 1.1(b)(ii).

"Balance Sheet Date" has the meaning set forth in Section 2.17(b).

"Base Consideration" has the meaning set forth in Section 1.2.

"Bill of Sale" has the meaning set forth in Section 8.1(a).

"Broadcast Incentive Auction" means the FCC reverse broadcast incentive auction conducted pursuant to Section 6403 of the Middle Class Tax Relief and Job Creation Act of 2012 (Pub. L. No. 112-96, § 6403, 126 Stat. 156, 225-230 (2012)), codified at 47 U.S.C. § 1452, which began on May 31, 2016.

"Business" means (i) the operation of the TV Stations, the Dayton Newspapers and the Dayton Radio Stations and (ii) the integrated broadcasting, publishing, direct marketing, digital media and advertising businesses of any of the Sellers primarily relating to the business described in clause (i), taken as a collective group and not on an individual basis. For the avoidance of doubt, the Business does not and shall not include the Excluded Corporate Functions.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are authorized or required by law to be closed in the City of New York, in the State of New York.

"Business Intellectual Property" means the Intellectual Property owned by the Acquired Companies or Sellers to the extent used primarily in the operation of the Business.

"Business IT" means any Software, hardware, communications devices, networks or other information technology owned, leased or licensed by the Acquired Companies or their subsidiaries or Sellers in the conduct of the Business.

"Buyer" has the meaning set forth in the Preamble.

"Buyer FSA Plan" has the meaning set forth in Section 5.5(i).

"Buyer Indemnified Parties" has the meaning set forth in Section 9.2(a).

"Buyer Landlord Lease" has the meaning set forth in Section 8.1(n).

"Buyer Material Adverse Effect" has the meaning set forth in Section 3.3.

"Buyer Related Party" means Buyer, the Debt Financing Sources and any other financing sources of Buyer, the Guarantor and any of the foregoing's respective former, current or future Affiliates and any of the foregoing's respective former, current or future, direct or indirect, officers, directors, employees, affiliates, stockholders, equityholders, managers, members, partners, agents, attorneys, advisors or other representatives or any of the foregoing's respective successors or assigns.

"Buyer Termination Fee" has the meaning set forth in Section 10.4(a).

"Buyer's 401(k) Plan" has the meaning set forth in Section 5.5(e).

"Capital Lease" means a lease of property or equipment that is capitalized in the Management Report or is required to be capitalized under GAAP.

"Carriage Agreement" means each written agreement with an MVPD that grants such MVPD retransmission consent, pursuant to 47 U.S.C. § 325(b), to retransmit such TV Station's Signal, on a linear basis, on such MVPD's systems in such DMA.

41462373.9

"Carriage Resolution Damages" means all Damages suffered or incurred by any Seller (or any Affiliate of Seller) arising from the failure to transfer an Excluded Carriage Agreement to Buyer in connection with the Transactions.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., and any regulations promulgated thereunder.

"Chosen Court" has the meaning set forth in Section 11.10(a).

"Closing" has the meaning set forth in Section 1.3(a).

"Closing Date" has the meaning set forth in Section 1.3(a).

"Closing Indebtedness" means the aggregate amount of Indebtedness of the Acquired Business as of immediately prior to the Effective Time.

"Closing Statement" has the meaning set forth in Section 1.4(b).

"CMG" has the meaning set forth in the Preamble.

"CMG JAX Interests" has the meaning set forth in Section 2.3(a).

"CMG Owned Interests" has the meaning set forth in Section 2.3(a).

"COBRA" has the meaning set forth in Section 5.5(j).

"Code" means the Internal Revenue Code of 1986, as amended.

"Commingled Contract Rights" has the meaning set forth in Section 5.4(b)(i).

"Commingled Contracts" has the meaning set forth in Section 5.4(b)(i).

"Commitment Letters" has the meaning set forth in Section 3.6(a).

"Communications Laws" has the meaning set forth in Section 4.1(a)(iv).

"Company Indemnified Parties" has the meaning set forth in Section 4.3(a).

"Company Transaction Expenses" means, without duplication, all fees, costs, disbursements and expenses (including those related to travel, legal, consulting, professional advising, professional services, accounting or investment banking) incurred, in each case, on or prior to the Closing (whether or not invoiced, whether accrued for or not) and unpaid at the Effective Time with any Acquired Company retaining the liability to pay, or as may become due and payable, post-Closing, and are payable by or on behalf of any Acquired Company, (a) related to or arising out of the negotiation, execution and delivery and consummation of the Transactions and the other transactions contemplated hereby, (b) related to or arising out of the potential sale, spin-off or similar business separation or reorganization of some or all of the Acquired Companies or other subsidiaries of any Seller and (c) with respect to bonuses or other forms of compensation to any Person as a result of or in connection with the transactions contemplated by this Agreement

41462373.9

pursuant to any change in control, retention, transaction, severance, discretionary or similar bonuses or other payment or obligation, including (x) any amounts payable pursuant to any Employee Plan in effect prior to the Closing and (y) the applicable payroll, social security, unemployment or similar Taxes thereon. Company Transaction Expenses shall not include any fees or expenses associated with obtaining the insurance policies contemplated by <u>Section 4.3(b)</u>.

"<u>Compliant</u>" means, with respect to the Required Financing Information, that (i) such Required Financing Information does not contain any untrue statement of a material fact regarding Acquired Business or omit to state any material fact regarding the Acquired Business necessary in order to make such Required Financing Information not misleading under the circumstances, (ii) such Required Financing Information complies in all material respects with all requirements of Regulation S-K and Regulation S-X under the Securities Act for a registered public offering of non-convertible debt securities on Form S-1 that would be applicable to such Required Financing Information (other than such provisions for which compliance is not customary in a Rule 144A offering of high yield debt securities) and (iii) the financial statements and other financial information included in such Required Financing Information would not be deemed stale or otherwise be unusable under customary practices for offerings and private placements of high yield debt securities under Rule 144A promulgated under the Securities Act and are sufficient to permit the Acquired Business' independent accountants to issue comfort letters to the Debt Financing Sources to the extent required as part of the Debt Financing, including as to customary negative assurances and change period, in order to consummate any offering of debt securities on any day during the Marketing Period (and such accountants have confirmed they are prepared to issue a comfort letter subject to their completion of customary procedures).

"<u>Contract</u>" means any written or oral contract, deed of trust, lease, license, commitment, instrument, customer order, loan or credit agreement, indenture, note, bond, mortgage, obligation, undertaking or agreement.

"<u>Contribution Agreement</u>" has the meaning set forth in <u>Section 5.17</u>.

"<u>Cox Ohio</u>" has the meaning set forth in the Preamble.

"<u>Cox Radio</u>" has the meaning set forth in the Preamble.

"<u>Current Assets</u>" means, as of the Effective Time, the current assets of the Acquired Companies, and of Sellers included in the Purchased Assets, determined in accordance with the Agreed Accounting Principles, but excluding (i) any Excluded Assets and (ii) any cash or cash equivalents (other than security deposits of the Business that will remain with the applicable third party following the Closing).

"<u>Current Liabilities</u>" means, as of the Effective Time, the current liabilities of the Acquired Companies, and of Sellers included in the Assumed Liabilities, determined in accordance with the Agreed Accounting Principles, but excluding the Excluded Liabilities. In no event shall the current portion of Closing Indebtedness, or any other Liabilities included in Closing Indebtedness or Company Transaction Expenses, be included in Current Liabilities.

"<u>Damages</u>" has the meaning set forth in Section 9.2(a).

"Dayton Newspapers" has the meaning set forth in the Recitals.

"Dayton Radio Stations" has the meaning set forth in the Recitals.

"Debt Commitment Letter" has the meaning set forth in Section 3.6.

"Debt Financing" has the meaning set forth in Section 3.6.

"Debt Financing Related Parties" means the affiliates, current or future officers, directors, employees, agents, representatives, stockholders, limited partners, managers, members or partners of the Persons identified in the definition of Debt Financing Sources and who are involved in the Debt Financing, together with their successors and assigns.

"Debt Financing Sources" means the persons that have committed to provide or arrange all or any part of the debt financing contemplated by, or have otherwise entered into agreements in connection with, the Debt Commitment Letter or alternative debt financings in connection with the acquisition of the Acquired Companies by Buyer, and any joinder agreements, indentures or credit agreements entered into pursuant thereto or relating thereto, together with their Debt Financing Related Parties and their successors and assigns.

"Debt Payoff Letters" means one or more customary payoff letters with respect to any Indebtedness for borrowed money that is to be repaid at Closing, which payoff letters shall, among other things, (i) indicate the total amount required to be paid to fully satisfy all principal, interest, prepayment premiums, penalties, breakage costs and any other monetary obligations then due and payable under such Indebtedness for borrowed money (and the daily accrual thereafter) (the "Payoff Amount"), (ii) state that upon receipt of the Payoff Amount under each such payoff letter, such Indebtedness for borrowed money and all related loan documents (or similar agreements) shall be terminated and (iii) provide that all Liens and guarantees in connection with such Indebtedness for borrowed money relating to the Acquired Companies, their respective subsidiaries and the Purchased Assets securing the obligations under such Indebtedness for borrowed money shall be released and terminated upon payment of the Payoff Amount on the Closing Date.

"Deed" has the meaning set forth in Section 8.1(p).

"Dispute Resolution Period" has the meaning set forth in Section 1.4(d).

"Divestiture" has the meaning set forth in Section 4.1(b)(iv).

"Divestiture Deadline Date" has the meaning set forth in Section 4.1(b)(v).

"Divestiture Markets" has the meaning set forth in Section 4.1(b)(v).

"Divestiture Plan" has the meaning set forth in Section 4.1(b)(v).

"Divestiture Station Assets" has the meaning set forth in Section 4.1(b)(v).

41462373.9

"<u>DMA</u>" means with respect to any TV Station, such TV Station's Nielsen Designated Market Area.

"<u>DOJ</u>" has the meaning set forth in <u>Section 4.1(b)(i)</u>.

"<u>Effect</u>" has the meaning set forth in the definition of Material Adverse Effect.

"<u>Effective Time</u>" means 12:01 a.m. Eastern Time on the Closing Date.

"<u>Employees</u>" means the employees of any Acquired Company or its subsidiaries and the full-time and part-time employees employed by a Seller or any of its Affiliates who are primarily engaged in work or tasks related to the Business, in either case, other than the employees set forth on <u>Schedule 11.15(b)(i)</u>, and shall not include (a) the Management Employees or (b) any employee of a Seller or its Affiliates whose principal work location is at CMG's corporate headquarters in Atlanta, Georgia or in Cox's Washington News Bureau or whose employment responsibilities relate substantially to the corporate operations of CMG or its parent.

"<u>Employee Plans</u>" means any (a) employee benefit plan, arrangement or policy whether or not subject to ERISA, including any retirement, pension, deferred compensation, profit sharing, savings, group health, dental, life insurance, vacation, sick pay or paid time off, disability or cafeteria plan, policy or arrangement, (b) equity or equity-based compensation plan; (c) bonus or incentive arrangement; and (d) employment, consulting, severance, retention or termination agreements, policies or arrangements; in each case, whether formal or informal, written or unwritten maintained or contributed to or required to be maintained or contributed to by Sellers or any of their ERISA Affiliates for the benefit of any current or former Employee or their dependents, but excluding in all cases any Multiemployer Plan.

"<u>Employment Commencement Date</u>" has the meaning set forth in <u>Section 5.5(a)</u>.

"<u>Enforceability Exceptions</u>" means bankruptcy, moratorium, insolvency, reorganization, fraudulent conveyance or preferential transfers, receivership or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

"<u>Environmental Law</u>" means all Laws relating to or addressing the pollution, natural resources, environment, or the use, handling or Release of, or exposure to, Hazardous Materials, including but not limited to CERCLA, OSHA and RCRA and any state equivalent thereof.

"<u>Equity Commitment Letter</u>" has the meaning set forth in the Recitals.

"<u>Equity Financing</u>" has the meaning set forth in <u>Section 3.6(a)</u>.

"<u>Equity Interests</u>" has the meaning set forth in <u>Section 2.3(a)</u>.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that, together with Sellers, would be deemed a "single employer" within the meaning of Section 4001(b)(i) of ERISA.

"ERISA Affiliate Plan" means each Employee Plan sponsored or maintained or required to be sponsored or maintained at any time by any ERISA Affiliate, or with respect to which such ERISA Affiliate has any liability or obligation.

"Estimated Closing Statement" has the meaning set forth in Section 1.4(a).

"Estimated Purchase Price" has the meaning set forth in Section 1.4(a).

"Ex-Im Laws" means all applicable laws and regulations relating to export, re-export, transfer or import controls (including without limitation, the Export Administration Regulations administered by the U.S. Department of Commerce, and customs and import laws administered by U.S. Customs and Border Protection).

"Excluded Assets" means the Excluded Dayton Assets, the Excluded CMG Assets, the Excluded Owned Real Properties, the Excluded Cox Contracts, the Excluded Carriage Agreements and the Fox modification fee and Repack receivables excluded from Current Assets pursuant to the Agreed Accounting Principles.

"Excluded Carriage Agreements" shall mean the Carriage Agreement set forth on Schedule 3.14, and any additional Carriage Agreements added to Schedule 3.14 prior to Closing as mutually agreed by the Parties in accordance with the principles set forth on Schedule 11.15(b)(ii).

"Excluded CMG Assets" means, other than the Purchased Assets (including the Purchased Related Assets), the following:

(i)     any assets, equipment, properties, contracts and/or rights of CMG not used primarily in connection with, or not primarily related to, the operation of the TV Stations or the Business;

(ii)     any cash and cash equivalents held for use in connection with the TV Stations, except any security deposits used primarily in connection with, or primarily related to, the operation of the TV Stations or the Business and included in the determination of Net Working Capital;

(iii)    all bank and other depository accounts of CMG, except any deposits used primarily in connection with, or primarily related to, the operation of the TV Stations or the Business and included in the determination of Net Working Capital;

(iv)    all insurance policies relating to the TV Stations and all claims, credits, causes of action or rights, including rights to insurance proceeds or refunds, thereunder;

(v)     all interest in and to refunds of Taxes relating to Pre-Closing Tax Periods or the other Excluded Assets;

(vi)     all Organizational Documents of CMG or its Affiliates (other than any of the Acquired Companies or their subsidiaries);

(vii)     any assets related to the operation of the TV Stations actually sold or otherwise disposed of prior to Closing as permitted by this Agreement;

(viii)     all contracts or agreements that are not used primarily in connection with, or not primarily related to, the operation of the TV Stations, other than the Assumed Contracts;

(ix)     other than the Assumed Contracts and as specifically set forth in Section 5.5, any Employee Plan not maintained by an Acquired Company and any ERISA Affiliate Plan, as well as any assets held by or relating thereto;

(x)     all Tax Records of CMG and its Affiliates, other than real and personal property and sales and use Tax records;

(xi)     the Cox TMs whether or not used in connection with the operation of the TV Stations;

(xii)     all Commingled Contracts, except to the extent Buyer is allocated Commingled Contract Rights in accordance with Section 5.4(b); and

(xiii)     the assets identified on Schedule 11.15(c).

"Excluded Corporate Functions" means the services and personnel set forth on Schedule 11.15(d).

"Excluded Cox Contracts" means those contracts set forth on Schedule 11.15(e).

"Excluded Dayton Assets" means, other than the Purchased Assets (including the Purchased Dayton Assets), the following:

(i)     any assets, equipment, properties, contracts and/or rights of Cox Ohio or Cox Radio not used primarily in connection with, or not primarily related to, the operation of the Dayton Radio Stations, Dayton Newspapers or the Business;

(ii)     any cash and cash equivalents held for use in connection with the Dayton Radio Stations or Dayton Newspapers, except any security deposits used primarily in connection with, or primarily related to, the operation of the Dayton Radio Stations, Dayton Newspapers or the Business and included in the determination of Net Working Capital;

(iii)     all bank and other depository accounts of Cox Radio or Cox Ohio, except any deposits used primarily in connection with, or primarily related to, the operation of the Dayton Radio Stations, Dayton Newspapers or the Business and included in the determination of Net Working Capital;

41462373.9

(iv)    all insurance policies relating to the Dayton Radio Stations and Dayton Newspapers and all claims, credits, causes of action or rights, including rights to insurance proceeds or refunds, thereunder;

(v)    all interest in and to refunds of Taxes relating to Pre-Closing Tax Periods or the other Excluded Assets;

(vi)    all Organizational Documents of Cox Ohio, Cox Radio or their Affiliates (other than any of the Acquired Companies or their subsidiaries);

(vii)    any assets related to the operation of the Dayton Radio Stations or Dayton Newspapers actually sold or otherwise disposed of prior to Closing as expressly permitted by this Agreement;

(viii)    all contracts or agreements that are not used primarily in connection with, or not primarily related to, the operation of the Business, other than the Assumed Contracts, including, without limitation, those contracts or agreements listed on Schedule 11.15(f) (collectively, the "Excluded Dayton Contracts");

(ix)    other than the Assumed Contracts and as specifically set forth in Section 5.5, any Employee Plan not maintained by an Acquired Company and any ERISA Affiliate Plan, as well as any assets held by or relating thereto;

(x)    all Tax Records of Cox Radio and Cox Ohio and their Affiliates, other than real and personal property and sales and use Tax records;

(xi)    the Cox TMs whether or not used in connection with the operation of the Dayton Radio Stations or Dayton Newspapers;

(xii)    all Commingled Contracts, except to the extent Buyer is allocated Commingled Contract Rights in accordance with Section 5.4(b); and

(xiii)    the assets identified on Schedule 11.15(g).

"Excluded Dayton Contracts" has the meaning set forth in the definition of "Excluded Dayton Assets" in this Section 11.15.

"Excluded Liabilities" means the following Liabilities of the Sellers and their Affiliates:

(a) the Closing Indebtedness;

(b) Company Transaction Expenses;

(c) Liabilities for Pre-Closing Taxes;

(d) Liabilities arising out of any pre-closing reorganization conducted by Sellers;

(e) all Employee Plans (except for the Employee Plans set forth on Schedule 2.13(a)(i)) and all Liabilities related thereto;

41462373.9

(f) Liabilities arising from the Excluded Assets; and

(g) the Liabilities set forth on Schedule 1.1(b)(ii).

"Excluded Owned Real Properties" means those Owned Real Properties set forth on Schedule 11.15(h).

"FCC" has the meaning set forth in the Recitals.

"FCC Applications" has the meaning set forth in Section 4.1(a)(i).

"FCC Assignment Agreement" has the meaning set forth in Section 8.1(c).

"FCC Consent" has the meaning set forth in Section 4.1(a)(i).

"FCC Licenses" means, with respect to the TV Stations or the Dayton Radio Stations any FCC license or Permit issued by the FCC under Subpart G of Part 74 of Title 47 of the Code of Federal Regulations and granted or assigned to any Acquired Company or its subsidiaries, and issued by the FCC under Part 73 of Title 47 of the Code of Federal Regulations and granted or assigned to any Acquired Company or its subsidiaries (or Cox Radio with respect to the Dayton Radio Stations).

"Final Purchase Price" has the meaning set forth in Section 1.4(b).

"Financial Reports" has the meaning set forth in Section 2.17(a).

"Financing" has the meaning set forth in Section 3.6(a).

"FTC" has the meaning set forth in Section 4.1(b)(i).

"GAAP" means, with respect to any date of determination, United States generally accepted accounting principles as in effect on such date of determination, consistently applied.

"Georgia Television Interests" has the meaning set forth in Section 2.3(a).

"Governmental Consents" has the meaning set forth in Section 4.1(b)(i).

"Governmental Entity" means any (i) federal, state, local, municipal, foreign or other government (or any political subdivision thereof), (ii) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iii) body exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Governmental Order" means any statute, rule, regulation, order, decree, consent decree, award, settlement, judgment, writ, injunction, stipulation or determination issued, promulgated, rendered or entered by or with any Governmental Entity of competent jurisdiction (in each case, whether temporary, preliminary or permanent).

"Guarantors" mean, collectively, Apollo Investment Fund IX, L.P., Apollo Overseas Partners (Delaware) IX, L.P., Apollo Overseas Partners (Delaware 892) IX, L.P., Apollo Overseas Partners IX, L.P., and Apollo Overseas Partners (Lux) IX, SCSp.

"Hazardous Materials" means any pollutant, contaminant, hazardous substance, hazardous waste, medical waste, special waste, toxic substance, toxic chemical, any petroleum or petroleum-derived substance, waste or additive, asbestos, asbestos-containing material, polychlorinated byphenol, radioactive compound, or other compound, element, material or substance (including products) that may give rise to liability under any Environmental Law.

"Hoffman Credit Agreement" means that certain Credit Agreement, dated of December 3, 2012, by and among Hoffman Communications, Inc. as successor-in-interest to Bayshore Television, LLC, the lenders party thereto and Wells Fargo Bank, National Association, as administrative agent.

"Hoffman Guaranty" means, collectively, that certain Amended and Restated Guaranty Agreement, dated as of November 30, 2017, by Parent in favor of Wells Fargo Bank, National Association, and that certain Reaffirmation Agreement, dated as of May 7, 2018, by and between Parent and Wells Fargo Bank, National Association.

"Hoffman Guaranty Agreement" has the meaning set forth in Section 8.1(t).

"Holdco Stockholders Agreement" has the meaning set forth in Section 5.17.

"HSR Act" has the meaning set forth in Section 4.1(b)(i).

"HSR Clearance" has the meaning set forth in Section 4.1(b)(i).

"Inactive Employee" has the meaning set forth in Section 5.5(a).

"Indebtedness" means, with regard to any Person and without duplication, any liability or obligation, whether or not contingent, (a) in respect of the outstanding principal amount of any indebtedness for borrowed money or evidenced by bonds, monies, debentures, loan agreements, or similar instruments; (b) guaranties, direct or indirect, in any manner, of all or any part of any Indebtedness of any other Person; (c) all obligations under acceptance, standby letters of credit or similar facilities; (d) all Capital Leases; (e) all payment obligations under any currency or interest rate swap agreements, currency or interest rate hedge agreements or similar arrangements; (f) all direct obligations under letters of credit, surety bonds and similar funding guarantees, in each case, to the extent drawn; (g) the deferred purchase price of property, businesses, securities, assets, or services in respect of which such Person is liable, contingently or otherwise (including earn-outs, third-party bonuses or seller-notes (assuming the maximum amount earned)); (h) all Company Transaction Expenses; (i) declared by unpaid dividends or any other obligations owed to any Seller or its Affiliates (other than the Acquired Companies); (j) pension and other similar post-retirement obligations (excluding for the avoidance of doubt any post-Closing obligations assumed by Buyer pursuant to Section 5.5); (k) all accrued and unpaid interest and prepayment and breakage fees, penalties, premiums, costs or expenses related to the retirement of each of the obligations referred to in clauses (a) – (j); and (l) all obligations referred to in clauses (a) – (k) of a third party secured by any Lien on property or assets of such Person; provided, that in no event shall any Indebtedness

95

between or among such Person and its Affiliates be considered "Indebtedness" for purposes of this Agreement if such indebtedness and all obligations related thereto are terminated and all Liens in connection therewith are released prior to the Effective Time; provided, further, that the foregoing shall be calculated in a manner consistent with the Agreed Accounting Principles. For the avoidance of doubt, Indebtedness (for any purpose hereunder) shall not include the Hoffman Guaranty or any guaranty, letter of credit or similar obligation provided by Parent or any Affiliate of Parent that is not an Acquired Company or subsidiary of an Acquired Company.

"Indebtedness Payoff Amount" means an amount equal to the total amount of the Closing Indebtedness.

"Indemnified Party" has the meaning set forth in Section 9.3(a).

"Indemnifying Party" has the meaning set forth in Section 9.3(a).

"Information Privacy and Security Laws" means all applicable Laws relating to the processing, use, disclosure, collection, privacy, transfer or security of Protected Information, and all regulations promulgated and guidance issued by Governmental Entities thereunder, including, but not limited to, the following Laws, each as amended from time to time: the General Data Protection Regulation (EU) 2016/679, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, the Federal Trade Commission Act, the Privacy Act of 1974, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, Children's Online Privacy Protection Act, state data security Laws, state social security number protection Laws, state data breach notification Laws, state consumer protection Laws, and any applicable Laws concerning requirements for website and mobile application privacy policies and practices, call or electronic monitoring or recording or any outbound communications (including, but not limited to, outbound calling and text messaging, telemarketing, and email marketing).

"Intellectual Property" means all of the following, together with all goodwill associated therewith: call letters, trademarks, trade names, service marks, designs, business names, patents, inventions, trade secrets, know-how, processes, methods, techniques, Internet domain names, websites, social media identifiers (such as a Twitter® Handle) and related accounts, web content, databases, copyrights and other works of authorship, programs and programming material, jingles, slogans, logos, content, Software or applications, all rights of privacy and publicity, all applications, registrations and renewals relating to any of the foregoing, any other intellectual property rights or proprietary rights in or arising from any of the foregoing, whether registered or not, throughout the world, and in all tangible embodiments of the foregoing, including all licenses, sublicenses and other rights granted and obtained with respect thereto, and rights thereunder, including rights to collect royalties, products and proceeds, rights to sue and bring other Claims and seek remedies against past, present and future infringements or misappropriations thereof or other conflicts therewith, rights to recover damages or lost profits in connection therewith, and other rights to recover damages (including attorneys' fees and expenses) or lost profits in connection therewith, and otherwise to seek protection or enforcement of interests therein, and all other corresponding rights, under the laws of all jurisdictions, and whether arising by operations of law, contract, license or otherwise.

"Intentional Breach" shall mean, with respect to any representation, warranty, agreement or covenant, a material breach that is the consequence of an action or omission by the breaching party with actual or constructive knowledge (which shall be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such action or omission is, or would reasonably be expected to be or result in, a breach of such representation, warranty, agreement or covenant.

"IP Assignment Agreement" has the meaning set forth in Section 8.1(e).

"IT Systems" means all software, hardware, networks and systems owned or controlled by or on behalf of the Acquired Companies, each of their subsidiaries or any Seller, including, without limitation, all servers, workstations, routers, hubs, switches, data lines, desktop applications, server-based applications, mobile applications, cloud services hosted or provided by the Acquired Companies, each of their subsidiaries or any Seller, mail servers, firewalls, databases, source code and object code.

"Knowledge" means with respect to Sellers the actual knowledge of Kimberly Guthrie, Brett Fennell, or Jane Williams, in each case, after due inquiry and assuming the discharge of such Person's duties in a professional manner.

"Knowledge of Buyer" means with respect to Buyer the actual knowledge of David Sambur, Aaron Sobel and Houston McCurry, in each case, after due inquiry and assuming the discharge of such Person's duties in a professional manner.

"Law" means any United States federal, state or local law or any foreign law (in each case, including common and statutory law or otherwise), constitution, treaty, statute, ordinance, regulation, rule, code, order, judgment, injunction, writ, decree or other similar requirement or Governmental Order enacted, issued, adopted, promulgated, entered into or applied by a Governmental Entity.

"Leased Real Property" has the meaning set forth in Section 2.8(b).

"Lender" has the meaning set forth in Section 3.6.

"Liability" means any and all debts, liabilities, guarantees, assurances, commitments and obligations of any kind or nature, known or unknown, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, due or to become due, whenever or however arising (including whether pursuant to contract, tort based on negligence or strict liability, or Action).

"Liens" means claims, liabilities, Taxes, security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, covenants, restrictions, encroachments or other survey defects, easements, proxies, voting trusts or agreements, transfer restrictions under any Contract or encumbrances of any kind or nature whatsoever.

"Limited Guarantee" has the meaning set forth in the Recitals.

"Management Employees" means those employees identified on Schedule 5.5(r).

"Management Report" has the meaning set forth in Section 2.17(b).

"Marketing Period" means the first period of 18 consecutive days after the date of this Agreement and throughout which and at the end of which (i) Seller has delivered to Buyer the Required Financing Information and the Required Financing Information is Compliant, (ii) the conditions set forth in Article 7 are satisfied (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), and (iii) nothing has occurred and continued and no condition exists that would cause any of the conditions set forth in Article 7 to fail to be satisfied (other than those conditions that by their nature can only be satisfied at the Closing), assuming that such conditions were applicable at any time during such 18 consecutive day period; provided, that (x) May 27, 2019, July 4, 2019, July 5, 2019 and November 27, 2019 through December 1, 2019 shall not be considered calendar days for purposes of such 18 consecutive day period (provided, however, that such exclusions shall not restart such period), (y) if such 18 consecutive day period shall not have fully elapsed on or prior to August 16, 2019, then such period shall not commence any earlier than September 3, 2019 and (z) if such 18 consecutive day period shall not have fully elapsed on or prior to December 20, 2019, then such period shall not commence any earlier than January 3, 2020. Notwithstanding the foregoing, (A) the Marketing Period will end on any earlier date on which the Debt Financing is closed; and (B) the Marketing Period will not commence or be deemed to have commenced if, after the date of this Agreement and prior to the completion of the consecutive day period referenced herein (1) the Acquired Business' auditors shall have withdrawn any audit opinion with respect to any audited financial statements contained in or that includes the Required Financing Information, in which case the Marketing Period shall not commence or be deemed to commence unless and until, at the earliest, a new unqualified audit opinion is issued with respect to such financial statements for the applicable periods by such auditors or another independent public accounting firm reasonably acceptable to Buyer, (2) any Seller or any Acquired Company has announced its intention to, or determines that it must, restate any historical financial statements or other financial information that comprises a portion of, or contains, the Required Financing Information or any such restatement is otherwise required in accordance with GAAP or any such restatement is under active consideration, in which case, the Marketing Period shall not commence or be deemed to commence unless and until, at the earliest, such restatement has been completed and the applicable Required Financing Information has been amended and updated or any such Seller or Acquired Company has announced and informed Buyer that it has concluded that no restatement shall be required in accordance with GAAP or (3) any Required Financing Information would not be Compliant at any time during such consecutive day period (it being understood that if any Required Financing Information provided at the commencement of the Marketing Period ceases to be Compliant during such consecutive day period, then the Marketing Period will be deemed not to have occurred) or otherwise does not include the "Required Financing Information" as defined.  If at any time Sellers in good faith believe that the Required Financing Information has been provided and is Compliant, Sellers may deliver to Buyer a written notice to that effect (stating when it believes it completed such delivery), in which case the requirement to deliver the Required Financing Information will be deemed to have been satisfied as of the date of such notice, unless Buyer reasonably believes that the Sellers have not completed the delivery of the Required Financing Information and, within two (2) Business Days after the delivery of such notice by Sellers, delivers a written notice to Sellers to that effect (stating with specificity which Required Financing Information the Buyer reasonably believes the Sellers have not delivered); provided that it is understood that delivery of such written notice from the Buyer to the Sellers will not prejudice

41462373.9

the Sellers' right to assert that the Required Financing Information has in fact been delivered and is Compliant.

"Material Adverse Effect" means any event, state of facts, circumstance, development, change, effect or occurrence (an "Effect") that, individually or in the aggregate with any other Effect, (A) would, or would reasonably be expected to, prevent or materially delay the ability of any Seller to consummate the Transactions and the other transactions contemplated hereby or (B) has had, or would reasonably be expected to have, a materially adverse effect on the business, properties, assets, condition (financial or otherwise) or results of operations of the Business and the Purchased Assets, taken as a whole, other than, solely in the case of clause (B), any Effect arising out of or resulting from (a) changes in the United States or foreign credit, debt, capital or financial markets (including changes in interest or exchange rates) or the economy of any town, city, region, state or country in which the Business is conducted, (b) general changes or developments in the broadcast television, radio or newspaper industries in which the Business operates, (c) the execution and delivery of this Agreement, the announcement of this Agreement and the Transactions and the consummation of the Transactions, including the identity of Buyer and its Affiliates; provided, that this clause (c) shall not apply to any Effect that results from the breach by Sellers of any representation or warranty set forth in Section 2.4 (No Conflict) , (d) the compliance with the covenants and agreements contained in this Agreement or the taking of any action by the Business required by this Agreement or consented to in writing by Buyer after disclosure to Buyer by Sellers of all material and relevant facts and information; provided, that this clause (d) shall not apply to the covenants and agreements set forth in Section 4.2(a)(i); (e) earthquakes, hurricanes, tornadoes, natural disasters or global, national or regional political conditions, including hostilities, military actions, political instability, acts of terrorism or war or any material escalation or material worsening of any such hostilities, military actions, political instability, acts of terrorism or war, (f) any failure, in and of itself, by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions for any period (it being understood that the Effect underlying, contributing or giving rise to such failure may be deemed to constitute, or be taken into account in determining whether there has been or will reasonably be expected to be, a Material Adverse Effect); (g) any Effect that results from any action taken by the Business at the express prior written request of Buyer or with Buyer's prior written consent after disclosure to Buyer by Sellers of all material and relevant facts and information; or (h) changes in applicable Law or generally accepted accounting principles or the interpretation thereof after the date hereof (including, for the avoidance of doubt, any change after the date hereof in any rule or policy and the issuance of any order, in any case, the effect of which is to restrict in any respect the ability accorded to Buyer under FCC rules and policies in effect as of the date of this Agreement to enter into and perform joint sales, shared services, and such other operational arrangements and agreements related to any TV Station); provided, that any Effects resulting from the matters described in clauses (a), (b), and (e) may be taken into account in determining whether there has been a Material Adverse Effect if they have a disproportionate effect on the Business relative to other companies operating in the industries in which the Business operates.

"Material Agreement" has the meaning set forth in Section 2.9(a).

"Maximum Liability Amount" means Three Hundred Million Dollars ($300,000,000).

"Maximum Percentage" has the meaning set forth in Section 5.17.

"MFN" has the meaning set forth in Section 2.6(c).

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 3(37) of ERISA.

"MVBC Stock" has the meaning set forth in Section 2.3(a).

"MVPDs" means cable systems, wireline telecommunications companies, and direct broadcast satellite systems that, in each case, qualify as multi-channel video programming distributors, as that term is defined by the FCC.

"NDA" has the meaning set forth in Section 5.1.

"Net Working Capital" means the amount (expressed as a positive amount), if any, by which (i) the Current Assets, exceed (ii) the Current Liabilities; provided that if such Current Assets are equal to such Current Liabilities, then the Net Working Capital shall be zero.

"Network Affiliation Agreement" has the meaning set forth in Section 2.9(a)(iv).

"Northwest Closing" means the Closing as defined in the Northwest Purchase Agreement.

"Northwest Purchase Agreement" means that certain Purchase Agreement, dated as of February 14, 2019, by and among Brian W. Brady, Jason R. Wolff, Bristlecone, LLC, NBI Holdings, LLC, Northwest Broadcasting, L.P., Bryson Broadcast Holdings, LLC and Terrier Media Buyer, Inc.

"Northwest Transactions" means the Contemplated Transactions as defined in the Northwest Purchase Agreement.

"Objection Notice" has the meaning set forth in Section 1.4(b).

"Objection Period" has the meaning set forth in Section 1.4(b).

"Organizational Documents" means, with respect to any Person (other than an individual), the articles or certificate of incorporation, bylaws, certificate of limited partnership, partnership agreement, certificate of formation, limited liability company operating agreement, and all other organizational and governing documents of such Person.

"Original Production" means any audio or audio-visual program produced, co-produced or commissioned by the Acquired Business.

"OSHA" means the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq., and any regulations promulgated thereunder.

"Outside Date" has the meaning set forth in Section 10.1(d).

"Owned Real Property" means (i) all Real Property owned by the Acquired Companies and (ii) all Real Property owned by CMG, Cox Ohio or Cox Radio that is primarily used in the operation of the Business, except to the extent an Excluded Owned Real Property.

"Party" and "Parties" have the meanings set forth in the Preamble.

100

41462373.9

"PCI DSS" shall mean the Payment Card Industry Data Security Standard, issued by the Payment Card Industry Security Standards Council, as may be revised from time to time.

"Permits" has the meaning set forth in Section 2.15.

"Permitted Liens" means, collectively, (a) Liens for taxes, assessments and governmental charges not yet due and payable or that are being contested in good faith and for which adequate reserves have been created in accordance with GAAP; (b) Liens arising under any zoning laws or ordinances which are not violated by the current use or occupancy of the Real Property or the operation of the Business thereon, other than any Liens resulting from any violation or non-compliance in any material respect with such zoning laws or ordinances by any Acquired Company or its subsidiaries; (c) any right reserved to any Governmental Entity to regulate the affected property (including restrictions stated in any permits); (d) in the case of any leased asset, (i) the rights of any lessor under the applicable Contract or any Lien granted by any lessor or any Lien that the lessor's interest in the applicable Contract is subject to, (ii) any statutory Lien for amounts that are not yet due and payable or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been created in accordance with GAAP and (iii) the rights of the grantor of any easement or any Lien granted by such grantor on such easement property, (e) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, material men and other Liens imposed by law arising or incurred in the ordinary course of business for amounts that are not yet due and payable or that are being contested in good faith by appropriate proceedings and for which appropriate reserves have been created in accordance with GAAP that do not result from any breach, violation or default by any Acquired Company or its subsidiaries of any Contract or applicable Law, (f) Liens created by or through Buyer or any of its Affiliates, (g) minor defects of title, easements, rights-of-way, restrictions and other Liens not securing the payment of a sum of money and not materially interfering with the present use of any Real Property or any Station, (h) Liens disclosed on Schedule 11.15(i) that will be released prior to or as of the Closing Date, (i) non-exclusive licenses of Intellectual Property granted in the ordinary course of business, (j) Liens designated as Permitted Liens on Schedule 11.15(i), if any, (k) with respect to any equity interest, any restrictions on transfer of such equity interest imposed by Federal or state securities laws and (l) any state of facts an accurate survey would show, other than those which materially and adversely impact the present use of such Real Property or the present operation of the Business thereon. Notwithstanding anything to the contrary elsewhere in this definition or in this Agreement, with respect to any equity interest (including the Equity Interests), "Permitted Liens" shall mean only clauses (a), (c), (f) and (k).

"Person" means any natural person, general or limited partnership, corporation, limited liability company, firm, association, joint venture, trust or other legal entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

"Post-Closing Tax Period" means any Tax period beginning and ending after the Closing Date and the portion of any Straddle Period occurring after the Closing Date. In the case of any Straddle Period, the amount of Taxes for such period attributable to the Post-Closing Tax Period shall be determined pursuant to Section 5.11(d).

"Pre-Closing Restructuring" has the meaning set forth in Section 5.14.

"Pre-Closing Tax Period" means any Tax period ending on or prior to the Closing Date and the portion of any Straddle Period ending on the Closing Date. In the case of any Straddle Period, the amount of Taxes for such period attributable to the Pre-Closing Tax Period shall be determined pursuant to Section 5.11(d).

"Pre-Closing Taxes" means, without duplication, (i) Taxes of the Acquired Companies for Pre-Closing Tax Periods; (ii) Taxes of any other Person for which the Acquired Companies are liable as a transferor or successor, by contract or Law, that are attributable to Pre-Closing Tax Periods; or (iii) Taxes of any other Person for which the Acquired Companies are liable under Treasury Regulation Section 1.1502-6 (or any similar provision of applicable Tax law) as a result of being a member of an affiliated, consolidated, combined, unitary or similar group prior to Closing. Pre-Closing Taxes do not include (i) any Taxes for Post-Closing Periods or (ii) any Taxes arising from any action or transaction outside the ordinary course of business on the Closing Date after the Closing.

"Premium Cap" has the meaning set forth in Section 4.3(b).

"Programming Rights" means rights to broadcast and rebroadcast television programs, feature films, shows or other television programming.

"Protected Information" means any information that (i) relates to an identified or identifiable individual or device used by an individual; (ii) is governed, regulated or protected by one or more Information Privacy and Security Laws; (iii) any information that is covered by the PCI DSS; or (iv) is derived from Protected Information.

"Purchase Price" has the meaning set forth in Section 1.2.

"Purchased Assets" means the Purchased Dayton Assets and the Purchased Related Assets.

"Purchased Dayton Assets" means (i) all of the assets and properties, in each case, primarily used, or primarily held for use by CMG or its Affiliate, in the operation of the Dayton Radio Stations, and (ii) all of the assets and properties, in each case, primarily used, or primarily held for use by Cox Ohio or its Affiliate, in the operation of the Dayton Newspapers, including:

(i)     all FCC Licenses and all transferable municipal, state and federal franchises, licenses, permits or other governmental authorizations relating primarily to the Dayton Radio Stations;

(ii)    the Owned Real Property that is primarily used, or held for use, in the operation of the Dayton Radio Stations or the Dayton Newspapers;

(iii)   the Real Property Leases used, or held for use, primarily in the operation of the Dayton Radio Stations or the Dayton Newspapers;

(iv)    the tower leases used, or held for use, primarily in the operation of the Dayton Radio Stations;

(v)    all rights under all Contracts to which Cox Radio or Cox Ohio is a party that (i) are listed or referenced on Schedule 2.9(a); (ii) are not required by the terms thereof to be listed on Schedule 2.9(a) but are used, or held for use, primarily in connection with the operation of the Dayton Radio Stations or the Dayton Newspapers; (iii) are referenced in other subsections to this definition of Purchased Dayton Assets or the corresponding Section in the Schedules; or (v) are entered into after the date hereof by Cox Ohio or Cox Radio, as applicable, pursuant to the terms and subject to the conditions of Section 4.2 (collectively, the "Assumed Dayton Contracts"), provided, however, that the Assumed Dayton Contracts shall in no event include any Excluded Cox Contracts;

(vi)    the Accounts Receivable of the Dayton Radio Stations and the Dayton Newspapers;

(vii)    the Intellectual Property used, or held for use, primarily in the operation of the Dayton Radio Stations or the Dayton Newspapers, including, but not limited to, the Intellectual Property listed on Schedule 11.15(j);

(viii)    the equipment and personal property primarily used, or held for use, in connection with the operation of the Dayton Radio Stations or the Dayton Newspapers, including the equipment and personal property listed on Schedule 11.15(k);

(ix)    rights of Cox Radio and Cox Ohio in any management and other systems (including computers and peripheral equipment), databases, Software (including computer disks and similar assets), and all licenses and rights in relation thereto, in each case, that are used, or held for use, primarily in the operation of the Dayton Radio Stations or the Dayton Newspapers, including the equipment and personal property listed on Schedule 11.15(k) (the "Purchased Dayton Equipment"); provided, however, in no event shall such management and other systems, databases, and Software include any Excluded Assets;

(x)    all rights, claims, credits, causes of action or rights of set-off of Cox Radio and Cox Ohio against third parties relating primarily to the Purchased Dayton Assets, including unliquidated rights under manufacturers' and vendors' warranties, in each case only to the extent Buyer incurs losses relating thereto occurring after the Effective Time;

(xi)    all inventories of merchandise, newsprint, and other raw materials, work in process, finished goods and supplies (including photo supplies, composition supplies, camera supplies, press room supplies, mailroom supplies, plant supplies and route and circulation supplies) owned, leased or otherwise held by Cox Ohio and primarily used, or held for use, in connection with the operation of the Dayton Newspapers; and

(xii)    all information and data, sales and business records, books of account, files, invoices, inventory records, general, financial, and accounting and real and personal property and sales and use Tax records, and all books, documents and records, in each case, that are used, or held for use, primarily in the operation of the Dayton Radio Stations or the Dayton Newspapers (excluding, for the avoidance of doubt, any records to the extent relating to any other newspapers or radio stations owned or operated by CMG or its Affiliates).

"Purchased Related Assets" means all of the assets and properties, in each case, primarily used, or primarily held for use by CMG or its Affiliates, in the operation of the Business other than the Excluded CMG Assets, including:

(i)      the Owned Real Property, Real Property Leases and tower leases, including as set forth on Schedule 11.15(l);

(ii)      the equipment and personal property primarily used, or held for use, in connection with the operation of the TV Stations, including as listed on Schedule 11.15(m);

(iii)      all of CMG's rights under all Contracts that (x) are listed or referenced on Schedule 2.9(a), (y) are not required by the terms thereof to be listed on Schedule 2.9(a) but are used, or held for use, primarily in connection with the operation of the TV Stations, or (z) are entered into after the date hereof by CMG pursuant to the terms and subject to the conditions of Section 4.2 (collectively, the "Assumed Related Contracts"); provided, however, that Assumed Related Contracts shall in no event include Excluded Cox Contracts;

(iv)      (A) any and all claims, causes of action, defenses and rights of offset or counterclaim, or settlement agreements or rights of any kind (in any manner arising or existing, whether choate or inchoate, known or unknown, contingent or non-contingent) to the extent arising out of the any Contracts primarily relating to, or used primarily in connection with, the Business, any of the Purchased Assets or any of the Assumed Liabilities, other than any Excluded Liability and (B) all rights arising under or relating to any Assumed Liabilities;

(v)      all prepaid expenses and deposits (other than prepaid Taxes) and ad valorem Taxes, leases and rentals, in each case, to the extent relating primarily to the Purchased Related Assets;

(vi)      all Intellectual Property listed on Schedule 11.15(n);

(vii)      all goodwill and intangible assets; and

(viii)      the assets set forth on Schedule 11.15(o).

"R&W Insurance Policy" means the insurance coverage provided pursuant to any buyer-side representations and warranties insurance policy obtained by Buyer on or after the date of this Agreement.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., and any regulations promulgated thereunder.

"Real Property" means all Owned Real Property and all Leased Real Property.

"Real Property Assignment" has the meaning set forth in Section 8.1(d).

"Real Property Leases" has the meaning set forth in Section 2.8(b).

"Release" means any release, spill, emission, leaking, pumping, pouring, emptying, leaching, escaping, dumping, injection, deposit, discharge or disposing of any Hazardous Material in, onto or through the environment.

"Renewal Application" has the meaning set forth in Section 4.1(a)(iv).

"Replacement Contract" has the meaning set forth in Section 5.4(b)(i).

"Representative" of a Person means any officer, director or employee of such Person or any consultant, investment banker, attorney, accountant, agent or other advisor or representative of such Person.

"Required Financing Information" means (i) all financial statements, financial data, audit reports and other information regarding the Acquired Business of the type that would be required by Regulation S-X promulgated by the SEC and Regulation S-K promulgated by the SEC for a registered public offering of non-convertible debt securities on a registration statement on Form S-1 under the Securities Act of Buyer to consummate the offering(s) of high yield debt securities contemplated by the Debt Commitment Letter, assuming that such offering(s) were consummated at the same time during the Acquired Business' fiscal year as such offering(s) of debt securities will be made (including all audited financial statements (which, for the avoidance of doubt, may be in accordance with AICPA standards rather than PCAOB standards) and all unaudited financial statements (which will have been reviewed by Sellers' independent accountants as provided in Statement on Auditing Standards 100)); and (ii) such other financial and other information regarding the Acquired Business (A) as may be reasonably requested by Buyer to the extent that such information is required in connection with Exhibit D of the Debt Commitment Letter or is of the type and form customarily included in an offering memorandum for private placements of non-convertible high-yield bonds pursuant to Rule 144A promulgated under the Securities Act or (B) as otherwise necessary to receive from the Acquired Business' independent accountants (and any other accountant to the extent that financial statements audited or reviewed by such accountants are or would be included in such offering memorandum), customary "comfort" (including "negative assurance" comfort and change period comfort), together with drafts of customary comfort letters that such independent public accountants are prepared to deliver upon the "pricing" of any high-yield bonds being issued in lieu of any portion of the Debt Financing, with respect to the financial information to be included in such offering memorandum. Notwithstanding anything to the contrary in clauses (i) and (ii), nothing will require Sellers or the Acquired Companies to provide (or be deemed to require Sellers or the Acquired Companies to prepare) any (1) pro forma financial statements, (2) projections, (3) description of all or any portion of the Debt Financing, including any "description of notes", (4) risk factors relating to all or any component of the Debt Financing or (5) other information required by Rule 3-10 or Rule 3-16 of Regulation S-X, any Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K or any other information customarily excluded from an offering memorandum for private placements of non-convertible high-yield bonds pursuant to Rule 144A.

"Sanctioned Person" means at any time any Person: (i) listed on any Sanctions-related list of designated or blocked Persons; (ii) resident in or organized under the laws of a country or territory that is the subject of comprehensive restrictive Sanctions (which includes as of the date of this

Agreement Cuba, Iran, North Korea, Syria, and the Crimea region); or (iii) majority-owned or controlled by any of the foregoing.

"Sanctions" means those trade, economic and financial sanctions laws, regulations, embargoes, and restrictive measures (in each case having the force of law) administered, enacted or enforced by (i) the United States (including without limitation the Department of Treasury, Office of Foreign Assets Control), (ii) the European Union and enforced by its member states, (iii) the United Nations, (iv) Her Majesty's Treasury or (v) other similar governmental bodies.

"Schedules" means the disclosure schedules referenced herein and attached to this Agreement.

"Section 338(h)(10) Election" has the meaning set forth in Section 5.11(h).

"Securities Act" has the meaning set forth in Section 3.10.

"Seller(s)" has the meaning set forth in the Preamble.

"Seller Indemnified Parties" has the meaning set forth in Section 9.2(b).

"Seller Transferred Employee" has the meaning set forth in Section 5.5(a).

"Seller FSA Plan" has the meaning set forth in Section 5.5(i).

"Seller Landlord Lease" has the meaning set forth in Section 8.1(m).

"Seller Severance Policy" has the meaning set forth in Section 5.5(d).

"Sellers' 401(k) Plan" has the meaning set forth in Section 5.5(e).

"Sharing Agreement" has the meaning set forth in Section 2.9(a)(ii).

"Signal" means any TV Station signal or portion thereof, including any programming feed or service, whether primary or multicast.

"Software" means computer software programs, including all source code, object code, systems, specifications, network tools, data, databases, firmware, designs and documentation related thereto.

"Solvent" has the meaning set forth in Section 3.7.

"Straddle Period" means a Tax period commencing before the Closing Date and ending after the Closing Date.

"Surveys" has the meaning set forth in Section 5.9.

"Surviving Provisions" has the meaning set forth in Section 9.1.

"Target Net Working Capital" means $130,000,000.

"<u>Tax</u>" or "<u>Taxes</u>" means all federal, state, local or foreign income, excise, gross receipts, ad valorem, sales, use, employment, franchise, profits, gains, property, transfer, escheat, payroll, intangible or other taxes, value added, alternative or add-on minimum, estimated, unclaimed property fees, stamp taxes, duties, charges, levies or assessments of any kind whatsoever (whether payable directly or by withholding) imposed by a Governmental Entity, together with any interest and any penalties, additions to tax or additional amounts imposed by any Tax authority with respect thereto.

"<u>Tax Proceeding</u>" has the meaning set forth in <u>Section 5.11(j)</u>.

"<u>Tax Returns</u>" means all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) filed or required to be filed with a Tax authority relating to Taxes.

"<u>Third Party Buyer</u>" has the meaning set forth in <u>Section 4.1(b)(v)</u>.

"<u>Third Party Claim</u>" has the meaning set forth in <u>Section 9.3(a)</u>.

"<u>Third Party Transaction</u>" has the meaning set forth in <u>Section 4.1(b)(v)</u>.

"<u>Title Commitments</u>" has the meaning set forth in <u>Section 5.9</u>.

"<u>Top Tier Employee</u>" means an employee, officer, director or independent contractor of the Business, other than On-Air Talent (as defined below), who earns a base salary in excess of $300,000, and "On-Air Talent" means an employee of the Business who provides on-air services and earns a base salary in excess of $500,000.

"<u>Transaction Documents</u>" means this Agreement, the Bills of Sale, the Assignment and Assumption Agreements, the FCC Assignment Agreements, the Real Property Assignments, the IP Assignment Agreements, the Transition Services Agreement, the Seller Landlord Leases, the Buyer Landlord Leases, the Deeds, the Contribution Agreement, the Holdco Stockholders Agreement, and the other documents, agreements, certificates and instruments to be executed, delivered and performed in connection with the Transactions or the other transactions contemplated herein.

"<u>Transactions</u>" mean the sale of the Equity Interests and the Purchased Assets, and the assumption of the Assumed Liabilities, contemplated by this Agreement.

"<u>Transfer Date</u>" has the meaning set forth in <u>Section 5.5(i)</u>.

"<u>Transferred Employee</u>" has the meaning set forth in <u>Section 5.5(a)</u>.

"<u>Transfer Taxes</u>" means all transfer, documentary, sales, use, registration, stamp, or other similar Taxes payable by reason of the Transactions or attributable to the sale, transfer or delivery of the Equity Interests or the Purchased Assets under this Agreement.

"<u>Transition Services Agreement</u>" has the meaning set forth in <u>Section 8.1(l)</u>.

41462373.9

"TV Stations" has the meaning set forth in the Recitals.

"Union Employees" means those Employees covered by a collective bargaining agreement.

"WARN Act" has the meaning set forth in Section 5.5(o).


[SIGNATURE PAGE FOLLOWS]


108

IN WITNESS WHEREOF, the Parties have executed this Purchase Agreement as of the date set forth above.

**SELLERS:**

**COX ENTERPRISES, INC.**

By: _____

Name: Alex Taylor

Title: CEO

**COX MEDIA GROUP, LLC**

By: _____

Name: Brett Fennell

Title: CFO

**COX MEDIA GROUP OHIO, INC.**

By: _____

Name: Brett Fennell

Title: CFO

**COX RADIO, INC.**

By: _____

Name: Brett Fennell

Title: CFO

**BUYER:**

**TERRIER MEDIA BUYER, INC.**

By: _____

     Name: Laurie D. Medley

     Title:  Vice President

# EXHIBIT 4

EXECUTION VERSION

**PURCHASE AGREEMENT**

by and among

**BRIAN W. BRADY,**

**JASON R. WOLFF,**

**BRISTLECONE, LLC,**

**NBI HOLDINGS, LLC,**

**NORTHWEST BROADCASTING, L.P.**

**BRYSON BROADCAST HOLDINGS, LLC**

and

**TERRIER MEDIA BUYER, INC.**

Dated as of February 14, 2019

# TABLE OF CONTENTS

**Page**

1. Definitions....................................................................................................... 2
   1.1. Certain Matters of Construction........................................................... 2
   1.2. Certain Definitions ............................................................................... 3

2. The Transaction ............................................................................................ 17
   2.1. Purchase and Sale of the Interests ...................................................... 17
   2.2. Purchase Price ..................................................................................... 17
   2.3. The Closing.......................................................................................... 18
   2.4. Closing Deliveries and Payments ........................................................ 18
   2.5. Purchase Price Adjustment ................................................................. 19
   2.6. Withholding ......................................................................................... 23
   2.7. Tax Treatment; Purchase Price Allocation ......................................... 23

3. Representations and Warranties of the Targets ............................................ 24
   3.1. Existence and Power ........................................................................... 25
   3.2. Authorization ....................................................................................... 25
   3.3. Capitalization; Subsidiaries ................................................................ 25
   3.4. Governmental Authorization; Non-Contravention ............................. 27
   3.5. Financial Statements; No Undisclosed Material Liabilities; Accounting
        Controls; Information Supplied ........................................................... 27
   3.6. Absence of Certain Changes ............................................................... 28
   3.7. Taxes ................................................................................................... 29
   3.8. Real Estate .......................................................................................... 30
   3.9. Compliance with Laws and Court Orders; Governmental Authorizations........... 31
   3.10. Benefit Plans ....................................................................................... 33
   3.11. Intellectual Property ........................................................................... 35
   3.12. Environmental Matters........................................................................ 37
   3.13. Material Contracts............................................................................... 37
   3.14. Transactions with Affiliates ............................................................... 40
   3.15. Litigation............................................................................................. 40
   3.16. Insurance ............................................................................................. 41
   3.17. Labor Matters...................................................................................... 41
   3.18. MVPD Matters Relating to Target Stations........................................ 42
   3.19. MVPD Matters Relating to Target Programming Service .................. 43
   3.20. Most Favored Nations ......................................................................... 43
   3.21. Target Productions .............................................................................. 44
   3.22. Brokers ................................................................................................ 44
   3.23. No Additional Representations; Limitation on Warranties ................. 44

4. Representations and Warranties of the Sellers.............................................. 44
   4.1. Existence and Power ........................................................................... 45
   4.2. Authorization ....................................................................................... 45
   4.3. Title to Interests .................................................................................. 45

| | | |
|---|---|---|
| 4.4. | Governmental Authorization; Non-Contravention | 45 |
| 4.5. | Litigation | 46 |
| 4.6. | No Additional Representations; Limitation on Warranties | 46 |

| 5. | **Representations and Warranties of the Buyer** | 46 |
|---|---|---|
| 5.1. | Corporate Existence and Power | 46 |
| 5.2. | Authorization | 47 |
| 5.3. | Governmental Authorization | 47 |
| 5.4. | Non-Contravention | 47 |
| 5.5. | Litigation | 48 |
| 5.6. | Available Funds | 48 |
| 5.7. | Brokers | 48 |
| 5.8. | Investment Intent | 48 |
| 5.9. | Compliance with Law | 48 |
| 5.10. | Qualifications | 48 |
| 5.11. | No Additional Representations; Limitation on Warranties | 49 |

| 6. | **Conditions Precedent to the Obligations of the Buyer and the Sellers** | 49 |
|---|---|---|
| 6.1. | Statutes and Injunctions | 49 |
| 6.2. | Regulatory Approval | 49 |
| 6.3. | Camelot Purchase Agreement; Houston Purchase Agreement | 49 |

| 7. | **RESERVED]** | 50 |
|---|---|---|

| 8. | **Covenants of the Parties** | 50 |
|---|---|---|
| 8.1. | Access to Premises and Information | 50 |
| 8.2. | Conduct of Business Prior to Closing | 50 |
| 8.3. | Confidentiality | 55 |
| 8.4. | Business Records | 56 |
| 8.5. | Directors and Officers Indemnification and Insurance | 56 |
| 8.6. | Tax Matters | 58 |
| 8.7. | Termination of Affiliate Transactions | 61 |
| 8.8. | Change of Name | 61 |
| 8.9. | Further Assurances | 61 |
| 8.10. | Efforts | 61 |
| 8.11. | Employee Matters | 64 |
| 8.12. | Financing and Financing Cooperation | 66 |
| 8.13. | Exclusivity | 69 |
| 8.14. | Release | 69 |

| 9. | **Indemnification** | 70 |
|---|---|---|
| 9.1. | Survival | 70 |
| 9.2. | Indemnity by the Seller | 70 |
| 9.3. | Indemnity by the Buyer | 71 |
| 9.4. | Determination of Breach | 72 |
| 9.5. | Calculation of Losses | 72 |
| 9.6. | Matters Involving Third Parties | 73 |

9.7.    Effect of Knowledge ................................................................................. 74
9.8.    Limitations on Indemnification................................................................. 74
9.9.    Tax Treatment .......................................................................................... 74
9.10.   Acknowledgement by the Parties.............................................................. 75
9.11.   Manner of Payment .................................................................................. 75

10.     Termination .......................................................................................................... 76
10.1.   Termination .............................................................................................. 76
10.2.   Effect of Termination; Buyer Indemnification; Seller Termination Fee ............. 76

11.     Miscellaneous ...................................................................................................... 78
11.1.   Notices ..................................................................................................... 78
11.2.   Expenses of Transaction ........................................................................... 80
11.3.   Entire Agreement ...................................................................................... 80
11.4.   Severability ............................................................................................... 80
11.5.   Amendment ............................................................................................... 80
11.6.   Parties in Interest ...................................................................................... 81
11.7.   Assignment ............................................................................................... 81
11.8.   Governing Law .......................................................................................... 81
11.9.   Waiver of Jury Trial .................................................................................. 81
11.10.  Reliance .................................................................................................... 82
11.11.  Enforcement; Exclusive Jurisdiction ........................................................ 82
11.12.  No Waiver ................................................................................................. 84
11.13.  Disclosure Schedules ............................................................................... 84
11.14.  No Recourse .............................................................................................. 84
11.15.  Headings ................................................................................................... 86
11.16.  Counterparts; Electronic Signature .......................................................... 86
11.17.  Attorney Client Privilege; Conflict of Interest......................................... 86
11.18.  Control Prior to Closing ........................................................................... 87

**EXHIBITS**

Exhibit A            Accounting Principles
Exhibit B            Sample Working Capital Calculation
Exhibit C            Rollover Term Sheet

iii

**PURCHASE AGREEMENT**

This Purchase Agreement (this "Agreement") is made as of February __, 2019, by and among Brian W. Brady ("Brady"), Jason R. Wolff ("Wolff") and Bristlecone, LLC, a Michigan limited liability company  ("Bristlecone" and collectively with Brady and Wolff, the "Sellers"), NBI Holdings, LLC, a Delaware limited liability company ("NBI"), Bryson Broadcast Holdings, LLC, a Delaware limited liability company ("Bryson"), Northwest Broadcasting, L.P., a Delaware limited partnership, ("NW Broadcasting" and collectively with NBI and Bryson, the "Targets"), and Terrier Media Buyer, Inc., a Delaware corporation (the "Buyer").  The Sellers, the Targets and the Buyer are referred to individually as a "Party" and collectively as "Parties").

WHEREAS, the Sellers are the record and beneficial owner of all of the limited liability company interests and limited partnership interests, as applicable, of the Targets (except for the interests that NBI owns in the other Targets) (the "Interests");

WHEREAS, the Sellers desire to sell and transfer all of the Interests (other than the Rollover Interests) to the Buyer, and the Buyer desires to acquire all of the Interests (other than the Rollover Interests), all on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, concurrently with the execution of this Agreement, Buyer and Cox Enterprises, Inc., Cox Media Group, LLC, Cox Media Group Ohio, Inc. and Cox Radio, Inc. (collectively, "Cox") are entering into a purchase agreement, pursuant to which Buyer, or one or more of its Affiliates, will purchase the Purchased Assets (as defined therein) and the Equity Interests (as defined therein) and will assume certain Assumed Liabilities (as defined therein) (the "Camelot Purchase Agreement");

WHEREAS, Buyer and/or one or more of its Affiliates are in discussions with the Person set forth on Schedule 1.1 ("Houston") to potentially enter into an asset purchase agreement, pursuant to which Buyer or one or more of its Affiliates or other Persons will purchase certain assets and assume certain liabilities from Houston (the "Houston Purchase Agreement");

WHEREAS, following the date hereof but prior to the Closing, certain Sellers will enter into a Rollover and Subscription Agreement setting forth the terms of a rollover arrangement with an affiliated entity of Buyer (the "Rollover Agreement") on the terms set forth in the binding term sheet attached as Exhibit C hereto, pursuant to which such affiliated entity shall issue equity interests to such Sellers; and

WHEREAS, concurrently with the execution of this Agreement, and as a condition to the willingness of, and material inducement to, the Company to enter into this Agreement, Parent has delivered to the Company a limited guaranty (the "Limited Guaranty") from the Guarantors (as defined therein, and set forth on Exhibit A thereto) ("Sponsor"), pursuant to which Sponsor has guaranteed certain of Buyer's obligations under this Agreement.

NOW, THEREFORE, in consideration of these premises, the covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **DEFINITIONS**.

    1.1.  <u>Certain Matters of Construction</u>.

        1.1.1.  <u>Rules of Construction</u>.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The descriptive headings used herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in, and made a part of, this Agreement, as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  The definitions contained in this Agreement are applicable to the masculine as well as to the feminine and neuter genders of such term.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any statute shall be deemed to refer to such statute and to any rules or regulations promulgated thereunder.  References to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.  References to any Person include the successors and permitted assigns of that Person.  References herein to "$" or dollars will refer to United States dollars, unless otherwise specified.  References from or through any date mean, unless otherwise specified, from and including such date or through and including such date, respectively.  References to any period of days will be deemed to be to the relevant number of calendar days, unless otherwise specified.  The phrases "made available" or "furnished" with respect to documents shall include only documents provided prior to the date of this Agreement in the electronic data room hosted by Merrill Services to which the Targets have granted access to Buyer and its representatives and advisors.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  For all purposes under this Agreement, if the Sellers or Targets are required or permitted to take any action, receive any deliveries or payments, or make any other determinations, (i) each Seller and each Target hereby irrevocably appoints Brady as their agent and representative to act on their behalf and to do any and all things and execute any and all documents which Brady determines may be necessary, convenient or appropriate to facilitate the consummation of the Contemplated Transactions, and the Agreement shall be interpreted in such manner, and (ii) Buyer and its Affiliates (including, after the Closing, the Targets and their Subsidiaries) shall be entitled to deal exclusively with Brady on all matters relating to this Agreement and the Contemplated Transactions and disregard any decisions,

communications or writings made, given or executed by any other Seller or Target in connection with this Agreement and the Contemplated Transactions.

1.1.2. <u>Target Sharing Company</u>. Each representation made by the Targets or Sellers hereunder regarding any Target Sharing Company shall be deemed to be made to the Targets' Knowledge whether or not so specified. Notwithstanding anything in this Agreement to the contrary, the Targets and their Subsidiaries shall have no duty or obligation hereunder, or in the Contemplated Transactions, to cause any Target Sharing Company to take any action or to forego from taking any action, except to the extent that the Targets or any of their Subsidiaries have a right to cause such Target Sharing Company to take such action or forego from taking such action under any Contracts to which any Target or any of their Subsidiaries is a party.

1.1.3. <u>Houston Purchase Agreement</u>. Any references or applicable provisions in this Agreement to the Houston Purchase Agreement, and any references to, or rights of, Houston in this Agreement, shall only be applicable in the event that definitive documentation is entered into by (A) Buyer or one or more of its Affiliates, on the one hand, with (B) Houston or one or more of its Affiliates, on the other hand, in respect of the transactions contemplated by the Houston Purchase Agreement.

1.2. <u>Certain Definitions</u>. For purposes of this Agreement, the following terms will have the following meanings:

"<u>Accounting Principles</u>" means the accounting principles, policies, procedures and methodologies set forth on <u>Exhibit A</u>.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly controls or is controlled by, or is under common control with, such Person; <u>provided</u>, that other than in the case of the definition of Buyer Related Party, or for purposes of <u>Section 5.11</u>, <u>Section 8.11.4</u>, <u>Section 10.2</u>, and <u>Section 11.14</u>, in no event shall Buyer or any of its Subsidiaries be considered an Affiliate of any portfolio company or investment fund affiliated with Apollo Global Management, LLC, nor shall any portfolio company or investment fund affiliated with Apollo Global Management, LLC, be considered to be an Affiliate of Buyer or any of its Subsidiaries. The term "control" (including its correlative meanings "controlled" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of such Person's securities or partnership or other ownership interests, or by Contract or otherwise).

"<u>Balance Sheet Time</u>" means 11:59 p.m. New York time on the day immediately preceding the Closing Date.

"<u>Business</u>" means the businesses conducted by the Targets and their direct and indirect Subsidiaries as of the date hereof.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which commercial banks in the City of New York are authorized or required by Law to be closed.

3

"<u>Buyer Fundamental Representations</u>" means the representations and warranties set forth in <u>Sections 5.1</u> (Corporate Existence and Power), <u>5.2</u> (Authorization), 5.3 (Governmental Authorization), <u>5.4</u> (Non-Contravention), <u>5.6</u> (Available Funds), <u>5.7</u> (Brokers) and <u>5.8</u> (Investment Intent).

"<u>Buyer General Representations</u>" means the representations and warranties set forth in <u>Article 5</u> other than the Buyer Fundamental Representations.

"<u>Buyer's Knowledge</u>" means the actual knowledge of David Sambur, Aaron Sobel and Houston McCurry, in each case after reasonable internal inquiry of their respective direct reports.

"<u>Carriage Agreement</u>" means each Contract relating to retransmission, exhibition, distribution, subdistribution, display or broadcast of (i) any Target Station signal (or portion thereof, including any programming feed, whether primary or multicast) and/or (ii) any Target Programming Service, whether on a linear, on-demand, interactive or other basis, including any such Contract with an MVPD which has expired or otherwise terminated but the applicable Target (or the applicable Subsidiary) and the applicable MVPD continue to perform under and treat such expired or terminated Contract as in effect.

"<u>Cash on Hand</u>" means, as of the date in question, without duplication, all cash and cash equivalents held in the bank accounts of the Targets and their Subsidiaries (including short-term liquid investments with maturities of thirty (30) days or less), calculated in accordance with the Accounting Principles on a consolidated basis, without duplication, net of any unpaid checks or drafts issued by the Targets or any of their Subsidiaries prior to the date in question, excluding Trapped Cash.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the applicable Treasury regulations issued thereunder.

"<u>Communications Act</u>" means the Communications Act of 1934, as amended.

"<u>Competition Laws</u>" means the Sherman Antitrust Act of 1890, as amended, the Clayton Antitrust Act of 1914, as amended, the HSR Act, as amended, the Federal Trade Commission Act of 1914, as amended, the Robinson-Patman Act of 1936, as amended, and all other Laws including any antitrust, competition or trade regulation Laws, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening competition through merger or acquisition.

"<u>Compliant</u>" means, with respect to the Required Financing Information, that (i) such Required Financing Information does not contain any untrue statement of a material fact regarding any Target or any of their Subsidiaries or omit to state any material fact regarding any Target or any of their Subsidiaries necessary in order to make such Required Financing Information not misleading under the circumstances, (ii) such Required Financing Information complies in all material respects with all requirements of Regulation S-K and Regulation S-X under the Securities Act for a registered public offering of non-convertible debt securities on Form S-1 that would be applicable to such Required Financing Information (other than such provisions for which compliance is not customary in a Rule 144A offering of high yield debt

4

securities) and (iii) the financial statements and other financial information included in such Required Financing Information would not be deemed stale or otherwise be unusable under customary practices for offerings and private placements of high yield debt securities under Rule 144A promulgated under the Securities Act and are sufficient to permit the Targets' independent accountants to issue comfort letters to the Financing Sources, including as to customary negative assurances and change period, in order to consummate any offering of debt securities on any day during which the Debt Financing will be marketed (and such accountants have confirmed they are prepared to issue a comfort letter subject to their completion of customary procedures).

"Contemplated Transactions" means the transactions contemplated by this Agreement (including the Rollover Agreement) and the Escrow Agreement.

"Contract" means any agreement, contract, instrument, note, bond, mortgage, indenture, deed of trust, lease, license or other instrument or obligation, whether written or unwritten.

"Debt Commitment Letter" means the debt commitment letter, dated as of the date of this Agreement, by and among Buyer and the Financing Sources party thereto, providing for debt financing as described therein (including all exhibits, schedules and annexes).

"Debt Financing" means the debt financing incurred or intended to be incurred as contemplated by the Debt Commitment Letter, including the offering or private placement of debt securities or borrowing of loans contemplated by the Debt Commitment Letter and any related engagement letter.

"Disclosure Schedules" means the respective disclosure schedules to this Agreement delivered by the Targets, the Sellers and the Buyer concurrently with the execution and delivery hereof.

"Employee" means any employee of any Target or any of their Subsidiaries.

"Environmental Law" means any Law concerning the protection of the environment, pollution, contamination, natural resources, or the use, handling, release, discharge, emission or disposal of, or human health or safety relating to, exposure to Hazardous Substances.

"Environmental Permits" means Governmental Authorizations required under or issued pursuant to any Environmental Law.

"Equity Commitment Letter" means the equity commitment letter addressed to Buyer, dated as of the date hereof, from the Equity Investors (as defined therein) to provide, subject to the terms and conditions thereof, equity financing to Buyer as described therein.

"Equity Financing" means the provision of equity financing to Buyer from the Equity Investors (as defined in the Equity Commitment Letter), subject to the terms and conditions in the Equity Commitment Letter and in the amount set forth therein.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations issued thereunder.

5

"ERISA Affiliate" of any entity means each Person that at any relevant time would be treated as a single employer with such entity for purposes of Section 4001(b)(1) of ERISA or Section 414(b), (c), (m) or (o) of the Code.

"Escrow Agent" means an escrow agent to be mutually agreed between Buyer and the Sellers prior to Closing.

"Escrow Agreement" means an escrow agreement to be entered into on or prior to the Closing Date by the Buyer, the Sellers and the Escrow Agent, in a form mutually acceptable to the Buyer, the Sellers and the Escrow Agent.

"Estimated Working Capital Amount" means (i) if the Estimated Working Capital exceeds the Working Capital Target, then the amount, if any, by which the Estimated Working Capital exceeds (A) the Working Capital Target *plus* (B) Five Hundred Thousand ($500,000); or (ii) if the Working Capital Target exceeds the Estimated Working Capital, then the amount, if any, by which the Estimated Working Capital is less than (I) the Working Capital Target *minus* (II) Five Hundred Thousand ($500,000), in the case of this clause (ii), expressed as a negative number.

"FCC" means the U.S. Federal Communications Commission.

"FCC Applications" means those applications and requests for waivers required to be filed with the FCC to obtain the approvals and waivers of the FCC pursuant to the Communications Act and FCC Rules necessary to consummate the Contemplated Transactions.

"FCC Consent" means the grant by the FCC of the FCC Applications, regardless of whether the action of the FCC in issuing such grant remains subject to reconsideration or other further review by the FCC or a court.

"FCC Licenses" means the FCC licenses, permits and other authorizations, together with any renewals, extensions or modifications thereof, issued with respect to the Target Stations, or otherwise granted to or held by the Targets, any Target Sharing Company or any of their respective Subsidiaries.

"FCC Rules" means the rules, regulations, orders and promulgated and published policy statements of the FCC.

"Final Working Capital Amount" means (i) if the Final Working Capital exceeds the Working Capital Target, then the amount, if any, by which the Final Working Capital exceeds (A) the Working Capital Target *plus* (B) Five Hundred Thousand ($500,000); or (ii) if the Working Capital Target exceeds the Final Working Capital, then the amount, if any, by which the Final Working Capital is less than (I) the Working Capital Target *minus* (II) Five Hundred Thousand ($500,000), in the case of this clause (ii), expressed as a negative number.

"Financing" means the Equity Financing and the Debt Financing.

"Financing Sources" means the agents, arrangers, lenders and other entities that have committed to provide or arrange the Debt Financing, including the parties to any

engagement letter or to any joinder agreements, credit agreements, indentures, notes, purchase agreements or other agreements entered pursuant to the Debt Financing, together with their and their Affiliates' current, former or future officers, directors, employees, partners, trustees, shareholders, equityholders, managers, members, limited partners, controlling persons, agents and representatives of each of them and the successors and assigns of the foregoing Persons.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any nation or government, any federal, state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any court, tribunal or arbitrator and any self-regulatory organization (including stock exchanges).

"Governmental Authorization" means any licenses, franchises, approvals, clearances, permits, certificates, waivers, consents, exemptions, variances, expirations and terminations of any waiting period requirements (including pursuant to Competition Laws), and notices, filings, registrations, qualifications, declarations and designations with, and other similar authorizations and approvals issued by or obtained from a Governmental Authority.

"Hazardous Substance" means any substance, material or waste listed, defined, regulated or classified as hazardous or toxic or as a "pollutant" or "contaminant" or words of similar meaning or effect, or for which liability or standards of conduct may be imposed under any Environmental Law, including petroleum or any petroleum-derived substance, waste or additive, asbestos, asbestos-containing materials, polychlorinated byphenols, radioactive compounds and physical agents (including non-ionizing radiation).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HSR Affiliate" shall mean an "Affiliate" as defined in 16 C.F.R. § 801.1(d)(1).

"Income Tax" means any federal, state, local, or non-U.S. income tax, including any interest, penalty, or additions thereto, whether disputed or not.

"Indebtedness" means, with respect to any Person, without duplication, as of the date of determination: (i) all obligations of such Person for borrowed money, or with respect to deposits or advances of any kind to such Person, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all lease obligations of such Person which are required to be capitalized on the books and records of such Person, and any leases required to be capitalized in accordance with GAAP, (iv) all indebtedness of others secured by a Lien on property or assets owned or acquired by such Person, whether or not the indebtedness secured thereby have been assumed, (v) all letters of credit, bank guarantees, performance or surety bonds issued for the account of such Person, in each case, whether or not drawn, contingent or otherwise, (vi) all obligations of such Person pursuant to securitization or factoring programs or arrangements, (vii) net cash payment obligations of such Person under swaps, options, derivatives and other hedging agreements or arrangements that will be payable upon termination thereof (assuming they were terminated on the date of determination), (viii) the deferred

7

purchase price of property, assets, securities, or services in respect of which any Target or any of their Subsidiaries is liable, contingently or otherwise (including "earn-outs," indemnities and "seller notes" payable with respect to the acquisition of any business, assets or securities), (ix) all guarantees of such Person of any indebtedness of any other Person other than a wholly owned subsidiary of such Person and (x) interest, premium, fees, expenses, penalties (including prepayment and early termination penalties) and other amounts owing in respect of all items in clauses (i) through (ix) of this definition.

"Indemnified Party" means with respect to any claim for indemnification pursuant to Section 9, each Buyer Indemnified Party or Seller Indemnified Party asserting such claim (or on whose behalf such claim is asserted) under Section 9.2 or 9.3, as the case may be.

"Indemnifying Party" means, with respect to any claim for indemnification pursuant to Article 9, the party or parties against whom such claim has been asserted.

"Indemnity Cap Amount" means Thirty Million Dollars ($30,000,000).

"Independent Referee" means an independent and nationally recognized firm with expertise in disputes of the type contemplated by Section 2.5, to be mutually agreed by Buyer and the Sellers prior to Closing.

"Information Privacy and Security Laws" means all Laws concerning the receipt, collection, use, storage, processing, sharing, security, privacy, disclosure, sale, license or transfer of any Personal Data, including all Laws pertaining to marketing or contacting individuals.

"Intellectual Property" means any and all intellectual property rights throughout the world, whether registered or not, including all (a) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals and extensions thereof) (collectively, "Patents"); (b) copyrights and rights in copyrightable subject matter and content in published and unpublished works of authorship, including all characters, scripts, treatments, stories, formats, storylines, plots and teleplays and revisions, spin-offs, remakes, sequels and prequels thereof (collectively, "Copyrights"); (c) trade names, trademarks and service marks, logos, corporate names, domain names and other Internet addresses or identifiers, trade dress and similar rights, and all goodwill associated therewith (collectively, "Marks"); (d) registrations and applications for each of the foregoing; (e) rights, title and interests in all trade secrets and trade secret rights arising under common law, state law, federal law or laws of foreign countries, in each case to the extent any of the foregoing derives economic value (actual or potential) from not being generally known to other Persons who can obtain economic value from its disclosure or use (collectively, "Trade Secrets"); (f) computer software programs, including all source code, object code, systems, specifications, network tools, data, databases, firmware, designs and documentation related thereto ("Software") and (g) moral rights, publicity rights and any other intellectual property rights or other rights similar, corresponding or equivalent to any of the foregoing of any kind or nature.

"IRS" means the Internal Revenue Service.

"IT Systems" means the hardware, Software, data communication lines, network and telecommunications equipment, Internet-related information technology infrastructure, wide

8

area network and other information technology equipment, owned, licensed to, or controlled by the Targets or any of their Subsidiaries.

"Laws" means any United States, federal, state or local or any foreign law (in each case, statutory, common or otherwise), ordinance, code, rule, statute, regulation or other similar requirement or Order enacted, issued, adopted, promulgated, entered into or applied by a Governmental Authority.

"Lien" means, with respect to any property or asset, any mortgage, lien, pledge, charge, security interest, lease, encumbrance, conditional or installment sale agreement, deed of trust, right of way, encroachment or other survey defect, occupancy right, or community property interest.

"Loan Documents" means that certain (i) Credit Agreement, by and between Bryson Broadcast Holdings LLC and U.S. Bank National Association, dated as of August 1, 2016, as amended of August 31, 2018 and January 30, 2019 and (ii) Amended and Restated Credit Agreement, by and between Northwest Broadcasting, L.P. and U.S. Bank National Association, dated as of May 22, 2015, as amended August 31, 2018.

"Losses" means losses, debts, damages, awards, fines, Taxes, claims, interest, penalties, expenses, fees, costs and amounts paid in settlement in accordance with this Agreement (including fees and expenses of investigation and defense and in-house and third party fees and expenses and the cost of pursuing insurance providers) incurred or suffered by an Indemnified Party, in each case, whether direct or indirect, accrued or contingent, incurred in advance of or following the final disposition of any claim.

"Market" means the "Designated Market Area," as determined by The Nielsen Company, of a television broadcast station.

"MFN" means a "most favored nation" right or other similar provision in a Carriage Agreement which provides that the Person(s) which has been granted such right or provision under such Carriage Agreement may be entitled to certain rates, terms, conditions or other benefits offered, provided or otherwise applicable to, or certain license fee discounts, credits or reductions measured against provisions applicable to, any other Person(s) not party to such Carriage Agreement (including any payments, financial consideration, license fee refunds, reductions, discounts, caps or credits, economic or non-economic terms, conditions or other rights) (collectively, "MFN Benefits")

"MVPD" means any (a) multi-channel video programming distributor, including any operator of cable television systems, any direct broadcast satellite service provider or other satellite distributor of video programing, (b) telephone companies, including any wireline (including broadband) or wireless telecommunications service provider; or (c) any Person that distributes video programing via any other distribution platforms or means or transmission technology, including via the Internet or any other computer network, website, mobile platform, digital application or similar platform now known or hereafter devised.

"Order" means any order, writ, injunction, decree, consent decree, judgment, award, injunction, settlement or stipulation issued, promulgated, made, rendered or entered into

9

by or with any Governmental Authority (in each case, whether temporary, preliminary or permanent).

"Organizational Documents" means, with respect to any Person (other than an individual), the certificate or articles of incorporation, organization or formation of such Person and any limited liability company, operating or partnership agreement, by-laws or similar documents or agreements relating to the legal organization and governance of the internal affairs of such Person.

"Owned Intellectual Property" means any and all Intellectual Property owned or purported to be owned by any Target or any of their Subsidiaries.

"Permitted Liens" means (a) Liens for Taxes, assessments, governmental levies, fees or charges not yet due and payable or which are being contested in good faith and by appropriate proceedings and, in each case, for which adequate reserves (as determined in accordance with GAAP) have been established on the most recent balance sheet of each Target contained in the Financial Statements, (b) mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the ordinary course of business with respect to amounts not yet due and payable or which are being contested in good faith and by appropriate proceedings instituted promptly and for which adequate reserves (as determined in accordance with GAAP) have been established on the most recent balance sheet of each Target contained in the Financial Statements, (c) zoning, entitlement, building codes and other land use regulations, ordinances or legal requirements imposed by any Governmental Authority having jurisdiction over real property but only to the extent the Targets and their Subsidiaries are in material compliance with the same, (d) all rights relating to the construction and maintenance in connection with any public utility of wires, poles, pipes, conduits and appurtenances thereto, on, under or above real property which, individually or in the aggregate, do not materially impair the value or continued use of such real property for the purposes for which it is used by such Person, (e) all matters disclosed as a "Permitted Lien" in the Disclosure Schedules, (f) any state of facts which an accurate survey or inspection of real property would disclose and which, individually or in the aggregate, do not materially impair the value or continued use of such real property for the purposes for which it is used by such Person, (g) statutory Liens in favor of lessors arising in connection with any real property subject to the Real Property Leases, (h) other defects, irregularities or imperfections of title, encroachments, easements, servitudes, permits, rights of way, flowage rights, restrictions, covenants, sidetrack agreements and oil, gas, mineral and mining reservations, rights, licenses and leases, which, in each case, do not secure payment of a sum of money and do not materially impair the value of the applicable real property or the continued use of real property for the purposes for which it is used by such Person and (i) grants of non-exclusive licenses or other non-exclusive rights with respect to owned Intellectual Property that do not secure Indebtedness.

"Person" means an individual, group (within the meaning of Section 13(d)(3) of the Exchange Act), corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"Personal Data" means (i) any and all information that identifies, relates to or is capable of being linked to an individual, (ii) any information that enables a Person to contact the

individual (such as information contained in a cookie or an electronic device fingerprint), and (iii) any and all other personally identifiable information, the collection, use, sharing, transfer or other processing of which is governed, regulated or protected by one or more Information Privacy and Security Laws. Personal Data includes (A) personal identifiers such as name, address, email address, IP address, Social Security Number, date of birth, driver's license number or state identification number, Taxpayer Identification Number and passport number, (B) financial information, including credit or debit card numbers, account numbers, access codes, consumer report information or insurance policy number, (C) demographic information, (D) unique biometric data, such as fingerprint, retina or iris image, voice print or other unique physical representation and (E) individual medical or health information (including information of customers, employees, contractors and third parties who have provided information to the Targets or their Subsidiaries, and including information relating to services provided by or to third parties).

"Pledge Agreement" means the pledge agreement, to be entered into prior to the Closing by Buyer and the applicable Sellers, in a form mutually acceptable to Buyer and the applicable Sellers, for purposes of Article 9.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period ending on and including the Closing Date.

"Pre-Closing Taxes" means (A) Taxes of the Targets and their Subsidiaries for any Pre-Closing Tax Period, (B) any and all Taxes of any member of an affiliated, consolidated, combined, or unitary group of which the Targets or any of their Subsidiaries (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation §1.1502-6 or any analogous or similar state, local, or non-U.S. law or regulation, and (C) any and all Taxes of any person (other than the Targets and their Subsidiaries) imposed on the Targets or any of their Subsidiaries as a transferee or successor, by contract or pursuant to any law, rule or regulation, which Taxes relate to an event or transaction occurring before the Closing; provided, however, that "Pre-Closing Taxes" shall not include (1) Taxes arising as a result of any transactions occurring on the Closing Date after the Closing outside of the ordinary course of business (other than as explicitly contemplated by this Agreement); (2) Taxes arising as a result of a breach by Buyer of Section 8.6.3 herein; (3) Taxes arising as a result of, or in connection with, a Section 338 election; (3) any Transfer Taxes for which the Buyer is responsible pursuant to Section 8.6.1 herein; (4) Taxes to the extent such Taxes are reflected in Working Capital; or Taxes resulting from any Proceeding to the extent that such Taxes are paid directly by the Sellers as a result of any election pursuant to Section 6226 of the Code.

"Proceeding" means any suit, action, claim, proceeding, arbitration, subpoena, inquiry, investigation, mediation, audit or hearing (in each case, whether civil, criminal or administrative) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority.

"Program Rights" means rights to broadcast and rebroadcast television programs, feature films, series, specials, news or other audiovisual programming.

11

"<u>Purchase Price Adjustment Escrow Amount</u>" means $1,000,000.

"<u>Representative</u>" means, with respect to any Person, its officers, agents, control persons, employees, consultants, professional advisers (including attorneys, accountants and financial advisors).

"<u>Required Financing Information</u>" means (i) audited consolidated balance sheets as of the end of the two most recently completed fiscal years ended at least 90 days before the Closing Date and related statements of income, stockholders' equity and cash flows of NBI and its Subsidiaries for the three most recently completed fiscal years ended at least 90 days before the Closing Date, (ii) unaudited consolidated balance sheets and related statements of income and cash flows of NBI and its Subsidiaries, for each subsequent fiscal quarter and year to date period through the end of such fiscal quarter ended at least 45 days before the Closing Date (other than any fiscal fourth quarter) after the most recent fiscal period for which audited financial statements have been provided pursuant to clause (i) hereof, in each case prepared in accordance with GAAP (and, in the case of clause (ii), which will have been reviewed by the Targets' independent accountants as provided in Statement on Auditing Standards 100)), and (iii) such other financial and other information (A) regarding the Targets and their Subsidiaries as may be reasonably requested by Buyer (or the Financing Sources) to the extent that such information is required in connection with the Debt Financing or of the type and form customarily included in an offering memorandum for private placements of non-convertible high-yield debt securities pursuant to Rule 144A promulgated under the Securities Act; or (B) as otherwise necessary to receive from the Targets' independent accountants (and any other accountants to the extent that financial statements audited or reviewed by such accountants are or would be included in such offering memorandum), customary "comfort" (including "negative assurance" comfort and change period comfort), together with drafts of customary comfort letters that such independent accountants are prepared to deliver upon the "pricing" of any high-yield debt securities being issued as part of or in lieu of any portion of the Debt Financing, with respect to the financial information to be included in such offering memorandum.

"<u>Rollover Amount</u>" means the aggregate amount set forth on the schedules to the Rollover Agreement in respect of the Rollover Interests and designated as the "Rollover Amount".

"<u>Rollover Interests</u>" means any Interests set forth on a schedule to a Rollover Agreement to be exchanged for equity interests in an affiliated entity of Buyer.

"<u>Seller</u>" is defined in the Preamble.

"<u>Seller Fundamental Representations</u>" means the representations and warranties set forth in <u>Sections 3.1</u> (Existence and Power), <u>3.2</u> (Authorization), <u>3.3</u> (Capitalization; Subsidiaries), <u>3.4</u> (Governmental Authorization; Non-Contravention), <u>3.22</u> (Brokers), <u>4.1</u> (Existence and Power), <u>4.2</u> (Authorization), <u>4.3</u> (Title to Interests) and <u>4.4</u> (Governmental Authorization; Non-Contravention).

Doc#: US1:12600497v8

"Seller General Representations" means the representations and warranties set forth in Articles 3 and 4, other than the Seller Fundamental Representations and the Tax Representations.

"Sharing Agreement" means a local marketing, joint sales, shared services or similar Contract.

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"Subsidiary" means, with respect to any Person, any other Person (other than a natural Person) of which securities or other ownership interests (a) having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions or (b) representing more than 50% of such securities or ownership interests are at the time directly or indirectly owned by such Person (in each case, with respect to Subsidiaries of the Targets, aggregating all interests directly or indirectly held by the Targets for this purposes).

"Target" is defined in the Preamble.

"Target Indebtedness" means the amount outstanding as of the Closing in respect of the Indebtedness of the Targets and their Subsidiaries pursuant to the Loan Documents.

"Target Production" means any audio or audiovisual program produced, co-produced or commissioned by the Targets or any of their Subsidiaries, including without limitation, news content.

"Target Programming Service" means any programming service or network distributed or authorized for distribution by the Targets or any of their Subsidiaries, whether on a live, on-demand, interactive or other basis.

"Target Sharing Company" means any entity with which the Targets or any of their Subsidiaries has a Sharing Agreement.

"Target Station" means the television broadcast stations (including stations operated as "satellites" pursuant to Section 73.3555, Note 5, of the FCC Rules), low power television stations (including Class A stations) and TV translator stations (a) owned by the Targets and their Subsidiaries, each of which is listed in Schedule 3.9.7 or (b) licensed to a third party and subject to a Sharing Agreement with the Targets or their Subsidiaries, each of which is listed in Schedule 3.9.7 as a station subject to a Sharing Agreement.

"Target Station Licenses" means the main station license issued by the FCC with respect to each of the Target Stations.

"Targets' Knowledge" means the actual knowledge of Brady, Wolff and William Quarles, in each case after reasonable internal inquiry of their respective direct reports.

"Tax Returns" means returns, reports, declarations, claims for refund, elections, estimates, disclosures, forms and information statements filed or required to be filed with a

Taxing Authority relating to Taxes, including any schedules or attachments thereto and including any amendment thereof.

"<u>Taxes</u>" means any and all United States federal, state, provincial, local, foreign and other taxes, levies, fees, imposts, duties, and similar governmental charges (including any and all interest, fines, assessments, penalties, additional taxes or additions to tax imposed in connection therewith or with respect thereto) including, without limitation (x) taxes imposed on, or measured by, income, franchise, profits or gross receipts, and (y) ad valorem, value added, capital gains, sales, goods and services, use, real or personal property, capital stock, license, escheat, branch, payroll, estimated withholding, employment, social security (or similar), unemployment, compensation, utility, severance, production, excise, stamp, occupation, premium, windfall profits, transfer and gains taxes, and customs duties.

"<u>Taxing Authority</u>" means any United States, federal, state, local or any foreign or other governmental or quasi-governmental agency responsible or having jurisdiction for the imposition, determination assessment or collection of any Tax.

"<u>Third Party</u>" means any Person other than Buyer, the Sellers, the Targets or any of their respective Affiliates.

"<u>Transaction Bonus Payments</u>" means the bonus, change in control, discretionary bonus, retention and other compensatory payments that become payable by the Targets or any of their Subsidiaries as a result of, or that otherwise arise out of or relate to, the consummation of the Contemplated Transactions, and the employer portion of any withholding or employment Taxes related thereto.

"<u>Transaction Expenses</u>" means all out-of-pocket fees, costs and expenses incurred or otherwise payable by the Targets or any of their Subsidiaries in connection with the preparation, negotiation, documentation and consummation of the Contemplated Transactions, including (i) such fees and expenses of Brown Rudnick LLP, (ii) any other legal, accounting, consulting expenses and any other advisor and service provider fees, including the expenses relating to the electronic data room hosted by Merrill Services, (iii) fees and expenses of any broker, investment banker or financial advisor, in each case to the extent incurred but unpaid as of the Closing, and (iv) fifty percent (50%) of any Transfer Taxes.

"<u>Transfer Taxes</u>" means any sales, use, transfer, value added, real property transfer, stamp, registration, documentary, recording or similar duties or taxes together with any interest thereon, penalties, fines, costs, fees, additions to tax or additional amounts with respect thereto incurred in connection with the Contemplated Transactions.

"<u>Trapped Cash</u>" means all cash and cash equivalents that are not freely useable by the Targets or any of their Subsidiaries due to restrictions or limitations on use or distribution by Law, Contract or otherwise, including restrictions on dividends and repatriations and including, for the avoidance of doubt, cash collected on behalf of and payable to the former owners of KLAX.

"<u>Willful Breach</u>" means, with respect to any representation, warranty, agreement or covenant, a material breach that is the consequence of an action or omission by the breaching

party with actual or constructive knowledge (which shall be deemed to include knowledge of facts that a Person acting reasonably should have, based on reasonable due inquiry) that such action or omission is, or would reasonably be expected to be or result in, a breach of such representation, warranty, agreement or covenant.

"Working Capital" means (i) the current assets of the Existing Reporting Entities or any of their Subsidiaries including accounts receivable, broadcasting rights (both current and non-current), prepaid and other current assets, excluding all Cash on Hand, Trapped Cash, current and deferred Income Tax assets, receivables from Sellers and their Affiliates and assets held for sale minus (ii) the current liabilities of the Targets or any of their Subsidiaries including accounts payable, accrued expenses and other liabilities and broadcasting contracts payable (both current and non-current), excluding any amounts payable in respect of Transaction Expenses, Transaction Bonus Payments, Target Indebtedness, and current and deferred Income Tax liabilities, in each case determined, without duplication, in accordance with the Accounting Principles on a consolidated basis similar to the format as set forth on Exhibit B.

"Working Capital Target" means Nine Million Eight Hundred Fifty Eight Thousand Dollars ($9,858,000).

Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| 409A Authorities | 3.10.8 |
| Agreement | Preamble |
| Approval Action | 8.10.7 |
| Bryson | Preamble |
| Buyer | Preamble |
| Buyer Deficiency Amount | 2.5.5(a) |
| Buyer Indemnified Parties | 9.2.1 |
| Buyer Related Parties | 11.14 |
| Camelot Closing | 6.3 |
| Camelot Purchase Agreement | Recitals |
| Claim Notice | 9.6.1 |
| Closing | 2.3 |
| Closing Date | 2.3 |
| Closing Statement | 2.5.2 |
| Collective Bargaining Agreement | 3.17.1 |
| Company Plans | 3.10.1 |
| Confidentiality Agreement | 8.1 |
| Continuing Employees | 8.11.1 |
| Copyrights | 1.2 |
| D&O Indemnifiable Claim | 8.5.2 |
| D&O Indemnified Person | 8.5.1 |
| Deductible | 9.2.3 |
| Dispute Notice | 2.5.3 |
| Dispute Submission Notice | 2.5.4 |
| Disputed Item | 2.5.3 |

15

| Term | Section |
|------|---------|
| disqualified individual | 3.10.7 |
| Employee Plan | 3.10.1 |
| Enforceability Exceptions | 3.2 |
| Estimated Cash on Hand Amount | 2.5.1 |
| Estimated Closing Statement | 2.5.1 |
| Estimated Purchase Price | 2.5.1 |
| Estimated Target Indebtedness | 2.5.1 |
| Estimated Transaction Bonus Payments | 2.5.1 |
| Estimated Transaction Expenses | 2.5.1 |
| Estimated Working Capital | 2.5.1 |
| Existing Reporting Entities | 3.5.1 |
| Final Cash on Hand Amount | 2.5.5 |
| Final Purchase Price | 2.5.5 |
| Final Target Indebtedness | 2.5.5 |
| Final Transaction Bonus Payments | 2.5.5 |
| Final Transaction Expenses | 2.5.5 |
| Final Working Capital | 2.5.5 |
| Financial Statements | 3.5.1 |
| Fundamental Representation Termination Date | 9.1 |
| General Reps Termination Date | 9.1 |
| Incentive Auction & Repack | 8.2.17 |
| Indemnity Agreement | 8.5.1 |
| Insurance Policies | 3.16 |
| Insurance Proceeds | 9.5 |
| Interests | Recitals |
| Leased Real Property | 3.8.1(a) |
| Limited Guaranty | Recitals |
| Marks | 1.2 |
| MFN Audit | 3.20 |
| MFN Benefits | 1.2 |
| Minor Claims | 9.2.3 |
| Multiemployer Plan | 3.10.5 |
| NBI | Preamble |
| New Benefit Plans | 8.11.3 |
| NW Broadcasting | Preamble |
| Objections Notice | 2.7.2 |
| Owned Real Property | 3.8.1(a) |
| Party | Preamble |
| Patents | 1.2 |
| Purchase Price | 2.2 |
| Purchase Price Adjustment Escrow Account | 2.4.1(e) |
| Purchase Price Allocation | 2.7.2 |
| Real Property Leases | 3.8.1(a) |
| Records | 8.1 |
| Registered Intellectual Property | 3.11.1 |

16

| Term | Section |
|------|---------|
| Rollover Agreement | Recitals |
| Seller Indemnified Parties | 9.3.1 |
| Seller Parties | 8.14 |
| Seller Termination Fee | 10.2.3 |
| Sellers | Preamble |
| Software | 1.2 |
| Sponsor | Recitals |
| Target Affiliate Contract | 3.14 |
| Target Financial Advisor | 3.22 |
| Target Parties | 8.14 |
| Target Securities | 3.3.2 |
| Target Subsidiary Securities | 3.3.5 |
| Targets | Preamble |
| Tax Proceeding | 8.6.5 |
| Tax Representation Termination Date | 9.1 |
| Tax Representations | 9.1 |
| Tax Sharing Agreements | 3.7.9 |
| Third Party Claim | 9.6.1 |
| Third Party Leases | 3.8.1(a) |
| Trade Secrets | 1.2 |
| WARN Act | 8.2.12 |

2. **THE TRANSACTION**.

2.1. <u>Purchase and Sale of the Interests</u>. At the Closing, and subject to the terms and conditions set forth in this Agreement, the Sellers shall sell, transfer and deliver to the Buyer, free and clear of all Liens and the Buyer shall purchase from the Sellers, the Interests (other than the Rollover Interests).

2.2. <u>Purchase Price</u>. The aggregate consideration for the purchase and sale of the Interests (other than the Rollover Interests) pursuant to this Agreement will be an amount (such aggregate consideration, the "<u>Purchase Price</u>") calculated as follows:

2.2.1. Three Hundred and Eighty Four Million Dollars $384,000,000;

2.2.2. *minus* the Estimated Target Indebtedness;

2.2.3. *minus* the amount of the Estimated Transaction Expenses, including those to be paid at the Closing pursuant to <u>Section 2.4.1(c)</u>;

2.2.4. *minus* the amount of the Estimated Transaction Bonus Payments, including those to be paid pursuant to <u>Section 2.4.1(d)</u>;

2.2.5. *plus* the Estimated Cash on Hand Amount;

2.2.6. *plus* the Estimated Working Capital Amount.

17

The Purchase Price shall be subject to adjustment in accordance with the terms of this Agreement, including in accordance with Section 2.5.

2.3.    The Closing.  Subject to the terms and conditions hereof, the closing of the purchase and sale of the Interests (other than the Rollover Interests) pursuant to this Agreement (the "Closing") shall take place by electronic document transfer (*i.e.*, .pdf signature pages and fully executed documents exchanged via email) immediately prior to the first to occur of (a) the closing of the transactions contemplated by the Camelot Purchase Agreement or (b) the closing of the transactions contemplated by the Houston Purchase Agreement, (but for the avoidance of doubt, in each case, subject to the satisfaction or waiver of each of the conditions set forth in Article 6) (the day on which the Closing takes place, the "Closing Date").  Subject to the provisions of Article 10, the failure of any party to consummate the Closing on the date and time determined pursuant to this Section 2.3 shall not result in the termination of this Agreement and shall not relieve such party of any obligation under this Agreement.

2.4.    Closing Deliveries and Payments.

2.4.1.    Buyer Closing Deliveries and Payments.  At the Closing, the Buyer shall deliver or cause to be delivered the following:

(a)    to the Sellers (in respect of the Interests other than the Rollover Interests), an amount in cash equal to (i) the Purchase Price, *minus* (ii) the Purchase Price Adjustment Escrow Amount, *minus* (iii) the Rollover Amount, by wire transfer of immediately available funds to the accounts and in such amounts designated by the Sellers in writing on a schedule delivered to the Buyer not less than two (2) Business Days prior to the Closing Date, and each Seller acknowledges and agrees that none of Buyer, any of its Affiliates or any other Buyer Related Parties shall have any liability or obligation to any Person, including the Sellers, for any Losses arising from or relating to any errors, omissions or inaccuracies set forth on such schedule.

(b)    to accounts specified by the Targets at least five (5) Business Days prior to the Closing Date, by wire transfer of immediately available funds, such cash amounts as are necessary to discharge in full any outstanding amount of Estimated Target Indebtedness;

(c)    to accounts specified by the Targets at least five (5) Business Days prior to the Closing Date, by wire transfer of immediately available funds, such cash amounts as are necessary to pay in full the Estimated Transaction Expenses;

(d)    to the Targets, for further processing through payroll, by wire transfer of immediately available funds to an account designated in writing by the Targets to the Buyer not less than five (5) Business Days prior to the Closing Date, such cash amounts as are necessary to pay in full each of the Estimated Transaction Bonus Payments;

(e)    to the Escrow Agent, by wire transfer of immediately available funds, the Purchase Price Adjustment Escrow Amount (to be held in an account referred to herein as the "Purchase Price Adjustment Escrow Account");

(f)    to the Sellers, a copy of the Escrow Agreement, duly executed by the Buyer and the Escrow Agent; and

(g)    to the Sellers and the Targets, a copy of the Rollover Agreement, duly executed by the Buyer.

2.4.2.    Target Closing Deliveries.  At the Closing, the Targets shall deliver or cause to be delivered to the Buyer, the following:

(a)    a copy of the Escrow Agreement, duly executed by the applicable Sellers and the Escrow Agent;

(b)    copies of pay-off letters or other similar documentation to the effect that there will be no outstanding amounts payable in respect of the Estimated Target Indebtedness upon payment at the Closing of the amounts specified in such pay-off letter or similar documentation, including documentation in customary form evidencing the release of any Liens thereunder, in each case, in form and substance reasonably satisfactory to the Buyer;

(c)    an affidavit from each Seller certifying that such Seller is not a non-U.S. person and conforming to the requirements of Treasury Regulations section 1.1445-2(b)(2); and

(d)    a copy of the Rollover Agreement, duly executed by the applicable Targets.

2.4.3.    Sellers Closing Deliveries.  At the Closing, the Sellers shall deliver to the Buyer, the following:

(a)    duly executed limited liability company interest or limited partnership interest transfer powers for transfer of the Interests to the Buyer (other than in respect of any Rollover Interests); and

(b)    a copy of the Rollover Agreement, duly executed by the applicable Sellers.

2.5.    Purchase Price Adjustment.

2.5.1.    Estimated Balance Sheet and Estimated Closing Statement.  The Sellers will in good faith prepare and deliver, or cause to be prepared and delivered, to the Buyer not later than five (5) Business Days prior to the Closing Date, a written statement (the "Estimated Closing Statement") setting forth (a) in reasonable detail the Sellers' good faith estimates of (i) Transaction Expenses (listed by payee) (the "Estimated Transaction Expenses"), (ii) Transaction Bonus Payments (listed by payee) (the "Estimated Transaction Bonus

19

Payments"), (iii) Target Indebtedness (the "Estimated Target Indebtedness"), (iv) Working Capital (the "Estimated Working Capital") and the resulting Estimated Working Capital Amount and (v) Cash on Hand (the "Estimated Cash on Hand Amount"), in the case of clauses (iv) and (v), as of the Balance Sheet Time, as derived in accordance with the Accounting Principles, and (b) the resulting estimate of Purchase Price (the "Estimated Purchase Price"). The Estimated Transaction Bonus Payments, Estimated Transaction Expenses, Estimated Target Indebtedness, Estimated Working Capital Amount, Estimated Cash on Hand Amount and Estimated Purchase Price set forth in the Estimated Closing Statement will be prepared in accordance with the definitions thereof and, solely in the case of the Estimated Target Indebtedness, Estimated Working Capital Amount, Estimated Cash on Hand Amount and Estimated Purchase Price, the Accounting Principles.

       2.5.2.   Closing Statement. Within ninety (90) days after the Closing Date, the Buyer will in good faith prepare or cause to be prepared, and will provide to the Sellers, a written statement (the "Closing Statement") setting forth (a) in reasonable detail the Buyer's proposed determinations of (i) Transaction Expenses, (ii) Transaction Bonus Payments, (iii) Target Indebtedness, (iv) Working Capital and (v) Cash on Hand, in the case of clauses (iv) and (v), as of the Balance Sheet Time, as derived in accordance with definitions therefor and from the Accounting Principles, and (b) the Purchase Price. The Closing Statement (x) will be prepared in accordance with the Accounting Principles and (y) will solely be based on facts and circumstances as they exist at Closing in accordance with GAAP and disregard any and all effects on the assets and liabilities of the Targets as a result of the Contemplated Transactions (including any financing arrangements entered into by the Buyer or any of its Affiliates in connection with the Contemplated Transactions) except with respect to the calculation of Transaction Expenses (which shall give effect to the Contemplated Transactions).

       2.5.3.   Dispute Notice. The Closing Statement (and the proposed determinations of the Transaction Expenses, Transaction Bonus Payments, Target Indebtedness, Working Capital, Cash on Hand and Purchase Price reflected on the Closing Statement) will be final, conclusive and binding on the parties unless the Sellers provide a written notice (the "Dispute Notice") to the Buyer no later than sixty (60) days after delivery of the Closing Statement setting forth in reasonable detail and with reasonable supporting documentation any item(s) or amount(s) on the Closing Statement that are disputed by the Sellers (each, a "Disputed Item") including their proposed amount and the basis for the Sellers' objections; provided, that, such objections may only be that the Closing Statement contained arithmetic errors or were not prepared in accordance with the requirements of this Agreement. Any item or amount on the Closing Statement to which no dispute is raised in the Dispute Notice will be final, conclusive and binding on the parties. Any determination of the Transaction Expenses, Transaction Bonus Payments, Target Indebtedness, Working Capital, Cash on Hand or Purchase Price that is not objected to in the Dispute Notice will be deemed accepted and will be final and binding upon the parties upon delivery of the Dispute Notice. During such sixty (60) day period, the Buyer shall provide, and shall cause the Targets to provide, the Sellers and their Representatives with reasonable access to, and the opportunity to make copies of (at the Seller's expense), the Targets' books and records, work papers and other materials used or considered by the Buyer in the preparation of the Closing Statement, and reasonable access to personnel and Representatives of

the Buyer and the Targets who assisted or were consulted in the preparation of the Closing Statement during normal business hours and under the supervision of Targets.

2.5.4.    <u>Resolution of Disputes</u>.  Following the Buyer's receipt of the Dispute Notice, if any, the Buyer and the Sellers will attempt to resolve the Disputed Items in good faith during the twenty (20) day period following timely delivery of the Dispute Notice.  Disputed Items resolved in writing by the Sellers and the Buyer within the twenty (20) day period will be final, conclusive and binding on the parties.  If the Buyer and the Sellers are unable to resolve all Disputed Items in the Dispute Notice within such twenty (20) day period, either the Buyer or the Sellers may provide written notice to the other (the "<u>Dispute Submission Notice</u>") that such party is submitting any remaining Disputed Items, and only such remaining Disputed Items, for resolution to the Independent Referee.  The Buyer and the Sellers shall enter into a customary engagement letter with the Independent Referee.  The Buyer and the Sellers will use their commercially reasonable efforts to cause the Independent Referee to render its decision as soon as practicable (but in any event within thirty (30) days) after the submission to the Independent Referee of their respective proposed final calculations of the Disputed Items (which the Buyer and the Sellers shall submit to the Independent Referee not later than ten (10) days following the giving of the Dispute Submission Notice).  Each of the Buyer and Sellers shall, and the Buyer shall cause the Targets to, use commercially reasonable efforts to comply with all reasonable requests by the Independent Referee for access to their respective work papers, information, books, records and similar items, personnel and Representatives; <u>provided</u>, that such access rights shall be exercised in such manner as not to interfere unreasonably with the conduct of the business of the Buyer, the Sellers, the Targets or any of their Subsidiaries, and each of the Buyer, the Sellers, the Targets or any of their Subsidiaries may withhold any document (or portions thereof) or information to the extent that (i) it may not be disclosed pursuant to the terms of a nondisclosure agreement with a third party; <u>provided</u>, that such party shall use commercially reasonable efforts to obtain a waiver of such restriction, (ii) it may constitute privileged attorney-client communications or attorney work product and the transfer of which, or provision of access to which, as reasonably determined by legal counsel to any of the Buyer, the Sellers or the Targets or any of their Subsidiaries, constitutes a waiver of any such privilege or (iii) the provision of access to such document (or portion thereof) or information, as determined by legal counsel to any of the Buyer, the Sellers or the Targets or any of their Subsidiaries, would conflict with any applicable Laws.  The Independent Referee will review such final calculations of the Disputed Items and render a final determination solely based on whether the Disputed Items were prepared in accordance with this Agreement, and shall base such decision on the documentation submitted by the Buyer, the Sellers and the Targets; <u>provided</u>, that the Independent Referee's final determination with respect to each Disputed Item shall be within the range of dispute between the Buyer and the Sellers, as presented in the Buyer's Closing Statement pursuant to <u>Section 2.5.2</u> and the Sellers' Dispute Notice pursuant to <u>Section 2.5.3</u>. The Independent Referee's determination will be (a) in writing and shall include a reasonably detailed statement of the basis for the Independent Referee's decision, (b) furnished to each of the Buyer and the Sellers as soon as practicable (but in any event within thirty (30) days) after the Sellers' and the Buyer's respective final calculations of the Disputed Items have been submitted to the Independent Referee, (c) limited in scope to the Disputed Items and (d) final, conclusive, non-appealable and binding on the parties, other than in the event of manifest error, and shall constitute an arbitral award upon which judgment may be entered in any court of

21

competent jurisdiction. The fees and expenses of the Independent Referee shall be borne by (i) the Sellers, on the one hand, and (ii) the Buyer, on the other hand, based on the percentage that the portion of the contested amount not awarded to each party bears to the amount actually contested by the parties in the aggregate, and such allocation of fees and expenses shall be calculated by the Independent Referee and such calculation shall be final and binding on the parties. By way of illustration, if the Buyer's calculations would have resulted in a $1,000,000 net payment to the Buyer, and the Sellers' calculations would have resulted in a $1,000,000 net payment to the Sellers then (x) if the Independent Referee's final determination results in an aggregate net payment of $500,000 to the Sellers, the Buyer and the Sellers shall pay 75% and 25%, respectively, of such fees and expenses and (y) if each of such parties' calculations differs from the Independent Referee's calculation by $1,000,000, the Buyer and the Sellers shall split such fees and expenses evenly. At any time the Buyer and the Sellers may agree to settle any objections raised in the Dispute Notice, including any Disputed Items submitted to the Independent Referee, which agreement shall be in writing and final, conclusive and binding upon all of the parties hereto with respect to the subject matter of any such objection so resolved; provided, that, the parties shall promptly provide a copy of such agreement to the Independent Referee and instruct the Independent Referee not to resolve such Disputed Item, it being agreed that if the Independent Referee nonetheless resolves such Disputed Item for any reason, the agreement of the parties shall control.

2.5.5.    Post-Closing Purchase Price Adjustment. Following the final determination of the Purchase Price, in accordance with Section 2.5.3 and/or Section 2.5.4, of Transaction Expenses, Transaction Bonus Payments, Target Indebtedness, Working Capital, Cash on Hand and Purchase Price (respectively, the "Final Transaction Expenses", "Final Transaction Bonus Payments", "Final Target Indebtedness", "Final Working Capital," "Final Cash on Hand Amount" and "Final Purchase Price"), a Purchase Price adjustment shall be made as follows:

(a)    if (i) the sum of (A) the Final Working Capital Amount, *plus* (B) the Final Cash on Hand Amount, *minus* (C) the Final Transaction Expenses, *minus* (D) the sum of the Final Transaction Bonus Payments, *minus* (E) the Final Target Indebtedness is less than the sum of (A) the Estimated Working Capital Amount, *plus* (B) the Estimated Cash on Hand Amount, *minus* (C) the Estimated Transaction Expenses, *minus* (D) the sum of the Estimated Transaction Bonus Payments, *minus* (E) the Estimated Target Indebtedness, then the Purchase Price will be reduced by an amount equal to such shortfall, and such shortfall amount shall be paid to the Buyer (or to such other Person as directed by Buyer) from the Purchase Price Adjustment Escrow Account, in accordance with the terms of the Escrow Agreement; provided, however, if such shortfall amount is greater than the then-remaining Purchase Price Adjustment Escrow Amount (such excess, the "Buyer Deficiency Amount"), the Sellers (as a joint and several obligation) shall pay to the Buyer (or to such other Person as directed by Buyer) the Buyer Deficiency Amount by wire transfer of immediately available funds to an account or accounts designated by the Buyer in writing; provided, further, if such shortfall amount is less than the then-remaining Purchase Price Adjustment Escrow Amount, the amount by which the then-remaining Purchase Price Adjustment Escrow Amount exceeds such shortfall amount shall be paid from the Purchase Price Adjustment

Escrow Account to the Sellers, to the accounts and in such amounts designated by the Sellers;

(b)    if (i) the sum of (A) the Final Working Capital Amount, *plus* (B) the Final Cash on Hand Amount, *minus* (C) the Final Transaction Expenses, *minus* (D) the sum of the Final Transaction Bonus Payments, *minus* (E) the Final Target Indebtedness is greater than (ii) the sum of (A) the Estimated Working Capital Amount, *plus* (B) the Estimated Cash on Hand Amount, *minus* (C) the Estimated Transaction Expenses, *minus* (D) the sum of the Estimated Transaction Bonus Payments, *minus* (E) the Estimated Target Indebtedness, then the Purchase Price will be increased by an amount equal to such excess and (i) the Buyer will pay, or cause to be paid, such excess amount to the Sellers and (ii) the Buyer and the Sellers shall jointly instruct the Escrow Agent to release to the Sellers the then-remaining Purchase Price Adjustment Escrow Amount (provided, in each case, that compensatory payments shall be made as described in the last sentence of Section 2.6), in each case, within five (5) Business Days after the determination of such excess amount by wire transfer of immediately available funds to the accounts and in such amounts specified by the Sellers; or

(c)    if the Final Purchase Price is equal to the Estimated Purchase Price, then the Buyer and the Sellers shall jointly instruct the Escrow Agent to promptly (but in any event within three (3) Business Days following delivery of notice) release to the Sellers the then-remaining Purchase Price Adjustment Escrow Amount, to the accounts and in such amounts specified by the Sellers (provided that compensatory payments shall be made as described in the last sentence of Section 2.6).

2.6.    Withholding.  The Buyer and any other applicable withholding agent will be entitled to deduct and withhold or cause to be deducted and withheld from any amounts payable or consideration otherwise deliverable pursuant to this Agreement any withholding Taxes or other amounts required under the Code or any applicable legal requirement to be deducted and withheld; provided, however, that except in respect of compensatory payments, Buyer shall (i) provide written notice of such withholding at least fifteen (15) Business Days prior to such withholding together with an explanation of the relevant legal requirement that requires such withholding and (ii) upon the request of Sellers, cooperate with Sellers to reduce or eliminate such withholding.  Any such amounts deducted or withheld which are properly remitted to the appropriate taxing authorities will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made. Notwithstanding any other provision of this Agreement, all compensatory payments subject to withholding that are contemplated by this Agreement or the Escrow Agreement shall be payable through any Target's (or any applicable Subsidiary's) payroll in accordance with applicable payroll procedures.

2.7.    Tax Treatment; Purchase Price Allocation.

2.7.1.    Tax Treatment.  The parties acknowledge that NBI is a disregarded entity for U.S. federal income tax purposes (and will continue to be treated as a disregarded entity notwithstanding any transitory ownership of NBI by multiple owners as a result of the Contemplated Transactions) and the other Targets are partnerships for U.S. federal income tax

23

purposes. The parties further acknowledge that the Contemplated Transactions are intended to be treated for U.S. federal income Tax purposes and any relevant state or local income Tax purposes as (a) with respect to the exchange of the Rollover Interests for equity interests in an affiliated entity of Buyer pursuant to the Rollover Agreement, taken together with certain contributions of cash to the same entity, as a contribution of the portion of the assets of NBI (or partnership interests in the applicable Target, to the extent that the Rollover Interests are Interests in a Target other than NBI) attributable to the Rollover Interests to a corporation controlled by the transferors within the meaning of Section 351 of the Code, effective prior to the Closing and (b) with respect to the sale of the Interests (other than the Rollover Interests) pursuant to this Agreement, as a taxable transfer of (i) the assets of NBI (including any assets held directly by NBI and the interests in Subsidiaries held by NBI and excluding any portion of the assets of NBI attributable to the Rollover Interests) and (ii) partnership interests in the other Targets. The parties shall file all Tax Returns in accordance with this <u>Section 2.7.1</u> unless otherwise required by applicable Law.

2.7.2. <u>Purchase Price Allocation</u>. Within thirty (30) days of the final determination, in accordance with <u>Section 2.5.3</u> and/or <u>Section 2.5.4</u>, of the Closing Statement, or as soon thereafter as reasonably practicable, the Buyer shall prepare and deliver to the Sellers an allocation of the sum of (a) the purchase price (as determined for Tax purposes) and (b) the value of the Rollover Interests, among the assets of NBI, the interests in Subsidiaries held by NBI, and the interests in the Targets other than NBI (and further allocating the portion allocated to any partnership interest among the assets of the applicable partnership) in accordance with Section 755 and Section 1060 of the Code and the Treasury regulations thereunder (and any similar provision of state, local or foreign law, as appropriate) (the "<u>Purchase Price Allocation</u>"). The Sellers shall cooperate with the Buyer, as reasonably requested by the Buyer, in connection with the Buyer's preparation of the Purchase Price Allocation. The Sellers shall have a period of thirty (30) days following the Buyer's delivery of the Purchase Price Allocation to present in writing to the Buyer notice of any objections that the Sellers may have to the allocations set forth therein (an "<u>Objections Notice</u>"). If the Sellers shall raise any objections within such thirty (30) day period, the Buyer and the Sellers shall negotiate in good faith and use their commercially reasonable efforts to resolve such dispute. If the parties fail to agree within fifteen (15) days after the delivery of the Objections Notice, any dispute shall be resolved by a mutually agreed upon nationally recognized accounting firm, whose determination shall be final and binding on the parties, with fees of such accounting firm borne fifty percent (50%) by the Sellers and fifty percent (50%) by the Buyer. The Purchase Price Allocation as finally determined hereunder shall be binding and the Sellers and the Buyer shall (and shall cause their Affiliates to) file all Tax Returns in a manner consistent with such Purchase Price Allocation. Any subsequent adjustments to purchase price shall be allocated in a manner consistent with the finally prepared Purchase Price Allocation.

3. **REPRESENTATIONS AND WARRANTIES OF THE TARGETS**.

Except as provided in the Disclosure Schedules (<u>subject to Section 11.13</u>), the Targets each jointly and severally represent and warrant to the Buyer, as of the date hereof and as of the Closing Date, as follows (in each case, except where context implies otherwise, with respect to the Targets and their Subsidiaries on a consolidated basis):

3.1.    Existence and Power.  The Targets are each duly incorporated or otherwise duly organized, as applicable, validly existing and in good standing under the laws of the State of Delaware.  Each Target has all corporate, limited liability company or comparable powers to carry on its business as now conducted and is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where such qualification is necessary for the conduct of its business as now conducted, except where any failure to have such power or authority or to be so qualified would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole.  Prior to the date of this Agreement, the Targets have delivered or made available to Buyer true, correct and complete copies of the applicable Organizational Documents of each Target as in effect on the date of this Agreement. The Organizational Documents of each Target are in full force and effect, and no Target is in material violation of any of their provisions.

3.2.    Authorization.  The Targets have all requisite power and authority to execute and deliver this Agreement, to perform their obligations hereunder and to consummate the Contemplated Transactions.  The execution and delivery of this Agreement by each Target, the performance of its obligations hereunder and the consummation of the Contemplated Transactions have been duly authorized by all necessary action on the part of each Target.  No other proceeding on the part of the Targets is necessary to authorize the execution and delivery of this Agreement, the performance by the Targets of their obligations hereunder and the consummation by the Targets of the Contemplated Transactions.  This Agreement, assuming due authorization, execution and delivery by Buyer, constitutes a valid and binding obligation of each Target enforceable against each Target in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, receivership or other similar Laws relating to or affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at Law) (collectively, the "Enforceability Exceptions").

3.3.    Capitalization; Subsidiaries.

3.3.1.    The entire authorized equity of each Target is set forth on Schedule 3.3.1, and collectively consists only of the Interests, which Interests are duly authorized, validly issued, fully paid and have not been issued in violation of any preemptive, subscription or other similar rights.

3.3.2.    Except as set forth on Schedule 3.3.1, there are no outstanding (i) shares of capital stock or other voting securities of or other ownership interests in any Target, (ii) securities of any Target convertible into or exchangeable for shares of capital stock or other voting securities of or other ownership interests in any Target, (iii) options or other rights or agreements, commitments or understandings to acquire from any Target, or other obligation of any Target to issue, any shares of capital stock or other voting securities of or other ownership interests in such Target, or securities convertible into or exchangeable for shares of capital stock or other voting securities of or other ownership interests in such Target or (iv) restricted shares, stock appreciation rights, performance units, restricted stock units, contingent value rights, "phantom" stock or similar securities or rights issued or granted by any Target or any of their Subsidiaries that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any shares of capital stock or other voting securities of or other ownership

Doc#: US1:12600497v8

interests in such Target (the items in clauses (i) through (iv) being referred to collectively as the "Target Securities").

3.3.3.     There are no outstanding obligations of any Target or any of their respective Subsidiaries to repurchase, redeem or otherwise acquire any Target Securities.  None of the Targets nor any of their Subsidiaries is a party to any voting trust, proxy, voting agreement or other similar agreement with respect to the voting of any Target Securities.  All outstanding membership or partnership interests, as applicable, of the Targets have been duly authorized and validly issued and are fully paid and nonassessable, free of preemptive, antidilutive, first refusal or similar rights and have been issued in compliance with all applicable securities Laws.  There are no outstanding bonds, debentures, notes or other Indebtedness of the Targets having the right to vote (whether on an as-converted basis or otherwise) (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which equityholders of the Targets may vote.

3.3.4.     Each Subsidiary of the Targets is duly incorporated or otherwise duly organized, validly existing and (where such concept is recognized) in good standing under the laws of its jurisdiction of incorporation or organization, except, in the case of any such Subsidiary, where the failure to be so incorporated, organized, existing or in good standing would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole.  Each Subsidiary of the Targets has all corporate, limited liability company or comparable powers required to carry on its business as now conducted, except as would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole.  Each such Subsidiary is duly qualified to do business as a foreign entity and (where such concept is recognized) is in good standing in each jurisdiction in which it is required to be so qualified or in good standing, except where failure to be so qualified or in good standing would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole.  Prior to the date of this Agreement, the Targets have made available to Buyer true, correct and complete copies of the applicable Organizational Documents of each Subsidiary of the Targets, in each case, as in effect on the date of this Agreement.

3.3.5.     All of the outstanding capital stock or other voting securities of or other ownership interests in each Subsidiary of the Targets are owned by the Targets, directly or indirectly, free and clear of any Lien.  Schedule 3.3.5 contains a complete and accurate list of the Subsidiaries of the Targets, including, for each of the Subsidiaries, (x) its name, (y) its jurisdiction of organization and (z) its ownership interest (including type, amount and percentage) by the Targets, as well as its ownership interest (including type, amount and percentage) by any other Person or Persons.  Except as set forth on Schedule 3.3.5, each Subsidiary is directly or indirectly wholly owned by the Targets.  There are no issued, reserved for issuance or outstanding (i) securities of any Target or any of their Subsidiaries convertible into or exchangeable or exercisable for shares of capital stock or other voting securities of or other ownership interests in any Subsidiary of the Targets, (ii) options or other rights or agreements, commitments or understandings to acquire from any Target or any of their Subsidiaries, or other obligations of any Target or any of their Subsidiaries to issue, any shares of capital stock or other voting securities of or other ownership interests in, or any securities convertible into or exchangeable or exercisable for, any shares of capital stock or other voting

26

securities of or other ownership interests in any Subsidiary of the Targets or (iii) restricted shares, stock appreciation rights, performance units, contingent value rights, "phantom" stock or similar securities or rights issued or granted by any Target or any of their Subsidiaries that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock or other voting securities of or other ownership interests in any Subsidiary of the Targets (the items in clauses (i) through (iii) being referred to collectively as the "Target Subsidiary Securities"). There are no outstanding obligations of any Target or any of their Subsidiaries to repurchase, redeem or otherwise acquire any of the Target Subsidiary Securities.

3.3.6. Other than the capital stock or other ownership interests that the Targets own of their Subsidiaries, none of the Targets own, directly or indirectly, any capital stock or other ownership interests of any other Person. None of the Targets or their Subsidiaries is obligated to make any investment in or capital contribution to any Person.

3.4. Governmental Authorization; Non-Contravention.

3.4.1. The execution and delivery of this Agreement by the Targets and the performance of their obligations hereunder require no action by or in respect of, or filing with, any Governmental Authority, other than (a) compliance with any applicable requirements of the HSR Act, (b) compliance with any applicable requirements of the Securities Act, the Exchange Act and any other applicable state or federal securities laws, (c) the filing of the FCC Applications and obtaining the FCC Consent, together with any reports or informational filings required in connection therewith under the Communications Act and the FCC Rules and (d) any actions or filings the absence of which would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole.

3.4.2. The execution and delivery of this Agreement by the Targets and the performance of its obligations hereunder do not and will not, assuming the authorizations, consents and approvals referred to in clauses (a) through (d) of Section 3.4.1 are obtained, (a) conflict with or breach any provision of the Organizational Documents of any Target, (b) conflict with or breach any provision of any Law or Order, (c) require any consent of or other action by any Person under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit under, any provision of any Contract to which any Targets or any of their Subsidiaries is party or which is binding upon any Targets or any of their Subsidiaries, any of their respective properties or assets or any license, franchise, permit, certificate, approval or other similar authorization affecting any Target or any of their Subsidiaries or (d) result in the creation or imposition of any Lien, other than any Permitted Lien, on any property or asset of any Target or any of their Subsidiaries, except, in the case of each of clauses (c) and (d), as would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole.

3.5. Financial Statements; No Undisclosed Material Liabilities; Accounting Controls; Information Supplied.

3.5.1.    The financial statements of NW Broadcasting and Bryson (and to the extent applicable for prior reporting periods, Idaho Broadcast Partners, LLC) (the "Existing Reporting Entities") set forth on Schedule 3.5.1 (including all related notes and schedules thereto) (the "Financial Statements") fairly present in all material respects the financial position of the Existing Reporting Entities and their applicable Subsidiaries, as of the respective dates thereof, and the consolidated results of their operations and their consolidated cash flows for the respective periods then ended (subject, in the case of the unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein, including the notes thereto) and were prepared in accordance with GAAP (except, in the case of the unaudited statements, for normal year-end adjustments which are not reasonably expected to be material individually or in the aggregate and for the absence of notes none of which, if presented, would differ materially from those presented in the audited Financial Statements) applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto).  Such Financial Statements have been prepared from, and are in accordance with, the books and records of the Existing Reporting Entities and their Subsidiaries.  From December 31, 2017 to the date of this Agreement, there has not been any material change in the accounting methods used by the Existing Reporting Entities.

3.5.2.    There are no material liabilities or obligations of the Targets or any of their Subsidiaries (either individually or in the aggregate) that would be required by GAAP, as in effect on the date hereof, to be reflected on the balance sheet of any the Targets (including the notes thereto), other than (a) liabilities or obligations adequately disclosed, specifically reflected and adequately reserved against or otherwise provided for in the combined balance sheet of the Existing Reporting Entities as at December 30, 2018 or in the notes thereto, (b) liabilities or obligations incurred in the ordinary course of business since December 30, 2018 (excluding any liability for breach of Contract, breach of warranty, tort, infringement or violation of Law by the Targets or any of their Subsidiaries) and (c) liabilities or obligations arising out of the preparation, negotiation and consummation of the Contemplated Transactions.  None of the Targets or any of its Subsidiaries is a party to, or has any commitment to become a party to, any "off balance sheet arrangement" within the meaning of Item 303 of Regulation S-K promulgated under the Securities Act.

3.5.3.    The accounting controls of the Targets and their Subsidiaries have been and are sufficient to provide reasonable assurances (i) that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP, consistently applied; (ii) that transactions are executed only in accordance with the authorization of management; and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of the Targets' or their Subsidiaries' properties or assets.

3.6.    Absence of Certain Changes.  From December 31, 2017 through the date of this Agreement, except as for events giving rise to and the discussion and negotiation of this Agreement, (i) the business of the Targets and their Subsidiaries has been conducted in the ordinary course of business consistent with past practices in all material respects and (ii) there has not been any action taken by the Targets or any of their Subsidiaries that, if taken during the period from the date of this Agreement through the Closing without Buyer's consent, would constitute a breach of, or require consent of Buyer pursuant to Section 8.2.

3.7.    <u>Taxes</u>.  Except in each case as set forth on <u>Schedule 3.7</u>:

3.7.1.    Each Target and each of their Subsidiaries has been classified as set forth on <u>Schedule 3.7.1</u> for federal Income Tax purposes and for purposes of all applicable state and local Income Taxes for all times since the formation of such entity.  Each entity that is classified as a partnership on <u>Schedule 3.7.1</u> either has made a valid election under Section 754 that continues in effect, or has not made any such election, in each case as indicated on <u>Schedule 3.7.1</u>;

3.7.2.    Each Target and each of their Subsidiaries has filed, or has caused to be filed on its behalf, all material Tax Returns required to be filed by it or with respect to it, and all such Tax Returns (including information provided therewith or with respect to thereto) are true, complete and correct in all material respects.

3.7.3.    Each Target and each of their Subsidiaries has fully paid all material Taxes owed by it (whether or not shown on any Tax Return).

3.7.4.    All material Taxes (whether or not shown on any Tax Return) required to have been withheld and paid in connection with amounts paid by the Targets and their Subsidiaries to any employee or independent contractor have been withheld and paid to the appropriate Taxing Authority and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

3.7.5.    No material audit or other proceeding by any Taxing Authority is pending or threatened in writing with respect to any Taxes due from any Target or any of their Subsidiaries, and no Taxing Authority has given written notice of any intention to assert any deficiency or claim for additional Taxes against any Target or any of their Subsidiaries, and no claim has been made within the past three (3) years in writing by any Taxing Authority in a jurisdiction where any Target or any of their Subsidiaries does not file Tax Returns that such Target or such Subsidiary may be subject to taxation by that jurisdiction.

3.7.6.    The Targets have supplied the Buyer with true and complete copies of all material Tax Returns, examination reports and statements of deficiencies for the Targets and their Subsidiaries for the past three (3) years.

3.7.7.    There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection, assessment or reassessment of, Taxes due from any Target or any of their Subsidiaries for any taxable period. No request for any such waiver or extension is currently pending.

3.7.8.    None of the Targets nor any of their Subsidiaries is currently subject to any Liens for material Taxes, other than Permitted Liens, imposed on any of its assets or properties.

3.7.9.    None of the Targets or any of their Subsidiaries is a party to any Contract relating to the sharing, allocation or indemnification of Taxes (collectively, "<u>Tax Sharing Agreements</u>") or has any liability for Taxes of any Person under Treasury Regulation Section 1.1502-6, Treasury Regulation Section 1.1502-78 or similar provision of any Tax Law,

as a transferee or successor, pursuant to a Contract or otherwise (other than with respect to standard terms and conditions of an agreement for the purchase and sale of products or services in the ordinary course of business including, but not limited to, any standard customer software license).

3.7.10. No power of attorney has been granted by any Seller, any Target or any of the Targets' Subsidiaries with respect to any matter relating to Taxes of the Targets or any of their Subsidiaries, which power of attorney will remain in effect after the Closing.

3.7.11. None of the Targets or any of their Subsidiaries has (i) participated in any listed transaction within the meaning of Treasury Regulations Section 1.6011-4(b)(2) (or any similar provision of state, local or foreign Tax law) or (ii) taken any reporting position on a Tax Return, which reporting position (A) if not sustained would be reasonably likely, absent disclosure, to give rise to a penalty for substantial understatement of federal income Tax under Section 6662 of the Code (or any similar provision of any Tax Law) and (B) has not adequately been disclosed on such Tax Return in accordance with Section 6662(d)(2)(B) of the Code (or any similar provision of any Tax Law).

3.7.12. There are no Tax rulings, requests for rulings, closing agreements or grants in effect with any Taxing Authority relating to any Target or any of their Subsidiaries which could materially affect any Target's or any of their Subsidiaries' liability for Taxes after the Closing Date.

3.7.13. None of the Targets or any of their Subsidiaries has executed or entered into a closing agreement pursuant to Section 7121 of the Code or any similar provision of any Law. None of the Targets or any of their Subsidiaries is subject to any private letter ruling of the IRS or comparable ruling of any other Governmental Authority.

3.8. <u>Real Estate</u>.

3.8.1. <u>Properties</u>.

(a) <u>Schedule 3.8.1(a)</u> sets forth, as of the date of this Agreement, (i) a list of all real properties (by name and location) owned by the Targets or any of their Subsidiaries (the "<u>Owned Real Property</u>"), (ii) a list of all real properties (by name and location) leased, subleased or otherwise occupied by any Target or any of their Subsidiaries (the "<u>Leased Real Property</u>"), (iii) a list of the leases, subleases or other occupancies to which any of the Targets or any of their Subsidiaries is a party as tenant or subtenant for the Leased Real Property (the "<u>Real Property Leases</u>") and (iv) a list of all the leases, subleases or other occupancies to which the Targets or any of their Subsidiaries is a party as a landlord or sublandlord for the Owned Real Property or the Leased Real Property (the "<u>Third Party Leases</u>"). True, correct and complete copies of the Real Property Leases and Third Party Leases have been made available to the Buyer. There are no outstanding options, rights of first refusal or rights of first offer to purchase the Owned Real Property, Leased Real Property or any portion thereof or interest therein.

(b)    With respect to each Owned Real Property, (<u>i</u>) a Target or a Subsidiary of a Target has good and marketable title to such Owned Real Property, free and clear of all Liens (other than Permitted Liens) and (<u>ii</u>) there are no existing, pending, or to the Targets' Knowledge, threatened condemnation, eminent domain or similar proceedings affecting such Owned Real Property.  Except as set forth in <u>Schedule 3.8.1(b)</u>, neither the Targets nor any of their Subsidiaries has entered into an agreement to sell any of the Owned Real Property or granted a right to purchase any of the Owned Real Property to any third party.

(c)    With respect to each Leased Real Property, (<u>i</u>) a Target or a Subsidiary of a Target has valid leasehold title to each Leased Real Property, free and clear of all Liens (other than Permitted Liens), (<u>ii</u>) each Real Property Lease is valid, binding and in full force and effect, subject to the Enforceability Exceptions, and (<u>iii</u>) neither the Targets nor any of their Subsidiaries or, to the Targets' Knowledge, any other party to such Real Property Lease has violated, any provision of, or taken or failed to take any act which, with or without notice, lapse of time, or both, would constitute a default under the provisions of such Real Property Lease.

(d)    Except as would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, each of the Targets and their Subsidiaries, in respect of all of its properties, assets and other rights that do not constitute real property or Intellectual Property (<u>i</u>) has valid title to all such properties, assets and other rights reflected in its books and records as owned by it free and clear of all Liens (other than Permitted Liens) and (<u>ii</u>) owns, has valid leasehold interests in or valid contractual rights to use all of such properties, assets and other rights (in each case except for Permitted Liens).

3.9.    <u>Compliance with Laws and Court Orders; Governmental Authorizations</u>.

3.9.1.    Except for matters that have not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, the Targets and their Subsidiaries are, and have been since January 1, 2016, in compliance with all Laws and Orders applicable to the Targets or any of their Subsidiaries, and to the Targets' Knowledge, are not under investigation by any Governmental Authority with respect to any violation of any applicable Law or Order.

3.9.2.    Except as would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, (<u>i</u>) the Targets and their Subsidiaries have (and, to the extent applicable, have filed timely applications to renew) all Governmental Authorizations necessary for the ownership and operation of their businesses as presently conducted, and each such Governmental Authorization is in full force and effect, (<u>ii</u>) the Targets and their Subsidiaries are, and have been since January 1, 2016, in compliance with the terms of all Governmental Authorizations necessary for the ownership and operation of their businesses and (<u>iii</u>) since January 1, 2016, none of the Targets nor any of their Subsidiaries have received written notice from any Governmental Authority alleging any conflict with or breach of any such Governmental Authorization.

31

3.9.3.　　The Targets and their Subsidiaries, as the case may be, are the holders of the Target Station Licenses, which constitute all of the FCC Licenses material to the operation of the Target Stations.  Except as has not been and would not reasonably be expected to be material, individually or in the aggregate, to the Targets and the Subsidiaries, taken as a whole, the Target Station Licenses are in full force and effect in accordance with their terms and have not been actually or threatened to be revoked, suspended, canceled, rescinded, terminated or expired. The Targets hold no FCC Licenses other than the Target Station Licenses.

3.9.4.　　Except as has not been and would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, the Targets and their Subsidiaries (i) operate, and since January 1, 2016 have operated, each Target Station in compliance with the Communications Act and the FCC Rules and the applicable Target Station Licenses, (ii) have timely filed all material registrations and reports required to have been filed with the FCC relating to the Target Station Licenses (which registrations and reports were accurate in all material respects as of the time such registrations and reports were filed), (iii) have paid or caused to be paid all FCC regulatory fees due in respect of each Target Station and (iv) have completed or caused to be completed the construction of all facilities or changes contemplated by any of the Target Station Licenses or construction permits issued to modify the Target Station Licenses to the extent required to be completed as of the date hereof.

3.9.5.　　Except as has not been and would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, (i) there are no material applications, petitions, proceedings, or other material actions, complaints or investigations, pending or, to the Targets' Knowledge, threatened before the FCC relating to the Target Stations, other than proceedings affecting broadcast stations generally, and (ii) neither the Targets nor any of their Subsidiaries, nor any of the Target Stations, has entered into a tolling agreement or otherwise waived any statute of limitations relating to the Target Stations during which the FCC may assess any fine or forfeiture or take any other action or agreed to any extension of time with respect to any FCC investigation or proceeding as to which the statute of limitations time period so waived or tolled or the time period so extended remains open as of the date of this Agreement.

3.9.6.　　There is not (i) pending, or, to the Targets' Knowledge, threatened, any action by or before the FCC to revoke, suspend, cancel, rescind or materially adversely modify any such Target Station License (other than proceedings to amend the FCC Rules of general applicability) or (ii) issued or outstanding, by or before the FCC, any (A) order to show cause, (B) notice of violation, (C) notice of apparent liability or (D) order of forfeiture, in each case, against the Target Stations, the Targets or any of their Subsidiaries with respect to the Target Stations that would reasonably be expected to result in any action described in the foregoing clause (i) with respect to such Target Station Licenses.

3.9.7.　　The Target Station Licenses have been issued for the terms expiring as indicated on Schedule 3.9.7 and the Target Station Licenses are not subject to any material condition except for those conditions appearing on the face of the Target Station Licenses and conditions applicable to broadcast licenses generally or otherwise disclosed in Schedule 3.9.7. Except as set forth on Schedule 3.9.7, neither the Targets' nor the Sellers' entry into this

32

Agreement nor the consummation of the Contemplated Transactions will require any grant or renewal of any waiver granted by the FCC applicable to the Targets or for any of the Target Stations.

       3.9.8.    Since January 1, 2016, none of the Targets or their respective Affiliates, nor, to the Targets' Knowledge, their respective directors, officers, agents, employees, affiliates, or other persons that act for or on behalf of the Targets or their Affiliates has violated in any material respect any Competition Law.

       3.9.9.    There is no pending or, to the Targets' Knowledge, threatened investigation, inquiry, or enforcement proceedings upon the Targets or any of their Subsidiaries by any Governmental Authority or any customer regarding any offense or alleged offense under any Competition Law and, to the Targets' Knowledge, there are no circumstances likely to give rise to any such investigation, inquiry or proceeding, in each case which would reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole.

       3.9.10.    Since January 1, 2016, the Targets and their Subsidiaries have been conducted in material compliance with all applicable anti-money laundering, financial record keeping, reporting laws and export control laws or regulations.

       3.10.    <u>Benefit Plans</u>  <u>Schedule 3.10</u> contains a true, correct and complete list identifying each material Employee Plan that the Targets or any of their Subsidiaries sponsor, maintain or contribute to, or are required to maintain or contribute to, for the benefit of any current or former director, officer, employee or individual consultant (or any dependent or beneficiary thereof) of the Targets or any of their Subsidiaries or under or with respect to which the Targets or any of their Subsidiaries have any current or contingent material liability or obligation, but excluding Multiemployer Plans (the "<u>Company Plans</u>").  For purposes of this Agreement, "<u>Employee Plan</u>" means each "employee benefit plan" within the meaning of ERISA Section 3(3), whether or not subject to ERISA, including, but not limited to, all equity or equity-based, change in control, bonus or other incentive compensation, disability, salary continuation, employment, consulting, indemnification, severance, retention, retirement, pension, profit sharing, savings or thrift, deferred compensation, health or life insurance, welfare, employee discount or free product, vacation, sick pay or paid time off agreements, arrangements, programs, plans or policies, and each other material benefit or compensation plan, program, policy, Contract, agreement or arrangement, whether written or unwritten.

       3.10.2.    Except as would not reasonably be expected to be material, individually or in the aggregate, to the Targets and their Subsidiaries, taken as a whole, (i) each Company Plan has been maintained, funded, administered and operated in accordance with its terms and in compliance with the requirements of applicable Law, (ii) none of the Targets or any of their Subsidiaries have incurred or is reasonably expected to incur or to be subject to any material Tax or other penalty under Section 4980B, 4980D or 4980H of the Code, (iii) all contributions required to be made by the Targets or any of their Subsidiaries to any Company Plan by applicable Law or by any plan document or other contractual undertaking, and all premiums due or payable with respect to insurance policies funding any Company Plan, for any period in the prior three years through the date hereof, have been timely made, and (iv) to the Targets'

33

Knowledge, no non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code has occurred involving any Company Plan. Each Company Plan that provides health or welfare benefits is fully insured or, if not fully insured, is indicated as such on Schedule 3.10 and any incurred but not reported claims under any such Company Plan has been properly accrued in accordance with GAAP.

3.10.3.    Except as would not reasonably be expected to be material, individually or in the aggregate, to the Targets and their Subsidiaries, taken as a whole, other than routine claims for benefits, there are no pending or, to the Targets' Knowledge, threatened Proceedings by or on behalf of any participant in any Company Plan, or otherwise involving any Company Plan or the assets of any Company Plan.

3.10.4.    Except as would not reasonably be expected to be material, individually or in the aggregate, to the Targets and their Subsidiaries, taken as a whole, each Company Plan that is intended to be qualified under Section 401(a) of the Code has received a determination, advisory or opinion letter from the IRS that it is so qualified and each related trust that is intended to be exempt from federal income taxation under Section 501(a) of the Code has received a determination, advisory or opinion letter from the IRS that it is so exempt and, to the Targets' Knowledge, no fact or event has occurred since the date of such letter or letters from the IRS that would reasonably be expected to adversely affect the qualified status of any such Company Plan or the exempt status of any such trust.

3.10.5.    None of the Targets nor any of their ERISA Affiliates maintains, contributes to, or sponsors (or has in the past six (6) years maintained, contributed to, or sponsored) a multiemployer plan as defined in Section 3(37) or Section 4001(a)(3) of ERISA (a "Multiemployer Plan") or a plan subject to Title IV of ERISA. Except as would not reasonably be expected to be material, individually or in the aggregate, to the Targets and their Subsidiaries, taken as a whole, no liability under Title IV of ERISA has been incurred by the Targets or any of their ERISA Affiliates that has not been satisfied or discharged in full, and no condition exists that presents a reasonable risk to the Targets or any of their ERISA Affiliates of incurring or being subject (whether primarily, jointly or secondarily) to a liability (whether actual or contingent) thereunder.

3.10.6.    Except as set forth in Schedule 3.10.6, no Company Plan provides post-employment or post-termination life, health or welfare benefits for any current or former employees or other service providers (or any dependent thereof) of the Targets or any of their Subsidiaries, other than as required under Section 4980B of the Code or other applicable Law for which the covered Person pays the full cost of coverage. Any plan disclosed on Schedule 3.10 may be amended in any manner or terminated without material liability to the Targets or any of their Subsidiaries.

3.10.7.    Except as set forth in Schedule 3.10.7, the consummation of the Contemplated Transactions will not, either alone or in combination with another event, (i) result in any payment becoming due, accelerate the time of payment or vesting, or increase the amount of compensation (including severance) due to any current or former director, officer, individual consultant or employee of any Target or any of their Subsidiaries, (ii) result in any forgiveness of Indebtedness with respect to any current or former employee, director or officer, or individual

consultant of any Target or any of their Subsidiaries, trigger any funding obligation under any Company Plan or impose any restrictions or limitations on the Targets' or any of their Subsidiaries' rights to administer, amend or terminate any Company Plan or (iii) result in the acceleration or receipt of any payment or benefit (whether in cash or property or the vesting of property) by any Target or any of their Subsidiaries to any "disqualified individual" (as such term is defined in Treasury Regulations Section 1.280G-1) that would reasonably be expected, individually or in combination with any other such payment, to constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code). The Targets have made available to Buyer the "base amount" for each "disqualified individual" and a reasonable estimate of potential "parachute payments" such person could receive (each as defined in Section 280G of the Code). None of the Targets or any of their Subsidiaries has any obligation to provide any gross-up payment to any individual with respect to any income Tax, additional Tax, excise Tax or interest charge imposed pursuant to Section 409A or Section 4999 of the Code.

3.10.8.    Except as set forth in Schedule 3.10.8, each Company Plan or other plan, program, policy or arrangement that constitutes a "nonqualified deferred compensation plan" within the meaning of Treasury Regulation Section 1.409A-1(a)(i), to the extent then in effect, (i) was operated in material compliance with Section 409A of the Code between January 1, 2005 and December 31, 2008, based upon a good faith, reasonable interpretation of (A) Section 409A of the Code or (B) guidance issued by the IRS thereunder (including IRS Notice 2005-1), to the extent applicable and effective (clauses (A) and (B), together, the "409A Authorities"), (ii) has been operated in material compliance with the 409A Authorities and the final Treasury Regulations issued thereunder since January 1, 2009 and (iii) has been in material documentary compliance with the 409A Authorities and the final Treasury Regulations issued thereunder since January 1, 2009.

3.10.9.    With respect to each material Company Plan, to the extent applicable, current, true, correct and complete copies of the following have been delivered or made available to Buyer by the Targets:  (i) all plan documents (including all written amendments thereto) (which, for the avoidance of doubt, with respect to any material Company Plan for which a form agreement is used, shall consist of a copy of such form and a summary of any material deviations); (ii) the most recent audited financial statements and actuarial or other valuation reports; (iii) the most recent annual report on Form 5500 required to be filed with the Internal Revenue Service; (iv) the most recent determination, opinion or advisory letter from the IRS for any Company Plan that is intended to qualify under Section 401(a) of the Code; (v) the most recent summary plan description; and (vi) any related trust agreement or other funding instrument.

3.11.    Intellectual Property.

3.11.1.    Schedule 3.11.1 lists, as of the date hereof, the Marks, Copyrights and Patents that are registered, issued or subject to an application for registration or issuance that are owned by the Targets or any of their Subsidiaries (collectively, the "Registered Intellectual Property") and the Registered Intellectual Property is subsisting and to the Targets' Knowledge, where registered, valid and enforceable.  The Owned Intellectual Property is owned by the Targets and each of their Subsidiaries free and clear of all Liens, except for Permitted Liens.  To the Targets' Knowledge, the Targets and each of their Subsidiaries own or have the right to use

35

pursuant to a valid license Contract or otherwise as permitted by applicable Law the Intellectual Property necessary for or material to the conduct of their business.

3.11.2. Except as set forth in <u>Schedule 3.11.2</u>, (<u>i</u>) to the Targets' Knowledge, the conduct of the business of the Targets and each of their Subsidiaries does not infringe, violate or misappropriate, and to the Targets' Knowledge, none of the Targets nor any of their Subsidiaries has infringed, violated or misappropriated since January 1, 2016, any Intellectual Property of any other Person, (<u>ii</u>) there is no pending or, to the Targets' Knowledge, threatened Proceeding, and since January 1, 2016 no Proceeding has been pending or, to the Targets' Knowledge, threatened in writing, against the Targets or any of their Subsidiaries (<u>A</u>) alleging any such infringement, violation or misappropriation or (<u>B</u>) concerning the ownership, validity or enforceability, or the right to use, sell or license the Intellectual Property of the Targets (other than ordinary course Proceedings related to the application for, or registration of, any Registered Intellectual Property) and (<u>iii</u>) to the Targets' Knowledge, no Person is infringing, violating or misappropriating any Owned Intellectual Property that is material to the business of the Targets and any of their Subsidiaries in any manner that would have a material effect on such business.

3.11.3. The Targets and each of their Subsidiaries have taken commercially reasonable actions to maintain the (<u>i</u>) Registered Intellectual Property (other than applications for Registered Intellectual Property that have been abandoned in the ordinary course of business) and (<u>ii</u>) to the Targets' Knowledge, the secrecy of the Trade Secrets that are Owned Intellectual Property.

3.11.4. All IT Systems material to the business of the Targets and each of their Subsidiaries are in operating condition and in a good state of maintenance and repair (ordinary wear and tear excepted) and to the Targets' Knowledge, are adequate and suitable for the purposes for which they are presently being used or held for use. To the Targets' Knowledge, none of the IT Systems contains any unauthorized "back door", "drop dead device", "time bomb", "trojan horse", "virus" or "worm" (as such terms are commonly understood in the software industry) or any other unauthorized code intended to disrupt, disable, harm or otherwise impede the operation of, or provide unauthorized access to, a computer system or network or other device on which such code is stored or installed.

3.11.5. Since January 1, 2016, and to the Targets' Knowledge, the Targets and each of their Subsidiaries (<u>i</u>) have not had a unplanned outage, security or other failure, unauthorized access or use, or other adverse integrity or security event affecting any of the IT Systems or (<u>ii</u>) have not had any Knowledge of any data security, information security, or other technological deficiency with respect to the IT Systems, in each case of <u>clauses (i)</u> and <u>(ii)</u>, which caused or causes or presented or presents a risk of disruption to the IT Systems or of unauthorized access to or disclosure of Personal Data. Since January 1, 2016, neither the Targets nor any of their Subsidiaries have experienced any breach or other unauthorized access or disclosure of Personal Data.

3.11.6. [Reserved].

3.11.7. The Targets and each of their Subsidiaries have adopted, and are and have been in material compliance with, commercially reasonable policies, programs and

procedures with respect to privacy, data protection, processing, security, payment processing and the collection, use, storage and processing of Personal Data gathered or accessed in the course of the operation of the Targets' and their Subsidiaries' businesses. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not violate any Information Privacy and Security Law or Privacy Policy, and, to the Targets' Knowledge, upon the Closing, the Targets and each of their Subsidiaries will own and continue to have the right to use all such Personal Data on identical terms and conditions as the Targets and each of their Subsidiaries enjoyed immediately prior to the Closing in all material respects. The Targets have not received notice of any pending claims or, to the Targets' Knowledge, threatened claims, against the Targets or its Subsidiaries relating to the collection, use, storage or processing of Personal Data.

3.12.    Environmental Matters.  Except as disclosed in Schedule 3.12 or as has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, (i) the Targets and their Subsidiaries are and, since January 1, 2016, have been, in compliance with all applicable Environmental Laws and Environmental Permits, (ii) since January 1, 2016 (or any time with respect to unresolved matters), no notice of violation or other notice has been received by the Targets or any of their Subsidiaries alleging any violation of, or liability arising out of, any Environmental Law or Environmental Permit, the substance of which has not been resolved, (iii) no Proceeding is pending or, to the Targets' Knowledge, threatened against the Targets or any of their Subsidiaries under any Environmental Law and (iv) except in compliance with applicable Law, none of the Targets nor any of their Subsidiaries has released, disposed or arranged for disposal of, or exposed any Person to, any Hazardous Substances, or owned, leased or operated any real property contaminated by any Hazardous Substances.  The Targets have made available to Buyer all material environmental audits, assessments, investigations, studies or other evaluations relating to the business, assets or properties of the Targets and their Subsidiaries that are in the possession or reasonable control of the Targets or any of their Subsidiaries.

3.13.    Material Contracts.

3.13.1.    Schedule 3.13.1 sets forth, as of the date of this Agreement, a true, correct and complete list of each of the following types of Contracts to which the Targets, any Target Sharing Company (to the extent applicable) or any of their respective Subsidiaries is a party, or by which any of their respective properties or assets is bound:

(a)    each Contract that (A) limits or restricts any Target, any Target Sharing Company or any of their Subsidiaries or Affiliates from competing in any line of business or with any Person in any geographic region, (B) contains exclusivity obligations or restrictions binding on any Target, any Target Sharing Company or any of their respective Subsidiaries, (C) requires any Target, any Target Sharing Company or any of their respective Subsidiaries to conduct any business on a "most favored nations" basis with any third party or (D) provides for rights of first refusal, negotiation or offer or any similar requirement or right in favor of any third party and, in the case of each of clauses (A) through (D), that is material to the Targets and their Subsidiaries, taken as a whole;

(b)    each Contract that is a joint venture, partnership, limited liability company or similar agreement, or relates to the ownership of any equity interest in any entity or business enterprise other than the Subsidiaries of the Targets, which is material to the Targets and their Subsidiaries, taken as a whole;

(c)    each Contract that is a loan, guarantee of Indebtedness or credit agreement, note, bond, mortgage, indenture or other binding commitment (other than letters of credit and those between any Target and its wholly owned Subsidiaries) relating to Indebtedness for borrowed money in an amount in excess of $500,000 individually;

(d)    each Contract with respect to a hedge, collar, option, forward purchasing, interest, rate, currency or other swap or derivative transaction (other than those between any Target and its Subsidiaries) with a fair value in excess of $100,000;

(e)    each Contract that is an acquisition agreement or a divestiture agreement or agreement for the sale, lease or license of any business or properties (including real property) or assets of or by any Target (by merger, purchase or sale of assets or stock, or otherwise) entered into since January 1, 2016 pursuant to which (A) any Target or any of their Subsidiaries has any outstanding obligation to pay after the date of this Agreement consideration in excess of $50,000 or (B) any Target or their Subsidiaries has any ongoing indemnification obligations, or (C) any other Person has the right to acquire any assets of any Target or any of their Subsidiaries after the date of this Agreement, excluding, in each case, (x) any Contract relating to Program Rights and (y) acquisitions or dispositions of supplies, inventory or products in connection with the conduct of the Targets' and their Subsidiaries' business or of supplies, inventory, products, equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of business of the Targets or their Subsidiaries;

(f)    each Contract pursuant to which any Target or any of their Subsidiaries has continuing indemnification, guarantee, "earn-out" or similar contingent obligations that could result in payments in excess of $50,000 in the aggregate;

(g)    any Contract relating to Program Rights under which it would reasonably be expected that the Targets and/or their Subsidiaries would make annual payments equal to or in excess of $100,000 per year;

(h)    any network affiliation Contract (or similar Contract);

(i)    any Carriage Agreement with MVPDs that reported more than 25,000 paid subscribers to the Targets, any Target Sharing Company or any of their respective Subsidiaries for September 2018 with respect to at least one (1) Target Station;

(j)    any Contract that is a Sharing Agreement and any related option agreement (other than those among the Targets and their Subsidiaries);

(k)    any Contract that is a channel sharing agreement with a third party or parties with respect to the sharing of spectrum for the operation of two (2) or more separately owned television stations;

38

(l)　any material Contract with a Governmental Authority, including any settlement, conciliation, consent decree or similar Contract to which any Target or any of their Subsidiaries has continuing obligations involving the payment in excess of $50,000;

(m)　any collective bargaining agreement or other Contract with any labor organization;

(n)　any Contract not terminable at will by the Targets or their Subsidiaries for the employment of any executive officer or individual employee at the vice president level or above on a full-time, part-time or consulting basis with base compensation in excess of $200,000, or other employment-related Contracts pursuant to which payments by any Target or any of their Subsidiaries will be required by reason of consummation of the Contemplated Transactions;

(o)　any indemnification or other similar Contract pursuant to which any Target is obligated to indemnify or advance expenses on behalf of any current or former director, manager or officer of any Target or any of their Subsidiaries in connection with any loss based on the fact that such Person is or was an director, manager or officer of any Target or any of their Subsidiaries;

(p)　any commission, sales or agency Contract with any current employee, individual consultant, contractor or sales person that would require payments to any Person under such contract of an amount in excess of $150,000 over any one-year period;

(q)　any Contract (other than those for Program Rights) pursuant to which any Target or any of their Subsidiaries has sold or traded commercial air time in consideration for property or services with a value in excess of $50,000 in lieu of or in addition to cash;

(r)　all Contracts pursuant to which the Targets or any of their Subsidiaries grants or receives rights in or to Intellectual Property that is material to the Targets and any of their Subsidiaries, taken as a whole, other than (A) an intercompany license between the Targets and any of their Subsidiaries, (B) a license of Software that is generally commercially available on standard terms or (C) a non-exclusive license to a customer granted in the ordinary course of business;

(s)　any Contract that contains any "standstill" provisions or provisions of similar effect to which any Target or any of their Subsidiaries is a party or of which any Target or any of their Subsidiaries is a beneficiary;

(t)　any Target Affiliate Contract; and

(u)　any Contract not otherwise disclosed in Schedule 3.13.1 (other than those for Program Rights) under which it was reasonably expected that the Targets and their Subsidiaries would make annual payments of $100,000 or more during a

calendar year, except for those Contracts that can be cancelled by the Targets without cause on less than ninety (90) days' notice without incurring any termination fee.

Each Contract of the type described in clauses (a) through (u), whether or not so listed on Schedule 3.13.1, is referred to herein as a "Target Material Contract".

       3.13.2.   Except for any Target Material Contract that has terminated or expired in accordance with its terms and except as has not been, and would not reasonably be expected to be, individually or in the aggregate, material to the Targets and the Subsidiaries, taken as a whole, each Target Material Contract is valid and binding and in full force and effect and, to the Targets' Knowledge, enforceable against the other party or parties thereto in accordance with its terms, subject to the Enforceability Exceptions. Except for breaches, violations or defaults which have not had, and would not reasonably be expected to be, individually or in the aggregate, material to the Targets and the Subsidiaries, taken as a whole, neither the Targets nor any of their Subsidiaries, nor to the Targets' Knowledge any other party to a Target Material Contract, is in violation of or in default under any provision of such Target Material Contract. There are no disputes pending or, to the Targets' Knowledge, threatened with respect to any Target Material Contract, and neither the Targets nor any of their Subsidiaries has received any written notice of the intention of any other party to a Target Material Contract to terminate for default, convenience or otherwise any Target Material Contract, in each case except as would not reasonably be expected to be, individually or in the aggregate, material to the Targets and the Subsidiaries, taken as a whole. True, correct and complete copies of the Target Material Contracts and any material amendments thereto have been made available to Buyer.

       3.14.   Transactions with Affiliates. Except for Company Plans, Schedule 3.14 sets forth a true, correct and complete list of the Contracts (each such Contract, whether or not included on Schedule 3.14, a "Target Affiliate Contract") that are in existence as of the date of this Agreement between any Target or any of the Subsidiaries of the Targets and any (i) present executive officer or director of any Target or any of the Subsidiaries of the Targets or any person that has served as such an executive officer or director within the last five (5) years or, to the Targets' Knowledge, any of such officer's or director's immediate family members; (ii) record or beneficial owner of more than 5% of the outstanding Target Securities as of the date of this Agreement; or (iii) to the Targets' Knowledge, any affiliate of any such officer, director or owner (other than any Target or any of the Subsidiaries of the Targets).

       3.15.   Litigation. Except as has not been and would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, there is no (a) Proceeding pending (or, to the Targets' Knowledge, threatened) by any Governmental Authority with respect to the Targets or any of their Subsidiaries, (b) Proceeding pending (or, to the Targets' Knowledge, threatened) against the Targets or any of their Subsidiaries before any Governmental Authority or (c) Order against the Targets or any of their Subsidiaries. There are no Proceedings pending (or, to the Targets' Knowledge, threatened) against the Targets or any of their Subsidiaries that seek to materially interfere with or delay the consummation of the Contemplated Transactions. As of the date of this Agreement, there are no settlements of any Proceedings to which the Targets or any of their Subsidiaries is a party that are material to the Targets or their Subsidiaries, taken as a whole, and under which the Targets or any of their Subsidiaries have material continuing obligations.

3.16.  Insurance.  Schedule 3.16 sets forth a true, correct and complete list of the Insurance Policies (including historic, occurrence-based policies) as of the date hereof.  The Targets have made available to Buyer true, correct and complete copies of such Insurance Policies prior to the date hereof.  Except as has not been, or would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole, (a) each of the insurance policies and arrangements relating to the business, assets and operations of the Targets and their Subsidiaries are in full force and effect, and provide insurance in such amounts and against such risks as the management of the Targets and their Subsidiaries reasonably have determined to be prudent or as is required by Law or regulation (collectively, the "Insurance Policies"), (b) none of the Targets or any of their Subsidiaries have received any written notice regarding any cancellation or invalidation of any such insurance policy, (c) none of the Targets or any their Subsidiaries is in material breach of or material default under any of the Insurance Policies and (d) none of the Targets or any of their Subsidiaries has taken any action or failed to take any action which, with notice or the lapse of time or both, would constitute such a material breach or material default or permit termination or modification of any of the Insurance Policies.  All premiums due under the Insurance Policies have been paid and the Targets and their Subsidiaries are otherwise in compliance in all material respects with the terms and conditions of all such policies.  There are no material claims under any of the Insurance Policies for which coverage has been denied or disputed by the applicable insurance carrier (other than a customary reservation of rights notice).

3.17.  Labor Matters.

3.17.1.  Except as set forth in Schedule 3.17, (i) none of the Targets or any of their Subsidiaries is a party to or bound by any material collective bargaining agreement or other material Contract with any labor union or labor organization (each, a "Collective Bargaining Agreement"), (ii) since January 1, 2016, no labor union, labor organization, or group of employees of any Target or any of their Subsidiaries has made a demand for recognition or certification, and there are, and since January 1, 2016 have been, no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority with respect to any individuals employed by any Target or any of their Subsidiaries and (iii) except as would not reasonably be expected to be material to the Targets and their Subsidiaries, taken as a whole, there are no ongoing or threatened union organization or decertification activities relating to employees of any Target or any of their Subsidiaries and no such activities have occurred since January 1, 2016.  Since January 1, 2016, there has not occurred or, to the Targets' Knowledge, been threatened any strike or any slowdown, work stoppage, concerted refusal to work overtime or other similar labor activity, union organizing campaign, or labor dispute against or involving any Target or any of their Subsidiaries, except as would not reasonably be expected to be material to the Targets and their Subsidiaries, taken as a whole.  There is, and since January 1, 2016 there has been, no unfair labor practice complaint or grievance or other Proceeding pending or, to the Targets' Knowledge, threatened in writing against any Target or any of their Subsidiaries by or before the National Labor Relations Board or any other Governmental Authority with respect to any present or former Employee or independent contractor of any Target or any of their Subsidiaries that had

41

or would reasonably be expected to be material to the Targets and their Subsidiaries, taken as a whole.

3.17.2.    Except as has not been, or would not reasonably be expected to be material to the Targets and their Subsidiaries, taken as a whole, the Targets and their Subsidiaries have complied in all material respects with all Collective Bargaining Agreements set forth in Schedule 3.17 and all applicable Laws and contractual obligations relating to employment of labor, including all applicable Laws and contractual obligations relating to wages, hours, collective bargaining, labor relations, employment discrimination, harassment, retaliation, whistleblowing, civil rights, safety and health, child labor, workers' compensation, pay equity, classification of employees, immigration, data privacy and protection, reduction-in-force, severance and the collection and payment of withholding and/or social security Taxes.  All current or former employees, officers, directors, consultants or independent contractors of the Targets or any of their Subsidiaries have been properly classified under applicable Law (A) as employees or individual independent contractors and (B) for employees, as an "exempt" employee or a "non-exempt" employee (within the meaning of the Fair Labor Standards Act and state Law).

3.17.3.    The Targets have no plans to undertake any action as of the date of this Agreement that would trigger the WARN Act or applicable mini-WARN acts. During the one hundred and eighty-day (180) period preceding the date of this Agreement, there has not been any "mass layoff," "plant closing" or similar event as defined by the WARN Act affecting the Targets or any of their current or former employees.

3.17.4.    Schedule 3.17.4 contains a true, correct and complete list, as of the date of this Agreement, identifying each employment, consulting or independent contractor Contract with any Target or any of their Subsidiaries that cannot be cancelled at-will with no liability beyond requiring up to two (2) weeks' notice or pay in lieu. As of the date of this Agreement, no officer or senior management employee of any Target or any of their Subsidiaries has given written notice to the Targets or any of their Subsidiaries that such employee intends to terminate his or her employment.

3.17.5.    As of the date of this Agreement, all compensation, including wages, commissions, bonuses, fees, or other compensation payable to all employees, independent contractors, or consultants of the Targets or their Subsidiaries for services performed on or before the date of this Agreement have been paid in full or reserved for appropriately and there are no outstanding agreements, understandings, or commitments of the Targets regarding any compensation, wages, commissions, bonuses, or fees.

3.17.6.    The consent of any union is not required to consummate the transactions contemplated by this Agreement.

3.18.    MVPD Matters Relating to Target Stations.  Schedule 3.18 contains, as of the date hereof, a list of all Target Station retransmission consent agreements with MVPDs that reported more than 25,000 paid subscribers to the Targets, any Target Sharing Company or any of their respective Subsidiaries for September 2018 with respect to at least one Target Station.  To the Targets' Knowledge, the Targets, the Target Sharing Companies or their applicable respective

Subsidiaries have entered into Carriage Agreements with respect to each MVPD with more than 25,000 paid U.S. pay television subscribers in any of the Target Stations' Markets, calculated individually or an aggregate basis.  Except as set forth in Schedule 3.18, since January 1, 2016, (a) no such MVPD has provided written notice to the Targets, any Target Sharing Company, any Subsidiary of any Targets or any Subsidiary of a Target Sharing Company of any material signal quality issue or has failed to respond to a request for carriage or, to the Targets' Knowledge, sought any form of relief from carriage of a Target Station from the FCC, (b) neither the Targets, any Target Sharing Company nor any of their respective Subsidiaries has received any written notice from any such MVPD of such MVPD's intention to delete a Target Station from carriage on any system, facility or distribution service  or to change the channel position, tier or packaging placement of a Target Station (or any programming feed thereof) and (c) neither the Targets, any Target Sharing Company nor any of their respective Subsidiaries has received written notice of a petition seeking FCC modification of any Market in which a Target Station is located.

      3.19.   <u>MVPD Matters Relating to Target Programming Service</u>.  Schedule 3.19 contains, as of the date hereof, a list of all Carriage Agreements relating to a Target Programming Service with MVPDs that reported more than 25,000 paid subscribers to any Target Programming Service for September 2018.  To the Targets' Knowledge, the Targets and/or their applicable Subsidiaries have entered into Carriage Agreements with respect to each MVPD with more than 25,000 paid U.S. pay television subscribers in the U.S.  Except as set forth in Schedule 3.18, since January 1, 2016, (a) neither the Targets nor any of their Subsidiaries has received any written notice of the intention of any Person with more than 25,000 subscribers, in the aggregate (i) to delete a Target Programming Service from carriage on any system, facility or distribution service or change the Target Programming Service's channel position or tier placement or to otherwise modify packaging such that the Target Programming Service is received by a lesser number of subscribers to the applicable system, facility or service of such MVPD, (ii) cancel or otherwise terminate a Carriage Agreement and (b) no Person has asserted or threatened to assert, with respect to any party to any Carriage Agreement relating to a Target Programming Service, that (i) it has the right to a repayment of or other crediting of amounts paid to the Targets or any of their Subsidiaries pursuant to any Carriage Agreement or an offset or reduction in fees or other payments that will become due to the Targets or any of their Subsidiaries  pursuant to such Carriage Agreement or (ii) that the Targets or any of its subsidiaries have breached or defaulted any obligation(s) pursuant to any Carriage Agreement.

      3.20.   <u>Most Favored Nations</u>.  Schedule 3.20 sets forth a list, as of the date of this Agreement, of all Carriage Agreements that contain MFN provisions, which section sets forth any MFN Benefits which may have been offered to an MVPD or claimed or otherwise asserted by any MVPD.  The Targets and their Subsidiaries are and have been in material compliance with all of the Targets' obligations pursuant to MFNs in the Carriage Agreements and have no liabilities pursuant to such MFNs.  Schedule 3.20 sets forth a list, as of the date of this Agreement, of any audit of the Targets and/or their Subsidiaries relating to MFN compliance conducted by or on behalf of any MVPD (an "<u>MFN Audit</u>") and any reports relating thereto.  No Person has notified the Targets or any of their Subsidiaries of its intention to conduct or commence any MFN Audit.

3.21.   <u>Target Productions</u>.  (a) All Target Productions have been developed, produced and exploited in accordance with (i) all applicable Contracts, (ii) all applicable Laws, (iii) any applicable collective bargaining, union or guild agreement, (iv) the Communications Act, (v) as applicable, the Television Code of the National Association of Broadcasters, and (vi) any applicable standards or codes set forth by the Motion Picture Association or the Motion Picture Association of America, (b) all necessary clearances, consents and/or licenses have been obtained for the Target Productions and all elements therein, (c) none of the Target Productions, or any exploitation thereof, infringes upon or violates the right of privacy or publicity of, or constitutes a defamation against, any Person, and (d) the physical and/or digital materials relating to Target Productions have been properly stored, in each case in accordance with standards customarily applied in the industry.

3.22.   <u>Brokers</u>.  There are no brokerage commissions, finders' fees or similar compensation payable in connection with the Contemplated Transactions, or other liabilities or obligations, based on any arrangement or agreement made by or on behalf of any Seller, Target or any of their Subsidiaries other than fees (if any) that will be paid by the Sellers or their respective Affiliates (other than any Target or any of their Subsidiaries), or liabilities or obligations that will be assumed by the Sellers or their respective Affiliates (other than any Target or any of their Subsidiaries), and for which, in each case, the Buyer and its Affiliates (including, after the Closing, any Target or any of their Subsidiaries) will have no responsibility to pay and no liabilities or obligations in connection therewith.

3.23.   <u>No Additional Representations; Limitation on Warranties</u>.  Except for the representations and warranties expressly made by the Targets in this Agreement, none of the Targets or any other Person makes any express or implied representation or warranty whatsoever or with respect to any information provided or made available in connection with the Contemplated Transactions, including any information, documentation, forecasts, budgets, projections or estimates provided by the Targets or any Representative of the Targets, including in any "data rooms" or management presentations or the accuracy or completeness of any of the foregoing.  The Targets have conducted their own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and technology of Buyer and acknowledge that the Targets have been provided access to personnel, properties, premises and records of Buyer for such purposes.  In entering into this Agreement, except as expressly provided herein, the Targets have relied solely upon their independent investigation and analysis of Buyer and the Targets acknowledge and agree that they have not been induced by and have not relied upon any representations, warranties or statements, whether express or implied, made by Buyer or any of its directors, officers, stockholders, employees, affiliates, agents, advisors or representatives that are not expressly set forth in this Agreement, whether or not such representations, warranties or statements were made in writing or orally.

**4.     REPRESENTATIONS AND WARRANTIES OF THE SELLERS.**

Except as provided in the Disclosure Schedules (subject to <u>Section 11.13</u>), each Seller, jointly and severally, represents and warrants to the Buyer, as of the date hereof and as of the Closing Date, as follows:

4.1.    Existence and Power.  Such Seller (that is not a natural person) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.  Such Seller has the power and authority to execute and deliver this Agreement and the other ancillary documents hereto or any other agreement referenced herein, as applicable, and to perform its obligations hereunder and thereunder, as applicable, and to consummate the Contemplated Transactions.

4.2.    Authorization.  Such Seller has all requisite power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the Contemplated Transactions.  The execution and delivery of this Agreement by each Seller, the performance of its obligations hereunder and the consummation of the Contemplated Transactions have been duly authorized by all necessary action on the part of each Seller.  No other proceeding on the part of any Seller is necessary to authorize the execution and delivery of this Agreement, the performance by the Sellers of their obligations hereunder and the consummation by the Sellers of the Contemplated Transactions.  This Agreement, assuming due authorization, execution and delivery by Buyer, constitutes a valid and binding obligation of each Seller enforceable against each Seller in accordance with its terms, except as such enforceability may be limited by Enforceability Exceptions.

4.3.    Title to Interests.  Such Seller is the sole record and beneficial owner of, and has good and valid title to, the Interests that it is transferring hereunder, and collectively, the Sellers have good and valid title to all of the Interests (except for the interests that NBI owns in the other Targets), in each case, free and clear of any Liens, except as are imposed by applicable securities or other Laws.

4.4.    Governmental Authorization; Non-Contravention.

4.4.1.    The execution and delivery of this Agreement by the Sellers and the performance of their obligations hereunder require no action by or in respect of, or filing with, any Governmental Authority, other than (a) compliance with any applicable requirements of the HSR Act, (b) compliance with any applicable requirements of the Securities Act, the Exchange Act and any other applicable state or federal securities laws, (c) the filing of the FCC Applications and obtaining the FCC Consent, together with any reports or informational filings required in connection therewith under the Communications Act and the FCC Rules and (d) any actions or filings the absence of which would not reasonably be expected to have a material be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole or prevent or materially delay, the consummation of the Contemplated Transactions or the Sellers' ability to perform its obligations under this Agreement.

4.4.2.    The execution and delivery of this Agreement by the Sellers and the performance of their obligations hereunder do not and will not, assuming the authorizations, consents and approvals referred to in clauses (a) through (d) of Section 4.4.1 are obtained, (a) conflict with or breach any provision of the Organizational Documents of any Seller that is not a natural person, (b) conflict with or breach any provision of any Law or Order, (c) require any consent of or other action by any Person under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of

any benefit under, any provision of any Contract to which any Targets or any of their Subsidiaries is party or which is binding upon any Targets or any of their Subsidiaries, any of their respective properties or assets or any license, franchise, permit, certificate, approval or other similar authorization affecting any Target or any of their Subsidiaries or (<u>d</u>) result in the creation or imposition of any Lien, other than any Permitted Lien, on any property or asset of any Target or any of their Subsidiaries, except, in the case of each of <u>clauses (c)</u> and <u>(d)</u>, as would not reasonably be expected to be, individually or in the aggregate, material to the Targets and their Subsidiaries, taken as a whole or prevent or materially delay, the consummation of the Contemplated Transactions or the Sellers' ability to perform its obligations under this Agreement.

4.5.     <u>Litigation</u>.  Except (i) as would not reasonably be expected to be material to the Targets and their Subsidiaries, taken as a whole, and (ii) as would not reasonably be expected to prevent or delay, the consummation of the Contemplated Transactions or the Sellers' ability to perform its obligations under this Agreement, there is no (<u>a</u>) Proceeding or investigation pending (or, to the Targets' Knowledge, threatened) by any Governmental Authority with respect to any Seller, (<u>b</u>) Proceeding pending (or, to the Targets' Knowledge, threatened) against any Seller before any Governmental Authority or (<u>c</u>) Order against any Seller or any of their respective properties.

4.6.     <u>No Additional Representations; Limitation on Warranties</u>.  Except for the representations and warranties expressly made by the Sellers in this Agreement, none of the Sellers or any other Person makes any express or implied representation or warranty whatsoever or with respect to any information provided or made available in connection with the Contemplated Transactions, including any information, documentation, forecasts, budgets, projections or estimates provided by the Sellers or any Representative of the Sellers, including in any "data rooms" or management presentations or the accuracy or completeness of any of the foregoing.  The Sellers have conducted their own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and technology of Buyer and acknowledge that the Sellers have been provided access to personnel, properties, premises and records of Buyer for such purposes.  In entering into this Agreement, except as expressly provided herein, the Sellers have relied solely upon their independent investigation and analysis of Buyer and the Sellers acknowledge and agree that they have not been induced by and have not relied upon any representations, warranties or statements, whether express or implied, made by Buyer or any of its directors, officers, stockholders, employees, affiliates, agents, advisors or representatives that are not expressly set forth in this Agreement, whether or not such representations, warranties or statements were made in writing or orally.

5.     **REPRESENTATIONS AND WARRANTIES OF THE BUYER**

Except as provided in the Disclosure Schedules (subject to <u>Section 11.13</u>), the Buyer represents and warrants to the Sellers and the Targets as follows:

5.1.     <u>Corporate Existence and Power</u>.  Buyer is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.  Buyer has all applicable power and authority to carry on its business as now conducted and is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where such qualification

Doc#: US1:12600497v8

is necessary for the conduct of its business as now conducted, except where any failure to have such power or authority or to be so qualified would not reasonably be expected to prevent or materially delay, the consummation of the Contemplated Transactions or the Buyer's ability to perform its obligations under this Agreement.

5.2.    <u>Authorization</u>.  The Buyer has the applicable power and authority to execute and deliver this Agreement, the Escrow Agreement, any Rollover Agreement and the instruments required to be executed and delivered by it pursuant hereto, to perform its obligations hereunder and to consummate the Contemplated Transactions.  The Buyer has taken all applicable actions required to be taken by or on the part of the Buyer to authorize and permit the execution and delivery by the Buyer of this Agreement, the Escrow Agreement, the Rollover Agreement and the instruments required to be executed and delivered by it pursuant hereto and the performance by the Buyer of its obligations hereunder and the consummation by the Buyer of the Contemplated Transactions.  This Agreement has been (or in the case of the Escrow Agreement and Rollover Agreement, will be) duly executed and delivered by the Buyer, and assuming the due authorization, execution and delivery by each of the other parties hereto or thereto, constitutes (or will constitute) the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms.

5.3.    <u>Governmental Authorization</u>.  The execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder require no action by or in respect of, or filing with, any Governmental Authority, other than (<u>a</u>) compliance with any applicable requirements of the HSR Act, (b) compliance with any applicable requirements of the Securities Act and any other applicable state or federal securities laws, (<u>c</u>) the filing of the FCC Applications and obtaining the FCC Consent, together with any reports or informational filings required in connection therewith under the Communications Act and the FCC Rules and (<u>d</u>) any actions or filings the absence of which would not reasonably be expected to prevent or materially delay, the consummation of the Contemplated Transactions or the Buyer's ability to perform its obligations under this Agreement.

5.4.    <u>Non-Contravention</u>.  The execution and delivery of this Agreement by Buyer and the performance of its obligations hereunder do not and will not, assuming the authorizations, consents and approvals referred to in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 5.3</u> are obtained, (<u>a</u>) conflict with or breach any provision of the Organizational Documents of Buyer, (<u>b</u>) conflict with or breach any provision of any Law or Order, (<u>c</u>) require any consent of or other action by any Person under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit under any provision of any Contract to which Buyer or any of its Subsidiaries is party or which is binding upon Buyer or any of its Subsidiaries, any of their respective properties or assets or any license, franchise, permit, certificate, approval or other similar authorization affecting Buyer and its Subsidiaries or (<u>d</u>) result in the creation or imposition of any Lien, other than any Permitted Lien, on any property or asset of Buyer or any of its Subsidiaries, except, in the case of each of <u>clauses  (c)</u> and <u>(d)</u>, as would not reasonably be expected to prevent or materially delay, the consummation of the Contemplated Transactions or the Buyer's ability to perform its obligations under this Agreement.

5.5.    <u>Litigation</u>.  Except as would not reasonably be expected to prevent or delay, the consummation of the Contemplated Transactions or the Buyer's ability to perform its obligations under this Agreement, there is no (<u>a</u>) Proceeding or investigation pending (or, to Buyer's Knowledge, threatened) by any Governmental Authority with respect to Buyer or any of its Subsidiaries, (<u>b</u>) Proceeding pending (or, to Buyer's Knowledge, threatened) against Buyer or any of its Subsidiaries before any Governmental Authority or (<u>c</u>) Order against Buyer or any of its Subsidiaries or any of their respective properties.

5.6.    <u>Available Funds</u>.  Assuming the conditions to the first to occur of (a) the closing of the transactions contemplated by the Camelot Purchase Agreement or (b) the closing of the transactions contemplated by the Houston Purchase Agreement, have been satisfied, and assuming the funding of the Debt Financing and Buyer's financing in connection with the first to occur of (a) the consummation of the transactions contemplated by the Camelot Purchase Agreement or (b) the consummation of the transactions contemplated by the Houston Purchase Agreement, the Buyer as of the Closing will have immediately available funds in an amount sufficient to pay in cash all amounts payable pursuant to <u>Section 2</u> and all fees and expenses of the Buyer incurred in connection with the Contemplated Transactions.

5.7.    <u>Brokers</u>.  There are no brokerage commissions, finders' fees or similar compensation payable in connection with the Contemplated Transactions based on any arrangement or agreement made by or on behalf of the Buyer or any of its Affiliates other than fees (if any) that will be paid by the Buyer or its Affiliates and for which the Sellers and their Affiliates (excluding, after the Closing, any Target or any of its Subsidiaries) will have no responsibility to pay.

5.8.    <u>Investment Intent</u>.  The Buyer is acquiring the Interests (other than the Rollover Interests and the interests that NBI owns in the other Targets) for investment for its own account and not with a view to, or for sale in connection with, any distribution of any part thereof.  The Buyer acknowledges that the Interests and the sale thereof have not been registered under the Laws of any jurisdiction.

5.9.    <u>Compliance with Law</u>.  Except for matters that have not been, and would not reasonably be expected to be, individually or in the aggregate, material to Buyer, Buyer is in compliance with all Laws and Orders and, to Buyer's Knowledge, as of the date hereof is not under investigation by any Governmental Authority with respect to any violation of any applicable Law or Order.

5.10.    <u>Qualifications</u>.  Buyer is legally, financially and otherwise qualified under the Communications Act and FCC Rules to acquire the FCC Licenses. (a) There are no facts known to Buyer that would disqualify Buyer as the transferee of the FCC Licenses or, except as set forth on <u>Schedule 5.10</u>, prevent or materially delay the consummation of the transactions contemplated hereby, (b) no waiver or exemption, whether temporary or permanent, of the Communications Act or FCC Rules is necessary for the FCC Consent to be obtained due to any fact or circumstance relating to Buyer or any of its Affiliates, to Buyer's Knowledge, or any of their respective officers, directors, shareholders, members or partners, and (c) Buyer has no reason to believe that the FCC Applications will not be granted by the FCC in the ordinary

course due to any fact or circumstance relating to Buyer or any of its Affiliates or any of their respective officers, directors, shareholders, members or partners.

5.11.   No Additional Representations; Limitation on Warranties.  Except for the representations and warranties expressly made by Buyer in this Article 5, neither Buyer nor any other Person makes any express or implied representation or warranty whatsoever.  Buyer has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and technology of the Targets and their Subsidiaries and acknowledges that Buyer has been provided access to personnel, properties, premises and records of the Targets and their Subsidiaries for such purposes.  In entering into this Agreement, except as expressly provided herein, Buyer has relied solely upon its independent investigation and analysis of the Targets and their Subsidiaries and Buyer acknowledges and agrees that it has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by the Targets or any of their Subsidiaries, or any of their respective directors, officers, stockholders, employees, affiliates, agents, advisors or representatives that are not expressly set forth in this Agreement, whether or not such representations, warranties or statements were made in writing or orally.

6.   **CONDITIONS PRECEDENT TO THE OBLIGATIONS OF THE BUYER AND THE SELLERS**.

The obligations of the Buyer and the Sellers to consummate the Contemplated Transactions are subject to the satisfaction, at or prior to the Closing, of the following conditions (which may be waived, in whole or in part, to the extent permitted by applicable Law, by the mutual consent of Buyer and the Sellers):

6.1.   Statutes and Injunctions.  No Law or Order (whether temporary, preliminary or permanent) shall have been promulgated, entered, enforced, enacted or issued or be applicable to the Contemplated Transactions by any Governmental Authority that remains in effect and prohibits, enjoins or makes illegal the consummation of the Contemplated Transactions or the Closing.

6.2.   Regulatory Approval.  (i) Any waiting period (and extension thereof) under the HSR Act relating to the Contemplated Transactions shall have expired or been terminated and (ii) the FCC Consent shall have been granted by the FCC and shall be in effect as issued by the FCC or extended by the FCC.

6.3.   Camelot Purchase Agreement; Houston Purchase Agreement.  Either (a) all of the conditions set forth in Article VI and Article VII of the Camelot Purchase Agreement shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the closing of the transactions contemplated by the Camelot Purchase Agreement (the "Camelot Closing"), each of which is capable of being satisfied at the Camelot Closing) or (b) all of the conditions set forth in the Articles titled "Conditions Precedent to Obligations of Seller" and "Conditions Precedent to Obligations of the Buyer" in the Houston Purchase Agreement shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Effective Time (as defined in the Houston Purchase Agreement) or the closing of the transactions contemplated by the Houston Purchase Agreement (the "Houston Closing"), each of which is capable of being satisfied at the Effective Time or Houston Closing, as applicable).

49

7.        RESERVED].

8.        COVENANTS OF THE PARTIES.

8.1.    Access to Premises and Information.  From the date hereof until the earlier to occur of the valid termination of this Agreement or the Closing Date, upon reasonable notice from time to time, the Targets and their Subsidiaries will permit the Buyer and its Representatives to have reasonable access during normal business hours and under the supervision of Target personnel to the records (including Tax records, but excluding any and all of Sellers' Tax Returns and tax records) and books of account of the Targets and their Subsidiaries (including the Target's and their Subsidiaries' work papers, properties, Contracts, finances, litigation matters, environmental matters, commitments and other material being used or considered, or to be used or considered, in the preparation of the Estimated Closing Statement, and personnel and Representatives of the Targets and their Subsidiaries who are assisting or being consulted in connection therewith) (the "Records"), and to the personnel and Representatives and premises of the Targets and their Subsidiaries, and all other information concerning the Targets, their Subsidiaries and each of their respective businesses, properties and personnel as such Person may reasonably request; provided, however, that such access to such information and furnishing of such information will be conducted solely at the Buyer's expense and the Buyer and its Representatives shall not unreasonably disrupt the personnel or unreasonably interfere with the operations of the Targets or their Subsidiaries.  Notwithstanding anything to the contrary contained in this Section 8.1, the Targets and their Subsidiaries may withhold any document (or portions thereof) or information (a) that may constitute privileged attorney-client communications or attorney work product, or (b) if the provision of access to such document (or portion thereof) or information, as determined by the Targets in good faith after consultation with outside counsel, would reasonably be expected to conflict with applicable Laws.  All information exchanged pursuant to this Section 8.1 shall be subject to that certain confidentiality agreement by and between Northwest Broadcasting, Inc. and Apollo Management VIII, L.P., dated July 26, 2017 (the "Confidentiality Agreement") and Buyer acknowledges and agrees that it will abide by the terms of such Confidentiality Agreement.

8.2.    Conduct of Business Prior to Closing.  From the date of this Agreement until the earlier to occur of the Closing and the termination of this Agreement in accordance with Article 10, except as otherwise expressly permitted or expressly contemplated by this Agreement, as set forth in Schedule 8.2, as consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed) or as required by applicable Law, the Targets shall, and shall cause each of their Subsidiaries to, (i) conduct its business in all material respects in the ordinary course of business consistent with past practice and shall use its commercially reasonable efforts to cause each of the Target Sharing Companies and their respective Subsidiaries to conduct its business in the ordinary course of business consistent with past practice, (ii) use commercially reasonable efforts to (A) maintain the Target Station Licenses and the rights of it, the Target Sharing Companies and their respective Subsidiaries thereunder, (B) maintain and preserve intact its assets, properties, Contracts, and business organization, (C) keep available the services of its current officers and key employees and (D) preserve the current relationships with customers, suppliers, distributors, lessors, licensors, licensees, creditors, contractors, Governmental Authorities and other Persons with whom the Targets or any of their Subsidiaries has a business

50

relation.  Without limiting the generality of the foregoing, from the date of this Agreement until the earlier to occur of the Closing and the termination of this Agreement in accordance with Article 10, except as otherwise expressly permitted or expressly contemplated by this Agreement, as set forth in Schedule 8.2, as consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed) or as required by applicable Law, the Sellers and the Targets shall not, nor shall they permit any of their Subsidiaries to (whether by merger, consolidation, operation of law or otherwise):

8.2.1.　　amend, adopt any amendment to or otherwise change its Organizational Documents;

8.2.2.　　(i) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock or other equity securities, other than (x) dividends and other distributions by a direct or indirect Subsidiary of any Target to such Target or any direct or indirect wholly owned Subsidiary of any Target or (y) cash dividends or cash distributions paid prior to the Balance Sheet Time to the extent such dividends or distributions reduce the calculation of Estimated Cash on Hand, (ii) adjust, split, reverse split, recapitalize, subdivide, consolidate, combine or reclassify any shares of its capital stock or other Target Securities or issue or authorize the issuance of any other securities in respect of, or in substitution for, outstanding shares of capital stock of the Targets (including any warrants, options or other rights to acquire the foregoing) or (iii) purchase, redeem or otherwise acquire any ownership interests of any Target, except, in the case of this clause (iii), for such purchases, redemptions and other acquisitions solely between a Target and a wholly owned Subsidiary thereof, or between a wholly owned Subsidiary of a Target and another wholly owned Subsidiary of a Target;

8.2.3.　　(i) issue, deliver, pledge, sell or otherwise encumber to any Lien (other than a Permitted Lien) or authorize the issuance, delivery, pledge, sale of, or encumbrance to any Lien (other than a Permitted Lien) on, any interests of any Target Securities or Target Subsidiary Securities, other than issuances of securities of the Targets' Subsidiaries to a Target or to wholly owned Subsidiaries of a Target or (ii) amend any term of any Target Securities (in each case, whether by merger, consolidation or otherwise); provided, in each case, that the Targets shall not make any grants, awards or issuances to the extent that such grants, awards or issuances would cause the Targets or any of their Subsidiaries to be in violation of the Communications Act or the FCC Rules;

8.2.4.　　make, authorize or commit to any capital expenditures in excess of $4,000,000 in the aggregate during any calendar year;

8.2.5.　　make any acquisition (whether by merger, consolidation or acquisition of equity interests or assets) of any interest in any Person or any division or assets thereof, other than (i) purchases of assets (other than real property) in the ordinary course of business, not to exceed $250,000 individually and $1,000,000 in the aggregate (for the avoidance of doubt, "ordinary course of business" shall include acquisitions of programing and broadcast rights but shall not include acquisitions of broadcast television stations);

8.2.6.   sell, assign, license, lease, transfer, abandon or otherwise dispose of, or create any Lien (other than any Permitted Lien) on, or otherwise dispose of, any assets (other than real property) that are material to the Targets and their Subsidiaries, taken as a whole, other than (i) such sales, assignments, licenses, leases, transfers, Liens or other dispositions that are in the ordinary course of business, not to exceed $100,000 individually and $250,000 in the aggregate, or (ii) as listed on Schedule 8.2.6;

8.2.7.   except as set forth on Schedule 8.2.7,sell or enter into an agreement to sell any Owned Real Property, or purchase or enter into an agreement to purchase any interest in real property;

8.2.8.   amend, waive any material term, terminate, release or assign any material rights or grant any material consent of any Real Property Lease or Third Party Lease under which it was reasonably expected that the Targets and their Subsidiaries would make annual payments of $100,000 or more during a calendar year, renew or terminate any Real Property Lease or Third Party Lease or enter into any lease of real property as tenant under which it was reasonably expected that the Targets and their Subsidiaries would make annual payments of $100,000 or more during a calendar year;

8.2.9.   (i) incur, assume, endorse, guarantee or otherwise become liable for (whether directly, on a contingent basis or otherwise), refinance, syndicate or modify the terms of any Indebtedness, other than Indebtedness among the Targets and/or their wholly owned Subsidiaries or among wholly owned Subsidiaries of the Targets, and borrowings in the ordinary course or (ii) prepay any Indebtedness following the Balance Sheet time;

8.2.10.   make any loans, advances or capital contributions to, or investments in, any Person in excess of $1,000,000 in the aggregate, other than the Targets or their wholly owned Subsidiaries and ordinary course advancements and reimbursements to Employees for travel and other reimbursable expenses incurred in the ordinary course of business consistent with past practice and as would not have a material cost to the Targets or their Subsidiaries;

8.2.11.   other than in the ordinary course of business consistent with past practices (including renewals consistent with the terms thereof), (w) amend or modify in any material respect or terminate (excluding terminations or renewals upon expiration of the term thereof in accordance with the terms thereof) any Target Material Contract, (x) enter into any Contract that would constitute a Target Material Contract if in effect on the date hereof, (y) waive, release or assign any material rights, claims or benefits, or grant any material consent, under any Target Material Contract, or (z) consent to the termination of the Targets' or any of a Target Sharing Company's (or of their respective applicable Subsidiary's) rights thereunder; provided, that in no event shall the Targets or any of their Subsidiaries take any action covered by this subsection (including in the ordinary course of business consistent with past practices, and including renewals or extensions consistent with the terms thereof) with respect to any Target Material Contract (A) that is or would be a Carriage Agreement or any other agreement relating to cable or satellite transmission or retransmission with MVPDs, (B) that is or would be a network affiliation agreement, or (C) that is or would be a Sharing Agreement of the Targets or their Subsidiaries; provided, further, that the foregoing proviso shall not prohibit the Targets or their Subsidiaries from entering into or otherwise granting a temporary extension of a Carriage

52

Agreement that (1) expires no later than the Closing Date and (2) does not result in any liability pursuant to any MFN.

8.2.12.    other than as required by applicable Law or the existing terms of any Company Plan or a Collective Bargaining Agreement in effect on the date hereof: (i) grant or increase any severance or termination pay to any employee, officer, director or independent contractor of any Target or any of their Subsidiaries; (ii) enter into or amend any employment, severance or termination agreement with any employee, officer, director or independent contractor of any Target or any of their Subsidiaries; (iii) establish, adopt, terminate or materially amend any (A) Company Plan (including any plan, agreement or arrangement that would be a Company Plan if in effect on the date hereof) or (B) Collective Bargaining Agreement; (iv) take any action to accelerate the vesting or payment, or fund or secure the payment, of compensation (including any equity-based compensation) or benefits under a Company Plan; (v) loan or advance any money or any other property to any current or former director, officer, employee or independent contractor of any Target or any of their Subsidiaries; (vi) grant or increase any change-in-control or retention bonus to any director, officer, independent contractor or employee in the aggregate in an amount greater than $12,000,000 to the extent such bonuses are included in the calculation of Transaction Bonus Payments; or (vii) grant any other increase in compensation, bonus or other payments or benefits payable to any independent contractor, employee, officer or director of any Target or any of their Subsidiaries, except for increases in base salaries (and corresponding increases in target bonuses) in the ordinary course of business consistent with past practices; (viii) fund any rabbi trust or similar arrangement or otherwise secure funding for any Company Plan, (ix) accelerate the time of funding, vesting or payment of any award under any Company Plan; (x) terminate, other than for cause (as reasonably determined by the Targets in good faith), the employment or services of, or hire or engage the services of, any executive officer or employee of any Target or any of their Subsidiaries, in each case, other than in the ordinary course of business, consistent with past practices; (xi) effectuate any plant closing or mass layoff that would trigger for the Targets or any of their Subsidiaries any liability or obligation under the Worker Adjustment and Retraining Notification Act and the regulations promulgated thereunder or any similar state, local or foreign Law ("WARN Act"); (xii) materially change any actuarial or other assumptions used to calculate funding obligations with respect to any Company Plan or to change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP;

8.2.13.    change any Targets' or its Subsidiaries' methods, principles or practices of financial accounting or annual accounting period, except as required by GAAP or by any Governmental Authority or applicable Law;

8.2.14.    take any of the following actions if it would have the effect of increasing the Tax liability of any Target or any of its Subsidiaries for any period ending after the Closing Date or decreasing any Tax attribute of any Target or any of its Subsidiaries existing on the Closing Date: (i) materially change any method of Tax accounting, (ii) make or change any material election with respect to Taxes, (iii) amend any federal income Tax Return in a manner that would materially increase the Taxes of the Targets and their Subsidiaries, (iv) settle, or offer, propose or agree to settle, any claim or deficiency in respect of Taxes in excess of $500,000, (v) enter into any closing agreement within the meaning of Section 7121 of the Code

(or any similar provision of state, local, or non-U.S. Law) with respect to a material amount of Taxes, (vi) surrender any right to a material refund of Taxes, or (vii) consent to any extension or waiver of the limitation period applicable to any audit, assessment or claim for a material amount of income Taxes except in the ordinary course of business consistent with past practice;

       8.2.15.   adopt or propose a plan of complete or partial liquidation, dissolution, merger, consolidation, recapitalization or other reorganization, or resolutions providing for or authorizing such a liquidation, dissolution, merger, consolidation, recapitalization or other reorganization, in each case, of any Target or any of their Subsidiaries;

       8.2.16.   (A) waive, release, assign, compromise, settle, offer to settle, or propose to waive, release, assign, compromise, settle or offer to settle, any liabilities or obligations arising out of or relating to any Proceeding involving or against any Target or any of their Subsidiaries in excess of $250,000 per Proceeding, in each case, that would not involve injunctive, equitable or non-monetary relief or impose any material restrictions on the operation of the business of the Targets and their Subsidiaries, and without any admission of fault or wrongdoing or other liability, or (B) initiate any Proceedings that would reasonably be expected to involve amounts in dispute in excess of $250,000 or the imposition of any non-monetary relief;

       8.2.17.   modify or accede to the modification of any of the Target Station Licenses if doing so is reasonably likely to be materially adverse to the interests of Buyer and its Subsidiaries after giving effect to the Contemplated Transactions in the operation of television broadcast stations or fail to provide Buyer with a copy of (and a reasonable opportunity to review and comment on) any application for the modification of any of the Target Station Licenses reasonably in advance of filing with the FCC, except, in each case, as required by Law or as required in connection with the broadcast incentive auction, reassignment and repack conducted by the FCC pursuant to Section 4603 of the Middle Class Tax Relief and Job Creation Act (Pub. L. No. 112- 96, §6403, 126 Stat. 156, 225-230 (2012)) (the "Incentive Auction & Repack"); provided, however, that the Targets shall provide Buyer with reasonable advance notice of any such modification of any Target Station Licenses required by Law or in connection with the Incentive Auction & Repack;

       8.2.18.   apply to the FCC for any construction permit that would restrict in any material respect the Target Stations' operations or make any material change in the assets of the Target Stations that is not in the ordinary course of business, except as may be necessary or advisable to maintain or continue effective transmission of the Target Stations' signals within their respective service areas as of the date hereof, except, in each case as required by Law or as required in connection with the Incentive Auction & Repack;

       8.2.19.   fail to timely make any retransmission consent election with any MVPDs that reported more than 50,000 paid subscribers (calculated on an aggregate basis with respect to all Target Stations' Markets) to the Targets or any of their Subsidiaries for September 2018 located in or serving the Target Stations' Markets;

       8.2.20.   omit to take any commercially reasonable action necessary to maintain or renew, as applicable, any material Registered Intellectual Property;

8.2.21.    change the fiscal year of any Target or any of their Subsidiaries;

8.2.22.    enter into any new line of business outside its existing business as of the date hereof;

8.2.23.    terminate, modify in any material respect, fail to maintain or fail to exercise renewal rights with respect to any material Insurance Policy, except to the extent any such Insurance Policy is replaced with substantially similar coverage; or

8.2.24.    agree, resolve or commit to do any of the foregoing.

8.3.    <u>Confidentiality</u>.

8.3.1.    <u>Confidentiality Agreement</u>.  The Confidentiality Agreement shall remain in effect until the Closing, at which point it shall terminate automatically without any further action by any party thereto.  Notwithstanding the termination of the Confidentiality Agreement at the Closing, from and after the Closing, the Buyer shall, and shall cause its Affiliates and its and their respective Representatives to, keep confidential and not use or disclose documents and information concerning the Sellers or their respective Affiliates (other than the Targets and their Subsidiaries) furnished to the Buyer or its Affiliates or its or their respective Representatives in connection with the Contemplated Transactions; <u>provided</u>, that the Buyer and its Affiliates, and its and their respective Representatives, shall be permitted to disclose confidential information (i) in connection with the Contemplated Transactions or any dispute or Proceeding in connection therewith, (ii) to comply with Laws or accounting requirements and (iii) to the extent required for Tax reporting purposes.  Notwithstanding the foregoing restrictions, in the event that the Buyer or its Affiliates, or its or their respective Representatives, are requested or required by Law, Governmental Authority or Order to disclose any confidential information, such Person shall, to the extent legally permissible, notify the Sellers promptly of the request or requirement so that the Sellers may seek an appropriate protective order.  If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement will continue in full force and effect in accordance with its terms.

8.3.2.    <u>Announcements</u>.  The initial press release with respect to the execution of this Agreement and the Contemplated Transactions shall be a joint press release.  Thereafter, so long as this Agreement is in effect, neither Buyer nor the Sellers, nor any of their respective Affiliates, shall issue or cause the publication of any press release or other public statement relating to the Contemplated Transactions or this Agreement without the prior written consent of the other Party, unless such Party determines, after consultation with outside counsel, that it is required by applicable Law or by any listing agreement with or the listing rules of a national securities exchange or trading market to issue or cause the publication of any press release or other public announcement with respect to the Contemplated Transactions or this Agreement, in which event such Party shall provide, on a basis reasonable under the circumstances, an opportunity to the other Party to review and comment on such press release or other announcement in advance, and shall give reasonable consideration to all reasonable comments suggested thereto.  None of the limitations set forth in this <u>Section 8.3.2</u> shall apply to any disclosure of any information (<u>a</u>) in connection with any dispute between the Parties relating to this Agreement or the Contemplated Transactions or (b) consistent with previous press releases,

public disclosures or public statements made by Buyer or the Sellers in compliance with this Section 8.3.2. Notwithstanding the foregoing, Buyer and its Affiliates, without consulting with the Sellers, may provide ordinary course communications regarding this Agreement and the Contemplated Transactions to existing or prospective general and limited partners, equity holders, members, managers and investors of any Affiliates of such Person, in each case, who are subject to customary confidentiality restrictions.

8.4. Business Records. The Buyer acknowledges that the Sellers may from time to time from and after the Closing require access to the Records, solely for the purpose of permitting the Sellers to address and respond to any matters that arise as a result of or are otherwise related to any Proceeding in connection with the Sellers' prior ownership of the Targets and their Subsidiaries, and agrees that upon reasonable prior notice, it will, and will ensure that the Targets will, for a period of six (6) years following the Closing Date, during normal business hours, provide the Sellers and their Representatives with either access to or copies of the Records (at the Sellers' expense), solely for such purpose so long as such access to such information does not unreasonably disrupt the personnel, or unreasonably interfere with the operations, of the Targets or their Subsidiaries. If the Targets shall desire to dispose of any such Records prior to the sixth (6th) anniversary of the Closing Date, the Targets shall, prior to any such disposition, notify the Sellers and provide to the Sellers (or, if applicable, its designee) and its Representatives a reasonable opportunity, at the Sellers' expense, to make copies of or remove such Records. The Sellers acknowledge that the Buyer may from time to time from and after the Closing require access to any Records related to the Targets and their Subsidiaries that are available to the Sellers and that are not otherwise available to the Buyer, and each Seller agrees that upon reasonable prior notice it will for a period of six (6) years following the Closing Date, during normal business hours, provide the Buyer and its Representatives with either access to or copies of the Records, so long as such access to such information does not unreasonably disrupt or unreasonably interfere with the Sellers. If the Sellers shall desire to dispose of any such Records prior to the sixth (6th) anniversary of the Closing Date, the Sellers shall, prior to any such disposition, notify the Buyer and provide to the Buyer (or, if applicable, its designee) and its Representatives a reasonable opportunity to make copies of or remove such Records.

8.5. Directors and Officers Indemnification and Insurance.

8.5.1. The Buyer and the Targets agree that all rights to indemnification, advancement of expenses and exculpation from liability for or in connection with acts or omissions occurring at any time prior to or on the Closing Date that now exist in favor of any Person who prior to or on the Closing Date is or was a current or former director, manager or officer of any Target, or who, while serving as a director, manager or officer of any Target, served at the request of any Target prior to or on the Closing Date as a director, officer, member, manager, employee, trustee or fiduciary of any Subsidiary of the Targets (each a "D&O Indemnified Person"), if and to the extent the Organizational Documents of the applicable Target or in any agreement between a D&O Indemnified Person and the applicable Target set forth on Schedule 8.5.1 (an "Indemnity Agreement"), will survive the Closing and will continue in full force and effect for the six (6) year period following the Closing Date. In furtherance (and not in limitation) of the foregoing, for the six (6) year period following the Closing Date, each Target will (i) maintain in the Organizational Documents of such Target provisions with respect to

56

indemnification, advancement of expenses and exculpation from liability that in each such respect are at least as favorable to each D&O Indemnified Person as those contained in the Organizational Documents of the applicable Target as in effect on the date hereof and (ii) continue in existence each Indemnity Agreement without termination, revocation, amendment or other modification that would adversely affect the rights thereunder of any D&O Indemnified Person.

8.5.2.    In addition to the other rights of each D&O Indemnified Person provided for in this Section 8.5 and not in limitation thereof, from and after the Closing, for the six (6) year period following the Closing Date, each Targets shall (a) indemnify and hold harmless (and release from any liability to the Buyer or the Targets or any Subsidiary thereof), each D&O Indemnified Person against all losses, claims, damages, liabilities, awards, orders, decrees, rulings, judgments, fines, penalties, settlement agreements, amounts paid in settlement and reasonable expenses (including reasonable attorneys' fees) based upon, arising out of, in respect of or in connection with any threatened, pending or completed claim, subpoena or other legal process, demand, action, arbitration, suit or proceeding, whether criminal, civil, administrative or investigative, based upon, arising out of, in respect of or in connection with any actual or claimed acts or omissions occurring at any time prior to or on the Closing Date (including in respect of any actual or claimed acts or omissions based upon, arising out of, in respect of or in connection with the negotiation or approval of this Agreement and the consummation of the Contemplated Transactions) (each, a "D&O Indemnifiable Claim") and (b) advance to such D&O Indemnified Persons all expenses (including attorneys' fees) actually and reasonably incurred by a D&O Indemnified Person in connection with any D&O Indemnifiable Claim, promptly after receipt of reasonable supporting documentation thereof; provided, however, that such D&O Indemnified Person would be entitled to such advancement under the applicable Organizational Documents or indemnity agreements.  Notwithstanding anything to the contrary set forth herein, any advancement of expenses to a D&O Indemnified Person hereby shall be conditioned upon receipt from such D&O Indemnified Person of an undertaking to repay such amounts if it is ultimately determined in a final and non-appealable judgment of a court of competent jurisdiction that such D&O Indemnified Person is not entitled to be indemnified under applicable Laws.

8.5.3.    On or before the Closing Date, the Buyer will, or will cause each Target or their Subsidiaries to, obtain for each Target at the Buyer's sole expense, and, for a six (6) year period following the Closing Date, the Buyer will cause the Targets to maintain in effect, with no lapse in coverage, one or more "tail" or "runoff" directors' and officers' liability, employment practices liability and fiduciary liability insurance policies covering actual or claimed acts or omissions of any D&O Indemnified Person occurring on or before the Closing Date, in each case on terms with respect to coverage, retentions, amounts and other material terms at least as favorable to such D&O Indemnified Persons as those of such policies in effect on the date hereof.  Notwithstanding the foregoing, in no event shall the Targets or their Subsidiaries expend for such policies an aggregate premium amount in excess of 300% of the aggregate amount of the last annual premiums paid by the Targets for such insurance; provided, that, if the annual premiums of such coverage exceed such amount, the Targets or their Subsidiaries shall obtain a policy with the greatest coverage available for a cost not exceeding such amount for such six-year period with respect to the Targets' existing officers' and directors' or fiduciary liability

insurance with terms, conditions, retentions and levels of coverage no less favorable as provided in the Targets' existing policies for such matters as of the date hereof.

8.5.4.     If any Target (or any of their successors or assigns) (a) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, or (b) transfers all or substantially all of its properties and assets to any other Person (including by dissolution, liquidation, assignment for the benefit of creditors or similar action), then, and in each such case, the Buyer will cause proper provision to be made so that such other Person fully assumes the obligations set forth in this <u>Section 8.5</u>.

8.5.5.     The provisions of this <u>Section 8.5</u> shall survive the Closing.  This <u>Section 8.5</u> shall be for the irrevocable benefit of, and shall be enforceable by, each D&O Indemnified Person and his or her respective heirs, executors, administrators, estates, successors and assigns, and each such Person shall be an express intended third party beneficiary of this Agreement for such purposes.  Notwithstanding anything in this Agreement to the contrary, the obligations under this <u>Section 8.5</u> shall not be terminated, revoked, modified or amended in any way so as to adversely affect any Person referred to in the second sentence of this <u>Section 8.5.5</u> without the written consent of such Person.

8.6.     <u>Tax Matters</u>.

8.6.1.     <u>Transfer Taxes</u>.  Each of the Buyer, on the one hand, and the Sellers, on the other hand, shall be responsible for fifty percent (50%) of all Transfer Taxes in connection with the Contemplated Transactions.

8.6.2.     <u>Pre-Closing Tax Period Tax Returns</u>.

(a)     The Sellers shall prepare or cause to be prepared all Tax Returns for the Targets and their Subsidiaries for any Pre-Closing Tax Period (other than a Straddle Period), including any such Tax Returns that are due after the Closing Date. The Sellers shall provide drafts of all such Tax Returns that are due after the Closing Date to the Buyer for review at least thirty (30) days, in the case of Tax Returns that are filed less frequently than monthly, and three (3) Business Days, in the case of all other Tax Returns, prior to filing and the Sellers shall reasonably consider any changes to such Tax Return reasonably requested by the Buyer.  Any dispute shall be resolved by a mutually agreed upon nationally recognized accounting firm, in a manner consistent with this Agreement and, to the extent permitted by law, prior practice of the Targets and their Subsidiaries, with fees of such accounting firm borne fifty percent (50%) by Seller and fifty percent (50%) by Buyer.

(b)     The Buyer shall prepare or cause to be prepared all Tax Returns for the Targets and their Subsidiaries for any Straddle Period and any other period that is not a Pre-Closing Tax Period.  The Buyer shall provide drafts of all such Tax Returns for any Straddle Period to Sellers for review at least thirty (30) days, in the case of Tax Returns that are filed less frequently than monthly, and three (3) Business Days, in the case of all other Tax Returns, prior to filing and the Buyer shall reasonably consider any changes to such Tax Return reasonably requested by the Seller.  Any dispute shall be resolved by a

mutually agreed upon nationally recognized accounting firm, in a manner consistent with this Agreement and, to the extent permitted by law, prior practice of the Targets and their Subsidiaries, with fees of such accounting firm borne fifty percent (50%) by Seller and fifty percent (50%) by Buyer.

(c)     The parties agree that all losses, deductions, credits and any other Tax benefits available on account of the payment or incurrence of the Transaction Expenses, the Transaction Bonus Payments, the payment of the Target Indebtedness, and the other payments contemplated by this Agreement, but only to the extent such payments reduce the Purchase Price received by the Sellers, shall be reported in Pre-Closing Tax Periods to the maximum extent permitted by Law(and otherwise treated for purposes of this Agreement as attributable to Pre-Closing Tax Periods), and to the extent required to be treated as a loss, deduction, credit or benefit on Tax Returns of an owner of the Targets, shall be reported as a loss, deduction, credit or benefit on the Sellers' Tax Returns (rather than Buyer's Tax Returns) to the maximum extent permitted by Law.

8.6.3.     <u>Amended Returns; Tax Elections</u>.  In each case except as required by Law or a good faith resolution of a Tax Proceeding in accordance with the terms of this Agreement, the Buyer shall not, and shall cause the Targets and their Subsidiaries not to, (a) make any amendment of any Tax Returns of any Target or any of their Subsidiaries for any Pre-Closing Tax Period without such Seller's prior written consent (not to be unreasonably withheld, delayed or conditioned), (b) make any election that has retroactive effect to any Pre-Closing Tax Period without such Seller's prior written consent (not to be unreasonably withheld, delayed or conditioned), or (c) grant an extension of any applicable statute of limitations that relates to a Pre-Closing Tax Period.  Notwithstanding the foregoing, the Buyer in its sole discretion may cause any Target or any Subsidiary of a Target that is treated as a partnership for U.S. federal income tax purposes to make an election under Section 754 or Section 6226 of the Code.

8.6.4.     <u>Straddle Periods</u>.  In the case of any Straddle Period, the amount of any Taxes of the Targets and their Subsidiaries not based upon or measured by income, the level of any item, gain, receipts, proceeds, profits or similar items for the Pre-Closing Tax Period will be deemed to be the amount of such Taxes for the entire Tax period multiplied by a fraction, the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.  The amount of any other Taxes for a Straddle Period that relate to the Pre-Closing Tax Period will be determined based on an interim closing of the books where that method can be utilized and apply other applicable allocation rules to the greatest extent possible such that Pre-Closing Taxes are allocated to the Sellers; <u>provided</u>, <u>however</u>, that any item determined on an annual or periodic basis (such as deductions for depreciation or real estate Taxes) shall be apportioned on a daily basis.  In the case of any Tax based upon or measured by capital (including net worth or long-term debt) or intangibles, any amount thereof required to be allocated under this <u>Section 8.6.4</u> shall be computed by reference to the level of such items on the Closing Date.  The parties hereto will, to the extent permitted by applicable Law, elect with the relevant Governmental Authority to treat a portion of any Straddle Period as a short taxable period ending as of the close of business on the Closing Date.

Within thirty (30) days after the filing of any Tax Return for a Straddle Period or as soon thereafter as reasonably practicable, the Buyer shall prepare and deliver to the Sellers a statement setting forth the allocation of Taxes for the Straddle Period pursuant to this section 8.6.4 (the "Straddle Period Allocation"). The Sellers shall cooperate with the Buyer, as reasonably requested by the Buyer, in connection with the Buyer's preparation of the Straddle Period Allocation. The Sellers shall have a period of thirty (30) days following the Buyer's delivery of the Straddle Period Allocation to present in writing to the Buyer notice of any objections that the Sellers may have to the determinations set forth therein (a "Straddle Period Objections Notice"). If the Sellers shall raise any objections within such thirty (30) day period, the Buyer and the Sellers shall negotiate in good faith and use their reasonable best efforts to resolve such dispute. If the parties fail to agree within fifteen (15) days after the delivery of the Straddle Period Objections Notice, any dispute shall be resolved by a mutually agreed upon nationally recognized accounting firm, whose determination shall be final and binding on the parties, with fees of such accounting firm borne fifty percent (50%) by the Sellers and fifty percent (50%) by the Buyer. The Straddle Period Allocation as finally determined hereunder shall be binding and the Sellers and the Buyer shall (and shall cause their Affiliates to) file all Tax Returns in a manner consistent with such Straddle Period Allocation.

8.6.5.    Tax Proceedings. In the event of any audit, assessment, examination, claim or other controversy or proceeding relating to Taxes or Tax Returns of any Target or any of their Subsidiaries (a "Tax Proceeding") with respect to any Pre-Closing Tax Period, the Buyer shall inform the Sellers of such Tax Proceeding within thirty (30) Business Days after the receipt by the Buyer of notice thereof; provided that a failure to inform the Sellers shall not affect the Buyer's right to indemnification under this Agreement. The Buyer shall afford the Sellers the opportunity to control the conduct of any such Tax Proceeding that relates solely to (a) a Pre-Closing Tax Period or (b) Taxes for which the Buyer is indemnified under this Agreement or for which the Sellers are otherwise liable, with counsel or a tax adviser of their own choosing; provided, that the Sellers may not settle or otherwise resolve any such Tax Proceeding without the Buyer's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed). The Buyer shall have the right to reasonably be informed of material developments in any such Tax Proceeding. In the event that the Sellers do not assume control of such a Tax Proceeding, the Buyer may control the Tax Proceeding. In the event of any Tax Proceeding that relates to a Straddle Period (a "Straddle Period Tax Proceeding"), the Buyer shall inform the Sellers of such Straddle Period Tax Proceeding within thirty (30) Business Days after the receipt by the Buyer of notice thereof. The Buyer shall have the right to control a Straddle Period Tax Proceeding; provided, however, that the Buyer shall keep the Sellers reasonably informed regarding the progress and substantive aspects of such Straddle Period Tax Proceeding, the Sellers shall be entitled at their expense to participate in any such Straddle Period Tax Proceeding, and the Buyers shall not compromise or settle any such Straddle Period Tax Proceeding without obtaining the Sellers' prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

8.6.6.    Cooperation and Tax Record Retention. The Seller and the Buyer shall promptly furnish to each other, as promptly as practicable, such information as may be reasonably requested with respect to Tax matters relating to the Targets or any of their Subsidiaries, including by providing access to relevant books and records and making employees

60

of the Buyer and the Targets and their Subsidiaries reasonably available during normal business hours to provide additional information and explanation of any materials provided hereunder. The Buyer and the Seller shall cooperate with each other in connection with the preparation of any Tax Returns and in connection with any Tax Proceeding or Straddle Period Tax Proceeding pursuant to Section 8.6.5. Notwithstanding anything else contained herein to the contrary, the Buyer shall use commercially reasonable efforts to retain all books and records with respect to Tax matters pertinent to the Targets and their Subsidiaries relating to any Pre-Closing Tax Period until the expiration of the statute of limitations (taking into account any extensions thereof) applicable to such taxable periods, and to abide by all record retention agreements entered into with any Taxing Authority.

       8.6.7.   Refunds and Tax Benefits. Any Tax refunds that are received by Buyer or any Target and its Subsidiaries, and any amounts credited against Tax to which Buyer or any Target and its Subsidiaries become entitled, that relate to Pre-Closing Tax Periods, other than (a) any refund or amount credited that is attributable to a carryback of losses, credits or similar items from a period (or portion thereof) beginning after the Closing Date and (b) any refund or amount credited to the extent such refund or amount credited is reflected in Working Capital, shall be for the account of Sellers, and Buyer shall pay over to Sellers any such refund or the amount of any such credit (net of any Taxes of Buyer, Target, or any of its Subsidiaries attributable to such refund or credit and any out-of-pocket costs of obtaining such refund or credit) within 15 days after receipt or entitlement thereto. To the extent that any refund or amount credited (or any underlying tax deduction or similar item) is subsequently disallowed, adjusted or reduced by any Taxing Authority, Sellers shall repay the applicable amount to Buyer within 15 days after Buyer's request.

     8.7.   Termination of Affiliate Transactions. On or before the Closing Date, except as set forth on Schedule 8.7, all Target Affiliate Contracts shall be terminated in full without any liability to, or obligations of, the Buyer, the Targets or any of their respective Affiliates following the Closing.

     8.8.   Change of Name. In no event shall the Sellers use any name after the Closing in a manner likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection or association of the Sellers with the Targets and their Subsidiaries.

     8.9.   Further Assurances. Each of the Sellers and the Buyer, upon the request of the other from time to time after the Closing, and at the expense of the requesting party but without further consideration, shall sign such documents and take such actions as may be necessary or otherwise reasonably requested to effect, or make more fully effective, the consummation of the Contemplated Transactions and the transactions contemplated by the Camelot Purchase Agreement and the Houston Purchase Agreement.

     8.10.   Efforts.

       8.10.1.   Subject to the terms and conditions of this Agreement, each of the Sellers, Targets and Buyer shall take, or cause to be taken, and shall cause their HSR Affiliates to take, all actions and do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the Contemplated Transactions and the

transactions contemplated by the Camelot Purchase Agreement and the Houston Purchase Agreement as promptly as practicable after the date of this Agreement, including (i) preparing and filing, in consultation with the other Parties, as promptly as practicable with any Governmental Authority or other Third Party all documentation to effect all necessary, proper or advisable filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) using reasonable best efforts in obtaining and maintaining (and cooperating with each other to obtain or maintain) all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other Third Party, in each case, that are necessary, proper or advisable to consummate and make effective the Contemplated Transactions and the transactions contemplated by the Camelot Purchase Agreement and the Houston Purchase Agreement (whether or not such approvals, consents, registrations, permits, authorizations and other confirmations are conditions to the consummation of the Closing pursuant to Article 6).

8.10.2.    In furtherance and not in limitation of the foregoing, each of Buyer, the Sellers and Targets shall make, as promptly as reasonably practicable (i) appropriate filings of Notification and Report Forms pursuant to the HSR Act with respect to the Contemplated Transactions, and the transactions contemplated by the Camelot Purchase Agreement and the Houston Purchase Agreement, if any are required by Law; provided that the filing by each of Buyer, the Sellers and Targets of a Notification and Report Form pursuant to the HSR Act with respect to the Contemplated Transactions shall be made within ten (10) Business Days of the date of this Agreement, unless a later date is agreed to in writing by both Buyer and the Sellers and (ii) the FCC Applications with respect to the Contemplated Transactions and the transactions contemplated by the Camelot Purchase Agreement and the Houston Purchase Agreement; provided that the FCC Applications with respect to the Contemplated Transactions shall be made within ten (10) Business Days of the date of this Agreement, unless a later date is agreed to in writing by both Buyer and the Sellers. Each of Buyer, the Sellers and the Targets shall supply as promptly as practicable any additional information and documentary material that may be requested pursuant to the foregoing, and to take all other actions necessary to cause the expiration or termination of the applicable waiting periods regarding the foregoing as soon as practicable. Buyer, the Sellers and Targets shall each request early termination of the waiting period with respect to the Contemplated Transactions, if applicable, under the HSR Act. Buyer shall pay 100% of the filing fees payable under the HSR Act and all FCC filing fees payable by the Targets and their Subsidiaries, Buyer and each of its Subsidiaries relating to the Contemplated Transactions, irrespective of whether the Contemplated Transactions are consummated.

8.10.3.    Except as prohibited by applicable Law or Order, each of Buyer, the Sellers and the Targets shall (i) cooperate and consult with each other in connection with any filing or submission with a Governmental Authority in connection with the Contemplated Transactions and the transactions contemplated by the Camelot Purchase Agreement and the Houston Purchase Agreement, including by allowing the other Party to have a reasonable opportunity to review in advance and comment on drafts of filings and submissions, (ii) cooperate and consult with each other in connection with any investigation or other inquiry by or before a Governmental Authority relating to the Contemplated Transactions, including any proceeding initiated by a private party, including by allowing the other Party to have a reasonable opportunity to review in advance and comment on drafts of filings and submissions,

(iii) promptly inform the other Party of (and if in writing, supply to the other Party) any substantive communication received by such Party from, or given by such Party to, the Federal Trade Commission, the Antitrust Division of the Department of Justice, the FCC or any other similar Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the Contemplated Transactions, (iv) consult with each other prior to taking any material position with respect to the filings under the HSR Act (or any other Competition Law), the Communications Act and the FCC Rules in discussions with or filings to be submitted to any Governmental Authority, in each case, in connection with the Contemplated Transactions, (v) permit the other to review and discuss in advance, and consider in good faith the views of the other in connection with, any analyses, presentations, memoranda, briefs, arguments, opinions and proposals to be submitted to any Governmental Authority with respect to filings under the HSR Act (or any other Competition Law), the Communications Act and the FCC Rules, in each case, in connection with the Contemplated Transactions and (vi) coordinate with the other in preparing and exchanging such information and promptly provide the other (and its counsel) with copies of all filings, presentations or submissions (and a summary of any oral presentations) made by such Party with any Governmental Authority relating to this Agreement or the Contemplated Transactions under the HSR Act (or any other Competition Law), the Communications Act and the FCC Rules; provided that Buyer shall be entitled to direct, in consultation with the Sellers and the Targets, and approve (such approval not to be unreasonably withheld) the content of, any filings with or presentations or submissions to any Governmental Authority relating to this Agreement or the Contemplated Transactions and to take the lead in the strategic planning for any meetings with, and the conducting of negotiations with, Governmental Authorities relating to this Agreement or the Contemplated Transactions.

8.10.4.    The Sellers, the Targets and Buyer acknowledge that, to the extent reasonably necessary to expedite the grant by the FCC of any application for renewal of any FCC License with respect to any Target Station and thereby to facilitate the grant of the FCC Consent with respect to such Target Station, each of the Sellers, the Targets, Buyer and their applicable Subsidiaries shall be permitted to enter into tolling agreements with the FCC to extend the statute of limitations for the FCC to determine or impose a forfeiture penalty against such Target Station in connection with (i) any pending complaints that such Target Station aired programming that contained obscene, indecent or profane material or (ii) any other enforcement matters against such Target Station with respect to which the FCC may permit the Sellers, the Targets or Buyer (or any of their respective Subsidiaries) to enter into a tolling agreement.

8.10.5.    If the Closing shall not have occurred for any reason within the original effective periods of the FCC Consent, and neither party shall have terminated this Agreement pursuant to the terms hereof, the Sellers, the Targets and Buyer shall use their reasonable best efforts to obtain one or more extensions of the effective period of the FCC Consent to permit consummation of the transactions hereunder.  Upon receipt of the FCC Consent, the Sellers, the Targets and Buyer shall use their respective reasonable best efforts to maintain in effect the FCC Consent to permit consummation of the transactions hereunder.  No extension of the FCC Consent shall limit the right of the Sellers or Buyer to terminate this Agreement pursuant to the terms hereof.

8.10.6.    Unless prohibited by applicable Law or Order or by the applicable Governmental Authority, each of the Sellers, the Targets and Buyer shall (i) not participate in or attend any meeting, or engage in any substantive conversation, with any Governmental Authority in respect of the Contemplated Transactions (including with respect to any of the actions referred to in Section 8.10.1) without the other, (ii) give the other reasonable prior notice of any such meeting or conversation and (iii) in the event one such Party is prohibited by applicable Law or Order or by the applicable Governmental Authority from participating or attending any such meeting or engaging in any such conversation, keep the non-participating Party reasonably apprised with respect thereto.

8.10.7.    Subject to Section 8.10.8, Buyer shall take, and shall cause its HSR Affiliates to take, all necessary or advisable actions to avoid or eliminate each and every impediment that may be asserted by any Governmental Authority with respect to the Contemplated Transactions so as to enable the Closing to occur as soon as practicable, including (i) all necessary or advisable actions to avoid the entry of, or the commencement of any Proceeding in any forum that could result in, or to effect the dissolution of, any permanent, preliminary or temporary Order that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Contemplated Transactions, including the proffer and agreement by Buyer of its willingness to take such actions, and promptly to effect such actions (and the entry into agreements with, and submission to orders of, the relevant Governmental Authority giving effect thereto, including the entry into hold separate arrangements, terminating, assigning or modifying Contracts (or portions thereof) or other business relationships, accepting restrictions on business operations and entering into commitments and obligations) (each an "Approval Action"), and (ii) using reasonable best efforts to take, in the event that any permanent or preliminary Order is entered or issued, or becomes reasonably foreseeable to be entered or issued, in any proceeding or inquiry of any kind that would make consummation of the Contemplated Transactions in accordance with its terms unlawful or that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Contemplated Transactions, any and all steps (including the appeal thereof and the posting of a bond) necessary to resist, vacate, modify, reverse, suspend, prevent, eliminate or remove such actual, anticipated or threatened Order so as to permit such consummation on a schedule as close as possible to that contemplated by this Agreement.

8.10.8.    Notwithstanding anything herein to the contrary, nothing set forth in this Section 8.10 or otherwise in this Agreement shall require, or be construed to require the Sellers, the Targets, Buyer or any of their respective Subsidiaries to take, or agree to take, any Approval Action, unless such Approval Action shall be conditioned upon the consummation of the Contemplated Transactions.  The Sellers acknowledge that Buyer shall be permitted to take such actions required or reasonably necessary in connection with the transactions set forth on Schedule 8.10.

8.11.    Employee Matters.

8.11.1.    For a period beginning on the Closing Date and continuing thereafter for twelve (12) months or if shorter, the period of employment following the Closing Date of the relevant Employee, Buyer shall provide, or shall cause the Targets and their Subsidiaries to provide, each Employee (excluding any Employees represented by labor unions and/or covered by the Collective Bargaining Agreements) as of immediately prior to the Closing who continues

employment with Buyer or any of its Subsidiaries, including the Targets or their Subsidiaries, following the Closing (the "Continuing Employees"), with (i) base salary or other base cash compensation that is no less favorable than the base salary or other base cash compensation that was provided to such Continuing Employee immediately prior to the Closing, (ii) short-term annual cash incentive compensation opportunities that are no less favorable than the short-term annual cash incentive compensation opportunities that were provided to such Continuing Employee immediately prior to the Closing, (iii) severance, retention and any other termination pay and benefits plans, practices and policies that are no less favorable than such plans, practices and policies set forth on Schedule 8.11 that were applicable to such Continuing Employee immediately prior to the Closing and (iv) other employee benefits (other than any defined benefit pension, retiree medical or life insurance, retention, change in control or equity incentive compensation opportunities) that are substantially comparable in the aggregate to those employee benefits that were provided to such Continuing Employee immediately prior to the Closing. Notwithstanding the foregoing from and after the Closing, Buyer shall, and shall cause the Targets and their Subsidiaries, to honor the participating employees' accrued and vested obligations of the Targets and their Subsidiaries as of the Closing under any and all Company Plans. The compensation and benefits for Continuing Employees who are covered by a Collective Bargaining Agreement shall be provided in accordance with the applicable Collective Bargaining Agreement as amended, extended or terminated from time to time in accordance with its terms and applicable Law.

8.11.2.    Prior to the Closing, the Targets and their Subsidiaries, as applicable, shall use commercially reasonable efforts to comply in all material respects with all notice, consultation, effects bargaining or other bargaining obligations to any labor union, labor organization, works council or group of employees of the Targets and their Subsidiaries in connection with the Contemplated Transactions. Each of Buyer and the Targets agree to reasonably cooperate with each other in order to comply with such obligations.

8.11.3.    For purposes of eligibility, vesting, level of benefits and benefit accrual (but not for benefit accruals under defined benefit pension plans or post-retirement benefit plans) under the employee benefit plans, programs and arrangements established or maintained by Buyer and its Subsidiaries (including the Targets and their Subsidiaries) in which Continuing Employees may become eligible to participate in after the Closing (the "New Benefit Plans"), each Continuing Employee shall be credited with the same amount of service as was credited by the Targets or their Subsidiaries, as applicable, immediately prior to the Closing under similar or comparable Company Plans in which such Continuing Employee participated immediately prior to the Closing (except to the extent such credit would result in a duplication of benefits or compensation). In addition, and without limiting the generality of the foregoing and subject to the terms and conditions of the applicable New Benefit Plans, (i) with respect to any New Benefit Plans in which the Continuing Employees may be eligible to participate following the Closing, each Continuing Employee will be eligible to participate in such New Benefit Plans, without any waiting time, to the extent coverage under such New Benefit Plans replaces coverage under a similar or comparable Company Plan in which such Continuing Employee was participating immediately before such commencement of participation and (ii) for purposes of each New Benefit Plan providing medical, dental, pharmaceutical and/or vision benefits to any Continuing Employee, Buyer shall, or shall cause the Targets and their Subsidiaries to, use commercially reasonable efforts to, for the applicable plan year in which the Closing occurs, (A)

65

cause all pre-existing condition exclusions and actively-at-work requirements of such New Benefit Plan to be waived for such Continuing Employee and his or her covered dependents, to the extent any such exclusions or requirements were waived or were inapplicable under any similar or comparable Company Plan in which such Continuing Employee participated immediately prior to the Closing and (B) subject to the terms and conditions of the New Benefit Plans, Buyer shall use commercially reasonable efforts to cause any eligible expenses incurred by such Continuing Employee and his or her covered dependents during the portion of the plan year of the Company Plan ending on the date such Continuing Employee's participation in the corresponding New Benefit Plan begins to be taken into account under such New Benefit Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Continuing Employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such New Benefit Plan.

8.11.4.    The terms of this Section 8.11 are included for the sole benefit of the Parties and shall not confer any rights or remedies upon any Continuing Employee or former employee of any Targets or any of their Subsidiaries, any participant or beneficiary in any Company Plan or any other Person or Governmental Authority (whether as a third-party beneficiary or otherwise) other than the Parties hereto.  Nothing contained in this Section 8.11 shall (i) constitute or be deemed to constitute establishment of or an amendment to or termination of any Company Plan or other compensation or benefit plan, policy, program, Contract or arrangement, (ii) obligate Buyer or any of its Subsidiaries (including the Targets) to retain the employment or service of (or provide any term or condition of employment or service to) any particular Employee or other Person or (iii) prevent Buyer or any of its Subsidiaries (including the Targets) from amending, modifying or terminating any Company Plan, New Benefit Plan or other benefit or compensation plan, policy, program, Contract or arrangement, to the extent such amendment, modification, or termination is permitted by the terms of the applicable plan, policy, program, Contract or arrangement.

8.12.    Financing and Financing Cooperation.

8.12.1.    The Targets and their Subsidiaries shall use their reasonable best efforts to, and to cause their Representatives to use reasonable best efforts to, provide to Buyer such customary cooperation as may be reasonably requested by Buyer in connection with the Debt Financing, including:

(a)    assisting in preparation for and participating in (and cause senior management of the Targets or their Subsidiaries to participate), upon reasonable advance notice and at reasonable times, a reasonable number of meetings and calls (including customary one-on-one meetings with parties acting as lead arrangers, bookrunners or agents for, and prospective lenders of, the Debt Financing), rating agency presentations, road shows and due diligence sessions (including accounting due diligence sessions), drafting sessions and otherwise assisting with the marketing efforts for any of the Debt Financing and assisting Buyer in obtaining ratings (but not any specific ratings) in respect of the borrower/issuer of the Debt Financing and public ratings in respect of any debt issued or incurred as part of the Debt Financing;

(b)    assisting Buyer and its potential financing sources in the preparation of (A) customary bank information memoranda, customary offering documents, lender presentations, investor presentations and other customary disclosure and similar marketing documents for any of the Debt Financing, including the execution and delivery of customary authorization and representation letters in connection with the disclosure and marketing materials relating to the Debt Financing authorizing the distribution of information relating to the Targets and their Subsidiaries to prospective lenders and identifying any portion of such information that constitutes material, nonpublic information regarding the Targets or their Subsidiaries or their respective securities (in each case in accordance with customary syndication practices) and containing a representation that (to the extent accurate) the public-side version does not include material non-public information about the Targets and their Subsidiaries or their respective securities and (B) customary materials for rating agency presentations for the Debt Financing;

(c)    (x) delivering to Buyer and its potential financing sources (including the Financing Sources) as promptly as reasonably practicable (1) the Required Financing Information and other financial and other customary information (including assistance with preparing projections, financial estimates, forecasts and other forward-looking information) in connection with the preparation of customary disclosure and marketing materials, as applicable, and assisting Buyer in preparing (A) pro forma balance sheets and related notes as of the most recently completed interim period ended at least forty-five (45) days before the Closing Date (or ninety (90) days in case such period includes the end of the Targets' fiscal year) and (B) pro forma income statements and related notes for the most recently completed fiscal year, for the most recently completed interim period and the comparable interim period in the prior fiscal year and for the twelve (12) month period ending on the last day of the most recently completed four (4) fiscal quarter period ended at least forty-five (45) days before the Closing Date (or ninety (90) days in case such period includes the end of the Targets' fiscal year) and (2) (i) within 90 days after the end of each fiscal year ending after the date of this Agreement, audited consolidated balance sheets as of the end of such fiscal year and related statements of income, stockholders' equity and cash flows of each of the Existing Reporting Entities and their Subsidiaries for such fiscal year and (ii) within 45 days after the end of each fiscal quarter ending after the date of this Agreement, unaudited consolidated balance sheets and related statements of income and cash flows of the Existing Reporting Entities and their Subsidiaries, for each such fiscal quarter and year to date period through the end of such fiscal quarter (other than any fiscal fourth quarter), in each case prepared in accordance with GAAP (and, in the case of clause (ii), which will have been reviewed by the Targets' independent accountants as provided in Statement on Auditing Standards 100)),; and (y) informing Buyer if the chief executive officer, chief financial officer, treasurer or controller of the Targets' or any member of the Targets' board of directors (or other similar applicable governing bodies) shall have knowledge of any facts as a result of which a restatement of any financial statements to comply with GAAP is probable or under consideration; provided that Buyer that shall promptly reimburse Sellers for all out-of-pocket expenses incurred by Sellers in complying with this Section 8.12.1(c), which reimbursement obligation shall survive the termination of this Agreement;

67

(d)    causing its independent registered public accounting firm to provide (A) customary assistance with the due diligence activities of Buyer and its Financing Sources and the preparation of any pro forma financial statements to be included in the documents referred to in clause (iii) above, (B) customary consents to the use of audit reports in any disclosure and marketing materials relating to the Debt Financing and related government filings and (C) customary "comfort" letters (including negative assurance comfort and change period comfort) in connection the Debt Financing or any debt securities issued in connection therewith or in lieu thereof, and the Targets shall provide the information necessary to enable the applicable accountants to deliver customary "comfort" letters (including "negative assurance" comfort and change period comfort); provided that Buyer that shall promptly reimburse Sellers for all out-of-pocket expenses incurred by Sellers in complying with this Section 8.12.1(d), which reimbursement obligation shall survive the termination of this Agreement;

(e)    assisting with the prepayment or repayment of all Indebtedness of the Targets identified by Buyer and cooperating with any back-stop, "roll-over" or termination of any existing letters of credit thereunder (and the release and discharge of all related liens and security interests), including by providing to Buyer at least three (3) Business Days prior to Closing customary pay-off letters in form and substance reasonably satisfactory to Buyer, UCC-3 financing statements, filings with the United States Patent and Trademark and/or Copyright Office, and other similar and related ancillary agreements as are necessary in connection with the prepayment or repayment of such Indebtedness of the Targets or the Debt Financing (it being understood that no such documentation shall become effective until the Closing);

(f)    executing and delivering as of, but not effective before, the Closing, and subject in each case to the terms of the Debt Commitment Letter, customary definitive financing documentation as may be reasonably requested by Buyer, including pledge and security documents, supplemental indentures, currency or interest hedging arrangements, guarantees, customary officer's certificates (including a certificate of the chief financial officer of each Target with respect to solvency matters, instruments, filings, security agreements and other matters ancillary to, or required in connection with, the Debt Financing (including delivering stock certificates for certificated securities with transfer powers executed in blank) of the Targets and its domestic Subsidiaries to the extent required on the Closing Date; and

(g)    (A) at least three (3) Business Days prior to the Closing Date, providing all documentation and other information relating to the Targets and their Subsidiaries to be required by applicable "know your customer" and anti-money laundering rules and regulations including the USA PATRIOT Act and the requirements of 31 C.F.R. §1010.230 (the "Beneficial Ownership Regulation") to the extent reasonably requested by Buyer at least six (6) Business Days prior to the Closing Date and, if the Targets and their Subsidiaries qualify as "legal entity customers" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification and (B) cooperating reasonably with the Financing Sources' due diligence, to the extent customary and reasonable.

8.12.2.    The Targets shall, and shall cause each of the Targets' Subsidiaries to, (a) deliver to Buyer as promptly as practicable after the date hereof the Required Financing Information and (b) update any Required Financing Information provided to Buyer as may be necessary so that such Required Financing Information (i) is Compliant and (ii) meets the applicable requirements set forth in the definition of "Required Financing Information".  For the avoidance of doubt, Buyer may, to most effectively access the financing markets, require the cooperation of the Targets and the Targets' Subsidiaries under this <u>Section 8.12</u> at any time, and from time to time and on multiple occasions, between the date hereof and the Closing Date.

8.12.3.    The Targets hereby consent to the use of all of their and their Subsidiaries' logos in connection with the Debt Financing; <u>provided</u> that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage the Targets or their Subsidiaries or the reputation or goodwill of the Targets or any of their Subsidiaries; and subject to the prior review by, and consent of, the Targets (such consent not to be unreasonably withheld or delayed).  In addition, the Targets agree to use reasonable best efforts to supplement the written information (other than information of a general economic or industry specific nature) concerning the Targets and their Subsidiaries provided pursuant to this <u>Section 8.12</u> to the extent that any such information, to the Targets' Knowledge, contains any material misstatements of fact or omits to state any material fact necessary to make such information concerning the Targets and their Subsidiaries, taken as a whole, not misleading in any material respect as promptly as reasonably practicable after gaining Knowledge thereof.

8.13.    <u>Exclusivity</u>.  Until the earlier of the Closing and such time as this Agreement is terminated in accordance with its terms, except for the Contemplated Transactions, each of the Targets and Sellers shall not, and each shall cause its and its Affiliates' Representatives not to, directly or indirectly, unless otherwise expressly permitted by this Agreement, solicit, encourage or enter into any negotiation, discussion or Contract, with any party, with respect to the sale of the Interests or all or any portion of the assets of the Targets or any of their Subsidiaries, or any merger, recapitalization or similar transaction with respect to the Targets or any of their Subsidiaries or any of their respective businesses.

8.14.    <u>Release</u>.  Effective as of the Closing, each Seller on behalf of itself and its Affiliates, successors and assigns (the "<u>Seller Parties</u>"), hereby unconditionally and irrevocably waives any claims that such Person, in its capacity as a direct or indirect holder of Interests in the applicable Target, has or may have in the future against the Targets or any of their Subsidiaries and releases, on its own behalf and on behalf of its successors and assigns, each Target, each of their respective Subsidiaries and their respective Affiliates, directors and officers (the "<u>Target Parties</u>"), from any and all Proceedings with respect thereto.  Each Seller, on behalf of itself the applicable Seller Parties, expressly waives, to the full extent that it may lawfully waive, all rights pertaining to a general release of claims, and affirms that it is releasing all known or unknown claims that it has or may have against any applicable Target Party, in each case in its capacity as a direct or indirect holder of Interests in the applicable Target. Notwithstanding anything else to the contrary herein, the foregoing release does not apply to (i) any obligation of the Target Parties arising out of this Agreement, the Camelot Purchase Agreement, the Houston Purchase Agreement or any documents executed in connection with this Agreement, the Contemplated Transactions, the Camelot Purchase Agreement, the Houston Purchase Agreement or the transactions contemplated therein, (ii) unpaid salary, benefits, out-of-pocket expenses accrued in

69

the ordinary course of business prior to the Closing, or (iii) any obligation of the Targets or their Subsidiaries to indemnify and defend the Seller Parties from any third party claims arising from any Seller Party's capacity as a director, manager, officer, or employee of any Target or Subsidiary pursuant to <u>Section 8.5</u>.

**9.     INDEMNIFICATION**

9.1.    <u>Survival</u>.  The representations and warranties of the parties contained in this Agreement, and the covenants and agreements of the parties hereto to the extent they, by their terms, contemplate or provide for performance prior to the Closing, shall survive the Closing until the date that is the thirteen (13) month anniversary of the Closing Date (the "<u>General Reps Termination Date</u>"), except that the Seller Fundamental Representations and the Buyer Fundamental Representations shall survive the Closing until the sixth (6th) anniversary of the Closing Date (the "<u>Fundamental Representation Termination Date</u>") and the representations and warranties set forth in <u>Section 3.7</u> (the "<u>Tax Representations</u>") shall survive until the date that is sixty (60) days after the expiration of the applicable statute of limitations with respect to such representation (the "<u>Tax Representation Termination Date</u>").  The other covenants and agreements of the parties contained in this Agreement, or in any certificate or other writing delivered pursuant hereto or in connection herewith, shall survive the Closing in accordance with their terms.  No claim may be made seeking indemnification for breaches of any representations or warranties pursuant to this <u>Article 9</u> unless a written notice of such claim is provided to the applicable Indemnifying Party in accordance with this <u>Article 9</u> prior to the General Reps Termination Date or, in the case of a breach of a Seller Fundamental Representation or a Buyer Fundamental Representation, the Fundamental Representation Termination Date or, in the case of a breach of a Tax Representation, the Tax Representation Termination Date.  If a Buyer Indemnified Party or Seller Indemnified Party has made a proper claim for indemnification for breaches of any representation or warranty pursuant to <u>Sections 9.2</u> or <u>9.3</u> prior to the General Reps Termination Date or, in the case of a breach of a Seller Fundamental Representation or a Buyer Fundamental Representation, the Fundamental Representation Termination Date or, in the case of a breach of a Tax Representation, the Tax Representation Termination Date, then such claim (and only such claim), if then unresolved, will survive until such claim is resolved.

9.2.    <u>Indemnity by the Seller</u>.

9.2.1.    From and after the Closing, subject to the provisions of this <u>Article 9</u>, the Sellers shall jointly and severally indemnify the Buyer and each of its Affiliates and each of their respective directors, officers, employees, partners, equity holders, successors and assigns (collectively, the "<u>Buyer Indemnified Parties</u>") and hold them harmless from and against any and all Losses suffered or incurred by the Buyer Indemnified Parties to the extent arising from (i) any breach of or inaccuracy in any representations and warranties of the Targets in <u>Article 3</u> or the Sellers in <u>Article 4</u>, (ii) any breach of any covenant or agreement of the Sellers in this Agreement, (iii) any breach of any covenant or agreement in this Agreement that is required by its terms to be performed by the Targets or any of their Subsidiaries prior to the Closing or (iv) Pre-Closing Taxes.

9.2.2.    The Sellers' aggregate liability in respect of claims for indemnification for Seller General Representations pursuant to this <u>Article 9</u> will not exceed the Indemnity Cap

70

Doc#: US1:12600497v8

Amount. Any indemnifiable Losses for which Sellers are liable pursuant to this <u>Article 9</u> shall be satisfied as set forth in <u>Section 9.11</u>. Notwithstanding anything else to the contrary herein, except with respect to any claims for indemnification for fraudulent conduct, in no event shall Sellers' aggregate liability with respect to claims for indemnification pursuant to this <u>Article 9</u> exceed the Purchase Price.

        9.2.3.     Except with respect to any claims for indemnification for Sellers' breach of any Seller Fundamental Representation or Tax Representation, breach of any covenants or agreements made by the Sellers, breach of any covenant or agreement in this Agreement that is required by its terms to be performed by the Targets or any of their Subsidiaries prior to the Closing, fraudulent or criminal conduct or Willful Breach of this Agreement or any other agreement entered into in connection herewith or for Pre-Closing Taxes, the Buyer Indemnified Parties will not be entitled to indemnification under (a) this <u>Article 9</u> unless and until with respect to any individual item of Loss, such item is greater than One Hundred Thousand Dollars ($100,000) (any individual items of Loss that are less than or equal to One Hundred Thousand Dollars ($100,000), shall be "<u>Minor Claims</u>") and (b) <u>Section 9.2.1(i)</u> unless and until the aggregate Losses for which indemnification would otherwise be available under <u>Section 9.2.1(i)</u> (excluding Minor Claims) exceed Eight Million Dollars ($8,000,000) (the "<u>Deductible</u>"), at which point indemnification shall be available to the Buyer Indemnified Parties under <u>Section 9.2.1(i)</u> for the amount of any Losses in excess of the Deductible.

        9.2.4.     The applicable Buyer Indemnified Party will provide the Sellers with a prompt, reasonably detailed written notice for any claim made in respect of the indemnification provided in this <u>Section 9.2</u> (including the basis of such claim, the provisions of this Agreement alleged to have been breached and the amount of Losses incurred or suffered with respect thereto, in each case to the extent reasonably known at the time of such notice), whether or not arising out of a Third Party Claim; <u>provided</u>, <u>however</u>, that no delay on the part of the applicable Buyer Indemnified Party in notifying the Sellers will relieve the Sellers from any indemnification obligation hereunder unless and solely to the extent the Sellers are actually prejudiced thereby.

    9.3.    <u>Indemnity by the Buyer</u>.

        9.3.1.     From and after the Closing, subject to the provisions of this <u>Article 9</u>, the Buyer shall indemnify the Sellers and each of their Affiliates and each of their respective directors, officers, employees, partners, equity holders, successors and assigns (collectively, the "<u>Seller Indemnified Parties</u>") and hold them harmless from and against any and all Losses suffered or incurred by the Seller Indemnified Parties to the extent arising from (i) any breach of, or inaccuracy in, any representations and warranties of the Buyer in <u>Section 5</u> or in any certificate delivered hereunder with respect thereto, (ii) any breach of any covenant or agreement of the Buyer in this Agreement or (iii) any breach of any covenant or agreement to be performed by the Targets following the Closing.

        9.3.2.     The Buyer's aggregate liability in respect of claims for indemnification for Buyer General Representations pursuant to this <u>Article 9</u> will not exceed the Indemnity Cap Amount. Notwithstanding anything else to the contrary herein, in no event shall Buyer's

aggregate liability with respect to claims for indemnification pursuant to this Article 9 exceed the Maximum Liability Amount.

9.3.3.    Except with respect to any claims for indemnification for Buyer's breach of any Buyer Fundamental Representation, breach of any covenants or agreements made by the Buyer in this Agreement, breach of any covenant or agreement to be performed by the Targets following the Closing, fraudulent or criminal conduct or Willful Breach of this Agreement or any other agreement entered into in connection herewith, the Seller Indemnified Parties will not be entitled to indemnification under this Article 9 unless and until (a) with respect to any individual item of Loss, such item is greater than a Minor Claim and (b) the aggregate Losses for which indemnification would otherwise be available under Section 9.3.1 (excluding Minor Claims) exceed the Deductible, at which point indemnification shall be available to the Seller Indemnified Parties under Section 9.3.1 for the amount of any Losses in excess of the Deductible.  Buyer shall pay any amounts due to Sellers pursuant to this Section 9.3 within five (5) Business Days of a Final Determination.

9.3.4.    The applicable Seller Indemnified Party or the Sellers will provide the Buyer with a prompt, reasonably detailed written notice for any claim made in respect of the indemnification provided in this Section 9.3 (including the basis of such claim, the provisions of this Agreement alleged to have been breached and the amount of Losses incurred or suffered with respect thereto, in each case to the extent reasonably known at the time of such notice), whether or not arising out of a Third Party Claim; provided, however, that no delay on the part of the applicable Seller Indemnified Party in notifying the Buyer will relieve the Buyer from any indemnification obligation hereunder unless and solely to the extent the Buyer is actually prejudiced thereby.

9.4.    Determination of Breach.  For purposes of this Article 9, the determination as to whether a breach of a representation, warranty, covenant or agreement has occurred shall be made without regard to any "materiality" or similar qualification contained in such representation, warranty, covenant or agreement.

9.5.    Calculation of Losses.  For purposes of determining the amount of any Losses subject to indemnification under this Article 9, the amount of such Losses (a) will be determined without regard to any "materiality" or similar qualification contained in such representation, warranty, covenant or agreement giving rise to the claim for indemnity hereunder and (b) will be determined net of (i) any amounts to the extent taken into account as liabilities or reserves in the calculation of the Final Working Capital Amount or any other adjustments that reduced the Purchase Price set forth in Section 2.5, and (ii) the sum of any amounts actually recovered under insurance policies, or other amounts actually recovered from third parties with respect to such Losses (net of any actual out-of-pocket expenses incurred in collecting such amounts and any increases in premiums as a result thereof) ("Insurance Proceeds").  In the event that any Insurance Proceeds are actually received by an Indemnified Party after payment for the related indemnification claim has been made pursuant to this Section 9, then the Indemnified Party shall pay to the Indemnifying Party, as the case may be, an amount equal to the amount of the reduction in Losses that would have been applied pursuant to the first sentence of this Section 9.5 had such Insurance Proceeds been received at the time such indemnification claim was made (but, for the avoidance of doubt, in no event an amount greater than the amount paid

72

by the Indemnifying Party to the Indemnified Party in respect of such claim).  Each Indemnified Party shall use commercially reasonable efforts to seek recovery from third parties who may be responsible, in whole or in part, for Losses suffered by such Indemnified Party and to make claims under insurance policies providing coverage with respect to Losses suffered by such Indemnified Party.

       9.6.     <u>Matters Involving Third Parties</u>.

       9.6.1.     If any third party notifies any Indemnified Party with respect to any matter that may give rise to a claim for indemnification against any Indemnifying Party under this <u>Section 9</u> (a "<u>Third Party Claim</u>"), then the Indemnified Party will promptly, and in any event within twenty (20) Business Days, notify in writing the Indemnifying Party of such Third Party Claim (such notification, a "<u>Claim Notice</u>") describing in reasonable detail the basis for such Third Party Claim (including identification of the provisions of this Agreement alleged to have been breached and the amount of Losses incurred or suffered with respect thereto, in each case, to the extent reasonably known at the time of such notice) and enclosing copies of any documents then available to the Indemnified Party relating to such Third Party Claim and thereafter provide the Indemnifying Party such documents and information with respect thereto that the Indemnifying Party may reasonably request; <u>provided</u>, <u>however</u>, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party will relieve the Indemnifying Party from any indemnification obligation hereunder unless and solely to the extent the Indemnifying Party is actually prejudiced thereby.  Thereafter, the Indemnified Party will deliver to the Indemnifying Party, after  receipt thereof, copies of all notices, demands and other documents (including court papers) received by the Indemnified Party relating to the Third Party Claim. This <u>Section 9.6</u> shall not apply to the conduct of any Tax Proceedings or Straddle Period Tax Proceedings, which shall be exclusively governed by <u>Section 8.6.5</u>.

       9.6.2.     The Indemnifying Party will have the right to control the defense of the Third Party Claim with counsel of its choice (and reasonably acceptable to the Indemnified Party); <u>provided</u>, that the Indemnifying Party shall not be entitled to assume or continue to control the defense of any Third Party Claim if (i) the Third Party Claim relates to or arises in connection any criminal Proceeding or an Proceeding by any Governmental Authority, (ii) the Third Party Claim seeks an injunction or equitable relief against any Indemnified Party, (iii) the Third Party Claim has or would reasonably be expected to result in Losses in excess of the amounts available for indemnification pursuant to <u>Section 9.2</u> or <u>9.3</u>, as applicable, (iv) the Indemnifying Party has failed or is failing to defend in good faith the Third Party Claim, (v) the Third Party Claim would reasonably be expected to have a material and adverse effect on the Indemnified Party's business or relates to its material customers, suppliers, vendors or other service providers or (vi) the Indemnifying Party has not acknowledged and agreed that such Third Party Claim is subject to indemnification pursuant to this Article 9. If the Sellers undertake the defense of any Third Party Claim, at the election of the Sellers, the reasonable out-of-pocket costs and expenses of such defense shall be paid by the Sellers.

       9.6.3.     If the Indemnifying Party is conducting the defense of the Third Party Claim, (a) the Indemnified Party may participate in the defense of the Third Party Claim (but not of record, and shall not communicate with the Person asserting the Third Party Claim or its Representatives) and retain separate co-counsel at its sole cost and expense, unless the retention

of separate counsel is (x) so requested by the Indemnifying Party in writing or (y) in the reasonable opinion of counsel to the Indemnified Party, necessary to avoid a conflict of interest that would be created by joint representation of both the Indemnified Party and the Indemnifying Party (provided, that in such circumstance, the Indemnifying Party shall not be required to pay for more than one such counsel for all Indemnified Parties in connection with any Third Party Claim), (b) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim, nor take any voluntary action prejudicial to the determination of the Third Party Claim, without the prior written consent of the Indemnifying Party and (c) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim unless (i) written agreement is obtained releasing the Indemnified Party subject to the Third Party Claim from all liability thereunder, (ii) it involves only the payment of money and the amount of such judgment or settlement does not exceed an amount equal to the fair market value (determined in accordance with the procedures set forth in the Pledge Agreement) of the Rollover Interests against which the Buyer Indemnified Parties have recourse at such time and (iii) the judgment or settlement does not involve any finding or admission of a violation of any Law by the Indemnified Party. If the Indemnifying Party is not conducting the defense of the Third Party Claim, the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to such Third Party Claim without the prior written consent of the Indemnifying Party (such consent not to be unreasonably withheld).

9.6.4. Each party will cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim and will furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

9.7. Effect of Knowledge. The right to indemnification, payment in respect of Losses or other remedies based on any representations, warranties, covenants or agreements set forth in this Agreement or in any document delivered with respect hereto will not be affected by any investigation conducted with respect to, or any knowledge or information acquired (or capable of being acquired) at any time, whether before or after the Closing Date, and regardless of whether such knowledge or information was obtained through the Indemnified Party's own investigation or through disclosure by another party or another Person, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant or agreement (other than disclosures with respect to any such representation or warranty made in the Disclosure Schedules).

9.8. Limitations on Indemnification. Neither Buyer nor Sellers shall be liable for incidental, consequential or punitive damages under this Article 9 except to the extent such incidental, consequential or punitive damages are awarded or paid with respect to a third party claim as to which a Party is entitled to seek indemnification hereunder.

9.9. Tax Treatment. The Buyer and the Sellers will treat any payment received pursuant to Section 2.5.5 and this Article 9 as an adjustment to the purchase price for Tax and financial reporting purposes, except to the extent otherwise required by any Law.

9.10.    Acknowledgement by the Parties.

9.10.1.    Each party understands, acknowledges and agrees that, from and after the Closing, except for claims of fraudulent or criminal conduct or Willful Breach of this Agreement or any other agreement entered into in connection herewith, the indemnification provided pursuant to, and subject to the terms and conditions of, this Article 9, shall be the sole and exclusive monetary remedy of each of the parties and the Target Related Parties and Buyer Related Parties (or any Person claiming by, through or on behalf of any of them), with respect to (a) the subject matter of this Agreement, including the negotiation or performance hereof, or the Contemplated Transactions or (b) any other matter relating to the Targets prior to the Closing, the operation of its business prior to the Closing, or any other transaction, circumstance or state of facts involving the Targets prior to the Closing and that each of the parties and the Target Related Parties and Buyer Related Parties (and any Person claiming by, through or on behalf of any of them) shall have no other monetary remedy or recourse with respect to any of the foregoing other than indemnification pursuant to, and subject to the terms and conditions of, this Article 9.  Each party acknowledges and agrees, on behalf of the Target Related Parties and Buyer Related Parties, as applicable, (and any Person claiming by, through or on behalf of any of them), that none of them may avoid such limitation by (x) seeking relief for breach of contract, tort or pursuant to any other theory of liability, all of which are hereby expressly and irrevocably waived or (y) asserting or threatening any claim against any Person that is not a party hereto, including any Target Related Party or Buyer Related Party, with respect to this Agreement or the Contemplated Transactions.  Notwithstanding anything to the contrary herein, from and after the Closing, nothing in this Article 9 will limit any Buyer Indemnified Party's or Seller Indemnified Party's remedies with respect to fraud.

9.11.    Manner of Payment.  Any indemnification obligations of the Sellers pursuant to this Article 9, subject in each case to the limitations in this Article 9, will be satisfied, at Sellers' option, either in cash or against the Rollover Interests (in accordance with this Article 9 and pursuant to the Pledge Agreement); which election shall be provided by Sellers to Buyer in writing within five (5) Business Days of a Final Determination;  provided, however, that, if (i) Sellers elect, and subsequently fail to, pay to Buyer Indemnified Parties any such indemnifiable amounts in cash within ten 10 Business Days of a Final Determination or (ii) Sellers fail to provide written notice of the election as required in this Section 9.10, then the Buyer Indemnified Parties shall have recourse against the Rollover Interests for such indemnifiable Losses pursuant to the Pledge Agreement; provided, further, that to the extent such indemnifiable Losses are recovered by Buyer Indemnified Parties against the Rollover Interests, and such Losses exceed such available recourse against the Rollover Interests, such excess shall be paid in cash by the Sellers to the applicable Buyer Indemnified Parties, jointly and severally.  Any indemnification payment of monetary amounts to be made by any Indemnifying Party pursuant to this Article 9 will be effected by wire transfer of immediately available funds from or directed by the Indemnifying Party to the accounts and in such amounts designated by the applicable Indemnified Parties within five (5) Business Days after such Losses have been determined by (x) a final, non-appealable order or judgment of a court of competent jurisdiction or (y) a written, executed agreement between the Buyer and the Sellers (a "Final Determination").

**10.** **TERMINATION**.

10.1. <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing (except as otherwise provided in this Agreement, it being understood and agreed that this Agreement may not be terminated for any other reason on any other basis) by either the Sellers or Buyer upon the valid termination of both (a) the Camelot Purchase Agreement and (b) the Houston Purchase Agreement (to the extent that definitive documentation is entered into in respect of the transactions contemplated by the Houston Purchase Agreement).

10.2. <u>Effect of Termination; Buyer Indemnification; Seller Termination Fee</u>.

10.2.1. In the event of the termination of this Agreement by either the Sellers or the Buyer as provided in <u>Section 10.1</u>, written notice thereof shall forthwith be given by the terminating Party to the other Party. Notwithstanding anything set forth herein to the contrary, in the event of the valid termination of this Agreement in compliance with <u>Section 10.1</u>, this Agreement shall be terminated and this Agreement shall forthwith become void and have no effect, without any liability or obligation on the part of any Party (or any stockholder, director, officer, employee, agent, consultant, representative, direct or indirect equity holder, controlling person, partner, member, manager, or Affiliate of such Party or such Party's Affiliates or its or any of the foregoing's successors or assigns), other than the Confidentiality Agreement (which shall survive in accordance with its terms), this <u>Section 10.2</u> and <u>Article 11</u>, which provisions shall survive such termination (in each case, including the limitations set forth herein) <u>provided</u>, <u>however</u>, that, subject to the limitations set forth in this <u>Section 10.2</u> and <u>Section 11.11</u>, nothing in this <u>Section 10.2</u> shall relieve (<u>x</u>) the Sellers or the Targets from any liability resulting from fraud prior to such valid termination of this Agreement or (<u>y</u>) Buyer from any liability resulting from fraud prior to such valid termination of this Agreement (in each of the case of <u>clause (x)</u> and this <u>clause (y)</u>, which the parties acknowledge and agree will not be limited to reimbursement of expenses or out-of-pocket costs, and in the case of any damages sought by the non-breaching party, such damages will include the benefit of the bargain lost by the non-breaching party, taking into consideration relevant matters, including opportunity costs and the time value of money). Notwithstanding anything to the contrary in this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions, in no event will the Buyer Related Parties, collectively, have any liability for monetary damages, whether in equity or at Law, in Contract, in tort or otherwise (including damages for fraud or breach, whether willful, intentional, unintentional or otherwise (including Willful Breach) or monetary damages in lieu of specific performance) in the aggregate in excess of Fifty Million Dollars ($50,000,000) (the "<u>Maximum Liability Amount</u>") (A) under this Agreement or any other document related hereto, (B) in connection with the failure of the Contemplated Transactions (including the Equity Financing or the Debt Financing), or (C) in respect of any representation or warranty made or alleged to have been made in connection with this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions. No termination of this Agreement shall affect the obligations of the Parties contained in the Confidentiality Agreement. Notwithstanding anything to the contrary in this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions, other than for fraud, in no event will the Seller Related Parties, collectively, have any liability for monetary damages, whether in equity or at Law, in Contract, in tort or otherwise (including damages for breach, whether willful, intentional, unintentional or otherwise (including

Willful Breach) or monetary damages in lieu of specific performance) in the aggregate in excess of the Maximum Liability Amount in connection with the failure of the Contemplated Transactions. No termination of this Agreement shall affect the obligations of the Parties contained in the Confidentiality Agreement.

10.2.2.    In the event that this Agreement is validly terminated pursuant to Section 10.1, and the Willful Breach of the Camelot Purchase Agreement, the Houston Purchase Agreement or this Agreement by Sellers or any Target is not the primary cause of termination of the Camelot Purchase Agreement, the Houston Purchase Agreement or this Agreement, then:

(a)    if the primary cause of the termination of the Camelot Purchase Agreement, the Houston Purchase Agreement or this Agreement is (x) Buyer's Willful Breach of this Agreement, (y) Buyer's Willful Breach of Sections 5.10(a), (b) or (e) of the Camelot Purchase Agreement or (z) Buyer's (or such other applicable buyer entity's) Willful Breach of such Person's obligations in the covenant titled "Financing" in the Houston Purchase Agreement, the Buyer shall pay to Sellers, by wire transfer of immediately available funds, a fee equal to (i) Fifty Million Dollars ($50,000,000) (the "Buyer Termination Fee") as promptly as practicable following such termination (and, in any event, within ten (10) Business Days following such termination);

(b)    if the primary cause of the termination of the Camelot Purchase Agreement, the Houston Purchase Agreement or this Agreement is not (x) Buyer's Willful Breach of this Agreement, (y) Buyer's Willful Breach of Sections 5.10(a), (b) or (e) of the Camelot Purchase Agreement or (z) Buyer's (or such other applicable buyer entity's) Willful Breach of such Person's obligations in the covenant titled "Financing" in the Houston Purchase Agreement, then (I) the Buyer shall indemnify the Seller Indemnified Parties and hold them harmless from and against any and all (i) Losses suffered or incurred by the Seller Indemnified Parties from third party claims to the extent arising from the termination of the Camelot Purchase Agreement or the Houston Purchase Agreement; and (II) the Buyer shall reimburse the Sellers, by wire transfer of immediately available funds, all reasonable, documented out-of-pocket expenses incurred by Sellers and Targets in connection with the negotiation and performance of this Agreement of this Agreement, the Camelot Purchase Agreement and the Houston Purchase Agreement as promptly as practicable following such termination (and, in any event, within ten (10) Business Days following such termination).

10.2.3.    In the event that this Agreement is validly terminated pursuant to Section 10.1, and the primary cause of termination of the Camelot Purchase Agreement, the Houston Purchase Agreement or this Agreement is the Willful Breach of the Camelot Purchase Agreement, the Houston Purchase Agreement or this Agreement by any Seller or any Target, then the Sellers shall pay to Buyer, by wire transfer of immediately available funds, a fee in the amount of Fifty Million Dollars ($50,000,000) (the "Seller Termination Fee") as promptly as practicable following such termination (and, in any event, within ten (10) Business Days following such termination).

10.2.4.    The Parties acknowledge that (i) the agreements contained in this Section 10.2 are an integral part of the Contemplated Transactions, (ii) neither the Buyer

Termination Fee nor the Seller Termination Fee is a penalty, but is liquidated damages, in a reasonable amount that will compensate the Sellers or the Buyer, as applicable, in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision and (iii) that, without these agreements, the Parties would not enter into this Agreement. Accordingly, if (x) the Sellers fail to timely pay any amount due pursuant to this Section 10.2, and, in order to obtain such payment, Buyer commences a suit that results in a judgment against the Sellers for any amount due pursuant to this Section 10.2, then the Sellers shall pay Buyer its reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) in connection with such suit or (y) Buyer fails to timely pay any amount due pursuant to this Section 10.2, and, in order to obtain such payment, the Sellers commence a suit that results in a judgment against Buyer for any amount due pursuant to this Section 10.2, then Buyer shall pay the Sellers their reasonable and documented out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) in connection with such suit, in each case, together with interest on the amount due pursuant to this Section 10.2 from the date such payment was required to be made until the date of payment at the annual rate of two percent (2%) plus the prime lending rate as published in The Wall Street Journal in effect on the date such payment was required to be made (or such lesser rate as is the maximum permitted by applicable Law). All payments under this Section 10.2 shall be made by wire transfer of immediately available funds to an account designated in writing by Buyer or the Sellers, as applicable. In no event shall the Seller Termination Fee or the Buyer Termination Fee be payable more than once.

**11.**     **MISCELLANEOUS.**

     11.1.     Notices.  All notices, requests, demands, claims and other communications required or permitted hereunder will be in writing and will be sent by personal delivery, nationally recognized overnight courier, facsimile or by e-mail (as a PDF).  Any notice, request, demand, claim, or other communication required or permitted hereunder will be deemed duly given, as applicable, (a) upon personal delivery, (b) one (1) Business Day following the date sent when sent by courier delivery or (c) upon confirmation of receipt when sent by facsimile or e-mail (as a PDF), addressed as follows:

If to the Sellers or, prior to the Closing, the Targets, to:

Brian W. Brady
2111 University Park Drive, Suite 650,
Okemos, MI 48864,
Email: brady@northwestbroadcasting.com


and


Jason R. Wolff
4311 Wilshire Boulevard, Suite 408
Los Angeles, CA 90010
Email: jwolff@frcap.com


with a copy (which will not constitute notice) to:

Brown Rudnick LLP
600 13th St. NW
Washington, D.C. 20005
Facsimile number: (617) 289-0697
Email: flevy@brownrudnick.com
Attention: Fred L. Levy


If to the Buyer, or, after the Closing, to the Targets, to:

Terrier Media Buyer, Inc.
c/o Apollo Global Management
9 West 57th Street, 43rd Floor
New York, NY 10019
Facsimile number: (646) 417-6429
Email: dsambur@apollolp.com
        jsuydam@apollolp.com
Attention: David Sambur, Partner
        John Suydam, Chief Legal Officer

with a copy (which will not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile number: (212) 757-3990
Email:     tzeitzer@paulweiss.com
        bscrivani@paulweiss.com
Attention: Taurie M. Zeitzer
        Brian Scrivani


with a copy (which will not constitute notice) to:

Apollo Global Management
9 West 57th Street, 43rd Floor
New York, NY 10019
Facsimile number: (646) 417-6429
Email: dsambur@apollolp.com
        jsuydam@apollolp.com
Attention: David Sambur, Partner
        John Suydam, Chief Legal Officer

with a copy (which will not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile number: (212) 757-3990
Email:     tzeitzer@paulweiss.com
        bscrivani@paulweiss.com
Attention: Taurie M. Zeitzer
        Brian Scrivani


Any party may change the address to which notices, requests, demands, claims, and other communications required or permitted hereunder are to be delivered by providing to the other parties notice in the manner herein set forth.

11.2.    Expenses of Transaction.  Whether or not the Contemplated Transactions are consummated, except as otherwise specifically provided for in this Agreement, each of the parties hereto will assume and bear all expenses, costs and fees (including legal and accounting fees and expenses) incurred by such party in connection with the preparation, negotiation and execution and performance of this Agreement and the Escrow Agreement and the consummation of the Contemplated Transactions.

11.3.    Entire Agreement.  The agreement of the parties that is comprised of this Agreement (including all Schedules and Exhibits hereto), the Escrow Agreement, the Rollover Agreement, the Limited Guaranty, the Camelot Purchase Agreement and the Houston Purchase Agreement sets forth the entire agreement and understanding between the parties and their respective Affiliates with respect to the subject matter thereof and supersedes and cancels any and all prior and contemporaneous agreements, understandings, negotiations and communications (other than the Confidentiality Agreement), whether oral or written, express or implied, relating to the subject matter of this Agreement, the Escrow Agreement, the Rollover Agreement, the Camelot Purchase Agreement or the Houston Purchase Agreement.

11.4.    Severability.  If any term or other provision of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms and provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, so long as the economic and legal substance of the transactions contemplated hereby, taken as a whole, is not affected in a manner materially adverse to any Party.  Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

11.5.    Amendment.  This Agreement may be amended or modified, but only by an instrument in writing executed by each of the Buyer and the Sellers.  Notwithstanding anything set forth above, (x) (i) this Section 11.5, Section 2.3, Section 2.4, Article 4, Article 5, Section 8.9, Section 8.10, Section 8.12, Section 10.1, Section 11.6, Section 11.7, Section 11.8, Section 11.9 and Section 11.11 (and any provision of this Agreement to the extent an amendment, modification, waiver or termination of such provision would modify the substance of any such Section, and any related definitions insofar as they affect such Sections) shall not be amended, waived or otherwise modified without the prior written consent of Cox and Houston (to the extent definitive documentation is entered into in respect of the transactions contemplated by the Houston Purchase Agreement), and (ii) no other provision of this Agreement may be amended, waived or otherwise modified in a manner that would reasonably be expected to be adverse to the interests of Cox or Houston in any material respect without the prior written consent of Cox or Houston, respectively (in the case of Houston, to the extent definitive documentation is entered into in respect of the transactions contemplated by the Houston Purchase Agreement) and (y) this Section 11.5, Section 8.12, Section 10.2.3, Section 11.6, Section 11.8.2, Section 11.11.3, Section 11.9, Section 11.10, Section 11.11 and Section 11.14 (and any provision of this Agreement to the extent an amendment, modification, waiver or termination of such provision would modify the substance of any such Section, and any related definitions insofar as they affect such Sections) shall not be amended, waived or otherwise modified in a manner that is

80

adverse to the interests of any Financing Source in any material respect without the prior written consent of such Financing Source.

11.6.    <u>Parties in Interest</u>.  This Agreement will be binding upon and inure solely to the benefit of the parties hereto, and except as provided in <u>Section 8.5</u>, <u>Article 9</u> and <u>Section 11.14</u>, nothing in this Agreement, express or implied, is intended to or will be construed to or will confer upon any other Person any right, claim, cause of action, benefit or remedy of any nature whatsoever under or by reason of this Agreement, including by way of subrogation; <u>provided</u>, that, notwithstanding anything to the contrary set forth above, (x) Cox and Houston (to the extent definitive documentation is entered into in respect of the transactions contemplated by the Houston Purchase Agreement) shall each be third-party beneficiaries of <u>Section 2.3</u>, <u>Section 2.4</u>, <u>Article 4</u>, <u>Article 5</u>, <u>Section 8.9</u>, <u>Section 8.10</u>, <u>Section 8.12</u>, <u>Section 10.1</u>, <u>Section 11.5</u>, this <u>Section 11.6</u>, <u>Section 11.7</u>, <u>Section 11.8</u>, <u>Section 11.9</u>, <u>Section 11.10</u> and <u>Section 11.11</u>; (y) BR shall be a third-party beneficiary of <u>Section 11.17</u> and (z) the Financing Sources shall be a third-party beneficiary of <u>Section 8.12</u>, <u>Section 11.5</u>, this <u>Section 11.6</u>, <u>Section 11.8.2</u>, <u>Section 11.11.3</u>, <u>Section 11.9</u> and <u>Section 11.14</u>.

11.7.    <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the Parties in whole or in part (whether by operation of Law or otherwise) without the prior written consent of the other Parties, and any such assignment without such consent shall be null and void; <u>provided</u> that Buyer may assign all or any portion of its rights and obligations hereunder to a wholly owned direct or indirect Subsidiary of Buyer or to any of its Affiliates without the prior written consent of the Sellers, or to any Financing Source pursuant to the terms of the Debt Financing for purposes of creating a security interest herein or otherwise assigning as collateral in respect of the Debt Financing, but no such assignment shall relieve Buyer of any of its obligations hereunder.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

11.8.    <u>Governing Law</u>.

11.8.1.    This Agreement and all claims or causes of action (whether at Law, in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance hereof shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to conflicts of laws principles that would result in the application of the Law of any other state.

11.8.2.    Notwithstanding anything herein to the contrary, any action, cause of action, claim, cross-claim or third-party claim of any kind or description, whether at law or in equity, whether in contract or in tort or otherwise, against any Financing Source in any way relating to this Agreement or any of the transactions contemplated hereby, or any dispute arising out of or relating in any way to the Debt Financing, the Debt Commitment Letter, the performance thereof or the transactions contemplated thereby shall be governed by, and construed in accordance with, the Laws of the State of New York.

11.9.    <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY IRREVOCABLY WAIVES ANY AND ALL

RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR
RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED
HEREBY (INCLUDING ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM
INVOLVING ANY FINANCING SOURCE).

11.10.  Reliance.  Each of the parties hereto acknowledges that it has been informed by
each other party that the provisions of Sections 11.8 and 11.11 constitute a material inducement
upon which such party is relying and will rely in entering into this Agreement, and each such
party agrees that any breach by such party of any of the provisions of Sections 11.8 and 11.11
would constitute a material breach of this Agreement.

11.11.  Enforcement; Exclusive Jurisdiction.

11.11.1.  The rights and remedies of the Parties shall be cumulative with and not
exclusive of any other remedy conferred hereby.  The Parties agree that irreparable damage
would occur, that such damages (including monetary damages, even if available) would be
difficult to determine and that the Parties would not have any adequate remedy at law in the
event that any of the provisions of this Agreement were not performed in accordance with their
specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be
entitled to an injunction or injunctions to prevent breaches or threatened breaches of this
Agreement and to enforce specifically the terms and provisions of this Agreement, including the
obligations to consummate the Contemplated Transactions, in the Court of Chancery of the State
of Delaware or, solely in the case that the Court of Chancery of the State of Delaware declines to
accept jurisdiction over a particular matter, any state or federal court located in the State of
Delaware, without proof of actual damages or otherwise (and each Party hereby waives any
requirement for the securing or posting of any bond in connection with such remedy), this being
in addition to any other remedy to which they are entitled at law or in equity.  Notwithstanding
anything in this Agreement or any document entered into in connection with this Agreement to
the contrary, none of the Sellers, the Targets or any of their respective Affiliates shall be entitled
to seek to enforce specifically Buyer's obligations to fund (or cause to be funded) any portion of
the Equity Financing or otherwise consummate the Contemplated Transactions, the Financing or
any other transactions contemplated by this Agreement or any other related agreements unless
and only if: (i) all of the conditions set forth in Article 6 have been and continue to be satisfied
or, to the extent permitted by applicable Law, waived (except for any conditions that by their
nature can only be satisfied on the Closing Date, but subject to such conditions being capable of
satisfaction on the Closing Date or waiver by the Party entitled to waive such conditions), (ii) the
full amount of the Debt Financing has been funded or will be funded at the Closing in
accordance with the terms of the Debt Commitment Letter if the Equity Financing were funded
at the Closing, (iii) Buyer fails to consummate the Closing by the date that the Closing should
have occurred pursuant to Section 2.3, (iv) the Sellers have irrevocably and unconditionally
confirmed in a written notice to Buyer that if specific performance is granted and the Equity
Financing and Debt Financing are funded, then they would each take such actions that are
required of them by this Agreement to cause the Closing to occur, and (v) Buyer fails to
complete the Closing within two (2) Business Days after delivery of the Sellers' irrevocable and
unconditional written confirmation; provided, that the Sellers remain ready, willing and able to
consummate the Closing during such two (2) Business Day period after delivery of such
irrevocable and unconditional written confirmation.  In no event will the Sellers or the Targets be

entitled to enforce or seek to enforce specifically Buyer's obligation to cause the Equity Financing to be funded or to complete the Contemplated Transactions if the Debt Financing has not been funded in full (or will not be funded in full at the Closing if the Equity Financing is funded at the Closing). Furthermore, for the avoidance of doubt, it is agreed that Buyer and the Sellers will be entitled to an injunction, specific performance or other equitable relief as provided in this Section 11.11, except that, although the Sellers, in their sole discretion, may determine its choice of remedies under this Agreement, including by pursuing specific performance in accordance with, but subject to the limitations of, this Section 11.11, under no circumstances will the Sellers, directly or indirectly, be permitted or entitled to receive both specific performance of the type contemplated by this Section 11.11 or any monetary damages or other payments. The Parties' rights in this Section 11.11 are an integral part of the transactions contemplated hereby and each Party hereby waives any objections to any remedy referred to in this Section 11.11.

11.11.2.  In addition, to the fullest extent permitted by applicable Law, each of the Parties irrevocably (i) consents to submit itself, and hereby submits itself, to the personal jurisdiction of the Court of Chancery of the State of Delaware, or solely in the case that the Court of Chancery of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court located in the State of Delaware, in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion, as a defense, or other request for leave from any such court, and agrees not to plead or claim (or counterclaim) any objection to the laying of venue in any such court or that any judicial proceeding in any such court has been brought in an inconvenient forum, (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Court of Chancery of the State of Delaware, or solely in the case that the Court of Chancery of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court located in the State of Delaware, (iv) agrees not to assert that it and its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), (v) agrees that this Agreement, and the subject matter hereof, may be enforced in or by such courts and (vi) consents to service of process being made through the notice procedures set forth in Section 11.1; provided, that (A) nothing herein shall affect the right of any party to serve legal process in any other manner permitted by Law and (B) each such party's consent to jurisdiction and service contained in this Section 11.11 is solely for the purpose referred to in this Section 11.11 and shall not be deemed to be a general submission to said courts or in the State of Delaware other than for such purpose.

11.11.3.  Notwithstanding anything herein to the contrary, each of the Parties acknowledges and irrevocably agrees that any action or proceeding, whether in contract or tort, at law or in equity or otherwise, against any Financing Source arising out of, or relating to, the transactions contemplated by this Agreement (including the Debt Financing) shall be subject to the exclusive jurisdiction of the Supreme Court of the State of New York, County of New York, or if under applicable Law exclusive jurisdiction is vested in the federal courts, the United States District Court for the Southern District of New York in the Borough of Manhattan (and the appellate courts thereof) and each Party submits for itself and its property with respect to any such action or proceeding to the exclusive jurisdiction of such court and agrees not to bring any such action or proceeding in any other court.

11.12.  <u>No Waiver</u>.  No failure or delay on the part of any party hereto in the exercise of any right hereunder will impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty, covenant or agreement herein, nor will any single or partial exercise of any such right preclude any other or further exercise thereof or of any other right.  No waiver of any provision of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), or shall constitute a continuing waiver unless otherwise expressly provided.  No waiver of any right or remedy hereunder shall be valid unless the same shall be in writing and signed by the party against whom such waiver is intended to be effective.

11.13.  <u>Disclosure Schedules</u>.  All capitalized terms not defined in the Disclosure Schedules shall have the meanings assigned to them in this Agreement.  The Disclosure Schedules shall, for all purposes in this Agreement, be arranged in numbered and lettered parts and subparts corresponding to the numbered and lettered sections and subsections contained in this Agreement.  Each item disclosed in the Disclosure Schedules shall constitute an exception to or, as applicable, disclosure for the purposes of, the representations and warranties (or covenants, as applicable) to which it makes express reference and shall also be deemed to be disclosed or set forth for the purposes of every other part in the Disclosure Schedules relating to the representations and warranties (or covenants, as applicable) set forth in this Agreement to the extent a cross-reference within the Disclosure Schedules is expressly made to such other part in the Disclosure Schedules, as well as to the extent that the relevance of such item as an exception to or, as applicable, disclosure for purposes of, such other section of this Agreement is reasonably apparent from the face of such disclosure.  The listing of any matter on the Disclosure Schedules shall not be deemed to constitute an admission by the Sellers, the Targets or Buyer, as applicable, or to otherwise imply, that any such matter is material, is required to be disclosed by the Sellers, the Targets or Buyer, as applicable, under this Agreement or falls within relevant minimum thresholds or materiality standards set forth in this Agreement.  No disclosure in the Disclosure Schedules relating to any possible breach or violation by the Sellers, the Targets or Buyer, as applicable, of any Contract or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  In no event shall the listing of any matter in the Disclosure Schedules be deemed or interpreted to expand the scope of the representations, warranties, covenants or agreements set forth in this Agreement.

11.14.  <u>No Recourse</u>.  Each party agrees, on behalf of itself and (i) the Target Related Parties or (ii) Buyer's and its Subsidiaries' former, current or future stockholders, directors, officers, employees, Affiliates or Representatives ("<u>Buyer Related Parties</u>"), as applicable, that all proceedings (whether in Contract or in tort, in Law or in equity or otherwise, or granted by statute or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil or any other theory or doctrine, including alter ego or otherwise) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to: (a) this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions (including the Equity Financing or the Debt Financing) or any other transactions contemplated hereunder or thereunder; (b) the negotiation, execution or performance of this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions (including any representation or warranty made in connection with, or as an inducement to, this Agreement or

Doc#: US1:12600497v8

any documents executed in connection with this Agreement or the Contemplated Transactions); (c) any breach or violation of this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions; and (d) any failure of the Contemplated Transactions (including the Equity Financing or the Debt Financing) or any other transactions contemplated hereunder or thereunder to be consummated, in each case, may be made only against (and are those solely of) the Persons that are, in the case of this Agreement, expressly identified as parties to this Agreement, and in the case of the documents executed in connection with this Agreement or the Contemplated Transactions, Persons expressly identified as parties to such documents and in accordance with, and subject to the terms and conditions of, this Agreement or such documents, as applicable. Notwithstanding anything in this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions to the contrary, each party agrees, on behalf of itself and its Target Related Parties or Buyer Related Parties, as applicable, that (x) no Financing Source will have any liability or obligation in connection with or related in any manner to the items in the immediately preceding clauses (a) through (d) to any person that is not a party to the Debt Commitment Letter and (y) no recourse under this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions (including the Equity Financing or the Debt Financing) or any other transactions contemplated hereunder or under any other documents executed in connection with this Agreement or the Contemplated Transactions will be sought or had against any other Person, including any Target Related Party or Buyer Related Party, and no other Person, including any Target Related Party or Buyer Related Party, will have any liabilities or obligations (whether in Contract or in tort, in Law or in equity or otherwise, or granted by statute or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil or any other theory or doctrine, including alter ego or otherwise), for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to the items in the immediately preceding clauses (a) through (d), it being expressly agreed and acknowledged that no personal liability or losses whatsoever will attach to, be imposed on or otherwise be incurred by any of the aforementioned, as such, arising under, out of, in connection with or related in any manner to the items in the immediately preceding clauses (a) through (d), in each case, except for claims that the Targets, Sellers or Buyer, as applicable, may assert (subject, with respect to the following clauses (ii), in all respects to the limitations set forth in Section 10.2, 11.11.1 and this 11.14): (i) against any Person that is party to, and solely pursuant to the terms and conditions of, the Confidentiality Agreement; (ii) against each guarantor under, if, as and when required pursuant to the terms and conditions of the Limited Guaranty; (iii) against the equity providers for specific performance of their obligation to fund their committed portions of the Equity Financing solely in accordance with, and pursuant to the terms and conditions of, Section 6 of the Equity Commitment Letter; or (iv) against the Targets, Sellers and Buyer solely in accordance with, and pursuant to the terms and conditions of, this Agreement. Notwithstanding anything to the contrary in this Agreement or any documents executed in connection with this Agreement or the transactions contemplated hereby, no Buyer Related Party will be responsible or liable for any multiple, consequential, indirect, special, statutory, exemplary or punitive damages that may be alleged as a result of this Agreement or any documents executed in connection with this Agreement or the Contemplated Transactions (including the Financing), or the termination or abandonment of any of the foregoing.

11.15.  Headings.  The headings contained in this Agreement are inserted only for reference as a matter of convenience and in no way define, limit or describe the scope or intent of this Agreement, and will not affect in any way the construction, meaning or interpretation of this Agreement.

11.16.  Counterparts; Electronic Signature .  This Agreement may be executed in any number of counterparts, and by the different parties hereto in separate counterparts, each of which will be deemed an original for all purposes and all of which together will constitute one and the same instrument.  This Agreement may be executed by facsimile or PDF signature by any party and such signature will be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

11.17.  Attorney Client Privilege; Conflict of Interest.

11.17.1.  Buyer agrees not to assert, and following the Closing agrees to cause the Targets and their Subsidiaries not to assert, any attorney-client privilege with respect to communications between Brown Rudnick LLP ("BR") and any officer, director or employee of the Targets and their Subsidiaries related to the Contemplated Transactions and occurring prior to the Closing, it being the intention of the parties hereto that such attorney-client-privilege shall be deemed to be the right of, and retained by, the Sellers, and not that of the Targets or their Subsidiaries, following the Closing; provided that the foregoing shall in no event limit or otherwise affect the Targets' or their Subsidiaries' right to assert any attorney-client privilege with respect to any such communication against any Person other than any equityholder, officer, director or employee of the Targets or their Subsidiaries prior to the Closing.

11.17.2.  Each of the parties to this Agreement hereby agrees, on its own behalf and on behalf of its directors, members, stockholders, partners, officers, employees and Affiliates, that, prior to the Closing, BR may serve as counsel to each and any Seller and their respective Affiliates (individually and collectively, the "Holder Group"), on the one hand, and the Targets and their Subsidiaries, on the other hand, in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (the "Existing Representation"), and that, following consummation of the transactions contemplated hereby, BR (or any successor) may serve as counsel to the Holder Group or any director, member, partner, stockholder, officer, employee or Affiliate of the Holder Group, in connection with any litigation, claim or obligation arising out of or relating to this Agreement or the Contemplated Transactions (any such representation, a "Post-Closing Representation") notwithstanding the Existing Representation, and each of the parties hereto hereby consents thereto and waives any conflict of interest arising therefrom, and each of such parties shall cause any Affiliate thereof to consent to waive any conflict of interest arising from the Existing Representation.  Upon and after the Closing, the Targets and their Subsidiaries shall cease to have any attorney-client relationship with BR, unless and to the extent BR is specifically engaged in writing by the Targets or any of their Subsidiaries to represent the Targets or their Subsidiaries after the Closing and either such engagement involves no conflict of interest with respect to the Sellers, or the Sellers consent in writing at the time to such engagement.  Any such representation of the Targets and their Subsidiaries by BR after the Closing shall not affect the foregoing provisions hereof.

86

11.17.3.   This <u>Section 11.17</u> is for the benefit of the Holder Group and such Persons are intended third-party beneficiaries of this <u>Section 11.17</u>.

11.17.4.   Buyer hereby acknowledges that it has had the opportunity (including on behalf of its Affiliates) to discuss and obtain adequate information concerning the significance and material risks of, and reasonable available alternatives to, the waivers, permissions and other provisions of this <u>Section 11.17</u>, including the opportunity to consult with counsel.  This <u>Section 11.17</u> shall be irrevocable, and no term of this <u>Section 11.17</u> may be amended, waived or modified, in a manner that is adverse to the interests of the Sellers or BR, without the prior written consent of the Sellers and BR.

11.18.   <u>Control Prior to Closing</u>.  Notwithstanding anything else herein to the contrary, this Agreement and, without limitation, the covenants in Section 8.2 (but subject in all respects to compliance therewith), are not intended to and shall not be construed to transfer control of the Target Stations or to give Buyer any right, directly or indirectly, to control, supervise or direct, or attempt to control, supervise or direct, the personnel, programming or finances, or any other matter relating to the operation of the Target Stations prior to the Closing, and Sellers, the Targets, and/or their respective Affiliates, as applicable, shall have ultimate control and supervision of all aspects of Target Station operations up to the time of the Closing.

[*The remainder of this page is intentionally blank.  Signatures follow.*]

Doc#: US1:12600497v8

**THE BUYER:**

TERRIER MEDIA BUYER, INC.

By: _____

    Name: Laurie D. Medley
    Title:  Vice President

**THE SELLERS:**

BRIAN W. BRADY

*Brian W Brady*
Brian W Brady, by Fred L Levy under Power
of Attorney dated April 10, 2013

JASON R. WOLFF

_____

BRISTLECONE, LLC

By: *Brian W Brady*
    Name: Brian W. Brady, by Fred L Levy under Power
    Title: Co-Manager   of Attorney dated April 10, 2013

By: _____
    Name: Diane M. Brady
    Title: Co-Manager

**THE SELLERS:**

BRIAN W. BRADY

_____

JASON R. WOLFF

_____

BRISTLECONE, LLC

By: _____
     Name: Brian W. Brady
     Title: Co-Manager

By: _____
     Name: Diane M. Brady
     Title: Co-Manager

_Signature Page to Purchase Agreement_

**THE SELLERS:**

BRIAN W. BRADY

_____

JASON R. WOLFF

_____

BRISTLECONE, LLC

By: _____
    Name: Brian W. Brady
    Title: Co-Manager

By: _____
    Name: Diane M. Brady
    Title: Co-Manager

*Signature Page to Purchase Agreement*

**THE TARGETS:**

NBI HOLDINGS LLC

By: *Brian W Brady*
  Name: Brian W. Brady, by Fred L Levy under
  Title: President    Power of Attorney dated April 10, 2013

BRYSON BROADCAST HOLDINGS, LLC

By: *Brian W Brady*
  Name: Brian W. Brady, by Fred L Levy under Power of
  Title: Chairman    Attorney dated April 10, 2013

NORTHWEST BROADCASTING, L.P.

By: Northwest Broadcasting, Inc.
It's General Partner

By: *Brian W Brady*
  Name: Brian W. Brady, by Fred L Levy under Power
  Title: President    of Attorney dated April 10, 2013

## Schedule 3.8.1(a)

## **Properties**

Owned Real Property

| | Owner | Address | Description |
|---|---|---|---|
| 1 | Cala Broadcast Partners LLC | 849 Washington Ave., Greensville, MS 38701, Washington County | Main Studio |
| 2 | Cala Broadcast Partners LLC | 837 Washington Ave., Greensville, MS 38701, Washington County | Main Studio |
| 3 | Cala Broadcast Partners LLC | Chaney Lane/Alley Lot, Greensville, MS 38701, Washington County | Behind Main Studio |
| 4 | Cala Broadcast Partners LLC | 3015 E. Reed Street, Greensville, MS 38701, Washington County | Old WXVT Studio * |
| 5 | Redwood Television Partners LLC | 8998 Kneeland Road, Eureka, CA Humboldt County | KIEM and KVIQ-LD Transmitter Site** |
| 6 | Redwood Television Partners LLC | 5650 South Broadway, Eureka, CA, Humboldt County | Combined KIEM/KVIQ Studio |
| 7 | Lost Coast Broadcasting LLC | 1811 England Drive, Alexandria, LA | KLAX Studio Site |
| 8 | Lost Coast Broadcasting LLC | 1198 Forest Service Road No. 116A, Dry Prong, LA | KLAX Tower Site |
| 9 | Stainless Broadcasting, L.L.C. | 184 Ingraham Hill Road, Binghamton, NY 13851, Broome County | Tower Site |
| 10 | Stainless Broadcasting, L.L.C. | 4600 Vestal Parkway East, Vestal, NY 13851, Broome County | WICZ-TV Office |
| 11 | Idaho Broadcast Partners, LLC | 902 E. Sherman Street, Pocatello, ID 83201 | Studio and Offices |
| 12 | Idaho Broadcast Partners, LLC | N15 Lot 18, Lots 19-20, Block 169, Pocatello Townsite, Pocatello, 83201 | Parking Lot |
| 13 | Idaho Broadcast Partners, LLC | Lots 8-9, Block 168, Pocatello Townsite, Pocatello, 83201 | Satellite Lot |

* Property is currently vacant and is being listed for sale.
** Property is being listed for sale.

Leased Real Property

| | Lessee | Address | Description |
|---|---|---|---|
| 1 | Cala Broadcast Partners LLC | 200 East Washington Street, Greenwood, MS 38930 | Studio and Office |

| 2 | Blackhawk Broadcasting LLC | Black Mountain Road, Winterhaven, CA 92283, Imperial County, 30° 03' 10.0"N 114° 49' 40.0"W. | Transmitter and Tower |
|---|---|---|---|
| 3 | Blackhawk Broadcasting LLC | Black Mountain Road, Winterhaven, CA 92283, Imperial County, 30° 03' 17.0"N 114° 49' 34.0"W. | Transmitter and Tower |
| 4 | Redwood Television Partners LLC | 1603 Barry Road, Kneeland, County of Humboldt, CA | Old Transmitter Site (KJRW) |
| 5 | Cala Broadcast Partners LLC | Clare Blake Rd., O'Reilly, MS 38730, Bolivar County | WXVT-LD Transmitter Site |
| 6 | Redwood Television Partners LLC | 8998 Kneeland Road, Eureka, CA, Humboldt County | KIEM and KVIW-LD Vertical Bridge Lease. Redwood Television Partners owns land, but not tower. |
| 7 | Northwest Broadcasting, Inc. | 2111 University Park Drive, Suite 650, Okemos, MI 48864, Ingham County | Office Space |
| 8 | Broadcasting Communications, LLC | Suites 101-105 Cedar Mall, 820 Crater Lake Avenue, Medford, OR 97504, Jackson County | KMVU Station Office |
| 9 | Broadcasting Communications, LLC | Mt. Baldy, Medford, OR, Jackson County | KMVU Tower Site |
| 10 | Broadcasting Communications, LLC | Beacon Hill, Grants Pass, OR, Josephine County | KMVU Translator Station K34NO-D |
| 11 | Broadcasting Communications, LLC | Stukel Mountain, Klamath Falls, OR, Klamath County | KMVU Translator Station K26NB-D |
| 12 | Northwest Broadcasting, Inc. | 718-750 Crater Lake Ave., Medford, OR, Jackson County | Satellite Space at KMVU Office Location |
| 13 | Broadcasting Communications, LLC | Butcher Hill, Yreka, CA, Siskiyou County | KMVU Translator Station K32LQ-D |
| 14 | Mountain | 1205 West Lincoln Ave., Yakima, Washington | KCYU Station |

|  | Broadcasting, L.L.C. | 98904, Yakima County | Office |
|---|---|---|---|
| 15 | Mountain Broadcasting, L.L.C. | 6725 West Clearwater, Suites A & B, Kennewick, WA 99336, Benton County | KBWU/KFFX Station Office |
| 16 | Mountain Broadcasting, L.L.C. | 4600 S. Regal Street, Spokane, WA, Spokane County | KAYU Station Office |
| 17 | Mountain Broadcasting, L.L.C. | Krell Hill, Spokane, WA, Spokane County | KAYU Tower Site Land |
| 18 | Mountain Broadcasting, L.L.C. | Spout Springs, OR, Union County | KFFX Tower Site Land |
| 19 | Mountain Broadcasting, L.L.C. | Ahtanum Ridge, Yakima, WA, Yakima County | KCYU Ch 41 Tower Site* |
| 20 | Mountain Broadcasting, L.L.C. | Prosser Butte, Prosser, WA, Benton County | KCYU/KBWU Translator Station K10NQ |
| 21 | Mountain Broadcasting, L.L.C. | Baldy Mountain, Sandpoint, ID, Bonner County | KAYU Translator Station K33LW Site |
| 22 | Mountain Broadcasting, L.L.C. | Canfield Butte, Coeur D'Alene, ID, Kootenai County | KAYU Translator Station K46KE-D Site |
| 23 | Mountain Broadcasting, L.L.C. | Omak Mountain, Omak/Okanogan, WA, Okanogan County | KAYU Translator Station K31AH-D Site** |
| 24 | Mountain Broadcasting, L.L.C. | Omak Mountain, Omak/Okanogan, WA, Okanogan County | KAYU Translator Station K19AU-D Site** |
| 25 | Mountain Broadcasting, L.L.C. | Chelan Butte, Chelan, WA, Chelan County | KAYU Translator Station K44CK Site** |
| 26 | Mountain Broadcasting, L.L.C. | Eagle Peak / Colville Mountain, Colville, WA, Stevens County | KAYU Translator Station K09UP-D Site |
| 27 | Mountain Broadcasting, L.L.C. | Cottonwood Butte, Grangeville, ID, Idaho County | KAYU Translator Station K19BY-D Site** |

| 28 | Mountain Broadcasting, L.L.C. | Jump Off Butte, Stemilt, WA, Chelan County | KAYU Translator Station K38IT Site** |
|----|----|----|----|
| 29 | Mountain Broadcasting, L.L.C. | Lewiston Hill, Whitman County, WA | KAYU Translator Station K18LH-D Site |
| 30 | Mountain Broadcasting, L.L.C. | Pickens Mountain, Ellisford/Oroville, Washington, Okanogan County | KAYU Translator Station K35BJ Site** |
| 31 | Mountain Licenses, L.P. | Jump Off Joe Butte located in Benton County, WA. | KFFX Translator Station KBWU-LD Site |
| 32 | Bristlecone Broadcasting, LLC | 1000 James Street, Syracuse, NY 13203 | WSYT Station Office |
| 33 | Bristlecone Broadcasting, LLC | Otisco-Mann Hill, Otisco Township, NY | WSYT Tower Site |
| 34 | Bristlecone Broadcasting, LLC | Ithaca Tower, Ithaca, NY, Tompkins County | WYST Translator Station W16AX |
| 35 | Bristlecone Broadcasting, LLC | 2250 Barker Street, Otisco, NY 13084. | WSTM Tower Site |
| 36 | Idaho Broadcast Partners, LLC | Clark Building, Howard Mountain, Pocatello, ID 83201, Bannock County | Translator Site K40MS-D |
| 37 | Idaho Broadcast Partners, LLC | At the Rexburg Bench, near Rexburg, ID | Translator Site K13UF-D |
| 38 | Idaho Broadcast Partners, LLC | Parcel #R3851000600 in Pocatello, ID, Bannock County | Main Transmitter KPVI-DT |
| 39 | Idaho Broadcast Partners, LLC | Kelley Mountain, Cassia County, ID, Parcel #RP11S24E263600 | Translator Site K39GV |
| 40 | Idaho Broadcast Partners, LLC | 3300 E. Ski Hill Road, Alta, WY 83414 | Translator Site K32LS-D |
| 41 | Idaho Broadcast Partners, LLC | 151 North 3rd, Pocatello, ID 83201, Bannock County | KPVI Microwave Site |

* Two separate leases have been entered into regarding this property
**No written leases have been entered into regarding these properties.

Real Property Leases

1. Mississippi Commercial Lease Agreement, by and between Cala Broadcast Partners LLC and American Capital Investments, PLLC, dated on January 25, 2017 regarding the Studio and Office at 200 East Washington Street, Greenwood, MS 38930.

2. Communications Use Lease, by and between Blackhawk Broadcasting, LLC and the Bureau of Land Management to Yuma, dated as of December 28, 1987, regarding the Transmitter and Tower at Black Mountain Road, Winterhaven, CA 92283, Imperial County, 30° 03' 10.0"N 114° 49' 40.0"W.*

3. Communications Use Lease, by and between Blackhawk Broadcasting, LLC and the Bureau of Land Management in favor of Desert Telecasting Company Inc., dated as of July 21, 2000, regarding the Transmitter and Tower at Black Mountain Road, Winterhaven, CA 92283, Imperial County, 30° 03' 17.0"N 114° 49' 34.0"W.*

4. Tower Lease Agreement, by and between Redwood Television Partners LLC and Redwood Empire Public Television Inc., entered into on December 1, 2012, regarding the Transmitter Site at 1603 Barry Road, Kneeland, County of Humboldt, CA.

5. Site Use Agreement, by and between Cala Broadcast Partners LLC and Vertical Bridge, dated July 31, 2018, regarding Trasmitter Facilities at Clare Blake Rd., O'Reilly, MS 38730, Bolivar County.

6. Site Use Agreement, by and between Redwood Television Partners LLC and Vertical Bridge, dated July 31, 2018, regarding the land under the tower site at 8998 Kneeland Road, Eureka, CA, Humboldt County. (Two agreements, one for KIEM, one for KVIQ-LD)

7. Office Space Lease, by and between Northwest Broadcasting, Inc. and 2111 University Park Dr. LLC, dated as of October 14, 2002, regarding 2111 University Park Drive, Suite 650, Okemos, MI 48864, Ingham County.

8. Lease Agreement, by and between Broadcasting Communications, LLC and Valley Investments, dated May 17, 2001, regarding KMVU Station Office at Suites 101-105 Cedar Mall, 820 Crater Lake Avenue, Medford, OR 97504, Jackson County.

9. License Agreement, by and between Broadcasting Communications, LLC and Gary H. Safley & Judith A. Safley, dated as of October 25, 2004, regarding KMVU Tower Site at Mt. Baldy, Medford, OR, Jackson County.

10. Lease Agreement, by and between Broadcasting Communications, LLC and Phoenix Broadcasting Sites Inc., dated as of August 12, 1994, regarding KMVU Translator Station K34NO-D Site at Beacon Hill, Grants Pass, OR, Josephine County.

11. Telecommunications Site License Agreement, by and between Broadcasting Communications, LLC and the State Board of Higher Education acting by and through Southern Oregon University and its public radio network, Jefferson Public Radio and Broadcasting Communications, L.L.C, dated as of September 22, 2014, regarding KMVU Translator Station K26NB-D Site at Stukel Mountain, Klamath Falls, OR, Klamath County.

12. Lease Agreement, by and between Northwest Broadcasting, Inc. and Stanley C. Moore, dba Crater Lake Property Management, and Broadcasting Communications, LLC, dated as of January 1, 2012, regarding Satellite Space at KMVU Office Location, 718-750 Crater Lake Ave., Medford, OR, Jackson County.

13. Lease, between California Oregon Broadcasting, Inc. and Broadcasting Communications, LLC, dated as of September 15, 2016, regarding KMVU Translator Station K32LQ-D Site at Butcher Hill, Yreka, CA, Siskiyou County.

14. Commercial Lease, by and between Damon L. Vetsch, sole proprietor, dba Lendamon's, and Mountain Broadcasting, L.L.C., dated as of July 1, 2015, regarding KCYU Station Office at 1205 West Lincoln Ave., Yakima, Washington 98904, Yakima County.

15. Lease of Commercial Property, by and between RRO Land LLC and Mountain Broadcasting, L.L.C., dated June 12, 2015, regarding KBWU/KFFX Station Office at 6725 West Clearwater, Suites A & B, Kennewick, WA 99336, Benton County.

16. Lease Agreement, by and between Wolf Creek Holdings of Spokane, LLC and Mountain Broadcasting, L.L.C., dated as of January, 12, 1998, as amended, regarding KAYU Station Office at 4600 S. Regal Street, Spokane, WA, Spokane County.

17. Land Lease, by and between Spokane Investors and Mountain Broadcasting, L.L.C., dated as of March 30, 1982, as amended, regarding KAYU Tower Site at Krell Hill, Spokane, WA, Spokane County.

18. Communications Use Lease, by and between Mountain Broadcasting, L.L.C. and the United States of America Department of Agriculture Forest Service, dated July 13, 2009, regarding KFFX Tower Site at Spout Springs, OR, Union County.

19. Lease and Right of Access Agreement, by and between Apple Valley Television, Inc. and Mountain Broadcasting, L.L.C., dated as of October 1, 2003, regarding KCYU Ch 41 Tower Site Building at Ahtanum Ridge, Yakima, WA, Yakima County.

20. Tower Site Sublease Agreement, by and between Washington State University and Mountain Broadcasting, L.L.C., dated as of October 1, 2003, regarding KCYU Ch 41 Tower Site at Ahtanum Ridge, Yakima, WA, Yakima County.

21. Agreement, by and between Casa Media Partners LLC and Mountain Broadcasting, L.L.C., dated as of May 19, 2005, regarding KCYU/KBWU Translator Station K10NQ Site at Prosser Butte, Prosser, WA, Benton County.

22. Sublease and Tower Lease Agreement, by and between Active Electronics, Inc. and Mountain Broadcasting, L.L.C., dated as of October 1, 2013, regarding KAYU Translator Station K33LW Site at Baldy Mountain, Sandpoint, ID, Bonner County.

23. Site License and Use Agreement, by and between the State of Idaho through its State Board of Education, acting through Idaho Public Television, and Mountain Broadcasting, L.L.C., dated as of January 1, 2014, regarding KAYU Translator Station K46KE-D Site at Canfield Butte, Coeur D'Alene, ID, Kootenai County.

24. KAYU Translator Station K31AH-D Site – Omak Mountain, Omak/Okanogan, WA, Okanogan County.**

25. KAYU Translator Station K19AU-D Site – Omak Mountain, Omak/Okanogan, WA, Okanogan County.**

26. KAYU Translator Station K44CK Site – Chelan Butte, Chelan, WA, Chelan County.**

27. Lease Agreement, by and between North Country Broadcasting, dba Internet Express Inc., and Mountain Broadcasting, L.L.C., dated as of August 11, 2004, regarding KAYU Translator Station K09UP-D Site at Eagle Peak / Colville Mountain, Colville, WA, Stevens County.

28. KAYU Translator Station K19BY-D Site – Cottonwood Butte, Grangeville, ID, Idaho County.**

29. KAYU Translator Station K38IT Site - Jump Off Butte, Stemilt, WA, Chelan County.**

30. Site License and Use Agreement, by and between the State of Idaho through its State Board of Education, acting through Idaho Public Television, and Mountain Broadcasting, L.L.C.,

dated as of January 1, 2015, regarding KAYU Translator Station K18LH-D Site at Lewiston Hill, Whitman County, WA.

31. KAYU Translator Station K35BJ Site - Pickens Mountain, Ellisford/Oroville, Washington, Okanogan County.**

32. Communication Site Land Lease, by and between Mountain Licenses, L.P. and the State of Washington Department of Natural Resources, effective on June 1, 2014, regarding KFFX Translator Station Site KBWU-LD at Jump Off Joe Butte located in Benton County, WA.

33. Lease Agreement, by and between Sinclair Properties, LLC and Bristlecone Broadcasting, LLC, dated as of November 22, 2013, regarding WSYT Station Office at 1000 James Street, Syracuse, NY 13203.

34. Lease Agreement, by and between Sinclair Properties, LLC and Bristlecone Broadcasting, LLC, dated as of November 22, 2013, regarding WSYT Tower Site at Otisco-Mann Hill, Otisco Township, NY.

35. Lease Agreement, by and between Tower Talk of Ithaca and Bristlecone Broadcasting, LLC, dated November 1, 1995, as amended on December 14, 2007, regarding WYST Translator Station W16AX at Ithaca Tower, Ithaca, NY, Tompkins County.

36. Tower Lease Agreement, by and between Sinclair Properties, LLC and Bristlecone Broadcasting, LLC, dated as of June 1, 2018, regarding WSTM Tower Site at 2250 Barker Street, Otisco, NY 13084.

37. Lease Agreement, by and between Idaho Broadcast Partners, LLC and Clark Wireless / Day Wireless, dated November 1, 2017, regarding Translator Site K40MS-D at Clark Building, Howard Mountain, Pocatello, ID 83201, Bannock County.

38. Tower Space Lease, by and between Idaho Broadcast Partners, LLC and Teton Communications, dated April 1, 2008, regarding Translator Site K13UF-D at the Rexburg Bench, near Rexburg, ID.

39. Site Use Agreement, by and between Idaho Broadcast Partners, LLC and Vertical Bridge Towers LLC, dated September 14, 2015, regarding Main Transmitter KPVI-DT at Parcel #R3851000600 in Pocatello, ID, Bannock County.

40. Kelley Mountain Lease, by and between Idaho Broadcast Partners, LLC and George and Jo Ann Kelley, dated May 16, 2016, regarding Translator Site K39GV at Kelley Mountain, Cassia County, ID, Parcel #RP11S24E263600.

41. Communication Site License Agreement, by and between Idaho Broadcast Partners, LLC and Grand Targhee Resort LLC, dated July 29, 2014, regarding Translator Site K32LS-D at 3300 E. Ski Hill Road, Alta, WY 83414.

42. Office Lease, by and between Idaho Broadcast Partners, LLC and T14 Unison Site Management, dated July 1, 2012, regarding KPVI Microwave Site at 151 North 3rd, Pocatello, ID 83201.

\* Lease has been renewed, but Lessee is still awaiting a response from the Bureau of Land Management.
\*\*No written leases have been entered into regarding these properties.

Third Party Leases

1. Sub-Lease Agreement by and between Idaho Broadcast Partners, LLC and Rise Broadband, regarding Translator Site K39GV at Kelley Mountain, Cassia County, ID, Parcel #RP11S24E263600.
2. Transmitter Site Sub-Lease Agreement, by and between Redwood Television Partners LLC and KJRW owner, regarding 1603 Barry Road, Kneeland, County of Humboldt, CA.

# EXHIBIT 5

**COX**MEDIA
GROUP

6205 Peachtree Dunwoody Road
Atlanta, GA 30328
678.645.0000

December 7, 2019

**Via National Courier Service**

DISH Network LLC
Attn: Senior Vice President, Programming
9601 S. Meridian Boulevard
Englewood, CO 80112

**Re:**   Retransmission Consent Agreement by and between DISH Network LLC and Cox Media
Group, LLC effective March 31, 2019 (the "Agreement")

To Whom it May Concern:

Cox Media Group, LLC ("CMG") is in the process of selling all or substantially all of the
assets of CMG to Terrier Media Buyer, Inc. (the "Transactions"). The Transactions are expected
to close in the fourth quarter of 2019 (the "Closing Date").

Pursuant to Section 17(b)(ii) of the Agreement, we hereby provide notice of the
Transactions, and advise you that effective as of the Closing Date, the right to grant
retransmission consent with respect to the Stations listed on Exhibit A hereto will be transferred
to Terrier Media Buyer, Inc.

Sincerely,

**COX MEDIA GROUP LLC**

By:_____
Name: Kim Guthrie
Title:   President

cc:    Office of the General Counsel

## Exhibit A

| Station | DMA |
|---|---|
| WSB-TV | Atlanta |
| WFXT | Boston (Manchester) |
| WSOC-TV | Charlotte |
| WAXN-TV | Charlotte |
| WHIO-TV | Dayton |
| WFOX-TV | Jacksonville |
| WHBQ-TV | Memphis |
| WFTV | Orlando-Daytona Bch-Melbrn |
| WRDQ | Orlando-Daytona Bch-Melbrn |
| WPXI | Pittsburgh |
| KIRO-TV | Seattle-Tacoma |
| KOKI-TV | Tulsa |
| KMYT-TV | Tulsa |

# EXHIBIT 6

# brownrudnick | facsimile cover

12/13/2019

THIS TRANSMISSION CONSISTS OF 5 PAGE(S) PLUS THIS COVER SHEET

| DELIVER TO | COMPANY/FIRM | FAX NUMBER | PHONE NUMBER |
|---|---|---|---|
| 3037231999 | | 3037231999 | |

| | |
|---|---|
| **FROM** | Grant, Lonnie |
| **E-MAIL** | lgrant@brownrudnick.com |
| **DIRECT DIAL** | +1 212.209.4887 |
| **DIRECT FAX** | 212.938.2887 |
| **A/C/M #** | grantl/026778/0030 |
| **RE** | Dish Network |
| **MESSAGE** | To: 2nd recipient: Office of the General Counsel |

CONFIDENTIALITY NOTICE
The documents accompanying this fax transmission contain information from the law firm of Brown Rudnick LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this faxed information is prohibited. If you have received this fax in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you. Thank you.

Northwest Broadcasting, Inc.
2111 University Park Drive, Suite 650
Okemos, MI 48864

**Via Overnight Mail and Fax**

December 13, 2019

DISH Network L.L.C.
Attn: Senior Vice President, Programming
9601 S. Meridian Boulevard
Englewood, CO 80112
Fax: 303-723-1999

Office of the General Counsel
DISH Network L.L.C.
9601 S. Meridian Boulevard
Englewood, CO 80112
Fax: 303-723-1699

Re:     **Notice of Change in Control**

Ladies and Gentlemen:

Reference is made to that certain Retransmission Consent Agreement between Northwest Broadcasting, Inc. ("NBI") and DISH Network, L.L.C. dated June 6, 2018 (the "Retransmission Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Agreement.

This notice is to inform you that Brian W. Brady, Jason R. Wolff and Bristlecone, LLC, a Michigan limited liability company ("Sellers"), intend to sell and transfer the interests in NBI Holdings, LLC, a Delaware limited liability company, Bryson Broadcast Holdings, LLC, a Delaware limited liability company, and Northwest Broadcasting, L.P., a Delaware limited partnership ("Targets"), to Terrier Media Buyer, Inc., a Delaware corporation ("Terrier") pursuant to that certain Purchase Agreement between Sellers, Targets and Terrier (the "Transaction"). NBI is a wholly owned subsidiary of NBI Holdings, LLC.

Notice is hereby given in accordance with Section 17(b)(ii) of the Retransmission Agreement that the Transaction will result in a Station Change of Control and applications were filed with the Federal Communications Commission for consent to Transaction, which applications were approved. Upon the consummation of the Transaction, NBI will continue to have the right to grant retransmission consent with respect to each applicable station.

Furthermore, in accordance with Section 17(b)(iv) Retransmission Agreement, please find attached hereto as Exhibit A a Letter Agreement executed by Terrier whereby Terrier acknowledges and agrees that effective upon the consummation of the Transaction, Terrier will

unconditionally assume and fully perform all the duties and obligations imposed upon NBI and the Station as set forth in the Retransmission Agreement.

Please contact Fred Levy at FLevy@brownrudnick.com with any questions or comments.

Sincerely,

Fred Levy
Secretary

## Exhibit A

See attached.

Northwest Broadcasting, Inc.
2111 University Park Drive, Suite 650
Okemos, MI 48864

Via Email

December 13, 2019

Terrier Media Buyer, Inc.
c/o Apollo Global Management
9 West 57th Street, 43rd Floor
New York, NY 10019
Facsimile number: (646) 417-6429
Email: dsambur@apollo.com
       jsuydam@apollo.com
Attention: David Sambur, Partner
           John Suydam, Chief Legal Officer

and

Apollo Global Management
9 West 57th Street, 43rd Floor
New York, NY 10019
Facsimile number: (646) 417-6429
Email: dsambur@apollo.com
       jsuydam@apollo.com
Attention: David Sambur, Partner
           John Suydam, Chief Legal Office

and

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile number: (212) 757-3990
Email: tzeitzer@paulweiss.com
       bscrivani@paulweiss.com
Attention: Taurie M. Zeitzer
           Brian Scrivani

Re:    **Assumption of Obligations**

Ladies and Gentlemen:

       Reference is made to that certain Retransmission Consent Agreement between Northwest
Broadcasting, Inc. ("NBI") and DISH Network, L.L.C. ("DISH") dated June 6, 2018 (the

"Retransmission Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Agreement.

Further reference is made to that certain Purchase Agreement, dated as of February 14, 2019 (the "Purchase Agreement"), by and among Brian W. Brady ("Brady"), Jason R. Wolff ("Wolff"), Bristlecone, LLC ("Bristlecone" and collectively with Brady and Wolff, the "Sellers"), NBI Holdings, LLC ("Holdings"), Bryson Broadcast Holdings, LLC ("Bryson"), Northwest Broadcasting, L.P. ("NW Broadcasting" and collectively with NBI and Bryson, the "Targets") and Terrier Media Buyer, Inc. ("Terrier"), whereby the Sellers will sell and transfer the interests in the Targets to Terrier. NBI is a wholly owned subsidiary of Holdings.

In accordance with, and as required by, the Retransmission Agreement, Terrier hereby acknowledges and agrees that effective upon the consummation of the Transaction, Terrier will unconditionally assume and fully perform all the duties and obligations imposed upon NBI and the Station as set forth in the Retransmission Agreement. Should the Transaction not be consummated for any reason, this letter shall be null and void.

Sincerely,

Name: Fred Levy
Title: Secretary

ACKNOWLEDGED AND AGREED

Terrier Media Buyer, Inc.

By:
Name: Laurie D. Medley
Title: Vice President
Date: December 12, 2019

EXHIBIT 7

**NBI Holdings LLC**
as 100% parent of Northwest Broadcasting, Inc.
2111 University Park Drive, Suite 650
Okemos, MI 48864

**VIA FED-EX OVERNIGHT COURIER AND FACSIMILE**

December 20, 2019

DISH Network L.L.C.
Attn: SVP, Programming
9601 S. Meridian Blvd
Englewood, CO 80112
Fax - (303)-723-1999

With copy to:

DISH Network L.L.C.
Attn: General Counsel
9601 S. Meridian Blvd
Englewood, CO 80112
Fax - (303)-723-1699

         RE:   Station Acquisition

Ladies and Gentlemen:

         NBI Holdings LLC, the parent of Northwest Broadcasting, Inc. ("Northwest"), recently acquired the stations listed on Exhibit A (the "Stations").

         In accordance with Section 17 of the Retransmission Consent Agreement effective as of June 6, 2018 by and between Northwest and DISH Network, L.L.C. (the "Agreement"), each of the Stations is an Additional Station, as defined in the Agreement, and each is hereby added to Exhibit A to the Agreement and as such is covered by the terms of the Agreement. The transfer of the Stations was approved by the FCC on November 22, 2019 and the transaction was consummated and became effective on December 17, 2019.

         If you have any questions concerning the foregoing, please contact Fred Levy at FLevy@brownrudnick.com.

                                        Very truly yours,

                                        Fred Levy
                                        Counsel to NBI Holdings LLC

Exhibit A

| Station | DMA | Affiliation of Primary Feed | Multicast Feeds and Affiliations |
|---|---|---|---|
| WSB-TV | Atlanta | ABC | WSB.2: Bounce<br>WSB.3: Laff |
| WFXT | Boston (Manchester) | FOX | WFXT.2: Escape<br>WFXT.3: Laff |
| WSOC-TV | Charlotte | ABC | WSOC.2: Telemundo |
| WAXN-TV | Charlotte | Ind | WAXN.2: GetTV<br>WAXN.3: Court TV<br>WAXN.4: Laff |
| WHIO-TV | Dayton | CBS | WHIO.2: MeTV<br>WHIO.3: Laff |
| WFOX-TV | Jacksonville | FOX | WFOX.2: MyNetwork<br>WFOX.3: Heroes & Icons |
| WHBQ-TV | Memphis | FOX | WHBQ.2: Escape<br>WHBQ.3: Decades |
| WFTV | Orlando-Daytona Bch-Melbrn | ABC | WFTV.2: Laff<br>WFTV.3: Court TV |
| WRDQ | Orlando-Daytona Bch-Melbrn | Ind | WRDQ.2: Antenna TV<br>WRDQ.3: Grit<br>WRDQ.4: Telemundo |
| WPXI | Pittsburgh | NBC | WPXI.2: MeTV<br>WPXI.3: Laff |
| KIRO-TV | Seattle-Tacoma | CBS | KIRO.2: GetTV<br>KIRO.3: Laff |
| KOKI-TV | Tulsa | FOX | KOKI.2: MeTV<br>KOKI.3: Escape |
| KMYT-TV | Tulsa | MyNetwork | KMYT.2: GetTV<br>KMYT.3: Grit<br>KMYT.4: Heroes & Icons |



12/20/2019

THIS TRANSMISSION CONSISTS OF 2 PAGE(S) PLUS THIS COVER SHEET

| DELIVER TO | COMPANY/FIRM | FAX NUMBER | PHONE NUMBER |
|---|---|---|---|
| Attn: General Counsel | Cable One, Inc. | 303-723-1699 | |

| | |
|---|---|
| **FROM** | Ozoma, Ijeoma |
| **E-MAIL** | Iozoma@brownrudnick.com |
| **DIRECT DIAL** | +1 212.209.4814 |
| **DIRECT FAX** | 212.938.2814 |
| **A/C/M #** | ozoma/026778/0026 |
| **RE** | Re: Station Acquisition |
| **MESSAGE** | |

CONFIDENTIALITY NOTICE
The documents accompanying this fax transmission contain information from the law firm of Brown Rudnick LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this faxed information is prohibited. If you have received this fax in error, please notify us by telephone immediately so that we can arrange for the retrieval of the original documents at no cost to you. Thank you.

# EXHIBIT 8
## (Exhibit Filed Under Seal)

# EXHIBIT 9

Case: 1:20-cv-00570 Document #: 1 Filed: 01/24/20 Page 284 of 297 PageID #:1

| | |
|---|---|
| **From:** | Delva, John |
| **To:** | Levy, Fred L. |
| **Cc:** | Cvran, Michael |
| **Subject:** | Your 12/20 Letter regarding Cox Stations |
| **Attachments:** | WSOC Consummation (2019-11-22).pdf |
| | Cox Enterprises Announces Close of Cox Media Group Sale to Affiliates of Apollo Global Management.pdf |
| | 2019-12-09 Cox Letter re sale of CMG assets.pdf |

Fred,

We received your letter dated December 20, 2019, which states that NBI Holdings, LLC acquired certain stations that previously were owned by Cox Media Group, LLC.

Can you please substantiate this claim? This contradicts multiple other sources on the matter, including Cox's own letter to DISH dated December 7, 2019, the press release provided by Cox Enterprises and the consents to transfer filed on the FCC's website. Cox's letter, the press release and one of the consents to transfer are attached for your reference.

Appreciate any insights you can provide on the matter, apologies for reaching out over the holidays.

Thank you and Happy Holidays.

John

**John S. Delva**
Corporate Counsel
DISH Network L.L.C.
9601 S. Meridian Blvd.
Englewood, CO 80112
Office: 720-514-6208
Mobile: 720-560-4471
john.delva@dish.com



# UNITED STATES OF AMERICA
# FEDERAL COMMUNICATIONS COMMISSION
# WASHINGTON, D.C. 20554

```
(FOR CHIEF, VIDEO DIVISION, MEDIA BUREAU)


DATE: 11/22/2019
```

```
[ ] CONSENT TO ASSIGNMENT:     FROM:  COX ENTERPRISES INC.

[X] CONSENT TO TRANSFER:       TO:    TERRIER MEDIA BUYER, INC.
```

```
Licensee/Permittee:   WSOC TELEVISION, LLC
(for transfer only)
```

| CLASS | CALL SIGN | FACILITY ID | FILE# | STATION LOCATION | AUXILIARY STATIONS |
|-------|-----------|-------------|-------|------------------|--------------------|
| DT | WSOC-TV | 74070 | BTC-20190304ACZ | CHARLOTTE, NC | ALL CURRENTLY |
| LD | W26FA-D | 53891 | BTC-20190304ADA | MARION, NC | AUTHORIZED |
| DT | WAXN-TV | 12793 | BTCCDT-20190304ADB | KANNAPOLIS, NC | AUXILIARY STATIONS |

Under authority of the Communications Act of 1934, as amended, the consent of the Federal Communications Commission is hereby granted to the transaction indicated above.

The Commission's consent to the above is based on the representations made by the applicants that the statements contained in, or made in connection with, the application are true and that the undertakings of the parties upon which this transaction is authorized will be carried out in good faith.

The actual consummation of voluntary transactions shall be completed within 90 days from the date hereof, and notice in letter form thereof shall promptly be furnished to the Commission by the seller or buyer showing the date the acts necessary to effect the transaction were completed. Upon furnishing the Commission with such written notice, this transaction will be considered completed for all purposes related to the above described station(s).

# Cox Enterprises Announces Close of Cox Media Group Sale to Affiliates of Apollo Global Management

NEWS PROVIDED BY
**Cox Enterprises** ➞
Dec 17, 2019, 17:18 ET

ATLANTA, Dec 17, 2019 /PRNewswire/ -- Cox Enterprises, Inc. today announced it has completed the sale of its portfolio of television and radio stations, Ohio assets and its affiliated CoxReps and Gamut national advertising businesses to a new media company that is majority owned by private equity funds managed by affiliates of Apollo Global Management, Inc. (NYSE: APO). Cox Enterprises maintains a minority stake in the new company, which will include Northwest Broadcasting and will continue to operate under the name "Cox Media Group," ("CMG" or the "Company") with headquarters in Atlanta, Georgia.



Cox Enterprises

"We could not have asked for a better partner than Apollo in this new phase for CMG," said Alex Taylor, president and CEO of Cox Enterprises. "Together with the people who continue to make CMG the special company that it is, they're in a perfect position for future success."

"We are excited for our funds to acquire a majority interest in Cox Media Group and welcome the Company into our broader Apollo portfolio," said David Sambur, Co-Lead Partner of Private Equity at Apollo. "We look forward to working with the teams to grow the businesses, while continuing to deliver a high quality of journalistic integrity and local news within in the communities the Company serves."

The business assets involved with the transaction include:

- **Television**: 13 stations in 10 markets across the country
- **Radio**: 54 stations across 10 markets reaching 14 million listeners monthly
- **Newspapers**: 3 leading newspapers in the Ohio area
- **CoxReps**: the country's largest national television rep company for local broadcast television
- **Gamut**: offers market leading, customized and localized digital advertising and OTT solutions
- **Northwest Broadcasting**: 20 television stations in 10 markets

Kim Guthrie will lead the new Cox Media Group as president and CEO, overseeing all content, sales and operations for CMG businesses. "I am truly honored to lead CMG into the future, during such an exciting time for our company," Guthrie said. "We have a unique opportunity to continue to build on the foundation of our rich history, leverage our equity in the markets we serve and redefine CMG's place in the media landscape.  We look forward to this new partnership to drive future investment, innovation and growth."

Guthrie is joined by an executive leadership team with deep and proven experience in the media industry:

- Paul Curran, EVP, Television
- Heidi Eddy-Dorn, General Counsel, Chief Compliance Officer, Corporate Secretary
- Brett Fennell, EVP & Chief Financial Officer
- Bill Hendrich, EVP, Radio
- Mary Ellen Marcilliat-Falkner, EVP & Chief People Officer
- Marian Pittman, EVP, Content, Product & Innovation
- Steven J. Pruett, Executive Chairman

Steven Pruett joins Cox Media Group as Executive Chairman. Most recently, Pruett served as Executive Vice President and Chief TV Development Officer at Sinclair Broadcasting Group (NASDAQ: SBGI). Through acquisitions, Steve was responsible for creating Sinclair's Chesapeake Division and overseeing all TV stations in that group. Prior to Sinclair, he served as President and CEO of Communications Corporation of America and was special strategic advisor to DirectTV and Thomson Consumer Electronics.

### About Cox Enterprises

Cox Enterprises is dedicated to building a better future through our leading communications, automotive services and media companies. Our major operating subsidiaries include Cox Communications and Cox Automotive. Headquartered in Atlanta, Georgia, Cox is a global company with over $20 billion in annual revenues and brands that include Autotrader, Kelley Blue Book and Cox Homelife. Founded in 1898 by Ohio Governor James M. Cox, the company is a family-owned business committed to its people, communities and the planet. To learn more about Cox, visit coxenterprises.com.

### About Cox Media Group

Cox Media Group (CMG) is an industry-leading media company with dominant brands, award-winning content, and exceptional people. CMG provides valuable local content to viewers in the communities in which it serves. The company's operations primarily include 33 high-quality, market-leading television stations in 20 markets, 54 radio stations in 10 markets and numerous over-the-top (OTT) and digital platforms. Cox Media Group's portfolio includes primary affiliates of ABC, CBS, FOX, NBC, and MyNetworkTV, as well as several valuable independent stations. Additionally, the company also offers a full suite of local and regional advertising services with Local Solutions. For more information about Cox Media Group and its businesses, please visit www.coxmediagroup.com.

### About Apollo Global Management

Apollo is a leading global alternative investment manager with offices in New York, Los Angeles, San Diego, Houston, Bethesda, London, Frankfurt, Madrid, Luxembourg, Mumbai, Delhi, Singapore, Hong Kong, Shanghai and Tokyo. Apollo had assets under management of approximately $323 billion as of September 30, 2019 in credit, private equity and real assets funds invested across a core group of nine industries where Apollo has considerable knowledge and resources. For more information about Apollo, please visit apollo.com.

SOURCE Cox Enterprises

/

**COX**MEDIA
GROUP

6205 Peachtree Dunwoody Road
Atlanta, GA 30328
678.645.0000

December 7, 2019

**Via National Courier Service**

DISH Network LLC
Attn: Senior Vice President, Programming
9601 S. Meridian Boulevard
Englewood, CO 80112

**Re:**   Retransmission Consent Agreement by and between DISH Network LLC and Cox Media
Group, LLC effective March 31, 2019 (the "Agreement")

To Whom it May Concern:

Cox Media Group, LLC ("CMG") is in the process of selling all or substantially all of the
assets of CMG to Terrier Media Buyer, Inc. (the "Transactions"). The Transactions are expected
to close in the fourth quarter of 2019 (the "Closing Date").

Pursuant to Section 17(b)(ii) of the Agreement, we hereby provide notice of the
Transactions, and advise you that effective as of the Closing Date, the right to grant
retransmission consent with respect to the Stations listed on Exhibit A hereto will be transferred
to Terrier Media Buyer, Inc.

Sincerely,

**COX MEDIA GROUP LLC**

By:_____
Name: Kim Guthrie
Title:   President

cc:      Office of the General Counsel

www.coxmediagroup.com                               Creating solutions. **Delivering results.**

## Exhibit A

| Station | DMA |
|---|---|
| WSB-TV | Atlanta |
| WFXT | Boston (Manchester) |
| WSOC-TV | Charlotte |
| WAXN-TV | Charlotte |
| WHIO-TV | Dayton |
| WFOX-TV | Jacksonville |
| WHBQ-TV | Memphis |
| WFTV | Orlando-Daytona Bch-Melbrn |
| WRDQ | Orlando-Daytona Bch-Melbrn |
| WPXI | Pittsburgh |
| KIRO-TV | Seattle-Tacoma |
| KOKI-TV | Tulsa |
| KMYT-TV | Tulsa |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-CH-00528 |
| | ) | |
| COX MEDIA GROUP, LLC; | ) | |
| APOLLO GLOBAL MANAGEMENT, LLC; | ) | |
| APOLLO INVESTMENT FUND IX, L.P.; | ) | |
| TERRIER MEDIA BUYER, INC.; | ) | |
| NBI HOLDINGS, LLC; | ) | |
| BRYSON BROADCAST HOLDINGS, LLC; | ) | |
| NORTHWEST BROADCASTING, L.P.; | ) | |
| NORTHWEST BROADCASTING, INC.; | ) | |
| CAMELOT MEDIA BUYER, INC.; and | ) | |
| CAMELOT MEDIA HOLDINGS, LLC; | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

ENTERED
Judge Neil H. Cohon-1721
JAN 15 2020
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
DEPUTY CLERK OF COOK COUNTY, IL

## [PROPOSED] TEMPORARY RESTRAINING ORDER

This cause coming to be heard on Plaintiff DISH Network L.L.C.'s ("Plaintiff") Motion for Temporary Restraining Order (the "Motion"), due notice having been given, the Court having considered the Motion, Memorandum and affidavit in support thereof, and Plaintiff's Verified Complaint, exhibits thereto, and the arguments of counsel, and the Court otherwise being fully advised in the premises, finds as follows:

A.  Plaintiff has shown that it has a clearly ascertainable right in need of protection;

B.  Plaintiff has shown that it will suffer irreparable harm if a temporary restraining order does not issue;

C.  Plaintiff has shown that it has no adequate remedy at law; and

D.     Plaintiff has shown that there is a reasonable likelihood it will succeed on the merits.

WHEREFORE, IT IS HEREBY ORDERED as follows:

1.     A Temporary Restraining Order is entered against Defendants Cox Media Group, LLC; Apollo Global Management, LLC; Apollo Investment Fund IX, L.P.; Terrier Media Buyer, Inc.; Camelot Media Buyer, Inc.; Camelot Media Holdings, LLC; NBI Holdings, LLC; Bryson Broadcast Holdings, LLC; Northwest Broadcasting, L.P.; and Northwest Broadcasting, Inc. (collectively, "Defendants") to maintain the *status quo ante pendente lite*.

2.     Beginning on January 15, 2020, Defendants are temporarily enjoined from taking any action to interfere with performance of the Retransmission Consent Agreement between DISH and Cox, dated March 31, 2019, which will remain in full force and effect until further order of this Court. Defendants, and those in active concert with them, are further enjoined from (i) prohibiting Plaintiff from retransmitting the Cox stations listed below, and/or (ii) otherwise interfering with Plaintiff's right to retransmit those stations. The stations subject to this Temporary Restraining Order are as follows:

    a.     WSB-TV (ABC, Atlanta)
    b.     WFXT (FOX, Boston)
    c.     WSOC-TV (ABC, Charlotte)
    d.     WAXN-TV (Independent, Charlotte)
    e.     WHIO-TV (CBS, Dayton)
    f.     WFOX-TV (FOX, Jacksonville)
    g.     WHBQ-TV (FOX, Memphis)
    h.     WFTV (ABC, Orlando-Daytona Beach-Melbourne)
    i.     WRDQ (Independent, Orlando-Daytona Beach-Melbourne)
    j.     WPXI (NBC, Pittsburgh)
    k.     KIRO-TV (CBS, Seattle-Tacoma)
    l.     KOKI-TV (FOX, Tulsa)

m.    KMYT-TV (Independent, Tulsa)

3.    This Temporary Restraining Order shall remain in full force and effect until the further order of this Court.

4.    Plaintiff shall timely file a motion for preliminary and permanent injunction and the parties will be afforded a full opportunity to be heard in connection with any such motion.

5.    For good cause shown, Plaintiff shall not be required to post a bond as security for issuance of this order.

6.    This case is set for status at _____, 2020 at _____ a.m. in Courtroom _____

7.    This Temporary Restraining Order is entered on January 15, 2020, at _____ p.m.

DATED: _____, 2020.

ENTERED:

_____

Hon. Caroline Kate Moreland

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| DISH NETWORK L.L.C., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| COX MEDIA GROUP, LLC; | ) |
| APOLLO GLOBAL MANAGEMENT, LLC; | ) |
| APOLLO INVESTMENT FUND IX, L.P.; | ) |
| TERRIER MEDIA BUYER, INC.; | ) |
| NBI HOLDINGS, LLC; | ) |
| BRYSON BROADCAST HOLDINGS, LLC; | ) |
| NORTHWEST BROADCASTING, L.P.; | ) |
| NORTHWEST BROADCASTING, INC.; | ) |
| CAMELOT MEDIA BUYER, INC.; and | ) |
| CAMELOT MEDIA HOLDINGS, LLC; | ) |
| | ) |
| | ) |
| Defendants. | ) |

ENTERED
Judge Neil H. Cohen - ~21
JAN 24 2020
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## ORDER CONTINUING THE TEMPORARY RESTRAINING ORDER

This cause coming to be heard on Plaintiff DISH Network L.L.C.'s ("Plaintiff") request to continue the temporary restraining order entered on January 15, 2020 and Defendants' motion to dissolve that order ("Temporary Restraining Order"), due notice having been given, the Court having considered the request and the parties' submissions, and the arguments of counsel, and the Court otherwise being fully advised in the premises, finds as follows:

A. Plaintiff has shown that it has a clearly ascertainable right in need of protection;

B. Plaintiff has shown that it will suffer irreparable harm if the Temporary Restraining Order is not continued;

C. Plaintiff has shown that it has no adequate remedy at law; and

D. Plaintiff has shown that there is a fair question that it will succeed on the merits.

WHEREFORE, IT IS HEREBY ORDERED as follows:

1.    The Temporary Restraining Order is maintained against Defendants Cox Media Group, LLC; Apollo Global Management, LLC; Apollo Investment Fund IX, L.P.; Terrier Media Buyer, Inc.; Camelot Media Buyer, Inc.; Camelot Media Holdings, LLC; NBI Holdings, LLC; Bryson Broadcast Holdings, LLC; Northwest Broadcasting, L.P.; and Northwest Broadcasting, Inc. (collectively, "Defendants") to maintain the *status quo ante pendente lite*.

2.    Defendants are temporarily enjoined from taking any action to interfere with performance of the Retransmission Consent Agreement between DISH and Cox, dated March 31, 2019, which will remain in full force and effect until further order of this Court. Defendants, and those in active concert with them, are further enjoined from (i) prohibiting Plaintiff from retransmitting the Cox stations listed below, and/or (ii) otherwise interfering with Plaintiff's right to retransmit those stations. The stations subject to this Temporary Restraining Order are as follows:

   a.    WSB-TV (ABC, Atlanta)
   b.    WFXT (FOX, Boston)
   c.    WSOC-TV (ABC, Charlotte)
   d.    WAXN-TV (Independent, Charlotte)
   e.    WHIO-TV (CBS, Dayton)
   f.    WFOX-TV (FOX, Jacksonville)
   g.    WHBQ-TV (FOX, Memphis)
   h.    WFTV (ABC, Orlando-Daytona Beach-Melbourne)
   i.    WRDQ (Independent, Orlando-Daytona Beach-Melbourne)
   j.    WPXI (NBC, Pittsburgh)
   k.    KIRO-TV (CBS, Seattle-Tacoma)
   l.    KOKI-TV (FOX, Tulsa)
   m.    KMYT-TV (Independent, Tulsa)

3.    The Temporary Restraining Order shall remain in full force and effect until the further order of this Court.

4.    For good cause shown, Plaintiff shall not be required to post a bond as security for issuance of this order.

5.    This Order does not prevent any Defendant from asserting a right to monetary relief for copyright infringement or Plaintiff from asserting any defenses thereto. The Court takes no position as to the effect of this Temporary Restraining Order in any such copyright infringement lawsuit, including one asserting any claim for damages based on a finding of infringement during the period of the Temporary Restraining Order.

6.    This matter is continued for status on January 2$\underline{8}$ 2020 at $\underline{9:30}$ a.m./p.m.

7.    This Order continuing the Temporary Restraining Order is entered on January 24, 2020, at $\underline{1:30}$ p.m.

DATED:    _1 - 24_____, 2020.

ENTERED:

_____