IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DISH NETWORK L.L.C., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> COX MEDIA GROUP, LLC et al., ) <br> ) <br> Defendants. ) | Case No. 1:20-CV-00570 <br> Hon. Thomas M. Durkin |

**PLAINTIFF DISH NETWORK L.L.C.'S
REPLY IN SUPPORT OF MOTION TO REMAND**

## INTRODUCTION

The Removing Defendants' arguments in favor of this Court's jurisdiction are based on three false premises: (1) DISH Network L.L.C. ("DISH") artfully sued Apollo Investment Fund IX, L.P. ("Apollo") because it knew that doing so would defeat complete diversity; (2) Apollo is not a proper defendant; and (3) the Removing Defendants' decision to test their fortunes in state court before removing to this Court was wholly innocent. None of these premises is true. Apollo is a limited partnership that is based in New York but composed of limited partners from multiple jurisdictions whose identities and locations Apollo guards like a state secret. That information is not on Defendants' websites, it is not in their filings with the Securities and Exchange Commission, and it is not in the materials that were filed with the Federal Communications Commission ("FCC"). Even in the papers that the Removing Defendants filed with this Court, they have declined to list the partners and their citizenship. DISH first learned that some investors were from Colorado when Apollo admitted in its removal papers that their presence defeats diversity.

The reason that DISH included Apollo in this lawsuit had nothing to do with defeating diversity and everything to do with the grievance at the heart of this complaint: publicly available information, including statements by the Removing Defendants themselves, points to Apollo as central to the scheme that was designed to misappropriate DISH's right to retransmit the stations subject to the retransmission agreement between Cox Media Group, LLC ("Cox") and DISH ("Cox Retransmission Agreement") for the next two years. The central involvement of Apollo was:

- touted by Defendants in a press release stating the "Apollo Funds" would be acquiring and operating the stations;

- relied upon in the application filed with the FCC, which stated under penalty of perjury that the Apollo "funds," of which Apollo was the only one identified, were involved in the "instant transaction," caused the transactions to be financed, and were "steward[s]" of the companies they acquire by supporting "value creation" and "strategically build[ing] acquired businesses"; and

1

- reported by the trade press, which stated that the Cox stations were acquired by a "new media company" majority owned by "private equity funds" managed by Apollo Global Management ("Apollo Global").

Apollo's role in the scheme was also suggested by the corporate organizational chart appended to the FCC application, which listed no fewer than four Apollo IX entities, putting Apollo's fingerprints all over the transactions that were designed to harm DISH. These, then, are the reasons why DISH asserted claims against Apollo.

The Removing Defendants claim that this evidence should be ignored because, according to them, Apollo had absolutely no involvement in the transactions at issue in this case: it did not make the decision to enter the transactions, it did not directly invest in the entities involved in the acquisitions, and it is not a partner or member of any of the entities in the ownership structure of the stations. Rather than submitting any documents to support these arguments, however, they rely solely on declaration testimony of a witness who has never been cross-examined. There are many problems with this testimony. The idea of Apollo as a purely passive investor collides once again with what the Removing Defendants said in the FCC application: they said that the Apollo funds are involved in funding the transactions and running the show by creating value and building businesses, and in fact argued that *other* Apollo parties, not Apollo, were insulated private investors. Moreover, media reports, including one submitted in the Removing Defendants' materials, show that the Removing Defendants sought "to use some of Northwest Broadcasting's contracts, which have higher fees than Cox's, to hike up fees from the cable operators," *see* Dkt. No. 47-7, Opp. at Ex. F at 3 (ECF Page No. 1797), and that "[a] motivation for Apollo's deal-making is its belief that it can greatly increase the fees most of the television stations it is acquiring receive from pay-TV distributors in return for carrying their channels." Ex. 10, Joe Flint and Miriam Gottfried, *Apollo to Buy Majority Stake in Cox TV Stations*, W.S.J. (Feb. 15, 2019). There are thus many indications that Apollo caused the transactions to be funded precisely based on the hope of the unlawful conduct of which DISH

complains. The Removing Defendants, for their part, have not provided DISH with the offering memorandum that would provide the basis for Apollo's investment decisions despite DISH's request for it.

In any event, even if the Court were inclined to give credence to the declaration, the only thing it does is create a factual dispute with the public statements about Apollo's involvement. And that is insufficient: all factual disputes are resolved in DISH's favor when there is a claim of fraudulent joinder. *Hayes-Murphy v. Gonzalez*, No. 12 CV 5899, 2012 WL 6590500, at *4 (N.D. Ill. Dec. 18, 2012).

Defendants' diversity argument boils down to a contention that DISH mistakenly sued the wrong entity. The Removing Defendants effectively say that, rather than suing the party that is the locus of funding activity and stands to profit handsomely from Defendants' bad faith conduct, DISH should have sued the four other Apollo IX entities (AP IX (PMC) VoteCo, LLC; AP IX Titan Holdings GP, LLC; AIF IX (PMC Equity AIV), L.P.; and AP IX Titan Holdings, L.P.), which they claim were the real entities that controlled and funded the transactions. Of course, the status of Apollo as an appropriate defendant does not preclude the same status for these additional Apollo IX entities. DISH has accepted the Removing Defendants' invitation and contemporaneously is amending its complaint to join these additional Apollo IX entities to its lawsuit. DISH believes that their presence, too, may add to the absence of complete diversity to the extent that the partners of AIF IX (PMC Equity AIV), L.P. include citizens of Colorado. Even assuming that, as the Removing Defendants claim happened here, a party sues the wrong entity and suing the right one would defeat complete diversity, courts will permit an amendment to the complaint and remand the case to state court. *See, e.g., Cue v. Learjet Inc.*, 837 F. Supp. 2d 788, 793-94 (N.D. Ill. 2011).

Finally, the Removing Defendants have failed to demonstrate that their affirmative attempts to dissolve the temporary restraining order in state court did not waive their ability to remove. In every

3

case cited by the Removing Defendants that did not find waiver in the context of a temporary restraining order, the removing party did not voluntarily invoke the state court's jurisdiction. Each is a case where the subsequently removing party simply defended itself in the context of a request for a temporary restraining order or requested that the court maintain the status quo to avoid irreparable harm. Here, in contrast, the Removing Defendants *twice* invoked the state court's jurisdiction, asking the state court on January 21 and January 24 to dissolve the temporary restraining order. Only after losing twice did the Removing Defendants remove, after having waived the ability to do so.

## ARGUMENT

### I. The Removing Defendants Have Failed To Establish that Apollo Was Fraudulently Joined.

In their opposition, the Removing Defendants do not appear to appreciate the burden that they must meet to demonstrate that Apollo was fraudulently joined. Competing evidence is not enough: they must demonstrate that there is **no** evidence of Apollo's involvement in the scheme to terminate DISH's contract right in bad faith and that there is **no chance** of success on DISH's claims against Apollo. *See Blockinger v. Reach Med. Holdings, Inc.*, No. 09-CV-1805, 2009 WL 3617530, at *3 (N.D. Ill. Oct. 28, 2009) ("Defendants must convince the Court that the claim against the in-state defendant simply has no chance of success."). Here, DISH has sought a declaration of its rights under its contract with Cox but also seeks damages for Defendants' interference with that contract and other tortious acts. Apollo is a proper defendant in those claims.

### a. The Public Documents and DISH's Sworn Allegations Establish that Apollo Was Involved in the Bad Faith Scheme.

If the Court were to read the Removing Defendants' opposition in a vacuum, it would conclude that there was no evidence of Apollo's involvement in the scheme to usurp DISH's right to retransmit the Cox stations for the next two years. Yet, in their very first press release about the transactions, Defendants stated that Cox had reached an agreement with "funds . . . managed by affiliates of [Apollo

4

Global]" to buy the Cox stations and that the "Apollo Funds" would form a "new company to operate these stations." Dkt. No. 25-10, Ex. 9, Apollo Global Press Release. In their FCC application, Defendants stated that the Apollo "funds [were] involved in the instant transaction" and suggested that those "funds" would be providing "follow on capital" to "build [the] acquired businesses." Dkt. No. 25-7, Ex. 6, Motion to Dissolve at Ex. C at 12 (ECF Page No. 603). Then, when specifically discussing the Apollo "funds" in the comprehensive exhibit, Defendants noted that Apollo would be "direct[ing its] limited partners to directly commit capital" to the transactions designed to terminate DISH's contract right. Ex. 11, Comprehensive Exhibit at 4.[1] Defendants also included an ownership chart that listed four Apollo IX entities (AP IX (PMC) VoteCo, LLC; AP IX Titan Holdings GP, LLC; AIF IX (PMC Equity AIV), L.P.; and AP IX Titan Holdings, L.P.), putting Apollo's stamp all over the transactions. Dkt. No. 25, Mem. at App'x A. And the FCC Declaratory Ruling specifically says "Apollo Investment Fund IX, L.P. … will make capital calls to its predominately U.S. owned investors that are organized under U.S. law" to fund the transactions. Ex. 12, Terrier Media Buyer, Inc., Declaratory Ruling, 34 FCC Rcd. 10544, 10546 ¶ 5 (2019).

Crucially, Defendants not only conceded Apollo's involvement but affirmatively touted it, presumably as a reason why the FCC should approve the transactions. In their words: Apollo is a "steward" of the companies it acquires by supporting "value creation" and "strategically build[ing] these businesses." Dkt. No. 25-7, Ex. 6, Motion to Dissolve at Ex. C at 12 (ECF Page No. 603). In all

---

[1] Defendants further cemented the affirmative involvement of Apollo in the transactions in their FCC application by not characterizing it as an insulated investor. This means that Apollo was an affirmative actor in the transactions. 47 C.F.R. § 1.5000 *et seq*.

of these public statements and FCC documents, Defendants' own statements demonstrate that Apollo was both financing and directing the transactions at the heart of this case.[2]

### b. The Removing Defendants at Most Create a Factual Dispute that Cannot Support Fraudulent Joinder.

In an attempt to establish that Apollo was not involved in the transactions, the Removing Defendants *entirely* rely on a declaration of one of the principals at Apollo Global. Opp. at 10-11. Of course, the untested declaration testimony of an interested witness must be seen for what it is. But there are more fundamental problems with the testimony.

First, the testimony does not address many of the public statements that Defendants made about Apollo's involvement, including the statement made in the FCC application that *Apollo caused each of the transactions at issue in this case to be funded*. *Compare* Ex. 11, Comprehensive Exhibit at 4, *with* Dkt. No. 47-4, Opp. at Ex. C. The declarant says only that none of the money used for the transactions actually "passed through" Apollo. Even if this were true, it is beside the point. Apollo's affirmative actions—including causing its limited partners to fund the transactions—to consummate the transactions sit at the heart of this case. *See* Ex. 11, Comprehensive Exhibit at 4.

Second, not only did the Removing Defendants state proudly to the FCC that the Apollo funds (including Apollo) are value-creating and strategically building stewards of the businesses they acquire; they also made clear they did not consider Apollo a passive investor. Instead, they pointed to other Apollo entities as passive investors. *Id*. at 2.[3]

---

[2] And that is not the only evidence. The trade press also reported on Apollo's involvement in the transactions at issue. For example, in news stories following the completion of the transactions, the trade press reported that "private equity funds management by affiliates of Apollo Global" had acquired the Cox stations. Ex. 13, Insider Radio, Apollo Affiliates Complete Cox Radio, TV Acquisition (Dec. 17, 2019).

[3] Insulation is the set of criteria used by the FCC to determine passive investor status. *See, e.g.*, 47 C.F.R. § 73.3555, n. 2(b).

Third, the trade press reported that the transactions were structured in a manner designed to cancel the Cox Retransmission Agreement and foist higher fees on DISH. Dkt. No. 47-7, Opp. at Ex. F at 3 (ECF Page No. 1797) (noting that Apollo Global sought "to use some of Northwest Broadcasting's contracts, which have higher fees than Cox's, to hike up fees from the cable operators"); Ex. 10, Joe Flint and Miriam Gottfried, *Apollo to Buy Majority Stake in Cox TV Stations*, W.S.J. (Feb. 15, 2019) ("A motivation for Apollo's deal-making is its belief that it can greatly increase the fees most of the television stations it is acquiring receive from pay-TV distributors in return for carrying their channels, the people said. Northwest Broadcasting has lucrative deals for those fees, known as retransmission-consent fees, with major cable and satellite distributors."). In the words of one report, "Apollo [was] going to use the 'after-acquired' clauses in its retrans contracts to immediately boost retrans fees for all the Cox stations." Ex. 14, Henry Jessell, *Musings About Apollo-Cox-Northwest-Nexstar*, TVNewsCheck (Feb. 25, 2019).

No matter how active or passive an investor Apollo is, and no matter whether a steward or an absentee overlord, it seemed to have invested in the acquisitions based on the promise of the unlawful conduct that is at issue here. Despite DISH's request, Defendants have not provided DISH with the offering memorandum that would provide the basis for Apollo's investment decisions—a memorandum that presumably builds the business case on the hope that Defendants would extricate themselves from the Cox Retransmission Agreement.

All of this supports the assertion that Apollo was at the center of the transactions that harmed DISH, made decisions to move those transactions forward, and caused those transactions to be funded. And this is precisely what DISH alleged in its complaint as to Apollo's involvement. *See,* e.g., Verified Compl. ¶ 3 (stating that Apollo and other entities were "at the heart of this scheme"); *id.* ¶ 54 (stating that Apollo was engaged in the transactions that were "attempted for no economic purpose other than

7

to deny DISH the right it negotiated under the Cox Retransmission Agreement"); *id.* ¶ 44 (stating that Apollo "controlled" the entity that entered into the purchase agreements for the transactions).

Fourth, the testimony offered by the Removing Defendants at most creates a fact issue. While Apollo may not be a partner or member of the entities that ultimately acquired the Cox stations and Northwest stations (if the Removing Defendants are to be believed), it does not mean Apollo did not participate in the transactions (through funding, direction, or otherwise) or have some say in how they were structured. This is what the publicly available information declares and nothing submitted by the Removing Defendants conclusively refutes that.[4] At best it creates a fact issue that must be resolved in DISH's favor. *See Hayes-Murphy*, 2012 WL 6590500, at *4; *CC Indus., Inc. v. ING/ReliaStar Life Ins. Co.*, No. 03 C 2075, 2003 WL 21360905, at *4 (N.D. Ill. June 11, 2003); *Cty. of Cook v. Mellon Stuart Co.*, 812 F. Supp. 793, 797 (N.D. Ill. 1992) (remanding where affidavits created factual dispute).

  c. **DISH's Allegations and the Public Documents Establish that DISH Has a Cause of Action Against Apollo.**

The Removing Defendants misapprehend the nature of DISH's claims against Apollo: DISH is not attempting to hold Apollo liable for the "acts or omissions" of other entities. Opp. at 14. Instead,

---

[4] The declaration does not even establish that Apollo had no involvement in the transactions at issue in this case. The declaration attempts to distance Apollo from the transactions by stating that its general partner (Apollo Advisors, IX), through a contracted investment advisor (Apollo Management IX, L.P.), is the only entity that took any action with respect to transactions. Dkt. No. 47-4, Opp. at Ex. C ¶ 5 (ECF Page No. 1775). Its general partner, however, is acting on the partnership's behalf, so the conduct of its general partner is fairly attributed to it. Moreover, the web of facts concerning who is acting on behalf of whom show that there many issues about Apollo's involvement that need to be worked through in the discovery process, so now is not the time to dismiss Apollo.

Indeed, the Removing Defendants do not seem to appreciate the fact that Apollo is listed in their FCC application and the FCC's order, which may be one reason why they have claimed fraudulent joinder. In a letter sent to counsel for DISH on February 14, 2020, counsel for the Removing Defendants stated that Apollo was not listed in the FCC application and relied on a statement in the declaration that did not (and could not) support that proposition. Ex. 15, Letter from John Skakun (Feb. 14, 2020). The declaration, in fact, supported a different proposition—that Apollo was not listed in the FCC order, which is itself wrong. In reality, Apollo is referred to both in the FCC application and in the order.

8

DISH has brought claims against Apollo for the *affirmative* acts of Apollo in the transactions that were designed to usurp DISH's rights under the Cox Retransmission Agreement. *See,* e.g., Verified Compl. ¶ 3 (stating that Apollo and other entities were "at the heart of this scheme"); *id.* ¶ 54 (stating that Apollo was engaged in the transactions that were "attempted for no economic purpose other than to deny DISH the right it negotiated under the Cox Retransmission Agreement"); *id.* ¶ 44 (stating that Apollo "controlled" the entity that entered into the purchase agreements for the transactions); *id.* ¶ 124 (stating that Defendants, including Apollo, engaged in unfair competition by knowingly and intentionally misappropriating DISH's rights).[5]

While the Removing Defendants want to fault DISH for "collective pleading," they grudgingly recognize that DISH asserted specific allegations against both Apollo and Apollo Global for their conduct in the scheme to harm DISH. Opp. at 12-14.[6] DISH has not engaged in improper collective pleading simply because some of its allegations are directed at both Apollo and Apollo Global. *See Smith-Brown v. Ulta Beauty, Inc.*, No. 18 C 610, 2019 WL 932022, at *7 (N.D. Ill. Feb. 26, 2019) (allegations against two intertwined business entities sufficient to survive motion to dismiss where complaint alleged plausible basis for claims against both entities). These allegations are collectively

---

[5] Courts have made clear that actions by a corporate entity to direct the behavior of an affiliate where injury is foreseeable are actionable. *See Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 290 (2007); *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1997).

[6] All of the "collective pleading" cases cited by the Removing Defendants are distinguishable because, in each of the cases, the plaintiffs lumped together all of the defendants and failed to distinguish between them in the allegations. *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (Contention that all "defendants looted the corporation—without any details about who did what—is inadequate."); *Chamberlain Grp., Inc. v. Techtronic Indus. N. Am., In*c., No. 16 CV 06113, 2017 WL 4269005, at *3 (N.D. Ill. Sept. 26, 2017) (improper collective pleading where plaintiff failed to distinguish between corporate defendants); *Rehabcare Grp. E., Inc. v. CC Care, LLC*, No. 15 C 10876, 2016 WL 2595108, at *6 (N.D. Ill. May 4, 2016) (allegations that "defendants" made promises, representations and requests did not provide sufficient notice of the basis for plaintiff's promissory estoppel claim against individual defendant). Here, DISH did not do this. It, instead, broke out Apollo and Apollo Global and asserted specific allegations of tortious conduct against them.

pled against Apollo and Apollo Global because the facts demonstrate that both of the entities engaged in the tortious conduct being alleged. The Removing Defendants' real complaint with the allegations pled against Apollo and Apollo Global is that they want to dispute them. But now is not the time to resolve factual disputes. *See CC Indus., Inc.*, 2003 WL 21360905, at *4.

When the factual disputes are resolved in DISH's favor, it is clear that it has "colorable claims" against Apollo that defeat the Removing Defendants' contention of fraudulent joinder. *Peters v. AMR Corp., No. 95 C 1417*, 1995 WL 358843, at *3-4 (N.D. Ill. June 13, 1995). As stated in DISH's opening brief, the burden on the Removing Defendants to establish fraudulent joinder is high. Mem. at 7-8. In evaluating whether a party has been fraudulently joined, "the Court must be careful not to use the evidence to 'pre-try' the case." *Smith v. Phillip Morris USA Inc.*, No. 18 C 06397, 2019 WL 4750119, at *3 (N.D. Ill. Sept. 30, 2019). The Removing Defendants must show that DISH has "no chance of success" on its claims against Apollo. *See Blockinger*, 2009 WL 3617530, at *3. The Removing Defendants have not done this.

The Removing Defendants contend that DISH's allegations against Apollo cannot support an unfair competition claim because it has also asserted a contract claim. Opp. at 16. This argument is meritless. A mere two sentences above this argument, the Removing Defendants assert that Apollo "is not a party to any of the relevant contracts" and, as a result, DISH does not have a contract claim against Apollo. *Id.* The Removing Defendants cannot ignore DISH's tort claims to have it both ways.

Moreover, the Removing Defendants misunderstand the nature of the case law that they cite. In those cases, the courts make clear that an unfair competition claim, for example, is only duplicative of a contract claim when the conduct alleged for the unfair competition claim was identical to the conduct alleged for the breach of contract claim. *See, e.g., Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 509-10 (S.D.N.Y. 2018) (denying motion to dismiss unfair competition claim where plaintiff alleged wrongful conduct extraneous to the contract that suggested defendants undertook "affirmative

10

steps to internationally harm plaintiff"). This is not the case here. DISH alleges that Defendants breached the Cox Retransmission Agreement because they have taken the position that DISH no longer has a right to retransmit the Cox stations even though the acquisitions of Cox and Northwest stations were concurrent and did not trigger the termination provisions and "After-Acquired" station provisions in the retransmission agreements. *See* Verified Compl. ¶¶ 70-75, 95-108. On the other hand, even if the acquisitions triggered the termination provisions and "After-Acquired" station provisions in the retransmission agreements, DISH alleges that Defendants, including Apollo, engaged in unfair competition because they used confidential knowledge of the retransmission agreements to misappropriate DISH's right to retransmit the Cox stations for the next two years in bad faith and for their own benefit. *See id.* ¶¶ 50, 54, 68, 122-126. And Apollo's conduct—engineering and funding the transactions with "no economic purpose other than to deny DISH the right it negotiated under the Cox Retransmission Agreement," *see id* ¶¶ 50, 54—establishes a claim for unfair competition. *See Dior v. Milton*, 155 N.Y.S.2d 443, 457 (Sup. Ct.), *aff'd*, 156 N.Y.S.2d 996 (1956) (allegation that defendants interfered with the plaintiffs' valuable contractual relationships with their licensees enough to sustain cause of action for unfair competition); *Flexitized, Inc. v. Nat'l Flexitized Corp.*, 335 F.2d 774, 782 (2d Cir. 1964) ("Particularly where the defendant's conduct has involved a clear attempt to profit at the expense of the plaintiff . . . New York courts have deemed the conduct to be unfair competition.").[7]

---

[7] The Removing Defendants quote *Franklin First Financial, Ltd. v. Contour Mortgage Corp.* in their opposition and say "DISH alleges nothing of the sort," but do not explain what they mean. Opp. at 17. Based on the italics, the Removing Defendants presumably are claiming that DISH has not alleged bad-faith misappropriation by exploitation of proprietary information or a trade secret. New York law does not require a plaintiff to prove that the misappropriation was by exploitation of proprietary information or a trade secret to establish a claim for unfair competition. *Redf Organic Recovery, LLC v. Rainbow Disposal Co.*, 985 N.Y.S.2d 10, 11 (2014) (allegations that defendant acted in bad faith in misappropriating a commercial advantage belonging to plaintiff sufficient to survive motion to dismiss unfair competition claim). Even if it did, DISH has pled allegations sufficient to demonstrate that the

11

As for the Removing Defendants' claim that the allegations are insufficient because Apollo is "not a party to any of the relevant contracts" so there is no "actual controversy" between DISH and Apollo for which to make a declaratory judgment, Opp. at 16, DISH suspects that the Removing Defendants would say this about any of them (if it helped them with diversity). But the facts demonstrate that this is not the case because the station acquisitions were concurrent. *See* Verified Compl. ¶¶ 70-75. And because the Removing Defendants were required to assume the obligations under the Cox Retransmission Agreement and perform under it, there is an actual controversy with these defendants for which a declaratory judgment is needed. *Gizmo Beverages, Inc. v. Park*, No. SACV171037DOCJDEX, 2017 WL 6941362, at *3 (C.D. Cal. Sept. 18, 2017) ("Parties may seek declaratory judgment to determine disputed rights and legal relations under contract.").

II. **Even If the Court Ignores the Citizenship of Apollo, the Court Will Still Lack Diversity Jurisdiction.**

According to the Removing Defendants, the entities that sit "atop the organizational structure" and that were the architects of this deal were AP IX (PMC) VoteCo, LLC; AP IX Titan Holdings GP, LLC; AIF IX (PMC Equity AIV), L.P.; and AP IX Titan Holdings, L.P. Opp. at 3. While this intricate game of "three card monte" cannot extricate Apollo from this lawsuit, this does not mean that these additional companies, too, are not appropriate defendants. Indeed, DISH takes Defendants' assertion seriously and is contemporaneously amending its complaint to name the other Apollo IX entities, too. The addition of these entities may be an additional ground defeating diversity to the extent that the partners of AIF IX (PMC Equity AIV), L.P. include citizens of Colorado—and it is notable that Removing Defendants hide the citizenship of these investors as they do that of the partners in Apollo.

---

misappropriation occurred by Apollo exploiting the knowledge of the terms of Cox Retransmission Agreement, which is confidential and proprietary. *See* Verified Compl. ¶¶ 24, 50, 54.

In the continued absence of complete diversity, the Court should remand this matter. *See,* e.g., *Cue*, 837 F. Supp. 2d at 793 (remanding case after plaintiff amended complaint to add non-diverse entity).

### III. The Removing Defendants Waived Their Ability To Remove by Twice Moving the State Court To Dissolve the Temporary Restraining Order.

The Removing Defendants claim that they did not waive their right to remove, Opp. at 18, but the cases that they cite stand only for one simple proposition: if the removing party has not voluntarily invoked the state court's jurisdiction, then it has not waived its ability to remove. For example, in three of the cases, the court found that opposing a request to issue a temporary restraining order or a request to continue a temporary restraining order—both entirely defensive actions—did not waive the defendants' ability to remove. *See Rothner v. City of Chicago*, 879 F.2d 1402, 1418–19 (7th Cir. 1989); *Radaszewski v. Garner*, 2002 WL 31430325, at *5 (N.D. Ill. Oct. 21, 2002); *Blair v. City of Chicago*, 1988 WL 6918, at *1 (N.D. Ill. Jan. 26, 1988).[8] In the fourth case, *Cahill v. Ivex Novacel, Inc.*, 2004 WL 2064305 (N.D. Ill. Sept. 1, 2004), the court found that the removing party had not waived its ability to remove even though it had filed a request for, and obtained, a temporary restraining order from the state court to avoid immediate irreparable injury. *Id.* at *1-3. While the removing party's request to the state court for a temporary restraining order appeared to be a voluntary invocation of the state court's jurisdiction, the federal court held that it was not. *Id.* at *3. This is because, according to the federal court, the removing party only requested the temporary restraining order based on a "perceived emergency" to protect the status quo and avoid irreparable harm. *Id.* In other words, it was forced to petition the state court for relief or suffer irreparable harm.

None of those factors applies to this case. Specifically, the Removing Defendants made an ***affirmative*** decision to request that the state court dissolve the temporary restraining order not once

---

[8] The Removing Defendants' citation to Wright & Miller, which says that "defending" the state-court action prior to the expiration of the removal period does not constitute waiver, is consistent with these cases.

13

but twice. As detailed in DISH's motion to remand, they were not simply opposing DISH's request for a temporary restraining order or acting out of a need to prevent irreparable harm. They were, instead, testing the waters in state court, then diving in these waters headfirst, and asking for affirmative relief. These types of affirmative acts invoking the state court's jurisdiction have been found to evince a party's intent to litigate in that forum and waive any right to right to removal. *See Johnson v. Heublein Inc.,* 227 F.3d 236, 244 (5th Cir. 2000) (holding that by "filing both motions to dismiss and a motion for summary judgment in the state court proceeding" defendant had waived its right to remove)*; Fate v. Buckeye State Mut. Ins. Co.,* 174 F. Supp. 2d 876, 882 (N.D. Ind. 2001) (holding that, because defendant "sought affirmative action in state court," it "evidenced an intent to litigate in state court," and had waived its right to remove)*; McKnight v. Illinois Cent. R.R.*, 967 F. Supp. 182, 186 (E.D. La. 1997) (same).

      Here, the Removing Defendants also have used the removal process to try to avoid the impact of the temporary restraining order. A primary focus in the temporary restraining order briefing and at the hearing on Defendants' Motion to Dissolve was the risk to which DISH would subject itself if it continued to retransmit the Cox stations during the pendency of this lawsuit, including Defendants' claims of willful copyright infringement, which carry the potential for draconian sanctions. As DISH explained to the state court, no reasonable company would take that risk no matter how unlikely it is that the there would be an adverse finding against it. As a result, DISH told the state court that it would be required to shut off the Cox stations in the absence of a temporary restraining order, which would cause it irreparable harm. When the state court issued its ruling, it recognized this risk to DISH and crafted its order so as to avoid this risk. Specifically, the state court ordered that Defendants were prevented from taking any action that interfered with DISH's contractual right to retransmit during the duration of its order and had to treat the Cox Retransmission Agreement (which gives DISH the right

to retransmit the Cox stations) as if it is still in full force and effect. Dkt. No. 1 at App'x at Temporary Restraining Order (Jan. 24, 2020) (ECF Page Nos. 295-297).

After the state court issued its order, the Removing Defendants removed this case and simultaneously filed a lawsuit against DISH in this Court for willful copyright infringement for supposedly retransmitting without consent, based on assertions that blatantly disregard the State Court's order. Dkt. No. 1, Notice of Removal; *Terrier Media Buyer, Inc. v. DISH Network, L.L.C.*, Case No. 1:20-cv-583, Dkt. No. 1, Compl. (N.D. Ill. Jan. 24, 2020). In other words, the Removing Defendants removed this lawsuit in the hope that they would not be taken to task by the state court judge for their violation of the temporary restraining order. While DISH intends to redress this violation at the appropriate time with the appropriate court after this Motion to Remand is decided, this Court should not overlook the clear intent of the Removing Defendants in seeking a path away from the state court whose order they have flouted. In similar circumstances where the removing party has sought removal for improper purposes, courts have remanded the matter to state court. *See,* e.g., *Handlon v. Allis-Chalmers Coal Gas Corp.*, 666 F. Supp. 153, 154 (S.D. Ill. 1987) (granting motion to remand where defendant was using right to remove as an appeal device); *Kiddie Rides USA, Inc. v. Elektro-Mobiltecknik GMBH*, 579 F. Supp. 1476, 1480 (C.D. Ill. 1984) ("Defendant may not, after having argued and lost an issue in state court, remove the action to federal court for what is in effect an appeal of the adverse decision.").

## CONCLUSION

For the foregoing reasons and the reasons stated in its opening brief, DISH respectfully requests the Court grant its Motion to Remand, remand this lawsuit, and award it attorneys' fees.

Dated: February 17, 2020       Respectfully submitted,

/s/ *Michael Dockterman*
Pantelis Michalopoulos (*pro hac vice*)
Michael Dockterman (ARDC #: 3121675)
Jared R. Butcher (*pro hac vice*)
STEPTOE & JOHNSON LLP (Firm ID: 43315)
227 West Monroe, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1243
Fax: (312) 577-1370

- and -

1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000

*Attorneys for Plaintiff DISH Network L.L.C*

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that this reply was served on counsel of record via the ECF Pacer E-Filing system on February 17, 2020, and on the parties without counsel of record in accordance with the Federal Rules of Civil Procedure.

                                                  /s/ *Michael Dockterman*
                                                  Michael Dockterman