**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DISH NETWORK L.L.C.<br>9601 S. Meridian Blvd.,<br>Englewood, Colorado 80112<br><br>                    Plaintiff,<br><br>     vs.<br><br>COX MEDIA GROUP, LLC<br>6205 Peachtree Dunwoody Road<br>Atlanta, GA 30328<br><br>APOLLO GLOBAL MANAGEMENT, INC.<br>APOLLO INVESTMENT FUND IX, L.P.<br>9 West 57th Street,<br>New York, NY 10019<br><br>TERRIER MEDIA BUYER, INC.<br>NBI HOLDINGS, LLC<br>AP IX TITAN HOLDINGS GP, LLC<br>AP IX (PMC) VOTECO, LLC<br>1 Manhattanville Road, Suite 201<br>Purchase, NY 10577<br><br>BRYSON BROADCAST HOLDINGS, LLC<br>4311 Wilshire Boulevard, Suite 408<br>Los Angeles, CA 90010<br><br>NORTHWEST BROADCASTING, L.P.<br>NORTHWEST BROADCASTING, INC.<br>2111 University Park Drive, Suite 650,<br>Okemos, MI 48864<br><br>CAMELOT MEDIA BUYER, INC.<br>CAMELOT MEDIA HOLDINGS, LLC<br>1 Manhattanville Road, Suite 201<br>Purchase, NY 10577<br><br>                  Defendants. | Case No. 1:20-CV-00570<br>Hon. Thomas M. Durkin |

**FIRST AMENDED COMPLAINT**

Plaintiff DISH Network L.L.C. ("DISH"), for its First Amended Complaint against Cox Media Group, LLC ("Cox"); Terrier Media Buyer, Inc. ("Terrier"); NBI Holdings, LLC ("NBI Holdings"); Bryson Broadcast Holdings, LLC ("Bryson"); Northwest Broadcasting, L.P. ("Northwest Broadcasting"); Northwest Broadcasting, Inc. ("Northwest"); Camelot Media Buyer Inc. ("CMB"); Camelot Media Holdings, LLC ("CMH" and together with CMB, "Camelot"); and Apollo Global Management, Inc.; Apollo Investment Fund IX, L.P.; AP IX Titan Holdings GP, LLC; and AIF IX (PMC) VoteCo, LLC (collectively "Apollo"), alleges as follows:

**INTRODUCTION**

1. With the ink fresh on the retransmission contract between DISH and Cox, the Defendants—a collection of private equity vehicles created by Apollo—are trying to consign that contract to the trash heap, let the television screens of hundreds of thousands of DISH customers go dark, and hold out for higher prices for retransmission of Cox's stations based on a fictional construct that has no basis in law. DISH therefore seeks the assistance of this Court to preserve its contractual rights and to prevent an alteration of the *status quo ante* with irreparable consequences to DISH while this Court determines whether Defendants' arguments have any weight whatsoever.

2. As of late 2019, Cox owned thirteen local television broadcast stations. Each operates in one of ten U.S. local markets—Atlanta, Georgia; Boston, Massachusetts; Seattle, Washington; Charlotte, North Carolina; Pittsburgh, Pennsylvania, Dayton, Ohio; Jacksonville and Orlando, Florida; Memphis, Tennessee; and Tulsa, Oklahoma—and ten of them are affiliated with one of the "Big Four" broadcast networks—ABC, CBS, NBC, or Fox. In March 2019, DISH entered into a contract with Cox that permits DISH to retransmit the signal of each

of the stations it owns ("Cox Retransmission Agreement"). The Cox Retransmission Agreement remains in full force and effect.

3.     Through an artful reading of the documents crafted by Apollo, Defendants seek to take advantage of two acquisitions, consummated in December 2019, in an effort to abrogate the Cox Retransmission Agreement, avoid Cox's contractual obligations to DISH, and deprive DISH of the benefit of its 2019 bargain with Cox. The Apollo private equity firms at the heart of this scheme have not previously engaged in the broadcast business. Rather, various Apollo affiliates simultaneously acquired local television broadcast stations owned by Cox as well as another group of local stations formerly owned by Northwest, which DISH also retransmits. The Defendants contend that the Northwest acquisition occurred a millisecond before the Cox acquisition, so that the Cox Stations were supposedly acquired by a freshly minted broadcaster— an owner that already had a retransmission consent agreement with DISH. Defendants make this argument to trigger a provision in the Cox Retransmission Agreement in an attempt to take the Cox Stations out of that agreement and move them under DISH's retransmission consent agreement covering Northwest stations, which expired on Wednesday, January 15, 2020. Defendants have run "crawls" on the screens of Cox programming advising viewers that DISH will soon no longer have the right to carry the Cox Stations on the DISH platform.

4.     As a result, as of January 14, the hundreds of thousands of DISH subscribers in those ten U.S. markets were about to lose access to at least one of the major broadcast networks.

5.     DISH will be irreparably harmed if this occurs. When major networks "go dark" on DISH's platform, DISH loses goodwill with its existing and potential subscribers. DISH subscribers who have suddenly lost access to their favorite TV programming have an incentive to abandon DISH and switch to another multichannel video programming distributor—the local cable system or DIRECTV—and some unknown number of them will do so. Others may cut the

cord altogether and switch to online video distributors such at Hulu Plus or YouTube TV. This is particularly true when the subscribers lose network programming to some of the most popular live sports (such as the NFL playoffs), hit shows, and other marquee events. In addition, the lack of such popular programming means that potential new subscribers in these ten markets will find DISH less attractive—and some unknown number of them who otherwise would have subscribed to DISH will fail to do so. This loss of goodwill and incalculable loss of existing and potential subscribers constitutes irreparable harm. Damages would not compensate DISH either for the loss of existing and potential subscribers or for the lingering goodwill effects in each market from having lost access to Big 4 network channels.

6. The loss of programming in these ten markets would also harm the public interest by depriving these consumers of access to network programming. To continue receiving such programming, the customers would have to switch either to another multichannel video programming distributor that is not their first choice, switch to an online video distributor, or resort to the solution of a "rabbit-ears" antenna to receive these stations over the air, if they can.

7. Accordingly, DISH brings this Complaint seeking declaratory and injunctive relief to preserve the status quo, compel specific performance of its contract with Cox, and prevent further interference with its contract rights.

## PARTIES

8. Plaintiff DISH Network L.L.C. is a Colorado limited liability company with its principal place of business at 9601 S. Meridian Blvd., Englewood, Colorado 80112. DISH maintains an office at 500 North Michigan Ave, Suite 1920, Chicago, IL 60611.

9. Defendant Cox Media Group, LLC is a Delaware limited liability company with its principal place of business at 6205 Peachtree Dunwoody Road, Atlanta, GA 30328.

10.     Defendant Apollo Global Management, Inc. is a Delaware corporation with its principal place of business at 9 West 57th Street, New York, NY 10019.   Apollo is a private equity firm that invests in alternative assets on behalf of the world's most prominent investors. Apollo had a lead role in orchestrating the transactions at issue, as confirmed by multiple news stories and press releases.

11.     Defendant Apollo Investment Fund IX, L.P. ("Apollo IX") is a Delaware limited partnership with its principal place of business at 9 West 57th Street, New York, NY 10019. Terrier listed Apollo IX in an application filed with the Federal Communications Commission ("FCC") for approval of the transactions at issue.  Specifically, Terrier touted the public interest benefits of the transactions, including the capital commitments to these transactions from the Apollo-affiliated "funds"—of which Apollo IX was the only fund identified.  On information and belief, Apollo IX also guaranteed certain obligations of the purchasers to the sellers with respect to the transactions at issue.

12.     Defendant AP IX Titan Holdings GP, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.  On information and belief, AP IX Titan Holdings GP, LLC is in active concert with the other Defendants; it is the general partner of AP IX Titan Holdings, L.P. and operates and controls AP IX Titan Holdings, L.P.

13.     Defendant AP IX (PMC) VoteCo, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577. On information and belief, AP IX (PMC) VoteCo, LLC is in active concert with the other Defendants; it is the general partner of AIF IX (PMC Equity AIV), L.P. and operates and controls AIF IX (PMC Equity AIV), L.P.

14.     Defendant Terrier Media Buyer, Inc. is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

15.     Defendant NBI Holdings, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

16.     Defendant Bryson Broadcast Holdings, LLC is a Delaware limited liability company with its principal place of business at 4311 Wilshire Boulevard, Suite 408, Los Angeles, CA 90010.

17.     Defendant Northwest Broadcasting, L.P. is a Delaware limited liability company with its principal place of business at 2111 University Park Drive, Suite 650, Okemos, MI 48864.

18.     Defendant Northwest Broadcasting, Inc. is a Delaware corporation with its principal place of business at 2111 University Park Drive, Suite 650, Okemos, MI 48864.

19.     Defendant Camelot Media Buyer, Inc. is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

20.     Defendant Camelot Media Holdings, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

## JURISDICTION AND VENUE

21.     This Court has personal jurisdiction over the Defendants because the contract at issue in this dispute, *i.e.*, the Cox Retransmission Agreement provides for disputes to be litigated here.

22.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, as "the county in which the transaction or some part thereof occurred out of which the cause of action arose." Venue is also proper in Cook County pursuant to the venue selection provision in the Cox Retransmission Agreement.

6

23.     Pursuant to the governing law provision of the contract at issue in this dispute
(*i.e.*, the Cox Retransmission Agreement), the Cox Retransmission Agreement and the conduct
of the parties to the Cox Retransmission Agreement are governed by the laws of the state of New
York.

## FACTUAL BACKGROUND

**Cox and DISH Execute the Cox Retransmission Agreement.**

24.     DISH is a multichannel video programming distributor ("MVPD") that carries
hundreds of programming networks by satellite directly to subscribers, who receive them at their
homes by means of a pizza-sized dish.  Among other programs, DISH retransmits local
television broadcast stations in each of the nation's 210 local markets.  That includes the local
stations that are affiliated with one of the Big 4 networks (ABC, CBS, Fox, and NBC).  In some
markets, the local stations are actually owned by the networks.  In most markets, they are only
affiliated with one of the networks and are owned by broadcast groups such as Cox.

25.     Pursuant to 47 U.S.C. § 325(b), MVPDs are not permitted to "retransmit the
signal of a broadcasting station, or any part thereof, except with the express authority of the
originating station . . .."

26.     DISH negotiated a retransmission consent agreement with Cox, which became
effective on March 31, 2019 (previously defined as the "Cox Retransmission Agreement").  The
Cox Retransmission Agreement is, by its terms, confidential.  Pursuant to 735 ILCS 5/2-606,
DISH sets out the relevant portions of the Cox Retransmission Agreement herein, incorporates
the full Cox Retransmission Agreement by reference as if fully set forth herein, and has filed a
true and correct copy of the Cox Retransmission Agreement as **Exhibit 1** under seal.[1]

---

[1] All Exhibits accompanying DISH's First Amended Complaint, except those filed under seal,
have been appended to Defendants' Notice of Removal. [Dkt. No. 1, ECF Pg. Nos. 45-291.]

27.     Section 3(a) of the Cox Retransmission Agreement gives DISH the right to retransmit the signals of thirteen local television broadcast stations in ten major U.S. markets during the term of the Agreement:

> Grant of Retransmission Consent by Broadcaster.   Pursuant to 47 U.S.C. § 325(b)(1) and the rules and regulations promulgated thereunder, Broadcaster [Cox] grants to DISH consent throughout the Term to retransmit the signal of each station (including each Programming Stream) on a non-exclusive basis via the Distribution System with the applicable Station's Local Market and Significantly Viewed Areas substantially contemporaneously with the applicable Station's primary broadcast.   For clarity, such consent does not convey to DISH any ownership rights in or to the underlying programming.

28.     The Cox Retransmission Agreement granted DISH consent to retransmit Big 4 network programming and other programming to its customers in Atlanta, Georgia; Boston, Massachusetts; Charlotte, North Carolina; Dayton, Ohio; Jacksonville and Orlando, Florida; Memphis, Tennessee; Pittsburgh, Pennsylvania; Seattle, Washington; and Tulsa, Oklahoma.

29.     The following thirteen stations[2] and markets are covered by the Cox Retransmission Agreement (collectively, the "Cox Stations").   Ten of them are affiliated with ABC, NBC, CBS, or Fox, as shown below:

    a.  WSB-TV (ABC, Atlanta)
    b.  WFXT (FOX, Boston)
    c.  WSOC-TV (ABC, Charlotte)
    d.  WAXN-TV (Independent, Charlotte)
    e.  WHIO-TV (CBS, Dayton)
    f.  WFOX-TV (FOX, Jacksonville)
    g.  WHBQ-TV (FOX, Memphis)
    h.  WFTV (ABC, Orlando-Daytona Beach-Melbourne)
    i.  WRDQ (Independent, Orlando-Daytona Beach-Melbourne)
    j.  WPXI (NBC, Pittsburgh)
    k.  KIRO-TV (CBS, Seattle-Tacoma)
    l.  KOKI-TV (FOX, Tulsa)

---

Defendants received permission of this Court to file Exhibits 1, 2, and 8 (which were filed under seal in the Circuit Court of Cook County) under seal [Dkt. No. 22.] Those Exhibits are available at Dkt. No. 7.

[2] Two stations (KIRO and KOKI) are delivered to DISH via fiber connections instead of over-the-air.

      m.  KMYT-TV (Independent, Tulsa)

30.     Pursuant to Section 2, the Term of the Cox Retransmission Agreement does not expire for about two years from now.

31.     Pursuant to Section 11 of the Cox Retransmission Agreement, either party has the right to early termination only in the event of (i) an uncured, material breach or default by the other party, (ii) a "change in Law" as defined in the Agreement, or (iii) bankruptcy or insolvency of the non-terminating party.  No such event has occurred.

32.     Pursuant to Section 8 of the Cox Retransmission Agreement, DISH pays monthly retransmission fees to Cox.  Those fees are based on a pre-determined monthly rate per DISH customer receiving each Cox Station.

33.     Pursuant to Section 12(b)(iii) of the Cox Retransmission Agreement, Cox represented and warranted to DISH that "no third party has or has claimed any right that would be inconsistent with the rights granted to DISH in this Agreement."

34.     Pursuant to Section 12(c)(ii) of the Cox Retransmission Agreement, Cox covenanted that it "will maintain, at all times during the Term, all licenses, permits, rights, exemptions, authorizations and consents necessary to fully perform this Agreement."

**A Change in Control Does Not Extinguish DISH's Retransmission Rights Under the Cox Retransmission Agreement.**

35.     Section 17 of the Cox Retransmission Agreement defines the parties' rights in the event of a change in control of a Cox station.

36.     Section 17(b) also provides a mechanism granting DISH the right to continue retransmitting the Cox station's programming under an agreement with the new owner of the station, as follows:

     a.  If the new owner of the Cox station already has an existing retransmission agreement with DISH that requires incorporation of the station, then the station

becomes subject to the terms of that agreement and the Cox Retransmission Agreement terminates with respect to that station.

b.  If the new owner has an existing retransmission agreement with DISH that permits, but does not require, incorporation of the Cox station, then DISH has the right to choose whether the station will become subject to the terms of the agreement with the new owner or, instead, will continue to be subject to the terms of the Cox Retransmission Agreement, pursuant to a valid assignment by Cox to the new owner of the rights and obligations with respect to that station.

c.  If neither of these two situations applies, then the Cox Retransmission Agreement requires Cox to assign its rights and obligations under the Cox Retransmission Agreement to the new owner of the Cox station.  This means that, if the new owner does not have an existing retransmission agreement with DISH, then the new owner must take the station subject to the terms of the Cox Retransmission Agreement.

37.  The third alternative is what has happened here, and this is what Defendants unlawfully attempt to hide.

38.  Thus, under the change-in-control provisions of Section 17, the terms of the Cox Retransmission Agreement continue to apply to the Cox Stations.

39.  DISH has complied with its obligations under the Cox Retransmission Agreement at all relevant times.

**DISH Has a Separate Retransmission Agreement Covering the Northwest Stations.**

40.  Northwest Broadcasting Inc. had a separate retransmission agreement with DISH. On June 6, 2018, DISH had executed a retransmission agreement with Northwest that became effective on or around June 6, 2018 (the "Northwest Retransmission Agreement") and covered

10

the retransmission by DISH of Northwest's separate group of eighteen local television broadcast

stations, fourteen of which are affiliated with one of the four major networks:

    a. WBPN-LD (MNT, Binghamton, NY)
    b. WICZ-TV (FOX, Binghamton, NY)
    c. KIEM-TV (NBC, Eureka, CA)
    d. KVIQ-LD (CBS, Eureka, CA)
    e. WABG-TV (ABC, Greenwood, MS)
    f. WNBD-LD (NBC, Greenwood, MS)
    g. WXVT-LD (CBS, Greenwood, MS)
    h. KPVI-DT (NBC, Idaho Falls, ID)
    i. KFBI-LD (MNT, Medford, OR)
    j. KMVU-DT (FOX, Medford, OR)
    k. KMCW-LD (Not currently broadcasting, Medford, OR)
    l. KAYU-TV (FOX, Spokane, WA)
    m. WNYS (MNT, Syracuse, NY)
    n. WSYT (FOX, Syracuse, NY))
    o. KCYU-LD (FOX, Yakima, WA)
    p. KFFX-TV (FOX, Yakima, WA)
    q. KFFX-TV (FOX, Yakima, WA)
    r. KSWT (CBS, Yuma, AZ)
    s. KYMA-DT (NBC, Yuma, AZ)

41. The Northwest Retransmission Agreement is, by its terms, confidential. Pursuant to 735 ILCS 5/2-606, DISH sets out the relevant portions of the Northwest Retransmission Agreement herein and incorporates the full Northwest Retransmission Agreement by reference as if fully set forth herein, and has filed a true and correct copy of the Northwest Retransmission Agreement as **Exhibit 2** under seal.

42. The Northwest Retransmission Agreement granted DISH consent to retransmit Big 4 network programming and other programming to its customers in Birmingham and Syracuse, New York; Eureka, California; Greenwood, Mississippi; Idaho Falls, Idaho; Medford, Oregon; Spokane and Yakima, Washington; and Yuma, Arizona until December 31, 2019.

43. The Northwest Retransmission Agreement was set to expire on December 31, 2019, and was been extended by the parties to 11:59 p.m. Mountain Time on January 15, 2020. Paragraph 5 of the extension agreement states, "Nothing contained in this letter agreement shall

11

constitute an agreement or acknowledgment by DISH that the [Cox Stations] listed in Exhibit A to NBI Holdings, LLC's letter to DISH dated December 20, 2019 are After-Acquired Stations."

44.     The Northwest Retransmission Agreement contained a change-in-control clause like the change-in-control clause in the Cox Retransmission Agreement.

45.     The Northwest Retransmission Agreement also contained a clause commonly referred to as an After-Acquired Station Clause.  This clause provides that any TV station not covered by the Northwest Retransmission Agreement shall be deemed added to the Northwest Retransmission Agreement and governed by its terms if the station is acquired by Northwest *after* the Northwest Retransmission Agreement's effective date.  Assuming satisfaction of the applicable change-in-control provisions, the effect of the After-Acquired Station Clause is to impose the terms of the Northwest Retransmission Agreement on TV stations that Northwest acquires after June 6, 2018, the effective date of the Agreement.  Northwest has not acquired the Cox Stations.

**Cox and Northwest Agree to Transactions that Result in the Acquisition of the Cox Stations and the Northwest stations by Different Apollo Affiliates.**

46.     Terrier was created by Apollo, a private equity firm that invests in alternative assets on behalf of the world's most prominent investors, and is controlled by Apollo Global Management.  Apollo and its affiliates, including Apollo IX, AP IX Titan Holdings GP, AP IX (PMC) VoteCo, Terrier, NBI Holdings, and Camelot, are new entrants in the broadcast television market.

47.     On or around February 14, 2019, Terrier entered into a purchase agreement (the "Northwest Acquisition Agreement") with entities operating under the name Northwest Broadcasting, to acquire, among other things, the interests in Northwest's 18 broadcast television stations in markets covering nearly 13 percent of U.S. television households (the "Northwest Acquisition").  The Northwest Acquisition required the prior approval of the FCC.

48.     All parties to this action have copies of the Northwest Acquisition Agreement.
Pursuant to 735 ILCS 5/2-606, DISH sets out the relevant portions of the Northwest Acquisition
Agreement herein and incorporates the full Northwest Acquisition Agreement by reference as if
fully set forth herein, and has filed a true and correct copy of the Northwest Acquisition
Agreement as **Exhibit 3**.

49.     On or around February 14, 2019, Terrier entered into a purchase agreement (the
"Camelot Purchase Agreement") with Cox whereby certain Apollo subsidiaries and affiliates
would acquire interests in the Cox Stations (the "Cox Acquisition").  Defendants refer to the
agreement as the "Camelot Purchase Agreement" because certain Camelot-named affiliates of
Apollo were part of the transaction.

50.     All parties to this action have copies of the Camelot Purchase Agreement.
Pursuant to 735 ILCS 5/2-606, DISH sets out the relevant portions of the Camelot Purchase
Agreement herein and incorporates the full Camelot Purchase Agreement by reference as if fully
set forth herein, and has filed a true and correct copy of the Camelot Purchase Agreement as
**Exhibit 4**.

51.     The Cox Acquisition was also subject to FCC approval.  The parties requested
FCC approval of the Northwest Acquisition on the same day as the Cox Acquisition by means of
a consolidated application on March 4, 2019.  The FCC approved both transactions on the same
day—November 22, 2019.  Finally, both transactions were consummated on the same day—
December 17, 2019. The FCC also approved the transfer of the relevant broadcasting licenses to
Terrier.

**Apollo's Broadcasting Assets at the Time of the Cox Acquisition.**

52.     The crux of this dispute is Apollo's wrongful reliance upon the simultaneous
acquisition of another broadcast group by Apollo affiliates to try to engineer an early termination

of the Cox Retransmission Agreement. The mechanism on which Apollo relies is its concurrent acquisition of the Northwest broadcast stations. Apollo argues that the Northwest Asset Acquisition gives it the right to treat the Cox Stations as after-acquired under the Northwest Agreement, and to treat the Cox Retransmission Agreement as terminated. As explained below, this argument is incorrect both under the terms of the relevant contracts and because the sequence of events does not support the argument. The Apollo affiliates that acquired the Cox Stations did not own the Northwest stations at the time they acquired the Cox Stations (or at any time for that matter), and as a result, Defendants cannot invoke the provisions of the Northwest Retransmission Agreement to treat the Cox Retransmission Agreement as if it were terminated when the Cox Stations were acquired.

53. The acquisition of Northwest was described in the Northwest Acquisition Agreement as being "concurrent" with the Cox acquisition:

> [C]oncurrently with the execution of this Agreement, Buyer and Cox Enterprises, Inc., Cox Media Group, LLC, Cox Media Group Ohio, Inc. and Cox Radio, Inc. (collectively, "Cox") are entering into a purchase agreement, pursuant to which Buyer, or one or more of its Affiliates, will purchase the Purchased Assets (as defined therein) and the Equity Interests (as defined therein) and will assume certain Assumed Liabilities (as defined therein). . . .

54. Moreover, under the terms of the Northwest Purchase Agreement, closing of the Northwest Acquisition was "[s]ubject to the satisfaction or waiver of each of the conditions set forth in Article 6." And Article 6.3 of the Northwest Acquisition Agreement provided in relevant part that "all of the conditions set forth in Article VI and Article VII of the Camelot [Cox] Purchase Agreement shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the closing of the transactions contemplated by the Camelot [Cox] Purchase Agreement (the "Camelot Closing"), each of which is capable of being satisfied at the Camelot Closing)."

55.     Under these conditions, the Cox Acquisition had to be capable of being completed before the Northwest Acquisition could close.

56.     DISH is informed and believes that the extraordinary web of transactions in which Apollo engaged to subsequently consummate the acquisitions was attempted for no economic purpose other than to deny DISH the right it negotiated under the Cox Retransmission Agreement to have that same Cox Retransmission Agreement govern the Cox Stations when they were acquired by affiliates of Terrier.

**Cox Notifies DISH Regarding the Acquisition by Terrier.**

57.     In December 2019, Cox notified DISH that it was consummating a sale to Terrier and that Cox's rights under the Cox Retransmission Agreement would be transferred to Terrier.

58.     On or around December 7, 2019, Cox's President Kim Guthrie sent a letter to DISH regarding the Cox Retransmission Agreement.  Ms. Guthrie represented that Cox "is in the process of selling all or substantially all of the assets of [Cox] to Terrier Media Buyer, Inc . . . " She further stated that the transaction was expected to close in the fourth quarter of 2019.  She concluded by informing DISH "that effective as of the Closing Date, the right to grant retransmission consent with respect to the Stations listed on Exhibit A hereto [the Cox Stations] will be transferred to Terrier Media Buyer, Inc."  A true and correct copy of the letter has been filed as **Exhibit 5**.

59.     Terrier did not have a retransmission agreement with DISH.  Therefore, if this is what in fact occurred, the Cox Stations continue to be governed by the terms of the Cox Retransmission Agreement pursuant to the change-in-control provision of Section 17 of the Cox Retransmission Agreement.

**Terrier and Cox Act to Circumvent the Cox Retransmission Agreement.**

60.     Instead of adhering to the terms of the Cox Retransmission Agreement, however, Defendants Terrier and Cox devised a scheme to attempt to circumvent the Cox Retransmission Agreement.

61.     On or around December 13, 2019, counsel for NBI Holdings sent a notice to DISH regarding a change in control under the Northwest Retransmission Agreement.  A true and correct copy of the letter has been filed as **Exhibit 6**.

62.     Terrier then apparently arranged the Northwest and Cox acquisitions to close in quick succession on December 17, 2019.  Despite the "concurrent" language in the Northwest Acquisition Agreement, Terrier takes the position that, because Cox's stations were supposedly acquired by an existing broadcaster rather than a private equity vehicle, they are subsumed within that broadcaster's expired retransmission agreement, and the Cox Retransmission Agreement becomes a dead letter.

63.     To effectuate that scheme, on or around December 20, 2019, counsel for NBI Holdings sent a letter to DISH stating that NBI Holdings had acquired the Cox Stations.  DISH responded and requested confirmation.  A true and correct copy of the letter has been filed as **Exhibit 7**. DISH responded by email to the letter on December 23, 2019, asking NBI Holdings to substantiate its claim because its claim contradicted multiple public sources about the Terrier transactions.

64.     On or around December 27, 2019, NBI Holdings counsel sent a follow-up letter and draft presentation purporting to describe the legal steps in the Northwest transaction and the Cox transaction.  Although the details remain unclear, a presentation by Terrier's deal counsel was provided to DISH.  That presentation suggests that the Cox Stations came to be held by Camelot and the Northwest entities came to be held by NBI Holdings.  In turn, NBI Holdings is

directly owned by Terrier. True and correct copies of the letter and draft presentation has been filed as **Exhibit 8** under seal. Indeed, these documents support the position that the Apollo affiliates that acquired the Cox Stations did not own the Northwest stations at the time they acquired the Cox Stations (or at any time for that matter).

65.     Neither Terrier nor Camelot had an existing retransmission agreement with DISH. This means that neither the prospective purchaser of the Cox Stations nor the apparent current owner of the Cox Stations had an existing retransmission agreement with DISH at the time of the Cox acquisition.

66.     Moreover, neither the letter nor the presentation by deal counsel shows the actual structure of the transactions. Accordingly, DISH responded that it would not be able to treat the Cox Stations as after-acquired stations subject to the Northwest Retransmission Agreement. A true and correct copy of DISH's response has been filed as **Exhibit 9**.

67.     On or around December 30, 2019, DISH requested information to confirm the timing of the transactions. Counsel for NBI Holdings agreed to provide additional information. To date, however, NBI Holdings has not demonstrated either that the Cox Stations were actually acquired by the owner of the Northwest stations or that the Cox Stations were acquired after the acquisition of the Northwest stations.

68.     In January 2020, Defendants started to run a "crawl" message on the Cox Stations stating that DISH would lose its Cox Stations at 5 p.m. Mountain Time on January 14, 2020, because "it has refused to agree to reasonable terms for the valuable programming we provide."

69.     On January 10, 2020, Defendants reiterated the position that the Cox Stations also are subject to the Northwest Transmission Agreement and that, if DISH did not reach a new retransmission consent agreement for the Cox Stations, they must "go dark" soon.

17

**Defendants Are Acting in Bad Faith.**

70.     Defendants have engaged in bad-faith conduct to conceal their maneuverings and have constructed a façade of transactions in an effort to obscure the end result, which is their attempt to avoid the remaining two years of the Cox Retransmission Agreement and create an unfair opportunity to increase the retransmission fees that DISH previously negotiated with Cox—all at the expense of DISH customers whose television screens would go dark.

71.     If the Cox Stations were sold directly to Camelot (which appears to be the case), they would be subject to the Cox Retransmission Agreement.  This is because the new owner (Camelot) did not have an existing retransmission agreement with DISH and, therefore, was obligated to take the Cox Stations subject to the terms of the Cox Retransmission Agreement. That agreement does not expire for about two years.

72.     Instead, Terrier and NBI Holdings have contended that the Cox Stations were acquired by NBI Holdings and are subject to the Northwest Retransmission Agreement.  But the documents provided by Defendants are not consistent with the position that Defendants have taken regarding the acquisitions of Cox and Northwest.

73.     For example, nowhere does the Northwest Acquisition Agreement, the Camelot Purchase Agreement, or any other transaction document suggest that Northwest was involved in the purchase of the Cox assets.

74.     In this circumstance, the change-in-control provision of Section 17 of the Cox Retransmission Agreement requires that the terms of the Cox Retransmission Agreement continue to apply to the Cox Stations and their new owner, whether that be Terrier, Camelot, or another of Terrier's subsidiaries or affiliates.

75.     The terms of the two agreements show that they were intended to be part of the same unitary transaction.

a. The Northwest Acquisition Agreement specifies that the two agreements were executed "concurrently."

b. The Northwest transaction could not close until after Cox and Terrier had obtained the rights to close their transaction.

c. While the Northwest Acquisition Agreement contemplates closing "immediately prior to . . . the closing of the transactions contemplated by the Camelot [Cox] Purchase Agreement," the ability to close the Camelot Purchase Agreement is a condition precedent to the obligations of the Buyer (Terrier) and the Sellers (Northwest's owners) for the Northwest Acquisition Agreement.

d. The Northwest Acquisition Agreement could not be amended or modified without the prior written consent of Cox.

e. The Camelot Purchase Agreement provides "for the avoidance of doubt, that the consummation of the transactions contemplated by the Northwest Acquisition Agreement shall not be a condition to Buyer's obligation to consummate the Closing."

76. In addition, both purchase agreements were actually executed on the same day, were the subject of the same application filed with the FCC, were approved by the FCC in the same decision, and were consummated on the same day.

77. In any event, the Cox Stations were not even acquired by Terrier (the Apollo entity that acquired the interests in the Northwest stations). While the Camelot Purchase Agreement provides for Terrier to acquire these interests, an assignment agreement dated December 16, 2019 assigns to the Camelot subsidiaries *pre-closing* Terrier's contractual rights to

the Cox Stations.  This means that the Cox Stations were never acquired by an entity in which the Northwest stations were housed.

**DISH Will Suffer Irreparable Harm.**

78.     DISH will suffer irreparable harm unless the status quo is preserved under the Cox Retransmission Agreement.

79.     Unless Defendants are restrained, they will act to deprive DISH of its rights under the Cox Retransmission Agreement.  This will prevent DISH from offering ABC, CBS, NBC, or Fox programming to the ten major U.S. markets covered by the Cox Retransmission Agreement, which means that DISH subscribers in these markets will suddenly lose access to their favorite TV programming—such as the popular live sports, hit shows, and other marquee events offered by the Big Four networks.

80.     These stations, however, will continue to be available from DISH's competitors, including cable systems, DIRECTV, and online video distributors.  Thus, many subscribers are likely to leave DISH and switch to a competitor in order to continue receiving their favorite programming.  Indeed, DISH had already begun to experience increased call volume and some customer loss in response to the "crawl" messages on the Cox Stations.

81.     Additional harm will be suffered by DISH's subscribers.  Those who remain with DISH will be deprived of programming, including live events such as sporting events that only happen once.  Those who leave DISH will face the burdens of switching and may be locked into more expensive long-term contracts with other MVPDs who are not their first choice.

82.     Defendants, on the other hand, will not be harmed irreparably if the status quo is preserved.  This is because DISH has paid, and will continue to pay, the monthly retransmission fees under the Cox Retransmission Agreement for the balance of its term.

## CLAIMS

### COUNT I
### (All Defendants)
### Declaratory Judgment

83.　DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

84.　This Court has the power to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.

85.　The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

86.　Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the change-in-control and assignment terms of the Cox Retransmission Agreement.

87.　No Defendant has a right to interfere with or avoid the Cox Retransmission Agreement.

88.　Therefore, DISH is entitled to a declaration that the terms of the Cox Retransmission Agreement remain in force with respect to the Cox Stations through its full term.

### COUNT II
### (Cox, Camelot)
### Specific Performance of the Cox Retransmission Agreement

89.　DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

90.　The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

91.　DISH has performed all of its obligations under the Cox Retransmission Agreement.

92.     Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the change-in-control and assignment terms of the Agreement.

93.     Cox and Camelot have breached the retransmission rights granted to DISH under Section 3 of the Cox Retransmission Agreement with respect to the Cox Stations by taking actions that deprive DISH of the ability to retransmit those stations for the full term of the Agreement.

94.     Cox and Camelot have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Retransmission Agreement.

95.     DISH has no adequate remedy at law.  Money damages will not adequately compensate DISH.  Unless Cox and Camelot are enjoined, DISH will suffer irreparable harm caused by these breaches of the Cox Retransmission Agreement.

96.     Accordingly, DISH is entitled to an injunction and specific performance of the Cox Retransmission Agreement.

**COUNT III**
**(Cox, Camelot)**
**Breach of the Cox Retransmission Agreement**

97.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

98.     The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

99.     DISH has performed all of its obligations under the Cox Retransmission Agreement.

100.     Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the change-in-control and assignment terms of the Cox Retransmission Agreement.

101.    Cox and Camelot have breached the retransmission rights granted to DISH under Section 3 of the Cox Retransmission Agreement with respect to the Cox Stations by taking actions that deprive DISH of the ability to retransmit those stations for the full term of the Cox Retransmission Agreement.

102.    Cox and Camelot have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Retransmission Agreement.

103.    Cox and Camelot's breaches of the Cox Retransmission Agreement have caused damages to DISH.

104.    DISH is entitled to an injunction and specific performance of the Cox Retransmission Agreement, or in the alternative, DISH is entitled to money damages in an amount to be determined at trial.

### COUNT IV
### (Cox)
### Breach of the Cox Retransmission Agreement

105.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

106.    The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

107.    DISH has performed all of its obligations under the Cox Retransmission Agreement.

108.    Cox breached the representation and warranty of Section 12(b)(iii) that "no third party has or has claimed any right that would be inconsistent with the rights granted to DISH in this Agreement." Cox knew, or should have known, that Terrier's acquisition of Cox was at least inconsistent with the rights granted to DISH.

23

109.    Cox also breached the covenant of Section 12(c)(ii) that it "will maintain, at all times during the Term, all licenses, permits, rights, exemptions, authorizations and consents necessary to fully perform this Agreement."  Instead, Cox has acted to prevent full performance of the Cox Retransmission Agreement.

110.    Cox's breaches of its warranties and covenants under the Cox Retransmission Agreement have caused damages to DISH in an amount to be determined at trial.

**COUNT V**
**(Cox)**
**Breach of Duty of Good Faith and Fair Dealing**

111.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

112.    Cox has exercised its contractual rights in a way that deprives DISH of the benefit of its bargain.

113.    Specifically, Cox engaged in a sale of the Cox Stations that was and is intended to deprive DISH of (i) its retransmission rights under the Cox Retransmission Agreement and (ii) its rights under the change-in-control and assignment provisions of the Agreement in the event of new ownership of the Stations.

114.    Cox has assisted the other Defendants in thwarting the purpose of the Cox Retransmission Agreement, which was to establish the pricing and other terms by which DISH would be able to retransmit the Cox Stations for the full term of the Agreement.

115.    Cox's conduct breaches not only its express contractual obligations but also the implied obligations that a reasonable person in DISH's position would be justified in understanding were included in the Cox Retransmission Agreement.

116.    Cox's breach of its duty of good faith and fair dealing has caused damages to DISH in an amount to be determined at trial.

**COUNT VI**
**(All Defendants)**
**Tortious Interference with the Cox Retransmission Agreement**

117.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

118.     The Cox Retransmission Agreement is a valid and enforceable contract to which Cox is a party and under which Cox owes duties to DISH.

119.     Defendants had knowledge of the Cox Retransmission Agreement and its terms.

120.     As set forth above, Cox and Camelot breached their obligations under the Cox Retransmission Agreement.

121.     The conduct of Defendants, as set forth above, constitutes intentional procurement of these breaches of the Cox Retransmission Agreement, without justification.

122.     DISH has no adequate remedy at law.  Money damages will not adequately compensate DISH.  Unless Defendants are enjoined, DISH will suffer irreparable harm caused by these breaches of the Cox Retransmission Agreement.  Alternatively, because of the damages caused to DISH by these breaches of the Cox Retransmission Agreement and by Defendants' unjustified interference therewith, DISH is entitled to damages in an amount to be determined at trial.

**Count VII**
**(All Defendants)**
**Unfair Competition**

123.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

124.    DISH's rights with respect to the Cox Stations have commercial value, as demonstrated by the fact that DISH pays for them and uses them to generate revenues from subscribers.

125.    Defendants have engaged in unfair competition by knowingly and intentionally misappropriating DISH's rights—specifically by acting to deprive DISH of (i) its retransmission rights with respect to the Cox Stations and (ii) its rights under the change-in-control and assignment provisions of the Cox Retransmission Agreement.

126.    Defendants' conduct has adversely affected, and will continue to adversely affect, the operations of DISH.  Defendants are threatening to "black out" the four major networks in ten of DISH's markets, which will harm DISH and cause its subscribers to leave.

127.    On information and belief, Defendants' unfair competition is willful, deliberate, and in bad faith.

128.    DISH has no adequate remedy at law.  Defendants' conduct has caused, and if not enjoined, will continue to cause, immediate and irreparable damage to DISH.

129.    DISH is entitled to injunctive relief to prevent Defendants from engaging in further acts of unfair competition.

130.    Alternatively, DISH is entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, DISH respectfully requests that the Court enter judgment in favor of DISH and against Defendants and issue an order as follows:

1.    Granting all relief requested in this Complaint;

2.    Declaring that the terms of the Cox Retransmission Agreement remain in force with respect to the Cox Stations through its full term;

3.    Ordering specific performance of the Cox Retransmission Agreement;

4.  Enjoining Defendants from continuing to breach the terms of the Cox Retransmission Agreement and enjoining them from depriving DISH of its retransmission rights with respect to the Cox Stations;

5.  Enjoining Defendants from continuing to tortiously interfere with the Cox Retransmission Agreement;

6.  Alternatively, if specific performance is not ordered, awarding DISH actual, incidental, and consequential damages for Defendants' breaches of and tortious interference with the Cox Retransmission Agreement;

7.  Awarding DISH interest, attorneys' fees, and costs; and

8.  Ordering such other and further relief as the Court may deem appropriate.


Dated: May 1, 2020                              Respectfully submitted,

                                                */s/Michael Dockterman*
                                                Pantelis Michalopoulos (*pro hac vice*)
                                                Michael Dockterman (ARDC #: 3121675)
                                                Jared R. Butcher (*pro hac vice*)
                                                STEPTOE & JOHNSON LLP (Firm ID: 43315)
                                                227 West Monroe, Suite 4700
                                                Chicago, Illinois 60606
                                                Telephone: (312) 577-1243
                                                Fax: (312) 577-1370
                                                - and -
                                                1330 Connecticut Avenue, N.W.
                                                Washington, D.C. 20036
                                                Telephone: (202) 429-3000

                                                *Attorneys for Plaintiff DISH Network L.L.C.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that this First Amended Complaint was served on counsel of record via the ECF Pacer E-Filing system on May 1, 2020, and on the parties without counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Michael Dockterman*
Michael Dockterman