**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:20-CV-00570 |
| v. | ) | Hon. Thomas M. Durkin |
| | ) | |
| COX MEDIA GROUP, LLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF DISH NETWORK L.L.C.'S REDACTED MEMORANDUM**
**IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

**MOTION TO FILE UNDER SEAL PENDING**

STEPTOE & JOHNSON LLP (Firm ID: 43315)
Pantelis Michalopoulos (*pro hac vice*)
Michael Dockterman (ARDC #: 3121675)
Jared R. Butcher (*pro hac vice*)
227 West Monroe, Suite 4700
Chicago, Illinois 60606
Telephone: (312) 577-1243
Fax: (312) 577-1370

- and -

1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 429-3000

*Attorneys for Plaintiff DISH Network L.L.C.*

## Table of Contents

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 3

    I.    DISH, Broadcast Stations, and Retransmission Agreements ...................................... 3

    II.    DISH and Cox Enter into the Cox Agreement ............................................................. 4

    III.    Apollo Agrees to Acquire Two Groups of Stations in Order to Swap Low for High Rates .. 5

    IV.    The Defendants Try to Conceal the Facts and Create a Misperception ........................ 6

    V.    The Applicants Fail to Close the Northwest Acquisition First ..................................... 7

    VI.    DISH Obtains a TRO to Prevent Irreparable Harm ..................................................... 8

ARGUMENT .............................................................................................................................. 9

    I.    DISH Will Likely Succeed on the Merits .................................................................... 9

        a.    DISH Will Likely Succeed on Its Contract Claims .............................................. 10

        b.    DISH Will Likely Succeed on Its Implied Good Faith Covenant, Interference and Unfair Competition Claims ................................................................................................. 14

    II.    DISH Will Be Irreparably Harmed and Have No Adequate Remedy at Law Without a Preliminary Injunction ...................................................................................................... 15

    III.    The Balance of Hardships Weighs in Favor of a Preliminary Injunction ........................... 18

    IV.    A Preliminary Injunction Is in the Public Interest ..................................................... 19

CONCLUSION ........................................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*,
98 N.Y.2d 144 (N.Y. 2015) ......................................................................................... 15

*Am. Para Prof'l Sys., Inc. v. Examination Mgmt. Servs., Inc.*,
625 N.Y.S.2d 33 (1995)................................................................................................ 16

*Associated Wholesale Grocers, Inc. v. United States*,
927 F.2d 1517 (10th Cir. 1991) ................................................................................... 14

*Barnes Grp., Inc. & Subsidiaries v. Comm'r*,
593 F. App'x 7 (2d Cir. 2014) ...................................................................................... 14

*Brown & Brown, Inc. v. Ali*,
494 F. Supp. 2d 943 (N.D. Ill. 2007) .......................................................................... 10

*Brunswick Corp. v. Jones*,
784 F.2d 271 (7th Cir. 1986) ....................................................................................... 10

*Cavel Int'l, Inc. v. Madigan*,
500 F.3d 544 (7th Cir. 2007) ....................................................................................... 11

*City of Chicago v. Sessions*,
264 F. Supp. 3d 933 (N.D. Ill. 2017) .......................................................................... 18

*Corning Glass Works v. Jeannette Glass Co.*,
308 F. Supp. 1321 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970) .......................... 16

*Dior v. Milton*,
155 N.Y.S.2d 443 (Sup. Ct.), *aff'd*, 156 N.Y.S.2d 996 (1956)................................. 16

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*,
35 F.3d 1134 (7th Cir. 1994) ....................................................................................... 20

*Greene v. United States*,
13 F.3d 577 (2d Cir. 1994).......................................................................................... 14

*Highland Sand & Gravel, Inc. v. Squicciarini*,
709 N.Y.S.2d 91 (N.Y. App. Div. 2000) .................................................................... 13

*In re Best Prod. Co., Inc.*,
157 B.R. 222 (Bankr. S.D.N.Y. 1993).......................................................................... 14

*In re Waterford Wedgwood USA, Inc.*,
500 B.R. 371 (Bankr. S.D.N.Y. 2013) ......................................................................... 14

*JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*,
    893 N.Y.S.2d 237 (N.Y. App. Div. 2010) ............................................................................ 11

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*,
    6 N.Y.S.3d 7 (N.Y. App. Div. 2015) ................................................................................... 16

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*,
    128 F.3d 1111 (7th Cir. 1997) ............................................................................................ 10

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ............................................................................................................ 18

*N.L.R.B. v. Dorothy Shamrock Coal Co.*,
    833 F.2d 1263 (7th Cir. 1987) .............................................................................................. 3

*Personeta, Inc. v. Persona Software, Inc.*,
    418 F. Supp. 2d 1013 (N.D. Ill. 2005) ............................................................................... 17

*Reuschenberg v. Town of Huntington*,
    791 N.Y.S.2d 652 (2005) .................................................................................................... 16

*Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*,
    754 F. Supp. 2d 616 (S.D.N.Y. 2010) ................................................................................ 13

*Rockwood Pigments NA, Inc. v. Elementis Chromium LP*,
    124 A.D. 3d 509 (1st Dep't 2015) ...................................................................................... 19

*SKF USA, Inc. v. Bjerkness*,
    636 F. Supp. 2d 696 (N.D. Ill. 2009) ................................................................................. 21

*SMC Corp. v. Lockjaw, LLC*,
    481 F. Supp. 2d 918 (N.D. Ill. 2007) ............................................................................ 17, 20

*Turnell v. CentiMark Corp.*,
    796 F.3d 656 (7th Cir. 2015) .............................................................................................. 20

*Ty, Inc. v. Jones Grp., Inc.*,
    237 F.3d 891 (7th Cir. 2001) .............................................................................................. 17

*Vendavo, Inc. v. Long*,
    397 F. Supp. 3d 1115 (N.D. Ill. 2019) .......................................................................... 11, 17

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ............................................................................................ 16

*White Plains Coat & Apron Co. v. Cintas Corp.*,
   8 N.Y.3d 422 (2007) ................................................................................................................. 15

*YTB Travel Network of Illinois, Inc. v. McLaughlin*,
   No. 09-CV-369-JPG, 2009 WL 1609020 (S.D. Ill. June 9, 2009) .......................................... 17

### INTRODUCTION

In March 2019, DISH renewed its agreement with Cox Media Group, LLC ("Cox") to retransmit Cox's thirteen broadcast stations until 2022 ("Agreement"). A few months after, in January 2020, DISH obtained a Temporary Restraining Order in state court in light of Cox's threat to terminate the contract prematurely. The documents produced by the Defendants lay bare their behavior: they hatched a cynical ploy to compel Cox to breach that contract and thereby further accelerate the spiral of rising retransmission prices, already up more than 3,591% nationwide since 2006, by raising Cox's prices mid-cycle. To that end, Defendants knowingly concealed the facts, consciously masqueraded a myth as a fact, breached the Agreement by invoking its termination based on that myth, and failed to implement correctly their own plan to boot.

If allowed to terminate the Agreement, Defendants will force a blackout of the Cox Stations in 10 markets with irreversible harm to DISH, some of whose customers will leave for other distributors never to come back, and to consumers nationwide. Money damages will not recoup DISH's customers or goodwill. The Court should preserve the *status quo ante* until this Court finally reaches the merits of DISH's claims.

***Likelihood of success on the merits.*** The scheme was led by Defendant Apollo Global Management ("Apollo"). Apollo's main objective behind the purchase of two groups of stations was to replace the relatively low retransmission rates of one group with the higher rates of the other, for a gain of REDACTED In the Defendants' words, one of the transaction's REDACTED

REDACTED

REDACTED Ex. 1, TMDEFS-0000268. To achieve that goal, the Defendants had to conceal the facts—that a New York financial firm was buying two broadcast groups at the same time—and disseminate a cover story— that the group with the lower rates (Cox)

was being acquired by the other group (Northwest). That was necessary because the Cox Agreement (and presumably Cox's agreements with other distributors) allowed termination only when the Cox stations were acquired by an existing broadcaster.

To that end, the Defendants embarked on a disinformation campaign. They tried to divert attention from their true motive, and REDACTED the perception of that motive REDACTED REDACTED Ex. 1, TMDEFS-0000273. They instructed a PR company to foster the public impression that Cox was being acquired by a broadcaster: REDACTED REDACTED Ex. 2, TMDEFS-0004649. As if that direction was not clear enough, Apollo left no doubt that it was aiming for the dissemination of a fiction: REDACTED *Id.* (emphasis added). Subsequently, when DISH wrote to Northwest that it did not believe the Cox stations could be added to the Northwest agreement, the erstwhile head of Northwest complained to Apollo that PR attempts at concealment were failing: REDACTED REDACTED Ex. 3, TMDEFS-0004839. And this picture emerges even though Defendants have arbitrarily refused to produce any documents on the sequence of the Cox and Northwest transactions dating from the period when these transactions were negotiated. The Defendants' discovery failure allows an adverse inference that the missing information would not be favorable to them. *N.L.R.B. v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1269 (7th Cir. 1987).

Much of Defendants' plan went wrong. The two acquisitions were so interdependent that the Northwest deal could not close before the Cox deal was ready to close. And so the Defendants did not really acquire the two station groups in two stages. Instead, they applied to the FCC for joint approval of the two deals and received that approval. This made Apollo (not Northwest) into

2

an "authorized" transferee under the Cox Agreement's change in station control/after-acquired clause.

The missteps did not stop there. According to Defendants, what matters is which of the two acquisitions closed first. But, even if that "fig leaf" pretext were enough, it is not what happened. Two of the payments required to close the Northwest acquisition, to the tune of [REDACTED] [REDACTED] were completed more than one hour after all Cox payments had been made.

*Irreparable Injury.* Absent a preliminary injunction, the Cox stations will go dark on DISH and no later award will recover the lost customers or reputational damage flowing from that loss. The Defendants have taken the position that DISH will not be injured because it is free to break the law and engage in piracy. But piracy could cause DISH the loss of its ability to retransmit thousands of local stations in 210 markets across the country.

## STATEMENT OF FACTS

### I. DISH, Broadcast Stations, and Retransmission Agreements

DISH is a satellite multichannel video programming distributor. DISH distributes networks to millions of households by sending signals from satellites, located more than 22,000 miles above the Earth's equator, directly to pizza-sized dishes at the subscriber's home. DISH retransmits local broadcast stations in all 210 of the nation's Designated Market Areas.

Because of an unusual statutory provision, broadcasters enjoy a "heads-I-win, tails-you-lose" relationship with satellite and cable multichannel video programming distributors. Every three years, each of almost two thousand broadcast stations may choose between "must-carry" or retransmission consent status. If it chooses must-carry, DISH has to carry it, no questions asked. If it chooses retransmission consent status, it can negotiate an agreement with the distributor setting forth a per-subscriber, per-month retransmission fee and important non-monetary terms. Cox has consistently chosen retransmission consent status for all of its stations.

Retransmission rates have followed a steep upward trajectory. In 2006, distributors paid $214.6 million for local stations. By 2016, broadcast retransmission fees reached $7.9 billion, or 3,591% of the 2006 number. By 2023, retransmission fees are projected to increase to $12.82 billion, or 5,880% of 2006 revenues. By contrast, the annual Producer Price Index increase between 2006 and 2018 ranged from negative 5.1% to 7.8%.[1] The reason for these phenomenal price increases is not that the quality of the broadcast content has improved over that time. It is simply that each station affiliated with one of the four networks—ABC, CBS, Fox, and NBC—is the local monopoly provider for that network, and that many multichannel video customers demand a full complement of all four networks.

## II.     DISH and Cox Enter into the Cox Agreement

On March 31, 2019, DISH renewed its retransmission relationship with Cox and entered into the Agreement, which is set to expire in 2022. Dkt. No. 84, First Amended Complaint ("FAC") ¶¶ 26, 30. DISH agreed to pay Cox rates on a per-subscriber basis that amount to several million dollars per month, in exchange for the right to retransmit the signals of Cox's thirteen local TV stations in ten major U.S. markets. *Id.* ¶ 27. Ten of these stations are affiliated with one of the four major networks. *Id.* ¶ 29. The Agreement also includes numerous non-monetary terms that govern the retransmission relationship. Dkt. No. 7, Cox Agreement § 5(a).

Under the Agreement's change in station control/after-acquired station clause, if a "Station Change of Control" occurs, the continued applicability of the Agreement depends on whether the "Acquiring Entity" has an existing retransmission agreement with DISH. If it does not, the station continues to be subject to the Agreement. *Id.* If it does, then the station is governed by the

---

[1] *See* Petition to Deny of DISH Network Corporation, MB Docket No. 19-30, at 15 (Mar. 18, 2019), https://ecfsapi.fcc.gov/file/1031842167256/(redacted)%20(as%20filed)%20DISH%20Petition%20to%20 Deny%2019-30%2018Mar.pdf

Acquiring Entity's retransmission agreement. *Id.* A "Station Change of Control" is triggered by either of two events: either an entity gains the ability to control a majority of the board or the voting interests for the Cox stations or to direct the stations' management; or an entity becomes the FCC-authorized assignee or transferee of the broadcast license(s) of [the Cox stations]." *Id.* at § 17(b)(i). In each case, the entity in question is the Acquiring Entity.

Just as with Cox, DISH had in place a retransmission agreement with the Northwest group of stations, set to expire December 31, 2019.

## III. Apollo Agrees to Acquire Two Groups of Stations in Order to Swap Low for High Rates

The documents produced by the Defendants demonstrate clearly Apollo's main objective behind the dual purchase of the Cox and Northwest groups: Apollo wanted to replace the relatively low retransmission rates of one group (Cox) with the higher rates of the other (Northwest), for a gain of REDACTED In the Defendants' words: REDACTED

REDACTED

Ex. 1, TMDEFS-0000268 & TMDEFS-0000270. Apollo emphasized: REDACTED

REDACTED

REDACTED Ex. 4, TMDEFS-0000790 & TMDEFS-0000794. And, in its effort to attract investors to the deal, Apollo articulated not only the main objective, but its plan for achieving it: REDACTED

REDACTED

REDACTED Ex. 5, TMDEFS-0001526-27.

5

The Defendants could have acquired Northwest first, secured FCC approval for that purchase, then have Northwest buy Cox and seek FCC approval for that transaction. But they chose not to implement the purchases in stages. The reason was that, if they were to buy Northwest first, the main transaction benefit—the REDACTED in retransmission price increases from extending the Northwest rates to Cox—would not be assured. The transactions were so interdependent that they could not be meaningfully separated from one another.

Thus, on February 14, 2019, Apollo's Terrier entered into purchase agreements with Cox to acquire the Cox stations through its Camelot subsidiaries, FAC ¶ 49, and with Northwest to acquire the Northwest stations. *Id.* ¶ 47. The Northwest Purchase Agreement recited that it was being entered into "concurrently with"—***not before***—the Camelot Purchase Agreement, and conditioned the closing of the Northwest deal on the ability of Terrier to close the Cox deal. *Id.* at ¶¶ 53,54.

The two acquisitions' inextricable paths continued. The parties requested FCC approval of these acquisitions jointly on March 4, 2019. *Id.* ¶ 51. The FCC approved both transactions by one decision on November 22, 2019, with Terrier Media Buyer, LLC as the authorized transferee. *Id.* Defendants consummated both acquisitions on December 17, 2019. *Id.*

## IV.   The Defendants Try to Conceal the Facts and Create a Misperception

To achieve their REDACTED immediate retransmission hike objective, the Defendants decided to manufacture a misperception. To begin with, the Defendants tried to distract attention from their objective. In a draft presentation regarding the transaction, a handwritten comment urges REDACTED Ex. 1, TMDEFS-0000273. Then, the Defendants set out to create what they candidly, in the comfort of their confidential correspondence, called a REDACTED Ex. 2, TMDEFS-0004649. Thus, on December 18, 2019, the day after consummating the Cox Acquisition and Northwest Acquisition, Apollo emailed a

6

well-known public relations expert, asking for **REDACTED**

**REDACTED** *Id.* The email made clear that the PR specialist was not being asked to

disseminate the truth: **REDACTED** *Id.*

    The Defendants were frustrated when facts contradicting the narrative seeped out in the

public record. **REDACTED**

**REDACTED** that these were just the inconvenient facts

that the Defendants had been trying to suppress:  this was **REDACTED**

**REDACTED** Ex. 3,

TMDEFS-0004839.

    Apollo's counsel also contributed to the effort.  They suggested that Northwest's president

**REDACTED**

**REDACTED** another artifice that the documents show was carefully contrived:

**REDACTED**

**REDACTED** Ex. 6, TMDEFS-0003074.

    Apollo was also willing to **REDACTED** to accomplish its goal.  Apollo

offered Northwest's Brian Brady **REDACTED**

**REDACTED** . *See* Ex. 7, TMDEFS-0005014 at TMDEFS-00005016.

These incentives ensured that Northwest and Apollo stayed **REDACTED**

**REDACTED** when Cox's relationship with Apollo deteriorated prior to closing,

jeopardizing Apollo's scheme.  Ex. 8, TMDEFS-0003872.

    **V.**    **The Applicants Fail to Close the Northwest Acquisition First**

    The Defendants claim that, for their plan to succeed, all that was necessary was for the

Northwest deal to be consummated first, even by as little as one second.  But, even if that pretext

were enough, they failed to achieve it.  The few documents produced by the Defendants in response

to this Court's order show that the actual closing did not go as planned.[2]  It is true that the Defendants made elaborate plans to close the Northwest acquisition first.  But these plans were observed in the breach.  One of the conditions precedent to consummation of the Northwest deal was payments for the debt of two Northwest entities, **REDACTED** **REDACTED**  *See* Dkt. No. 1 (ECF Page No. 185), Northwest Purchase Agreement § 2.4.1(b) (listing required closing payments).  But the Defendants' flow-of-funds spreadsheet shows that these two payments, totaling about **REDACTED** were completed more than an hour after *all* Cox payments were made.[3]  *See* Ex. 9, Funding Flow Exhibit.  Furthermore, emails confirm that the executed transaction documents for the Cox Acquisition were delivered **REDACTED** **REDACTED** **REDACTED** Ex. 10, TMDEFS-0000121; Ex. 11, TMDEFS-0000171.[4]  If any one of the two acquisitions closed first, it was Cox.

## VI.  DISH Obtains a TRO to Prevent Irreparable Harm

On December 20, 2019, the Defendants claimed the Cox stations should be added to the Northwest agreement, which was set to expire by year-end.  On January 15, 2020, before the two-week-extension of that agreement ran out and DISH would be forced to shut off the Cox stations, DISH asked the Circuit Court of Cook County ("State Court") to issue a temporary restraining order ("TRO") maintaining the Cox Agreement in full force and effect.  Dkt. No. 1 (ECF Page No. 11), Verified Complaint ("Verified Compl.").

---

[2] The Court required the production of all documents related to the sequencing of the transactions. Nevertheless, Defendants have refused to produce pre-December 2019 sequencing documents.

[3] Specifically, the spreadsheet shows that the **REDACTED** **REDACTED** **REDACTED**

[4]  Defendants have informed DISH that the executed documents were released from escrow during a phone call and that there are no minutes or other documentation of that call.

That same day, the State Court entered the TRO requested by DISH. Dkt. No. 1 at App'x at TRO (Jan. 15, 2020) (ECF Page Nos. 292-294). In deciding against dissolving the TRO, despite two attempts by the Defendants, the State Court expressly found all factors, under both Illinois state law *and federal law*, weighed in favor of injunctive relief. Dkt. No. 25-9, Transcript of Proceedings (Jan. 24, 2020) (ECF Page Nos. 1267-85).

Defendants then removed the case to this Court, where the order has remained in place with the parties' consent. DISH now asks this Court to convert the TRO into a preliminary injunction.

## ARGUMENT

"The purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 950 (N.D. Ill. 2007). The moving party must show (1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer is greater than the irreparable harm the defendant will suffer if the injunction is granted; (4) that it has a reasonable likelihood of prevailing on the merits; and (5) that the injunction will not harm the public interest. *Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997). "[T]he degree of likelihood of prevailing on the merits that the plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor." *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986).

## I. DISH Will Likely Succeed on the Merits

The threshold to establish a likelihood of success on the merits is low. *Id.* A "likelihood of success" exists if the party seeking injunctive relief shows that it has a "better than negligible" chance on its claims. *Meridian Ins.*, 128 F.3d at 1114; *Vendavo, Inc. v. Long*, 397 F. Supp. 3d

1115, 1129 (N.D. Ill. 2019). The plaintiff does not need to have a winning "or even a good case."
*See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 549 (7th Cir. 2007).

        a.        ***DISH Will Likely Succeed on Its Contract Claims***

In its First Amended Complaint, DISH has asserted claims that Defendants have breached the Cox Agreement under the governing New York law by refusing to allow it to retransmit the Cox stations until the Agreement expires in 2022. FAC ¶¶ 23, 97-110.

There is no dispute that the Cox Agreement grants DISH the right to retransmit the Cox stations for two more years, that DISH has performed its obligations under the contract, that Defendants have tried to terminate the contract under the after-acquired station clause, that Defendants therefore refuse to consent to DISH's continued retransmission of the Cox stations, or that DISH would be harmed by Defendants' refusal. FAC ¶¶ 30, 79; *see JP Morgan Chase v. J.H. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010). The only issue is whether the Cox stations are after-acquired stations subject to the Northwest retransmission agreement.

They are not. Cox was not acquired by Northwest, an existing broadcaster. Rather, Cox and Northwest were acquired by Apollo, a financial firm. Apollo agreed to the two acquisitions at the same time; Defendants applied for FCC approval by one indivisible, consolidated application; they received from the FCC the consolidated approval they requested; and they closed the two on the same day.

The documents produced by Defendants show they know these are the facts, and that they have tried to cloak them in a ❚REDACTED❚ When Northwest's former principal complained that DISH knew too much, the ❚REDACTED❚ stands for the truth; the ❚REDACTED❚ in turn, stands for the fiction that Northwest was acquiring Cox. And there is no doubt that the retention of Mr. Brady's figurehead role as Northwest officer and director for a few hours (between the time the Defendants

*thought* Northwest would close and the time Cox would close) served no substantive purpose. There was no call for Mr. Brady to issue a command or manage any company affairs during those hours. The only reason why that arrangement REDACTED in the view of Apollo's counsel is simply the Defendants' effort to erect a façade—the misimpression that control over Cox was being acquired, not by Apollo, but Mr. Brady and therefore Northwest. Mr. Brady's tenure is as ephemeral as Defendants' disguise of Apollo as a broadcaster adding the Cox stations to its existing stable.

The Defendants claim that, for their plan to succeed, all that was necessary was for the Northwest deal to be consummated first, even by as little as one second. Of course, the entire public relations campaign launched by the Defendants shows they realized that pretext would not be enough. But, in any event, despite all the careful planning and choreography, the REDACTED in payments for the debt of two Northwest entities were not completed until *after* Cox had been fully paid. And it was the Cox signatures that were delivered first. It is no surprise the Defendants resisted so strenuously DISH's requests for evidence that the Northwest acquisition closed first. Such evidence did not exist then, and does not exist now. It was Apollo, not Northwest, that gained control of the Cox stations and thus became the Acquiring Entity under the first prong of the Cox Agreement's change in station control/after-acquired station clause.

In fact, Apollo had likely become the Acquiring Entity already at the time of the FCC's approval under the clause's second prong, whereby the Acquiring Entity is the one that becomes the "authorized assignee or transferee" for the stations. FCC precedent shows that an entity is the "authorized transferee" of a station upon the FCC authorizing the transfer of control of a station to that entity, even though the transfer has not yet been consummated. Ex. 12, Application for Consent to the Assignment of Construction Permit of Station WKAF(TV), *Memorandum Opinion*

11

*and Order*, 60 Rad. Reg. 2d (P&F) 1161 ¶ 1 (1986) (acquirors were "authorized transferees" of station where FCC authorized transfer of control but such transfer had not yet been consummated). Thus, the Apollo entities, not Northwest, became the "FCC-authorized assignee or transferee" of the Cox and Northwest stations concurrently when the FCC approved the acquisitions of both groups by one decision. No Apollo entity has a retransmission agreement with DISH, which means the Cox Agreement cannot be terminated.

In any event, the parties to the Cox Agreement never intended that clause to be used in the manner attempted by Defendants. Contracts should be interpreted to "give effect to the intention of the parties." *Highland Sand & Gravel, Inc. v. Squicciarini*, 709 N.Y.S.2d 91, 92 (N.Y. App. Div. 2000). "Under New York (and every other state's) law, parties are not free to interpret a contract in a way that frustrates the purpose of that contract or that makes any provision of the contract meaningless." *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010). Change in station control/after-acquired station provisions are good housekeeping provisions meant to apply when a pre-existing broadcaster with which a distributor has a retransmission agreement acquires additional stations. Declaration of Melisa Ordoñez Boddie, ¶ 17 ("Boddie Decl."). They avoid the hassle of having to either negotiate a new retransmission agreement or amend the existing retransmission agreement. *Id*. ¶ 18. They are not meant to give an entity that concurrently acquires stations a unilateral right to elect the retransmission agreement that it wants to apply to those stations through artful deal structuring. *Id*. ¶ 21. In fact, the extent to which Apollo's attempt deviates from industry practice and the widely understood meaning of change in station control/after-acquired station clauses was vividly illustrated in colloquial terms in a comment that a cable system official made to Vanity Fair: "Look, unless Northwest Broadcasting is the one that has the contract here, if they think we're

12

going to respect that after-acquired clause just because they bought both assets at the same time, they're smoking crack."[5]

Even if, contrary to the evidence, the Apollo entities technically acquired the Northwest stations moments before the Cox stations, the Court should treat the Cox and Northwest acquisitions as a single, concurrent, integrated transaction. In similar circumstances where a party imposes a complicated deal structure to disadvantage a stranger to a transaction, courts have routinely "collapsed" a series of transactions to determine liability. *See, e.g.*, *Barnes Grp., Inc. & Subsidiaries v. Comm'r*, 593 F. App'x 7, 9 (2d Cir. 2014) (emphasizing that the focus should be on substance over form if a transaction has been structured to escape liability); *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994) (in the tax context, "the step transaction doctrine. . . treats the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are substantially linked. . . . Under the end result test, the step transaction doctrine will be invoked if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result."); *Associated Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1521-22 (10th Cir. 1991) (same); *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 380 (Bankr. S.D.N.Y. 2013) ("Here, the Court finds it appropriate to collapse the two sales agreements and treat them as one integrated transaction. In doing so, the Court is mindful that it need not adhere to labels assigned by the parties, but rather can consider the intent of the parties in structuring the transaction."); *In re Best Prod. Co., Inc.*, 157 B.R. 222 (Bankr. S.D.N.Y. 1993). Here, of course, the Court need not

---

[5] Ex. 13, William D. Cohan, *"Television is What Gets Senators Elected": Private-Equity Mogul Leon Black is Building a Local TV Empire to Rival Sinclair and Fox*, Vanity Fair (Apr. 15, 2019), https://www.vanityfair.com/news/2019/04/leon-black-is-building-a-local-tv-empire-to-rival-sinclair-and-fox; *see also* Boddie Decl. ¶ 23.

even collapse anything because the two transactions *were* concurrent, and the Cox and Northwest stations remain subject to their respective retransmission agreements.

      **b.**    ***DISH Will Likely Succeed on Its Implied Good Faith Covenant, Interference and Unfair Competition Claims***

Every contract governed by New York law, like the Cox Agreement, imputes a duty of good faith and fair dealing on the parties. *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. 2015). This duty "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (internal citation omitted). Similarly, outsiders to a contract are prohibited from taking action that wrongly frustrates or interferes with the rights of a party to a contract or induces a breach of contractual duties. *See White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007).

The facts demonstrate that there is a much better than "negligible" chance Defendants caused Cox to violate these precepts of New York law and themselves committed torts against DISH. Limited discovery has already confirmed that the main reason for Defendants' structuring of the Cox and Northwest station acquisitions was to frustrate distributors' right to retransmit the Cox stations under the Cox Agreement. FAC ¶¶ 3, 56, 60-70; *see* Ex. 5, TMDEFS-0001527-28; Ex. 4, TMDEFS-0000790 & TMDEFS-0000794. **REDACTED** **REDACTED** to accomplish its goal. Ex. 7, TMDEFS-0005014. The result? When Cox's relationship with Apollo deteriorated leading up to closing, jeopardizing Apollo's scheme, Northwest and Apollo stayed **REDACTED** Ex. 8, TMDEFS-0003872. Moreover, Apollo launched a PR campaign to conceal its goal, demonstrating its knowledge that what it was doing was wrong or, under the most charitable reading, at odds with Cox's good faith obligations. These facts demonstrate Defendants'

14

determination to interfere with the Cox Agreement, causing Cox to breach its obligations of good faith and fair dealing with its retransmission counterparty.

DISH also has a better than "negligible" chance on its unfair competition claim. Under New York law, "[i]t is well settled that the primary concern in unfair competition is the protection of a business from another's misappropriation." *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 6 N.Y.S.3d 7, 13 (N.Y. App. Div. 2015) (internal citations omitted). "[C]ommercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one person, of a benefit or property right belonging to another." *Dior v. Milton*, 155 N.Y.S.2d 443, 451 (Sup. Ct.), *aff'd*, 156 N.Y.S.2d 996 (1956). Here, the evidence to date shows not only that Defendants misappropriated DISH's valuable right to retransmit the Cox stations for their own commercial advantage—to make money for the investors in Apollo—but also did so to the unfair commercial disadvantage of DISH. FAC ¶¶ 124-26; Ex. 4, TMDEFS-0000790 & TMDEFS-0000794. There is also evidence that Defendants' misappropriation of DISH's rights under the Cox Agreement was done in bad faith. *Id.* ¶¶ 1, 3, 54, 126; Ex. 5, TMDEFS-0001527-28; Ex. 7, TMDEFS-0005014.[6]

## II. DISH Will Be Irreparably Harmed and Have No Adequate Remedy at Law Without a Preliminary Injunction

"[H]arm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1143 (N.D. Ill.

---

[6] Like DISH's contract claim, its bad faith, tortious interference, and unfair competition claims justify preliminary injunctive relief. *See, e.g., Reuschenberg v. Town of Huntington*, 791 N.Y.S.2d 652, 653 (2005) (preliminary injunction based on breach of covenant of good faith and fair dealing); *Am. Para Prof'l Sys., Inc. v. Examination Mgmt. Servs., Inc.*, 625 N.Y.S.2d 33, 34 (1995) (preliminary injunction based on tortious interference); *Corning Glass Works v. Jeannette Glass Co.*, 308 F. Supp. 1321, 1329 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970) (preliminary injunction based on unfair competition).

2019). Intangible harms such as damage to reputation or goodwill are presumed irreparable. *SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 928 (N.D. Ill. 2007); *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 902 (7th Cir. 2001); *see also YTB Travel Network of Illinois, Inc. v. McLaughlin*, No. 09-CV-369-JPG, 2009 WL 1609020, at *5 (S.D. Ill. June 9, 2009); *Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1020 (N.D. Ill. 2005).

If the Court does not issue a preliminary injunction, the Cox stations will go dark. As Ms. Boddie testifies, almost one million households subscribing to DISH receive one of the Cox stations, and will lose access to it. Boddie Decl. ¶ 30. Although some of these customers may have alternatives short of leaving DISH, the burden on them will be significant. They will be required to obtain and install a digital antenna, but local station reception from an over-the-air antenna is dependent on geographic location and topography, and is not an option for all subscribers. Some customers may be able to stream the lost programming. Invariably, many customers will not do either. *Id.* ¶ 31.

It is therefore no wonder that many customers in a market where DISH experiences a blackout leave DISH for other distributors—cable systems or DIRECTV. Because broadcasters stagger the terms of retransmission agreements so that they come up for renewal at different times for different distributors, the distributors competing against DISH typically have the right to uninterrupted retransmission of the broadcast station that is blacked out on DISH's screens. When evaluating the merger of Comcast and NBC nearly a decade ago, the FCC looked to DISH's experience from the blackout of the Fisher broadcast group. The FCC concluded that the blackout directly resulted in significant customer losses for DISH.[7] In the many blackouts DISH has

---

[7] Applications of Comcast Corporation, *Memorandum Opinion and Order*, 26 FCC Rcd. 4238, Appendix B, 4390 ¶ 34 (2011) ("Due to the loss of a broadcast affiliate signal, DISH lost a statistically significant **[REDACTED]** of its subscribers in a six month period. Even six months after the

experienced since then, it has suffered a consistently significant loss of customers as a result. Most of these losses are not reversible. When the programming is back on DISH's screens, most customers leaving DISH (many of whom have entered fixed-term contracts with DISH's competitors) do not switch back.

DISH has not found any case law where a court has considered, let alone entertained, the remarkable idea advanced by Defendants that DISH is free to avoid injury by breaking the law and pirating Cox's signals.[8] In any event, DISH does not have any such freedom. In fact, in a plot development worthy of the theater of the absurd, Defendants have filed a copyright infringement complaint against DISH, arguing there that DISH should not be doing what they say here DISH is free to do (retransmitting the Cox signals), and making that argument even though they are enjoined from ending Cox's retransmission consent.

Defendants appear to believe that DISH has been granted its copyright license by Cox and have filed a copyright infringement complaint based on that belief. While the belief is grossly incorrect, the legal peril faced by DISH is in fact even more grave. In fact, DISH derives its copyright license to retransmit Cox's programming, not from Cox, but from the Copyright Act itself, which grants satellite carriers a so-called local-into-local statutory license to retransmit the programming of local broadcast stations back into these stations' local markets. *See* 17 U.S.C. § 122. But that statutory license is conditioned on the satellite carrier's compliance with the FCC's rules "governing the carriage of television broadcast station signals." *Id*. § 122(a)(1)(B).

---

programming was restored, DISH subscriber levels in the treatment group DMAs remained below the pre-dispute levels.").

[8] In fact, courts have found the type of Hobson's choice Defendants attempt to impose upon DISH here sufficient to establish irreparable harm. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017); *see also Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992).

In turn, the FCC's rules, and the Communications Act itself, prohibit multichannel video programming distributors such as DISH from retransmitting a broadcast signal without the station's consent. *See* 47 C.F.R. § 76.64(a); 47 U.S.C. § 325(b). If Cox is allowed to withhold its consent and DISH nonetheless continues retransmitting its signal, DISH could lose the statutory license in its entirety. It is based on that license that DISH retransmits more than 1,000 stations in 210 markets. Without local stations, DISH would be at a severe handicap compared to cable systems and DIRECTV.

Defendants also claim that nothing stops DISH physically from breaking the law if DISH were so inclined. That is wrong, too. Cox will be able to shut off some of the Cox stations. This is because the signals of two Cox stations—the CBS affiliate in Seattle and the Fox affiliate in Tulsa—are delivered by Defendants to DISH by fiber. FAC ¶ 29, fn. 2.

There is no adequate remedy at law for DISH's loss of subscribers, the diminution in DISH's ability to attract new customers, and the damage to DISH's goodwill.[9] In fact, New York courts have found that where, as here, a contract prohibits the recovery of certain categories of damages—including damages for lost profits, lost business and diminished goodwill—parties will suffer irreparable injury in the absence of preliminary injunctive relief.[10]

## III. The Balance of Hardships Weighs in Favor of a Preliminary Injunction

A prerequisite to the issuance of a *status quo* injunction is that the balance of the hardships or harms weighs in favor of the movant. *SMC Corp. v. Lockjaw, LLC,* 481 F. Supp. 2d 918, 929-

---

[9] FAC ¶¶ 5, 79-80. To show it has no adequate remedy at law, DISH is not required to demonstrate that the "remedy be wholly ineffectual," but only that any award would be "seriously deficient as compared to the harm suffered." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017).

[10] *Rockwood Pigments NA, Inc. v. Elementis Chromium LP*, 124 A.D. 3d 509, 511 (1st Dep't 2015); *see* Agreement § 15(a) (providing that parties will generally not be liable for any incidental, punitive, or consequential or other indirect damages arising from breach).

30 (N.D. Ill. 2007). Additionally, courts in the Seventh Circuit weigh the balance of potential harms on a "sliding scale" against the movant's likelihood of success. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). The balance under both standards here weighs heavily in favor of granting a preliminary injunction.

Defendants have never articulated any harm to them as a result of the TRO or that would occur if a preliminary injunction were to issue. Nor could they. This is because DISH has paid, and intends to pay, Defendants the retransmission rates under the Cox Agreement during the pendency of this lawsuit. DISH also can and will pay Defendants any additional retransmission rates in any successor agreement to retroactively "true up" Defendants in the unlikely event the Court finds that the Cox Agreement does not cover the Cox stations, which would bring Defendants' potential damages to zero by reason of the preliminary injunction. Moreover, while DISH continues to retransmit, Defendants have the benefit of nearly one million viewers watching their programming with the corresponding benefit from the advertising revenues they can command for the additional viewership.

In sharp contrast, as shown above, the absence of a preliminary injunction would have devasting consequences to DISH. Tipped further by DISH's significant likelihood of success on the merits, the balance heavily favors a preliminary injunction.

## IV.    A Preliminary Injunction Is in the Public Interest

In deciding a motion for a preliminary injunction, a court considers the effect that the grant or denial of the injunction will have on nonparties. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1137 (7th Cir. 1994). Here, in the absence of injunctive relief, there will be a substantial negative impact on the public. Specifically, the screens of almost one million of DISH's viewers—*i.e.,* the public—will go dark. These customers will lose access to stations that broadcast local news, pandemic coverage, favorite shows, and election coverage, and will have to either

19

switch to other distributors or make do with an over the air antenna.  Ordoñez Decl. ¶ 32; *see SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 716 (N.D. Ill. 2009) (court should take into consideration any effect the injunction may have on customers).

## CONCLUSION

For the foregoing reasons, DISH respectfully requests that its motion for a preliminary injunction be granted.

Dated: June 1, 2020                                    Respectfully submitted,

/s/ *Michael Dockterman*
Pantelis Michalopoulos (*pro hac vice*)
Michael Dockterman (ARDC #: 3121675)
Jared R. Butcher (*pro hac vice*)
STEPTOE & JOHNSON LLP (Firm ID: 43315)
227 West Monroe, Suite 4700
Chicago, Illinois  60606
Telephone:  (312) 577-1243
Fax:  (312) 577-1370

- and -

1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 429-3000

*Attorneys for Plaintiff DISH Network L.L.C.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this memorandum was served on counsel of record via the ECF Pacer E-Filing system on June 1, 2020, and on the parties without counsel of record in accordance with the Federal Rules of Civil Procedure.

/s/ *Michael Dockterman*
Michael Dockterman