**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DISH NETWORK L.L.C., ) <br> ) <br> Plaintiff, ) <br> ) Case No. 1:20-CV-00570 <br> v. ) Hon. Thomas M. Durkin <br> ) <br> COX MEDIA GROUP, LLC., et al., ) <br> ) <br> ) <br> Defendants. ) | |

## DECLARATION OF MELISA ORDOÑEZ BODDIE

1. I am a Director of Programming Acquisitions for DISH Network L.L.C. ("DISH"). I have been employed by DISH since 2007. I submit this declaration in support of DISH's motion for preliminary injunction. Except as otherwise stated herein, this declaration is based upon my personal knowledge, the books and records at DISH, and/or information reported to me in the regular course of business by other individuals in the organization with personal knowledge of such facts.

2. I manage the Local Broadcasting business unit for DISH. As part of my responsibilities, I oversee our retransmission consent agreements and negotiations with all broadcast stations in the country. I have over twelve years' experience dealing with retransmission consent agreements, including successfully negotiating over 1,000 such agreements. I routinely lead these negotiations with respect to local broadcast stations across the country. I oversaw the negotiation of the March 31, 2019 retransmission consent agreement with Cox Media Group, and I have led ongoing negotiations with Northwest Broadcasting.

**Retransmission Fees And Negotiations**

3. DISH is a satellite multichannel video programming distributor. DISH distributes networks to millions of households by sending signals from dozens of satellites, located more than 22,000 miles above the Earth's equator, direct to pizza-sized dishes at the subscriber's home. DISH retransmits local broadcast stations in all 210 of the nation's Designated Market Areas.

4. Because of an unusual statutory provision, broadcasters enjoy a "heads-I-win, tails-you-lose" relationship with satellite and cable multichannel video programming distributors. Every three years, each of almost two thousand broadcast stations must elect between "must-carry" or "retransmission consent" status. If it elects must-carry, we have to carry it, no questions asked. If it elects retransmission consent status, it can negotiate an agreement with the distributor setting forth a per-subscriber per-month retransmission fee and important non-monetary terms, using the threat of a "blackout" if the parties do not come to terms.

5. Generally, broadcast stations affiliated with the four major networks—ABC, CBS, Fox, and NBC—constitute must-have programming in their local markets, and elect retransmission consent status. The Cox Media Group has consistently made that choice for its stations. Our last negotiation concluded in March 2019 and resulted in a three-year retransmission consent agreement set to run until 2022 (the "Agreement"). DISH and Cox have always been able to reach retransmission consent agreements, and the Cox stations have never been blacked out on DISH.

6. Retransmission rates industry-wide have increased by some 3500% from 2006 to 2016.[1] That increase makes no market or business sense. For one thing, unlike cable networks,

---

[1] *See* Petition to Deny of DISH Network Corporation, MB Docket No. 19-30, at 15 (Mar. 18, 2019),

broadcast signals are already available for free, over the air, each in its local market. The reason they are free is two-fold. First, the broadcasters have received for free, from the federal government, licenses to broadcast spectrum, worth many billions of dollars, so they are barred from charging for over-the-air transmission. Second, the broadcasters' original business model was to sell audiences to advertisers.

7. At first, retransmission consent fees were low, reflecting the mutually beneficial character of retransmission. They were either zero or a few cents per subscriber per month. Often, they were retransmission-for-carriage deals with no money changing hands for the retransmission.

8. Since 1999, this has changed dramatically. The rates have followed a steep upward trajectory. The percentage increases are telling. In 2006, distributors paid just over $200 million for local stations. By 2016, broadcast retransmission fees reached $7.9 billion, or 3,591% of the 2006 number. More recent projections estimate that, by 2023, retransmission fees will increase to $12.8 billion, or 5,880% of 2006 revenues.[2]

9. What is the reason for the phenomenal increase? It is not that the content of broadcast stations has become more compelling over the last twenty years. If anything, while the four major broadcast networks still enjoy robust ratings, it is my understanding that, since 2006, the gap in ratings between these networks and cable networks has diminished.

10. The reason is that the network-affiliated stations have exploited their monopoly as the exclusive provider for one of the four networks in each local market. For example, WMAQ (which happens to be owned by NBC itself) is the exclusive provider of NBC programming in

---

https://ecfsapi.fcc.gov/file/1031842167256/(redacted)%20(as%20filed)%20DISH%20Petition%20to%20Deny%2019-30%2018Mar.pdf.

[2] *Id.*

3

the Chicago local market. If DISH and NBC were unable to reach a retransmission consent agreement covering WMAQ, federal law prohibits DISH from retransmitting another NBC affiliate, say, WEEK of Peoria, to its Chicago subscribers as a substitute. As a consequence, all NBC programming would be blacked out for DISH's Chicago viewers.

11. Many multichannel video customers want, not just one of the four networks, but the full complement of all four, available to them. As a result, network stations have become staples—essential offerings for a multichannel distributor to have a chance at competing.

12. While each network-affiliated broadcast station enjoys monopoly status in its market, distributors face significant competition. A customer often has alternative provider options, including two satellite companies, one or two cable and/or fiber systems (for example, Comcast Xfinity, RCN and Verizon FiOS), and a growing number of online live TV distributors (for example, Hulu + Live TV and YouTubeTV). So the network affiliate can, and does, play off these distributors against one another. If the local exclusivity that the networks lobbied into federal law did not exist, the leverage of broadcast stations would be lost, and the retransmission rates would come to reflect the mutual benefits of retransmission—that is, they would approach zero.

13. The main weapon used by broadcasters to force the precipitous price increases I have described is blackouts. When the distributor does not agree to the new price hike, the broadcaster withholds its retransmission consent. Often, the broadcaster will not even agree to an interim standstill agreement while the parties negotiate, subject to a retroactive true up at the eventually agreed-upon rates. Broadcasters reason that, if they agree to an extension, they will lose their "leverage." But these leverage-preserving techniques are nothing other than an extortionate pattern of behavior at the expense of the distributors and the consumer alike.

4

14. DISH is the low-price competitor in the multichannel video space, and has tried hard to hold the line and ward off consumer price increases despite the hikes in retransmission fees that it pays. Nonetheless, as a result of the broadcasters' fee demands, often enforced by blackouts, DISH has had to follow other distributors in raising fees for our customers. DISH charged $6/month for local channels in 2010, increased the price to $10/month in 2016 and increased the price again to $12/month in 2017. Depending on further retransmission rate increases, which we continually analyze, we may have to increase the price further.

15. For example, DISH and Northwest Broadcasting were unable to reach a new retransmission consent agreement when the parties' prior agreement expired on January 18, 2020 (after extensions from December 31, 2019). As a result, DISH viewers in nine markets lost one or more of their broadcast affiliate stations (and, in Greenwood, Mississippi, DISH viewers lost all major network affiliates).

16. Apollo and Cox have taken that upward price trajectory one step further. Instead of waiting for their retransmission consent agreement with DISH to come up for renewal, in December 2019, they sought to impose the imminently-expiring Northwest Broadcasting agreement to the Cox stations, thus threatening a blackout that would also include all 13 of Cox's stations if DISH would not agree to Northwest's extortionate rate demands.

**Change in Station Control and After-Acquired Station Clauses**

17. In their effort to upend the 2019 Agreement, Apollo and Cox invoked that agreement's change in station control/after-acquired station clause. These clauses are intended to pick the prevailing agreement when one broadcast group acquires another. They are not intended to terminate an existing agreement when a private equity firm acquires two broadcast groups at the same time, and claims that it should be treated as a pre-existing broadcaster by

5

buying the group with the highest rates, or the retransmission consent agreements closest to expiration, one second earlier.

18. I am well-acquainted with the use of change in station control and after-acquired station clauses in retransmission consent agreements in the local television broadcast industry. They are found in all DISH agreements with broadcasters that have Big-4 stations (ABC, CBS, FOX, NBC). They are used to facilitate the transfer of local television broadcast stations from one existing broadcaster to another, by ensuring a smooth transition of ownership without the need to amend or negotiate a new retransmission consent agreement, or, where stations are sold to a new owner without a pre-existing retransmission consent agreement, they ensure a smooth, no-negotiation transition by locking in the continuity of existing agreement covering the transferred stations. In this context, the risk that one set of contract terms will be more favorable than the other can be managed by DISH. DISH knows the existing broadcasters, knows which stations they own, and knows which stations they cannot acquire because of limitations imposed by the Federal Communications Commission.

19. It is my understanding that Defendants have taken the position that the Agreement has been superseded and that DISH no longer has the right to retransmit the thirteen local television broadcast stations that are located in ten different markets, which are covered by that agreement. Instead, in December 2019, Defendants said that the Cox stations became subject to DISH's imminently-expiring retransmission consent agreement with Northwest Broadcasting. Defendants claim that Cox was acquired by another broadcaster, Northwest, triggering the change in station control clause in the Agreement. Under that clause, if the Cox stations were acquired by a broadcaster with an existing retransmission agreement with DISH, that agreement would govern.

20.     I know that the acquisition of the Cox stations was led by a private equity firm called Apollo Global Management, and understand, based on my extensive experience in the industry, that Apollo and its affiliates are new entrants into the local television broadcast industry. Prior to the acquisition of the Cox stations in December 2019, none of Apollo or its affiliates had an existing retransmission consent agreement with DISH (or, to my knowledge, with any other distributor of local television programming).

21.     Based on my extensive experience negotiating retransmission consent agreements on behalf of DISH, I can say that DISH would not agree to allow a change in station control or after-acquired station clause to be used by a new entrant to cherry-pick the highest possible retransmission fees from among a group of stations that the new entrant is acquiring. This is unfair to DISH because it is inconsistent with the parties' expectations when they entered into the agreement, and because Apollo is gaming the system.

22.     As far as I am aware, this is the first time in the history of the industry that a private equity group or other financial firm has attempted to take undue advantage of an after-acquired station clause by twisting the provision beyond its original intent.

23.     A Vanity Fair story reported that an official at a cable system said: "Look, unless Northwest Broadcasting is the one that has the contract here, if they think we're going to respect that after-acquired clause just because they bought both assets at the same time, they're smoking crack."[3] While I would have picked a different metaphor, this statement accurately describes the extent to which Apollo's attempt deviates from industry practice and the widely understood application of after-acquired clauses.

---

[3] Ex. 13, William D. Cohan, *"Television is What Gets Senators Elected": Private-Equity Mogul Leon Black is Building a Local TV Empire to Rival Sinclair and Fox*, Vanity Fair (Apr. 15, 2019), https://www.vanityfair.com/news/2019/04/leon-black-is-building-a-local-tv-empire-to-rival-sinclair-and-fox.

24. While we have repeatedly asked Cox for evidence that the transactions were consummated in the order claimed, we have never received such evidence.

25. If Apollo's attempt were to succeed, this would encourage a new form of arbitrage where financial firms buy groups in pairs and schedule the closings in artificial sequences, at the expense of distributors and the consumer's wallet.

**Harm to DISH From Termination of the DISH- Agreement**

26. DISH will be irreparably harmed if the Agreement is terminated in this case.

27. Blackouts hurt DISH and its customers. Many customers in a market where we experience a blackout leave us for other distributors. In the many blackouts we have experienced involving Big-4 stations, we have suffered a consistently significant loss of customers as a result. Most of these losses are not reversible—most of the customers are lost forever. In other words, when the blackout ends and the programming is back on our screens, most customers who left us do not switch back.

28. The injury from a blackout is asymmetrical. Blackouts hurt the consumer and DISH much more than they hurt the broadcaster. While we do not pay retransmission fees during the blackout, the flight of customers from us to other distributors means that the broadcast group receives more in fees from these other distributors.

29. Like the prior blackouts that we have experienced, a blackout of the Cox stations would hurt our customers and would hurt us. Many of our customers would leave us for other distributors (cable, online, or satellite). Our reputation and goodwill would suffer. So would our ability to attract new customers, especially since blackouts are highly publicized.

30. Almost one million households subscribing to DISH receive one of the Cox stations. These households will lose access to the Cox stations' programming including critical

local news relating to the COVID-19 crisis, the 2020 election, and other local programming. Because broadcasters stagger the terms of retransmission agreements so that they come up for renewal at different times for different distributors, the distributors competing against DISH typically have the right to uninterrupted retransmission of the broadcast station that is blacked out on our screens.

31. Although some of these customers may have alternatives short of leaving DISH, the burden that will be imposed on these customers to access these alternatives if the Defendants succeed in forcing DISH to shut off the Cox stations is significant. These customers will be required to obtain and install a digital antenna or sign up for the internet and stream the programming (if an option). Invariably, many (if not most) customers will not do this. Local station reception from an over-the-air antenna is dependent on geographic location and topography, and is not an option for all subscribers. Locast (a free service providing local broadcast signals over the Internet) is not an option for subscribers in the following Cox markets: Charlotte, Dayton, Jacksonville, Memphis, Orlando, Pittsburgh and Tulsa. In the three Cox markets where Locast is available (Atlanta, Boston and Seattle), it requires a high-speed broadband connection and a receiving device, computer, smart phone or streaming media player.

32. While DISH takes steps to assist its subscribers in the event of a blackout, including by assisting with the installation of digital antennas to capture over-the-air signals from the blacked-out stations, these options are inconvenient for most subscribers. In my experience, many of them will either go without the blacked-out programming or turn to DISH's competitors.

33. Without a court order preventing Cox from terminating the agreement, the only realistic option for DISH is to stop retransmitting the Cox stations. I understand Apollo suggests

DISH is free to break the law, pick up the Cox station signals off the air, and retransmit them without consent. This suggestion is ludicrous. If we did what Apollo suggests, DISH would risk not only a copyright infringement lawsuit from Cox—which Cox has already filed, notwithstanding the Temporary Restraining Order preventing it from withholding its retransmission consent—but also, and more importantly, the loss of our statutory copyright license. This would mean that we would lose the right to retransmit more than 1,000 broadcast stations in 210 markets making up the entire country. The loss of that license would be disastrous for DISH and cannot be repaired with money. Despite Cox's encouragement, we are not, and will not risk becoming, pirates.

34. Cox and Apollo are also wrong that we are picking up all of Cox's stations off the air, and therefore that nothing physically stops us from continuing to do so and breaking the law. Two of the Cox stations deliver their programming directly to DISH through fiber optic cables that Cox leases rather than rely on their over-the-air signals. These stations are the stations that carry CBS programming in Seattle (KIRO) and Fox programming in Tulsa (KOKI). Fiber optic cables provide a superior and more reliable signal to DISH for retransmission to DISH subscribers, which the Defendants would doubtless terminate if the Agreement is no longer in effect.

35. If DISH is eventually forced to accept the significantly higher retransmission rates that Defendants have sought to extract for the Cox stations, there will also be an irreversible ripple effect of setting new market rates. Frequently, broadcasters coming up for renewal demand that DISH pay them the highest rate that any other station in the same market is getting. If DISH cannot deflect those demands, the Cox ploy will accelerate the pace of rate increases, resulting in permanent cost increases to DISH (and its subscribers) well beyond any money

10

damages that may be awarded in this case. In addition, we have no idea what non-economic terms Cox would demand as a condition of a retransmission agreement alongside higher rates. These terms are just as important as the rates, as they define the rights we are buying.

Case: 1:20-cv-00570 Document #: 96-16 Filed: 06/01/20 Page 11 of 12 PageID #:2698

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  June 1, 2020

By: *Melisa Boddie*

Melisa Ordoñez Boddie
Director, Programming Acquisitions
DISH Network L.L.C.