**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DISH NETWORK L.L.C., Plaintiff, v. COX MEDIA GROUP, LLC, et al., Defendants. | No. 1:20-cv-00570 <br> Hon. Thomas M. Durkin |

**THE TERRIER DEFENDANTS' OPPOSITION TO
DISH'S MOTION FOR PRELIMINARY INJUNCTION**

Scott Lassar (No. 1586270)
Bruce R. Braun (No. 6206628)
Hille R. Sheppard (No. 6226077)
John M. Skakun III (No. 6297636)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
slassar@sidley.com
bbraun@sidley.com
hsheppard@sidley.com
jskakun@sidley.com

*Counsel for the Terrier Defendants*

## TABLE OF CONTENTS


**INTRODUCTION** ..... 1

**FACTUAL AND PROCEDURAL BACKGROUND** ..... 2

- **A. The Northwest And Cox Transactions Were Fully Disclosed To The Public.** ..... 2
- **B. [REDACTED] That DISH Knew In February 2019 That The Northwest RCA Would Govern The Cox Stations After The Closings** ..... 3
- **C. The Transactions Closed As Planned.** ..... 5
- **D. After The Closings, DISH Contested The Application Of Northwest's RCA But None Of Its Competitors Did.** ..... 6

**ARGUMENT** ..... 6

**I. DISH Will Not Succeed On The Merits** ..... 6

- **A. The Northwest RCA's Plain Language Forecloses DISH's Claims.** ..... 7
- **B. DISH's Arguments About The Closings Have No Basis.** ..... 11
- **C. DISH's Other Arguments, Including Its Tort Theories, Are Meritless.** ..... 14

**II. DISH Will Not Suffer Irreparable Harm Without A Preliminary Injunction.** ..... 16

**III. A Preliminary Injunction Is Not In the Public Interest.** ..... 20

**CONCLUSION** ..... 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566 (2d Cir. 2005) ....15

*Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379 (S.D.N.Y. 2019) ....15

*Bell Fuels, Inc. v. Butkovich*, 559 N.E.2d 164 (Ill. App. Ct. 1990) ....17

*Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496 (S.D.N.Y. 2018) ....16

*Calderon-Serra v. Wilmington Trust Co.*, 715 F.3d 14 (1st Cir. 2013) ....15

*City of Evanston v. N. Ill. Gas Co.*, 381 F. Supp. 3d 941 (N.D. Ill. 2019) ....19

*Dior v. Miltoni*, 155 N.Y.S.2d 443 (Sup. Ct.), *aff'd*, 156 N.Y.S.2d 996 (1956) ....16

*DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263 (10th Cir. 2018) ....8

*E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700 (7th Cir. 2005) ....19

*Fox v. I-10, Ltd.*, 957 P.2d 1018 (Colo. 1998) ....20

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84 (2d Cir. 2013) ....15

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357 (7th Cir. 2019) ....7

*Highland Sand & Gravel, Inc. v. Squicciarini*, 709 N.Y.S.2d 91 (N.Y. App. Div. 2000) ....11

*Hildebrand v. Wilmar Corp.*, 2019 WL 4010738 (D. Colo. Aug. 26, 2019) ....11

*Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64 (2d Cir. 2014) ....11

*Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*,
6 N.Y.S.3d 7 (N.Y. App. Div. 2015)....................16

*Mediacom Commc'ns Corp. v. Sinclair Broad. Grp.*,
460 F. Supp. 2d 1012 (S.D. Iowa 2006)....................19, 20

*Orr v. Shicker*,
953 F.3d 490 (7th Cir. 2020)....................16

*Ricoh Co. v. Quanta Computer, Inc.*,
2010 WL 1607908 (W.D. Wisc. 2010)....................19

*Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*,
320 F.3d 1081 (10th Cir. 2003)....................18

*ScentSational Techs., LLC v. PepsiCo, Inc.*,
2017 WL 4403308 (S.D.N.Y. Oct. 2, 2017)....................16

*Second City Music, Inc. v. City of Chicago*,
333 F.3d 846 (7th Cir. 2003)....................17, 18

*Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*,
957 F.3d 337 (2d Cir. 2020)....................8

*Valencia v. City of Springfield, Ill.*,
883 F.3d 959 (7th Cir. 2018)....................6, 7

*Winter v. NRDC*,
555 U.S. 7 (2008)....................6

*Yassan v. J.P. Morgan Chase & Co.*,
708 F.3d 963 (7th Cir. 2013)....................20

**Statutes & Regulations**

17 U.S.C. § 122....................19

47 U.S.C. § 325(b)(3)(C)....................20

47 C.F.R. § 76.65....................20

47 C.F.R. § 76.7....................20

**FCC Decisions**

*In re DirectTV, LLC v. Deerfield Media, Inc.*,
MB Docket No. 19-168, 2019 WL 5861949 (F.C.C. Nov. 8, 2019)....................20

*In re Liberman Broad., Inc. v. Comcast Corp.*,
MB Docket No. 16-121, 31 FCC Rcd. 9551 (Aug. 26, 2016) ............................................. 20

## INTRODUCTION

This is a garden-variety contract dispute about money. In March 2019, DISH negotiated an agreement that authorized and set rates for its retransmission of the broadcast signals of local TV stations referred to here as the Cox stations. When DISH signed that retransmission consent agreement (the "Cox RCA"), DISH *knew* that the Cox RCA would automatically terminate early when the Cox stations were brought under common ownership with other stations that had their own RCA with DISH. And DISH *knew* the Cox stations were slated to be purchased later in 2019 and would be brought under common ownership with a group of stations—the Northwest stations—that had their own agreement with DISH (the "Northwest RCA") set to expire at the end of 2019. DISH signed the Cox RCA knowing it was [redacted] that it would have to renegotiate a new deal for 2020 and beyond for all the stations. Now that its own prediction *has* occurred, DISH claims that it has been wronged and that the wrong threatens it with irreparable injury. This Court should deny DISH's request for a preliminary injunction.

*First*, DISH has shown no prospect of success on the merits. DISH ignores the plain language of the RCAs and of the contracts under which the acquisition by Terrier Media Buyer, Inc. ("Terrier") of the Northwest stations would be followed by the acquisition of the Cox stations. DISH understood the proposed change in ownership when it negotiated the Cox RCA. Public documents described exactly how the transactions would unfold and left no ambiguity about their effect under the RCAs. DISH has produced no evidence that the transactions unfolded otherwise than as planned. So its breach of contract claim fails on the merits. And because what happened is precisely what DISH agreed to in the RCAs, its tort claims fail, too.

*Second*, DISH has no risk of irreparable harm. DISH asserts that it need not negotiate a new deal covering the Cox stations because the Cox RCA remains in effect. If the Court agrees, DISH will suffer no harm at all. If Defendants prevail, DISH will be subject to money damages

for copyright infringement for retransmitting broadcast signals without consent. DISH—which had 2019 revenue of $13 billion—is under no threat of being shut down. Rather, it lacks confidence in its own legal position and does not *want* to risk having to pay copyright damages. So, without an injunction, it may *choose* to stop retransmitting. And it is DISH's *choice* to blackout the stations, because Terrier is not physically able to prevent DISH from capturing and retransmitting the over-the-air signals of every Cox station. Such self-inflicted "harm" to avoid the monetary consequences of its own wrongdoing is not irreparable injury. Moreover, Terrier offered to negotiate a new RCA with rates that would depend on the outcome of this litigation, which would eliminate any claimed "irreparable" injury. DISH rejected that offer.

The simple truth is that DISH does not want to negotiate. It has refused to make any offer modifying the rates in the Cox RCA since obtaining the TRO, which it (erroneously) claims protects it from copyright damages. DISH wants to use the Court to provide legal cover that it believes insulates it from the financial consequences of being wrong. The public interest, however, is not served by using this Court's equitable powers to favor one party over another in arms-length negotiations between sophisticated businesses. The motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Northwest And Cox Transactions Were Fully Disclosed To The Public.

On February 14, 2019, Terrier[1] entered into agreements to purchase two groups of local broadcast TV stations. First, Terrier agreed to buy NBI Holdings, LLC ("NBI") and certain of its affiliates, which owned the Northwest stations. (Ex. F, Northwest Purchase Agreement.) Second, Terrier agreed to buy assets including the Cox stations from Cox Enterprises, Inc. and certain of its affiliates. (Ex. G, Cox Purchase Agreement.) The transactions were widely reported. In

[1] Funds managed by affiliates of Apollo Global Management, Inc. own a majority interest in Terrier.

particular, many articles reported that part of the strategy and design of the transactions was to leverage the Northwest stations' higher retransmission rates via contractual provisions that would cause the Cox stations to be governed by the Northwest stations' RCAs upon closing. (*See, e.g.*, Ex. FF (11/28/18, 2/10/19, and 2/25/19 articles).)

On March 4, 2019, the parties to the Northwest and Cox Purchase Agreements filed public applications with the FCC seeking consent for the transactions. (Ex. U, 3/4/19 FCC App.) The applications made clear the structure and order of the "two separate transactions," which would "close in close succession": "*In the first transaction*, Terrier . . . will acquire companies owning all of the television stations owned by Northwest Broadcasting," *i.e.*, NBI. (*Id.* at 1.) In the second transaction, NBI will acquire the Cox stations through a subsidiary, so that "all of the Northwest stations, Cox stations, and other assets not regulated by the Commission will be held by subsidiaries of NBI, which will be 100% owned by Terrier." (*Id.* at 2.) This structure was also clear from the Purchase Agreements, which were attached to the public FCC filing. (*Id.*)

**B. [REDACTED] That DISH Knew In February 2019 That The Northwest RCA Would Govern The Cox Stations After The Closings.**

To avoid infringing copyrights, DISH must have legal authority to retransmit local TV signals to its customers. In June 2018, DISH and NBI's subsidiary Northwest Broadcasting, Inc. entered into the Northwest RCA, which had a term ending on December 31, 2019. (Ex. D, Northwest RCA § 2.) As is standard, the Northwest RCA included an "After-Acquired Station" provision, which specified that any stations acquired by a "Broadcaster Affiliate" of Northwest Broadcasting, Inc., including its parents, would be governed by the Northwest RCA "[n]otwithstanding" any RCA between the acquired stations and DISH. (*Id.* § 17(c).)

On March 31, 2019, DISH and Cox Media Group, LLC entered into the Cox RCA, which had a stated term of three years. (Ex. E, Cox RCA § 2.) The Cox RCA includes a "Station

Change in Control" provision specifying that the agreement terminates early if the Cox stations become owned by a "group of entities" pursuant to a "series of transactions," and as a result become subject to the After-Acquired Station provision in another RCA. (*Id*. § 17(b)(i), (iii).)

When it signed the Cox RCA, DISH *knew* the Cox stations were under contract to become owned by a "Broadcaster Affiliate" under the Northwest RCA. The Cox RCA expressly recognizes the Cox stations' pending sale to "one or more entities under common control with Terrier." (*Id*. § 17(b)(ii).) And the FCC application stated that NBI would end up owning the Cox stations, and that NBI would be 100% owned by Terrier. (Ex. U, 3/4/19 FCC App. 2.)



(Ex. DD at -180.)

[REDACTED] it also knew that if the transactions did not receive FCC consent or were not consummated, it would have a long-term Cox RCA in place.

### C. The Transactions Closed As Planned.

On December 17, 2019, the transactions closed as contractually specified, described to the public, and approved by the FCC. The details are in the declarations of Aaron Sobel (Ex. A ("Sobel Dec.")) and Brian Brady (Ex. B ("Brady Dec.")), as well as the transaction documents produced by Terrier but ignored by DISH. First, Terrier acquired 100% of the ownership of NBI, which owned the Northwest stations, and the Northwest RCA became assumed by Terrier. (Sobel Dec. ¶ 32(a).) Second, Terrier, which was already the parent of Camelot Media Parent, Inc. ("CMP"), contributed 100% of the CMP shares to NBI, making NBI the owner of CMP and its subsidiary Camelot Media Buyer, Inc. ("Camelot"). (*Id.* ¶ 32(b).) Third, Camelot, which had earlier been assigned Terrier's rights under the Cox Purchase Agreement, acquired the Cox stations. (*Id.* ¶ 32(b)–(c).) In the end, the Northwest and Cox stations were all owned by subsidiaries of NBI, which was 100% owned by Terrier:




(*Id.* ¶ 41; *see also* Brady Dec. ¶¶ 33–34 (also explaining transactions).)

### D. After The Closings, DISH Contested The Application Of Northwest's RCA But None Of Its Competitors Did.

At this point, what DISH had considered [REDACTED] to occur had come to pass. DISH's right to retransmit the Cox stations' signals was governed by the Northwest RCA, and the Cox RCA terminated in accordance with its terms. This was also the case for the RCAs with DISH's competitors: in each case, the Cox stations became governed by the Northwest stations' RCA, and the Cox stations' RCA terminated. (Brady Dec. ¶ 56.) Unlike everyone else, DISH did not accept this outcome, even though it had foreseen it nearly a year before.

With DISH's Northwest RCA set to expire on December 31, 2019, Terrier sought to negotiate a new RCA and agreed to several extensions through January 18, 2020. (*Id.* ¶ 57.) Unhappy with its negotiating position, DISH filed this lawsuit in Illinois state court on January 15, alleging contract and tort claims based on purported "bad-faith conduct." (Compl. ¶¶ 3, 50, 68.) While DISH could have sought relief from the FCC, which has rules governing bad-faith negotiations and an expedited process to resolve disputes, it instead obtained an *ex parte* TRO stating that the Cox RCA "remain[s] in full force and effect." (Dkt. 1 at 292–94.) On January 24, the state court extended the TRO, and Defendants removed the case. (*Id.* at 295–97, 1–9.)

## ARGUMENT

"A preliminary injunction is an extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Extraordinary relief is not justified here because DISH has failed to carry its burden regarding success on the merits and irreparable harm, and an injunction would be against the public interest. *See Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 965–66 (7th Cir. 2018).

### I. DISH Will Not Succeed On The Merits.

DISH's claims fail as a matter of law because (i) they are foreclosed by the unambiguous contracts, (ii) DISH's arguments about the closings have no basis, and (iii) DISH's fallback

arguments, including its tort claims, are meritless. This alone is a sufficient basis to deny DISH's injunction. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 367–68 (7th Cir. 2019).[2]

### A. The Northwest RCA's Plain Language Forecloses DISH's Claims.

The core of DISH's complaint—and the theory behind its TRO—is that Defendants breached the Cox RCA by treating the Cox stations as falling under the (now expired) Northwest RCA. (Dkt. 96 ("PI Br.") 10.) DISH concedes that "[t]he *only issue* is whether the Cox Stations are after-acquired stations subject to the Northwest retransmission agreement." (*Id.* (emphasis added).) Yet DISH conspicuously fails to discuss the Northwest RCA's After-Acquired Station provision. That provision unambiguously bars DISH's claims. Further, the Cox RCA confirms that result, and DISH's arguments about Apollo and about extrinsic evidence are nonstarters.

**The Northwest RCA.** The Northwest RCA defines an "After-Acquired Station" as any "local television broadcast station not listed in Exhibit A as of [June 6, 2018] . . . *of which Broadcaster (or a Broadcaster Affiliate) subsequently becomes the owner*." (Ex. D § 17(c) (emphasis added).) The "Broadcaster" is Northwest Broadcasting, Inc. (*Id.* at preamble.) When the RCA was executed, NBI was a "Broadcaster Affiliate" because it is Northwest Broadcasting, Inc.'s parent and thus "directly or indirectly (including through one or more intermediaries) controls, is controlled by or is under common control with" Northwest Broadcasting, Inc. (*Id.* § 1; Brady Dec. ¶ 40.) When Terrier gained ownership of NBI, it too became a "Broadcaster Affiliate," as did the Camelot entities (collectively, the "Terrier Group").

DISH does not, and cannot, dispute that, on December 17, 2019—subsequent to June 6, 2018—the Cox stations became owned by the Terrier Group: Terrier owns NBI, which owns the

---

[2] DISH claims its case on the merits need only be "better than negligible." (PI Br. 9.) That might be true if it made an especially strong showing of irreparable harm. *Valencia*, 883 F.3d at 966. But, as described below, DISH has failed to establish any irreparable injury. Regardless, DISH's likelihood of success is not better than negligible.

Camelot entities, which own the Cox stations. (Sobel Dec. ¶¶ 32, 41.) The Cox stations thus became "after-acquired stations subject to the Northwest [RCA]." (PI Br. 10.)

This disposes of DISH's motion. Section 17(c) of the Northwest RCA provides: "*Notwithstanding any then-existing agreement between DISH and any third party with respect to any After-Acquired Station*, an After-Acquired Station will be deemed added to Exhibit A and *governed by the terms of this Agreement* effective immediately upon the applicable local television broadcast station becoming an After-Acquired Station." (Ex. D (emphases added).) Once the Terrier Group, including NBI, became the owner of the Cox stations, those stations became governed by the Northwest RCA *notwithstanding the Cox RCA*.

DISH has no answer to this. Despite acknowledging that whether the Cox stations are after-acquired stations under the Northwest RCA is the "only issue," DISH does not offer a way to read the provision that supports its view that the Cox RCA still controls. (PI Br. 10–14.) Nor could it; DISH's claims contradict the plain language of § 17(c). The Northwest RCA must be enforced "in accordance with the plain and ordinary meaning of its terms." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1273 (10th Cir. 2018) (Colorado law).[3] Enforcing the unambiguous terms of the Northwest RCA precludes DISH's requested injunction ordering that the Cox RCA remains "in full force and effect." (PI Br. 8–9.) Such an order would erase the Northwest RCA's "notwithstanding" clause.

**The Cox RCA.** The Cox RCA's plain language unsurprisingly confirms this result. *See Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 957 F.3d 337, 344 (2d Cir. 2020) (plain language controls under New York law).[4] Its Station Change in Control provision, § 17(b), terminates the agreement when the Cox stations become after-acquired stations under a different

[3] The Northwest RCA is governed by Colorado law. (Ex. D § 18(a).)
[4] The Cox RCA is governed by New York law. (Ex. E § 18(a).)

DISH RCA (here, the Northwest RCA). (Ex. E, Cox RCA.) There is no doubt that there was a change in control under § 17(b)(i): DISH's counterparty to the Cox RCA no longer owns the stations because it sold them in an asset deal. The Terrier Group became a "group of entities" that, pursuant to a "series of transactions," qualified as an "Acquiring Entity" under § 17(b)(i)(A) because each member of the Terrier Group "gain[ed] the ability to," among other things, "directly or indirectly . . . control more than 50% of the voting interests" of the Cox stations.

And the Cox RCA terminated pursuant to § 17(b)(iii) because the Terrier Group "then-currently"—*i.e.*, at the time it became the owner of the Cox stations—had the Northwest RCA, which is "an agreement granting DISH consent to retransmit" stations, and which "require[d] the incorporation" of the Cox stations under an After-Acquired Station provision. Not only was NBI a pre-existing broadcaster—itself sufficient—Terrier also assumed "all the duties and obligations imposed upon NBI" under the Northwest RCA effective on its acquisition of NBI. (Brady Dec. ¶ 45; Sobel Dec. ¶¶ 32(a), 35; Ex. J (12/13/19 letter agreement, citing Northwest RCA § 17(b)(iv)).) Terrier thus itself had a governing RCA [REDACTED] (Ex. DD at -180.)

**DISH's Arguments About Apollo.** Instead of analyzing the plain language of the RCAs, DISH invokes "Apollo," as if that could somehow change the contracts. DISH asserts that the Cox stations "were acquired by Apollo, a financial firm" that was not "an existing broadcaster." (PI Br. 10.) This is wrong; Apollo, defined as Apollo Global Management, Inc., didn't acquire the stations. The Terrier Group, including NBI, did. Yet DISH is silent about Terrier and NBI.

Additionally, DISH's assertions regarding "Apollo" are designed to distract from the breadth of the Cox RCA Station Change in Control provision. The Cox RCA defines "Acquiring

Entity" as the "entity *or group of entities*" that gains "direct[] or indirect[]" control of the Cox stations "pursuant to a single transaction *or series of transactions*." (Ex. E, Cox RCA § 17(b)(i) (emphases added).) This language unambiguously encompasses the entire Terrier Group, including Terrier, NBI and its subsidiaries, and the Camelot entities. DISH does not engage with this language and does not argue to the contrary. Nor could it, as it expressly "acknowledge[d] and agree[d]" *in § 17 of the Cox RCA itself* that there would be a change in control involving "*one or more entities under common control with Terrier*." (*Id*. § 17(b)(ii) (emphasis added).)

In another distraction, DISH states that "Apollo had likely become the Acquiring Entity already at the time of the FCC's approval under the [Station Change in Control] clause's second prong." (PI Br. 11 (referring to but not citing Ex. E, Cox RCA § 17(b)(i)(B).) DISH is wrong three times over. First, the FCC authorized "the transfer of control . . . to Terrier," not Apollo. (Ex. X, FCC Order 16.) Second, the "second prong" of the clause, § 17(b)(i)(B), addresses the transfer of *licenses*, whereas the "first prong," § 17(b)(i)(A), addresses the transfer of *control of the licensed entity*. The Cox stations' licenses were not transferred, only station ownership and control was, so the second prong does not apply. (*Id*. at 1; Brady Dec. ¶ 18.) Third, the actual change in ownership and control did not occur until the transactions were consummated on December 17, 2019, after which the parties filed Notices of Consummation with the FCC. (Brady Dec. ¶ 36.) The FCC's decision gave the parties *consent* to effect the change in control—subject to conditions that still needed to be satisfied. (Ex. X, FCC Order 16–17.) The decision plainly did not change control itself. That happened when the transactions closed in December.

**DISH's Arguments About Extrinsic Evidence.** DISH relies heavily on extrinsic evidence about its purported "intent." (PI Br. 12–14.) But as DISH's own case recognizes, "the intention of the parties" is "expressed in the unequivocal language employed" in their contract.

*Highland Sand & Gravel, Inc. v. Squicciarini*, 709 N.Y.S.2d 91, 92 (N.Y. App. Div. 2000) (*see* PI Br. 12). DISH's extrinsic evidence cannot rewrite unambiguous language that DISH—a sophisticated, counseled party—now wants to circumvent. *E.g.*, *Hildebrand v. Wilmar Corp.*, 2019 WL 4010738, at *2 (D. Colo. Aug. 26, 2019) (Colorado law); *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014) (New York law).

In any event, the extrinsic evidence definitively undermines DISH's claims. DISH complains it "never intended" its contracts "to be used in the manner attempted by Defendants," and suggests it was surprised by Defendants' actions. (PI Br. 12; Dkt. 96-16 ¶ 21 (Boddie Dec.).) [REDACTED] (Ex. DD at -180.) [REDACTED] (Ex. EE (DISH 3/25/19 draft of § 17(b)(iii) (relevant text highlighted in green).) [REDACTED] (Ex. E, Cox RCA § 17(b)(iii).) Now DISH is asking the Court to give it precisely what it could not get through negotiation.

Nor is DISH helped by its claim that Defendants' position is wrong because it "deviates from industry practice," or its suggestion that a *Vanity Fair* story suggests that other industry participants (*i.e.*, DISH's competitors) concur. (PI Br. 12–13; Dkt. 96-16 ¶¶ 22–23.) In fact, *none of DISH's competitors has disputed Defendants' position and the operation of the After-Acquired Station provisions in their RCAs with Northwest.* (Brady Dec. ¶ 46.) The only deviation from industry practice is DISH's persistent belligerence during RCA negotiations. (*Id.* ¶¶ 57–61.)

### B. DISH's Arguments About The Closings Have No Basis.

DISH does not dispute that every party to the Northwest and Cox transactions in fact

agrees the Northwest transaction closed first. It does not dispute that the parties intended and planned that result. It does not dispute that the FCC filings and the FCC order accurately said the two transactions were separate and that Northwest would close first. DISH does not even dispute that the legally binding contracts governing the transactions—the Purchase Agreements and other ancillary implementing agreements—specify that Northwest must close first. Instead, DISH argues that something "went wrong" at the closings such that the Cox stations did not become After-Acquired Stations under the Northwest RCA. (PI Br. 2, 10–11.) This is baseless.

Section 2.3 of the Northwest Purchase Agreement states that "the closing of the purchase and sale of the Interests [*i.e.*, the equity interests of NBI and its affiliates] . . . shall take place by electronic document transfer (*i.e.*, .pdf signature pages and fully executed documents exchanged via email) immediately prior to . . . the closing of the [Cox] transactions." (Ex. F, Northwest Purchase Agreement § 2.3.) The signature pages were exchanged via email and expressly held in escrow pending oral release on the December 17, 2019 closing call. (Sobel Dec. ¶ 31; Brady Dec. ¶ 30; DISH Exs. 10 & 11.) As described in the declarations of Aaron Sobel and Brian Brady—the only witnesses with actual knowledge of the closings to have submitted sworn statements—the parties to the Northwest Purchase Agreement released their signature pages first on the call. That release of signature pages, pursuant to § 2.3, effected the transfer of the ownership of NBI and its affiliates to Terrier, and the Northwest transaction therefore was declared "closed" on the call. (Sobel Dec. ¶ 34; Brady Dec. ¶ 32.)

DISH claims otherwise based on the time stamp of the emails circulating the signature pages. (PI Br. 11.) But DISH ignores that the Cox email expressly says the signature pages "*are being sent into escrow pending our express authorization to release*." (DISH Ex. 10 (bottom email) (emphasis added).) Nor does DISH cite any authority or evidence to invalidate the parties'

agreed procedure—standard in M&A transactions—to hold signature pages in escrow and release them orally on the call. DISH's *ipse dixit* cannot change the agreement of the actual parties to the transaction, and indeed its argument here is pure nonsense. The timing of the emails exchanging signature pages is irrelevant. (Sobel Dec. ¶ 31; Brady Dec. ¶ 30.)

DISH also points out that wire "payments for the debt of two Northwest entities were not completed until *after* Cox had been fully paid." (PI Br. 11.) This does not change anything either. Section 2.3 of the Northwest Purchase Agreement states that "the closing . . . *shall take place*" upon release of the signature pages; that was when the parties expressly agreed that ownership of NBI would be transferred. (Ex. F (emphasis added).) Section 2.4.1 merely provides that "[a]t the Closing, the Buyer shall deliver *or cause to be delivered*" the relevant payments, along with a host of other things. (*Id*. (emphasis added).) That happened here. After the signature pages were released and Terrier became the owner of NBI, Terrier satisfied its obligation to cause the funds to be delivered by starting the wire process. (Sobel Dec. ¶ 36; Ex. C ("Boyarsky Dec.") ¶ 12.) Nothing more was required, and for good reason: a buyer does not control the timing of when wires are processed or received.

This case illustrates the good reason. DISH claims that "the two remaining Northwest payments were made at around 15:38," whereas the "Cox payments were made at about 14:25." (PI Br. 8 n.3.) In fact, these two Northwest payments were initially released at 12:56, along with the other Northwest-related wires—*before* the Cox wires were released at 14:25. However, these two wires were rejected due to a typo and had to be re-released. (Boyarsky Dec. ¶¶ 11–12; Ex. T at 13.) There is no reason in the contract, the law, or common sense to treat this ministerial typo as changing the time of closing. That is especially true here, where the parties had an express contractual provision governing when closing took place, and where the payments were to retire

debt and were not payments for ownership. (*See* Sobel Dec. ¶¶ 28–30, 39.) To rule otherwise would disrupt the reliable execution of commercial transactions.

**C. DISH's Other Arguments, Including Its Tort Theories, Are Meritless.**

**DISH's Argument That Defendants "Concealed The Facts."** DISH repeatedly accuses Defendants of "conceal[ing] the facts," conducting a "disinformation campaign," and propagating a false "narrative" regarding the transactions. (*E.g.*, PI Br. 1–2, 6–7.) This is empty rhetoric. The structure and sequencing of the Northwest and Cox transactions were transparently and publicly disclosed, including in the Purchase Agreements and the FCC filings. (Sobel Dec. ¶¶ 14–25.) Despite its bombast, DISH points to no fact that is contrary to those public documents. Indeed, Defendants never tried to hide that the transactions were designed to take advantage of the Northwest RCA's After-Acquired Station provision, including by having NBI become a parent of the Cox stations. (*Id.* ¶¶ 46–48.) DISH itself has cited *February 2019* press reports stating just that.[5] DISH's accusations are especially ironic [REDACTED] [REDACTED] Like every other cable and satellite distributor subject to RCAs with Northwest and Cox, DISH knew the Cox RCAs would terminate early and that the Cox stations would become governed by Northwest's RCAs. Unlike its competitors, DISH has refused to accept that.

**DISH's "Collapse the Transactions" Argument.** DISH urges this Court to treat the transactions "as a single, concurrent, integrated transaction" pursuant to the "step transaction doctrine." (PI Br. 13.) This is inconsistent with the express terms of the contract DISH wants to enforce; the Cox RCA specifically provides for its termination "pursuant to a single transaction *or series of transactions*." (Ex. E § 17(b)(i).) DISH provides no legal basis for it to escape the

[5] (*E.g.*, Dkt. 72 at 1 n.3 & 4 (quoting 2/10/19 article: "Apollo would seek to use some of Northwest Broadcasting's contracts, which have higher fees than Cox's, to hike up fees"); *see also* Ex. FF.)

language of its own contract. It cites only decisions from two specialized areas of federal law—tax and bankruptcy—that are utterly inapplicable to state-law contract claims. (PI Br. 13.) *See Calderon-Serra v. Wilmington Trust Co.*, 715 F.3d 14, 19 (1st Cir. 2013) ("The step-transaction doctrine is used to asses[] tax liability . . . and it is of no assistance in this non-tax case.").[6]

**DISH's Implied Covenant Claim.** DISH's allegation that Cox Media Group, LLC breached the implied covenant of good faith and fair dealing also fails. An implied covenant claim cannot survive when there is an express provision of the contract governing the conduct at issue. *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 400 (S.D.N.Y. 2019). That is the case here. DISH's generalized accusations of "bad faith" do not allow it to use the implied covenant "to imply an obligation inconsistent with" the express language of the RCAs. *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013).

**DISH's Tort Claims.** DISH's recent pivot to emphasize tort claims does not save it. "In order for the plaintiff to have a cause of action for tortious interference of contract [under New York law], it is axiomatic that *there must be a breach of that contract*." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 589 (2d Cir. 2005) (emphasis added). As explained above, there has been no breach of the Cox RCA. So there is no tortious interference claim.

DISH's unfair competition claim likewise has no chance of success. DISH's unfair competition claim is expressly and inextricably linked to its contract claim. (*See* Am. Compl. ¶ 125.) DISH wants to maintain the provision of the Cox RCA setting its term until March 31, 2022. That is what DISH claims has been "misappropriated." But *the same contract* contains an industry-standard early-termination provision. (Ex. E, Cox RCA § 17(b)(iii).) So DISH cannot claim Defendants have behaved unfairly by treating the Cox RCA as terminated *unless* the Cox

[6] Nor does DISH satisfy the underlying rationale for the step transaction doctrine, which is to avoid what would amount to fraud. [redacted]

RCA did not terminate early. That premise—the Cox RCA has not terminated early—*is* its contract claim. And New York law is unequivocal: "Where a plaintiff's unfair competition claim is based entirely *on the same alleged conduct* proscribed by contract, and plaintiff has pled a breach of contract claim, the unfair competition claim is dismissed as duplicative of the breach claim." *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 508 (S.D.N.Y. 2018) (emphasis added). That Defendants are enforcing a valid contract term precludes DISH from "asserting [a] separate cause[] of action for unfair competition." *ScentSational Techs., LLC v. PepsiCo, Inc.*, 2017 WL 4403308, at *18 (S.D.N.Y. Oct. 2, 2017).[7]

## II. DISH Will Not Suffer Irreparable Harm Without A Preliminary Injunction.

DISH's inability to demonstrate that it "likely" will suffer irreparable harm is another reason to deny its motion. *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). This case is about money—specifically, the difference between retransmission consent fees under the Cox RCA and whatever new RCA the parties will negotiate when DISH finally accepts that the agreement has terminated, plus damages for copyright infringement. DISH prefers the rates under the Cox RCA, as it thinks retransmission consent fees are too high. (PI Br. 4; Dkt. 96-16 ¶ 8.) So it has taken the position that the Cox RCA continues to govern. Defendants disagree and prefer to negotiate new rates. This garden-variety contract dispute can and should be litigated or settled like any other dispute about money. DISH is a sophisticated party capable of evaluating the strength of its position and deciding whether to accept an offer for a new RCA or stand on its view that the Cox RCA remains effective. This is a matter of routine business judgment.

---

[7] DISH's cases are not to the contrary because they have nothing to do with holding a plaintiff to the valid terms of its own contract. (PI Br. 15.) *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.* found unfair competition where a defendant obtained, developed, and sold a third-party's designs for which it knew the plaintiff had exclusive rights. 6 N.Y.S.3d 7, 13 (N.Y. App. Div. 2015). And *Dior v. Milton* notes that interfering with a plaintiff's licensing contract by creating unauthorized recordings of its broadcasts and records can be actionable. 155 N.Y.S.2d 443, 456–57 (Sup. Ct.), *aff'd*, 156 N.Y.S.2d 996 (1956).

For similar reasons, DISH has an adequate legal remedy: if it is right that the Cox RCA has not been terminated, it can enforce that contract. Terrier has even offered to negotiate a new RCA contingent on the outcome of this lawsuit, and it remains willing to do so. (Brady Dec. ¶ 61.) That DISH has refused to negotiate is no reason to deny that a legal remedy is available.

DISH's concern about its exposure to copyright infringement damages does not save it. (*See* Dkt. 47-15 at 9 (1/24/20 Tr. 17:3–21: DISH describing "ruinous damages that would flow" from copyright claim as irreparable harm); Dkt. 47-14 at 6 (1/21/20 Tr. 10:1–10: "And it is the threat of [copyright damages] . . . that creates irreparable harm [to DISH].").) It was DISH's choice to continue to retransmit after the Cox RCA was terminated and thereby expose itself to copyright damages. Yet DISH is concerned its copyright defense will fail because its contract argument is so weak. So it obtained an *ex parte* TRO and now seeks an injunction that it believes will shield it from having to pay damages for infringement as it continues to litigate. But as a matter of law, damages for breaking the law cannot be irreparable injury to DISH. Liability for copyright infringement is not injury *to DISH* at all; it is a legal remedy for injury *caused by DISH*. *See Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("Only the injury inflicted by one's adversary counts" for irreparable harm.); *Bell Fuels, Inc. v. Butkovich*, 559 N.E.2d 164, 165–66 (Ill. App. Ct. 1990) (denying injunction where plaintiff alleged that, absent an injunction, it would be "continuously exposed to liability"). DISH's alleged injury—having to pay money damages to redress copyright infringement—occurs *only* if DISH has been found to have caused injury *to Terrier*. This clearly would not be irreparable harm *to DISH*.

DISH's argument about a blackout of the Cox stations also does not support irreparable harm. DISH obtained its *ex parte* TRO by convincing the state judge that Defendants would shut

off their signals. But that was false: as DISH knows, Defendants have not, will not, and cannot prevent DISH from retransmitting the over-the-air signals from all 13 Cox stations. (Brady Dec. ¶ 49 (also explaining that DISH's claims about fiber connections for two stations are wrong).) So DISH declares it will *choose* to shut off the signals as part of its negotiation strategy rather than risk incurring copyright liability. In fact, DISH frequently chooses this tactic in negotiations with broadcasters because it knows blackouts harm broadcasters. (*Id.* ¶¶ 51–53 (listing numerous blackouts DISH has imposed on broadcasters in the last few years).) If blackouts irreparably harmed DISH, it would not so frequently choose to impose them. And if the collateral harm to its customers is harm to DISH at all, it is self-inflicted, which does not qualify as irreparable harm. *See Second City Music*, 333 F.3d at 850 ("self-inflicted wounds are not irreparable injury"); *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) (harm from "express terms of a contract" plaintiff negotiated was "self-inflicted" and not irreparable).

*Second City Music* shows that DISH's alleged harm cannot justify an injunction. There, the Seventh Circuit affirmed the denial of an injunction, explaining that "two things could keep [the plaintiff] in business; an injunction or a license." 333 F.3d at 850. And "[i]f the license can be had, then the lack of an injunction does not lead to irreparable harm." *Id.* Likewise, DISH can avoid the claimed irreparable harm by negotiating a new RCA. As mentioned, Terrier has offered to negotiate while allowing this lawsuit to proceed, promising to refund the difference if DISH prevails, and Terrier remains willing to negotiate on that basis now. (Brady Dec. ¶ 61.)

DISH has *admitted* that such a "true up" to align the payments with the outcome of this litigation means there is no irreparable harm.[8] (PI Br. 19.) DISH just wants to put off negotiating in earnest until after this Court rules on the merits. Such an aid to DISH in service of its

[8] That DISH thinks Terrier will not be harmed is not the test (and is not true). It is DISH's obligation to establish irreparable harm to DISH.

negotiating leverage is not what injunctive relief is for. *See, e.g.*, *Ricoh Co. v. Quanta Computer, Inc.*, 2010 WL 1607908, at *4 (W.D. Wisc. 2010) (seeking injunction to increase "leverage in negotiations for a higher licensing fee" is "not an adequate ground for an injunction").[9]

Moreover, DISH's actions regarding its claim of irreparable harm "are more telling than its words." *City of Evanston v. N. Ill. Gas Co.*, 381 F. Supp. 3d 941, 965 (N.D. Ill. 2019). Rather than negotiate a new agreement after the Northwest RCA expired, DISH stopped retransmitting the Northwest signals. (Brady Dec. ¶ 57.) DISH preferred turning the signals off to facing copyright liability.[10] DISH now claims it fears customers will leave and not come back after having their service disrupted. But DISH cites no evidence to support that speculation. *See E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005) ("[S]peculative injuries do not justify this extraordinary remedy."); *Mediacom Commc'ns Corp. v. Sinclair Broad. Grp.*, 460 F. Supp. 2d 1012, 1019 (S.D. Iowa 2006) (denying injunction and rejecting claim of irreparable harm to goodwill and reputation in the context of retransmission dispute). DISH cannot explain why the harm it suffers from halting retransmission to its Cox subscribers is irreparable but its harm from doing so to its Northwest ones is not. Nor can it explain why, if the harm from blackouts was irreparable, it imposes multiple blackouts every year. (Brady Dec. ¶¶ 51–53; Ex. GG.)

---

[9] DISH also speculates that, without an injunction, it could lose its statutory license to retransmit under 17 U.S.C. § 122 "in its entirety." (PI Br. 17–18.) DISH identifies no basis or legal authority for this assertion, and Terrier is aware of none. Terrier is not arguing that DISH should lose its nationwide license by retransmitting 13 local stations without consent. And DISH made clear in the copyright case that it does not think it will lose its license: "Even if DISH had violated an FCC rule . . . , DISH's statutory license would remain in effect at least until the adjudication of such a violation." *Terrier Media Buyer, Inc. v. DISH Network L.L.C.*, No. 20-cv-00583, Dkt. 37, DISH MTD brief at 15 (N.D Ill. June 11, 2020).

[10] After a period during which DISH had stopped retransmitting the Northwest stations' signals, Terrier gave DISH temporary authority to retransmit them due to the COVID-19 crisis. (Brady Dec. ¶ 59.)

**III. A Preliminary Injunction Is Not In the Public Interest.**

DISH is using this Court to advance its position in a commercial negotiation between sophisticated parties about money. That is not in the public interest, and indeed would undermine the public's interest in the enforcement of contracts according to their terms. *See Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 976 (7th Cir. 2013) (court "intervention after the fact . . . can only destabilize the institution of contract, increase risk, and make parties worse off" (New York law)); *Fox v. I-10, Ltd.*, 957 P.2d 1018, 1022 (Colo. 1998) (interfering with a "valid bargain of the parties . . . would be an unwarranted interference with the freedom" to contract (Colorado law)). DISH claims to be looking after its viewing public. (PI Br. 19.) But to credit that would reward DISH for using its customers as hostages. Although DISH's subscribers "may experience some inconvenience" from the parties' "inability to reach an agreement during negotiations," this "inconvenience is outweighed by the greater public interest of assuring competition in the market place." *Mediacom*, 460 F. Supp. at 1029. That principle is enshrined in the federal statutory right for the Cox stations to withhold their consent to retransmission.

Moreover, the FCC provides a means to protect consumers by allowing distributors to bring expedited proceedings to address bad-faith conduct. *See* 47 U.S.C. § 325(b)(3)(C); 47 C.F.R. §§ 76.7, 76.65; *In re Liberman Broad., Inc. v. Comcast Corp.*, MB Docket No. 16-121, 31 FCC Rcd. 9551, 9560 (Aug. 26, 2016). The FCC can, and does, address the type of complaint DISH has raised here. *See, e.g.*, *In re DirectTV, LLC v. Deerfield Media, Inc.*, MB Docket No. 19-168, 2019 WL 5861949 (F.C.C. Nov. 8, 2019). DISH knew what was going to happen to the Cox RCA months in advance, yet chose to litigate rather than avail itself of these procedures to protect consumers. It should not be heard to speak in defense of consumers now.

**CONCLUSION**

For these reasons, this Court should deny DISH's motion for a preliminary injunction.

Dated: June 22, 2020

Respectfully submitted,

*/s/ Hille R. Sheppard*
Scott Lassar (No. 1586270)
Bruce R. Braun (No. 6206628)
Hille R. Sheppard (No. 6226077)
John M. Skakun III (No. 6297636)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
slassar@sidley.com
bbraun@sidley.com
hsheppard@sidley.com
jskakun@sidley.com

*Counsel for the Terrier Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2020, I caused the foregoing to be electronically filed using the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/ Hille R. Sheppard*

Hille R. Sheppard (No. 6226077)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000
hsheppard@sidley.com

*Counsel for the Terrier Defendants*