UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DISH NETWORK L.L.C.,

Plaintiff,

v.

COX MEDIA GROUP, LLC et al.,

Defendants.

No. 20 C 570

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

This case involves a contract dispute over the rates DISH Network must pay to retransmit television stations that Defendant Terrier Media Buyer, Inc. purchased from Defendant Cox Media Group. DISH moved for a preliminary injunction so that it may continue to retransmit the stations at issue during this litigation at rates previously agreed upon with Cox. R. 91. For the following reasons, DISH's motion is denied.

**Background**

The Court begins with a brief description of the parties. Plaintiff DISH Network is a satellite multichannel video programming distributor. Defendant Cox Media Group is a media conglomerate that owned the television broadcast stations at issue in this case. R. 84 ¶ 2. Defendant NBI Holdings, LLC ("NBI"), through its subsidiary Northwest Broadcasting, Inc. ("Northwest"), owned a different group of television broadcast stations. *Id.* ¶ 40. Defendant Apollo Global Management

("Apollo") is a private equity firm and the parent company of Defendant Terrier Media Buyer, Inc. ("Terrier"). *Id.* ¶ 46.

In March 2019, DISH entered into a three-year contract with Cox that permitted DISH to retransmit 13 Cox television stations in ten major U.S. markets (the "Cox Retransmission Agreement"). *Id.* ¶ 29. DISH had a separate retransmission agreement with Northwest to retransmit 18 broadcast stations that was set to expire on December 31, 2019 (the "Northwest Retransmission Agreement"). *Id.* ¶¶ 40, 42. Under the Cox and Northwest Retransmission Agreements, DISH paid retransmission fees based on a predetermined monthly rate per DISH customer receiving each Cox or Northwest station. *Id.* ¶ 32.

On February 14, 2019, Terrier entered into separate agreements to acquire the Cox stations (the "Cox Purchase Agreement") and the entities owning the Northwest stations (the "Northwest Purchase Agreement"). R. 84 ¶¶ 47, 49. The strategy of these transactions was widely reported: "Apollo would seek to use some of Northwest Broadcasting's contracts, which have higher fees than Cox's, to hike up fees from the cable operators[.]" R. 108-31 at 5 (Liana B. Baker, Greg Roumeliotis, *Exclusive: Apollo nears $3 billion deal to buy Cox TV stations - sources*, REUTERS (Feb. 10, 2019)). Apollo's internal communications confirm that increasing the retransmission rates was a significant part of its plan. *See* R. 95 at 10.

On March 4, 2019, the parties to the Cox and Northwest Purchase Agreements filed public applications with the FCC seeking consent for the transactions. R. 108-20. The Northwest application describes that "[i]n the first transaction, Terrier Media

Buyer, Inc. ("Terrier Media") will acquire companies owning all of the television stations owned by Northwest Broadcasting. After acquiring those companies, Terrier Media will acquire companies owning all of Cox's television stations[.]" *Id.* at 1. The application further states that it "is anticipated that the Northwest Transaction and the Cox Transaction will close in close succession. At the conclusion of the Northwest Transaction and the Cox Transaction, all of the Northwest Stations, Cox Stations, and other assets not regulated by the Commission will be held by subsidiaries of NBI, which will be 100% owned by Terrier Media." *Id.* at 2.

The transactions were designed to trigger the Cox Retransmission Agreement's "Station Change in Control" and the Northwest Retransmission Agreement's "After-Acquired Station" provisions. The Cox Retransmission Agreement provides that a "Station Change in Control" occurs either when 1) an entity gains the ability to control a majority of the board or the voting interests for the Cox stations or to direct the stations' management; or 2) an entity becomes the FCC-authorized assignee or transferee of the broadcast licenses of the Cox stations. R. 95 at 10; R. 109-2 § 17(b). The impact such a change in control has on the Agreement depends on the identity of the acquiring entity. If the acquiring entity has a preexisting retransmission agreement with DISH, the Cox stations become subject to that agreement, and if not, the Cox Retransmission Agreement continues to control. R. 95 at 9-10; R. 109-2 § 17(b).

Meanwhile, the Northwest Retransmission Agreement's "After-Acquired Station" clause establishes that notwithstanding any preexisting agreement, the

Agreement's terms will govern any "After-Acquired Station." R. 84 ¶ 45; 109-1 § 17(c). In turn, the Agreement defines "After-Acquired Station" as "a local television broadcast station not listed in Exhibit A as of [June 6, 2018] . . . of which [Northwest Broadcasting] (or a [Northwest Broadcasting] Affiliate) subsequently becomes the owner or licensee. R. 109-1 § 17(c).

Thus, Terrier's plan was first to acquire NBI and assume the Northwest Retransmission Agreement. R. 108-2 ¶ 32(a). Next, Terrier would transfer the ownership of Camelot Media Buyer (one of Terrier's subsidiaries to which the Cox Purchase Agreement had previously been assigned such that Camelot would directly acquire the Cox stations) to NBI. *Id.* ¶¶ 9, 32(b). Finally, Camelot would acquire the Cox stations. *Id.* ¶ 32(c). The relevant corporate ownership chart appears as follows:



R. 109 at 10.

Defendants contend that the Cox and Northwest transactions closed as planned on December 17, 2019, and thus the Cox stations became After-Acquired Stations governed by the rates set by the Northwest Retransmission Agreement. DISH contends that the Cox transaction closed before the Northwest transaction, and thus Terrier did not have a preexisting retransmission agreement when it acquired Cox, and the Cox Retransmission Agreement's rates remain in effect.

Beginning in December 2019, counsel for NBI informed DISH that the Cox stations were subject to the Northwest Retransmission Agreement. R. 84 ¶ 61. After DISH disagreed, Defendants began to run a crawl message on the Cox stations stating that DISH would lose the stations on January 14, 2020 because "it has refused to agree to reasonable terms for the valuable programming we provide." *Id.* ¶ 68.

On January 15, 2020, DISH filed this case in the Circuit Court of Cook County and moved for a TRO to prevent Defendants from interfering with its right to retransmit Cox stations, which the state court granted *ex parte*.[1] On January 24, Defendants removed the case to federal court. DISH subsequently filed a motion to remand, which this Court denied. *See* R. 57. On February 17, DISH moved for leave to add nondiverse defendants to the case, and on February 19 the parties agreed to

---

[1] The TRO states that "Defendants are temporarily enjoined from taking any action to interfere with performance of the Cox Retransmission Consent Agreement between DISH and Cox, dated March 31, 2019, which will remain in full force and effect until further order of this Court. Defendants, and those in active concert with them, are further enjoined from (i) prohibiting Plaintiff from retransmitting the Cox stations listed below, and/or (ii) otherwise interfering with Plaintiff's right to retransmit those stations." The TRO is available on the docket in the related case also before the Court, *Terrier Media Buyer Inc. v. DISH Network L.L.C.*, No. 20 CV 583 (N.D. Ill.), R. 21-2.

extend the TRO indefinitely pending resolution of whether this Court had subject matter jurisdiction. *See* R. 59.[2] The Court denied DISH's motion to add nondiverse defendants on April 10 and concluded it had subject matter jurisdiction to hear this case. The Court subsequently permitted the parties to undertake limited discovery for purposes of DISH's preliminary injunction motion. *See* R. 80; R. 83. That motion was fully briefed as of June 26, 2020.

## Legal Standard

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail on a motion for a preliminary injunction, "the moving party must make an initial showing that (1) it will suffer irreparable harm in the period before final resolution of its claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015) (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008)). "If the moving party makes this showing, the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Id.* at 324 (citing *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)). "This balancing involves a sliding scale analysis: the greater [the movant's] chance of success on the merits, the less

---

[2] Defendant Cox Media Group took no position on extending the TRO.

strong a showing it must make that the balance of harm is in its favor." *Foodcomm Intern. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003) (citing *Storck v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)).

## Analysis

I.  <u>Likelihood of Success on the Merits</u>

In determining whether a party has a reasonable likelihood of success on the merits, "the court must find that the petitioner's chances are 'better than negligible,' no matter how heavily other equities weigh in her favor." *Kinney for & on Behalf of N.L.R.B. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 994 F.2d 1271, 1278 (7th Cir. 1993) (quoting *Ill. Council on Long Term Care v. Bradley*, 957 F.2d 305, 307 (7th Cir. 1992)). DISH asserts seven claims, including: a declaratory judgment that the Cox Retransmission Agreement remains valid and enforceable (Count I); specific performance of the Cox Retransmission Agreement (Count II); breach of the Cox Retransmission Agreement against Cox and Camelot (Counts III and IV); breach of duty of good faith and fair dealing against Cox (Count V); tortious interference with the Cox Retransmission Agreement against all Defendants (Count VI); and unfair competition against all Defendants (Count VII).

A.  <u>Contract Claims (Counts I-IV)</u>

Turning first to the contract claims, DISH contends that the "only issue is whether the Cox stations are after-acquired stations subject to the Northwest retransmission agreement." R. 95 at 15. The Cox Retransmission Agreement is governed by New York law and the Northwest Retransmission Agreement is

governed by Colorado law. R. 109-1 at § 18(a) (Northwest); R. 109-2 § 18(a) (Cox). As such, the Court will apply Colorado law to the extent DISH's contract claims hinge on the Northwest Agreement and New York law to the extent they hinge on the Cox Agreement.

The Northwest Retransmission Agreement provides that "[n]otwithstanding any then-existing agreement between DISH and any third party with respect to any After-Acquired Station, an After-Acquired Station will be . . . governed by the terms of this Agreement[.]" R. 109-1 § 17(c). The Agreement defines "After-Acquired Station" as "a local television broadcast station not listed in Exhibit A as of [June 6, 2018] . . . of which Broadcaster (or a Broadcaster Affiliate) subsequently becomes the owner or licensee." *Id.* In turn, the Broadcaster is Northwest and a Broadcaster "Affiliate" means "any person or entity that directly or indirectly (including through one or more intermediaries) controls, is controlled by or is under common control with [Northwest]." *Id.* § 1(a).

DISH does not dispute that NBI, as Northwest's parent, is a Broadcaster Affiliate, or that Terrier and the Camelot entities became Broadcaster Affiliates when they acquired NBI. Rather, DISH argues that the Cox Retransmission Agreement should continue to control because Terrier acquired the Cox stations *before* the Northwest stations and thus did not have a preexisting retransmission agreement. *See* R. 109-2 § 17(b)(v). Indeed, DISH continues, because the Cox transaction closed first, the Northwest stations became After-Acquired Stations pursuant to the Cox Retransmission Agreement. *See id.* § 17(d).

8

Section 2.3 of the Northwest Purchase Agreement states that "the closing of the purchase and sale of the Interests . . . shall take place by electronic document transfer (*i.e.*, .pdf signature pages and fully executed documents exchanged via email) immediately prior to . . . the closing of the [Cox] transactions." R. 108-7 § 2.3. Nevertheless, DISH points out that the email containing the executed documents for the Cox transaction was sent before the email containing the executed documents for the Northwest transaction. *See* R. 95-10 (Cox email); R. 95-11 (Northwest email). But those emails expressly state that the signature pages "are being sent *in escrow pending our express authorization to release*." (emphasis added). Thus, the order in which those emails were sent did not impact which transaction closed first.

Meanwhile, Defendants submitted affidavits from Aaron Sobel, a principal at Apollo Global Management, and Brian Brady, a director at Terrier and the former president of NBI, that a closing call occurred at 11:45 a.m. eastern on December 17, 2019 during which the parties confirmed that they were ready to close, the money was ready to be wired, and all conditions had been satisfied. R. 108-3 ¶ 32; R. 108-2 ¶ 34. Sobel and Brady state that they orally released the executed signature pages, first for the Northwest Purchase Agreement and then for Cox Purchase Agreement. R. 108-3 ¶¶ 32, 34; R. 108-2 ¶¶ 34, 37. DISH has offered nothing to suggest that this is not the order in which the signature pages were released. And indeed, it would be astonishing if the Defendants closed the Cox transaction first given that the entire purpose of acquiring the stations depended on the opposite occurring.

DISH also argues that the Cox transaction closed first because one of the conditions precedent to the Northwest Purchase Agreement was paying the debt of the Northwest entities, and the Defendants' flow-of-funds spreadsheet shows that the Cox payments were completed first. *See* R. 95-9 at 3; R. 108-7 § 2.4.1(b). Specifically, after the Northwest signature pages were released, Terrier initiated the wire transfer of the debt payments. R. 109 at 18 (citing Sobel Dec. ¶ 36; Boyarsky Dec. ¶ 12). But two of those payments had to be re-released 2.5 hours later due to a typo in the routing number. R. 108-4 ¶ 13 (Boyarsky Dec.). In the interim, the Cox payments were completed. Yet in arguing that this means the Cox transaction closed first, DISH changes the terms of the Northwest Purchase Agreement. The agreement does not state that the closing "shall take place" by the full amount of the required payments being deposited in Northwest's account (as discussed, the closing occurred when the fully executed electronic documents were transferred). Rather, the agreement provides that "*[a]t the Closing*, the Buyer shall deliver or *cause to be delivered* . . . [the required payments]." R. 108-7 § 2.4.1 (emphases added). Defendants satisfied their obligation to "cause to be delivered" the required payments by initiating the wire transfer after the signed electronic documents were exchanged. It is irrelevant that Cox ultimately received the money in its account first.

In the alternative, DISH contends that the transactions occurred concurrently, and as such, Terrier did not have a preexisting agreement with either Northwest or Cox when the stations were acquired. To support its position, DISH first relies on the second prong of the "Station Change in Control" provision—i.e., when an entity

10

becomes the FCC-authorized assignee or transferee of the broadcast licenses of the Cox stations. DISH contends that Apollo became the FCC-authorized assignee of the Cox and Northwest stations at the same time because the FCC approved the acquisitions of the groups by one decision. But the "Station Change in Control" provision states that it applies when there is "*a change in the ownership or license status* of [the stations], . . . the result of which is an entity or group of entities . . . becoming the FCC-authorized assignee." R. 109-2 § 17(b) (emphases added). The FCC decision granted "consent to (1) the transfer of control of certain license subsidiaries of NBI Holdings, LLC to Terrier Media Buyer, LLC; [and] (2) the transfer of control of certain license subsidiaries of Cox Enterprises, Inc. to Terrier Media Buyer, LLC." R. 108-23 ¶ 45. But the actual change in the ownership or license status of the stations did not occur until the closings on December 17. DISH's argument thus falls flat.

DISH also contends that the Court should treat the acquisitions as a single transaction even if Terrier technically acquired the Northwest stations moments before the Cox stations. In support, DISH cites several cases in which courts "collapsed" a series of transactions. *See* R. 95 at 18. But the "Station Change in Control" provision expressly provides that it applies "whether pursuant to a single transaction or *series of transactions*." R. 109-2 § 17(b) (emphasis added). DISH offers no reason to rewrite the express terms to which it agreed.

Finally, DISH argues that the parties never intended for the "Station Change in Control" provision to permit an entity to acquire two sets of stations and then elect the retransmission agreement with more favorable terms. As an initial matter, the

11

provision unambiguously allows for an acquiring entity to do exactly that. *See Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014) ("New York law is well settled that a written agreement that is complete and unambiguous is to be interpreted without the aid of extrinsic evidence and that industry practice may not be used to vary the terms of such a contract."). But regardless, DISH was aware that Apollo may acquire the Cox and Northwest stations while it was still negotiating the Cox Retransmission Agreement. Indeed, DISH concluded that should Apollo acquire both entities the "most likely" scenario was that the Cox stations would "go under Apollo's Northwest [retransmission agreement]" and shorten the Cox stations term from March 31, 2022 to December 31, 2019, the date on which Northwest's retransmission agreement was set to expire. R. 109-14 at 8. And DISH unsuccessfully attempted to negotiate including language in the Cox Retransmission Agreement that would have allowed for it to remain in effect notwithstanding any After-Acquired Station provision in a different retransmission agreement. *See* R. 109-15 § 17(b)(iii) (DISH 3/25/19 Draft Cox Retransmission Agreement). DISH cannot now credibly claim that it was blindsided by Defendants' use of the provision.

In sum, Defendants submitted two affidavits stating that on a closing call attended by representatives and lawyers for the parties and the multiple banks and financial institutions involved, Terrier closed the Northwest transaction before closing the Cox transaction. By doing so, it appears the transactions triggered the Cox Retransmission Agreement's "Station Change in Control" provision and the Northwest Retransmission Agreement's "After-Acquired Station" provision such that

the Northwest Agreement then governed the Cox stations. DISH has offered no persuasive evidence based on the timing of the transactions or otherwise to call that narrative into question. Nor does the Court find persuasive DISH's arguments that the transactions should be considered to have closed concurrently. It appears that Defendants simply executed their plan as contemplated, and in a way that was permitted under the Cox and Northwest Retransmission Agreements. That DISH was economically disadvantaged by it does not mean Defendants' actions were in breach of contract. Accordingly, DISH has not demonstrated a reasonable likelihood of success on the merits of its contract claims.

B.  Breach of Duty of Good Faith and Fair Dealing, Tortious Interference, and Unfair Competition Claims (Counts V-VII)

The gravamen of DISH's breach of good faith and fair dealing, tortious interference, and unfair competition claims is that Defendants frustrated DISH's right to retransmit the Cox stations and then launched a PR campaign to conceal their plan. R. 95 at 19-20. First, to the extent Defendants launched a concealment campaign, those efforts were unsuccessful as DISH was already internally discussing the effect of Apollo's acquisition of Cox and Northwest prior to signing the Cox Retransmission Agreement. *See* R. 109-14 at 8.

But more importantly, DISH has not adduced evidence in expedited discovery to show that Defendants acted unlawfully. As Defendants point out in their response, under New York law, "to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 589 (2d Cir. 2005) (quoting *Jack*

13

*L. Inselman & Co., v. FNB Fin. Co.*, 364 N.E.2d 1119, 1120 (N.Y. 1977)). As previously discussed, DISH has not shown a reasonable likelihood of success on its claim that Cox breached the Retransmission Agreement, and thus its tortious interference claim also seems unlikely to succeed.

Relatedly, an implied covenant of good faith and fair dealing "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989). DISH contends that Cox breached this duty by helping the other Defendants thwart "the purpose of the Cox Retransmission Agreement, which was to establish pricing and other terms by which DISH would be able to retransmit the Cox Stations for the full term of the Agreement." R. 84 ¶ 114. To begin, DISH's memorandum cites an email from Northwest to Apollo discussing working together to "crush [Cox's] soul." R. 95 at 19. This calls into question the extent to which Cox assisted Northwest and Apollo at all. But regardless, "to simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must . . . base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims." *Great Lakes Reinsurance (UK) SE v. Herzig*, 413 F. Supp. 3d 177, 184 (S.D.N.Y. 2019) (alteration in original) (quoting *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009)). Here, DISH's implied covenant claim is based on the same factual predicate as its breach of contract claims – depriving DISH of its right to retransmit the stations – and thus is unlikely to

14

succeed. *Compare* R. 84 ¶¶ 97-104 (breach of contract claim), *with id.* ¶¶ 111-116 (breach of duty of good faith and fair dealing claim).

Finally, DISH's unfair competition claim also appears to have little to no chance of success. The "essence of an unfair competition claim is that the defendant has misappropriated the labors and expenditures of another and has done so in bad faith." *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 329 (E.D.N.Y 2014) (quoting *Coca-Cola N. Am. v. Crawley Juice, Inc.*, 2011 WL 1882845, at *6 (E.D.N.Y. May 17, 2011)). DISH alleges that "Defendants have engaged in unfair competition by knowingly and intentionally misappropriating [its] rights—specifically by acting to deprive [it] of (i) its retransmission rights with respect to the Cox stations and (ii) its rights under the change-in-control and assignment provisions of the Cox Retransmission Agreement." R. 84 ¶ 125. But DISH has failed to adduce any evidence that Defendants acted in bad faith.[3] The Cox Retransmission Agreement expressly provides for what would transpire if the Cox stations were acquired by an entity with an existing retransmission agreement. The Defendants simply did what that provision allows. That Defendants availed themselves of it in a way not contemplated by DISH (or at least in a way DISH hoped they would not) does not alone establish bad faith. *See Michele Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc.*, 14 F. Supp. 2d 331, 337 (S.D.N.Y. 1998), *aff'd*, 173 F.3d 845 (2d Cir. 1999) ("a[n unfair competition] claim based only on allegations that a defendant's

---

[3] DISH's discussion of bad faith in its memorandum is limited to a single conclusory sentence: "There is also evidence that Defendants' misappropriation of DISH's rights under the Cox Agreement was done in bad faith." R. 95 at 20.

action is 'unfair' is legally insufficient without a showing of bad faith.") (quoting *Saratoga Vichy Spring Co. Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)).

Accordingly, DISH has failed to demonstrate a reasonable likelihood of success on its breach of good faith and fair dealing, tortious interference, and unfair competition claims.

II.  <u>Irreparable Harm and Inadequate Legal Remedies</u>

DISH's failure to demonstrate a reasonable likelihood of success on the merits alone is enough to deny its motion. *See Adams v. City of Chicago*, 135 F.3d 1150, 1154 (7th Cir. 1996). But DISH also has not shown it will suffer irreparable harm in the period before final resolution of its claims, or that traditional legal remedies are inadequate.

The crux of DISH's argument is that if the Court does not issue a preliminary injunction, "the Cox stations will go dark," and this will cause irreparable harm because it will damage its goodwill, cause it to lose subscribers, and diminish its ability to attract new customers. R. 95 at 21. But Defendants cannot prevent DISH from retransmitting the stations. They go dark only if DISH so chooses.[4] DISH contends that this presents a "Hobson's choice" because retransmitting the stations without consent could result in large copyright damages and jeopardize its statutory

---

[4] DISH contends in its preliminary injunction motion that Defendants have the ability shut off two of the 13 stations because Defendants deliver them to DISH by fiber-optic cable. R. 95 at 23; R. 96-16 (Boddie Dec. ¶ 34). Defendants state in their response that this is incorrect, and that they have no ability to prevent DISH from retransmitting any of the Cox stations. R. 109 at 22-23 (citing Brady Dec. ¶ 49). DISH does not appear to contest this in its reply.

license to retransmit local broadcast stations. But the Cox Retransmission Agreement grants DISH consent to retransmit the stations through 2022. 109-2 § 3(a). DISH thus only faces potential copyright liability if it is wrong that the Agreement remains in effect.[5] For purposes of a preliminary injunction, DISH cannot credibly claim both that it has a likelihood of success on the merits (i.e., that the Cox Retransmission Agreement is valid and enforceable) and that copyright damages constitute a "likely" source of irreparable harm. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) ("The moving party must demonstrate that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief.") (emphasis added).

Putting that aside, DISH also ignores that it can avoid a blackout by negotiating with Terrier and paying presumably higher retransmission rates during the pendency of this litigation. Simply put, DISH is effectively choosing to black out the stations rather than incurring the extra costs that would be required to reach a new agreement. And when assessing irreparable harm, "self-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts[.]" *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003). To be sure, "the question of whether an injury is readily avoidable and truly self-inflicted if not avoided—and thus not irreparable harm—depends on the particular circumstances of the case." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 679 (7th

---

[5] Nor has DISH identified a single instance in which the FCC stripped a party of its statutory license in similar circumstances.

17

Cir. 2012). But the well-capitalized DISH does not contend that paying higher rates (either by incurring them itself or passing them to its customers) jeopardizes its corporate viability. *See id.* (threatening termination of a restaurant's franchise agreement if it did not adopt a policy that would make it impossible for the restaurant to operate is not a true choice). Nor has DISH introduced evidence that Defendants' demands are extortionate. If DISH believes the rates Defendants are seeking are too high, it can refuse to strike a deal and opt for a blackout.[6] That is no different than the choice DISH makes numerous times each year in standard retransmission agreement negotiations with broadcasters. *See* R. 108-3 (Brady Dec. ¶ 53) (listing the stations DISH has blacked out); R. 108-32 (series of articles discussing recent DISH retransmission fee disputes).

Even if a blackout was DISH's only alternative – i.e., it does not have a true choice in the matter – it has not shown it will suffer irreparable harm. DISH argues that a blackout will cause "many subscribers" to permanently switch to a new provider. R. 95 at 21. To support its claim, DISH cites a 2011 FCC order that discusses the effect of blackouts on DISH's subscribers in various designated market areas ("DMAs") from December 1, 2008 to December 1, 2009. The order states that "[d]ue to the loss of a broadcast affiliate signal, DISH lost a statistically significant [REDACTED] of its subscribers in a six month period. Even six months after the programming was restored, DISH subscriber levels in the treatment group DMAs

---

[6] Presumably, any difference between the Cox Retransmission Agreement rates and new rates the parties agreed to in the interim could later be recovered as damages.

remained below the pre-dispute levels." Applications of Comcast Corp., *Memorandum Opinion and Order*, 26 FCC Rcd. 4238, Appendix B, 4390 ¶ 34 (2011) ("[REDACTED]" appears in the original). As an initial matter, the very next sentence in the FCC's order states that "[a]s of December 2010, DISH subscriber levels were [REDACTED] what would be expected based on the trends in the control group DMAs over the same time period."). *Id.* But regardless, if anything, DISH's evidence shows that a loss in subscribers can be reasonably measured and later awarded as damages should a blackout occur. *See D.U. v. Rhoades*, 825 F.3d 331, 339 (7th Cir. 2016) ("Because money damages could make [plaintiff] whole again should she prevail in her lawsuit, she does not meet the standard for irreparable harm."). And DISH provides no other evidence of damages to its reputation or goodwill that would result due to a blackout. *See Mediacom Commc'ns Corp. v. Sinclair Broad. Grp., Inc.*, 460 F. Supp. 2d 1012, 1019 (S.D. Iowa 2006) (denying preliminary injunction and concluding that plaintiff had not shown irreparable harm to goodwill and reputation in dispute over retransmission rates because letters introduced as evidence appeared to blame the broadcaster for the loss of stations).

Moreover, that DISH itself has routinely imposed blackouts over the past five years belies that any harm would be irreparable. *See* R. 108-3 (Brady Dec. ¶ 53). DISH contends that this was done "to protect its customers from price increases." R. 113 at 15. That may be so, but ostensibly that is also why DISH is opting for station blackouts now rather than paying the Defendants' demanded higher retransmission rates. And DISH fails to explain what distinguishes this prospective blackout of 13

stations from the scores of station blackouts it has previously imposed and ably navigated.

Finally, the Court reiterates that as early as February 2019, DISH internally concluded that if Apollo acquired the Cox and Northwest stations, the "most likely" scenario was that the Cox stations would go under the Northwest Retransmission Agreement, which would shorten the Cox stations' term to December 31, 2019. R. 109-14 at 8. DISH attempted to include language in the Cox Retransmission Agreement to prevent this, but still signed the Agreement when those efforts failed. *See* R. 109-15 § 17(b)(iii). A party as sophisticated as DISH cannot now claim irreparable harm based on a scenario it explicitly contemplated prior to freely entering its Agreement with Cox more than a year ago. *See Morgan v. White*, 2020 WL 3818059, at *1 (7th Cir. July 8, 2020) ("One important question, when a plaintiff seeks emergency relief, is whether the plaintiff has brought the emergency on himself."). And to be sure, DISH has already been afforded more time that it would have otherwise had due to the parties' agreement to extend the TRO. For all these reasons, DISH has not shown it will suffer irreparable harm.

III.  Balance of Hardships

Because DISH has failed to make the threshold showing that a preliminary injunction is warranted, the Court need not proceed to the balancing phase of the analysis. *See Girl Scouts.*, 549 F.3d at 1086; *Arjo, Inc. v. Handicare USA, Inc.*, 2018

WL 5298527, at *10 (N.D. Ill. Oct. 25, 2018), *appeal dismissed*, 2019 WL 2208392 (7th Cir. Apr. 15, 2019).[7]

## Conclusion

For the reasons stated, the Court denies DISH's motion for a preliminary injunction. R. 91. This Order supersedes the TRO, which will dissolve at 12:00 p.m. CST on July 22, 2020.

ENTERED:

*Thomas M Durkin*

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: July 20, 2020

_____

[7] In DISH's reply in support of its motion, it requests that an evidentiary hearing be held should the Court disagree that a preliminary injunction is warranted. In support, DISH cites the "sharp conflict between some of [Defendants'] testimony and the written record." R. 114 at 16. Presumably, DISH is referring to the Sobel and Brady affidavits stating that the Northwest transaction closed before the Cox transaction and the wire transfer records showing the Cox payments were completed first. But Defendants do not dispute that they had to re-release two of Northwest's payments after they sent the Cox payments, and as the Court discussed, which party received the funds first does not affect the order in which the transactions closed. Indeed, DISH's motion turns more on contract interpretation than factual disputes. Given the voluminous number of exhibits submitted by both parties, Defendants' uncontradicted affidavits stating that the transactions closed as planned and as described in both its internal communications and to the FCC, and the otherwise general lack of material factual disputes, the Court does not believe that a hearing is necessary to resolve DISH's request for a preliminary injunction.