**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DISH NETWORK L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-CV-00570 |
| | ) | Hon. Thomas M. Durkin |
| | ) | |
| APOLLO GLOBAL MANAGEMENT, | ) | |
| INC.; TERRIER MEDIA BUYER, INC.; | ) | |
| NBI HOLDINGS, LLC; NORTHWEST | ) | |
| BROADCASTING, INC.; CAMELOT | ) | |
| MEDIA BUYER, INC.; and CAMELOT | ) | |
| MEDIA HOLDINGS, LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff DISH Network L.L.C. ("DISH"), for its Second Amended Complaint ("Complaint") against Apollo Global Management, Inc. ("Apollo"); Terrier Media Buyer, Inc. ("Terrier"); NBI Holdings, LLC ("NBI Holdings"); Northwest Broadcasting, Inc. ("Northwest"); Camelot Media Buyer Inc. and Camelot Media Holdings, LLC (together "Camelot") (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.    This Complaint arises from a scheme orchestrated, but crucially mis-executed, by a wealthy private-equity group to buy its way into the broadcast television industry, conscript and disrupt existing commercial relationships, and impose massive cost increases on American consumers to line the pockets of its principals and investors.  The private-equity group is led by Apollo and has targeted DISH and other distributors of multi-channel video programming.  Apollo

decided to acquire two large groups of local television broadcast stations in order to replace comparatively lower prices charged by one of them with the higher prices charged by the other. The primary goal behind Apollo's foray into broadcast television was to make money by jettisoning contracts and raising prices—the fees that DISH and other distributors must pay for permission to retransmit those stations' programming to subscribers.

2.       DISH, a satellite multi-channel video distributor, had separate retransmission agreements with each of the station-owning entities, which operated broadcast television stations in different markets known, respectively, as the Northwest Stations and the Cox Stations (as defined below).  Each of these agreements contained "station change-in-control" and "after-acquired station" clauses, which are intended to ensure continuity of retransmission in the event of changes in control.  Under these provisions, if control over a station or its owner changes and the acquiring entity (or an affiliate) has its own retransmission agreement with DISH, the acquiring entity's agreement prevails, and the acquired entity's agreement automatically terminates. Correspondingly, if the owner acquires additional stations, these stations become subject to the acquiring owner's agreement.

3.       Last year, Apollo bought both the Northwest Stations and the Cox Stations.  The Northwest Stations had extracted generally higher rates from distributors, including DISH, than the Cox Stations.  Thus, Apollo's primary, and avowed, goal behind the twin purchases was to replace the Cox rates with the Northwest rates.  To achieve this, Apollo tried to close the Northwest purchase a few hours earlier on the same day, December 17, 2019, that it purchased the Cox Stations.  In the Defendants' view, this meant that Cox would have been acquired by Northwest or its affiliates, a broadcaster with an existing agreement with DISH, meaning that Cox's retransmission agreement with DISH (the "Cox Agreement") would have terminated and Northwest's retransmission agreement with DISH (the "Northwest Agreement") would have

prevailed over all of the stations. But the plan misfired. The deal that was supposed to close first closed second. Because of an error, the Cox transaction actually closed first.

4.     Under Defendants' own view, the actual sequence of the two closings (*i.e.*, Cox first, then Northwest) triggers the station change-in-control provision of the Northwest Agreement. Under that provision, control over Northwest was acquired by an entity (Terrier) whose affiliate already had an existing agreement with DISH (*i.e.*, the Cox Agreement). Therefore, as of the December 17, 2019 close of the Northwest transaction, the Northwest Agreement terminated, and the Cox Agreement, which does not expire until 2022, began to cover the Northwest Stations too.

5.     But in an effort to avoid these outcomes, Defendants hid the true sequence of the transactions from DISH, and maintained that the Northwest Agreement continued until its regular expiration date of December 31, 2019, which was extended by the parties to January 18, 2020. Thus, for part of the period since December 17, 2019 (the closing date), DISH paid higher rates for the Northwest Stations than it should be paying. For another part of that period, DISH was forced into a blackout of the Northwest Stations, as Northwest withheld its retransmission consent between January 18, 2020 and March 15, 2020, even though DISH should have been able to continue retransmitting the Northwest Stations under the Cox Agreement during that period.

6.     Because of the blackout of the Northwest Stations, DISH lost many existing customers and new customer prospects to the other multichannel video distributors, such as cable operators and DIRECTV, which continued to retransmit the Northwest Stations without interruption.

7.     It was only because of the COVID pandemic that Defendants eventually agreed to a temporary extension of the Northwest Agreement (at the expired Northwest Agreement's rates but subject to true-up based on the rates to eventually be agreed upon). The threat of a new

blackout of the Northwest Stations persists, and the rates to be agreed eventually would likely be higher than those in the existing Cox Agreement.

8.     Furthermore, Defendants continue to refuse to honor their obligations under the Cox Agreement.  Their insistence that the Cox Agreement—including its consent to DISH's retransmission—had been superseded forced DISH into a blackout of the Cox Stations.  The screens went dark for the approximately one million DISH customers in markets where the Cox Stations are located.  Many DISH customers left for other distributors, such as cable or DIRECTV, which continue to retransmit the Cox Stations.  Consumers who otherwise would likely have joined DISH decided against doing so.  The blackout continues to date.

9.     Defendants' ongoing breach of, and interference with, DISH's contractual rights, regarding the Cox Stations and the Northwest Stations, has caused DISH to suffer both money damages and irreparable harm in the form of lost subscribers and diminished goodwill.

10.     Accordingly, DISH brings this Complaint seeking declaratory and injunctive relief, to compel specific performance of Defendants' contractual obligations, and to prevent further interference with its contractual rights, as well as damages for past injuries.

## PARTIES

11.     Plaintiff DISH Network L.L.C. is a Colorado limited liability company with its principal place of business at 9601 S. Meridian Blvd., Englewood, CO 80112.  DISH maintains an office at 500 North Michigan Ave, Suite 1920, Chicago, IL 60611.

12.     Defendant Apollo Global Management, Inc. is a Delaware corporation with its principal place of business at 9 West 57th Street, 43rd Floor, New York, NY 10019.  Apollo is a private equity firm that invests in alternative assets on behalf of the world's most prominent investors.  Apollo had a lead role in orchestrating the transactions at issue, as confirmed by multiple news stories and press releases.

4

13.     Defendant Terrier Media Buyer, Inc. is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

14.     Defendant NBI Holdings, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

15.     Defendant Northwest Broadcasting, Inc. is a Delaware corporation with its principal place of business at 2111 University Park Drive, Suite 650, Okemos, MI 48864.

16.     Defendant Camelot Media Buyer, Inc. is a Delaware corporation with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

17.     Defendant Camelot Media Holdings, LLC is a Delaware limited liability company with its principal place of business at 1 Manhattanville Road, Suite 201, Purchase, NY 10577.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Based on the Defendants' own representations to this Court, there is complete diversity among the parties. The amount in controversy exceeds $75,000.

19.     This Court has personal jurisdiction over the Defendants because the contract at issue in this dispute, *i.e.*, the Cox Agreement, provides for disputes to be litigated here.

20.     Venue is proper pursuant to 28 U.S.C. § 1391 and the forum selection clause of the Cox Agreement.

21.     Pursuant to the governing law provision of the Cox Agreement, the Agreement and the conduct of the parties to the Agreement are governed by the laws of the state of New York.

## FACTUAL BACKGROUND

**DISH and Northwest Entered into a Retransmission Consent Agreement in 2018.**

22.     DISH is a multichannel video programming distributor ("MVPD") that carries hundreds of programming networks by satellite directly to subscribers, who receive them at their homes by means of a pizza-sized dish.  Among other programs, DISH retransmits local television broadcast stations in each of the nation's 210 local markets.  That includes the local stations that are affiliated with one of the Big 4 networks (ABC, CBS, Fox, and NBC).  In some markets, the local stations are actually owned by the networks.  In most markets, they are only affiliated with one of the networks and are owned by third-party broadcast groups such as Northwest.

23.     As a satellite carrier, DISH has a statutory copyright license permitting it to retransmit the copyrighted content contained in each broadcast signal back into the station's local market.  17 U.S.C. § 122.  Nevertheless, under the Communications Act, 47 U.S.C. § 325(b), MVPDs such as DISH are not permitted to "retransmit the signal of a broadcasting station, or any part thereof, except with the express authority of the originating station . . . ."  The express authority necessary for retransmission is typically provided through a retransmission consent agreement between the MVPD and the owner of the originating station(s).  The rates set forth in these agreements have increased exponentially, from close to zero in the year 2000 to many dollars per subscriber per month today.  In 2014, the FCC had projected that, in 2016, retransmission fees would reach $2.6 billion, 12 times (1,200%) the 2006 level of $214.6 million.  The reality proved even more extreme.  Retransmission fees in 2016 actually reached $7.9 billion, almost 36 times the 2006 number—an increase of about 3,591% between 2006 and 2016 alone.

24.     On information and belief, as of 2018, Northwest owned and controlled a group of 18 local television broadcast stations (two with dual programming streams) that DISH was obligated to carry (the "Northwest Stations").  Each of the Northwest Stations operated, and still

operates, in one of nine U.S. local markets, and fifteen of them are affiliated with one of the "Big 4" broadcast networks—ABC, CBS, NBC, or Fox. The Northwest Stations, relevant programming streams, local markets and network affiliations are shown below:

a. WBPN-LD (MNT, Binghamton, NY)
b. WICZ-TV (FOX, Binghamton, NY)
c. KIEM-TV (NBC, Eureka, CA)
d. KVIQ-LD (CBS, Eureka, CA)
e. WABG-TV (ABC, Greenwood, MS)
    i. WABG.2 (FOX, Greenwood, MS)
f. WNBD-LD (NBC, Greenwood, MS)
g. WXVT-LD (CBS, Greenwood, MS)
h. KPVI-DT (NBC, Idaho Falls, ID)
i. KFBI-LD (MNT, Medford, OR)
j. KMVU-DT (FOX, Medford, OR)
k. KMCW-LD (Not currently broadcasting, Medford, OR)
l. KAYU-TV (FOX, Spokane, WA)
m. WNYS (MNT, Syracuse, NY)
n. WSYT (FOX, Syracuse, NY))
o. KCYU-LD (FOX, Yakima, WA)
p. KFFX-TV (FOX, Yakima, WA)
q. KFFX-TV (FOX, Yakima, WA)
r. KSWT (CBS, Yuma, AZ)
s. KYMA-DT (NBC, Yuma, AZ)
    i. KYMA.2 (Ion, Yuma, AZ)

25.    DISH negotiated and reached a retransmission consent agreement with Northwest in 2018 (previously defined as the "Northwest Agreement"), for the purpose of procuring Northwest's consent to the retransmission of the Northwest Stations. The Northwest Agreement is, by its terms, confidential. DISH sets out the relevant portions of the Northwest Agreement herein, incorporates the full Northwest Agreement by reference as if fully set forth herein, and has filed a true and correct copy of the Northwest Agreement under seal at Docket No. 7 (Exhibit 2).[1]

---

[1] All Exhibits accompanying DISH's Second Amended Complaint, except those filed under seal, have been appended to Defendants' Notice of Removal. *See* Dkt. No. 1, ECF Pg. Nos. 45-291. Defendants received permission of this Court to file Exhibits 1, 2, and 8 (which were filed under seal in the Circuit Court of Cook County) under seal (*see* Dkt. No. 22). Those Exhibits are available at Dkt. No. 7.

26.     Section 3(a) of the Northwest Agreement gave DISH the right to retransmit the signals of the Northwest Stations in their respective U.S. markets during the term of the Agreement:

> Grant of Retransmission Consent by Broadcaster.     Pursuant to 47 U.S.C. § 325(b)(1)(A) and the rules and regulations promulgated thereunder, Broadcaster [Northwest] grants to DISH consent throughout the Term to retransmit the signal of each Station (including each Programming Stream) on a non-exclusive basis via the Distribution System with the applicable Station's Local Market and Significantly Viewed Areas substantially contemporaneously with the applicable Station's primary broadcast.  For clarity, such consent does not convey to DISH any ownership rights in or to the underlying programming.

27.     Pursuant to Section 8 of the Northwest Agreement, DISH paid Northwest monthly retransmission fees, based on a pre-determined monthly rate per DISH customer receiving each Northwest Station.  DISH continues to pay the fees that were contemplated under the Northwest Agreement pursuant to the terms of the temporary extension, subject to a retroactive rate true-up depending on a future possible agreement between Northwest and DISH.  The rates to be agreed in a renewal deal would likely have to be significantly higher than the rates set forth in the Cox Agreement.  But, since the Northwest Stations have been subsumed to the Cox Agreement, no such renewal will be necessary for the Northwest Stations until expiration of the Cox Agreement in 2022, as explained below.

28.     Pursuant to Section 2, the Term of the Northwest Agreement was set to expire on December 31, 2019.

29.     DISH has complied with its obligations under the Northwest Agreement at all relevant times.

30.     Section 17 of the Northwest Agreement defines the parties' rights in the event of a change in control of a Northwest station.

31.     Section 17(b) of the Northwest Agreement governs a "Station Change in Control" of the Northwest Stations.  Under Section 17(b), "Station Change in Control" is triggered by either

8

of two events:  either (i) an entity gains the ability to control a majority of the board or the voting interests for the Northwest Stations or to direct the stations' management; or (ii) an entity becomes the FCC-authorized assignee or transferee of the broadcast license(s) of the stations.  In each case, the entity in question is the "Acquiring Entity."

32.    If a "Station Change in Control" occurs, the continued applicability of the Northwest Agreement depends on whether the "Acquiring Entity" has an existing retransmission consent agreement with DISH.  If it does, which is what happened here, then Section 17(b)(iv) requires that the "Acquiring Entity's retransmission consent agreement will govern the retransmission of the Station(s) following such Station Change in Control."

**DISH Entered into a Separate Retransmission Consent Agreement with Cox in 2019.**

33.    DISH also negotiated a retransmission consent agreement with Cox Media Group, LLC ("Cox"), which became effective on March 31, 2019 (previously defined as the "Cox Agreement").  The Cox Agreement is, by its terms, confidential.  DISH sets out the relevant portions of the Cox Agreement herein, incorporates the full Cox Agreement by reference as if fully set forth herein, and has filed a true and correct copy of the Cox Agreement under seal at Docket No. 7 (Exhibit 1).

34.    Section 3(a) of the Cox Agreement gives DISH the right to retransmit the signals of thirteen local television broadcast stations (one with a dual programming stream) in ten major U.S. markets during the term of the Agreement:

> Grant of Retransmission Consent by Broadcaster.  Pursuant to 47 U.S.C. § 325(b)(1)(A) and the rules and regulations promulgated thereunder, Broadcaster [Cox] grants to DISH consent throughout the Term to retransmit the signal of each station (including each Programming Stream) on a non-exclusive basis via the Distribution System with the applicable Station's Local Market and Significantly Viewed Areas substantially contemporaneously with the applicable Station's primary broadcast.  For clarity, such consent does not convey to DISH any ownership rights in or to the underlying programming.

35.     Specifically, the Cox Agreement covered the following thirteen stations[2], programming streams and markets (collectively, the "Cox Stations").  Ten of them are affiliated with ABC, NBC, CBS, or Fox, as shown below:

      a.   WSB-TV (ABC, Atlanta)
      b.   WFXT (FOX, Boston)
      c.   WSOC-TV (ABC, Charlotte)
      d.   WAXN-TV (Independent, Charlotte)
      e.   WHIO-TV (CBS, Dayton)
      f.   WFOX-TV (FOX, Jacksonville)
          a.   WFOX.2 (MyNetwork, Jacksonville)
      g.   WHBQ-TV (FOX, Memphis)
      h.   WFTV (ABC, Orlando-Daytona Beach-Melbourne)
      i.   WRDQ (Independent, Orlando-Daytona Beach-Melbourne)
      j.   WPXI (NBC, Pittsburgh)
      k.   KIRO-TV (CBS, Seattle-Tacoma)
      l.   KOKI-TV (FOX, Tulsa)
      m.   KMYT-TV (Independent, Tulsa)

Dkt. No. 7 (Exhibit 1, Exhibit A Station List).

36.     Pursuant to Section 2, the Term of the Cox Agreement does not expire until 2022.

37.     Pursuant to Section 11 of the Cox Agreement, either party has the right to early termination only in the event of (i) an uncured, material breach or default by the other party, (ii) a "change in Law" as defined in the Agreement, or (iii) bankruptcy or insolvency of the non-terminating party.  No such event has occurred.

38.     Pursuant to Section 8 of the Cox Agreement, DISH pays monthly retransmission fees to Cox.  Those fees are based on a pre-determined monthly rate per DISH customer receiving each Cox Station.

39.     Pursuant to Section 12(b)(iii) of the Cox Agreement, Cox represented and warranted to DISH that "no third party has or has claimed any right that would be inconsistent with the rights granted to DISH in this Agreement."

---

[2] Two stations (KIRO and KOKI) are delivered to DISH via fiber connections instead of over-the-air.

40.     Pursuant to Section 12(c)(ii) of the Cox Agreement, Cox covenanted that it "will maintain, at all times during the Term, all licenses, permits, rights, exemptions, authorizations and consents necessary to fully perform this Agreement."

**A Change in Control Does Not Extinguish DISH's Retransmission Rights Under the Cox Agreement.**

41.     Section 17 of the Cox Agreement defines the parties' rights in the event of a change in control of a Cox Station.

42.     Section 17(b) also provides a mechanism granting DISH the right to continue retransmitting the Cox Station's programming under an agreement with the new owner of the station, as follows:

a.     If the new owner of the Cox Station already has an existing retransmission agreement with DISH that requires incorporation of the station, then the station becomes subject to the terms of that agreement and the Cox Agreement terminates with respect to that station.

b.     If the new owner has an existing retransmission agreement with DISH that permits, but does not require, incorporation of the Cox Station, then DISH has the right to choose whether the Station will become subject to the terms of the agreement with the new owner or, instead, will continue to be subject to the terms of the Cox Agreement, pursuant to a valid assignment by Cox to the new owner of the rights and obligations with respect to that Station.

c.     If neither of these two situations applies, then the Cox Agreement requires Cox to assign its rights and obligations under the Cox Agreement to the new owner of the Cox Station.   This means that, if the new owner does not have an existing retransmission agreement with DISH, then the new owner must take the Station subject to the terms of the Cox Agreement.

11

43.     The third alternative is what has happened here, and this is what Defendants unlawfully attempt to hide.

44.     DISH has complied with its obligations under the Cox Agreement at all relevant times.

**Cox and Northwest Agree to Transactions that Result in the Acquisition of the Cox Stations and the Northwest Stations by Different Apollo Affiliates.**

45.     On or around February 14, 2019, Terrier entered into a purchase agreement (the "Northwest Purchase Agreement") with entities operating under the name Northwest Broadcasting, to acquire, among other things, the interests in the Northwest Stations (the "Northwest Acquisition").  The Northwest Acquisition required the prior approval of the FCC.

46.     All parties to this action have copies of the Northwest Purchase Agreement.  DISH sets out the relevant portions of the Northwest Purchase Agreement herein and incorporates the full Northwest Purchase Agreement by reference as if fully set forth herein, and a true and correct copy of the Northwest Purchase Agreement is available at Docket No. 1, ECF Pg. Nos. 47-162 (Exhibit 3).

47.     On or around the same day, February 14, 2019, Terrier entered into a purchase agreement (the "Camelot Purchase Agreement") with Cox whereby certain Apollo subsidiaries and affiliates would acquire interests in, among other things, the Cox Stations (the "Cox Acquisition").  Defendants refer to the agreement as the "Camelot Purchase Agreement" because certain Camelot-named affiliates of Apollo were part of the transaction.

48.     All parties to this action have copies of the Camelot Purchase Agreement.  DISH sets out the relevant portions of the Camelot Purchase Agreement herein and incorporates the full Camelot Purchase Agreement by reference as if fully set forth herein, and a true and correct copy of the Camelot Purchase Agreement is available at Docket No. 1, ECF Pg. Nos. 163-267 (Exhibit 4).

49.    The Cox Acquisition was also subject to FCC approval.  The parties requested FCC approval of the Northwest Acquisition at the same time as the Cox Acquisition by means of a single consolidated application on March 4, 2019.  The FCC approved both transactions in a single order on November 22, 2019.  Finally, both transactions were consummated on the same day—December 17, 2019.  The FCC also approved the transfer of the relevant broadcasting licenses to Terrier, under the *de facto* control of Apollo.

**Apollo's Broadcasting Assets at the Time of the Cox Acquisition.**

50.    Terrier was created by Apollo, a private equity firm that invests in alternative assets on behalf of the world's most prominent investors.  Thus, the FCC's approval paved the way for Apollo to launch its initial foray in the television broadcast industry.

51.    On the closing date—December 17, 2019—two things were true:  First, neither Apollo, Terrier, nor Camelot was an existing broadcaster; none had ever owned or operated a local television broadcast station.  Second, none of their affiliates had an existing retransmission agreement with DISH.

52.    In fact, the entire Apollo-led group (including Terrier and Camelot) are new entrants in the broadcast television market.  According to their FCC application, "[Apollo] and its affiliates, however, are not broadcast operators."  They told the FCC that their role would be to provide "financial, strategic, and management expertise" to the new owner of the Cox and Northwest Stations—*i.e.*, Terrier.  They promised not to "be involved in the day-to-day operations of the Northwest Stations or the Cox Stations."

53.    Because Apollo, Terrier, and Camelot were not broadcasters and did not have retransmission agreements with DISH as of December 17, 2019, they had no legitimate avenue to avoid the continued application of the Cox Agreement to the Cox Stations once Cox sold the Stations to Terrier.  So, they tried to create the façade of an existing broadcaster by attempting to

close the Northwest Acquisition a few hours earlier on the same day, December 17, 2019, that they closed the Cox Acquisition, but they failed.

54.     Had Defendants not attempted to create the façade of sequential acquisitions, it would have been Apollo, acting through Terrier, that acquired both sets of stations at the same time. Apollo negotiated the deals with Cox and Northwest. Apollo caused Terrier and Camelot to be created and funded. Apollo caused Terrier to consummate the Cox Acquisition and assign the Cox Stations to Camelot. Apollo caused Terrier to consummate the Northwest Acquisition and take a controlling interest in NBI Holdings, the parent of Northwest. Apollo has arranged for its advisory affiliates to provide financial, strategic, and management expertise to Terrier. In fact, the FCC order approving the transactions concluded that Apollo has *de facto* control over Terrier.

55.     Such simultaneous acquisition also would have been consistent with Cox's and DISH's intent, as of the time of entering in to the Cox Agreement, and Northwest's and DISH's intent, as of the time of entering into the Northwest Agreement, of how each Agreement's "station change in control" and "after-acquired station" clauses were supposed to work. Because, but for Defendants' machinations, the Cox Stations and the Northwest Stations were each being acquired by Apollo entities that had no pre-existing retransmission consent agreement with DISH (either directly or through affiliates), the expectation, as of the time of contracting, was that the respective retransmission agreements would have remained in effect to govern its respective stations in the hands of the new owner.

**Cox Notifies DISH Regarding the Impending Acquisition by Terrier.**

56.     Apollo and Terrier personnel orchestrated the closing of the two acquisitions in December 2019, working directly with the sellers, Cox and Northwest.

57.     Cox had a contractual obligation under the Cox Agreement to notify DISH of a station change in control, and Northwest had the same obligation under the Northwest Agreement.

14

Inherent in these contractual provisions was the obligation to provide accurate and complete information to DISH so that DISH could determine the impact of the purported station change in control.

58.     On or around December 7, 2019, Cox's President, Ms. Kim Guthrie, sent a notification letter to DISH regarding the Cox Agreement. Ms. Guthrie represented that Cox "is in the process of selling all or substantially all of the assets of [Cox] to Terrier Media Buyer, Inc. . . . ." She further stated that the transaction was expected to close in the fourth quarter of 2019. She concluded by informing DISH "that effective as of the Closing Date, the right to grant retransmission consent with respect to the Stations listed on Exhibit A hereto [the Cox Stations] will be transferred to Terrier Media Buyer, Inc." A true and correct copy of the letter has been filed at Docket No. 1, ECF Pg. Nos. 268-70 (Exhibit 5).

59.     On or around December 13, 2019, NBI Holdings and Northwest sent a notice to DISH regarding a station change in control under the Northwest Agreement. The letter stated that there was to be a sale and transfer of ownership of NBI Holdings to Terrier, and it further stated that Northwest was a wholly owned subsidiary of NBI Holdings. The letter claimed that Northwest "will [ ] continue to have the right to grant retransmission consent with respect to each applicable station," but it indicated that "Terrier will unconditionally assume and fully perform all the duties and obligations imposed upon [Northwest] . . . ." A true and correct copy of the letter has been filed at Docket No. 1, ECF Pg. Nos. 273-74 (Exhibit 6).

**Defendants Consummate the Northwest and Cox Acquisitions and Attempt to Circumvent the Cox Agreement.**

60.     Defendants proceeded with the closing of the two purchases a few days later on December 17, 2019.

61. On the eve of closing, December 16, Terrier assigned to Camelot *pre-closing* Terrier's contractual rights to the Cox Stations. This means that the Cox Stations were never acquired by an entity in which the Northwest Stations were housed.

62. The following day, Defendants continued the façade, but they failed to terminate the Cox Agreement because they closed the Cox Acquisition *before* they closed the Northwest Acquisition.

    a. Each acquisition was subject to a number of closing conditions. Thus, under Section 2.4.1(b) of the Northwest Purchase Agreement, the Northwest Acquisition was subject to "deliver[ing] or caus[ing] to be delivered" a number of payments, including two payments to discharge certain Northwest indebtedness.

    b. Defendants' plan to close the Northwest Acquisition first included approximately 32 steps developed with the assistance of an accounting firm and a law firm. Those steps reflected an effort to satisfy the Northwest closing conditions first, including the two payments for the discharge of Northwest's indebtedness. At a minimum, for Defendants to close the Northwest Acquisition first, the closing conditions for the Northwest Acquisition had to be satisfied before those for the Cox Acquisition, and the planned steps for the Northwest Acquisition had to be completed before the Cox Acquisition steps.

    c. The closing on December 17, 2019 was initiated via a phone call. Upon information and belief, although Defendants' representatives and their counsel participated in the call, they did not document the sequence of the steps taken to consummate the closing, such as the release of signatures. DISH has repeatedly requested such documentation since December 2019, and it has not been provided.

But what *was* documented was that the Defendants failed to make the payments, and close the acquisitions, in the order contemplated.

d.   After the call, Apollo employees (including its Director of Treasury and Research Services) worked to consummate the acquisitions by causing payments of the respective purchase prices to be delivered on behalf of Terrier (the buyer).  But the two payments for the Northwest debt discharge were not delivered until 3:38 p.m. on December 17, 2019, more than an hour after all Cox payments were delivered at 2:25 p.m. and the Cox Acquisition was closed.

63.   Accordingly, the Northwest Acquisition closed at 3:38 p.m. on December 17, 2019, at which time Terrier had an existing retransmission consent agreement with DISH because it had just completed the acquisition of the Cox Stations and it had become the assignee of the Cox Agreement when the Cox Acquisition closed at 2:25 p.m.  Additionally, Terrier was the Acquiring Entity of the Northwest Stations because it gained the ability to exert majority control over the Northwest Stations and/or because it was the FCC-authorized transferee of the broadcast licenses of those stations.

64.   As a result, the Northwest Agreement was terminated pursuant to the station change-in-control provision of Section 17(b), and the Northwest Stations became subject to the terms of the Cox Agreement by no later than December 17, 2019.

65.   DISH therefore continues to have contractual consent to retransmit the Northwest Stations and the Cox Stations under the terms of the Cox Agreement, until that Agreement expires in 2022.

66.   Terrier assumed the duties and obligations of the Cox Agreement when it acquired the Cox Stations from Cox.

67.     The Camelot Defendants assumed the duties and obligations of the Cox Agreement when they entered into an assignment and assumption agreement with Terrier regarding the Cox Stations.

68.     Northwest and NBI Holdings were obligated by the Northwest Agreement to treat the Northwest Stations as subject to the terms of the Cox Agreement.

**Defendants Conceal the Facts and Spread a False Narrative to Support their Erroneous Position.**

69.     Notwithstanding that the scheme to terminate the Cox Agreement failed, Defendants implemented a plan to cover up the facts and deceive DISH into agreeing that the Cox Agreement had been terminated and that the Cox Stations had become subject to the Northwest Agreement.

70.     Apollo employee, Mr. Houston McCurry, emailed a well-known public relations expert on December 18, 2019—the day after closing—and requested assistance to disseminate the false public narrative that Northwest had acquired Cox.  Aaron Sobel, a Principal at Apollo, was also involved in these PR efforts.  These efforts were intended to counter the initial wave of press reports on or around December 18, which stated that Apollo had acquired both the Cox Stations and the Northwest Stations.  For example, Inside Radio reported on December 18 that the Cox Stations were sold to a "new media company" that also included "20 TV stations in 10 markets acquired from Northwest Broadcasting."  This was not an instance of mistaken reporting; Cox's own press release on December 17 confirmed that it had sold the Cox Stations "to a new media company."

71.     The fact that a new media company had acquired both groups of stations was not conducive to the plan to terminate the Cox Agreement.  So, NBI and Northwest collaborated with Apollo and Terrier to implement the cover up and spread a false narrative instead.

a. When Cox's relationship with Apollo deteriorated prior to closing, jeopardizing the scheme, Northwest's founder and former CEO Mr. Brady rallied the Apollo team to finalize the deal and maintain their leverage. And when the deal lawyers needed some last-minute assistance, Mr. Brady agreed to stay on as an officer and member of the board of the entity acquiring Northwest, for a matter of a few hours, to facilitate the façade of a sequencing of the acquisitions.

b. Mr. Brady continued to represent Northwest in negotiations with DISH using his "northwestbroadcasting.com" email account. In return for the promise of additional equity if Apollo achieved enhanced retransmission rates from DISH and other distributors, Mr. Brady assisted several Apollo personnel in their efforts to create a misimpression that control over the Cox Stations was acquired by Northwest.

c. Ms. Kim Guthrie, the newly appointed president of Terrier, likewise participated in the attempt to deceive DISH. She was involved in various email exchanges and calls regarding negotiations with DISH for higher retransmission fees. As the former CEO of Cox who was directly involved in negotiating the Cox Agreement with DISH, Ms. Guthrie was aware that the Cox Agreement could not be terminated if the Northwest Acquisition closed after, or simultaneous with, the Cox Acquisition.

d. Mr. Jon Rand, Northwest's Chief Operating Officer, participated in negotiations with DISH after the closing and also assisted in the attempt to extract higher retransmission rates from DISH.

72. In support of the false narrative perpetuated by Defendants, on or around December 20, 2019, counsel for NBI Holdings sent a letter to DISH—on behalf of NBI Holdings and

Northwest—stating that NBI Holdings had acquired the Cox Stations. A true and correct copy of the letter has been filed at Docket No. 1, ECF Pg. Nos. 278-81 (Exhibit 7).

73.     This notice from NBI Holdings was inconsistent with the notice that Cox had sent on December 7, 2019, informing DISH that *Terrier* would acquire the Cox Stations. DISH responded by email to the letter on December 23, 2019, asking NBI Holdings to substantiate its claim because its claim contradicted the Cox notice and multiple public sources about the Terrier transactions. A true and correct copy of DISH's response has been filed at Docket No. 1, ECF Pg. Nos. 283-91 (Exhibit 9).

74.      On or around December 27, 2019, NBI Holdings counsel sent a follow-up letter and draft presentation purporting to describe the legal steps in the Northwest Acquisition and the Cox Acquisition. Although the details remained unclear, a presentation by Terrier's deal counsel was provided to DISH. That presentation suggested that the Cox Stations came to be held by Camelot and the Northwest Stations continued to be held by NBI Holdings. In turn, according to the presentation, NBI Holdings became directly owned by Terrier. True and correct copies of the letter and draft presentation have been filed under seal at Docket No. 7 (Exhibit 8). This sequence supports the fact that the Apollo affiliates that acquired the Cox Stations did not own the Northwest Stations at the time they acquired the Cox Stations (or at any time for that matter).

75.     DISH responded that it would not be able to treat the Cox Stations as after-acquired stations subject to the Northwest Agreement.

76.     On or around December 30, 2019, DISH requested information to confirm the timing of the transactions. Counsel for NBI Holdings agreed to provide additional information, but no such information was provided. NBI Holdings did not demonstrate either that the Cox Stations were actually acquired by the owner of the Northwest Stations or that the Cox Stations were acquired after the acquisition of the Northwest Stations.

77.     That same day, Mr. Brady forwarded a DISH email to Apollo's Mr. McCurry and complained that the public information related by Apollo had not been sufficiently supportive of Defendants' attempt to terminate the Cox Agreement and subject the Cox Stations to higher rates. Presumably, Mr. Brady was referring to the initial press reports in the days after the closing.

78.     In January 2020, Defendants started to run a "crawl" message on the Cox Stations stating that DISH would lose its Cox Stations at 5 p.m. Mountain Time on January 14, 2020, because "it has refused to agree to reasonable terms for the valuable programming we provide."

79.     On January 10, 2020, Defendants reiterated the position that the Cox Stations are subject to the Northwest Agreement and that, if DISH did not reach a new retransmission consent agreement for the Cox Stations, they must "go dark" soon.

80.     Upon information and belief, Defendants have communicated with, and continue to communicate with, DISH subscribers through advertising campaigns designed and intended to persuade those subscribers to leave DISH if the Cox Stations and/or the Northwest Stations are blacked out.  For example, a Cox press release from July 24, 2020 stated that DISH customers are "encouraged to drop DISH" and "switch TV providers."

**Defendants Are Acting in Bad Faith.**

81.     Defendants have engaged in bad-faith conduct to conceal their maneuverings and have constructed a façade of transactions in an effort to obscure the end result, which is their attempt to avoid the remaining two years of the Cox Agreement and create an unfair opportunity to increase the retransmission fees that DISH previously negotiated with Cox—all at the expense of DISH customers whose television screens would go, and have gone, dark.

82.     DISH is informed and believes that the extraordinary web of transactions in which Apollo engaged to consummate the acquisitions was attempted for no economic purpose other than

21

to deny DISH and other distributors rights they negotiated under the Cox Agreement and retransmission agreements with other distributors covering the Cox Stations.

83. Terrier and NBI Holdings have contended that the Cox Stations were acquired by NBI Holdings and are subject to the Northwest Retransmission Agreement. But the documents provided by Defendants are not consistent with the position that Defendants have taken regarding the acquisitions of Cox and Northwest.

84. In these circumstances, the station change-in-control provision of Section 17 of the Cox Agreement requires that the terms of the Cox Agreement continue to apply to the Cox Stations and are binding on their new owner, whether that be Terrier, Camelot, or another of Terrier's subsidiaries or affiliates. Correspondingly, the after-acquired station provision of the Cox Agreement and station change-in-control provision of the Northwest Agreement require that the Northwest Stations become subject to the Cox Agreement.

85. DISH is further informed and believes that Apollo gained access to DISH's confidential retransmission rates for both the Cox Stations and the Northwest Stations through the process of conducting due diligence on the Cox and Northwest Acquisitions in 2019. DISH takes reasonable measures to maintain the confidentiality of the rates it pays to different broadcasters, and one broadcaster's knowledge of the rates DISH pays to another can provide a significant commercial advantage in that broadcaster's rate negotiations with DISH.

86. Upon information and belief, Apollo's knowledge of both the Cox rates and the Northwest rates allowed it to determine whether it could generate a sufficient return on investment by purchasing both sets of stations and subjecting the Cox Stations to the higher Northwest rates. Apollo believed it could achieve tens of millions of dollars in increased retransmission fees, and this was a substantial factor in Apollo's decision to consummate the two acquisitions in a way that Apollo hoped would appear as if the Cox Stations were being acquired by an existing broadcaster.

**DISH Has Suffered, and Will Continue to Suffer, Damages Including Irreparable Harm.**

87. Unless Defendants are restrained, they will continue to deprive DISH of its rights under the Cox Agreement. This will prevent DISH from restoring ABC, CBS, NBC, or Fox programming to the ten U.S. markets covered by the Cox Stations, and may disrupt DISH's offering of network programming to the nine markets covered by the Northwest Stations. This means that DISH subscribers in these markets will continue to be deprived of access to, or in the case of the Northwest Stations, lose their current provisional access to, their favorite TV programming—such as the popular live sports, hit shows, and other marquee events offered by the Big Four networks.

88. These Stations, however, will continue to be available from DISH's competitors, including cable systems, DIRECTV, and online video distributors. Thus, many subscribers have left DISH—and others are likely to leave DISH—to switch to a competitor in order to continue receiving their favorite programming. Indeed, DISH experienced increased call volume in response to the "crawl" messages on the Cox Stations, and has experienced increased customer loss and reduced customer intake as a result of the blackouts involved.

89. Additional harm will be suffered by DISH's subscribers. Those who remain with DISH will be deprived of programming, including coverage of local and national elections and live events such as the return of the NFL and other sporting and entertainment events that only happen once. Those who leave DISH will face the burdens of switching and may be locked into more expensive long-term contracts with other pay-TV distributors who are not their first choice.

90. DISH cannot simply continue to retransmit the Cox Stations or the Northwest Stations in the absence of either consent or a court order. This could result in the loss of DISH's statutory license under Section 122 of the Copyright Act, 17 U.S.C. § 122, meaning that DISH

could lose the right to retransmit all local television broadcast stations across all 210 U.S. local markets.

91.     Nor can DISH agree to the exorbitant fee increases demanded by Defendants.  The increased fees come with various non-monetary strings attached, which, once included in a final agreement, cannot be remedied by money damages.  And Defendants have stated to this Court during the July 20, 2020 status hearing that they will not accept a "true-up" of fees subject to the outcome of the litigation.  Regardless, the fee increases alone would have a ripple effect across DISH's negotiations with other broadcasters, leading to additional retransmission fee increases, which also could not be remedied by money damages in this case.

92.     Defendants, on the other hand, will not be harmed irreparably if the *status quo ante* is restored.  This is because DISH is willing to pay the monthly retransmission fees under the Cox Agreement for the Cox Stations for the balance of its term.

## CLAIMS

### COUNT I
**(Terrier, Camelot)**
**Specific Performance of the Cox Agreement (Cox Stations)**

93.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

94.     The Cox Agreement is a valid and enforceable contract.

95.     DISH has performed all of its obligations under the Cox Agreement.

96.     Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the station change-in-control and assignment terms of the Agreement.

97.     Terrier also assumed Cox's duties under the Cox Agreement when it purchased the Cox Stations.

98.     Terrier and Camelot have breached the retransmission rights granted to DISH under Section 3 of the Cox Agreement with respect to the Cox Stations by taking actions that deprive DISH of the ability to retransmit those Stations for the full term of the Agreement at the rates set forth therein.

99.     Terrier and Camelot have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Agreement.

100.     DISH has no adequate remedy at law.  Money damages will not adequately compensate DISH.  Unless Terrier and Camelot are enjoined, DISH will continue to suffer irreparable harm caused by these breaches of the Cox Agreement.

101.     Accordingly, DISH is entitled to an injunction and specific performance of the Cox Agreement.

**COUNT II**
**(Terrier, Northwest)**
**Specific Performance of the Cox Agreement (Northwest Stations)**

102.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

103.     The Cox Agreement is a valid and enforceable contract.

104.     DISH has performed all of its obligations under the Cox Agreement.

105.     Terrier assumed Cox's duties under the Cox Agreement when it purchased the Cox Stations.

106.     After closing the purchase of the Cox Stations, Terrier acquired the Northwest Stations, which became after-acquired stations subject to the same terms and conditions of the Cox Agreement.

107.    As the current owner of the Northwest Stations and a party to the Northwest Agreement, Northwest is contractually obligated to honor the terms and conditions of the Cox Agreement as applied to the Northwest Stations.

108.    Terrier and Northwest have breached the retransmission rights granted to DISH under Section 3 of the Cox Agreement with respect to the Northwest Stations by taking actions that deprive DISH of the ability to retransmit those Stations for the full term of the Agreement at the rates set forth therein.

109.    Terrier and Northwest have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Agreement.

110.    DISH has no adequate remedy at law.  Money damages will not adequately compensate DISH.  Unless Terrier and Northwest are enjoined, DISH will continue to suffer irreparable harm caused by these breaches of the Cox Agreement.

111.    Accordingly, DISH is entitled to an injunction and specific performance of the Cox Agreement.

## COUNT III
### (Terrier, Camelot)
### Breach of the Cox Agreement (Cox Stations)

112.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

113.    The Cox Agreement is a valid and enforceable contract.

114.    DISH has performed all of its obligations under the Cox Agreement.

115.    Cox's duties with respect to the Cox Stations transferred to, and became legally binding on, Camelot by virtue of the station change-in-control and assignment terms of the Cox Agreement.

116.     Terrier also assumed Cox's duties under the Cox Agreement when it purchased the Cox Stations.

117.     Terrier and Camelot have breached the retransmission rights granted to DISH under Section 3 of the Cox Agreement with respect to the Cox Stations by taking actions that deprive DISH of the ability to retransmit those Stations for the full term of the Cox Agreement at the rates set forth therein.

118.     Terrier and Camelot have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Agreement.

119.     Terrier and Camelot's breaches of the Cox Agreement have caused damages to DISH.

120.     DISH is entitled to an injunction and specific performance of the Cox Agreement. DISH also is entitled to compensation for damages already incurred in an amount to be determined at trial.

## COUNT IV
## (Terrier, Camelot)
## Breach of the Duty of Good Faith and Fair Dealing

121.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

122.     Terrier and Camelot have acted to deprive DISH of the benefit of its bargain under the Cox Agreement.

123.     Specifically, they arranged an acquisition of the Cox Stations that was and is intended to deprive DISH of (i) its retransmission rights under the Cox Agreement and (ii) its rights under the change-in-control and assignment provisions of the Agreement in the event of new ownership of the Cox Stations.

124.    Terrier and Camelot have assisted the other Defendants in thwarting the purpose of the Cox Agreement, which was to establish the pricing and other terms by which DISH would be able to retransmit the Cox Stations for the full term of the Agreement.

125.    The conduct of Terrier and Camelot breaches not only their express contractual obligations but also the implied obligations that a reasonable person in DISH's position would be justified in understanding were included in the Cox Agreement.

126.    Camelot's and Terrier's breaches of their duties of good faith and fair dealing have caused damages to DISH in an amount to be determined at trial.

### COUNT V
### (Terrier, Northwest)
### Breach of the Cox Agreement (Northwest Stations)

127.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

128.    The Cox Agreement is a valid and enforceable contract.

129.    DISH has performed all of its obligations under the Cox Agreement.

130.    Terrier assumed Cox's duties under the Cox Agreement when it purchased the Cox Stations.

131.    After closing the purchase of the Cox Stations, Terrier acquired the Northwest Stations, which became after-acquired stations subject to the same terms and conditions of the Cox Agreement.

132.    As the current owner of the Northwest Stations and a party to the Northwest Agreement, Northwest is contractually obligated to honor the terms and conditions of the Cox Agreement as applied to the Northwest Stations.

133.    Terrier and Northwest have breached the retransmission rights granted to DISH under Section 3 of the Cox Agreement with respect to the Northwest Stations by taking actions

28

that deprive DISH of the ability to retransmit those Stations for the full term of the Cox Agreement at the rates set forth therein.

134.    Terrier and Northwest have also prevented DISH from performing its retransmission obligations under Section 6 of the Cox Agreement.

135.    Terrier and Northwest's breaches of the Cox Agreement have caused damages to DISH.

136.    DISH is entitled to an injunction and specific performance of the Cox Agreement. DISH also is entitled to compensation for damages already incurred in an amount to be determined at trial.

## COUNT VI
## (NBI Holdings)
## Breach of the Cox Agreement

137.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

138.    The Cox Agreement is a valid and enforceable contract.

139.    DISH has performed all of its obligations under the Cox Agreement.

140.    Terrier assumed Cox's duties under the Cox Agreement when it purchased the Cox Stations.

141.    If NBI Holdings validly acquired the Cox Stations from Terrier, as it claimed in its December 20, 2019 letter to DISH, then it too assumed the duties of the Cox Agreement, as is required under the assignment provisions of Section 17 of that Agreement.

142.    NBI Holdings' duties under the Cox Agreement extend to the Cox Stations and to any after-acquired stations, including the Northwest Stations.

143. NBI Holdings has breached its contractual duties by refusing to permit DISH to retransmit the signals of the Cox Stations and by taking actions to deprive DISH of the ability to retransmit those Stations for the full term of the Cox Agreement at the rates set forth therein.

144. NBI Holdings also has breached its duties by refusing to permit DISH to retransmit the signals of the after-acquired Northwest Stations and by taking actions to deprive DISH of the ability to retransmit those Stations for the full term of the Cox Agreement at the rates set forth therein.

145. NBI Holdings' breaches of the Cox Agreement have caused damages to DISH.

146. DISH is entitled to an injunction and specific performance of the Cox Agreement. DISH also is entitled to compensation for damages already incurred in an amount to be determined at trial.

**COUNT VII**
**(Apollo)**
**<u>Tortious Interference with the Cox Agreement</u>**

147. DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

148. The Cox Agreement is a valid and enforceable contract.

149. Defendants had knowledge of the Cox Agreement and its terms.

150. As set forth above, Terrier, Camelot, NBI Holdings, and Northwest breached their obligations under the Cox Agreement.

151. The conduct of Apollo, as set forth above, constitutes intentional procurement of these breaches of the Cox Agreement, without justification. In particular, although Apollo knew that it had failed to close the Northwest Acquisition first, it nevertheless misrepresented the closing sequence to DISH in an effort to force DISH to abandon the Cox Agreement and agree to higher retransmission fees.

152.    DISH has no adequate remedy at law.  Money damages will not adequately compensate DISH.  Unless Apollo is enjoined, DISH will continue to suffer irreparable harm caused by Apollo's intentional procurement of these breaches of the Cox Agreement. Additionally, because of the damages already caused to DISH by Apollo's unjustified interference with the Cox Agreement, DISH is entitled to damages in an amount to be determined at trial.

**COUNT VIII (IN THE ALTERNATIVE)**
**(NBI Holdings, Terrier)**
**<u>Tortious Interference with Cox Agreement</u>**

153.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

154.    The Cox Agreement is a valid and enforceable contract.

155.    Defendants had knowledge of the Cox Agreement and its terms.

156.    As set forth above, Camelot and Northwest breached their obligations under the Cox Agreement.

157.    Terrier and NBI Holdings are not parties to the Cox Agreement or otherwise privileged to interfere with it.

158.    The conduct of Terrier and NBI Holdings, as set forth above, constitutes intentional procurement of these breaches of the Cox Agreement, without justification.  In particular, although Terrier and NBI Holdings knew that they had failed to close the Northwest Acquisition first, they nevertheless misrepresented the closing sequence to DISH in an effort to force DISH to abandon the Cox Agreement and agree to higher retransmission fees.

159.    DISH has no adequate remedy at law.  Money damages will not adequately compensate DISH.  Unless Defendants are enjoined, DISH will continue  to suffer irreparable harm caused by Terrier's and NBI Holdings' intentional procurement of these breaches of the Cox Agreement.  Additionally, because of the damages already caused to DISH by Terrier's and NBI

31

Holdings' unjustified interference with the Cox Agreement, DISH is entitled to damages in an amount to be determined at trial.

**Count IX**
**(Apollo)**
**Unfair Competition**

160.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

161.    DISH's rights with respect to the Cox Stations and the Northwest Stations have commercial value, as demonstrated by the fact that DISH pays for them and uses them to generate revenues from subscribers.

162.    Apollo has engaged in unfair competition by knowingly and intentionally misappropriating DISH's rights—specifically by acting to deprive DISH of (i) its retransmission rights with respect to the Cox Stations and the Northwest Stations and (ii) its rights under the station change-in-control and assignment provisions of the Cox Agreement.

163.    Upon information and belief, Apollo obtained and used DISH's confidential information—the retransmission rates in place between DISH and Cox and DISH and Northwest—and used that information without DISH's authorization to develop a scheme to structure the Cox and Northwest Acquisitions to enrich itself at DISH's expense.

164.    Apollo also concealed the facts of the closing from DISH and disseminated a false narrative to DISH and to the public regarding which Acquisition closed first.  Apollo used this narrative to support the claim that the Cox Agreement was terminated and to conceal the fact that the Northwest Stations became after-acquired stations subject to the Cox Agreement's lower rates.

165.    Apollo's conduct has adversely affected, and will continue to adversely affect, the operations of DISH.  Apollo is using its control over the other Defendants to impose a "black out" of the four major networks in ten of DISH's markets served by the Cox Stations and to threaten

similar actions with respect to the Northwest Stations, all of which will harm DISH and cause its subscribers to leave.

166.    On information and belief, Apollo's unfair competition is willful, deliberate, and in bad faith.

167.    DISH has no adequate remedy at law.  Apollo's conduct has caused, and if not enjoined, will continue to cause, irreparable harm to DISH.

168.    DISH is entitled to injunctive relief to prevent Apollo from engaging in further acts of unfair competition.

169.    DISH is entitled to damages in an amount to be proven at trial.

## COUNT X
### (Northwest)
### Breach of the Northwest Agreement

170.    DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

171.    The Northwest Agreement is a valid and enforceable contract to which Northwest is a party and under which Northwest owes duties to DISH.

172.    DISH has performed all of its obligations under the Northwest Agreement.

173.    Northwest has breached its station change-in-control obligations under Section 17(b) of the Northwest Agreement by (i) failing to advise DISH that control over the Northwest stations has changed and that the acquiring entity's affiliate had an existing retransmission agreement (the Cox Agreement) with DISH at the time of such change of control, (ii) failing to incorporate the Northwest Stations into the Cox Agreement and (iii) instead, withholding consent to retransmit those stations, demanding increased retransmission fees, and taking other actions to deprive DISH of its right to retransmit the Northwest Stations at the same rates applicable to the Cox Stations.

33

174.     Northwest's breach of the Northwest Agreement has caused damages to DISH.

175.     DISH is entitled to an injunction and specific performance of the Northwest Agreement.  DISH also is entitled to compensation for damages already incurred in an amount to be determined at trial.

## COUNT XI
### (Northwest)
### Breach of the Duty of Good Faith and Fair Dealing

176.     DISH restates and incorporates all of the foregoing paragraphs of the Complaint as if set forth fully herein.

177.     Northwest has acted to deprive DISH of the benefit of its bargain under the Northwest Agreement.

178.     Northwest engaged in a transaction—the Northwest Acquisition—that was and is intended to deprive DISH of (i) its retransmission rights regarding the Northwest Stations and (ii) its rights under the change-in-control provision of the Northwest Agreement.

179.     Immediately upon consummating the transaction, Northwest engaged in a charade designed to deceive DISH into believing that the change-in-control provision was not triggered and that DISH would lose retransmission consent upon the expiration of the Northwest Agreement.

180.     Additionally, Northwest has assisted the other Defendants in thwarting the letter and purpose of the Northwest Agreement's change-in-control provision, disrupting the continuity of retransmission consent and rates when control over the Northwest Stations was transferred to an Acquiring Entity that had an existing retransmission consent agreement with DISH.

181.     Northwest's conduct breaches not only its express contractual obligations but also the implied obligations that a reasonable person in DISH's position would be justified in understanding were included in the Northwest Agreement.

182.     Northwest's conduct was at least unreasonable, if not dishonest.

34

183.    Northwest's breach of its duty of good faith and fair dealing has caused damages to DISH in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, DISH respectfully requests that the Court enter judgment in favor of DISH and against Defendants and issue an order as follows:

1.    Granting all relief requested in this Complaint;

2.    Declaring that the terms of the Cox Agreement remain in force with respect to the Cox Stations and the Northwest Stations through its full term;

3.    Ordering specific performance of the Cox Agreement;

4.    Enjoining Defendants from continuing to breach the terms of the Cox Agreement and enjoining them from depriving DISH of its retransmission rights with respect to the Cox Stations and the Northwest Stations;

5.    Enjoining Defendants from continuing to tortiously interfere with the Cox Agreement;

6.    Awarding DISH actual, incidental, and consequential damages for Defendants' breaches of and tortious interference with the Cox Agreement and the Northwest Agreement;

7.    Awarding DISH interest, attorneys' fees, and costs; and

8.    Ordering such other and further relief as the Court may deem appropriate.

Dated: October 14, 2020                                 Respectfully submitted,

*/s/ Jared R. Butcher*
Pantelis Michalopoulos (*pro hac vice*)
Michael Dockterman (ARDC #: 3121675)
Jared R. Butcher (*pro hac vice*)
STEPTOE & JOHNSON LLP
227 West Monroe, Suite 4700
Chicago, Illinois 60606

Telephone:  (312) 577-1243
Fax:  (312) 577-1370

- and –

1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 429-3000

*Attorneys for Plaintiff DISH Network L.L.C.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 14th day of October 2020, a true and correct copy of the foregoing document was served via electronically using the Court's CM/ECF system to all counsel of record and parties receiving electronic notice of pleadings filed in this case.

*/s/ Jared R. Butcher*
Jared R. Butcher
